# Exhibits in Support of Habeas Corpus Petition

| Tabs | Description | Page(s) |
|------|-------------|---------|
| TAB A | **Email Correspondence(s) with ICE ERO and Medical Staff** | |
| Exhibit 1 | Email Exchange from Aurora ICE Detention Facility Medical Director Dr. Cary Walker, Summarizing Respondent's Medical Treatment, September 20, 2022 – September 23, 2022 | 1-6 |
| Exhibit 2 | Email Correspondences with Geo Group, ICE ERO Denver, Acting Officer in Charge Christopher L. Jones, Denying Parole Requests August 19, 2022 – September 27, 2022 | 7-16 |
| Exhibit 3 | Email Correspondences with SDDO Jerimee Joyner, Requesting Complete Medical Record from Medical Staff, September 20, 2022 – September 23, 2022 | 17-22 |
| TAB B | **Medical Expert Opinion Evidence** | |
| Exhibit 6 | Expert Medical Opinion of Psychiatrist Dr. Hadley Osran, M.D., | 23-26 |
| Exhibit 7 | Qualifications of Medical Expert Dr. Hadley Osran (CV) | 27-32 |
| Exhibit 8 | Keller et al., "Mental Health of Detained Asylum Seekers" *Lancet* 2003:362 at 1721 | 33-35 |
| Exhibit 9 | Verhülsdonk et al., "Prevalence of psychiatric disorders among refugees and migrants in immigration detention: systematic review with meta-analysis" (2021) | 36-43 |
| Exhibit 10 | Katherine B. McGuire, American Psychological Association Public Comment to DHS, ID: USCIS-2021-0012-5280 (May 25, 2022) (Applicable to Respondent's Health and Wellbeing) | 44-47 |
| Exhibit 11 | Hamed Aleaziz, "A Congressional Oversight Committee Found That ICE Detainees Died After Receiving Poor Medical Care" *Buzzfeed* (September 24, 2020) (Applicable to Respondent's Health and Wellbeing) | 48-57 |
| TAB C | **Respondent's Medical Records in Detention** | |
| Exhibit 12 | Respondent's Medical Records (Mental Health Diagnoses of Dr. Anne Ortiz) (May 11, 2022 – May 17, 2022) | 58-67 |

| Exhibit 13 | Respondent's Medical Records from Core Civic / Cibola County Correctional Center (April 18th, 2022 – June 2nd, 2022) | 68-132 |
|---|---|---|
| Exhibit 14 | Respondent's Medical Records from GEO Group / Aurora ICE Detention Center (July 19, 2022 – September 21, 2022) | 133-365 |
| **TAB D** | **Board of Immigration Appeals Record concerning Detained Asylum Seeker's Record of Proceedings before the Board of Immigration Appeals with Respect to Custody Determination of the Immigration Court and Lack Thereof** | |
| Exhibit 15 | Motion for Expedited Decision from the BIA, July 27, 2022 | 366-665 |



| **From:** | Jones, Christopher L <Christopher.L.Jones@ice.dhs.gov> |
|---|---|
| **Sent:** | Friday, September 23, 2022 5:12 PM |
| **To:** | Mariza Gayeski; Joyner, Jerimee R; Cary Walker; william.shipley@serbestlaw.com; Cynthia Cincotta; Deidre Ross-Pearson; Aurora Nurses; Steven Byrne |
| **Cc:** | Anhtuan Pham; metin@serbestlaw.com; Black, Nichole; Jarvis, Christopher; Rabe, Christopher A; Garcia, Sarah C |
| **Subject:** | RE: [EXTERNAL] request for medical intervention and September 2022 records for Serhat BOZKUS |
| | |
| **Flag Status:** | Flagged |

Please complete the medical record request and let us know when they are ready for us to pickup.

Christopher Jones
Officer in Charge
(720) 354-6626

Sent with BlackBerry Work
(www.blackberry.com)

---

**From:** Mariza Gayeski <mgayeski@geogroup.com>
**Date:** Friday, Sep 23, 2022 at 15:44
**To:** Joyner, Jerimee R <Jerimee.R.Joyner@ice.dhs.gov>, Cary Walker <Cary.Walker@geogroupconsultants.com>, william.shipley@serbestlaw.com <william.shipley@serbestlaw.com>, Cynthia Cincotta <ccincotta@geogroup.com>, Deidre Ross-Pearson <drpearson@geogroup.com>, Aurora Nurses <auroranurses@geogroup.com>, Steven Byrne <sbyrne@geogroup.com>
**Cc:** Anhtuan Pham <apham@geogroup.com>, metin@serbestlaw.com <metin@serbestlaw.com>, Black, Nichole <Nichole.Black@ice.dhs.gov>, Jones, Christopher L <Christopher.L.Jones@ice.dhs.gov>, Jarvis, Christopher <Christopher.Jarvis@ice.dhs.gov>, Rabe, Christopher A <Christopher.A.Rabe@ice.dhs.gov>, Garcia, Sarah C <Sarah.C.Garcia@ice.dhs.gov>
**Subject:** Re: [EXTERNAL] request for medical intervention and September 2022 records for Serhat BOZKUS

**CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

Who is the consulate attorney? and does the consulate attorney general actually needing this record???

**Mariza B. Gayeski**
**MRC Geo Secure Services**

**The GEO Group, Inc.®**
**Aurora Processing Center**
**3130 Oakland Street**
**Aurora, CO 80010-1525**
**Tel: 303-361-6612    Fax: 303-341-2652**
**Email: mgayeski@geogroup.com**
**Website: www.geogroup.com**

*This email and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to which they are addressed. If you are not the intended recipient or the person responsible for delivering the email to the intended recipient, be advised that you have received this email in error, and that any use, dissemination, forwarding, printing or copying of this email is strictly prohibited. If you have received this email in error, please immediately notify by replying to this email.*

**From:** Joyner, Jerimee R <Jerimee.R.Joyner@ice.dhs.gov>
**Sent:** Friday, September 23, 2022 2:41 PM
**To:** Cary Walker <Cary.Walker@geogroupconsultants.com>; william.shipley@serbestlaw.com <william.shipley@serbestlaw.com>; Cynthia Cincotta <ccincotta@geogroup.com>; Deidre Ross-Pearson <drpearson@geogroup.com>; Aurora Nurses <auroranurses@geogroup.com>; Steven Byrne <sbyrne@geogroup.com>
**Cc:** Anhtuan Pham <apham@geogroup.com>; metin@serbestlaw.com <metin@serbestlaw.com>; Black, Nichole <Nichole.Black@ice.dhs.gov>; Jones, Christopher L <Christopher.L.Jones@ice.dhs.gov>; Jarvis, Christopher <Christopher.Jarvis@ice.dhs.gov>; Rabe, Christopher A <Christopher.A.Rabe@ice.dhs.gov>; Garcia, Sarah C <Sarah.C.Garcia@ice.dhs.gov>
**Subject:** RE: [EXTERNAL] request for medical intervention and September 2022 records for Serhat BOZKUS

Good Afternoon,

Can we get a copy of the complete medical records for the detainee (220 712 429). ERO will begin the process of his removal and the complete medical records are needed to setup a continuation of care plan with his consulates office.

Respectfully,

**Jerimee Joyner**
Acting Assistant Officer in Charge
Detained Unit
Denver Field Office
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
Cell: (619) 847-8997

**From:** Cary Walker <Cary.Walker@geogroupconsultants.com>
**Sent:** Friday, September 23, 2022 1:22 PM
**To:** william.shipley@serbestlaw.com; Cynthia Cincotta <ccincotta@geogroup.com>; Deidre Ross-Pearson <drpearson@geogroup.com>; Aurora Nurses <auroranurses@geogroup.com>; Steven Byrne <sbyrne@geogroup.com>
**Cc:** Anhtuan Pham <apham@geogroup.com>; Joyner, Jerimee R <Jerimee.R.Joyner@ice.dhs.gov>; metin@serbestlaw.com
**Subject:** Re: [EXTERNAL] request for medical intervention and September 2022 records for Serhat BOZKUS

**CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

Good Afternoon-

This detainee has been seen 2-3 times a week for his psych and medical issues since arrival on 7/19/22. I will break down his diagnosis and treatment plans.

1. Allergic rhinitis- Currently on flonase. Not significant as vitals signs and labs are stable. CBC 15.8 ( within normal range). He has never been to medical with a nose bleed.

2. L ear drum rupture- Chronic. Came to the facility with this issue. He has been treated with ear drops for otitis externa since arrival. ENT referral ordered.
3. Periodic dizziness- secondary to ear drum rupture. Treated with antivert which is helping.
4. PTSD- currently on zyprexa, remeron, and vistaril. Seen weekly by psych.
5. Severe anxiety/depression
6. Chronic food intolerance- Pt says this issue has been chronic , but has worsened since facility arrival.
7. 16 pound weight loss in 60 days- Weight 148 on arrival, now 132.  Unsure if issue is a matter of just not liking the food or anxiety.  Pt has been given crackers with meds, protein shakes with meals,  gastritis medications , and nausea medications. Labs and vitals have always been stable. He is receiving daily weight checks.
8. Hypertension- On BP meds and seen and evaluated/followed per ICE protocol.
9. Constipation- On stool softeners and improving

I am concerned for his weight loss and we are watching him closely in medical. The documents sent to you are accurate on my review. Our psychologist, Dr. Willson, and I are in agreement that the majority of his issues stem from his mental health issues and poor insight. We do not believe he is malingering or that his food intolerance issues are caused by a treatable medical issue. It is likely that if this behavior continues we will escalate his mental health management to inpatient treatment as he may be a risk to himself.

**Dr. Cary Walker**
**Medical Director**
**Aurora Contract Detention Facility | ICE**
**3130 North Oakland Street**
**Aurora, CO 80010**

---

**From:** william.shipley@serbestlaw.com <william.shipley@serbestlaw.com>
**Sent:** Friday, September 23, 2022 11:42 AM
**To:** Cynthia Cincotta <ccincotta@geogroup.com>; Deidre Ross-Pearson <drpearson@geogroup.com>; Aurora Nurses <auroranurses@geogroup.com>; Cary Walker <Cary.Walker@geogroupconsultants.com>; Steven Byrne <sbyrne@geogroup.com>
**Cc:** Anhtuan Pham <apham@geogroup.com>; 'Joyner, Jerimee R' <Jerimee.R.Joyner@ice.dhs.gov>; metin@serbestlaw.com <metin@serbestlaw.com>
**Subject:** RE: [EXTERNAL] request for medical intervention and September 2022 records for Serhat BOZKUS

Dear Ms. Cincotta,

Thank you for your assistance.  I wanted to ask how those records are coming along. It's been two days since our request. I believe you provided us with more records in less time earlier this month, so I would have thought this would have been enough time to download Serhat's medical records.  I believe Serhat's actually in the medical unit now so it shouldn't be a challenge to get his vitals or assessment of his present state of health, so I'd greatly appreciate any updates as to your progress with respect to our request for his records month-to-date.

I'd also greatly appreciate it if you could please inform me of any status updates with respect to the following issues:
-whether Serhat's actually being provided with any of the accommodations we requested for a means of bathing himself other than the showers which those trigger his PTSD and the other difficulties he's been having with his mobility and inability to eat solid food;
-whether or not Serhat's receiving or going to receive any of the medical treatments or medical procedures we've been requesting (especially repairing his ear drum so he doesn't lost his hearing, dental work to fix fillings some of which now require root canals, so he can chew solid food);

3

-whether or not Serhat's been seen by, or going to be seen by, any of the physicians we've requested he be allowed to see for his multiple health conditions, especially an ENT for his ears and throat (to ensure his ability to hear and swallow) a neurologist for the neurological challenges he is having (with his motor functions and to determine if these are caused by or related to the herniated disc in his neck or aggravated by his mental health conditions);
-any additional steps medical staff are taking to stabilize his weight given his present difficulties swallowing and keeping down anything but water at this point.

I realize you're handling a lot simultaneously, but if you're unable to provide status update(s) on the above, or if you're not the appropriate person to whom to direct these inquiries, I'd appreciate if you could please immediately forward this email to the appropriate persons responsible for any information or further feedback they can provide with respect to these questions.

And anything you could do to expedite the availability of Serhat's medical records that we've been requesting would also be very much appreciated. I'd respectfully ask if you could provide them by c/o/b today or, failing that, provide some explanation for the further delay and guidance as to when you anticipate being able to do so.

I thank you in advance for your timely attention to this extremely pressing matter.

Sincerely,

William B. Shipley, Esq. | *Senior Associate*
**Law Offices of Metin Serbest LLC**
Chicago Office
2200 E Devon Ave, Ste. 358
Des Plaines, IL 60018
312-473-5500 ext. 204

---

**From:** Cynthia Cincotta <ccincotta@geogroup.com>
**Sent:** Wednesday, September 21, 2022 11:29 AM
**To:** william.shipley@serbestlaw.com; Deidre Ross-Pearson <drpearson@geogroup.com>; Aurora Nurses <auroranurses@geogroup.com>; Cary Walker <Cary.Walker@geogroupconsultants.com>; Steven Byrne <sbyrne@geogroup.com>
**Cc:** Anhtuan Pham <apham@geogroup.com>; 'Joyner, Jerimee R' <Jerimee.R.Joyner@ice.dhs.gov>; metin@serbestlaw.com
**Subject:** Re: [EXTERNAL] request for medical intervention and September 2022 records for Serhat BOZKUS

Mr. Shipley,

I am in the process of downloading the latest records for you. I will send them when they are ready. Please let me know if there is anything else that I can help with.

Thank you,

## Cindy Cincotta

Medical Records Clerk, Geo Secure Services
The GEO Group, Inc.®
Aurora Processing Center

3130 Oakland Street
Aurora, CO 80010-1525

(303) 361-6612 Ext. 217
Fax (303) 360-8825

ccincotta@geogroup.com

---

**From:** william.shipley@serbestlaw.com <william.shipley@serbestlaw.com>
**Sent:** Wednesday, September 21, 2022 10:24 AM
**To:** Deidre Ross-Pearson <drpearson@geogroup.com>; Aurora Nurses <auroranurses@geogroup.com>; Cary Walker <Cary.Walker@geogroupconsultants.com>; Steven Byrne <sbyrne@geogroup.com>
**Cc:** Cynthia Cincotta <ccincotta@geogroup.com>; Anhtuan Pham <apham@geogroup.com>; 'Joyner, Jerimee R' <Jerimee.R.Joyner@ice.dhs.gov>; metin@serbestlaw.com <metin@serbestlaw.com>
**Subject:** RE: [EXTERNAL] request for medical intervention and September 2022 records for Serhat BOZKUS

Thank you Ms. Ross,

I understand that after your last email that our client Serhat Bozkus may have received some kind of medical attention yesterday, but I have not been able to speak to him to confirm this, nor received any information from anyone as to his location, health status, or medical treatment he's receiving (if any) for any of his conditions.

We remain extremely concerned about his precarious state of health. Are there any updates on the health status, medical care he's receiving, where, and from whom, or copies of those medical records we requested?

Please advise on the above as soon as possible.

Thank you,

William B. Shipley, Esq. | *Senior Associate*
**Law Offices of Metin Serbest LLC**
Chicago Office
2200 E Devon Ave, Ste. 358
Des Plaines, IL 60018
312-473-5500 ext. 204

---

**From:** Deidre Ross-Pearson <drpearson@geogroup.com>
**Sent:** Tuesday, September 20, 2022 3:40 PM
**To:** william.shipley@serbestlaw.com; Aurora Nurses <auroranurses@geogroup.com>; Cary Walker <Cary.Walker@geogroupconsultants.com>; Steven Byrne <sbyrne@geogroup.com>
**Cc:** Cynthia Cincotta <ccincotta@geogroup.com>; Anhtuan Pham <apham@geogroup.com>; 'Joyner, Jerimee R' <Jerimee.R.Joyner@ice.dhs.gov>; metin@serbestlaw.com
**Subject:** Re: [EXTERNAL] request for medical intervention and September 2022 records for Serhat BOZKUS

Yes, we will do a wellness check on him now!!! Thanks

Deidre Ross Rn
Geo Secure Services
Aurora Processing Center

3130 Oakland Street
Aurora, CO 80010-1525
Tel: 303-361-6612   Fax: 303-341-2652

---

**From:** william.shipley@serbestlaw.com <william.shipley@serbestlaw.com>
**Sent:** Tuesday, September 20, 2022 2:25 PM
**To:** Aurora Nurses <auroranurses@geogroup.com>
**Cc:** Cynthia Cincotta <ccincotta@geogroup.com>; Anhtuan Pham <apham@geogroup.com>; 'Joyner, Jerimee R'
<Jerimee.R.Joyner@ice.dhs.gov>; metin@serbestlaw.com <metin@serbestlaw.com>
**Subject:** [EXTERNAL] request for medical intervention and September 2022 records for Serhat BOZKUS

Dear Nursing Staff of the Medical Unit of Aurora ICE Detention Facility,

I was referred to you by ICE ERO (Denver) S.D.D.O. Joyner (cc'd) for updated medical records concerning our client Serhat BOZKUS A# 220-712-429.  I am one of the legal counsel representing Mr. Bokus in his asylum and other proceedings.

Due to Serhat's difficulties eating and swallowing (among other mental and physical health conditions from which he is suffering) he is dangerously underweight and in an extremely vulnerable state of health.  I understand from his family that he has suffered an additional incident yesterday of vomiting and bleeding through his nose while unsuccessfully attempting to ingest liquids, which is all he has been able to keep down.

I'd therefore ask if you could please conduct a wellness check on him today, and also provide myself and S.D.D.O. Joyner with his updated medical status and medical records as soon as possible (we already have his records through September 1st, but we do not have records for this month).  His signed waiver for the sharing of this medical information is attached.

Thank you for your work attending to the medical care and medical needs of ICE detainees in custody at the Aurora ICE Detention Center, and in particular Mr. Bozkus.

Sincerely,

William B. Shipley, Esq. | *Senior Associate*
**Law Offices of Metin Serbest LLC**
Chicago Office
2200 E Devon Ave, Ste. 358
Des Plaines, IL 60018
312-473-5500 ext. 204

| **From:** | Jones, Christopher L <Christopher.L.Jones@ice.dhs.gov> |
| **Sent:** | Tuesday, September 27, 2022 11:49 AM |
| **To:** | william.shipley@serbestlaw.com |
| **Cc:** | Davies, Gregory; Black, Nichole |
| **Subject:** | RE: Automatic reply: consideration for ATD, compassionate release, and request for medical intervention for BOZKUS A#220-712-429 |

| **Flag Status:** | Flagged |

Good morning,

The request for release for your client has been reviewed. In this review, all pertinent facts of the immigration case and medical records, both submitted by you and from facility medical, were reviewed.

Your client was housed in medical for observation from September 20, 2022 until this morning. He was released back to general population due to his request. Your client's medical needs have been attended too and will continue to be so long has as he is in custody.

The BIA appeal of the immigration judge ruling denying your client Asylum, Withholding, and CAT has been denied.

Your client will not be released from custody as ERO is now in the process of beginning the removal process. Your client will be provided with paperwork explaining this process and what his role in that process is. Any attempts to thwart the removal process will see your client identified as a Failure to Comply case and this will simply prolong his detention.

Please let me know if you have any questions on this.

Christopher L. Jones
Acting Deputy Field Office Director/Officer in Charge
Denver Contract Detention Facility
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
3130 North Oakland Street
Aurora, CO 80010
(O) (303) 361-6612, Ext. 130
(C) (720) 354-6626

**From:** william.shipley@serbestlaw.com <william.shipley@serbestlaw.com>
**Sent:** Tuesday, September 20, 2022 11:18 AM
**To:** Denver.Outreach <Denver.Outreach@ice.dhs.gov>
**Cc:** metin@serbestlaw.com; 'Anhtuan Pham' <apham@geogroup.com>; 'Cynthia Cincotta' <ccincotta@geogroup.com>; Garcia, Sarah C <Sarah.C.Garcia@ice.dhs.gov>; Black, Nichole <Nichole.Black@ice.dhs.gov>; Jones, Christopher L <Christopher.L.Jones@ice.dhs.gov>; Jarvis, Christopher <Christopher.Jarvis@ice.dhs.gov>; Rabe, Christopher A <Christopher.A.Rabe@ice.dhs.gov>; Joyner, Jerimee R <Jerimee.R.Joyner@ice.dhs.gov>
**Subject:** FW: Automatic reply: consideration for ATD, compassionate release, and request for medical intervention for BOZKUS A#220-712-429
**Importance:** High

**CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

Dear ICE ERO Denver Field Office,

The ongoing detention of our client Serhat Bozkus, a Kurdish asylum-seeker fleeing anti-Kurdish persecution in Turkey, is putting his life at risk. He suffers from chronic PTSD and related anxiety (including panic attacks and sleeplessness from insomnia or "night terrors"), Major Depression - recurrent, as well as a "mood problem" as diagnosed by mental health clinicians at the previous facility where he was detained between April 20th and July 19th (Cibola County Correctional Center – see attached) according to his medical records. He also suffers from a perforated tympanic membrane (multiple holes in his eardrum), a herniated disc in his neck causing nerve or neurological problems limiting his ability to move, and untreated severe chronic pharyngitis, all of which cause severe pain in his neck and make it extremely difficult to swallow or to swallow without severe pain. Also, he had multiple untreated dental problems (untreated decay underneath his fillings), some of which have advanced to the point of requiring oral surgery (root canals) due to the non-treatment. I'd note this is not in keeping with the Performance Based National Detention Standards (PBNDS) 2011 (rev. 2016) Ch. 4.3 (Medical Care).

Additionally, Serhat's exposure to the steam of the showers triggers his PTSD, which, in combination with the nerve and/or neurological problems from his neck, risks a panic attack (whose risk is heightened anxiety by his prolonged detention), or his passing out, either of which risk possible physical injury, all of which has also happened at least once already. His multiple requests to the detention facility to provide him some ability to bathe himself through means other than a shower have not been accommodated. Therefore, he must risk triggering his PTSD and possible injury by showering, or have to clean himself in a way that is inadequate and/or does not otherwise afford him privacy or dignity.

Serhat's ongoing detention has rendered him increasingly unable to maintain his basic life functions (chewing, eating, swallowing, sleeping, and bathing). Immediately prior to his transfer by the ICE ERO El Paso Field Office to ICE's Denver office, we were assured by both his SDDO and the Warden at Cibola County Correctional Center that some of the requested medical treatment requested would be provided. After I further indicated to them that the failure to accommodate his impairments constituted a violation of Section 504 of the Rehabilitation Act, he was unilaterally transferred to the Aurora ICE Detention Facility. This transfer was also not in keeping with ICE policy regarding the transfer of detainees (ICE Policy 11022.1 Detainee Transfers issued and in effect a/o 4 Jan 2012 (Federal Enterprise Architecture Number 306-112-002b), and resulted in our client being infected with the coronavirus and contracting COVID-19, as is also indicated in his medical records (specifically "Med records-Bozkus pt. 3.pdf" indicating a negative COVID test at the time of his departure followed by a positive COVID test after his arrival at the Aurora facility).

I realize you cannot speak to the treatment at Cibola County Correctional Center which is outside of your area of responsibility, or the decisions of the El Paso ICE ERO Field Office in that regard, I would hope you would agree that no humanely operated facility would force anyone to make a choice between their cleanliness and their mental health; intentionally or unintentionally deprive someone of their physical health, their hearing, or their sanity; or negotiating in bad faith after promising to finally provide care, instead, transferring him without notice to his legal counsel and then getting him infected with COVID and starting the process of attempting to obtain required medical care all over again.

The need for his care is long overdue. His health has degraded to a state of precariousness no human being should be forced to endure. U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) holds itself out as securing "an orderly immigration system that treats individuals humanely" (per your office's March 2021 press conference announcing ICE Case Review (ICR) process for appropriate cases – of which Serhat's is one) (https://www.ice.gov/news/releases/ice-announces-case-review-process). I trust you'd agree that it is not in the public interest for ICE to continue to detain him under these circumstances, either with respect to the United States' immigration and asylum laws, regulations, and adjudication procedures, or with respect to the public interest in federal agencies (intentionally or unintentionally) fail to accommodate an individual's depriving persons in federal custody of their mental and physical health, or subjecting them to treatment amounting to a form of cruel and unusual punishment.

Therefore, on our client's behalf, and in light of Deportation Officer Sarah Garcia's absence, and S.D.D.O. Joyner's denials (see emails immediately following, below), I'm requesting an internal case review by the Senior Reviewing Official in the Denver Field Office, of the denial of our requests for compassionate release, humanitarian parole, and consideration under Fraihat, pursuant to ICE ERO policy under these circumstances (in particular, the attached medical records, medical research, and medical expert opinions on the impact of prolonged detention on the health and wellness of detainees seeking asylum).

Please confirm your receipt of this request for immediate review by your Senior Reviewing Official at the ICE ERO Denver Field Office. In light of the emergency circumstances of our client's extremely vulnerable state of health, and because you have all the medical information necessary to make a determination, we'd request that this Review be expedited and would appreciate it if you could please give some indication as soon as possible but no later than today as to whether or not you will authorize off-site medical care for our client, release our client to his sponsor so that he can seek and obtain needed medical care, or, failing that, what steps you will be taking to provide our client minimally adequate stabilizing medical care, treatment, and nutrition and caloric intake as of today to prevent his health from suffering any further degradation.

I thank you in advance for your timely attention to this request under these emergency circumstances.

Sincerely,

William B. Shipley, Esq.
Law Offices of Metin Serbest

**From:** Joyner, Jerimee R <Jerimee.R.Joyner@ice.dhs.gov>
**Sent:** Tuesday, September 20, 2022 10:19 AM
**To:** william.shipley@serbestlaw.com
**Cc:** Denver.Outreach <Denver.Outreach@ice.dhs.gov>; Anhtuan Pham <apham@geogroup.com>; 'Cynthia Cincotta' <ccincotta@geogroup.com>; metin@serbestlaw.com; Garcia, Sarah C <Sarah.C.Garcia@ice.dhs.gov>; Black, Nichole <Nichole.Black@ice.dhs.gov>; Jones, Christopher L <Christopher.L.Jones@ice.dhs.gov>; Jarvis, Christopher <Christopher.Jarvis@ice.dhs.gov>; Rabe, Christopher A <Christopher.A.Rabe@ice.dhs.gov>
**Subject:** RE: consideration for ATD, compassionate release, and request for medical intervention for BOZKUS A#220-712-429

Good Morning,

Your client is currently ineligible for parole release under 8 CFR 212.5(b)(1) and 8 CFR 212.5(b)(5) as it pertains to noncitizens who are considered arriving alien and as a result of a positive credible fear finding by an asylum officer was issued a Notice to Appear. Your client was issued a Notice to Appear after he was apprehended illegally entering the United States.

As to the medical concerns. We have consulted, and continue to consult with both the Field Medical Coordinator and GEO medical and they have assured us that your client is receiving adequate care. We are unable to release certain medical information due to HIPAA unless you have a release of information signed by your client on file, which I do not see in his medical file. If you require any further information regarding your client's medical concerns you can email auroranurses@geogroup.com. Just note they will ask for a release of information.

Respectfully,

**Jerimee Joyner**
Acting Assistant Officer in Charge
Detained Unit
Denver Field Office
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
Cell: (619) 847-8997

---

**From:** Garcia, Sarah C <Sarah.C.Garcia@ice.dhs.gov>
**Sent:** Tuesday, September 20, 2022 9:59 AM
**To:** william.shipley@serbestlaw.com
**Subject:** Automatic reply: consideration for ATD, compassionate release, and request for medical intervention for BOZKUS A#220-712-429

I am currently out of the office until March 22, 2022. Please contact any available Supervisor or the Duty Deportation Officer for assistance otherwise I can reply after I return.

Thank you.

Officer Garcia

**From:** william.shipley@serbestlaw.com <william.shipley@serbestlaw.com>
**Sent:** Tuesday, September 20, 2022 9:58 AM
**To:** 'Garcia, Sarah C' <Sarah.C.Garcia@ice.dhs.gov>; jerimee.r.joyner@ice.dhs.gov
**Cc:** Denver.Outreach@ice.dhs.gov; 'Anhtuan Pham' <apham@geogroup.com>; 'Cynthia Cincotta' <ccincotta@geogroup.com>; metin@serbestlaw.com
**Subject:** RE: consideration for ATD, compassionate release, and request for medical intervention for BOZKUS A#220-712-429
**Importance:** High

Dear Ofcr. Garcia,

I left a message with you yesterday afternoon that our client Serhat Bozkus has been throwing up the water and tea he was drinking yesterday which is all he has been able to ingest to keep him alive. His vomiting was so severe he was bleeding from his nose and he is critically ill.

We cannot wait any longer for ICE to follow its own guidelines to afford him the necessary medical care to begin to stabilize from his multiple serious health conditions. He has lost 25% of his body weight on top of his multiple other untreated physical conditions and mental health conditions. The weight loss alone puts him at an objectively serious risk of severe harm as his BMI is below 18.5.

Please confirm what actions ICE and/or the facility are taking to stabilize our client's extremely precarious medical state and/or afford him the medical care he needs. And please confirm your response to our requests (below) for parole under 8 C.F.R. § 212.5(b)(1) and 8 C.F.R. § 212.5(b)(5), as well as our request for reconsideration of your Fraihat denial in light of the ICE ERO policy which indicates Serhat "should continue to be detained only after individualized consideration of the risk of severe illness or death" which risk appears to be manifesting itself now.

If Serhat is unable to keep down any water, food, or liquids, as appears to be the case, then he is going to die soon. ICE and the Aurora Detention Center facility need to take action taken on his behalf as soon as possible – i.e. TODAY – to stabilize him and provide him with the emergency care he needs.

In light of the critical situation here, please confirm your responses to the above today and be sure to cc our principal attorney Metin Serbest (cc'd here).
If you'd like to discuss directly by phone please reach me on my cell: 312-216-7161.

Thank you,

William B. Shipley, Esq. | *Senior Associate*
**Law Offices of Metin Serbest LLC**
Chicago Office
2200 E Devon Ave, Ste. 358
Des Plaines, IL 60018
312-473-5500 ext. 204


**From:** william.shipley@serbestlaw.com <william.shipley@serbestlaw.com>
**Sent:** Wednesday, September 14, 2022 7:37 PM
**To:** 'Garcia, Sarah C' <Sarah.C.Garcia@ice.dhs.gov>; jerimee.r.joyner@ice.dhs.gov
**Subject:** RE: consideration for ATD, compassionate release, and request for medical intervention for BOZKUS A#220-712-429
**Importance:** High

Dear Officer Garcia and S.D.D.O. Joyner,

Thank you for your reply, for your office's expedited consideration of our request for consideration under *Fraihat*, and for S.D.D.O. Joyner's consideration of our request. I did not see any reference here to our requests for parole under 8 C.F.R. § 212.5(b)(1) and 8 C.F.R. § 212.5(b)(5).
Will you be replying separately to those requests (and if so, when)? Or should I direct those to another department?

With respect to these parole requests, and in-line with your own policy quoted above, I'd ask for ICE's specific and explicit consideration of the professional opinions of his mental health care providers with respect to the impact of prolonged and continued detention on his multiple serious mental health conditions, as well as of our medical evidence submitted to you on this point (indicating that prolonged detention for persons with PTSD, anxiety, and depression has serious and detrimental impacts on their health).

As for your response to our request under *Fraihat*, while I appreciate at least receiving a formal reply to our *Fraihat* request, contrary to the assertions in your reply, there is no evidence in support of the conclusion that our client is a flight risk, other than his initial means of entry, after which he voluntarily surrendered himself for the express purpose of applying for asylum after entering without inspection. He has no prior immigration record, and multiple community ties and sponsors willing to care for him.

Neither does the record support your contention that our client is receiving adequate medical care in detention – in fact, all evidence indicates the opposite: that his health continues to decline precipitously which poses an unnecessary risk of irreparable harm to him.
His health is not being adequately maintained – indeed, he hasn't been able to eat any solid food for at least two weeks, and he is vomiting up the liquid diet with which he is being provided. Our client now weighs 135 lbs. despite being 5'11-6'0 tall. He has lost 25% of his body weight since entering detention (his weight having been recorded as 180 lbs. when he entered ICE custody). He is weak and emaciated and he still cannot eat, sleep, or properly bathe himself without triggering his PTSD and inducing severe anxiety and panic attacks. He doesn't even have the energy to walk on his own or carry on a conversation longer than 30 minutes.

This situation is untenable and cannot continue without serious and unnecessary risk to our client's life, health, well-being, and future ability to function long-term as an independent adult even after the process for which he is being detained has concluded.

It is arbitrary and capricious for you to baldly assert, in the face of this evidence, that our client is fine and being cared for adequately without providing any further individualized review of the medical evidence to the contrary, or explanation as to why ICE disagrees with the medical evidence before it, or explanation why ICE refuses to abide by our client's medical care plan, or explanation why ICE has refused and continues to refuse to provide authorization for the specific medical procedures his health providers have indicated are immediately necessary and must take place as soon as possible, but which cannot take place without ICE's permission and prior authorization which has yet to be provided.

Your department's own COVID-19 Requirements presently in force (attached) state as follows (at p. 30):
"When making a custody re-determination for a *Fraihat* subclass member, the SDDO shall ensure that the presence of a Risk Factor is given significant weight. <u>Only in rare cases should a *Fraihat* subclass member not subject to mandatory detention remain detained, and as previously instructed in the ongoing docket review, a justification for continued detention is required.</u> *Fraihat* subclass members subject to INA § 236(c) mandatory detention must also receive custody determinations. The SDDO must not apply the Docket Review Guidance rule against release of aliens detained pursuant to INA § 236(c) detainees so inflexibly that none of the *Fraihat* subclass members are released. Although traditional factors, such as danger to the community and risk of flight, may be considered, under the terms of the PI, aliens subject to detention pursuant to INA § 236(c) should continue to be detained only after individualized consideration of the risk of severe illness or death, with due regard to the public health emergency. Blanket or cursory denials do not comply with the court's requirement that ERO make individualized determinations. *Fraihat* subclass members that are released should be enrolled into a GPS program when possible." [emphasis in original]

With all due respect to you and your office, you did not assign any weight to any of the risk factors, nor provide any explanation beyond repeating that our client is allegedly a "flight risk." Your reply failed to specifically address or consider the specific impacts of continued detention on any of his risk factors; the medical evidence of his declining state of health over the past several months; the professional medical opinions of his health care providers in detention concerning his need for immediate care and of the negative impact prolonged detention is having and will continue to have on his PTSD, Depression, Anxiety, and his multiple physical health conditions; or the clinical reports indicating all the ways his health is worsening in detention. In light of our client's medical evidence, as well as the other evidence we provided concerning the impact of prolonged detention on persons with the same mental health conditions from which our client suffers, your response does not comport with your office's own COVID-19 Requirements which require individualized consideration of these risk factors notwithstanding the assertion that our client is a "flight risk" – which, again, is not substantiated with any evidence.

Therefore I would qualify your one-page form response as a "blanket or cursory denial" which does not comport with your own department's policy or with the federal court's requirements that the ERO make individualized determinations "only after individualized consideration of the risk of severe illness or death, with due regard to the public health emergency."

We have done everything we can to expedite the consideration of our client's appeal and to follow appropriate channels to make these repeated requests for medical intervention on our client's behalf. In the meantime, ICE has an obligation to provide for his immediate care needs and accommodate the mental and physical health conditions from which he suffers to ensure ICE and its agents and partners maintain a minimally adequate standard of care and reasonable accommodation for his physical and mental impairments which includes, at a minimum, basic reasonable measures to ensure our client's health does not decline further and that any risk untreated conditions result in serious harm or permanent injury does not manifest itself. Right now, the evidence indicates that ICE is willfully disregarding the obvious and immediate medical needs of our client, as well as failing to accommodate his mental and physical disabilities.

If ICE will not provide our client with any alternatives to detention which are called for by your own policy under these circumstances, nor release our client from custody, then ICE needs to meet his basic health needs and accommodate his disabilities, which thus far, ICE has failed to do with respect to our client's above-referenced medical conditions. Failing any reconsideration on your part, if ICE continues to insist he remain in custody no matter the cost to his physical and mental health (not to mention the cost to the public of his detention), then ICE has a legal obligation to authorize or otherwise provide the basic medical care he needs in order to support his minimally essential life functions and avoid irreparable harm, permanent injury, and possible disability due to the impairment of those essential life functions that are occasioned by the aggravation of his medical conditions due to this lack of care during his prolonged detention in ICE custody, and I would expect some explanation as to when and how his acute medical needs are going to be met.

While I realize the majority of our client's time in detention (and the lack of care in connection with that detention) was spent in New Mexico under the aegis of ICE ERO – El Paso, our client is still in dire need of medical care that cannot wait any longer. The ENT care and procedure to repair his eardrum were deemed medically necessary by Cibola County Correctional Center's Medical Unit per the records in your possession in APRIL and again in the first week of JUNE. However, ICE's authorization for that care outside of the detention facility was required, and to the best of my knowledge, that authorization from the ICE ERO office (in either El Paso or Denver) has not been forthcoming, despite its medical necessity, despite repeated requests from our client and his legal counsel every month for the past 4 months, and despite written requests from his medical care providers that ICE authorize this necessary emergency care.

Therefore, I would appreciate an answer as to whether and when our client can expect to receive in-person consultation with an Ear, Nose, and Throat (ENT) doctor to examine his ear, throat, and neck for his ruptured eardrum, chronic pharyngitis, and an appropriate provider to examine the herniated disc in his neck, as well as assess the chronic pain he's experiencing relating to these conditions, and to see a dentist for the dental care he has been needing since April for his decaying molars, which conditions are collectively preventing him from being able to eat, chew, drink, and swallow properly. I'd also like to know whether and when ICE will provide specific authorization for the basic operation our client needs to repair his ruptured ear drum so he does not permanently lose his hearing in that ear. Forcing our client to endure the slow decline in his physical health and capabilities combined with an ever-increasing aggravation of his mental health conditions and concomitant deterioration of his mental health, combined with a growing inability to maintain his basic essential life functions, collectively constitute a form of cruel and unusual punishment that is not in keeping with your own policies, legal obligations, or with the standards of a civilized society. Therefore, I urge you to reconsider your insistence on detention under these circumstances, or in the alternative, provide us with further explanation as to why you refuse to accommodate our client's conditions or provide our client with the urgent medical care he needs.

My thanks again for ICE's timely consideration of our client's acute mental and physical health conditions and what steps (if any) ICE is taking (and when) to preserve our client's health under the circumstances.

Sincerely,

William B. Shipley, Esq. | *Senior Associate*
**Law Offices of Metin Serbest LLC**
Chicago Office
2200 E Devon Ave, Ste. 358
Des Plaines, IL 60018
312-473-5500 ext. 204

**From:** Garcia, Sarah C <Sarah.C.Garcia@ice.dhs.gov>
**Sent:** Wednesday, August 24, 2022 4:37 PM
**To:** william.shipley@serbestlaw.com

**Subject:** RE: consideration for ATD, compassionate release, and request for medical intervention for BOZKUS A#220-712-429

Please see attached decision for your client.

Thank you.

Best Regards,

Sarah C. Garcia
Deportation Officer
Department of Homeland Security
Immigration Customs Enforcement
Enforcement Removal Operations - Detained Unit
Phone: 303-361-6612 x 182
Fax:    303-361-0694

*CONFIDENTIALITY NOTICE:*
**Warning: This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO).** It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. **No portion of this report should be furnished to the media, either in written or verbal form.**

**From:** william.shipley@serbestlaw.com <william.shipley@serbestlaw.com>
**Sent:** Friday, August 19, 2022 5:01 PM
**To:** Garcia, Sarah C <sarah.c.garcia@ice.dhs.gov>
**Cc:** Joyner, Jerimee R <jerimee.r.joyner@ice.dhs.gov>
**Subject:** consideration for ATD, compassionate release, and request for medical intervention for BOZKUS A#220-712-429

**CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

Dear Officer Garcia,

Thank you for taking the time to speak with me today in regards to our client Serhat Bozkus A# 220-712-429.  Mr. Bozkus is a legitimate ethnic Kurdish asylum-seeker from a politically active family in Turkey who has suffered torture and persecution there and who suffers here from Major Depression, chronic PTSD from past torture in Turkey, and a partially-diagnosed mood disorder – which were diagnosed while in ICE custody in the month following the hearing that resulted in the denial of his asylum claim in April but which is currently on appeal and which we have every confidence will result in an affirmation of his legitimate asylum claim.  Below are links found on the DOJ EOIR's website of relevant and reliable Country Conditions evidence specific to Turkey which speak to the systematic persecution Kurds in Turkey face there:
-Minority Rights International: https://minorityrights.org/minorities/kurds-2/ (outlining the systemic and historic persecution of Kurds in Turkey, including outlawing all publications in Kurdish, all Kurdish-language education, outlawing Kurdish parents from giving their children Kurdish by outlawing any names with the letters "q," "w," and "x," and "a heavily discriminatory policy towards the community as a whole" including "the removal of Kurdish public officials, harassment of Kurdish political groups, targeting of Kurdish media outlets and the arrest of Kurdish politicians for holding party gatherings in Kurdish," and conflating any effort to promote Kurdish rights, such as use of the Kurdish language, with support for "PKK terrorists.")
-US Department of State report on Turkey: https://www.state.gov/wp-content/uploads/2021/10/TURKEY-2020-HUMAN-RIGHTS-REPORT.pdf (details include a ruling party member's posting photos and videos of torture of detainees at a state facility in Diyarbakir, the largest ethnic Kurdish city in the majority-Kurdish region in southeastern Turkey at p.

6, and other credible complaints of torture, forced disappearances, and suspicious deaths of ethnic Kurds and perceived opponents of Turkey's mono-ethnic state, etc.)

Our client was the victim of this persecution including torture at the hands of Turkish police on multiple occasions, for which he suffers from Depression and chronic PTSD which was unfortunately inadequately assessed and undiagnosed at the time of his hearing and which likely impacted his ability to easily answer questions around the details of his trauma. He also suffers from periodic anxiety attacks as a result of his PTSD, some of which is triggered when he's exposed to the hot water and steam in the shower which has already resulted in one episode where he passed out and injured himself at the previous facility.

His mental health is severely detrimentally impacted by his continued detention which is now going on 10 months. His physical health has also worsened considerably since he was first held in ICE custody as he has not received adequate treatment for several health conditions including chronic pharyngitis, a ruptured eardrum, tooth decay underneath his existing fillings on both sides of his mouth, a herniated disc in his neck, among other issues.

He continues to suffer from further deterioration to both his physical and mental health which is at an extremely acute stage. He's barely able to chew and swallow due to the combination of his chronic pharyngitis, the herniated disc in his neck, the decaying teeth in his mouth several of which – because the decaying fillings were not treated – now require a root canal, and his ruptured eardrum, from which he's probably already lost hearing in his ear due to its not being treated despite multiple requests, and he's barely able to walk due to his herniated disc as well as general dizziness from a neurological disorder which may be in part due to his ear.

He's rapidly losing weight to the point of extreme danger to his life, as he's unable to keep down solid food and is on a liquid protein diet, and he's still not able to bathe himself properly due to the lack of access to bathing facilities other than showers which trigger his PTSD.

Per our conversation, I'm forwarding you and your office the previous requests we made to ICE in April, May, June (in the form of our bond redetermination request which was opposed by ICE on the basis of a cursory, inaccurate, and incomplete reading of his medical records) and July just prior to his transfer, including:
-letter to ICE D.O. of April 19th, 2022 reporting his health conditions and requesting consideration pursuant to the standing injunction in the *Fraihat* case.
-follow-up email of May 3rd, 2022 requesting the same, as well as medical intervention to address his health care needs
-the medical evidence from our request for a bond hearing in June 2022 as well as our reply to DHS's opposition to that request (clarifying the record with respect to that medical evidence)
-additional medical evidence concerning the detrimental effects of ongoing detention on the mental health of asylum seekers, particularly with respect to PTSD, Depression, and anxiety, all of which are mental health conditions our client suffers from;
-my prior correspondence with his previous D.O. and S.D.D.O. at ICE ERO – El Paso Field Office, and with the Warden at Cibola County Correctional Center, repeating these requests – and the follow-up from our conference call to resolve the crisis resulting from our client's threatened hunger strike which he took out of desperation for his ill-treatment at that facility – the advocacy around which appears to have resulted in his unilateral transfer by those officials to your facility and jurisdiction.

I am repeating the same requests here for your consideration of Alternatives to Detention for our client and for his immediate release from ICE custody on humanitarian grounds in light of his extremely acute medical needs which have not been met and still are not being met, as well as the facility's failure to accommodate his incapacities including in particular his inability to bathe himself properly and his inability to chew or swallow which are the result of the decaying teeth in his mouth for which he has received only partial care at Cibola just prior to his transfer (in mid-July) after I finally got through to the new Warden at that facility who assured me he'd get the necessary care he needed just days before he was unilaterally transferred to Denver for reasons that were never explained.

We are again requesting his immediate release for which he qualifies under 8 C.F.R. § 212.5(b)(1) "Aliens who have serious medical conditions in which continued detention would not be appropriate" and 8 C.F.R. § 212.5(b)(5) "Aliens whose continued detention is not in the public interest as determined by those officials identified in paragraph (a) of this section," as well as for the fact that his continued detention without adequate medical care is causing severe and possibly irreparable harm to his physical and mental health.

While I realize similar requests may include some hyperbole by advocates representing detained clients, the medical evidence shows clearly that it is not hyperbole to say that his life is at risk and if he is not released or provided with adequate medical care that allows him to swallow, chew and eat solid food, to bathe himself properly, and which does not further aggravate his PTSD, Depression, anxiety, and mental health issues, without which he may very well die in your custody.

I have done everything in my power to pursue good-faith efforts with DHS and ICE to release my client who should never have been detained in the first place. He has no criminal record. He has no prior immigration record. He is not a flight risk. He has no desire to return to Turkey and his only motivation in coming here was fleeing the anti-Kurdish persecution that is systemic throughout Turkey. His only "crime" was entering without inspection, which was done for the sole purpose of seeking asylum, which is his right as a person fleeing persecution to pursue. He has multiple sponsors ready and willing to receive him pending the outcome of his asylum application proceedings. I know you are aware of who these sponsors are and we can put you in touch with them if you have not done so already.

I ask you sincerely to evaluate the facts of his situation and release him immediately, and in the meantime, authorize medical procedures to repair his eardrum, to repair the fillings in his teeth, to consult with an Ear, Nose, and Throat doctor to treat his pharyngitis so the man can eat and swallow food at least. His circumstances should never have become this dire.

Given the extreme acuity of his present situation, I ask you to respond to this request within the next 7 days.

I thank you in advance for you prompt attention to this matter.

Sincerely,

William B. Shipley, Esq. | *Senior Associate*
**Law Offices of Metin Serbest LLC**
Chicago Office
2200 E Devon Ave, Ste. 358
Des Plaines, IL 60018
312-473-5500 ext. 204

| From: | Joyner, Jerimee R <Jerimee.R.Joyner@ice.dhs.gov> |
|---|---|
| Sent: | Friday, September 23, 2022 3:41 PM |
| To: | Cary Walker; william.shipley@serbestlaw.com; Cynthia Cincotta; Deidre Ross-Pearson; Aurora Nurses; Steven Byrne |
| Cc: | Anhtuan Pham; metin@serbestlaw.com; Black, Nichole; Jones, Christopher L; Jarvis, Christopher; Rabe, Christopher A; Garcia, Sarah C |
| Subject: | RE: [EXTERNAL] request for medical intervention and September 2022 records for Serhat BOZKUS |

| Flag Status: | Flagged |
|---|---|

Good Afternoon,

Can we get a copy of the complete medical records for the detainee (220 712 429). ERO will begin the process of his removal and the complete medical records are needed to setup a continuation of care plan with his consulates office.

Respectfully,

**Jerimee Joyner**
Acting Assistant Officer in Charge
Detained Unit
Denver Field Office
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
Cell: (619) 847-8997

---

**From:** Cary Walker <Cary.Walker@geogroupconsultants.com>
**Sent:** Friday, September 23, 2022 1:22 PM
**To:** william.shipley@serbestlaw.com; Cynthia Cincotta <ccincotta@geogroup.com>; Deidre Ross-Pearson <drpearson@geogroup.com>; Aurora Nurses <auroranurses@geogroup.com>; Steven Byrne <sbyrne@geogroup.com>
**Cc:** Anhtuan Pham <apham@geogroup.com>; Joyner, Jerimee R <Jerimee.R.Joyner@ice.dhs.gov>; metin@serbestlaw.com
**Subject:** Re: [EXTERNAL] request for medical intervention and September 2022 records for Serhat BOZKUS

**CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

Good Afternoon-

This detainee has been seen 2-3 times a week for his psych and medical issues since arrival on 7/19/22. I will break down his diagnosis and treatment plans.

1. Allergic rhinitis- Currently on flonase. Not significant as vitals signs and labs are stable. CBC 15.8 ( within normal range). He has never been to medical with a nose bleed.
2. L ear drum rupture- Chronic. Came to the facility with this issue. He has been treated with ear drops for otitis externa since arrival. ENT referral ordered.
3. Periodic dizziness- secondary to ear drum rupture. Treated with antivert which is helping.

**17**

4. PTSD- currently on zyprexa, remeron, and vistaril. Seen weekly by psych.
5. Severe anxiety/depression
6. Chronic food intolerance- Pt says this issue has been chronic , but has worsened since facility arrival.
7. 16 pound weight loss in 60 days- Weight 148 on arrival, now 132.  Unsure if issue is a matter of just not liking the food or anxiety.  Pt has been given crackers with meds, protein shakes with meals,  gastritis medications , and nausea medications. Labs and vitals have always been stable. He is receiving daily weight checks.
8. Hypertension- On BP meds and seen and evaluated/followed per ICE protocol.
9. Constipation- On stool softeners and improving

I am concerned for his weight loss and we are watching him closely in medical. The documents sent to you are accurate on my review. Our psychologist, Dr. Willson, and I are in agreement that the majority of his issues stem from his mental health issues and poor insight. We do not believe he is malingering or that his food intolerance issues are caused by a treatable medical issue. It is likely that if this behavior continues we will escalate his mental health management to inpatient treatment as he may be a risk to himself.

**Dr. Cary Walker**

**Medical Director**

**Aurora Contract Detention Facility | ICE**

**3130 North Oakland Street**

**Aurora, CO 80010**

---

**From:** william.shipley@serbestlaw.com <william.shipley@serbestlaw.com>
**Sent:** Friday, September 23, 2022 11:42 AM
**To:** Cynthia Cincotta <ccincotta@geogroup.com>; Deidre Ross-Pearson <drpearson@geogroup.com>; Aurora Nurses <auroranurses@geogroup.com>; Cary Walker <Cary.Walker@geogroupconsultants.com>; Steven Byrne <sbyrne@geogroup.com>
**Cc:** Anhtuan Pham <apham@geogroup.com>; 'Joyner, Jerimee R' <Jerimee.R.Joyner@ice.dhs.gov>; metin@serbestlaw.com <metin@serbestlaw.com>
**Subject:** RE: [EXTERNAL] request for medical intervention and September 2022 records for Serhat BOZKUS

Dear Ms. Cincotta,

Thank you for your assistance.  I wanted to ask how those records are coming along. It's been two days since our request. I believe you provided us with more records in less time earlier this month, so I would have thought this would have been enough time to download Serhat's medical records.  I believe Serhat's actually in the medical unit now so it shouldn't be a challenge to get his vitals or assessment of his present state of health, so I'd greatly appreciate any updates as to your progress with respect to our request for his records month-to-date.

I'd also greatly appreciate it if you could please inform me of any status updates with respect to the following issues:

-whether Serhat's actually being provided with any of the accommodations we requested for a means of bathing himself other than the showers which those trigger his PTSD and the other difficulties he's been having with his mobility and inability to eat solid food;
-whether or not Serhat's receiving or going to receive any of the medical treatments or medical procedures we've been requesting (especially repairing his ear drum so he doesn't lost his hearing, dental work to fix fillings some of which now require root canals, so he can chew solid food);
-whether or not Serhat's been seen by, or going to be seen by, any of the physicians we've requested he be allowed to see for his multiple health conditions, especially an ENT for his ears and throat (to ensure his ability to hear and swallow) a neurologist for the neurological challenges he is having (with his motor functions and to determine if these are caused by or related to the herniated disc in his neck or aggravated by his mental health conditions);
-any additional steps medical staff are taking to stabilize his weight given his present difficulties swallowing and keeping down anything but water at this point.

I realize you're handling a lot simultaneously, but if you're unable to provide status update(s) on the above, or if you're not the appropriate person to whom to direct these inquiries, I'd appreciate if you could please immediately forward this email to the appropriate persons responsible for any information or further feedback they can provide with respect to these questions.

And anything you could do to expedite the availability of Serhat's medical records that we've been requesting would also be very much appreciated.  I'd respectfully ask if you could provide them by c/o/b today or, failing that, provide some explanation for the further delay and guidance as to when you anticipate being able to do so.

I thank you in advance for your timely attention to this extremely pressing matter.

Sincerely,

William B. Shipley, Esq. | *Senior Associate*
**Law Offices of Metin Serbest LLC**
Chicago Office
2200 E Devon Ave, Ste. 358
Des Plaines, IL 60018
312-473-5500 ext. 204

---

**From:** Cynthia Cincotta <ccincotta@geogroup.com>
**Sent:** Wednesday, September 21, 2022 11:29 AM
**To:** william.shipley@serbestlaw.com; Deidre Ross-Pearson <drpearson@geogroup.com>; Aurora Nurses <auroranurses@geogroup.com>; Cary Walker <Cary.Walker@geogroupconsultants.com>; Steven Byrne <sbyrne@geogroup.com>
**Cc:** Anhtuan Pham <apham@geogroup.com>; 'Joyner, Jerimee R' <Jerimee.R.Joyner@ice.dhs.gov>; metin@serbestlaw.com
**Subject:** Re: [EXTERNAL] request for medical intervention and September 2022 records for Serhat BOZKUS

Mr. Shipley,

I am in the process of downloading the latest records for you. I will send them when they are ready. Please let me know if there is anything else that I can help with.

Thank you,

**Cindy Cincotta**

Medical Records Clerk, Geo Secure Services

The GEO Group, Inc.®

Aurora Processing Center

3130 Oakland Street

Aurora, CO 80010-1525

(303) 361-6612 Ext. 217

Fax (303) 360-8825

ccincotta@geogroup.com

---

**From:** william.shipley@serbestlaw.com <william.shipley@serbestlaw.com>
**Sent:** Wednesday, September 21, 2022 10:24 AM
**To:** Deidre Ross-Pearson <drpearson@geogroup.com>; Aurora Nurses <auroranurses@geogroup.com>; Cary Walker <Cary.Walker@geogroupconsultants.com>; Steven Byrne <sbyrne@geogroup.com>
**Cc:** Cynthia Cincotta <ccincotta@geogroup.com>; Anhtuan Pham <apham@geogroup.com>; 'Joyner, Jerimee R' <Jerimee.R.Joyner@ice.dhs.gov>; metin@serbestlaw.com <metin@serbestlaw.com>
**Subject:** RE: [EXTERNAL] request for medical intervention and September 2022 records for Serhat BOZKUS

Thank you Ms. Ross,

I understand that after your last email that our client Serhat Bozkus may have received some kind of medical attention yesterday, but I have not been able to speak to him to confirm this, nor received any information from anyone as to his location, health status, or medical treatment he's receiving (if any) for any of his conditions.

We remain extremely concerned about his precarious state of health. Are there any updates on the health status, medical care he's receiving, where, and from whom, or copies of those medical records we requested?

Please advise on the above as soon as possible.

Thank you,

William B. Shipley, Esq. | *Senior Associate*
**Law Offices of Metin Serbest LLC**
Chicago Office

2200 E Devon Ave, Ste. 358
Des Plaines, IL 60018
312-473-5500 ext. 204

---

**From:** Deidre Ross-Pearson <drpearson@geogroup.com>
**Sent:** Tuesday, September 20, 2022 3:40 PM
**To:** william.shipley@serbestlaw.com; Aurora Nurses <auroranurses@geogroup.com>; Cary Walker <Cary.Walker@geogroupconsultants.com>; Steven Byrne <sbyrne@geogroup.com>
**Cc:** Cynthia Cincotta <ccincotta@geogroup.com>; Anhtuan Pham <apham@geogroup.com>; 'Joyner, Jerimee R' <Jerimee.R.Joyner@ice.dhs.gov>; metin@serbestlaw.com
**Subject:** Re: [EXTERNAL] request for medical intervention and September 2022 records for Serhat BOZKUS

Yes, we will do a wellness check on him now!!! Thanks

Deidre Ross Rn

Geo Secure Services

Aurora Processing Center

3130 Oakland Street

Aurora, CO 80010-1525

Tel: 303-361-6612   Fax: 303-341-2652

---

**From:** william.shipley@serbestlaw.com <william.shipley@serbestlaw.com>
**Sent:** Tuesday, September 20, 2022 2:25 PM
**To:** Aurora Nurses <auroranurses@geogroup.com>
**Cc:** Cynthia Cincotta <ccincotta@geogroup.com>; Anhtuan Pham <apham@geogroup.com>; 'Joyner, Jerimee R' <Jerimee.R.Joyner@ice.dhs.gov>; metin@serbestlaw.com <metin@serbestlaw.com>
**Subject:** [EXTERNAL] request for medical intervention and September 2022 records for Serhat BOZKUS

Dear Nursing Staff of the Medical Unit of Aurora ICE Detention Facility,

I was referred to you by ICE ERO (Denver) S.D.D.O. Joyner (cc'd) for updated medical records concerning our client Serhat BOZKUS A# 220-712-429.  I am one of the legal counsel representing Mr. Bokus in his asylum and other proceedings.

Due to Serhat's difficulties eating and swallowing (among other mental and physical health conditions from which he is suffering) he is dangerously underweight and in an extremely vulnerable state of health.  I understand from his family that he has suffered an additional incident yesterday of vomiting and bleeding through his nose while unsuccessfully attempting to ingest liquids, which is all he has been able to keep down.

I'd therefore ask if you could please conduct a wellness check on him today, and also provide myself and S.D.D.O. Joyner with his updated medical status and medical records as soon as possible (we already have his records through September 1st, but we do not have records for this month).  His signed waiver for the sharing of this medical information is attached.

Thank you for your work attending to the medical care and medical needs of ICE detainees in custody at the Aurora ICE Detention Center, and in particular Mr. Bozkus.

Sincerely,

William B. Shipley, Esq. | *Senior Associate*
**Law Offices of Metin Serbest LLC**
Chicago Office
2200 E Devon Ave, Ste. 358
Des Plaines, IL 60018
312-473-5500 ext. 204

**B**

**Hadley C. Osran, M.D.**
Forensic Psychiatry
P. O. Box 180
Atascadero, CA 93423
Telephone (805) 440-7830

September 28, 2022

William B. Shipley, Esq.
Law Offices of Metin Serbest
2200 E. Devon Ave., #358
Des Plaines, IL 60018

RE: Bozkus, Serhat

Dear Mr. Shipley:

Pursuant to your request to provide psychiatric/medical expert opinions on the above captioned individual, I reviewed the documents that were sent to me. These include:

1. Medical records from the Cibola County Correctional Facility.
2. Medical records from the Aurora ICE Processing Center.
3. Documents labeled as contemporaneous notes of ICE custody at Cibola County Correctional Center.
4. Documents labeled contemporary notes of ICE custody.
5. 5 pages of emails between Mr. Shipley, Dr. Cary Walker and Cynthia Cincotta
6. Two research articles, "Mental Health of Detained Asylum Seekers," Lancet 2003, and "Prevalence of Psychiatric Disorders Among Refugees and Migrants in Immigration Detention; Systematic Review with Meta Analysis," British Journal of Psychiatry, 2021.

**Opinions**

1. Can detention have an adverse impact on detainees suffering from chronic PTSD, major depression--recurrent, and anxiety?

Detention or incarceration is a serious psychosocial stressor that can significantly impact the mental health of a detainee suffering from chronic PTSD or major depression and anxiety. It is well known that incarceration in a jail facility can often precipitate depression and suicidal ideation and suicidal behavior. Being detained with the resultant loss of freedom, isolation from peers and social support, poor food and living environment are certainly stressors that can exacerbate serious mental disorders, especially those with a mood component such as PTSD, major depression, and anxiety.

23

2. Can a lack of certainty around length and duration of detention negatively impact a person with his mental health conditions? If so, how?

One of the most common symptoms of major depression is hopelessness. Individuals with hopelessness most often see nothing positive in the future, and this can be a major driver of suicidal ideation. If an individual is incarcerated and does not have an identified release date, or possibly a very long prison sentence, this would contribute to feelings of hopelessness as the individual would have little hope for a future out of custody.

3. Can a lack of certainty around whether or not he will receive medical treatment for his physical health conditions negatively impact a person with his mental health conditions? If so, how?

Uncertainty in whether or not an individual will receive medical treatment for their health conditions would cause increased levels of anxiety, therefore negatively impacting individuals with major depression and anxiety.

4. Do the medical records of Mr. Bozkus indicate his mental health is negatively impacted by uncertainty around the duration of his detention, or uncertainty around whether or not he will receive medical treatment for his physical health conditions?

The medical records do not address this issue specifically; however, the inmate's diary/notes do indicate that he has been frustrated with his perception of not getting appropriate health care, which has caused him to become increasingly depressed, suicidal, and want to go into a hunger strike.

5. Do you agree with the assessment of Doctors Walker and Wilson that "the majority of his issues stem from the mental health issues and poor insight," and that his "food intolerance issues are (not) caused by a treatable medical issue?" If so, is it likely that his "food intolerance" is caused by or aggravated by his mental health conditions?

It appears that the patient's weight loss has coincided with his incarceration, depression, anxiety, and PTSD symptoms which have been exacerbated during his incarceration. His nausea and vomiting is likely a somatic symptom of depression, and therefore I would agree that it appears that his food intolerance issues are likely a symptom of a psychiatric illness, as there appears to be no record that he was having food intolerance prior to his incarceration.

6. Are there any other physical health symptoms from which Mr. Bozkus is suffering consistent with psychosomatic symptoms attributable to his mental health conditions?

Dr. Walker listed 9 medical conditions from which the inmate is currently suffering. Some have a clear medical basis, such as allergic rhinitis, left eardrum rupture, and periodic dizziness secondary to the ruptured eardrum. However, the food intolerance, hypertension, and

constipation can be somatic symptoms that are consistent with psychiatric disorders such as major depression and anxiety.

7. Based on your review of his medical records, is his detention the underlying cause of or an aggravating factor of his mental health conditions?

His trauma, which is the proximate cause of his PTSD occurred prior to his incarceration, so he had PTSD prior to his detention. However, detention is a serious psychosocial stressor that would no doubt aggravate mental health conditions such as major depression, PTSD, and anxiety. There is nothing in his medical records or in his notes/diary that would contradict this. The inmate's notes/diary clearly indicate that incarceration and detention is a negative experience for the inmate, which has caused or aggravated his depression, even to the point where he has voiced suicidal ideation and suicidal plan by "hunger strike."

8. If so, is it likely that his continued detention will adversely impact his mental health conditions or the psychosomatic symptoms of those conditions?

I believe that continued detention would likely adversely impact his mental health conditions and the psychosomatic symptoms of those conditions. It is clear that his weight has consistently dropped since admission to the detention facilities, with a low reached on September 19, 2022, of 130 pounds with a BMI of 17.6, which places him in the underweight category. There is nothing in the medical records which has documented that the detainee has improved clinically or has accepted his detention in a more positive light. It appears that detention will continue to be a serious psychosocial stressor, and thus negatively impact his mental health conditions.

9. Are there other indicators of the increasing severity or acuity of his mental health conditions or the psychosomatic symptoms of those conditions over the course of his time in detention?

Based on the review of the records, I cannot adequately gauge if there is an increase in the severity or acuity of his mental health conditions as no clear rating scales for depression, PTSD, or anxiety were administered. However, his weight loss is concerning, and appears to be continually progressing.

10. Does his current weight level put him at a risk of serious harm?

Based on the medical records that I reviewed, there is insufficient data to indicate whether his current BMI/weight is placing him at a serious risk of harm. There was some laboratory data from September 21, 2022, which was basically a CBC and electrolyte panel, all of which was within normal limits. There was no evidence of severe medical consequences based on those labs; however, there were no labs to indicate more appropriate determinations of starvation such as the level of his blood proteins. He would need to have his weight, BMI, and other laboratory data monitored in the future to see if future weight loss is putting his health at risk.

11. Are there any other medical indicators that he is presently at risk of serious harm?

Having severe clinical depression, coupled with incarceration places him at risk for suicide.

12. Are the psychosomatic symptoms from his mental health condition likely to improve without effective treatment of or improvements in his underlying mental health conditions?

No; in my opinion, his psychosomatic symptoms are most likely related to his mental health conditions. Therefore, they will improve when his mental health conditions improve, either with treatment or due to spontaneous remission due to improvement in psychosocial factors.

13. Is the medical research submitted with respect to the psychological impacts of detention in asylum seekers reliable and relevant to Mr. Bozkus' circumstances? If so, are Mr. Bozkus' mental health symptoms consistent with the symptoms of other asylum seekers in detention described in this research?

The first journal article was assessing the mental health of detained asylum seekers, and the second was a meta analysis on the prevalence of psychiatric disorders among refugees and migrants in immigration detention. Clearly, this detainee meets criteria for both; he is a detained asylum seeker and could be considered a refugee in immigration detention. Therefore, findings from these articles would be clinically applicable to this detainee. Both of the articles indicate a high prevalence of anxiety, depression, and PTSD among individuals in those categories; therefore, this detainee's symptoms are consistent with the findings of those journal articles.

14. Do you think in his present state of health, Mr. Bozkus would be capable of recalling details of trauma at length or of answering detailed questions about his past traumas at length in a future hearing? If not, why not?

Individuals suffering from major depression suffer from a variety of cognitive symptoms including impairment in their ability to think, concentrate, and make decisions, as well as complain of being easily distracted and having memory difficulties. Research has shown numerous neurocognitive deficits individuals with depression, including impairment in information processing speed, attention, learning and memory, and general executive functioning deficits. Therefore, I believe that these deficits and symptoms of major depression can cause significant impairment in an individual's ability to appropriately communicate, recall details of past trauma, and answer detailed questions in a legal hearing situation, which is often quite stressful.

Thank you for this interesting referral. Feel free to contact me if you have any questions, (805) 440-7830.

Sincerely,

Hadley Osran, M.D.
Diplomate American Board of Psychiatry and Neurology

# CURRICULUM VITAE

## HADLEY C. OSRAN, M.D.

Atascadero State Hospital
P. O. Box 7001
Atascadero, California 93423
805-468-2046
Fax 805-468-2954

Private Practice:
P. O. Box 180
Atascadero, California 93423-0180

BIRTH: Evanston, Illinois; August 16, 1960
CITIZENSHIP: United States
CALIFORNIA MEDICAL LICENSE NUMBER: G 61672
DEA NUMBER: BO 1242609

EDUCATION:

Undergraduate: Creighton University, Omaha Nebraska, 1978-1982.  B.S., 1982
Chemistry, Magna Cum Laude

Graduate: University of Illinois College of Medicine, Rockford, Illinois 1982-1986 M.D.,
1986

PSYCHIATRY INTERNSHIP AND RESIDENCY:

University of California, Irvine, Department of Psychiatry and Human Behavior, 1986-
1990

FORENSIC PSYCHIATRY FELLOWSHIP:

University of Southern California, School of Medicine, Department of Psychiatry and
Behavioral Sciences, Institute of Psychiatry, Law and Behavioral Sciences, July 1990 to
June 1992

1

BOARD CERTIFICATIONS:

Diplomate American Board of Psychiatry and Neurology, 1992 (lifetime), added qualifications in Forensic Psychiatry, 1994-2004 and 2009 to 2019.


APPOINTMENTS:

Chief Resident, Department of Psychiatry, Long Beach Veterans Administration Medical Center, July 1989-June 1990

Assistant Ward Chief, Special Treatment Unit Department of Psychiatry, Long Beach Veterans Administration Medical Center, July 1998-June 1990

Resident Representative Education and Curriculum Committee University of California, Irvine, Department of Psychiatry and Human Behavior, April 1987-June 1990

Resident Representative, Executive Council, Orange County psychiatric Society, July 1989-June 1990

Senior Psychiatrist Specialist, Atascadero State Hospital, July 1999 – current

Chief of Staff, Atascadero State Hospital 2015 to 2019, 2021 to 2022

Vice Chief of Staff, Atascadero State Hospital 2002 to 2005, 2020 to 2021

Chair, Department of Psychiatry, Atascadero State Hospital 2005 to 2007, 2008-2010


RESEARCH EXPERIENCE:

"Adrenal Androgen Dissociation in Patients with Major Depression," Department of Psychiatry and Internal Medicine, university of California, Irvine Long Beach Veterans Administration Medical Center. July to December 1987. Adviser: Lawrence Parker, M.D., Chistopher Reist, M.D.

2

"Double - Blind, Dose Ranging Trial Comparing the Extra pyramidal (EPS) Liability of CGP-19486A to Haloperidol in Hospital Patients with Chronic Schizophrenia." Department of Psychiatry, University of California, Irvine, Long Beach Veterans Administration Medical Center. July 1989-June 1990. Adviser: Christopher Reist, M.D.

Factors clinicians use to identify the "dangerous" patient. Atascadero State Hospital, Forensic Services. Co-investigator: Angela Kedzior, M.D., January 1998

EMPLOYMENT:

Atascadero State Hospital, Atascadero, California . August 2007 to present. Senior Psychiatrist Specialist, Duties: Chief of Trial Competency Project, forensic consultation and report writing, education of psychiatry staff in Forensic Psychiatry

Department of Corrections and Rehabilitation (CDCR) Sate of California, February 2007 to July 2007. Staff Psychiatrist, Duties: treatment of mentally ill inmates

Atascadero State Hospital; Atascadero, California. February 1997 to February 2007. Appointed as Chief of Forensic Psychiatry July 1999., Duties: Forensic evaluation and testimony, consultation and education of medical staff, teaching and supervision of Forensic psychiatry fellows, clinical care of patients

Medical College of Virginia, Department of Psychiatry; work assignment to Central State Hospital, Petersburg, Virginia as Medical Director of Forensic Unit. March 1994 to February 1997. Duties: oversee medical treatment, supervision of medical staff, program development, patient treatment and forensic evaluation.

Correctional Health Services, Maricopa County, Arizona, September 1992 to March 1994. Duties: psychiatric consultant, treatment of inpatient and outpatient adults, juveniles and forensic evaluation.

West End Family Counseling, Ontario, California. April 1988 to June 1992 (inclusive). Psychiatric Consultant. Duties: psychiatric consultant, treatment and evaluation of adults and children, consultation to staff.

ACADEMIC APPOINTMENTS/ TEACHING EXPERIENCE:

Director, Atascadero State hospital rotation, University of California at Los Angeles, Forensic Psychiatry Fellowship, April 1997 to June 2001

Director, University of California, San Francisco (UCSF) - Atascadero State Hospital - Forensic Psychiatry Fellowship Program and Assistant Clinical Professor of Psychiatry -

3

UCSF, April 1997 to June 1998. Duties: Direct forensic psychiatry education for forensic psychiatry fellows.

Assistant Professor and Director of Forensic Psychiatry, Department of Psychiatry, Medical College of Virginia - Virginia Commonwealth University, 1994 to 1997. Duties: Direct forensic psychiatry education for forensic psychiatry fellow, psychiatry residents and teach medical students.

Clinical Instructor, University of Southern California, School of Medicine, Department of Psychiatry and Behavioral Sciences, July 1990 - June 1992. Duties: Supervise forensic psychiatry experience for psychiatry residents.

Assist in teaching mental health professionals, Basic Forensic Psychiatry and NGRI evaluation, for Department of Mental Health, Substance Abuse and Mental Retardation, State of Virginia, March 1994 to 1997.

JUDICIAL APPOINTMENTS:

Maricopa County Superior Court, Mental Health Panel, 1992-1994

State of Virginia, Psychiatric Forensic Review Panel, 1994 to 1997

San Luis Obispo Country Superior Court Mental Health Panel 1997 to 2006

PUBLICATIONS:

*Adrenal Androgens and Cortisol in Major Depression*, Osran H, Reist C, Chen C, Lifrak E, Chicz DeMet A, Parker L, American Journal of psychiatry 1993; 150:806-809.

*Personality Disorders and "Restoration of Sanity"*, Osran H, Weinberger L, Bulletin of the American Academy of Psychiatry and the Law, 1994; Vol. 22, No. 2:257-267.

*Cocaine and Criminal Responsibility*, Osran H , Sharma K, Weinberger L., American Journal of Forensic Psychiatry, 1996; Vol 17, No.3:37-52.

*The Impact of Surgical Castration on Sexual Recidivism Among Sexually Violent Predatory Offenders*, Weinberger L, Sreenivasan S, Garrick T, Osran H., The Journal of the American Academy of Psychiatry and Law, 2005; Vol.33, No.1: 16-36

*Living Outside the Wire: Toward a Transpersonal Resilience Approach for OIF/OEF Veterans Transitioning to Civilian Life,* Osran H., Smee D., Sreenivasan S., Weinberger L., The Journal of Transpersonal Psychology, 2010 Vol. 42, No.2 209-235

4

PRESENTATIONS:

Adrenal Androgens and Cortisol in Major Depression. Osran H, Reist C, Chen C, Lifrak E, Parker L, presented American Psychiatric Association, 143rd Annual Meeting, NY, NY, May 14, 1990.

Personality Disorders and "Restoration of Sanity". Osran H, Weinberger L, presented American Academy of Forensic Sciences, New Orleans, LA, 44th Annual Meeting, February 22, 1992.

Cocaine and Criminal Responsibility, Osran H, Sharma K, presented American Academy of Forensic Sciences, New Orleans, LA, 44th Annual Meeting, February 22, 1992.

Jail Treatment and Dual Agency. Forensic Symposium, Charlottesville, VA May 1994 May 10, 1996.

Schizophrenia and Violence: Panel Discussion, Forensic Symposium, Charlottesville, VA, May 10, 1996.

Towards an Integrative Model of Dangerousness. Osran H, Sharma K, presented American Academy of Forensic Sciences, San Francisco, CA 50th Annual Meeting, February 12, 1998.

Clinical Factors Correlated with the Finding of Dangerousness in Mentally Disordered Offenders. Osran H, presented American Academy of Forensic Sciences, Reno, Nevada, February 26, 2000.

The Bullet Train to Competency, Osran H., Gaines Gayle, presented Forensic Mental Health Conference, Patton State Hospital, Patton California, October 1, 2009

The Bullet Train to Competency, Osran H., Gaines Gayle, presented Forensic Mental Health Association of California, Seaside, California March 25, 2010


AWARDS:

Senior Resident Research Award, First Prize, June 15, 1990.

MILITARY EXPERIENCE:

United States Army Reserve, Medical Corp, Commissioned Officer: 2004 to 2019, rank Colonel.

5

Deployed:
1. March to June 2007, Iraq, assigned to the 399th Combat Support Hospital
2. February to May 2009, Iraq assigned to the 55th Combat Stress Control Company
3. March to June 2011, Kosovo, assigned to the 115th Hospital Detachment
4. April to July 2012, Keller Army Hospital, West Point, NY
5. April to July 2014, Landstuhl Regional Medical Center, Germany
6. June to September 2019, Walter Reed Military Medical Center, Bethesda Maryland

# Mental health of detained asylum seekers

*Allen S Keller, Barry Rosenfeld, Chau Trinh-Shevrin, Chris Meserve, Emily Sachs, Jonathan A Leviss, Elizabeth Singer, Hawthorne Smith, John Wilkinson, Glen Kim, Kathleen Allden, Douglas Ford*

**Asylum seekers arriving in the USA are likely to be held in detention for months or years pending adjudication of their asylum claims. We interviewed 70 asylum seekers detained in New York, New Jersey, and Pennsylvania. We used self-report questionnaires to assess symptoms of anxiety, depression, and post-traumatic stress disorder. At baseline, 54 (77%) participants had clinically significant symptoms of anxiety, 60 (86%) of depression, and 35 (50%) of post-traumatic stress disorder; all symptoms were significantly correlated with length of detention (p=0·004, 0·017, and 0·019, respectively). At follow-up, participants who had been released had marked reductions in all psychological symptoms, but those still detained were more distressed than at baseline. Our findings suggest detention of asylum seekers exacerbates psychological symptoms.**

*Lancet* 2003; **362:** 1721–23

Worldwide, there is a growing trend toward detention of asylum seekers arriving in industrialised countries for months or even years pending adjudication of their asylum claims.[1] In the USA, 5000 asylum seekers are estimated to be held in detention,[1-3] although reliable statistics on the number of detained asylum seekers are unavailable. Detention of asylum seekers has concerned health professionals and human rights advocates, in part because of the potential detrimental effects on the mental health of detainees.[1,3] Research on this subject, however, has been limited by difficulties in gaining access to detention centres. The Bellevue New York University (NYU) Program for Survivors of Torture and Physicians for Human Rights have done a systematic and longitudinal study of the effects of postmigration detention on the mental health of asylum seekers.

The US Immigration and Naturalization Services (INS) permitted access to detention facilities in New York, New Jersey, and Pennsylvania. These facilities included two INS detention centres run by private contractors. These jails are virtually windowless converted warehouses where only non-criminal INS detainees are incarcerated. Additionally, access was permitted to three local government-run jails in which criminals are also held. In all of these facilities, asylum seekers are heavily guarded, required to wear jail uniforms, and are shackled whenever they are transported outside of the detention facilities. The INS did not allow us access to a random sample of detained asylum seekers at these facilities. Therefore, we asked six local organisations providing pro-bono legal representation to detained asylum seekers to contact clients and ask about their willingness to be interviewed. Detainees were informed by researchers of the voluntary nature of the study and that participation would not affect their asylum applications. We obtained written informed consent from all participants. The study was approved by the Institutional Review Board of New York University School of Medicine and a review committee for Physicians for Human Rights.

Detainees were interviewed by physicians experienced in caring for refugees; translators assisted if necessary. Standardised psychological symptom measures were used: the Hopkins symptom checklist-25 (HSCL-25)[4] and the post-traumatic stress disorder subscale of the Harvard trauma questionnaire (HTQ).[5] Both measures have been used in studies of refugee populations and previously translated and back-translated in several languages, including French, Spanish, and Arabic. For participants who spoke other languages, scales were translated by the interpreter. Demographic information and history of

| | Detained (n=35) | | Released (n=26) | |
|---|---|---|---|---|
| | Number (%) above recommended cut-off* | Symptom scores, mean (SD) | Number (%) above recommended cut-off* | Symptom scores, mean (SD) |
| **Baseline** | | | | |
| Anxiety | 28 (80%) | 2·40 (0·71) | 19 (73%) | 2·33 (0·72) |
| Depression | 30 (86%) | 2·52 (0·69) | 22 (85%) | 2·45 (0·65) |
| PTSD | 19 (54%) | 2·52 (0·62) | 10 (39%) | 2·45 (0·62) |
| **Follow-up** | | | | |
| Anxiety | 30 (86%) | 2·58 (0·80) | 9 (35%) | 1·59 (0·56) |
| Depression | 31 (89%) | 2·73 (0·70) | 10 (39%) | 1·65 (0·59) |
| PTSD | 21 (60%) | 2·63 (0·71) | 3 (12%) | 1·80 (0·56) |
| **Change in symptom scores†** | | | | |
| Anxiety | ·· | 0·17 (0·61) | ·· | −0·75 (0·84) |
| Depression | ·· | 0·21 (0·42) | ·· | −0·80 (0·81) |
| PTSD | ·· | 0·12 (0·51) | ·· | −0·64 (0·64) |

PTSD=post-traumatic stress disorder. *Cut-offs: 1·75 for HSCL-25 depression and anxiety subscales, 2·5 for HTQ. †p not significant for changes in any symptom score in detained group. p=0·0001 for all three symptom score changes in released group. Mean (SD) values are group mean at each assessment. Change=change in mean score from baseline assessment.

**Psychological symptoms of asylum seekers still detained and those released at follow-up**

For personal use. Only reproduce with permission from The Lancet.



**Changes in psychological distress at follow-up**
PTSD=post-traumatic stress disorder.

traumatic experiences were elicited from participants' asylum applications. Detainees who could be located were followed up 2 months or more after the initial interview to assess psychological changes.

Spearman correlation coefficients were used to analyse the relation between length of detention, which had a skewed distribution, and psychological distress. Independent sample $t$ tests were used to assess differences in psychological distress between baseline and follow-up for patients who had been released and those still detained at follow-up.

Between Jan 1, 2001, and June 15, 2002, 87 detainees (73% of the caseload for the six agencies providing referrals) were referred to the study. Of these 87, 17 were excluded from the study: one was deported; ten were released before interview; one had been granted asylum but was still awaiting release; three did not complete the interview questionnaires; one withdrew the asylum claim; and one lost pro-bono legal support. Analyses are based on the remaining 70 participants (56 male, 14 female, mean age 28 years [SD 7·3; range 15–52]). Follow-up interviews were done at a median of 101 days (62–299) with 61 participants; 35 were still in detention and 26 had been released. Of the 26 released, 22 had been granted asylum and four released without asylum for medical or humanitarian reasons. Of the nine participants lost to follow-up: two had been deported; five could not be located; one had been transferred to another facility; and one refused to be interviewed. In April, 2003, 40 (57%) of the 70 participants had been granted asylum in the USA, and 14 individuals (20%) had been denied asylum and deported. Of the 40 individuals granted asylum, the median length of detention had been 7 months (2–42).

61 (87%) participants were detained in two INS detention centres and nine (13%) in three local government-run jails. The median length of detention before initial interview was 5 months (1–54). Most participants were from Africa (n=54), seven were from eastern Europe, four from Asia, two from the Middle East, and three from South America. 28 interviews were done in English, 17 in French, seven in Arabic, and 18 in other languages.

52 (74%) detainees had been tortured before immigration, 47 (67%) had been imprisoned in their native country, 41 (59%) reported the murder of a family member

or friend, and 18 (26%) reported sexual assault. 54 (77%) detainees had clinically significant symptoms of anxiety, 60 (86%) of depression, and 35 (50%) of post-traumatic stress disorder. 18 (26%) participants reported thoughts of suicide while in detention, and two reported having attempted suicide.

49 (70%) participants perceived their mental health as having worsened substantially while in detention, and this perception was supported by Spearman correlations between length of time in detention and baseline levels of anxiety ($r_s$=0·34, p=0·004), depression (0·28, p=0·017), and post-traumatic stress disorder (0·28, p=0·019). Baseline mental health scores did not differ significantly between detainees eventually released and those who remained in detention, although differences were significant at follow-up (table). Participants still detained at follow-up had increased symptom scores for anxiety, depression, and post-traumatic stress disorder, whereas those who had been released had lower scores on all three scales (p<0·0001; figure).

Nearly all the detainees in our study had clinically significant symptoms of anxiety, depression, or post-traumatic stress disorder, which worsened with time in detention and improved on release. Our findings support anecdotal observations of other researchers and highlight the concerns raised by health professionals about the adverse effect of detention on asylum seekers.[1,2]

A limitation of our study is that there was no comparison group of non-detained asylum seekers. Although our sample of released participants was confounded by the fact that most were also granted asylum, the significant correlation between symptom severity at baseline and length of time in detention supports the hypothesis that detention significantly contributed to psychological distress. However, our reliance on self-report questionnaires rather than diagnostic interviews might have increased the proportion of individuals assessed as having clinically significant distress. Additionally, sampling was not random, which might limit the general applicability of our results to the entire population of detained asylum seekers. Furthermore, although we have no reason to think that detained asylum seekers represented by pro-bono legal groups differ from other detained asylum seekers, we cannot be certain.

Some participants could have deliberately exaggerated psychological symptoms, past traumatic experiences, or both, in order to bolster their asylum claims—despite being informed that their asylum application would not be affected by their responses. Nevertheless, the large proportion of participants ultimately granted asylum lends credence to their reports. Furthermore, there was no difference in reported distress at baseline or premigration traumatic experiences between detainees who were or were not granted asylum. Finally, despite a marked reduction in symptoms after release, many participants still had high levels of psychological distress, suggesting that symptom endorsement was not solely motivated by secondary gain.

Despite the limitations of this study, our results suggest that detaining asylum seekers exacerbates symptoms of depression, anxiety, and post-traumatic stress disorder in this vulnerable population. Our findings suggest that

For personal use. Only reproduce with permission from The Lancet.

34

policies concerning detention of asylum seekers should be reviewed, and highlight the need for mental health intervention to address the psychological needs of these individuals.

*Contributors*
A Keller, D Ford, C Trinh-Shevrin, J Leviss, H Smith, K Allden, and G Kim conceived and designed the study. A Keller, C Meserve, E Sachs, J Leviss, E Singer, H Smith, and J Wilkinson participated in the acquisition of data. E Sachs coordinated data collection. C Trinh-Shevrin and B Rosenfeld did statistical analyses. A Keller, B Rosenfeld, C Trinh-Shevrin, D Ford, C Meserve, J Leviss, E Sachs, and B Rosenfeld participated in analysis and interpretation of data. All authors helped to write the report.

*Conflict of interest statement*
None declared.

*Acknowledgments*
This study was done by the Bellevue/NYU Program for Survivors of Torture and Physicians for Human Rights. We are grateful to Eleanor Acer, Anwen Hughes, Lin Piwowarczyk, and Jon Hubbard for their assistance in developing this project. Zachary Steele, Derrick Silove, and Richard Mollica also provided invaluable insight into issues concerning the health of detained asylum seekers. We thank the INS staff at headquarters and at the detention facilities for their courtesy and cooperation with this study. We thank the following organisations for their cooperation in referring individuals for participation in this study: American Friends Service Committee, Catholic Legal Immigration Network, Circle York, The Lawyers Committee for Human Rights, New York Association for New Americans, and Hebrew Immigrant Aid Society. We also thank Suzanne Dieter for background research; Melanie Jay, Alyssa Finlay, Amina Chaudry, and Joshua Lee for helping with interviews; Caroline Lai and Angela Lee for data entry; and Vincent Iacopino, Frank Davidoff, and Barbara Ayorte for reviewing the manuscript. Support for this research was provided by a grant from the Jeht Fund of the New York Community Trust and the Morton K and Jane Blaustein Foundation. A Keller was supported by a Soros Advocacy Fellowship from the Medicine as a Profession Program of the Open Society Institute. Funding sources had no role in study design, data collection, data analysis, data interpretation, writing of the report, or decision to submit the paper for publication.

1   Keller A, Ford D, Sachs E, et al. From persecution to prison: the health consequences of detention for asylum seekers. Boston and New York City: Physicians for Human Rights and the Bellevue/NYU Program for Survivors of Torture, 2003. http://www.phrusa.org/campaigns/asylum_network/detention_execSummary/(accessed October, 2003).
2   Silove D, Steel Z, Mollica R. Detention of asylum seekers: assault on health, human rights, and social development. *Lancet* 2001; **357:** 1436–37.
3   Amnesty International. Lost in the labyrinth: detention of asylum seekers. New York: Amnesty International, 1999.
4   Mollica RF, Wyshak G, de Marneffe D, Khoun F, Lavelle J. Indochinese versions of the Hopkins symptom checklist-25: a screening instrument for the psychiatric care of refugees. *Am J Psychiatry* 1987; **144:** 497–500.
5   Mollica RF, Caspi-Yavin Y, Bollini P, Truong T, Tor S, Lavelle J. The Harvard trauma questionnaire: validating a cross-cultural instrument for measuring torture, trauma, and post traumatic stress disorder in refugees. *J Nerv Ment Dis* 1992; **180:** 111–16.

**Bellevue/New York University (NYU) Program for Survivors of Torture, Division of Primary Care Medicine, Department of Medicine** (A S Keller MD, C Meserve MD, H Smith PhD, E Sachs BA, J Wilkinson MS), **Institute for Urban and Global Health** (C Trinh-Shevrin MS), **and Department of Emergency Services** (E Singer MD), **NYU School of Medicine, New York, NY 10016, USA; Department of Psychology, Fordham University, Bronx, NY** (B Rosenfeld PhD); **New York City Health and Hospitals Corporation, New York, NY** (J A Leviss MD); **Department of Medicine, Harvard Medical School, Boston, MA, USA** (G Kim MD); **Department of Psychiatry, Dartmouth Medical School, Hanover, NH, USA** (K Allden MD); **and Physicians for Human Rights, Boston, MA** (D Ford JD, A S Keller)

Correspondence to: Dr Allen S Keller, Bellevue/NYU Program for Survivors of Torture, Bellevue Hospital, 462 First Avenue, CD710, New York, NY 10016, USA
(e-mail: allen.keller@med.nyu)

# Association of intercellular adhesion molecule-1 gene with type 1 diabetes

Sergey Nejentsev, Cristian Guja, Rose McCormack, Jason Cooper, Joanna M M Howson, Sarah Nutland, Helen Rance, Neil Walker, Dag Undlien, Kjersti S Ronninger, Eva Tuomilehto-Wolf, Jaakko Tuomilehto, Constantin Ionescu-Tirgoviste, Polly J Bingley, Kathleen M Gillespie, David A Savage, Dennis J Carson, Chris C Patterson, A Peter Maxwell, John A Todd

Intercellular adhesion molecule-1 (ICAM-1) functions via its ligands, the leucocyte integrins, in adhesion of immune cells to endothelial cells and in T cell activation. The third immunoglobulin-like extracellular domain binds integrin Mac-1 and contains a common non-conservative aminoacid polymorphism, G241R. Phenotypically, ICAM-1 has been associated with type 1 diabetes, a T-cell-mediated autoimmune disease. We assessed two independent datasets and found that R241 was associated with lower risk of type 1 diabetes than is G241 (3695 families, relative risk 0·91, p=0·03; 446 families, 0·60, p=0·006). Our data indicate an aetiological role for ICAM-1 in type 1 diabetes, which needs to be confirmed in future genetic and functional experiments.

*Lancet* 2003; **362:** 1723–24

The molecular mechanisms underlying type 1 diabetes are partly known. Three disease loci have been identified so far: the human leucocyte antigen (HLA) complex, the variable number tandem repeat locus located in the promoter region of the insulin gene (*INS*), and the cytotoxic T lymphocyte-associated antigen-4 gene (*CTLA4*).[1] The known functions of these genes suggest that T-cell activity is an important pathway in development of type 1 diabetes. Results of analysis in the mouse shows that ICAM-1 function during immune priming is necessary for the generation of effector T cells capable of destroying pancreatic insulin-producing β cells.[2] Genetic analysis of the ICAM-1 gene in families affected by type 1 diabetes could indicate whether its function has a causal role in the disease.

*ICAM1* is located on chromosome 19p13 in a region that has shown some evidence of linkage to type 1 diabetes.[1] Two non-synonymous single nucleotide polymorphisms are known to be frequent in European populations: G→A in exon 4 encoding G241R, and A→G in exon 6 encoding K469E (rs1799969 and rs5030382, respectively; http://www.ncbi.nlm.nih.gov/SNP/). The K469E polymorphism has been investigated in type 1 diabetes in small samples, with variable results.[3] We assessed association of these two *ICAM1* coding polymorphisms in a sample of 3695 families affected by type 1 diabetes.

All family members were white, from Europe or the USA, with at least one affected child in every family (table). Mean age at onset of the affected offspring was 9·3 years (range 0–50). We obtained approval from the relevant research ethics committees and written informed consent of participants. DNA samples were genotyped with Invader (Third Wave Technologies, Madison, WI, USA) and TaqMan (Perkin Elmer Applied Biosystems, Foster City, CA, USA) assays. We recorded 99·5% concordance between these methods in 1242 samples tested to assess error in genotyping of the G241R polymorphism. Statistical analysis was done with STATA (version 8.1). Calculations of p values and 95% CI of relative risk (RR) were based on robust variance estimates, used to correct for clustering of affected individuals within families.

K469E did not show any association with the disease. K469 was transmitted 1931 times of 3897 (49·6%, p=0·59). By contrast, R241 was transmitted significantly less often: 938 transmissions of 1974 (47·5%, p=0·03; table). To control for the possibility that genotyping error or transmission ratio

For personal use. Only reproduce with permission from The Lancet.

35

BJPsych Open (2021)
7, e204, 1–8. doi: 10.1192/bjo.2021.1026



## Review

# Prevalence of psychiatric disorders among refugees and migrants in immigration detention: systematic review with meta-analysis

Irina Verhülsdonk, Mona Shahab and Marc Molendijk

**Background**

The number of forced migrants is increasing worldwide. Some governments detain refugees and migrants in immigration detention centres, which is associated with adverse mental health outcomes.

**Aims**

To estimate prevalence rates of depression, anxiety and post-traumatic stress disorder (PTSD) in child and adult refugees and migrants in immigration detention.

**Method**

Pre-registered systematic review with meta-analysis (Prospero ID: CRD42020196078).

**Results**

Systematic searches in Medline, Embase and Web of Science (final search date 1 October 2020) yielded nine eligible studies on the mental health of detained refugees and migrants (total $n = 630$ refugees and migrants, 522 of them in detention, among which 26 were children). For adults, prevalence rates for depression were 68% (95% CI 0.53–0.83%), for anxiety 54% (95% CI 0.36–0.72%) and for PTSD 42% (95% CI 0.22–0.63%). Theoretical comparisons with data from other meta-analyses

revealed that prevalence rates and symptom severity were higher in detained, relative to non-detained samples.

**Conclusions**

Our data show a huge burden of mental health problems in detained refugees and migrants of all ages, also relative to non-detained samples. This suggests that immigration detention independently and adversely affects the mental health of refugees and migrants. This insight should encourage countries to minimise the use of immigration detention and implement alternative measures instead.

**Keywords**

Refugees; immigration detention; depression; anxiety; PTSD.

**Copyright and usage**

© The Author(s), 2021. Published by Cambridge University Press on behalf of the Royal College of Psychiatrists. This is an Open Access article, distributed under the terms of the Creative Commons Attribution licence (https://creativecommons.org/licenses/by/4.0/), which permits unrestricted re-use, distribution, and reproduction in any medium, provided the original work is properly cited.

## Background

In the past two decades, forced migration and the displacement of people have reached a new high.[1] Forced by war, civil conflicts, (natural) disasters, persecution or other violations of human rights, 82.4 million people worldwide have been forced to flee their homes by June 2021.[2] Among them are internally displaced people, refugees and asylum seekers. Internally displaced people, representing the majority of forced migrants (around 48 million people) are those who have been 'forced or obliged to flee from their home or place of habitual residence, in particular as a result of or in order to avoid the effects of armed conflicts, situations of generalised violence, violations of human rights or natural or human-made disasters' and have not crossed 'an internationally recognised State border'.[3] Refugees are the second largest group among those forcefully displaced (around 20.7 million people).[2] According to the 1951 Refugee Convention, a refugee is 'unable or unwilling to return to their country of origin owing to a well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group, or political opinion'.[4] The third and smallest group (around 4.1 million people) are asylum seekers.[2] Whereas refugees are already under a form of protection, asylum seekers are still awaiting a decision whether or not they will be granted protection.[5] Terms to refer to these groups are used inconsistently and interchangeably. The International Organization for Migration defines irregular migrants as individuals moving 'outside the regulatory norms of the sending, transit and receiving countries'.[6] In this article, we will follow the

recommended practice of the United Nations High Commissioner for Refugees (UNHCR) and use 'refugees and migrants' as a generic term to refer to internally displaced people, refugees, asylum seekers and irregular migrants as defined above.[7,8] Forced migration in general is associated with adverse mental health outcomes because of different pre-, peri- and post-migration factors.[9,10]

Refugees and migrants may be exposed to potentially traumatic events and other stressful situations that can occur before migration, during migration and after arrival in the receiving country. As a result, refugees and migrants are particularly vulnerable to psychiatric problems, such as symptoms of depression, post-traumatic stress disorder (PTSD) or anxiety.[11–13] Upon arrival many countries regularly detain refugees and migrants.[14,15] The International Organization for Migration defines immigration detention as 'the deprivation of liberty for migration-related reasons'.[16] According to the UNHCR, confinement that is enforced 'within a narrowly bounded or restricted location … and where the only opportunity to leave this limited area is to leave the territory' qualifies as immigration detention, for example in prisons, detention facilities or closed camps.[17] Immigration detention is mostly used as a tool to manage migration by speeding up the asylum process. Immigration detention assures compliance with the migration process decision and facilitates efficient deportation after irregular entry, irregular residence or after the commitment of a criminal offence.[14,18]

Even though immigration detention centres mostly do not have a punitive purpose as prisons do, detainees perceive them as punishing and even worse than prisons.[19] Reliable statistics on how many

individuals are currently in detention on a worldwide scale are not available.[20] In the USA, in 2019, 143 099 forced migrants were arrested, and the average population in detention centres per day amounted to 50 165. On average, detainees spent 34.3 days in so-called US Immigration and Customs Enforcement detention facilities.[21] In Canada, between 2019 and 2020, 8825 people were detained in total and spend on average 13.9 days in so-called immigration holding centres.[22] In Australia, 1440 people were detained in immigration detention centres at 31 August 2021; the majority of them (95%) have been detained for more than 31 days at that point, more than a quarter of them (35%) for more than 2 years.[23] Australia is particularly being criticised for implementing offshore detention facilities, that are inhumane and unsafe for their detainees.[24,25] In the UK, between April 2019 and March 2020, 23 075 people were detained.[26] Many other countries implement immigration detention but do not share statistics.[15]

### The association between immigration detention and mental health

Research on the underlying mechanisms through which immigration detention could have an impact on mental health remains scarce. Some detainees fear their safety because of inhumane conditions, criminalisation, and physical and verbal abuse by the officers. They may often experience uncertainty concerning their future and remain isolated the majority of their time, and experience a loss of control.[27–30] Studies suggest that the deterioration of mental health in detainees may be related to the loss of agency that is reported by detainees. Refugees and migrants who have experienced lengthy asylum processes often feel trapped, as if they were 'boxed in', and report being helpless and hopeless.[31] The confinement of refugees and migrants has been associated with adverse mental health effects.[28–31] Upon release from detention, a substantial proportion of the detainees report symptoms of depression, anxiety and PTSD. They often withdraw themselves from others, fearing rejection or exclusion.[29,32–34] The only efficient way to improve the detainees' mental health is to release them from detention.[35]

Detained children are at an even higher risk of experiencing symptoms of depression, anxiety or self-harm and may be as a result of the lack of parental support. Their parents are often distressed and emotionally unavailable, and children have no sense of adult protection.[36] The detention itself, the exposure to potentially traumatic events in detention as well, and the absence of parental support may negatively affect the children's mental health. Because of its adverse effects, the implementation of immigration detention centres has been repeatedly criticised.[15,27,28] Even though the UNHCR, among others, has urged countries to apply alternative solutions,[15,19] immigration detention continues to be a widely used method.[15,20,37]

### The current meta-analysis

Von Werthern and colleagues[37] performed a systematic review of the impact of immigration detention on mental health. They concluded that detained refugees and migrants experience more severe symptoms of anxiety, depression, PTSD and a lower quality of life than non-detained refugees and migrants. Furthermore, symptoms are more severe when the detainees are isolated. Filges and colleagues[18] applied meta-analytical methods and found preliminary evidence that immigration detention has an independent role in deteriorating mental health. The authors also conclude that the more time refugees and migrants spend in immigration detention, the more accentuated the symptoms become. However, this evidence derives from only two studies that head-to-head compared detained and non-detained refugees and

migrants. Owing to ethical considerations, controlled studies on mental health in detained samples are scarce if not non-existant.[33,38]

The current meta-analysis aims to provide an updated systematic review of the existing body of literature and to add to the previously conducted meta-analytical methods by including single-group studies in the analysis. We thereby address the following research question: are refugees and migrants under immigration detention at increased risk for psychiatric disorders, such as anxiety, depression and PTSD, compared with refugees and migrants in community settings or other non-confining environments?

## Method

The execution and reporting of this meta-analysis followed the guidelines as defined in the PRISMA statement.[39] A drafted protocol for this meta-analysis was pre-registered in the International Prospective Register of Systematic Reviews (PROSPERO), registration number: CRD42020196078.

### Search and selection strategy

A computer-based search was performed using Embase, Medline, Web of Science and Google Scholar.[40] The formulation of search strings followed the strategy by Filges and colleagues.[41] The search terms were all related to immigration detention. In Supplementary Table 1 available at https://doi.org/10.1192/bjo. 2021.1026, we present the complete search strategy. The reference lists of systematic reviews and meta-analyses that were conducted on the topic before, as well as included studies, were additionally reviewed for eligible studies. Only articles that were written in English, German, French, Spanish or Dutch were considered. The literature search was carried out, independently, by two researchers (I.V. and M.M.), who also independently screened the identified articles' titles and abstracts to assess their eligibility. If it was ambiguous whether a study was eligible, the study was assessed in full. Based on the inclusion and exclusion criteria, a conclusion was made on the eligibility of the study. Disagreement was resolved through discussion and consensus.

### Inclusion and exclusion criteria

Inclusion was not limited to comparison studies but extended to single-group, prospective and retrospective cohort studies, case–control studies, cross-sectional studies and multiple case series.

Articles were included when the sample consisted of refugee or migrant populations who were in immigration detention either at the time of the study or who were released from immigration detention. For comparison studies, we included studies that contained a refugee or migrant sample that was not in detention either before or during the time of assessment as a control group. Studies were eligible when individuals were in immigration detention in a country other than their home country and when detention had immigration purposes. Studies that reported prevalence rates or mean severity scores on depression, anxiety disorder, PTSD or other psychiatric disorders, assessed through clinical diagnostic interviews or using the validated cut-off score on self-report questionnaires were included.

Articles were excluded when the detention had a punitive purpose solely, and when detention was not depriving the liberty of movement (such as semi-open centres), when they did not report original data or when participants were selected based on the outcome. In cases where data on the prevalence or the mean severity score of psychiatric disorders were missing in articles where it was expected that such data were gathered, the corresponding authors of these particular articles were contacted with the



**Fig. 1** Flow chart on identification, screening and inclusion of eligible articles.

PTSD, post-traumatic stress disorder.

request to share relevant data. Only if the data could not be acquired was the study excluded. We did not implement additional exclusion criteria for the comparison group, as it is challenging to find a suitable control group and approaches in doing so differ among studies.[18] Studies were not excluded based on methodological quality.

### Assessment of methodological quality

Included studies were assessed on their methodological quality independently by two of the authors (I.V. and M.M.). The methodological quality was assessed using the quality assessment tool recommended by the US Department of Health and Human Services.[42]

### Data extraction and management

Information on the prevalence of depression, anxiety disorders, PTSD or other psychiatric disorders, participant characteristics, detention characteristics, assessment type, time of assessment (during versus post-detention), sample size and research design were extracted, in duplicate, by two researchers (I.V. and M.M.).

### Statistical analysis

The analyses were conducted using the software Jamovi and the *metafor* package for meta-analyses.[43] We used the random-effects model with 95% CI for data synthesis.[44] Pooled prevalence rates of anxiety, depression and PTSD were calculated for child/adolescent and adult detained refugees and migrants separately for data derived by self-report and diagnostic interviews.

The $I^2$ measure was used as a measure for statistical heterogeneity. To explore statistical heterogeneity, moderator analyses were performed with age (child versus adult samples), gender distribution, host country, time of assessment and assessment type as predictors. Publication bias was assessed by means of Kendall's Tau rank correlation test for the assessment of funnel plot asymmetry. Statistical significance was set at $P < 0.05$.

### Theoretical comparison

The pooled prevalence rates of detained refugees and migrants were compared with prevalence rates for non-detained refugees and migrants as reported in the meta-analysis by Henkelmann and colleagues (2020).[9] Theoretical comparisons were also made with continent-specific prevalence rates of anxiety, depression and PTSD in general adult and child/adolescent populations.

For the purpose of comparability among samples, we choose estimates derived through a diagnostic interview. The estimates on prevalence rates for non-detained refugees and migrants were derived from the three most recent meta-analyses on non-detained refugees and migrants.[9,10,45] Studies that reported on detained refugees were excluded from the Henkelmann and colleagues (2020) data[9] and prevalence rates were re-calculated prior to comparisons.

## Results

### Description of studies

The search was performed between July 2020 and 1 October 2020. Overall, we identified 3529 citations after the removal of duplicates. After screening these records, 93 studies were assessed in full text for eligibility. Fig. 1 outlines the search and selection process. Nine independent studies were included in the review, reporting on a total of 630 participants, 522 of them were in immigration detention before or at the time of the study. Key characteristics of the included studies can be found in Table 1.

The included studies predominantly assessed depression, anxiety and PTSD. For the assessment of depression and anxiety, different instruments were used (see Supplementary Table 2). Supplementary Table 3 provides single-study prevalence rates for other disorders. Country-specific differences in detention policy and approach are provided in Supplementary Table 4.

https://doi.org/10.1192/bjo.2021.1026 Published online by Cambridge University Press

**Table 1** Description of studies included in the meta-analysis of the prevalence of psychiatric disorders among forced refugees and migrants in immigration detention

| Author (year) | Assessment | n, detained | n, non-detained | Age, years: mean | Female, % | Country of origin | Host country | Year of assessment | Months in detention[a] | Meta-analysis[b] |
|---|---|---|---|---|---|---|---|---|---|---|
| **Adults** | | | | | | | | | | |
| Coffey et al (2010)[29] | Diagnostic interview post-detention | 17 | – | 42 | 5.88 | Asia, Africa, Europe | Australia | 2007–2009 | x̄: 38 | I, III |
| Cleveland & Rousseau (2013)[46] | Diagnostic interview/self-report during detention[c] | 122 | 66 (asylum seekers) | 31.6 | 40.96 | Africa, Asia, South America and Europe | Canada | 2010–2011 | x̄: 1 | I, III |
| Ehntholt et al (2018)[33] | Diagnostic interview post-detention | 35 | – | 19.1 | 40 | Africa, Asia | UK | 2004–2006 | x̄: 0.76 | I, III |
| Graf et al (2013)[47] | Diagnostic interview during detention | 80 | – | 29.9 | 0 | Africa, Europe | Switzerland | 2007–2008 | – | I, II, III |
| Keller et al (2003)[48] | Diagnostic interview during detention | 61 | – | 28 | 20 | Africa, Europe, Asia, South America | USA | 2001–2002 | x̄: 5 | I, II, III |
| Robjant et al (2009)[49] | Self-report during detention | 66 | 42 (asylum seekers) | 29.5 | 32.88 | – | UK | – | x̄: 1 | I, II, III |
| Sen et al (2018)[50] | Diagnostic interview during detention | 101 | – | 31.65 | 0 | Asia, Africa | UK | 2014–2015 | – | I, II, III |
| Steel et al (2004)[51] | Diagnostic interview post-detention | 14 | – | – | 64.29 | Not disclosed to protect anonymity | Australia | 2002–2003 | x̄: 28 | I, III |
| **Children** | | | | | | | | | | |
| Lorek et al (2009)[52] | Self-report during detention | 6 | – | – | 50 | Asia, Jamaica, North America | UK | 2006 | – | I, III |
| Steel et al (2004)[51] | Diagnostic interview post-detention | 20 | – | – | 40.9 | Not disclosed to protect anonymity | Australia | 2002–2003 | x̄: 28 | I, III |

a. x̄ = mean, x̃ = median.
b. I, Depression; prevalence; II, Anxiety; prevalence; III, PTSD; prevalence.
c. Assessed using self-report questionnaires, due to literacy problems, clinical interviews were implemented for some of the participants.

## Quality assessment

Methodological quality scores for the included studies ranged between 4 and 9.5 (mean 6.3, s.d. = 2.4). The interrater reliability of the quality assessments was high ($\kappa = 0.88$, s.e. = 0.04).[53] In the Supplementary Tables 5 and 6, information on the methodological scores can be found.

## Prevalence rates of depression, anxiety and PTSD in detained refugees and migrants

Pooled prevalence rates were 0.72 for depression (see Supplementary Figure 1), 0.55 for anxiety (see Supplementary Figure 2) and 0.45 for PTSD (see Supplementary Figure 3) for detained refugees and migrants.

For an overview of prevalence rates for depression, anxiety and PTSD in adult and child detainees, see Table 2. Heterogeneity was high in all cases. There was no evidence of publication bias in any of the analyses (see Table 2).

## Prevalence rates of depression, anxiety and PTSD in detained compared with non-detained refugees and migrants

Only two studies met the inclusion criteria for a direct comparison between detained and non-detained refugees and migrants.[46,49] Therefore, comparative prevalence rates could not be calculated for either depression, anxiety or PTSD.

Among the eligible studies, three included a control group. Keller and colleagues[48] compared the prevalence rates for anxiety, depression and PTSD in detained versus released non-detained asylum seekers. Their study did not meet our inclusion criteria for comparative analysis, as the control group was in detention at baseline, too. Participants were interviewed twice; at follow-up, the symptoms of the detained sample significantly deteriorated. The detained sample reported significantly higher levels of depression (0.89 $v.$ 0.35), anxiety (0.86 $v.$ 0.35), and PTSD (0.60 $v.$ 0.12) than the non-detained sample.[48]

The two studies that met inclusion criteria reported on refugees and migrants living in community settings as a control group. In both studies, the control group had not been detained before.[46,49] Cleveland & Rousseau report that significantly more participants in the detained group met the criteria for depression (0.78 $v.$ 0.52), anxiety (0.63 $v.$ 0.47) and PTSD (0.32 $v.$ 0.18) than in the non-detained control group.[46] Robjant and colleagues compared detained asylum seekers with non-detained asylum seekers living in community settings and former prisoners. The latter control group did not match our inclusion criteria. Detained asylum seekers reported higher mean and prevalence rates for depression (0.76 $v.$ 0.26), anxiety (0.72 $v.$ 0.50), and PTSD (mean 68.02 $v.$ 54.35).[49]

## Moderators for pooled prevalence rates in detained refugees and migrants

Pooled prevalence estimates for depression and PTSD did not differ significantly for adults compared with children ($P = 0.28$ and 0.69, respectively) (for stratified analyses, see Supplementary Table 7). The age of the sample and host country did not have a significant moderating effect on the prevalence rates of depression ($P = 0.27$ and 0.08, respectively), anxiety ($P = 0.57$ and 0.97 respectively) or PTSD ($P = 0.79$ and $P = 0.23$, respectively). The time of assessment (during $v.$ post-detention) and the type of assessment (interview $v.$ self-report questionnaire) did not have a significant moderating effect on the prevalence rates of depression ($P = 0.61$ and $P = 0.56$, respectively) or PTSD ($P = 0.53$ and $P = 0.29$, respectively). Prevalence rates of anxiety were also not associated with type of assessment ($P = 0.32$) The percentage of female participants in the sample was positively associated with the prevalence rate of

| | Studies, $n$ | Participants, $n$ | Prevalence (95% CI) | $I^2$ | Kendall's Tau[a] |
|---|---|---|---|---|---|
| **Table 2** Prevalence rates of depression, anxiety and post-traumatic stress disorder with 95% CI | | | | | |
| Adults | | | | | |
| Depression | 9 | 496 | 0.68 (0.53–0.83) | 93.88*** | −0.22 |
| Anxiety | 6 | 429 | 0.54 (0.36–0.72) | 93.85*** | 0.2 |
| Post-traumatic stress disorder | 7 | 395 | 0.42 (0.22–0.63) | 95.61*** | 0.52 |
| Children/adolescents | | | | | |
| Depression | 2 | 26 | 0.83; 0.95[c] | NA*** | NA |
| Anxiety[b] | 1 | 6 | 1.00 | NA | NA |
| Post-traumatic stress disorder | 2 | 26 | 0.17; 0.5[c] | NA*** | NA |

NA, not applicable.
a. Kendall's Tau; rank correlation test for funnel plot asymmetry. A significant correlation is an indication for the presence of publication bias.
b. Only one of the included studies[41] reported on anxiety prevalence data for children.
c. Only two of the included studies 51,52 reported on depression and PTSD prevalence data for children.
*** $P < 0.001$.

depression ($r = 0.58$, $P = 0.03$) but not with the prevalence rate of anxiety and PTSD ($P = 0.09$ and 0.19, respectively).

## Theoretical comparison

Prevalence rates for all three disorders were considerably higher in adults and child/adolescent detained refugees and migrants, notably for depression and anxiety, relative to non-detained refugees and migrants,[8] (see Supplementary Table 8). Supplementary Table 9 provides an overview of the prevalence estimates for depression, anxiety and PTSD in detained and non-detained refugees and migrants.[9,10,45]

## Discussion

### Summary of main results

The present meta-analysis shows that three out of four detained refugees and migrants experienced depression, more than half of them experienced anxiety, and almost half of them experienced PTSD. Prevalence rates for all three disorders are around twice as high in detained relative to non-detained refugees and migrants. In line with studies on gender differences and depression,[54] our data shows that estimated prevalence rates were higher in females; however, gender did not have a significant moderating effect on either anxiety or PTSD.

In previously conducted systematic reviews, von Werthern and colleagues[37] and Filges and colleagues[18] concluded that immigration detention exacerbates and elicits depression, anxiety and PTSD symptoms. Our current meta-analysis gives further evidence for an independent and negative effect of immigration detention on mental health.

### Immigration detention and the aversive impact on mental health

The literature states that exposure to trauma, especially torture, is linked to PTSD symptoms in a dose-dependent manner, and the severity of pre-migration war-related traumatic events negatively influence trauma-related mental health, such as depression, anxiety and PTSD.[32,55,56] However, trauma as a stressor cannot solely explain the deterioration of refugees' and migrants' mental health. Contextual factors in the hosting country have a significant impact.[57,58] Symptoms of depression, anxiety and PTSD have been associated with post-migration factors, such as holding a temporary visa, insecurity about visa status, no access to health services and being separated from society.[13,59–61] Refugees and migrants who are integrated into society or hosted in a supportive environment experience fewer symptoms of depression, distress and PTSD than refugees and migrants separated from society.[27,61,62] Hence,

as expected, prevalence rates of depression and PTSD are higher among non-detained refugees and migrants than among non-refugee or migrant populations.[10,63,64] Given lack of experimental control, it remains inconclusive whether immigration detention causally elicits or exacerbates anxiety, depression and PTSD symptoms.

Keller and colleagues[48] published the first study that directly compared symptom scores within-subjects during detention and after being released from detention. They found that depression, anxiety and PTSD symptoms increased with detention length and decreased upon release. Our results did not yield a significant difference between symptoms during detention and post-detention and therefore do not support their finding. In a longitudinal study on asylum seekers holding a temporary protection visa released from immigration detention, Steel and colleagues[34] found that overall mental health did not improve or even deteriorated further 2 years upon release, compared with after being released from detention. Prospective studies investigating whether mental health improves or deteriorates upon release from detention are scarce. Future research should investigate the development and the content of the PTSD, depression and anxiety symptoms in detained and released refugees and migrants to shed more light on the theoretical explanation of elevated levels of depression, anxiety and PTSD.

### Strengths and limitations

A strength of our meta-analysis is our broad approach (we included studies focusing on detained samples without a control group and studies using different assessment methods). Additionally, we implemented a comprehensive search strategy. We assume, therefore, that all relevant studies on the effect of immigration detention on refugees' and migrants' mental health were identified and included in the present meta-analysis.

The methodological score for most studies was good. All included studies were observational; hence, no causal conclusions can be drawn. However, ethical issues rule out the implementation of randomised controlled comparison studies on the impact of immigration detention on mental health. As the included studies used convenience, opportunity or snowball sampling, confounding factors are likely to have an impact on the results of the included studies.

Heterogeneity among studies was high, and the source of the high heterogeneity between studies remains mostly unclear. It is possible that differences between countries, detention centres, visa status or demographic characteristics of the sample accounted for the heterogeneity. Unfortunately, the data reported in the studies was insufficient to specify the impact of those variables, and moderator analyses to investigate their impact were most likely underpowered. Also, it is possible that country-specific policies, such as

defining refugees and migrants for an indefinite versus a definite time period, may lead to increased symptoms of depression, anxiety and PTSD. In addition, it is possible that symptoms differ when comparing detention centres managed by private companies compared with federal institutions. In the USA, for example, conditions in private immigration detention centres were less humane compared with federal immigration detention centres.[65] We had too little data on these potential moderator variables to actually perform such comparisons. Further studies are needed to investigate differences between refugee and migrant samples from different backgrounds and residing in different host countries and institutions.

One source of heterogeneity is the difference in sampling methods between studies. Ehntholt and colleagues[33] reported mental health data obtained from previously detained refugees who were in a legal process to get compensated for being unlawfully detained as minors. Participants were informed that the mental health assessment aimed to support their legal case. In the studies by Lorek and colleagues[52] and by Steel and colleagues,[51] participants responded to an advertisement for free legal assistance to challenge individual detention. Participants in these studies could have exaggerated their symptoms to increase their chances of compensation or being released. It is also possible that the detention's unlawful character increased symptoms of anxiety, depression and PTSD in the study by Ehntholt and colleagues[33] and that those who reached out for legal assistance in the samples studied by Lorek and colleagues[52] and Steel and colleagues[51] were most severely affected by immigration detention. Although the results were not significantly different when those three references were excluded from analysis, further research with greater statistical power is needed to exclude with certainty the possibility that symptoms were not higher in those samples.

Second, our results most likely do not provide a complete picture of the impact of immigration detention on mental health. Very few studies reported on psychiatric disorders other than depression, anxiety or PTSD. Previous research shows that disorders such as personality disorders and psychosis are more prevalent among detained than non-detained refugees and migrants.[47,50] However, more research on a broader spectrum of psychiatric disorders among refugees and detained migrants is needed to further shed light on this. Also, the pooled prevalence rates are based on samples from only five different countries. However, many other countries implement immigration detention and the conditions vary between detention. Prevalence rates for mental health disorders may be higher in detention centres that are known for their inhumane conditions. Australia, for example, is being criticised for their offshore detention policies.[66] A study that did not meet inclusion criteria because it was not peer reviewed showed that on Manus Island, 90% of detained asylum seekers report symptoms of depression, anxiety and PTSD.[67] An investigation by UNHCR revealed that almost 90% of asylum seekers in Papua New Guinea met criteria for depression and anxiety, and almost 80% of them for PTSD.[68] Other countries are infamous for their inhumane conditions in their detention centres. For example, in immigration detention centres in Libya,[69,70] detainees endure deprivation of food, water and medical supplies. They often report being sexually assaulted, raped and tortured.[71] Humanitarian organisations, such as Doctors without Borders or UNHCR, witness adverse effects on the detainees' mental health. However, to our knowledge, no empirical research on the detainees' mental health has been conducted yet. It is possible that prevalence rates are higher when studies are conducted in countries known for their inhumane conditions.

Third, among the studies that included a control group,[46,48,49] the samples differed considerably. Keller and colleagues[48]

administered a mixed design. They studied detained refugees and migrants and compared between- and within-subjects, including a follow-up, at which time part of the sample was released from detention. Their study did not match inclusion criteria. Cleveland & Rousseau[46] and Robjant and colleagues[49] included asylum seekers in community settings who had not been held in detention before as a control group. As a result of the scarceness of studies including a control group and the heterogeneity among those who did, pooled prevalence rates for depression, anxiety and PTSD could not be derived to directly compare detained and non-detained samples.

Fourth, using psychiatric concepts such as depression, anxiety and PTSD are limited in investigating the detainees' symptoms. Those concepts are subject to cultural bias. The instruments used may fail to consider culture-specific expressions of symptoms.[72] Additionally, some populations tend to report lower symptom scores compared with high-income populations. Those differences are unlikely to decrease the comparability between detained and non-detained refugees and migrants. However, when putting the prevalence rates into broader perspective and comparing them with the prevalence rates of high-income populations or other non-migrant populations, it is important to consider that the symptoms of detainees are most likely to be underreported.[73] Additionally, in clinical interviews and especially in self-report questionnaires, differentiating between emotional distress as a reaction to adverse circumstances and symptoms of an underlying mental disorder remains challenging.[36]

A final limitation is the lack of comparability between the prevalence data in our sample and the non-detained refugee and migrant sample from the most recent meta-analyses on refugee mental health by Henkelmann and colleagues[9] and Blackmore and colleagues.[10,45] These comparisons are not ideal because of the heterogeneity between samples. Such pooled prevalence data can, however, give a first indication for the direction of the impact of immigration detention. Further research is needed to draw more sound conclusions about the mental health of detained compared with non-detained refugees and migrants.

## Implications

In conclusion, immigration detention is associated with independent adverse effects on the mental health of refugees and migrants. Our results strengthen the findings of the previous systematic reviews[18,37,49,74] that immigration detention harms the mental health of detained refugees and migrants.

Refugees and migrants are a vulnerable sample owing to various pre- and peri-migration factors.[11–13] Based on our results, it could be argued that immigration detention should no longer be implemented to avoid further mental health deterioration. The aversive effects are likely to outweigh the reasons why some countries employ immigration detention. Countries claim to use immigration detention to guarantee that detainees are present at their proceedings, to ensure that they cannot be a flight risk when they are to be removed, to establish their identity, security status and their health.[15,21,22,75,76] Receiving countries should use alternative settings to host refugees and migrants. The Council of Europe[77] and the UNHCR[2] suggest different arrangements, such as community care, residential facilities or open settings in which forced migrants are required to regularly check-in with authorities. These alternatives are better equipped to host vulnerable populations, such as refugees and migrants, and offer them an adequate home with access to healthcare.[1] These arrangements serve the reasons for immigration detention mentioned above without leading to further deterioration in the mental health of refugees and migrants or even traumatising them.

https://doi.org/10.1192/bjo.2021.1026 Published online by Cambridge University Press

**Irina Verhülsdonk**, Faculty of Social and Behavioural Sciences, Clinical Psychology Department, Leiden University, the Netherlands; **Mona Shahab**, Faculty of Social and Behavioural Sciences, Clinical Psychology Department, Leiden University, the Netherlands and Department of Clinical Epidemiology, Leiden University Medical Center, the Netherlands; **Marc Molendijk** ⓘ, Faculty of Social and Behavioural Sciences, Clinical Psychology Department, Leiden University, the Netherlands and Leiden University Medical Center, Leiden Institute of Brain and Cognition, the Netherlands

**Correspondence:** Marc Molendijk, Email: m.l.molendijk@fsw.leidenuniv.nl

First received 19 Mar 2021, final revision 10 Sep 2021, accepted 11 Sep 2021

### Supplementary material

Supplementary material is available online at https://doi.org/10.1192/bjo.2021.1026.

### Data availability

The data that support the findings of this study are available upon request.

### Acknowledgements

We thank the anonymous reviewers for their constructive input and our colleagues at Leiden University for inspiration and the discussions on the topic on formal and informal occasions.

### Author contributions

I.V. and M.M. had full access to the data and takes responsibility for the integrity of the data and the accuracy of the results presented in this manuscript. Concept and design: all authors. Data acquisition and analysis: I.V. and M.M. Quality rating: I.V. and M.M. Drafting of the manuscript: I.V. and M.M. Critical revision of the manuscript for important intellectual content: all authors.

### Funding

This project was funded through continued support by Leiden University.

### Declaration of interest

The authors declare that there are no conflicts of interest.

### References

1 United Nations High Commissioner for Refugees (UNHCR). *UNHCR Beyond Detention Toolkit. Guiding Questions for the Assessment of Alternatives to Detention*. UNHCR, 2018 (https://www.refworld.org/docid/5b1e662d4.html).

2 United Nations High Commissioner for Refugees (UNHCR). *Figures at a Glance*. UNHCR, 2021 (https://www.unhcr.org/figures-at-a-glance.html).

3 United Nations High Commissioner for Refugees (UNHCR). *Guiding Principles on Internal Displacement*. UNHCR, 1998 (https://www.refworld.org/docid/3c3da07f7.html).

4 United Nations General Assembly. *Convention Relating to the Status of Refugees*. UN, 1951.

5 United Nations High Commissioner for Refugees (UNHCR). *UNHCR Master Glossary of Terms*. UNHCR, 2006 (https://www.refworld.org/docid/42ce7d444.html).

6 International Organization for Migration (IOM). Glossary on migration. *Int Migr Law* 2011; **25**: 1–114.

7 United Nations High Commissioner for Refugees (UNHCR). *'Refugees' and 'Migrants' – Frequently Asked Questions (FAQs)*. UNHCR, 2016 (https://www.unhcr.org/news/latest/2016/3/56e95c676/refugees-migrants-frequently-asked-questions-faqs.html#_ftn3).

8 United Nations General Assembly. *New York Declaration for Refugees and Migrants: Resolution adopted by the General Assembly on 19 September 2016*. UN General Assembly, 2016 (https://www.refworld.org/docid/57ceb74a4.html).

9 Henkelmann JR, de Best S, Deckers C, Jensen K, Shahab M, Elzinga B, et al. Anxiety, depression and post-traumatic stress disorder in refugees resettling in high-income countries: systematic review and meta-analysis. *BJPsych Open* 2020; **6**: e68.

10 Blackmore R, Boyle JA, Fazel M, Ranasinha S, Gray KM, Fitzgerald G, et al. The prevalence of mental illness in refugees and asylum seekers: a systematic review and meta-analysis. *PLoS Med* 2020; **179**: 1–24.

11 Fazel M, Wheeler J, Danesh J. Prevalence of serious mental disorder in 7000 refugees resettled in western countries: a systematic review. *Lancet* 2005; **365**: 1309–14.

12 Fazel M, Reed RV, Panter-Brick C, Stein A. Mental health of displaced and refugee children resettled in high-income countries: risk and protective factors. *Lancet* 2012; **379**: 266–82.

13 Hou WK, Liu H, Liang L, Ho J, Kim H, Seong E, et al. Everyday life experiences and mental health among conflict-affected forced migrants: a meta-analysis. *J Affect Disord* 2020; **264**: 50–68.

14 Sykiotou AP. *A Study of Immigration Detention Practices and the use of Alternative to Immigration Detention of Children*. Committee on Migration, Refugees and Displaced Persons of the Parliamentary Assembly of the Council of Europe, 2017 (https://edoc.coe.int/en/migration/7533-a-study-of-immigration-detention-practices-and-the-use-of-alternatives-to-immigration-detention-of-children.html).

15 United Nations High Commissioner for Refugees (UNHCR). *Beyond Detention: A Global Strategy to Support Governments to end the Detention of Asylum-Seekers and Refugees 2014–2019*. UNHCR, 2014. (https://www.unhcr.org/protection/detention/53aa929f6/beyond-detention-global-strategy-support-governments-end-detention-asylum.html).

16 Sampson R, Chew V, Mitchell G, Bowring L. *There Are Alternatives: A Handbook for Preventing Unnecessary Immigration Detention (Revised)*. Melbourne International Detention Coalition, 2015.

17 United Nations High Commissioner for Refugees (UNHCR). *Guidelines on the Applicable Criteria and Standards Relating to the Detention of Asylum-Seekers and Alternatives to Detention*. UNHCR, 2012 (https://www.refworld.org/docid/503489533b8.html).

18 Filges T, Montgomery E, Kastrup M. The impact of detention on the health of asylum seekers: a systematic review. *Res Soc Work Pract* 2018; **28**: 399–414.

19 United Nations High Commissioner for Refugees (UNHCR). *Global Strategy Beyond Detention*. UNHCR, 2020 (https://www.unhcr.org/protection/detention/5fa26ed64/unhcr-global-strategy-beyond-detention-final-progress-report-2014-2019.html).

20 Stefanelli JN. *Judicial Review of Immigration Detention in the UK, US and EU: From Principles to Practice*. Bloomsbury Publishing, 2020.

21 Enforcement And Removal Operations. *U.S. Immigration and Customs Enforcement Fiscal Year 2019 Enforcement and Removal Operations Report*. U.S. Immigration and Customs Enforcement, 2020 (https://www.ice.gov/sites/default/files/documents/Document/2019/eroReportFY2019.pdf).

22 Canada Border Services Agency. *Arrests, Detentions and Removals*. Government of Canada, 2020 (https://www.cbsa-asfc.gc.ca/security-securite/detent/menu-eng.html).

23 Australian Border Force. *Immigration Detention and Community Statistics Summary*. Australian Government Department of Home Affairs, 2021 (https://www.homeaffairs.gov.au/research-and-stats/files/immigration-detention-statistics-31-august-2021.pdf).

24 McLoughlin P, Warin M. Corrosive places, inhuman spaces: mental health in Australian immigration detention. *Health Place* 2008; **14**: 254–64.

25 Global Detention Project (GDP). *Country Report: Australia*. GDP, 2018 (https://www.globaldetentionproject.org/countries/asia-pacific/australia).

26 Home Office. *National Statistics: How Many People are Detained or Returned?* Gov.UK, 2020 (https://www.gov.uk/government/publications/immigration-statistics-year-ending-march-2020/how-many-people-are-detained-or-returned).

27 Broeders D. Return to sender?: administrative detention of irregular migrants in Germany and the Netherlands. *Punishm Soc* 2010; **12**: 169–86.

28 Khosravi S. Sweden: detention and deportation of asylum seekers. *Race Class* 2009; **50**: 38–56.

29 Coffey GJ, Kaplan I, Sampson RC, Tucci MM. The meaning and mental health consequences of long-term immigration detention for people seeking asylum. *Soc Sci Med* 2010; **70**: 2070–79.

30 Puthoopparambil SJ, Ahlberg BM, Bjerneld M. "A prison with extra flavours": experiences of immigrants in Swedish immigration detention centres. *Int J Migr Health Soc Care* 2015; **11**: 73–85.

31 Procter NG, Kenny MA, Eaton H, Grech C. Lethal hopelessness: understanding and responding to asylum seeker distress and mental deterioration. *Int J Ment Health Nurs* 2018; **27**: 448–54.

32 Steel Z, Silove D, Brooks R, Momartin S, Alzuhairi B, Susljik I. Impact of immigration detention and temporary protection on the mental health of refugees. *Br J Psychiatry* 2006; **188**: 58–64.

33 Ehmholt KA, Trickey D, Hendriks JH, Chambers H, Scott M, Yule W. Mental health of unaccompanied asylum-seeking adolescents previously held in British detention centres. *Clin Child Psychol Psychiatry* 2018; **23**: 238–57.

34 Steel Z, Momartin S, Silove D, Coello M, Aroche J, Tay KW. Two year psychosocial and mental health outcomes for refugees subjected to restrictive or supportive immigration policies. *Soc Sci Med* 2011; **72**: 1149–56.

35 Triggs G. Mental health and immigration detention. *Med J Aust* 2013; **199**: 721–2.

https://doi.org/10.1192/bjo.2021.1026 Published online by Cambridge University Press

36  Newman LK, Steel Z. The child asylum seeker: psychological and developmental impact of immigration detention. *Child Adolesc Psychiatr Clin N Am* 2008; **17**: 665–83.

37  von Werthern MV, Robjant K, Chui Z, Schon R, Ottisova L, Mason C, et al. The impact of immigration detention on mental health: a systematic review. *BMC Psychiatry* 2018; **18**: 382–401.

38  United Nations High Commissioner for Refugees (UNHCR). *Progress Report 2018: a Global Strategy to Support Governments to end the Detention of Asylum-Seekers & Refugees, 2014–2019.* UNHCR, 2019 (https://www.unhcr.org/protection/detention/5c934bbd7/unhcr-global-strategy-beyond-detention-progress-report-2018.html).

39  Moher D, Shamseer L, Clarke M, Ghersi D, Liberati A, Petticrew M, et al. Preferred reporting items for systematic review and meta-analysis protocols (PRISMA-P) 2015 statement. *Syst Rev* 2015; **4**: 1–9.

40  Bramer WM, Rethlefsen ML, Kleijnen J, Franco OH. Optimal database combinations for literature searches in systematic reviews: a prospective exploratory study. *Syst Rev* 2017; **6**: 245–57.

41  Filges T, Lindstrom M, Montgomery E, Kastrup M, Jørgensen AK. PROTOCOL: The impact of detention on the health of asylum seekers: a protocol for a systematic review. *Campbell Syst Rev* 2017; **13**: 1–51.

42  National Institutes of Health. *Quality Assessment Tool for Observational Cohort and Cross-Sectional Studies.* National Institutes of Health, 2014 (https://www.nhlbi.nih.gov/health-pro/guidelines/in-develop/cardiovascular-risk-reduction/tools/cohort).

43  Viechtbauer W. Conducting meta-analyses in R with the metafor package. *J Stat Softw* 2010; **36**: 1–48.

44  Metelli S, Chaimani A. Challenges in meta-analyses with observational studies. *Evid Based Ment Health* 2020; **23**: 83–7.

45  Blackmore R, Gray KM, Boyle JA, Fazel M, Ranasinha S, Fitzgerald G, et al. Systematic review and meta-analysis: the prevalence of mental illness in child and adolescent refugees and asylum seekers. *J Am Acad Child Adolesc Psychiatry* 2020; **59**: 705–14.

46  Cleveland J, Rousseau C. Psychiatric symptoms associated with brief detention of adult asylum seekers in Canada. *Can J Psychiatry* 2013; **58**: 409–16.

47  Graf M, Wermuth P, Häfeli D, Weisert A, Reagu S, Pflüger M, et al. Prevalence of mental disorders among detained asylum seekers in deportation arrest in Switzerland and validation of the brief jail mental health screen BJMHS. *Int J Law Psychiatry* 2013; **36**: 201–6.

48  Keller AS, Rosenfeld B, Trinh-Shevrin C, Meserve C, Sachs E, Leviss JA, et al. Mental health of detained asylum seekers. *Lancet* 2003; **362**: 1721–23.

49  Robjant K, Robbins I, Senior V. Psychological distress amongst immigration detainees: a cross-sectional questionnaire study. *Br J Clin psychol* 2009; **48**: 275–86.

50  Sen P, Arugnanaseelan J, Connell E, Katona C, Khan AA, Moran P, et al. Mental health morbidity among people subject to immigration detention in the UK: a feasibility study. *Epidemiol Psychiatr Sci* 2018; **27**: 628–37.

51  Steel Z, Momartin S, Bateman C, Hafshejani A, Silove DM, Everson N, et al. Psychiatric status of asylum seeker families held for a protracted period in a remote detention centre in Australia. *Aust N Z J Public Health* 2004; **28**: 527–36.

52  Lorek A, Ehntholt K, Nesbitt AW, Emmanuel G, Chipo RE, Wickramasinghe R. The mental and physical health difficulties of children held within a British immigration detention center: a pilot study. *Child Abuse Negl* 2009; **33**: 573–85.

53  McHugh ML. Interrater reliability: the kappa statistic. *Biochem Med* 2012; **22**: 276–82.

54  Salk RH, Hyde JS, Abramson LY. Gender differences in depression in representative national samples: meta-analyses of diagnoses and symptoms. *Psychol Bull* 2017; **143**: 783–822.

55  Carlsson J, Sonne C. Mental health, pre-migratory trauma and post-migratory stressors among adult refugees. In *Mental Health of Refugee and Conflict-Affected Populations* (eds N Morina, A Nickerson): 15–35. Cham: Springer International Publishing, 2018.

56  Silove D, Sinnerbrink I, Field A, Manicavasagar V, Steel Z. Anxiety, depression and PTSD in asylum-seekers: associations with pre-migration trauma and post-migration stressors. *Br J Psychiatry* 1997; **170**: 351–57.

57  Porter M, Haslam N. Predisplacement and postdisplacement factors associated with mental health of refugees and internally displaced persons: a meta-analysis. *JAMA* 2005; **294**: 602–12.

58  Wright AM, Dhalimi A, Lumley MA, Jamil H, Pole N, Arnetz JE, et al. Unemployment in Iraqi refugees: the interaction of pre and post-displacement trauma. *Scand J Psychol* 2016; **57**: 564–70.

59  Nickerson A, Steel Z, Bryant R, Brooks R, Silove D. Change in visa status amongst Mandaean refugees: Relationship to psychological symptoms and living difficulties. *Psychiatry Res* 2011; **187**: 267–74.

60  Newnham EA, Pearman A, Olinga-Shannon S, Nickerson A. The mental health effects of visa insecurity for refugees and people seeking asylum: a latent class analysis. *Int J Public Health* 2019; **64**: 763–72.

61  Iversen VC, Morken G. Differences in acute psychiatric admissions between asylum seekers and refugees. *Nord J Psychiatry* 2004; **58**: 465–70.

62  Jakobsen M, Meyer DeMott MA, Wentzel-Larsen T, Heir T. The impact of the asylum process on mental health: a longitudinal study of unaccompanied refugee minors in Norway. *BMJ Open* 2017; **7**: 1–8.

63  Koenen KC, Ratanatharathorn A, Ng L, McLaughlin KA, Bromet EJ, Stein DJ, et al. Posttraumatic stress disorder in the world mental health surveys. *Psychol Med* 2017; **47**: 2260–74.

64  Kessler RC, Aguilar-Gaxiola S, Alonso J, Chatterji S, Lee S, Ormel J, et al. The global burden of mental disorders: an update from the WHO World Mental Health (WMH) surveys. *Epidemiol Psichiatr Soc* 2009; **18**: 23–33.

65  United States Commission on Civil Rights (USCCR). *With Liberty and Justice for All. The State of Civil Rights at Immigration Detention Facilities.* USCCR, 2015 (https://www.usccr.gov/pubs/docs/Statutory_Enforcement_Report2015.pdf).

66  Global Detention Project (GDP) and Asia Pacific Refugee Rights Network. *Joint Submission to the Universal Periodic Review: Papua New Guinea.* GDP, 2021 (https://www.globaldetentionproject.org/joint-submission-to-the-universal-periodic-review-papua-new-guinea).

67  Sundram S, Ventevogel P. The mental health of refugees and asylum seekers on Manus Island. *Lancet* 2017; **390**: 2534–6.

68  United Nations High Commissioner for Refugees (UNHCR). *Submission by the Office of the United Nations High Commissioner for Refugees on the Inquiry into the Serious Allegations of Abuse, Self-Harm and Neglect of Asylum-Seekers in Relation to the Manus Regional Processing Centre.* UNHCR, 2016 (https://www.unhcr.org/583e2da34.pdf).

69  Doctors without Borders. *Refugees Face Death, Disease, and Despair in Libya's Detention Centers.* Doctors without Borders, 2019 (https://www.doctorswithoutborders.org/what-we-do/news-stories/story/refugees-face-death-disease-and-despair-libyas-detention-centers).

70  United Nations High Commissioner for Refugees (UNHCR). *'On this Journey, no One Cares if you Live or die' Abuse, Protection, and Justice Along the Routes Between East and West Africa and Africa's Mediterranean Coast.* UNHCR, 2020 (https://www.unhcr.org/protection/operations/5f2129fb4/journey-cares-live-die-abuse-protection-justice-along-routes-east-west.html).

71  Beşer ME, Elfeitori F. *Libya Detention Centres: A State of Impunity.* Migration Policy Center, 2018 ( https://aybu.edu.tr/ppm/contents/files/enesbeser.pdf).

72  Stevanovic D, Jafari P, Knez R, Franic T, Atilola O, Davidovic N, et al. Can we really use available scales for child and adolescent psychopathology across cultures? A systematic review of cross-cultural measurement invariance data. *Transcult Psychiatry* 2017; **54**: 125–52.

73  Silove D, Ventevogel P, Rees S. The contemporary refugee crisis: an overview of mental health challenges. *World Psychiatry* 2017; **16**: 130–9.

74  Storm T, Engberg M. The impact of immigration detention on the mental health of torture survivors: a systematic review. *Eur Psychiatry* 2013; **28**: A4778.

75  Canada Border Services Agency. *Annual Detention, Fiscal Year 2019 to 2020.* Government of Canada, 2020 (https://www.cbsa-asfc.gc.ca/security-securite/detent/stat-2019-2020-eng.html).

76  Silverman SJ, Griffiths M, Walsh PW. Immigration detention in the UK. *Migration Observatory,* 2020 (https://migrationobservatory.ox.ac.uk/resources/briefings/immigration-detention-in-the-uk/#:~:text=Policy%20reasons%20for%20detaining%20typically,to%20be%20'conducive%20to%20the).

77  Council of Europe. *Alternatives to Immigration Detention: Fostering Effective Results.* Council of Europe, 2019 (https://rm.coe.int/migration-practical-guide-alternatives-migration/1680990236).







May 25, 2022

Submitted via https://www. regulations.gov

Rená Cutlip-Mason
Chief
Division of Humanitarian Affairs
Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
5900 Capital Gateway Drive
Camp Springs, MD 20588

RE: DHS Docket No. USCIS-2021-0012, Comments on Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers

Dear Ms. Cutlip-Mason,

The American Psychological Association (APA), the leading scientific and professional organization representing psychology in the United States, with more than 133,000 researchers, educators, clinicians, consultants and students as its members, submits these comments in response to the Department of Homeland Security's (DHS) proposed interim final rule, DHS Docket No. USCIS-2021-0012, on Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers. We applaud the Administration's willingness to revise the proposed rule to improve the system for immigrants entering the country.

While we emphasize the importance of psychological expertise, we also want to mention the importance of limiting detention or at least limiting the amount of time individuals are held. While we appreciate the Department's emphasis on making the process more efficient, the expedited timeline should allow for sufficient time to allow immigrants to prepare for their hearings and proceedings. Also, we wish to emphasize the psychological importance of keeping families together.

**Importance of Psychological Expertise**

Border patrol officers, immigration enforcement officers, adjudicators and immigration judges are rarely trained to make educated assessments of credible or reasonable fear when dealing with immigrants applying for immigration relief.[1] Assessment of fear is a complex area of psychological expertise. Psychologists assessing credible fear utilize specialized methods and instruments that together with their cultural competence training helps them understand the individual's psychological picture. For instance, it is not unusual that when recounting traumatic experiences, an individual engages in self-protective strategies which may include minimization, dissociation of emotions, forgetfulness, resistance, or emotional disorganization that may confuse an untrained observer and lead them to misunderstand, understate, or ignore bona fide symptoms of credible fear to return to their country.[2]

In particular, these self-protective mechanisms can limit clear memory of traumatic events and make it difficult for such individuals to reveal their experience in a coherent fashion. Many refugees suffer from post-traumatic stress disorder, depression, anxiety, or other mental health difficulties in addition to the fact that they are in the process of making sense of the new country and the strangers with whom they are interacting.[3] These are all important factors to consider when the immigrants are being evaluated. The role of psychologists during this process cannot be forgotten either. Given these considerations, we would recommend having as many mental health experts available as possible during these proceedings.

**Expedited Timeline**

The expedited timeline proposed by the Department is problematic and may lead to streamlined removals because it demands the applicant proceed in an organized and systematic manner to relate their fears and experiences that prevent them from returning to their country safely. This process does not seem to take into consideration the manner in which trauma effects interfere with memory.[4] If an individual is forced to narrate their fears and experiences of trauma before they have had time to heal, it is likely that the asylum applicant may not be able to communicate effectively with officials and service providers, inadvertently omitting key events that are essential to the finding of credible or reasonable fear. One of the key elements of a trauma diagnosis is the avoidance of reminders of past trauma.[5] This is particularly challenging for young adults because the biological development of the brain, particularly those areas related to

---

[1] Filone, S. & DeMatteo, D. (2017) Assessing "credible fear": A psychometric examination of the Trauma Symptom Inventory-2 in the context of immigration court evaluations. *Psychological Assessment,* 29 (6), 701-709.

[2] Filone, S.

[3] Filone, S.

[4] Scott, J., et al., (2015) A Quantitative Meta-Analysis of Neurocognitive Functioning in Posttraumatic Stress Disorder, 141 Psych. Bulletin 105.

[5] Pechtel P. & Pizzagalli, D., (2010), Effects of early life stress on cognitive and affective function: An integrated review of human literature, 214 Psychopharmacology 55.

cognition, memory, and executive functioning, continues beyond the age of 18 and into the mid- or late-20s.[6]

## Holding Time and Psychological Impacts

We appreciate the Department's efforts to limit the amount of time immigrants are held in detention. The mental health problems that children and families experience as a result of family detention are well documented.

It is important for the mental health of immigrants to avoid detention during the credible and reasonable fear process. Unless there are extreme circumstances, detention should be minimized to avoid creating greater stress for the immigrants and worsening their mental health conditions. Many immigrants have experienced some form of trauma, but trauma affects a person in a variety of ways.[7] Because many immigrants experience traumatic and stressful events throughout the migration journey, they may not demonstrate any symptoms or experience the scope of their emotions, including credible and reasonable fear to return to their country, until they are in a safe environment.[8] Detention may not always make the immigrant feel safe and immigrants may present with blunted affect and suppression of their emotions due to the stress of their detention. It is important not to equate a blunted affect, suppression of symptoms, or personal minimization, with an underestimation of the impact of their traumatic experiences and fear.[9]

If it is absolutely necessary to detain immigrants, we cannot underscore enough the importance of considering the mental health of the detainees and the strong possibility that the longer individuals are held, the more likely their mental health will suffer – this is especially the case for children.[10] Prolonged family detention could also damage the primary relationship between parents and children because a child has many non-parental authority figures in detention centers.[11] Not only is the child likely to disregard the parents as strong authority figures the longer the period of detention, but this is also true for the parents' view of themselves. Meaningful access to trauma-informed mental health care is critical to ensure that both adult and child survivors of trauma heal and ultimately achieve self-sufficiency. The longer survivors go without such desperately needed services, the more challenging the healing process may be.[12]

[6] Pechtel, P.

[7] Bailey, C.A., McIntyre., E., Arreola, A., & Venta, A. (2019). What are we missing? A glance at immigrant narratives in two languages. *Journal of Child and Adolescent Trauma.* https://doi.org/10.1007/s40653-019-00263-3.

[8] Venta, A., (2016). Migration experiences interview (unpublished manuscript). Department of Psychology & Philosophy, Sam Houston State University.

[9] Evans, F.B. & Hass, G. (2018). Forensic Psychological Assessment in Immigration Court: A Guidebook for Evidenced Based and Ethical Practice. New York: Routledge.

[10] Cervantes, W. (2015). Family detention: The harmful impact on children, *First Focus,* https://firstfocus.org/wp-content/uploads/2015/07/Family-Detention.pdf.

[11] Cervantes, W., (2015).

[12] Barbash, E., Overcoming sexual assault: Symptoms and recovery. *Psychology Today.* April 18, 2017. https://www.psychologytoday.com/us/blog/trauma-and-hope/201704/overcoming-sexual-assault-symptoms-recovery

**Family Separation**

We would also like to highlight the importance of keeping families together during this process. Based on evidence of the psychological harm of parent-child separation, we appreciate and urge the Department's continued commitment to the humane policy of keeping families together to protect immigrants from further trauma.

Decades of psychological research have determined that it is in the best interest of the child and parents to keep families together. Families fleeing their homeland to seek sanctuary in the United States are already under a tremendous amount of stress.[13] Sudden and unexpected family separation, such as separating families during immigration proceedings, can add to that stress, leading to emotional trauma for children.[14] Research also suggests that the longer children and parents are separated, the greater the reported symptoms of anxiety and depression are for children.[15] Therefore, continuing the practice of keeping families together is vital to their mental health.

Thank you for the opportunity to comment on this important issue. Should you have any questions, please feel free to contact Serena Dávila at sdavila@apa.org.

Sincerely,

Katherine B. McGuire
Chief Advocacy Officer
American Psychological Association

---

[13] Chaundry, A. (2011). Children in the aftermath of immigration enforcement. *The Journal of the History of Childhood and Youth*, 4 (1), 137-154.

[14] Dreby, J. (2012). The burden of deportation on children in Mexican immigrant families. *Journal of Marriage and Family,* 74, 829- 845. doi:10:1111/j.1741-3737.2012.00989x.

[15] Suárez-Orozco, C., Bang, H.J. & Kim, H.Y. (2010). I felt like my heart was staying behind: Psychological implications of family separations and reunifications for immigrant youth. *Journal of Adolescent Research,* 26 (2), 222-257.

# A Congressional Oversight Committee Found That ICE Detainees Died After Receiving Poor Medical Care

"While the medical examiner ruled the cause of death 'undetermined,' the complete lack of medical leadership, supervision and care that this detainee was exposed to is simply astonishing," the report states.



**Hamed Aleaziz**
BuzzFeed News Reporter

Updated on September 24, 2020 at 6:35 pm
Posted on September 24, 2020 at 5:03 pm

      Be one of the first to comment



*A detainee receives dental treatment at the Adelanto ICE Processing Center in California, a facility privately operated by the Geo Group, in 2019.*

*Chris Carlson / AP*

The House Oversight Committee has found that ICE detainees died after receiving inadequate medical care and that jail staff "falsified records to cover up" issues, according to a report released on Thursday.

Committee staffers visited several for-profit detention centers during the course of their investigation and reviewed 60,000 pages of records related to the care of immigrants. The report also frequently cited in its findings a <u>memo obtained by BuzzFeed News</u> that revealed a whistleblower's complaint alleging that care at several facilities overseen by ICE was so dire, it resulted in two preventable surgeries, including an 8-year-old boy who had to have part of his forehead removed, and contributed to four deaths.

ADVERTISEMENT



**Get AT&T Fiber®**

Now with Hyper-Gig speeds.

Sponsored by **AT&T Fiber**

Learn more

The allegations in the whistleblower memo are still being investigated by Congress, according to the report released Thursday.

"The Committee's investigation shines a critical new light on the failures of the Administration's immigration detention system and the deaths of immigrants in custody," said Rep. Carolyn Maloney, chair of the committee. "This staff report and the documents the Committee obtained explain how the Administration and its private prison contractors have let known problems fester into a full-blown crisis — a crisis that has become far worse during the coronavirus pandemic."

ICE has come under fire in recent years for issues related to medical care provided within its detention centers. The agency's detention system relies on a variety of methods to provide medical care. In some facilities, ICE provides it directly; in others, it has a few ICE employees assist private or public contractors; and in many, it oversees care provided by a contractor.

The committee staff focused much of its efforts on immigrants in for-profit detention facilities and the deaths of immigrant detainees.

Committee staffers found that Huy Chi Tran, a 47-year-old man who died in June 2018 at the Eloy Detention Center in Arizona — operated by private contractor CoreCivic — had been placed in solitary confinement.

"CoreCivic detention staff were supposed to check on Mr. Tran every 15 minutes, but the detention officer on duty left Mr. Tran unsupervised for 51 minutes just before Mr. Tran's cardiac arrest that led to his death," the report found, citing an internal ICE

document. "Investigators found that the officer falsified observation logs to hide the fact that he had failed to conduct welfare checks over that 51-minute period."

ADVERTISEMENT



*Detainees talk on telephones at the Adelanto ICE Processing Center in California.*

*Chris Carlson / AP*

The report cited the whistleblower memo obtained by BuzzFeed News that stated that "ICE health officials were 'informed of multiple concerns regarding the care provided at the facility, particularly the facility's psychiatrist misdiagnosing, failing to treat detainees appropriately, and the lack of readily available emergency medications.'"

The report also highlighted the death of Kamyar Samimi, a 64-year-old man who died in late 2017 at the Aurora ICE Processing Center in Colorado, which is operated by Geo Group. The committee obtained an ICE death review and the Department of Homeland Security's Office for Civil Rights and Civil Liberties report on the matter, both of which documented deficiencies at the facility.

For example, the ICE report found that facility staff "failed to transfer Samimi to an ER even though he exhibited life-threatening withdrawal symptoms during the week following his intake," and that nurses in charge of his care were not trained in understanding opioid withdrawal symptoms.

"While the medical examiner ruled the cause of death 'undetermined,' the complete lack of medical leadership, supervision and care that this detainee was exposed to is simply astonishing and stands out as one of the most egregious failures to provide optimal care in my experience," a medical expert examining the case found. "The magnitude of failures to care for this detainee is only surpassed by the number of such failures."

The committee also examined the case of Vicente Caceres-Maradiaga, 46, who died at the Adelanto Detention Facility in May 2017 of an enlarged heart and liver. His blood pressure went "unmonitored while detained," the committee report states.

ADVERTISEMENT

**Schedule a demo and start your free trial now.**



See why thousands of immigration lawyers have
already switched to Docketwise. Docketwise is the...

Sponsored by **Docketwise**

Learn more

The congressional investigators obtained an internal report from the DHS Office for
Civil Rights and Civil Liberties that found: "The failure to hire an effective and qualified
clinical leader contributed to the inadequate detainee medical care that resulted in
medical injuries, including bone deformities and detainee deaths, and continues to
pose a risk to the safety of other detainees at ACF."

Committee staffers said the documents they obtained showed that there were "glaring
deficiencies" with the medical care provided to detainees and cited issues included in
an ICE report at a facility in Ohio as an example.

"This report substantiated an allegation of an 'unacceptably long' delay in treatment
for a detainee with possible lymph node cancer even after an outside doctor wrote to
the facility stressing the urgency of treatment," the committee wrote. "The report
concluded, 'This delay and [*sic*] resulted in an effective denial in access to care for a
serious medical condition.'"





*A detainee waits in a locked intake holding area at an ICE detention center in Tacoma, Washington.*

*Associated Press*

The report also documented general issues with the conditions within government detention facilities.

"Many ICE facilities, including those that house children, have had repeated sanitation problems, including dirty and moldy bathrooms, insufficient clean clothing, unsanitized dishes, dirty food preparation and service areas, and a lack of soap, toilet paper, paper towels, clean razors, and other hygiene items," the report states.

Stacey Daniels, ICE's director of public affairs, said in a statement that the agency "is fully committed to the health and safety of those in our care and will review the committee's report."

"However, it is clear this one-sided review of our facilities was done to tarnish our agency's reputation, as opposed to actually reviewing the care detainees receive while in our custody," she added. "Improvements to civil detention are based on concrete recommendations from the DHS Office of Inspector General (OIG) and an aggressive inspections program, which includes formal facility inspections, independent third-party compliance reviews, daily on-site compliance reviews and targeted site visits. The agency also maintains a toll-free service that provides a direct channel for detainees, their attorneys, and other stakeholders to communicate with ICE about detainee concerns or conditions of confinement."

ADVERTISEMENT



**Schedule a demo and start your free trial now.**

See why thousands of immigration lawyers have

54


This is Docketwise.

already switched to Docketwise. Docketwise is the...

Sponsored by **Docketwise**

Learn more

In a statement, Geo Group said it "strongly reject[s] these baseless allegations, which are part of another politically driven report that ignores more than three decades of providing high-quality services to those in [its] care."

"The Adelanto ICE Processing Center provides safe and humane residential care and high quality 24/7 medical services," a company spokesperson said. "The health services department at the center employs approximately 79 health services professionals, including; three doctors, five dental professionals, and forty-three nurses, as well as seven mental health professionals, including two psychiatrists.

"In 2019, the health services team provided more than 54,000 medical encounters, over 3,100 dental encounters, and over 20,000 mental health encounters to individuals at the center. In all of 2019, the center processed approximately 8,000 individuals in and approximately 8,200 individuals out of the center."

A CoreCivic spokesperson also said the company "is committed to the safety and health of every individual in our care."

"We don't provide the healthcare in the majority of our immigration facilities. In most cases, comprehensive medical, mental health and dental care is provided for by the ICE Health Services Corps," the spokesperson said in a statement. "Where we do provide care, our clinics are staffed with licensed, credentialed doctors, nurses and mental health professionals who contractually meet the highest standards of care."

ICE officials have long said that they are dedicated to providing timely and comprehensive medical care to immigrants in their custody, noting that they have access to a daily sick call and 24-hour emergency care.

The agency has also been criticized for its handling of the coronavirus pandemic in detention facilities.

Since the beginning of the pandemic, detainees and immigrant advocates have highlighted the health threats posed by the highly contagious disease for those in ICE custody. The agency has attempted to assure congressional officials and the public that it has carefully examined the issue and has even released certain "vulnerable" detainees as a precaution.

Earlier this week, a separate committee report issued by the House Homeland Security Committee found that ICE detainees are often given deficient medical care and that detention centers use segregation as a threat against immigrants.

---

## Want to see more from __Politics__?

| No | Yes |
|----|-----|

---

**MORE ON THIS**



**A Child's Forehead Partially Removed, Four Deaths, The Wrong Medicine — A Secret Report Exposes Health Care For Jailed Immigrants**



**ICE Often Gives Detained Immigrants Poor Medical Care And Uses Segregation As Punishment, A New Report Says**

**A Judge Ordered Him Released From Prison Due To COVID-19 Concerns. He Died Of The Disease Two Months Later In ICE Custody.**



...orter

Contact [Hamed Aleaziz](#) at [hamed.aleaziz@buzzfeed.com](#).

Got a confidential tip? 👉 [Submit it here](#)

# incoming

Your weekday morning guide to breaking news, cultural analysis, and everything in between

Your email address

Sign up

This site is protected by reCAPTCHA and the Google [Privacy Policy](#) and [Terms of Service](#) apply.

## 0 comments

- **Sign in to comment**

**MORE FROM BUZZFEED**

C

# Mental Health – Initial or Follow-Up Visit

**Inmate/Resident Name:** SERBAT BOZKUS    **Number** 220712429 – ICE    **DOB** 01/01/1992

**Facility:** Cibola County Correctional Facility    **Date:** 05/17/2022

## SUBJECTIVE (Check all that apply.)

1) Reason for this visit: ☐ Initial   ☑ Follow-up
2) Referral source:
   ☐ Sick Call   ☐ Intake   ☐ Medical staff   ☐ Security   ☑ Follow-up
3) Chief complaint:
   ☑ Depression    ☑ Anxiety    ☐ Psychosis    ☐ Irritability
   ☐ Fear    ☐ Anger    ☑ Sleeplessness    ☐ Decrease energy
   ☐ Thoughts of self-injury    ☐ Drug withdrawal    ☐ Change in appetite    ☐ Poor concentration
   ☐ Other

4) Please describe current signs and symptoms and/or responses to treatment:

Continued to Last Page

## OBJECTIVE (Check all that apply)

5) Please check all that apply

| | | | | | |
|---|---|---|---|---|---|
| Appearance: | ☑ Neat | ☐ Disheveled | ☐ Bizarre | ☑ Tense | ☐ Poised | ☑ Appropriate |
| Behavior: | ☑ Calm | ☐ Agitated | ☐ Paranoid | ☐ Restless | ☑ Cooperative | |
| Mood: | ☑ Depressed | ☑ Anxious | ☐ Labile | ☐ Euthymic | ☐ Frightened | |
| Affect: | ☐ Blunted | ☑ Within Normal Limits | ☐ Flat | ☐ Constricted | |
| Speech: | ☐ Rapid | ☐ Pressured | ☐ Mumbled | ☐ Soft | ☑ Normal | |
| Perception: | ☐ Hallucinations | ☐ Illusions | ☑ No Abnormalities | | |
| Thought process: | ☑ Organized | ☐ Racing | ☐ Loose Associations | ☐ Flight of Ideas | |
| Thought content: | ☐ Suicidal | ☐ Homicidal | ☐ Delusions | ☐ Paranoia | ☐ Phobias |

6) Oriented to person, place, and time: ☑ Yes   ☐ No   Specify

7) Concentration intact: ☑ Yes   ☐ No    Memory intact: ☑ Yes   ☐ No

8) Abstract thinking intact: ☑ Yes   ☐ No    Insight and judgment intact: ☑ Yes   ☐ No

9) Reliable history and information: Record ☑ Yes   ☐ No   From patient: ☑ Yes   ☐ No

Signature: Anne Ortiz, M.D.; May 17 2022  2:22PM MST (Author)

10) For new patients check all that apply:

☐ Prior mental health treatment      ☐ Recent suicidal/homicidal ideations
☐ History of psychiatric hospitalization      ☑ Current treatment with psychotropics
☐ Prior suicide attempt

11) Comments regarding result of AIMS assessment (if receiving antipsychotics / neuroleptics /phenothiazines):

12) Current Medications: ☑ Reviewed    Compliant with current medication regimen and/or treatment? ☑ No   ☐ Yes
   ** It is unacceptable to document "See MAR."     Medication name, Dosage and Frequency must be completed

Medication: Dose and Frequency

     Doxepin HCl - 10 MG Oral Capsule #30 Capsule, TAKE 1 CAPSULE BEDTIME, 2 refills
     OXcarbazepine 300 MG Oral Tablet #30 Tablet, 1QHS, 2 refills

Have medications or dosages changed over the past 8 weeks? ☑ No   ☐ Yes, Specify:

AM Medication Non-Compliance

Medication Allergies? ☐ No   ☑ Yes, List:

No Known Allergies

## ASSESSMENT

13) Diagnosis:

Continued to Last Page

Name: SERHAT BOZKUS        Inmate/Resident # 220712429 - ICE

Signature: Anne Ortiz, M.D.; May 17 2022 2:22PM MST (Author)

## Plan

14) Plan: Include new meds prescribed and/or dosage changes

Trileptal 300mg po qhs-Mood
Doxepin 10mg po qhs-Depression and PTSD caused sleep disturbance

*** Female offenders must have a pregnancy test prior to initiation of psychotropic medications

15) Follow-up:

16) Education:

| | | |
|---|---|---|
| Counseled on Medication Effects & S/E | ☑ Yes ☐ No | Counseled on Medication Compliance ☑ Yes ☐ No |
| Counseled on Signs of Toxicity | ☑ Yes ☐ No | Informed Consent for Medications ☑ Yes ☐ No |

17) Return visit: ☐ 2 weeks  ☑ 1 month  ☐ 3 months  ☐ other

(Order(s) must be written for next scheduled visit, to include laboratory testing, diet, medications, or other therapies)

**Name:** SERHAT BOZKUS          **Inmate/Resident #** 220712429 - ICE

Signature: Anne Ortiz, M.D.; May 17 2022  2:22PM MST (Author)

Page 3 of 5

60

*Please use this page to comment on findings from previous pages*

Continued from Subj 4 signs-symptoms-tx - "I am still having 4-5 nightmares every night after pacing in until 4 or 5 am. That is why I wasn't getting up to take the am medication. Taking the am medication and not having enough sleep makes me too sleepy in the day. So it is better not to take am medication. Being in jail here bring up all my fears of being put in jail and tortured. My stress keeps me from being able to watch TV or Spend time with others here. Even the officers ask how I am and say they are sorry that I am feeling so bad."

Continued from Assess 13 Diagnosis text - Chest wall pain
Chronic post-traumatic stress disorder (PTSD)
Major depression, recurrent
Mood problem
Neck pain
Perforation of tympanic membrane

Name: SERHAT BOZKUS

Inmate/Resident # 220712429 - ICE

Signature: Anne Ortiz, M.D.; May 17 2022  2:22PM MST (Author)

*Please use this page to comment on findings from previous pages*

Name: SERHAT BOZKUS    Inmate/Resident # 220712429 - ICE

Signature: Anne Ortiz, M.D.; May 17 2022  2:22PM MST (Author)

# Mental Health – Initial or Follow-Up Visit

**Inmate/Resident Name:** SERHAT BOZKUS        **Number** 220712429 - ICE     **DOB** 01/01/1992

**Facility:** Cibola County Correctional Facility        **Date:** 05/11/2022

## SUBJECTIVE (Check all that apply.)

1) Reason for this visit:    ☑ Initial    ☐ Follow-up
2) Referral source:
   ☐ Sick Call    ☑ Intake    ☐ Medical staff    ☐ Security    ☐ Follow-up
3) Chief complaint:

| | | | |
|---|---|---|---|
| ☑ Depression | ☑ Anxiety | ☐ Psychosis | ☐ Irritability |
| ☐ Fear | ☐ Anger | ☑ Sleeplessness | ☐ Decrease energy |
| ☐ Thoughts of self-injury | ☐ Drug withdrawal | ☐ Change in appetite | ☐ Poor concentration |
| ☐ Other | | | |

4) Please describe current signs and symptoms and/or responses to treatment:

Continued to Last Page

## OBJECTIVE (Check all that apply)

5) Please check all that apply

| | | | | | |
|---|---|---|---|---|---|
| Appearance: | ☑ Neat | ☐ Disheveled | ☐ Bizarre | ☑ Tense | ☐ Poised | ☑ Appropriate |
| Behavior: | ☑ Calm | ☐ Agitated | ☐ Paranoid | ☐ Restless | ☐ Cooperative | |
| Mood: | ☑ Depressed | ☑ Anxious | ☐ Labile | ☐ Euthymic | ☐ Frightened | |
| Affect: | ☐ Blunted | ☐ Within Normal Limits | ☐ Flat | ☑ Constricted | | |
| Speech: | ☐ Rapid | ☐ Pressured | ☐ Mumbled | ☐ Soft | ☑ Normal | |
| Perception: | ☐ Hallucinations | ☐ Illusions | ☑ No Abnormalities | | | |
| Thought process: | ☑ Organized | ☐ Racing | ☐ Loose Associations | ☐ Flight of Ideas | | |
| Thought content: | ☐ Suicidal | ☐ Homicidal | ☐ Delusions | ☐ Paranoia | ☐ Phobias | |

6) Oriented to person, place, and time:    ☑ Yes    ☐ No    Specify

7) Concentration intact:    ☑ Yes    ☐ No        Memory intact:    ☑ Yes    ☐ No

8) Abstract thinking intact:    ☑ Yes    ☐ No        Insight and judgment intact:    ☑ Yes    ☐ No

9) Reliable history and information:    Record ☑ Yes    ☐ No    From patient:    ☑ Yes    ☐ No

**Signature:** Anne Ortiz, M.D.; May 17 2022  1:53PM MST (Author)

10) For new patients check all that apply:

☐ Prior mental health treatment      ☐ Recent suicidal/homicidal ideations
☐ History of psychiatric hospitalization    ☒ Current treatment with psychotropics
☐ Prior suicide attempt

11) Comments regarding result of AIMS assessment (if receiving antipsychotics / neuroleptics /phenothiazines):

12) Current Medications: ☒ Reviewed    Compliant with current medication regimen and/or treatment? ☒ No   ☐Yes
   \*\* It is unacceptable to document "See MAR."     Medication name, Dosage and Frequency must be completed

Medication: Dose and Frequency

           OXcarbazepine 300 MG Oral Tablet #30 Tablet, 1QHS, 2 refills

Have medications or dosages changed over the past 8 weeks? ☒ No   ☐Yes, Specify:

Patient states he has not been AM compliant on Trileptal because it causes am drowsiness, but wants pm dose

Medication Allergies? ☐ No   ☒Yes, List:

No Known Allergies

## ASSESSMENT

13) Diagnosis:

Continued to Last Page

**Name:** SERRAT BOZKUS        **Inmate/Resident #** 220712429 - ICE

Signature: Anne Ortiz, M.D.; May 17 2022  1:53PM MST (Author)

## Plan

14) Plan:  Include new meds prescribed and/or dosage changes

Trileptal 300mg po qhs-Mood
Doxepin 10mg po qhs-Depression
Verbally consented for medication and AM medication that made him sleepy in the am was discontinued

*** Female offenders must have a pregnancy test prior to initiation of psychotropic medications

15) Follow-up:

16) Education:

| | | |
|---|---|---|
| Counseled on Medication Effects & S/E ☑ Yes ☐ No | Counseled on Medication Compliance ☑ Yes ☐ No |
| Counseled on Signs of Toxicity ☑ Yes ☐ No | Informed Consent for Medications ☑ Yes ☐ No |

17) Return visit: ☐ 2 weeks   ☑ 1 month   ☐ 3 months   ☐ other

(Order(s) must be written for next scheduled visit, to include laboratory testing, diet, medications, or other therapies)

Name: SERHAT BOZKUS _____  Inmate/Resident # 220712429 - ICE _____

Signature: Anne Ortiz, M.D.; May 17 2022  1:53PM MST (Author)

Page 3 of 5

65

Continued from Subj 4 signs-symptoms-tx - Discussed AM Medication NON-Compliance: Trileptal 300mg [1/2 Tablet] po BID:
Patient explained that medication makes him sleepy in the day, but does want it for the night.
"I am a Kurd. My dad was killed by the government when I was 2 y/o. My father was giving Kurdish classes for Kurdish
people at a time the Government made speaking in Kurdish illegal. My father also celebrated the Kurdish Holiday Newroz
which the Government also banded. Even saying Kurdish was banded. My 3 brothers were jailed and tortured by the police
and military working together. One of my brothers was tortured so severely he could not walk afterwards. The police and
military said of one of my 3 y/o noices would grow up to be a prostitute. I have almost died several times in Turkey.
Just walking down the street a police man tried to shoot me. I have feared the police and soldiers since I was 3 y/o
until now at 30 y/o. My university friends were arrested and detained in jail and tortured. The police would ask my
friends my where I was and if I was a terrorist. The Police and military picked me up several times, but did not take me
to the Police Station. They took me instead to random place where there was nobody and threatened me. I was studying
Civil Engineering and Justice and because I had to move around so much to not be found I would not have completed my two
degrees without the help from my professors. I even signed up for a third degree, but I had to flee from Turkey. I
finished my Justice degree with honors. I had to escape and leave without telling my sick mother and fiance whose mother
had just died and they both tell me I have left them. I don't understand, would they want me to be put in jail and
tortured and killed just to be in Turkey. Their logic is that I am in jail here anyway, but if I was in Turkey they would
be able to see me. I have only called my mom 4 or 5 times in 6 months because I don't want her to cry. My mom has
diabetes, urinary incontinence and I don't went to to hurt her heart by being here. I cannot sleep at night. I have
nightmares and I am depressed. I cannot even relax with the others. I walk around until 4 or 5am. The medication helps
but when I do finally sleep I will have 4 or 5 nightmares about being in Jail or my family in Turkey being harmed. I
actually cannot hear well out of my Left ear and have an old C-spine disc herniation and HTN.

Continued from Assess 13 Diagnosis text - Chest wall pain
Chronic post-traumatic stress disorder (PTSD)
Mood problem
Neck pain
Perforation of tympanic membrane

**Name:** SERRAT BOZKUS          **Inmate/Resident #** 220712429 - ICE

Signature: Anne Ortiz, M.D.; May 17 2022 1:53PM MST (Author)

Page 4 of 5

66

*Please use this page to comment on findings from previous pages*



**Name:** SERHAT   BOZKUS          **Inmate/Resident #** 220712429 - ICE

**Signature:** Anne Ortiz, M.D.; May 17 2022  1:53PM MST (Author)

# *Progress Note v11*

# Cibola County Correctional Facility
### 2000 Cibola Loop  P.O. Box 3540
### Milan, NM 87021
### (505) 285-4900

Inmate:      SERHAT BOZKUS
Inmate ID:      5985911
Age/DOB:      30/Jan 01, 1992
Agency No:      220712429 - ICE

**Allergies**
- No Known Allergies

**Vitals**
**Vital Signs**
** Printed in Appendix #1 below.

**Current Meds**
    1. Doxepin HCl - 10 MG Oral Capsule; TAKE 1 CAPSULE BEDTIME;
        Therapy: 17May2022-18Aug2022; Last Rx:17May2022 Ordered
    2. OXcarbazepine 300 MG Oral Tablet; 1QHS;
        Therapy: 17May2022-18Aug2022; Last Rx:17May2022 Ordered

**Subjective**
Patient presents for follow up L TM perforation and ear/neck pain
Interpreter 385388 Was used for the visit.

He states that before he left Turkey he was receiving treatment for his ruptured TM and was told he needed
surgery but ran away from Turkey and thought he would just get it done here but it has now been 7 months and he
has not had the surgery and his hearing is almost completely gone in that ear.
He reported pain in the ear and that radiates to his neck.

**Objective**
WDWN male in NAD
A/O x 4
Steady Gait
Using Agnes Otoscope, B TMs were evaluated
Right TM and canal with no erythma; All landmarks on TM were clearly visible.
L canal with erythma and TM perforation noted at 2:00. No drainage noted in canal.
S1S2 no MRG
CTA B

**Plan**
### Perforation of tympanic membrane
    • Miscellaneous Consult Offsite Miscellaneous Consult-Offsite  Offsite  Status:
      Unauthorized - Requires Authorization  Requested for: 01Jun2022
      Support for Order : 30 YO male with large perforation of TM on Left; per pt was diagnosed
        in Turkey 7 months ago and was scheduled for surgery but left the country before his
        surgery. Was evaluated in ortero County and TM was still perforated; pt was seen in clinic
        a few weeks ago and perf remained; still large TM and significant hearing loss.
      Type of Consult : ENT
Due to length of time of perforation and hearing loss, consult for ENT was completed today.

Pt was provided with extensive education regarding keeping the ear canal dry by using cotton and a/d ointment
when he showers. He denied vertigo but was advised that if vertigo occurs, to advise medical. Sit and rest while

# *Progress Note v11*

Inmate:      SERHAT BOZKUG
Inmate ID:      5985911
Age/DOB:      30/Jan 01, 1992
Agency No:      220712429 - ICE

vertigo passes and do not walk while dizzy. he verbalized understanding.
Patient denied need for further pain medication at this time.
Will F/U after ENT and PRN for change in sx or new issues or concerns. patient verbalized understanding and agreed with plan of care.

## Signatures

Electronically signed by : Tiffany Romero-Peralta, ACNS-BC; Jun 1 2022 10:36AM MST (Author)

Inmate: SERHAT BOZKUS
Inmate ID: 5985911
Age/DOB: 30/Jan 01, 1992
Agency No: 22071242-9 - ICE

Appendix #1

**Vital Signs**
Patient: BOZKUS, SERHAT; DOB: 1/1/1992; MRN: 5985911

| | Recorded: 01Jun2022 10:16AM | Recorded: 26May2022 06:02AM | Recorded: 20May2022 11:12AM | Recorded: 26Apr2022 11:45AM |
|---|---|---|---|---|
| Weight | 148 lb | | | |
| BMI Calculated | 20.27 kg/m2 | | | |
| BSA Calculated | 1.87 | | | |
| Systolic | 148 | | | |
| Diastolic | 105 | | | |
| Respiration | 20 | | | |
| Temperature | 96.9 F | | | |
| Heart Rate | 99 | | | |
| O2 Saturation | 95 | | | |
| Pulse Quality | | Normal | | |
| Systolic Lying | | | 137 | |
| Diastolic Lying | | | 98 | |
| Height | | | | 182 cm |
| Pain Scale | | | | |

# Cibola County Correctional Facility

2000 Cibola Loop, P.O. Box 3540
Milan, NM 87021
(505) 285-4900

Patient: BOZKUS, SERHAT

EMRN: 5985911
OMRN: 5985911

Age/DOB: 30 years  January 01, 1992

Home:
Work:

## Active Problems

| Problem Description | Managed By | Category Severity | Impression |
|---|---|---|---|
| Chest wall pain | | | |
| Chronic post-traumatic stress disorder (PTSD) | | | |
| Major depression, recurrent | | | |
| Mood problem | | | |
| Neck pain | | | |
| Perforation of tympanic membrane | | | |
| Suicide ideation | | | |

Report - Problem List

Page 1 of 1

Griego, Julie  2Jun-2022  1:20PM

Copyright © 2022 Allscripts Healthcare Solutions, Inc. and/or its affiliates. All rights reserved.

71

# *Clinic Note v11*

## Cibola County Correctional Facility
**2000 Cibola Loop  P.O. Box 3540**
**Milan, NM 87021**
**(505) 285-4900**

Inmate:      SERHAT BOZKU
Inmate ID:    5985911
Age/DOB:    30/Jan 01, 1992
Agency No:    220712429 - ICE

**Notes**

upon arrival inmate was in s supine position with eye closed breathing normally. responded his name he was
transported to medical, VS: 130/98, 98% on room air, pulse 104, temp 98.0, PERRLA.

**Signatures**
Electronically signed by : Felicia Hamilton, ; May 27 2022  7:20PM MST (Author)

*Progress Note v11*

# Cibola County Correctional Facility
### 2000 Cibola Loop P.O. Box 3540
### Milan, NM 87021
### (505) 285-4900

| | |
|---|---|
| Inmate: | SERHAT BOZKUS |
| Inmate ID: | 5985911 |
| Age/DOB: | 30/Jan 01, 1992 |
| Agency No: | 220712429 - ICE |

**Allergies**
- No Known Allergies

**Vitals**
**Vital Signs**
 ** Printed in Appendix #1 below.

**Current Meds**
1. Doxepin HCl - 10 MG Oral Capsule; TAKE 1 CAPSULE BEDTIME;
   Therapy: 17May2022-18Aug2022; Last Rx:17May2022 Ordered
2. OXcarbazepine 300 MG Oral Tablet; 1QHS;
   Therapy: 17May2022-18Aug2022; Last Rx:17May2022 Ordered

**Objective**
received orders from Dr. Ortiz to complete all suicide orders.

**Signatures**
Electronically signed by : Nicolas Arias, LPN; May 27 2022  1:09PM MST (Author)

*Progress Note v11*

Inmate:        SERHAT BOZKUS
Inmate ID:     5985911
Age/DOB:       30/Jan 01, 1992
Agency No:     220712429 - ICE

Appendix #1

**Vital Signs**
Patient: BOZKUS, SERHAT; DOB: 1/1/1992; MRN: 5985911

| | Recorded: 26May2022 06:02AM | Recorded: 20May2022 11:12AM | Recorded: 26Apr2022 11:45AM | Recorded: 22Apr2022 07:23PM |
|---|---|---|---|---|
| Systolic | 124, Sitting | | | |
| Diastolic | 76, Sitting | | | |
| Heart Rate | 78 | | | |
| Pulse Quality | Normal | | | |
| O2 Saturation | 98, Nasal Cannula | | | |
| Weight | | 149 lb | | |
| BMI Calculated | | 20.4 kg/m2 | | |
| BSA Calculated | | 1.87 | | |
| Systolic Lying | | 137 | | |
| Diastolic Lying | | 98 | | |
| Respiration | | 20 | | |
| Temperature | | 97.5 F | | |
| Height | | | 182 cm | |
| Pain Scale | | | | 8 |

Printed By: Julie Griego          2 of 2          Jun 2 2022  1:20PM

# *Progress Note v11*

## Cibola County Correctional Facility

**2000 Cibola Loop P.O. Box 3540**
**Milan, NM 87021**
(505) 285-4900

Inmate: SERHAT BOZKUS
Inmate-ID: 5985911
Age/DOB: 30/Jan 01, 1992
Agency No: 220712429 - ICE

**Allergies**

- No Known Allergies

**Vitals**
**Vital Signs**
** Printed in Appendix #1 below.

**Current Meds**

1. Doxepin HCl - 10 MG Oral Capsule; TAKE 1 CAPSULE BEDTIME;
   Therapy: 17May2022-18Aug2022; Last Rx:17May2022 Ordered
2. OXcarbazepine 300 MG Oral Tablet; 1QHS;
   Therapy: 17May2022-18Aug2022; Last Rx:17May2022 Ordered

**Subjective**
I want to kill myself I can't take it any more i can't sleep. i can't be here any more, I have been here six month and my mom is sick.

**Objective**
A&O X3 patient is sad and has tears in his eyes. Patient is speaking very softly. Patient making good eye contact.

**Assessment**
Suicidal Ideation

**Plan**
Called DR. Ortiz, patient placed on 1:1 constant watch.

*Progress Note v11*

Inmate: SERHAT BOZKUS
Inmate ID: 5985911
Age/DOB: 30/Jan 01, 1992
Agency No: 22071242 - ICE

Appendix #1

**Vital Signs**
Patient: BOZKUS, SERHAT; DOB: 1/1/1992; MRN: 5985911

| | Recorded: 26May2022 05:02AM | Recorded: 20May2022 11:12AM | Recorded: 26Apr2022 11:45AM | Recorded: 22Apr2022 07:23PM |
|---|---|---|---|---|
| Systolic | 124, Sitting | | | |
| Diastolic | 76, Sitting | | | |
| Heart Rate | 78 | | | |
| Pulse Quality | Normal | | | |
| O2 Saturation | 98, Nasal Cannula | | | |
| Weight | | 149 lb | | |
| BMI Calculated | | 20.4 kg/m2 | | |
| BSA Calculated | | 1.87 | | |
| Systolic Lying | | 137 | | |
| Diastolic Lying | | 98 | | |
| Respiration | | 20 | | |
| Temperature | | 97.5 F | | |
| Height | | | 182 cm | |
| Pain Scale | | | | 8 |

# *Progress Note v11*

# **Cibola County Correctional Facility**
### 2000 Cibola Loop  P.O. Box 3540
### Milan, NM 87021
### (505) 285-4900

Inmate:         SERHAT BOZKUS
Inmate ID:      5985911
Age/DOB:        30/Jan 01, 1992
Agency No:      220712429 - ICE

**Allergies**
- No Known Allergies

**Vitals**
**Vital Signs**
** Printed in Appendix #1 below.

**Current Meds**
1. OXcarbazepine 300 MG Oral Tablet (Trileptal); Take half of tab BID;
   Therapy: 24Apr2022-27Jul2022; Last Rx:24Apr2022 Ordered

**Subjective**
I have neck pain, high blood pressure and pain in my right ear. I can't drink more than a liter of water because its too cold and I felt dizzy just now and fell to the ground.I have been here for 6 month, my mother is sick and I need to go home. Can you release the information about my health to my attorney The doctor here told me that they can't do anything to help me, that i would have to be treated on the outside.

**Objective**
A&O X3, patient responded to sternal rub immediately when he was laying on another detainee lap on the floor. No acute deformities or injury found or reported.

**Assessment**
Anxiety
Requesting assistance to be released

**Plan**
Patient has mental health follow up and medical follow up scheduled. Patient educated of how to get his medical records to his attorney..

**Education**
Patient educated of how to get his medical records to his attorney..

*Progress Note v11*

Inmate:          SERHAT BOZKUS
Inmate ID:       5985911
Age/DOB:         30/Jan 01, 1992
Agency No:       220712429 - ICE

Appendix #1

**Vital Signs**
Patient: BOZKUS, SERHAT; DOB: 1/1/1992; MRN: 5985911

| | Recorded: 08May2022 12:07AM | Recorded: 28Apr2022 12:18PM | Recorded: 28Apr2022 08:58AM | Recorded: 26Apr2022 11:45AM |
|---|---|---|---|---|
| Systolic | 154, Supine | | | |
| Diastolic | 88, Supine | | | |
| Heart Rate | 62 | | | |
| Pulse Quality | Normal | | | |
| O2 Saturation | 96, RA | | | |
| Temperature | | 98 F | | |
| Weight | | | 154 lb | |
| BMI Calculated | | | 21.09 kg/m2 | |
| BSA Calculated | | | 1.9 | |
| Respiration | | | 20 | |
| Height | | | | 182 cm |
| Pain Scale | | | | |

Printed By: Julie Griego          2 of 2          Jun  2 2022  1:20PM

## *Progress Note v11*

# Cibola County Correctional Facility
### 2000 Cibola Loop  P.O. Box 3540
### Milan, NM 87021
### (505) 285-4900

| | |
|---|---|
| Inmate: | SERHAT BOZKUS |
| Inmate ID: | 5985911 |
| Age/DOB: | 30/Jan 01, 1992 |
| Agency No: | 220712429 - ICE |

**Allergies**
- No Known Allergies

**Vitals**
**Vital Signs**
 ** Printed in Appendix #1 below.

**Current Meds**
1. OXcarbazepine 300 MG Oral Tablet (Trileptal); Take half of tab BID; Therapy: 24Apr2022-27Jul2022; LastRx:24Apr2022 Ordered

*Progress Note v11*

| Inmate: | SERHAT BOZKUS |
|---|---|
| Inmate ID: | 5985911 |
| Age/DOB: | 30/Jan 01, 1992 |
| Agency No: | 220712429 - ICE |

Appendix #1

**Vital Signs**
Patient: BOZKUS, SERHAT; DOB: 1/1/1992; MRN: 5985911

| | Recorded: 08May2022 12:67AM | Recorded: 28Apr2022 12:16PM | Recorded: 28Apr2022 08:53AM | Recorded: 26Apr2022 11:45AM |
|---|---|---|---|---|
| Systolic | 154, Supine | | | |
| Diastolic | 88, Supine | | | |
| Heart Rate | 62 | | | |
| Pulse Quality | Normal | | | |
| O2 Saturation | 96, RA | | | |
| Temperature | | 98 F | | |
| Weight | | | 154 lb | |
| BMI Calculated | | | 21.09 kg/m2 | |
| BSA Calculated | | | 1.9 | |
| Respiration | | | 20 | |
| Height | | | | 182 cm |
| Pain Scale | | | | |

# *Clinic Note v11*

## Cibola County Correctional Facility
### 2000 Cibola Loop  P.O. Box 3540
### Milan, NM 87021
### (505) 285-4900

| | |
|---|---|
| Inmate: | SERHAT BOZKUS |
| Inmate ID: | 5985911 |
| Age/DOB: | 30/Jan 01, 1992 |
| Agency No: | 220712429 - ICE |

# *Clinic Note v11*

# **Cibola County Correctional Facility**
### 2000 Cibola Loop  P.O. Box 3540
### Milan, NM 87021
### (505) 285-4900

| | |
|---|---|
| Inmate: | SERHAT BOZKUS |
| Inmate ID: | 5985911 |
| Age/DOB: | 30/Jan 01, 1992 |
| Agency No: | 220712429 - ICE |

**Notes**

Patient brought down at the request of HSA Mr. Gober to discuss his mental and medical health care needs and concerns. He reports he is fine except that he met with Dr. Ortiz last week and she told him that she would write a note about his mental health and a nurse would give it to him. He was most concerned as to why he had not received that document. I informed him that that note was not available to me, that it would have to be given by the medical records department and signed for, he verbalized understanding of that information. I informed him that he would be seeing both mental health and the medical provider on 5/17/22 to go over his medical and mental health needs and concern. He reported he is really looking forward to seeing the medical provider to start taking care of his medical issues. He accepted all information well.

# *Clinic Note v11*

# **Cibola County Correctional Facility**
## 2000 Cibola Loop  P.O. Box 3540
## Milan, NM 87021
### (505) 285-4900

Inmate:       SERHAT BOZKUS
Inmate ID:    5985911
Age/DOB:    30/Jan 01, 1992
Agency No:   220712429 - ICE

**Notes**

IM brought to medical c/o of chest pain. Language lline called for help with translation. V/s:
EKG completed which was normal. He was told by interpreter that his EKG was normal. She stated that he refused to believe what was being said and stated he wanted to see a Doctor. He was told there were no providers available to see him at this time. He didn't have any s/s of distress or pain at this time. Im taken back to his unit. Will schedule the next available appt. for him with provider.

# *Clinic Note v11*

# Cibola County Correctional Facility
### 2000 Cibola Loop  P.O. Box 3540
### Milan, NM 87021
### (505) 285-4900

| | |
|---|---|
| Inmate: | SERHAT BOZKUS |
| Inmate ID: | 5985911 |
| Age/DOB: | 30/Jan 01, 1992 |
| Agency No: | 220712429 - ICE |

**Notes**

Medical officer called medical to indicating patient was having difficulty breathing. Arrived at housing unit patient sitting at table in day room, no acute respiratory distress observed. Vital 124/86, 75, 16, 97.6, 98%RA. Nurse will ask Dr. Ortiz to assess for anxiety and panic attacks.

# *Progress Note v11*

# Cibola County Correctional Facility
### 2000 Cibola Loop  P.O. Box 3540
### Milan, NM 87021
### (505) 285-4900

Inmate:      SERHAT BOZKUS
Inmate ID:    5985911
Age/DOB:    30/Jan 01, 1992
Agency No:   220712429 - ICE

## Allergies
- No Known Allergies

## Vitals
**Vital Signs**

|  | Recorded: 22Apr2022 07:23PM |
|---|---|
| Systolic | 129, LUE, Sitting |
| Diastolic | 81, LUE, Sitting |
| Respiration | 18 |
| Temperature | 97.1 F, Oral |
| Heart Rate | 86, L Radial |
| Pulse Quality | Normal, L Radial |
| O2 Saturation | 97 |
| Pain Scale | 8 |

## Objective
1855 pm : pt states chest pain mid sternal , stated 2 month period of chest pain 5-8/10 to mid sternal area. Pt taken to medical area whereupon EKG performed cramping sensation voiced; NSR in 80s only repolarization observed in most leads States per translator line chest pain increases when breathing expiration and inspiration and cardiologist in Turkey and left arm cramping and stated history of cramping to left arm occasionally; stress induced chest pain states diagnosed from cardiologist in Turkey. Pt states mid sternal to left sternal pain varying between 5-8 ; states nausea and pain to upper thoracic area to arm left on occasion weakness to left arm. Presents with clear breathe bilaterally no adventious breathe sounds noted. States no respiratory problems at this time. States no liver problems. Confirmed with Turkish translator , pain in chest reproducible and worsens with Notified Dr. Leon with EKG results, Clinical signs and symptoms reviewed with Dr. Leon. Order for tylenol 1gm bid po , 1 st dose now. Reviewed with patient to notify staff if pain increases , nausea or vomiting or no relief from tylenol. Verbalized understanding . Pt returns to area with CO

# Initial Intake Screening

| Facility Name: | | Today's Date: | 04/19/2022 | Time: | 06:38:54 AM |

**Inmate/Detainee Name:** BOZKUS, SERHAT  **#:** 220712429 - ICE  **DOB:** 01/01/1992

**Gender** ☐ Male ☐ Female ☐ Transgender  If transgender, document history of transition-related care in Comments section

**Primary Language:** .  **Communication Barrier:** ○ Yes  ○ No

**If Yes how resolved?**

**NEXT OF KIN:**

**Name:** .  **Relationship:**  **Phone #:**

**ARRIVED WITH:**

**Transfer Form** ○ Yes  ○ No  **Medical Record** ○ Yes  ○ No  **Adv Directives/Living Will:** ○ Yes  ○ No

**VITALS:**

**Ht:**  **Wt:**  **T:**  **P:**  **R:**

**\*B/P:**  \*FOR BLOOD PRESSURE OVER 140/90, REFER FOR URGENT PROVIDER EVALUATION

**Diabetic?** ○ Yes  ○ No  If yes, BS Reading  FOR BELOW 60 OR ABOVE 250, REFER TO PROVIDER

**NURSING OBSERVATION/INMATE REPORTS OF: (CHECK ALL THAT APPLY)**

|  Slurred Speech |  Tremors |  Aggressive |  Disheveled |  Not Oriented to Time/Place/Person

☐ Sick Now  ☐ Agitated  ☐ Anxious  ☐ Nausea/Vomiting  ☐ Movement Limitations

☐ Reports Recent Injury  ☐ Sweating Profusely  ☐ Dilated or Pinpoint Pupils  ☐ Difficulty Breathing - 02 Sat

**\*\*If any symptoms above checked, refer to RN or LIP immediately\*\***

**SKIN CONDITIONS:** ☐ Trauma Markings  ☐ Bruises  ☐ Jaundice  ☐ Rashes  ☐ Infestations  ☐ Lesions

(CHECK ALL THAT APPLY)  ☐ Recent Tattoos  ☐ Needle Marks other indications of Drug Abuse  ☐ Other:

**INMATE/DETAINEE INQUIRY:**

1. Do you have any allergies or medication sensitivites?  ○ Yes  ○ No

   If YES, list:

2. Do you have any physical deformities?  ○ Yes  ○ No

   If YES, please describe:

3. Do you have any prosthetic devices?  ○ Yes  ○ No  \*If YES - check all that apply

   ☐ Glasses  ☐ Hearing Aids  ☐ Wheelchair  ☐ Walker  ☐ Orthopedic Brace  ☐ Other:

4. Do you have a history of alcohol/tobacco/drug use?  ○ Yes  ○ No  \*If YES - check all that apply

   ☐ Cigarettes  ☐ Chewing Tobacco  ☐ Marijuana  ☐ Heroin  ☐ Methamphetamine  ☐ Cocaine

   ☐ Cigars  ☐ Alcohol  ☐ IV Drugs  ☐ Other:

   List amount, mode, frequency, and most recent use:

   Problems when ceasing use?  ○ Yes  ○ No  \*If YES list:

5. Do you have any special health care needs or current medical complaints?  ○ Yes  ○ No  \*If YES - check all that apply:

   ☐ Diabetes  ☐ Seizures  ☐ Hepatitis A  ☐ Hepatitis B  ☐ Hepatitis C  ☐ Heart Condition

   ☐ Asthma  ☐ Liver Disease  ☐ STD  ☐ HIV  ☐ High Blood Pressure  ☐ Stomach Problems

   ☐ Gunshot Wound  ☐ Active TB (You or a Family Member)  ☐ Accident/Head Injury w/ LOC

   ☐ Alcohol/Drug Withdrawal Symptoms  ☐ Other:

   History of chicken pox, shingles, or vaccination?  ○ Yes  ○ No  \*If YES, when?

   Are you currently receiving physician care or are enrolled in a chronic care clinic for items checked above?  ○ Yes  ○ No

6. Have you ever been hospitalized or had an operation/surgery within the last 6 months?  ○ Yes  ○ No

   \*If YES, please describe type/date:

7. Have you been seen or were you scheduled to be seen by a specialist/physician?  ○ Yes  ○ No

   \*If YES, please describe:

8. Are you having any pain?  ○ Yes  ○ No  \*If YES, rate intensity (1-10, 10=max)

   \*If YES describe location:

| Signature: | Abeita, Kateri | Title: | | Date: | 04/19/2022 | Time: | 06:38:54 AM |

Proprietary Information - Not For Distribution - Copyrighted - Property of CoreCivic  12/18/2018

# Initial Health Screening Form

| Inmate/Detainee | BOZKUS, SERHAT | Number | 220712429 - ICE | DOB | 01/01/1992 |
|---|---|---|---|---|---|

| Facility Name | | Today's Date: | 04/19/2022 |
|---|---|---|---|

**INMATE/DETAINEE INQUIRY CONTINUED:**

9. Are you currently taking any medications?  ○ Yes  ○ No  If YES, list below. If more than 12, list in Comment Section.

| Name | Dose | Frequency | Name | Dose | Frequency |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

10. Do you have any medications that you keep on your person?  ○ Yes  ○ No  *If YES, list below:

☐ Inhaler  ☐ Nitroglycerin  ☐ Other

11. Do you have any skin problems or concerns, such as:  ○ Yes  ○ No  *If YES - check all that apply

☐ Lesions  ☐ Rashes  ☐ Infestations  ☐ Bruises  ☐ Scars  ☐ Recent Tattoos  ☐ Other:

*If YES, describe:

12. Have you been prescribed a special diet(s)?  ○ Yes  ○ No

*If YES, describe:

**Refer to LIP if weight and chronic illness/disease places inmate at nutritional risk**

13. Do you have any dental issues?  ○ Yes  ○ No  *If YES, list below:

☐ Cavities  ☐ Toothache  ☐ Missing/Broken Teeth  ☐ Swelling  ☐ Gum Disease  ☐ Braces

☐ Full Dentures  ☐ Partial Dentures  ☐ Other:  **Refer dental problems to dental staff**

14.  **This question applies to female inmates only**

Are you pregnant?  ○ Yes  ○ No  Date of Last Period:  |  UA RESULTS:  ○ POS  ○ NEG

Currently on birth control?  ○ Yes  ○ No  If YES, list type:

Total Number of Pregnancies:  Number of Live Births:

*Describe pregnancy complications in comment section

## MENTAL HEALTH

If the inmate is disoriented or YES is marked on ANY of the questions below the inmate MUST be referred to Mental Health. **AT ANY TIME, YOU MAY UPGRADE URGENT AND ROUTINE REFERRALS LISTED BELOW BASED ON INMATE RESPONSES AND/OR PRESENTATION**

**EMERGENT -**
Ensure patient safety needs are met and consult immediately with mental health staff.

**URGENT -**
Ensure patient's safety needs are met. Phone consulation with mental health staff must occur within 24 hours. Face-to-face assessment by mental health staff must be completed by end of next business day.

**ROUTINE -**
Refer to assessment of intervention. Face-to-face assessment by mental health staff must occur within 7 to 14 days.

15. Are you currently thinking/planning about harming or killing yourself or someone else?  ○ Yes  ○ No  EMERGENT

16. Are you currently having hallucinations (i.e. hearing or seeing things other people don't)?  ○ Yes  ○ No  EMERGENT

What?

17 Observation:  Does the inmate appear to have difficulty understanding the questions or in making appropriate responses to them?  ○ Yes  ○ No  URGENT

18. Have you ever had thoughts, made plans, or attempted to harm or kill yourself?  ○ Yes  ○ No  URGENT

When?  Type of attempt(s)?  If YES, detail below:

**IF THE INMATE HAS CONSIDERED, BUT NOT TRIED SUICIDE, NOTE THIS IN THE COMMENT SECTION**

| Signature: | Abeita, Kateri | Title: | Date: | 04/19/2022 | Time: | 06:38:54 AM |
|---|---|---|---|---|---|---|

| Inmate/Detainee | BOZKUS, SERHAT | Number | 220712429 - ICE | DOB | 01/01/1992 |
|---|---|---|---|---|---|
| Facility Name | | | | Today's Date: | 04/19/2022 |

**INMATE/DETAINEE INQUIRY CONTINUED:**

19. Are you currently experiencing any serious problems (i.e. bad news, significant loss, close friend/family committing suicide) that you would like to discuss with mental health staff?  ○ Yes  ○ No  **URGENT**

20. Do you have a mental health problem or have you ever been treated for mental illness?  ○ Yes  ○ No  **ROUTINE**

    When? [　　　　] Where? [　　　　] For? [　　　　]

21. Have you ever been placed in a special education class?  ○ Yes  ○ No  **ROUTINE**

22. Have you ever been the perpetrator of a sex offense?  ○ Yes  ○ No  **ROUTINE**

    When? [　　　　]

23. Have you ever been the victim of a sex offense?  ○ Yes  ○ No  **ROUTINE**

    When? [　　　　]

24. Have you ever had hallucinations (i.e. heard or seen things other people didn't)?  ○ Yes  ○ No  **ROUTINE**

    When? [　　　　] What? [　　　　]

25. Have you ever been admitted to a state or private mental hospital by a psychiatrist or other mental health professional for emotional problems, nerves, or substance abuse treatments?  ○ Yes  ○ No  **ROUTINE**

    When? [　　　　] Where? [　　　　]

**ADDITIONAL COMMENTS:**

Intake completed on paper 4/18/2022@1645 Burnham LPN

**REFERRALS: (CHECK ALL THAT APPLY) E= Emergent / U= Urgent / R= Routine**

Excluding Mental Health, referrals are as follows (MH referrals are described in the Mental Health section):

| Emergent- | Urgent- | Routine- |
|---|---|---|
| Immediate consultation with or referral to an LIP | Referral to an LIP within 24 hours | Referral to an LIP within 2-14 days |

☐ RN:  ☐ E  ☐ U  ☐ R     To (name): [　　　　]

☐ LIP:  ☐ E  ☐ U  ☐ R     To (name): [　　　　]

☐ Chronic Clinic Type: [　　　　]

☐ Special Needs:  ☐ E  ☐ U  ☐ R

☐ Mental Health:  ☐ E  ☐ U  ☐ R

☐ Dental:  ☐ E  ☐ U  ☐ R

**DISPOSITION: (CHECK ALL THAT APPLY):**

☐ Emergency Care  ☐ Suicide Precaution  ☐ Mental Health Observation  ☐ Med Observation

☐ Segregation  ☐ Infirmary  ☐ General Population

**SCREENER INFORMATION:**

| Signature: | Abeita, Kateri | Title: | | Date: | 04/19/2022 | Time: | 06:38:54 AM |
|---|---|---|---|---|---|---|---|

   Proprietary Information - Not For Distribution - Copyrighted - Property of CoreCivic    12/18/2018

**88**

## Intake and Annual Symptom Screening

CoreCivic:

**(Facility)**

**Inmate/Resident Name:**

BOZKUS, SERHAT

**Date:** 04/19/2022

**Inmate/Resident Number:**

220712429 - ICE

**I.**

○ TB Intake     ○ TB Annual

### Symptom Screening

*(Annual screening to be completed only for those with positive PPD history)*

| | | |
|---|---|---|
| Have you ever been tested for TB in the last 12 months? - (Applies only to intake screening) | ○ Yes ○ No |
| What was the result of your last TB test? - (Applies only to intake screening) | ○ Positive ○ Negative |
| Have you ever taken TB medication before? - (Applies to intake and annual screening) | ○ Yes ○ No |

Medication [          ]     When          Where [          ]

*If therapy was not completed, refer to medical provider for history of inadequate treatment.

**Complete the Chart below:**

| Any current complaint of: | Yes | No | | Yes | No |
|---|---|---|---|---|---|
| Productive, prolonged cough (lasting three weeks or more) | ○ Yes | ○ No | Chest pain | ○ Yes | ○ No |
| Coughing up blood | ○ Yes | ○ No | Night sweats | ○ Yes | ○ No |
| Unexplained fatigue | ○ Yes | ○ No | Fever, chills | ○ Yes | ○ No |
| Unexplained weight loss | ○ Yes | ○ No | HIV Positive | ○ Yes | ○ No |

*If an inmate/resident has positive or negative PPD history and presently has pulmonary TB symptoms accompanied by general systemic symptoms of fever, chills, and night sweats, place in respiratory isolation and call medical provider immediately.

*Inmates/residents known to have HIV infection should have a chest x-ray taken as part of the initial screening-regardless of their tuberculin skin-test status.

**II.**

### Intake MRSA Screening

Do you have any open or draining sores?     ○ Yes ○ No

Do you have any bites (i.e., spider, mosquito, etc.)?     ○ Yes ○ No

Do you have any areas of skin infection?     ○ Yes ○ No

If yes to any of the above, list where [          ]

*If an inmate/resident has any open draining sores, isolation in Medical Observation is indicated until the LIP clears the inmate/resident for general population

**Examiner's Name:** Abeita, Kateri     **Title:** [          ]     **Date:** 04/19/2022

13-50A

## SUBJECTIVE

## OBJECTIVE

## ASSESSMENT

## PLAN

**Name:** BOZKUS, SERHAT

**Inmate/Resident#** 220712429 - ICE

Signature: Abeita, Kateri    Title: [ ]    Date: 04/19/2022    Time 06:38:54 AM

    Proprietary Information - Not For Distribution - Copyrighted - Property of CoreCivic    12/18/2018

**90**

# INITIAL INTAKE SCREENING

| Facility Name: | Cibola County Correctional Center | Date: | 4/18/22 | Time: | 1645 | ☑ AM ☐ PM |
|---|---|---|---|---|---|---|
| Inmate/Detainee Name: | Bozkus Serhat | Number: | A22-011 DOB: 1/1/42 | | | |

| Gender: | ☒ Male | ☐ Female | ☐ Transgender* | *If transgender, document history of transition-related care in the Comments section |
|---|---|---|---|---|

| Primary Language: | Turkish | Communication Barrier: | ☐ Yes ☐ No | If "Yes" how resolved? |
|---|---|---|---|---|

**NEXT OF KIN:**

| Name: | Relationship: | Phone#: |
|---|---|---|

**ARRIVED WITH:**

| Transfer Form? | ☒ Yes ☐ No | Medical Record? | ☐ Yes ☒ No | Adv. Directive/Living Will? | ☐ Yes ☒ No |
|---|---|---|---|---|---|

**VITALS:**

| Height: | 6' | Weight: | 157 | Temp: | 98.2 | Pulse: | 79 | Resp: | 18/18 | BP: | 134/99 |
|---|---|---|---|---|---|---|---|---|---|---|---|

**\*\*FOR BLOOD PRESSURE OVER 140/90, REFER FOR URGENT PROVIDER EVALUATION**

| Diabetic? | ☐ Yes ☒ No | If YES: FBS Reading: | *Normal: 70-100; for below 60 or above 100, refer to provider* |
|---|---|---|---|

## NURSING OBSERVATION – INMATE/DETAINEE REPORTS OF: (CHECK ALL THAT APPLY)

| ☐ Slurred Speech | ☐ Tremors | ☐ Aggressive | ☐ Disheveled | ☐ Not Oriented to Time/Place/Person |
|---|---|---|---|---|
| ☐ Sick Now | ☐ Agitated | ☐ Anxious | ☐ Nausea/Vomiting | ☐ Movement Limitations |
| ☐ Reports Recent Injury | ☐ Sweating Profusely | ☐ Dilated or Pinpoint Pupils | ☐ Difficulty Breathing – O2 Sat | 96 |

**\*\*If any symptoms above are checked, refer to RN or LIP immediately\*\***

**Skin Condition:** ☐ Trauma Markings ☐ Bruises ☐ Jaundice ☐ Rashes ☐ Infestations ☐ Lesions
☐ Recent Tattoos ☐ Needle Marks or other indications of Drug Abuse ☒ Other: (L) Ear pin

## INMATE/DETAINEE INQUIRY:

| 1. Do you have any allergies or medication sensitivities? | ☐ Yes ☐ No | If "YES" list: |
|---|---|---|

| 2. Do you have any physical deformities? | ☐ Yes ☒ No | If "YES", describe: |
|---|---|---|

| 3. Do you have any prosthetic devices? | ☐ Yes* ☒ No | *If "YES" – check all that apply |
|---|---|---|

☐ Glasses ☐ Hearing Aids ☐ Wheelchair ☐ Walker ☐ Orthopedic Brace ☐ Other: _____

| 4. Do you have a history of alcohol/tobacco/drug use? | ☐ Yes* ☒ No | *If "YES" – check all that apply |
|---|---|---|

☐ Cigarettes ☐ Chewing Tobacco ☐ Marijuana ☐ Heroin ☐ Methamphetamine ☐ Cocaine ☐ IV Drugs
☐ Cigars ☐ Alcohol ☐ Other: _____
List amount, mode, frequency, and most recent use: _____
Problems when ceasing use? ☐ Yes* ☐ No *If "YES" list: _____

| 5. Do you have any special health care needs or current medical complaints? | ☐ Yes* ☒ No | *if "YES" – check all that apply |
|---|---|---|

☐ Diabetes ☐ Seizures ☐ Hepatitis A ☐ Hepatitis B ☐ Hepatitis C ☐ Heart Condition ☐ Asthma ☐ Liver Disease
☐ STD ☐ HIV ☐ High Blood Pressure ☐ Stomach Problems ☐ Gunshot Wound ☐ Active TB (You or a Family Member)
☐ Accident/Head Injury w/LOC ☐ Alcohol/Drug Withdrawal Symptoms ☐ Other: _____
☐ History of chicken pox, shingles, or vaccination? ☐ Yes* ☐ No *If "YES", when? _____
Are you currently receiving physician care or are enrolled in a chronic care clinic for items checked above? ☐ Yes ☒ No

| 6. Have you ever been hospitalized or had an operation/surgery within the last six months? | ☐ Yes* ☒ No |
|---|---|
*If "YES", describe type/date: _____

| 7. Have you been seen or were you scheduled to be seen by a specialist/physician? | ☐ Yes* ☒ No |
|---|---|
*If "YES", describe: _____

| 8. Are you experiencing any pain right now? | ☐ Yes* ☒ No |
|---|---|
*If "YES", rate intensity (1-10, 10=max): _____ *If "YES" describe location: _____

| 9. Are you currently taking any medication? | ☐ Yes* ☒ No | *If "YES", list below; if more than 12, list in Comments section |
|---|---|---|

| | NAME | DOSE | FREQUENCY | | NAME | DOSE | FREQUENCY |
|---|---|---|---|---|---|---|---|
| 1 | | | | 7 | | | |
| 2 | | | | 8 | | | |
| 3 | | | | 9 | | | |
| 4 | | | | 10 | | | |
| 5 | | | | 11 | | | |
| 6 | | | | 12 | | | |

# INITIAL INTAKE SCREENING

Inmate/Detainee Name: _Brozicus Sentract_ Number: _____ DOB: _____

Facility Name: _Cibola County Correctional Center_ Date: _4/18/22_

## INMATE/DETAINEE INQUIRY *continued*:

| | | |
|---|---|---|
| 10. | Do you have any medications that you keep on your person? | ☐ Yes* ☑ No *If "YES", list below |
| | ☐ Inhaler ☐ Nitroglycerin ☐ Other: | |

| | | |
|---|---|---|
| 11. | Do you have any skin problems or concerns, such as: | ☐ Yes* ☑ No *If "YES" -- check all that apply |
| | ☐ Lesions ☐ Rashes ☐ Infestations ☐ Bruises ☐ Scars ☐ Recent Tattoos ☐ Other: | |
| | *If "YES", describe: | |

| | | |
|---|---|---|
| 12. | Have you been prescribed a special diet(s)? | ☐ Yes* ☑ No * If "YES", list below |
| | *If "YES", describe: | |
| | **Refer to LIP If weight and chronic illness/disease places inmate/detainee at nutritional risk** | |

| | | |
|---|---|---|
| 13. | Do you have any dental issues? | ☐ Yes* ☑ No *If "YES", list below |
| | ☐ Cavities ☐ Toothache ☐ Missing/Broken Teeth ☐ Swelling ☐ Gum Disease ☐ Braces | |
| | ☐ Full Dentures ☐ Partial Dentures Other: | **Refer dental problems to dental staff** |

| | |
|---|---|
| 14. | This question applies to female inmates/detainees only. |

Are you pregnant? ☐ Yes ☑ No   Date of Last Period: _____   UA RESULTS: ☐ Positive ☐ Negative

Currently on birth control? ☐ Yes* ☐ No *If "YES", list type: _____

Total Number of Pregnancies: _____   Number of Live Births: _____   *Describe pregnancy complications in Comments section

### MENTAL HEALTH

If the inmate/detainee is disoriented or "YES" is marked on ANY of the questions below, the inmate/detainee MUST be referred to Mental Health. AT ANY TIME YOU MAY UPGRADE URGENT AND ROUTINE REFERRALS LISTED BELOW BASED ON INMATE/DETAINEE RESPONSES AND/OR PRESENTATION.

| EMERGENT – Ensure patient's safety needs are met and consult immediately with mental health staff. | URGENT – Ensure patient safety needs are met. Phone consultation with mental health staff must occur within 24 hours. Face-to-face assessment by mental health staff must be completed by end of next business day. | ROUTINE – Refer to assessment of intervention. Face-to-face assessment by mental health staff must occur within 7 to 14 days. |
|---|---|---|

| | | | |
|---|---|---|---|
| 15. | Are you currently thinking/planning about harming or killing yourself or someone else? | ☐ Yes ☑ No | EMERGENT |
| 16. | Are you currently having hallucinations (i.e. hearing or seeing things other people don't)? | ☐ Yes ☑ No | EMERGENT |
| | What? | | |

| | | | |
|---|---|---|---|
| 17. | OBSERVATION: Does the inmate/detainee appear to have difficulty understanding the questions or in making appropriate responses to them? | ☐ Yes ☑ No | URGENT |
| 18. | Have you ever had thoughts, made plans, or attempted to harm or kill yourself? | ☐ Yes ☑ No  If "YES", list below | URGENT |
| | When? _____ Type attempt(s)? _____ | | |
| | **IF THE INMATE/DETAINEE HAS CONSIDERED, BUT NOT TRIED SUICIDE, NOTE THIS IN THE COMMENTS SECTION** | | |

| | | | |
|---|---|---|---|
| 19. | Are you currently experiencing any serious problems (i.e. bad news, significant loss, close friend/family committing suicide) that you would like to discuss with mental health staff? | ☐ Yes ☑ No | URGENT |
| 20. | Do you have a mental health problem or have you ever been treated for mental illness? | ☐ Yes ☑ No | ROUTINE |
| | When? _____ Where? _____ For? _____ | | |
| 21. | Have you ever been placed in a special education class? | ☑ Yes ☐ No | ROUTINE |
| 22. | Have you ever been the perpetrator of a sex offense? | ☐ Yes ☑ No | ROUTINE |
| | When? _____ | | |
| 23. | Have you ever been the victim of a sex offense? | ☐ Yes ☑ No | ROUTINE |
| | When? _____ | | |
| 24. | Have you ever had hallucinations (i.e. heard or seen things other people didn't)? | ☐ Yes ☑ No | ROUTINE |
| | When? _____ What? _____ | | |
| 25. | Have you ever been admitted to a state or private mental hospital by a psychiatrist or other mental health professional for emotional problems, nerves or substance abuse treatment? | ☐ Yes ☑ No  If "YES", list below | ROUTINE |
| | When? _____ Where? _____ | | |

## ADDITIONAL COMMENTS:

| |
|---|
| |
| |

# INITIAL INTAKE SCREENING

**ADDITIONAL COMMENTS** *continued:*

_(blank lined area)_

**REFERRALS: (CHECK ALL THAT APPLY)**  E = Emergent / U = Urgent / R = Routine
**Excluding Mental Health, referrals are as follows (MH referrals are described in the Mental Health section):**

| EMERGENT – Immediate consultation with or referral to an LIP | URGENT – Referral to an LIP within 24 hours | ROUTINE – Referral to LIP within 2-14 days |
|---|---|---|
| ☐ RN – ☐ E ☐ U ☐ R – To (name): _____ | ☐ LIP – ☐ E ☐ U ☐ R – To (name): _____ | |
| ☐ Mental Health – ☐ E ☐ U ☐ R | ☐ Dental – ☐ E ☐ U ☐ R | |
| ☐ Special Needs – ☐ E ☐ U ☐ R | ☐ Chronic Clinic – Type: _____ | |

**DISPOSITION: (CHECK ALL THAT APPLY)**

| ☐ Emergency Care | ☐ Suicide Precaution | ☐ Seg | ☑ Gen. Population | ☐ Med Observation | ☐ MH Observation | ☐ Infirmary |
|---|---|---|---|---|---|---|

**SCREENER INFORMATION:**

| Signature | _(handwritten signature)_ | Title | LPN | Date | 1/18/2 |
|---|---|---|---|---|---|

# Health Services Progress Notes

**#383738** 43-58B

## IMMEDIATE HEALTH SERVICES PRE-SCREENING – *COMPLETE PRIOR TO BOOKING*

| Facility Name | Cibola County Correctional Center |
|---|---|

Inmate/Resident Name: BOZKUS, SERHAT

Inmate/Resident # A220712429    Inmate/Resident DOB: 1/1/1992

Allergies:
☐ NKA
☐ Yes, List below:
NO

| Facility Arrival Date/Time | Notes |
|---|---|
| 4/18/2022  1648 | ☑ No ☐ Yes  Screening could *NOT* be completed due to language barrier – PRI-LB |
| Medical Screen Date/Time | ☐ No ☑ Yes  Was the detainee appropriately identified? If No, why not? |
| 4/18/2022  1649 | ☑ No ☐ Yes  Did the detainee transfer from another correctional facility? If yes, from where? |

Interpreter Used:
☐ No ☑ Yes
If yes, Language __Turkish__
Interpreter # _____
36-37-85 0
134/94  1645

**ASK DETAINEE/RESIDENT:** (L) Ear

- ☑ No ☐ Yes  Do you have a current illness or health problem?
- ☑ No ☐ Yes  Are you taking medications? If yes, be sure to verify medications
- ☑ No ☐ Yes  Are you currently in pain?
- ☑ No ☐ Yes  Have you recently used alcohol or drugs in the last 48-72 hours?
- ☑ No ☐ Yes  Are you afraid someone will hurt you?
- ☑ No ☐ Yes  Do you currently want to hurt yourself?
- ☑ No ☐ Yes  Females only: Do you think you may be pregnant? ☐ N/A

**STAFF OBERVATIONS OF THE DETAINEE/RESIDENT:** (some abnormal findings are listed beside each item as examples) any abnormal findings below will be a at least one of the priorities (PRI-E, 1, or 2)

98²
77
96%
157
6'0"

- ☑ Normal ☐ Abnormal  Appearance (e.g., sweating, tremors, anxious)
- ☑ Normal ☐ Abnormal  Behavior (e.g., uncooperative, inappropriate, insensible)
- ☑ Normal ☐ Abnormal  State of Consciousness (e.g., cognition appears impaired, disoriented, lethargic)
- ☑ Normal ☐ Abnormal  Ease of movement (e.g., poor gait, use of assistive devices)
- ☑ Normal ☐ Abnormal  Breathing (e.g., persistent cough, respiratory distress)
- ☑ Normal ☐ Abnormal  Skin (e.g. acute rash, infestations)

**DISPOSITION:**
- ☐ PRI-E Priority Level E – Emergency – sent to hospital or ER immediately
- ☐ PRI-1 Priority Level 1 – Urgent, time-sensitive medical needs. Immediate referral  Referred to:
- ☐ PRI-2 Priority Level 2 – Non-urgent, non-time-sensitive medical needs. Prioritized screening
- ☐ PRI-LB – Language Barrier *UNABLE* to conduct questions at pre-screening. Prioritized Screening – Full receiving screening immediately using interpretation services
- ☑ Routine healthy, no medical or mental health concerns were observed or reported.

**COMMENTS:**

Evaluated by (Print name and title): F. Burwell
Signature:

Proprietary Information – Not For Distribution – Copyrighted – Property of CoreCivic

12/08/10

94

# CIBOLA COUNTY CORRECTIONAL CENTER

CORECIVIC

## Discharge/Release Medication

Clinical Solutions strongly supports and encourages the use of child resistant containers in homes with young children. You will be taking home medication in non-child resistant packaging. Please take the necessary precautions when arriving home to keep your medication secure and out of reach of children.

I understand that my release/parole/discharge medicines are not in child resistant packaging and that it is my responsibility to ensure the medications are kept out of the reach of children.

Inmate Name (print)_BOZKUS, SERHAT_____

Signature: _X_____

Date__4/18/2022_____

Witness: _____

## Entrega de Medicamentos

La Farmacia Clinical Solutions recominda y utiliza constantemente envases con medicamentos que sean resistentes para los niños pequeños. Usted llevara medicinas en envases que no son resistentes para los niños. Por favor tome las precauciones necesarias cuando llegue a su casa para que su medicamento este seguro y fuera del alcance de los niños.

Yo entiendo que mi salida/bajo palabra/el remplazo de medicina no vendra en envases resistentes y que es mi responsabilidad asegurar el medicamento y que no este al alcance de los niños.

Nombre del residente (imprimir): _____

Firma: _____

Fecha: _4/18/2022_____

Testigo: _____

**CoreCivic**

**Cibola County Correctional Center**

**Intake Education Packet**

**Formas Medicas para Admisiones**

**English/Espanol**

__X__ Nutrition

__X__ Hygiene

__X__ Dental

__X__ HIV and AIDS/SIDA y VIH

__X__ Hepatitis

__X__ Tuberculosis (PPD)

__X__ Boils

__X__ Substance Abuse

__X__ Sexual Assault Prevention

__X__ Sleep Hygiene

__X__ Keep on Person Medications/Auto administracion de medicamentos

__X__ Inmate/Detainee Grievances

__X__ COVID-19

By signing below I acknowledge that I have received all the above information/ Al firmar a continuacion, reconozco que he recibido toda la informacion anterior:

| Offender Signature/Firma del Confinado | Witness/Tesigo |
|---|---|
| X | |

| Inmate/Detainee Name **BOZKUS, SERHAT** |
|---|
| Inmate/Detainee #: **A220712429** |
| Date: **4/18/2022** |

# Inmate/Resident Health Appraisal

| | | |
|---|---|---|
| Arrival at Facility: | Date 4/18/22 | Inmate/Resident Name: SERHAT BOZKUS |
| ☑ Initial Appraisal: | Date 4/26/22 | Inmate/Resident Number: 220712429 - ICE |
| ☐ Periodic Appraisal: | Date_____ | DOB: 01/01/1992 |

| Date: 04/26/2022 | Facility: Cibola County | | | | |
|---|---|---|---|---|---|
| **Height:** 71.653 IN | **Weight:** 169.753 LB | **Access to Care Understood?** ☑ Yes ☐ No | **Respiration:** 18 | **Pulse:** 66 | **Temp:** 97.3 F | **BP:** 126 / 81 |

**PRESENT COMPLAINTS:** Describe any current symptoms or complaints

Continued to Overflow

**MEDICAL/SURGICAL HISTORY:** Include any current or previously diagnosed medical or surgical conditions and any previous hospitalizations

Neck pain Dx in Turkey: possible herniated c spine disk
Perforated ear drum: occurred in Turkey continues now
Anxiety and on/off chest pain due to anxiety; per pt he was seen by cardiology in Turkey and was cleared from cardiac conditions.
right 5th digit amputation at age 2

**SOCIAL HISTORY:** Include history of drug, alcohol or tobacco use. Document intravenous drug use history.

Drugs: denied use
ETOH: denied use
Tobacco: 1-2 PPD x 10 years

**FAMILY HISTORY:** Parents and siblings.

Mother: Alive with no medical problems
Father: with herniated neck and also with heart problems
Siblings: x 6 all alive and well

**CURRENT MEDICATIONS:**

Amoxicillin 500 MG Oral Capsule #20 Capsule, TAKE 1 CAPSULE TWICE DAILY, NO REFILLS
OXcarbazepine 300 MG Oral Tablet #30 Tablet, Take half of tab BID, 2 refills

**ALLERGIES OR MEDICATION SENSITIVITIES:**

No Known Allergies

10/10/12

Proprietary Information – Not For Distribution – Copyrighted - Property of CoreCivic

97

# Inmate/Resident Health Appraisal

## HISTORY/REVIEW OF SYSTEMS (Check All Applicable)

| HEAD | EYE | EAR | NOSE | THROAT |
|---|---|---|---|---|
| ☐ Injury | ☐ Inflammation | ☑ Pain | ☐ Injury | ☐ Tonsillitis |
| ☐ Headaches | ☐ Impaired Vision | ☐ Discharge | ☐ Obstruction | ☐ Hoarseness |
| ☐ Sinus pain | ☐ Glasses | ☑ Deafness | ☐ Nose bleeds | ☐ Sore throat |
| ☐ Dizziness | ☐ Other | ☐ Ringing in ears | ☐ Postnasal Drip | ☐ Speech defect |
| ☐ Other | | ☐ Other | ☐ Other | ☐ Other |

| MOUTH | NECK | CHEST/HEART | LUNGS | |
|---|---|---|---|---|
| ☐ Teeth | ☐ Enlarged glands | ☑ Chest pain or pressure | ☐ Asthma | ☐ Tuberculosis |
| ☐ Lips | ☐ Thyroid disease | ☐ Heart Palpitations | ☐ Hay fever | ☐ SOB |
| ☐ Gums | ☑ Other | ☐ Swelling | ☐ Pain | |
| ☐ Tongue | | ☐ Shortness of breath | ☐ Cough | ☐ Other |
| ☐ Other | | ☐ Difficulty with exertion | ☐ Night sweats | |
| | |    or exercise | ☐ Pneumonia | |
| | | ☐ Other | | |

| ABDOMEN/GASTRO-INTESTINAL | | | DIABETES |
|---|---|---|---|
| ☐ Gas, belching | ☐ Pain on swallowing | ☐ Constipation | ☐ High blood sugar |
| ☐ Nausea | ☐ Pain or burning after eating | ☐ Diarrhea | ☐ Low blood sugar |
| ☐ Vomiting | ☐ Ulcer | ☐ Hernia | ☐ Insulin |
| ☐ Jaundice | ☐ Vomiting blood | ☐ Other | ☐ Oral medication |
| ☐ Gallstones | ☐ Black stools | | ☐ Frequent urination |

| GENITO-URINARY/RECTAL | | | WEIGHT |
|---|---|---|---|
| ☐ Painful urination | ☐ Getting up at night | ☐ Hemorrhoids | ☐ Recent weight loss |
| ☐ Frequent urination | ☐ History of venereal | ☐ Other | ☐ Recent weight gain |
| ☐ Blood in urine |    disease | | |
| ☐ Kidney stones | ☐ Rectal bleeding | | |

| NEUROLOGICAL/SPINE | MUSCULOSKELTAL | PSYCHIATRIC |
|---|---|---|
| ☐ Dizziness | ☐ Muscle pain | ☐ Suicide attempt |
| ☐ Fainting | ☐ Muscle weakness | ☐ Psychiatric hospitalization |
| ☐ Blackouts/loss of | ☐ Muscle twitching | ☐ Anxiety |
|    consciousness | ☐ Joint pain | ☐ Depression |
| ☐ Numbness or tingling | ☐ Arthritis | ☐ Anger difficulties |
| ☐ Pain | ☐ Deformities | ☐ Hear voices/hallucinations |
| ☐ Epilepsy/seizure | ☐ Paralysis | ☐ Other |
| ☐ Other | ☐ Other | |

**COMMENTS**

Inmate Name: SERHAT BOZKUS

Inmate Number: 220712429 - ICE

10/10/12

Proprietary Information – Not For Distribution – Copyrighted - Property of CoreCivic

# Inmate/Resident Health Appraisal

**GENERAL IMPRESSION: (To include identifying marks, scars and tattoos)**

Continued to Overflow

| Physical Exam | WNL | Abnormal Findings |
|---|---|---|
| 1. Head | WNL | |
| 2. Eyes | WNL | |
| 3. Ears | | Left ear with extensive erythma to the canal and large perforation noted at 2:00 |
| 4. Nose | WNL | |
| 5. Mouth | WNL | |
| 6. Neck | WNL | ful ROM without crepitus |
| 7. Chest | WNL | |
| 8. Lungs | WNL | |
| 9. Heart | WNL | S1S2 no MRG |
| 10. Vessels | WNL | |
| 11. Abdomen | WNL | |
| 12. Hernia | | not indicated pt denied sx |
| 13. Rectal | | not indicated pt denied sx |
| 14. Genital | | not indicated pt denied sx |
| 15. Upper Ext. | WNL | right hand missing 5th digit |
| 16. Lower Ext. | WNL | |
| 17. Spine | WNL | |
| 18. Neurological | WNL | |
| 19. Psychiatric (Mental Status) Psychiatric Consult Indicated? | Yes | on meds in clinic |

| Visual Acuity | | Visual Acuity (corrected) | | Hearing Aid | | Prosthesis | Housing Limitations |
|---|---|---|---|---|---|---|---|
| Right | Left | Right | Left | Yes | No | none | none |
| | | | | ☐ | ✓ | | |

**PROBLEM LIST**

Chest wall pain
Anxiety
Neck pain
Perforation of tympanic membrane

**PLAN OF CARE**

see orders

**LABORATORY/DIAGNOSTIC TESTS ORDERED (LIST):** see orders

**IMMUNIZATIONS?** ◯ Yes or ⦿ No List:

**CHRONIC CARE REFERRAL?** ◯ Yes or ⦿ No     **IF YES, DATE OF REFERRAL:**

**DATE OF FULL REVIEW OF MEDICAL RECORD:** 4/26/22

**MEDICAL FOLLOW-UP VISIT SCHEDULED?** ⦿ Yes or ◯ No     **IF YES, DATE OF APPT:** 2 weeks

**CIRCUMSTANCES PRECLUDING USE OF FORCE AGENTS/DEVICES:** none

**RECOMMENDATIONS FOR HOUSING, JOB ASSIGNMENT, PROGRAMMING:** none

Inmate Name: SERHAT BOZKUS     Inmate Number: 220712429 - ICE

Tiffany Romero-Peralta, ACNS-BC; Apr 26 2022 12:17PM MST (Author)
Date:

10/10/12

     Proprietary Information – Not For Distribution – Copyrighted - Property of CoreCivic

**99**

*Please use this page to comment on findings from previous pages*

Continued from GeneralImpression - wdwn male in NAD
A/O x 4
Steady Gait
No tattoos noted

Continued from PresentComplaints - Patient c/o chest tightness. He states he is not having any chest tightness right now, but it happens when he sometimes has anxiety. He states he was seen by a cardiologist in Turkey and he was told that he has no cardiac abnormalities. EKG was done last night and reviewed and found to be WNL. He states he knows he is normal because he was told that in Turkey but he wants to get rid of his anxiety to stop the chest tightness.
Also C/O x 2 "neck hernias". he states when he saw the cardiologist in Turkey they did some type of test and he was told his neck was herniated. he states the hernias cause him neck pan and shoulder pain. Attempts to determine if he was referring to a herniated disk were unsuccessful as the patient was not sure they were the same thing.
Also C/O Loft ear pain. he states when he was in Otoro Camp he was told he had a hole in the ear drum but he had not received any treatment. he states his hearing is also decreased in that ear. After further discussion he advised that this issue has been going on since Turkey and he was thinking about having surgery in Turkey to have a patch placed.

Name: SERHAT BOZKUS

Inmate/Resident # 220712429 - ICE

Signature: Tiffany Romero-Peralta, ACNS-BC; Apr 26 2022 12:17PM MST (Author)

Proprietary Information – Not For Distribution – Copyrighted - Property of CoreCivic

**100**

*Please use this page to comment on findings from previous pages*

New intake/or annual health appraisal completed today with the help of interpreter 381467
Pt with large perforation in TM: started on ABX and given petroleum jelly and cotton and was advised to keep it dry at all times. Shown how to make a barrier with the Vaseline when he showers. Keep it covered 24/7 until follow up. VSS. Pt with decreased hearing in that ear. Pt verbalized understanding and was able to demonstrate how to cover ear. If he develops fever chills nv or change in sx RTC right away. Continue taking any and all psyc medications if applicable and follow up with mental health as needed. Referral to mental health for evaluation if positive psyc history.
Discussed diet, encouraged diet low in fat and sodium.
Encouraged daily exercise as tolerated
Covid 19 status x 2 biotech
C spine x rays ordered for eval of herniated disks.
F/U: 2 weeks
Instructed inmate on procedure to complete and turn in sick call request if needed
Counseled inmate on NOT getting any tattoos while in prison due to high risk of HCV and HIV
All questions and concerns were addressed. Pt denied further questions and verbalized understanding of plan of care. If new issues or concerns arise before next visit, RTC PRN.
>45 minuets was spent face to face with the patient.

**Name:** _SERHAT BOZKUS_  **Inmate/Resident #** _220712429 - ICE_

**Signature:** _Tiffany Romero-Peralta, ACNS-BC; Apr 26 2022 12:17PM MST (Author)_

Proprietary Information – Not For Distribution – Copyrighted - Property of CoreCivic

**101**

## EARACHE

| | | | | |
|---|---|---|---|---|
| Inmate Name: | BOZKUS, SERHAT | Inmate #: | 220712429 - ICE | DOB: 01/01/1992 |
| Facility Name: | CCCC | Date: 05/20/2022 | Time: 11:14:29 AM | |

*ATTENTION: IF A PROFESSIONAL JUDGMENT IS REQUIRED BEYOND YOUR SCOPE OF PRACTICE SET FORTH BY THE NURSING PRACTICE ACT OF YOUR STATE OR YOU HAVE QUESTIONS ABOUT HOW TO PROCEED, YOU MUST CONSULT WITH A HIGHER DISCIPLINE.*

### SUBJECTIVE (Check all that apply)

**\*\*NOTE: IF A PATIENT/INMATE PRESENTS WITH FOREIGN BODY, SUSPECTED TRAUMA, OR BLEEDING FROM THE EAR IMMEDIATELY REFER TO AN LIP\*\***

*In cases of emergency call EMS - document all findings for an emergency on the Emergency Flowsheet 13-34A1*

**\*\*NOTE: If patient presents with obvious ear trauma/injury refer to HEAD TRAUMA/INJURY Protocol and notify LIP immediately.**

1) Chief Complaint: (in patients own words)

i have 3 problems i have high BP, ear pain, and hernia. c/o throat being swollen

2) Onset of Symptoms: 1    ○ hour(s)  ○ day(s)  ○ week(s)  ◉ month(s)
  ○ other
  ◉ New  ○ Recurrent  ○ Chronic

3) Are you allergic to anything (e.g. medications, bee stings)?  ◉ No  ○ Yes
  If yes, describe:

4) Location:  ○ Right ear  ◉ Left ear  ○ Both ears

5) Description of injury: has busted eardrum    (document on the anatomical form)
  Cause of injury:
  (If injury has security implications/issues, notify shift supervisor or designee)

6) Do you have history of the following?  ☐ Nausea  ☐ TMJ  ☐ Vertigo/dizziness  ☐ Sinus problem  ☐ Tinnitus
  ☐ Headaches  ☐ Recent cold/flu symptoms
  ☐ Recent trauma/foreign body in ear - describe:
  ☐ Other:

7) Are you experiencing any of the following?  ☐ Ear pressure  ☐ Decreased hearing  ☐ Popping  ☐ Ringing in ears
  ☐ Cold symptoms  ☐ Cough  ☐ Fever  ☐ Runny/stuffy nose  ☐ Sneezing  ☐ Jaw pain  ☐ Stiff neck
  ☐ discharge - describe
  ☐ Pain: On scale (1 - 10)    Is there anything that worsens the pain?  ○ No  ○ Yes
  If yes, describe:

SUBJECTIVE FINDINGS (continued):

**FINDINGS REQUIRING IMMEDIATE CONSULTATION WITH LICENSED INDEPENDENT PROVIDER (LIP):**
  ☐ Recent trauma, acute decreased/loss of hearing, severe pain, stiff neck, swelling/bruising behind ear

| | | | | | | |
|---|---|---|---|---|---|---|
| Signature: | Abeita, Kateri | Title: RN | Date: 05/20/2022 | Time: 11:14:29 AM |

Proprietary Information - Not For Distribution - Copyrighted - Property of CoreCivic    04/04/18

**OBJECTIVE (Check all that apply. Use space below for additional comments)**

8) Vital Signs:   B/P: 145/105   Pulse: 70   Respirations: 20   Temperature: 97.5

      Ht: ☐    Wt: ☐

9) Appearance (neck/ear external):   ☐ Swelling behind the ear   ☐ bruising

      ☐ Other: ☐

10) Ear drum/canal:   Normal ☑ R ☐ L   Red ☐ R ☐ L   Pearly gray ☐ R ☐ L   Dull ☐ R ☐ L

     Foreign Body - ☐ R ☐ L   describe: ☐

11) Wax:   None ☑ R ☑ L   Present ☐ R ☐ L   Canal occluded ☐ R ☐ L

12) Drainage:   None ☐ R ☐ L   Bloody ☐ R ☐ L   Pus present ☐ R ☐ L   Clear ☐ R ☐ L

     Other: ☐ R ☐ L ☐

13) Neck Glands:   ☑ Normal   ☐ Swollen   ☐ Enlarged Tonsils

14) Throat:   ☑ Normal   ☐ Redness   ☐ Swollen   ☐ White Patches

15) Gait:   ☑ Steady   ☐ Unsteady   ☐ Unable to stand

16) Is patient being followed in Chronic Care?   ◉ No   ○ Yes

     If yes, list: ☐

17) Has the patient been seen previously at sick call for this complaint?   ○ No   ◉ Yes

     If yes, list date(s): ☐

     (Note: if the patient has been seen two or more times for this same complaint, referral to an LIP is necessary)

18) Current Medications:   ☐ Reviewed with patient -   ◉ no issues

     ○ issues ☐

OBJECTIVE FINDINGS (continued): ☐

**FINDINGS REQUIRING IMMEDIATE CONSULTATION WITH LICENSED INDEPENDENT PROVIDER (LIP):**

☐ Temp < 96F or > 101F   ☐ Resp. < 14 or > 24   ☐ Pulse < 50 or > 110   ☐ BP: sys < 90 or > 160 / dia > 100

☐ Any abnormal findings noted in # 8 - 17 above

---

If LPN instructed to follow nursing intervention plan of care, consulted with: Name ☐

           Title: ☐

Medical Provider/RN Notified Date: ☐   Time: ☐   ○ AM   ○ PM

Emergency department notification time: ☐   Transport time: ☐

Inmate Name: BOZKUS, SERHAT   Inmate #: 220712429 -   DOB: 01/01/1992

Signature: Abeita, Kateri   Title: RN   Date: 05/20/2022   Time: 11:14:29 AM

**ASSESSMENT:**

EXPLAIN ASSESSMENT DECISION RELATED TO CLINICAL FINDINGS, TO INCLUDE PHYSICAL ASSESSMENT:

inmate

Findings requiring immediate consultation with Licensed Independent Provider (LIP)
- ꜛ Recent trauma, acute decreased/loss of hearing, severe pain, stiff neck, swelling/bruising behind ear
- ☐ Temp < 96F or > 101F    ☐ Resp. < 14 or > 24    ☐ Pulse < 50 or > 110    ☐ BP: sys > 90 or > 160 / dia > 100
- ☐ Any abnormal findings noted in # 8 - 17 in objective section

Findings requiring urgent consultation with Licensed Independent Provider (LIP)
- ☐ tinnitus    ☐ vertigo    ☐ erythema and/or swelling of the external ear (auricle)

Findings requiring routine consultation with Licensed Independent Provider (LIP)
- ꜛ decreased/loss of hearing over time
- ☐ ear canal remains occluded with wax after nursing intervention per nursing protocol

**PLAN:**

☐ Consulted with: Name [                    ]    Title: [            ]

☐ Orders received -   ○ No   ○ Yes

   If yes, list: [                                    ]

☐ CONFIRMED INTACT EARDRUM -    *(only complete the following if you can visualize an intact eardrum)* -
- ☐ Irrigate affected ear(s) gently with room temperature water, till clear (This will require an order from the medical provider)
- ☐ If above ineffective, instill Debrox (Carbamide Peroxide 6.5% in Anhydrous glycerol), 3-5 drops in affected ear(s) twice a day for 2 days, then repeat irrigation as above. (This will require an order from the medical provider)

☑ Disposition -
- ○ Emergent referral (immediately)    ○ Urgent referral (within 24 hrs)    ○ Routine referral (within 2 - 14 days)
- ☑ Scheduled with Provider: Name [LIP        ]    Title: [            ]
- ☐ Return to clinic if symptoms worsen    ☐ None

☑ Patient Education -
- ☑ Instructed not to insert Q-tips or other objects into ear,
- ☐ medication use,
- ☑ Follow-up sick call if no improvement within 4 days.
- ☑ Inmate verbalizes understanding of instructions.

☑ OTC Medication(s) [name, dose, route, frequency, duration]:
- ꜛ Acetaminophen 500- 650 mg by mouth for pain two to three times a day for 3 days
- ☑ Ibuprofen 200 - 400 mg by mouth for pain two to three times a day for 3 days
- ☐ Other: [                                    ]

PLAN (continued)

refer to LIP
to take BP 2daily for BP

| Inmate Name: | BOZKUS, SERHAT | Inmate #: | 220712429 - ICE | DOB: | 01/01/1992 |
|---|---|---|---|---|---|
| Signature: | Abeita, Kateri | Title: RN | Date: 05/20/2022 | Time: 11:14:29 AM | |

## SUBJECTIVE

NA

## OBJECTIVE

NA

## ASSESSMENT

NA

## PLAN

NA

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | BOZKUS, SERHAT | | Inmate #: | 220712429 - ICE | DOB: 01/01/1992 |
| Signature: | Abeita, Kated | Title: RN | Date 05/20/2022 | | Time: 11:14:29 AM |

Page 4 of 4

Proprietary Information - Not For Distribution - Copyrighted - Property of CoreCivic

04/04/18

## EARACHE

| Inmate Name: | BOZKUS, SERHAT | | Inmate #: | 220712429 - | DOB: | 01/01/1992 |
|---|---|---|---|---|---|---|
| Facility Name: | CCCC | | Date: | 04/28/2022 | Time: | 09:08:37 AM |

*ATTENTION: IF A PROFESSIONAL JUDGMENT IS REQUIRED BEYOND YOUR SCOPE OF PRACTICE SET FORTH BY THE NURSING PRACTICE ACT OF YOUR STATE OR YOU HAVE QUESTIONS ABOUT HOW TO PROCEED, YOU MUST CONSULT WITH A HIGHER DISCIPLINE.*

**SUBJECTIVE (Check all that apply)**

**\*\*NOTE: IF A PATIENT/INMATE PRESENTS WITH FOREIGN BODY, SUSPECTED TRAUMA, OR BLEEDING FROM THE EAR IMMEDIATELY REFER TO AN LIP\*\***

*In cases of emergency call EMS - document all findings for an emergency on the Emergency Flowsheet 13-34A1*

**\*\*NOTE: If patient presents with obvious ear trauma/injury refer to HEAD TRAUMA/INJURY Protocol and notify LIP immediately.**

1) Chief Complaint: (in patients own words)

I have a busted ear drum for a long time and i cant hear that well.

2) Onset of Symptoms: ○ hour(s)   ○ day(s)   ○ week(s)   ○ month(s)

○ other
○ New   ◉ Recurrent   ○ Chronic

3) Are you allergic to anything (e.g. medications, bee stings)?   ◉ No   ○ Yes

If yes, describe:

4) Location:   ○ Right ear   ◉ Left ear   ○ Both ears

5) Description of Injury:   Left ear   (document on the anatomical form)

Cause of injury:   assult when a child

(If injury has security implications/issues, notify shift supervisor or designee)

6) Do you have history of the following?   ☐ Nausea   ☐ TMJ   ☐ Vertigo/dizziness   ☐ Sinus problem   ☐ Tinnitus
☐ Headaches   ☐ Recent cold/flu symptoms

☐ Recent trauma/foreign body in ear - describe:
☐ Other:

7) Are you experiencing any of the following?   ☐ Ear pressure   ☑ Decreased hearing   ☐ Popping   ☐ Ringing in ears
☐ Cold symptoms   ☐ Cough   ☐ Fever   ☐ Runny/stuffy nose   ☐ Sneezing   ☐ Jaw pain   ☐ Stiff neck
☑ discharge - describe
☑ Pain: On scale (1 - 10)   Is there anything that worsens the pain?   ○ No   ○ Yes

If yes, describe:

SUBJECTIVE FINDINGS (continued):

**FINDINGS REQUIRING IMMEDIATE CONSULTATION WITH LICENSED INDEPENDENT PROVIDER (LIP):**

☐ Recent trauma, acute decreased/loss of hearing, severe pain, stiff neck, swelling/bruising behind ear

| Signature: | Abeita, Kateri | Title: | RN | Date: | 04/28/2022 | Time: | 09:08:37 AM |
|---|---|---|---|---|---|---|---|

   Proprietary Information - Not For Distribution - Copyrighted - Property of CoreCivic   04/04/18

**106**

**OBJECTIVE** (Check all that apply. Use space below for additional comments)

8) Vital Signs: B/P: 145/107 Pulse: 94 Respirations: 20 Temperature: 98.3
   Ht: Wt: 154

9) Appearance (neck/ear external): ☐ Swelling behind the ear ☐ bruising
   ☐ Other:

10) Ear drum/canal: Normal ☑ R ☐ L Red ☐ R ☐ L Pearly gray ☐ R ☐ L Dull ☐ R ☐ L
    Foreign Body - ☐ R ☐ L describe:

11) Wax: None ☑ R ☑ L Present ☐ R ☐ L Canal occluded ☐ R ☐ L

12) Drainage: None ☐ R ☐ L Bloody ☐ R ☐ L Pus present ☐ R ☐ L Clear ☐ R ☐ L
    Other: ☐ R ☑ L greenish

13) Neck Glands: ☑ Normal ☐ Swollen ☐ Enlarged Tonsils

14) Throat: ☑ Normal ☐ Redness ☐ Swollen ☐ White Patches

15) Gait: ☑ Steady ☐ Unsteady ☐ Unable to stand

16) Is patient being followed in Chronic Care? ☐ No ☑ Yes
    If yes, list:

17) Has the patient been seen previously at sick call for this complaint? ☐ No ☑ Yes
    If yes, list date(s):
    (Note: if the patient has been seen two or more times for this same complaint, referral to an LIP is necessary)

18) Current Medications: ☐ Reviewed with patient - ☑ no issues
    ☐ issues

**OBJECTIVE FINDINGS (continued):**

**FINDINGS REQUIRING IMMEDIATE CONSULTATION WITH LICENSED INDEPENDENT PROVIDER (LIP):**

☐ Temp < 96F or > 101F ☐ Resp. < 14 or > 24 ☐ Pulse < 50 or > 110 ☐ BP: sys < 90 or > 160 / dia > 100

☐ Any abnormal findings noted in # 8 - 17 above

---

If LPN instructed to follow nursing intervention plan of care, consulted with: Name
Title:
Medical Provider/RN Notified Date: Time: ☐ AM ☐ PM
Emergency department notification time: Transport time:
Inmate Name: BOZKUS, SERHAT Inmate #: 220712429 - DOB: 01/01/1992
Signature: Abeita, Kateri Title: RN Date: 04/28/2022 Time: 09:09:37 AM

**ASSESSMENT:**

**EXPLAIN ASSESSMENT DECISION RELATED TO CLINICAL FINDINGS, TO INCLUDE PHYSICAL ASSESSMENT:**
Left ear slight inflammed inmate on ABT and was seen by provider for ear. LIP will f/u with inmate in 2 weeks.

**Findings requiring immediate consultation with Licensed Independent Provider (LIP)**
☐ Recent trauma, acute decreased/loss of hearing, severe pain, stiff neck, swelling/bruising behind ear

☐ Temp < 96F or > 101F     ☐ Resp. < 14 or > 24     ☐ Pulse < 50 or > 110     ☐ BP: sys < 90 or > 160 / dia > 100

☐ Any abnormal findings noted in # 8 - 17 in objective section

**Findings requiring urgent consultation with Licensed Independent Provider (LIP)**
☐ tinnitus  ☐ vertigo  ☐ erythema and/or swelling of the external ear (auricle)

**Findings requiring routine consultation with Licensed Independent Provider (LIP)**
☐ decreased/loss of hearing over time
☐ ear canal remains occluded with wax after nursing intervention per nursing protocol

**PLAN:**

☐ Consulted with: Name [                    ]  Title: [          ]

☐ Orders received -  ○ No  ○ Yes

If yes, list: [                    ]

☐ CONFIRMED INTACT EARDRUM -   *(only complete the following if you can visualize an intact eardrum) -*

☐ Irrigate affected ear(s) gently with room temperature water, till clear (This will require an order from the medical provider)

☐ If above ineffective, instill Debrox (Carbamide Peroxide 6.5% in Anhydrous glycerol), 3-5 drops in affected ear(s) twice a day for 2 days, then repeat irrigation as above. (This will require an order from the medical provider)

☐ Disposition -

○ Emergent referral (immediately)   ○ Urgent referral (within 24 hrs)   ○ Routine referral (within 2 - 14 days)

☐ Scheduled with Provider: Name [                    ]  Title: [          ]

☐ Return to clinic if symptoms worsen          ☐ None

☑ Patient Education -

☐ Instructed not to insert Q-tips or other objects into ear,

☑ medication use,

☑ Follow-up sick call if no improvement within 4 days.

☑ Inmate verbalizes understanding of instructions.

☐ OTC Medication(s) [name, dose, route, frequency, duration]:

☐ Acetaminophen 500- 650 mg by mouth for pain two to three times a day for 3 days

☐ Ibuprofen 200 - 400 mg by mouth for pain two to three times a day for 3 days

☐ Other: [                    ]

**PLAN (continued)**

| Inmate Name: | BOZKUS, SERHAT | Inmate #: | 220712429 - ICE | DOB: | 01/01/1992 |
|---|---|---|---|---|---|
| Signature: | Abeita, Kateri | Title: | RN | Date: | 04/28/2022 | Time: | 09:09:37 AM |

Proprietary Information - Not For Distribution - Copyrighted - Property of CoreCivic

04/04/18

## SUBJECTIVE

NA

## OBJECTIVE

NA

## ASSESSMENT

NA

## PLAN

NA

| Inmate Name: | BOZKUS, SERHAT | | Inmate #: | 220712429 - ICE | DOB: | 01/01/1992 |
|---|---|---|---|---|---|---|
| Signature: | Abeita, Kated | Title: | | Date | 04/28/2022 | Time: | 09:09:37 AM |

Proprietary Information - Not For Distribution - Copyrighted - Property of CoreCivic

04/04/18

# *Mental Health Note v11*

## **Cibola County Correctional Facility**
**2000 Cibola Loop  P.O. Box 3540**
**Milan, NM 87021**
(505) 285-4900

Inmate:          SERHAT BOZKUS
Inmate ID:       5985911
Age/DOB:         30/Jan 01, 1992
Agency No:       220712429 - ICE

**Subjective**
"I feeling good, but I have concerns. Last week I was put on watch because it was a misunderstanding. I talked to ICE and yes I told them every I wanted, but I don't know if they got it."

**Objective**
No Apparent distress

**Assessment**
Mood Stable, patient remains concerned about getting asylum.

**Plan**
Continue Doxepin 10mg po qhs-Depression
Continue Trileptal 300mg po qhs-Mood
Continue Close Follow up

**Signatures**
Electronically signed by : Anne Ortiz, M.D.; Jun  1 2022 10:51AM MST (Author)

# *Dental Note v11*

## Cibola County Correctional Facility
### 2000 Cibola Loop  P.O. Box 3540
### Milan, NM 87021
### (505) 285-4900

Inmate:        SERHAT BOZKUS
Inmate ID:     5985911
Age/DOB:       30/Jan 01, 1992
Agency No:     220712429 - ICE

### Subjective
Pt. presents for Initial Dental Intake Exam.

### Objective
Initial Dental Intake Exam.

### Assessment
No, Pt. has not had a Dental Exam within the past year. No, Pt. has no Dental complaints. Informed Pt. teeth #1, #30 & #31 all have decay. Pt. states pain is a 4 out of 10 on the pain scale.

### Plan
Exam, Reviewed PMH,
OHI, Charting & Probing.
13-13A -- Medical Hx was taken and reviewed.
13-13B - Dental Exam was completed. RH&N Exam - WNL.
13-13C - Dental Treatment Plan was developed.
1) Restoration #1.
2) restoration #30.
3) Restoration #32.
4) Prophylaxis.

Next Visit: Prophylaxis.

### Education
OHI

Informed Pt. on how to access Dental Care.

### Signatures
Electronically signed by : Dennis Jackson, DDS; Apr 20 2022  2:55PM MST (Author)

# Dental Examination

| | |
|---|---|
| Inmate/Resident Name | BOZKUS, SERHAT |
| Inmate/Resident # | 220712429 - ICE |
| Date of Birth | 01/01/1992 |
| Facility | CCCC |

Race / Sex: U/M

**Type of Examination:** Initial ◉  Periodic ○  Date 04/20/2022

**Existing Conditions:**

Missing Teeth: (check all that apply)
1 ☐ 2 ☐ 3 ☐ 4 ☐ 5 ☐ 6 ☐ 7 ☐ 8 ☐ 9 ☐ 10 ☐ 11 ☐ 12 ☐ 13 ☐ 14 ☐ 15 ☐ 16 ☑
32 ☐ 31 ☐ 30 ☐ 29 ☐ 28 ☐ 27 ☐ 26 ☐ 25 ☐ 24 ☐ 23 ☐ 22 ☐ 21 ☐ 20 ☐ 19 ☐ 18 ☐ 17 ☐

Existing Restorations: (check all that apply)
1 ☐ 2 ☐ 3 ☐ 4 ☐ 5 ☐ 6 ☐ 7 ☐ 8 ☐ 9 ☐ 10 ☐ 11 ☐ 12 ☐ 13 ☐ 14 ☐ 15 ☐ 16 ☐
32 ☐ 31 ☑ 30 ☑ 29 ☐ 28 ☐ 27 ☐ 26 ☐ 25 ☐ 24 ☐ 23 ☐ 22 ☐ 21 ☐ 20 ☐ 19 ☐ 18 ☑ 17 ☐

Dental Prosthesis Present: (choose one)  F/F ○  P/P ○  None.

Calculus/Deposits: (choose one)  None ○  Sligh ○  Moderate ○  Heavy ◉

Gingiva: (choose one)  Norma ○  Inflamed ○  Highly Inflamed ◉

Masticating Efficiency:  Good ◉  Fair ○  Poor ○

| Head and Neck Exam: | Normal | Abnormal | Comments |
|---|---|---|---|
| Pharnyx | ☑ | ☐ | |
| Soft Palate | ☑ | ☐ | |
| Hard Palate | ☑ | ☐ | |
| Lips | ☑ | ☐ | |
| Tongue | ☑ | ☐ | |
| Floor of the Mouth | ☑ | ☐ | |
| Neck/Thyroid/Nodes | ☑ | ☐ | |
| TMJ | ☑ | ☐ | |
| Salivary Glands | ☑ | ☐ | |

**Signature of Dentist** Jackson, Dennis   **Title** DDS

Proprietary Information - Not For Distribution - Copyrighted - Property of CoreCivic

12/08/10

112

# Dental Examination

| | |
|---|---|
| Inmate/Resident Name | BOZKUS, SERHAT |
| Inmate/Resident # | 220712429 - ICE |
| Date of Birth | 01/01/1992 |
| Facility | CCCC |

Race / Sex: U/M

**Diseases and Abnormalities:**

Extractions Indicated:

(check all that apply)

1 ☐ 2 ☐ 3 ☐ 4 ☐ 5 ☐ 6 ☐ 7 ☐ 8 ☐ 9 ☐ 10 ☐ 11 ☐ 12 ☐ 13 ☐ 14 ☐ 15 ☐ 16 ☐

32 ☐ 31 ☐ 30 ☐ 29 ☐ 28 ☐ 27 ☐ 26 ☐ 25 ☐ 24 ☐ 23 ☐ 22 ☐ 21 ☐ 20 ☐ 19 ☐ 18 ☐ 17 ☐

Restorations Indicated:

(check all that apply)

1 ☑ 2 ☐ 3 ☐ 4 ☐ 5 ☐ 6 ☐ 7 ☐ 8 ☐ 9 ☐ 10 ☐ 11 ☐ 12 ☐ 13 ☐ 14 ☐ 15 ☐ 16 ☐

32 ☑ 31 ☐ 30 ☐ 29 ☐ 28 ☐ 27 ☐ 26 ☐ 25 ☐ 24 ☐ 23 ☐ 22 ☐ 21 ☐ 20 ☐ 19 ☐ 18 ☐ 17 ☐

Remarks: 

**Dental Priority:** 1 ☐ 2 ☐ 3 ☑ 4 ☐    *(see 13-13 for priority definitions)*

**Signature of Dentist** Jackson, Dennis     **Title** DDS

 Proprietary Information - Not For Distribution - Copyrighted - Property of CoreCivic 12/08/10

113

# Dental Attendance Coding Sheet

Date Seen: 04/20/2022

Inmate/Resident Name: BOZKUS, SERHAT

Inmate/Resident #: 5985911

Starting Time: 1:00

DOB: 01/01/1992

Ending Time: 1:10

Institution: CIBOL 100

**Type of Visit**
(Check Below)

| | | |
|---|---|---|
| ○ | DA | Dental Appointment (routine, comprehensive care) |
| ○ | DSC | Dental Sick Call/Complaints |
| ○ | DEM | Emergency (Unscheduled visit) |
| ○ | DNS | Dental No Show |
| ◉ | DIE | Dental Initial Exam (Intake) |
| ○ | DRF | Dental Appointment Refused |
| ○ | DAE | Dental Annual Exam |

## Blades and Needle Log

#27 Short Needles used

#27 Long Needles used

#30 Short Needles used

Number Blades used

Number of Sutures used

## Dental Procedures and Services — check boxes that apply

### 1. DIAGNOSTICS

- [ ] D0120 - Periodic oral eval
- [X] D0140 - Limited oral eval
- [ ] D0150 - Comp. oral eval

**RADIOGRAPHS**

- [ ] D0210 - Intraoral comp series
- [ ] D0220 - Periapica - first film
- [ ] D0230 - Periapical - add. film
- [ ] D0272 - Bitewing-two films
- [ ] D0274 - Bitewings - four films
- [ ] D0330 - Panoramic film

**TESTS/LAB EXAMS**

- [ ] D0460 - Pulp vitality tests
- [ ] D0470 - Diagnostic Casts

### II. PREVENTIVE

- [ ] D1110 Prophylaxis - adult
- [ ] D1204 FI without prophy
- [ ] D1205 FI with prophy
- [X] D1330 OHI
- [ ] D1351 Sealant - per tooth

- [ ] D2393 Resin-three surf., post.
- [ ] D2394 Resin-four+ surf., post.
- [ ] D2920 Recement crown
- [ ] D2951 Pin retention/tooth

### IV. ENDODONTICS

- [ ] D3110 Direct pulp cap
- [ ] D3120 Indirect pulp cap
- [ ] D3220 Pulpotomy
- [ ] D3221 Pulpal debridement
- [ ] D2940 Sedative filing
- [ ] D3310 Endo therapy-ant.
- [ ] D3320 Endo therapy-bicusp.

### V. PERIODONTICS

- [ ] D4274 Distal/proximal wedge
- [ ] D4341 Sealing/RP/quad
- [ ] D4355 Gross debridement
- [ ] D4910 Perio maintenance

- [ ] D5640 Replace broken tooth par dr
- [ ] D5750 Refine com dtr - max lab
- [ ] D5751 Refine com dtr - man lab
- [ ] D5850 Tissue cond - max
- [ ] D5851 Tissue cond - man

### X. ORAL SURGERY

- [ ] D7140 Ext erupted tooth or exp. roct
- [ ] D7210 Surg ext erupted tooth
- [ ] D7220 Rem imp - soft tissue
- [ ] D7230 Rem imp - part bony
- [ ] D7240 Rem imp - full bony
- [ ] D7250 Surg rem residual roots
- [ ] D7286 Biopsy - soft tissue
- [ ] D7310 Alveolo with ext/quad
- [ ] D7320 Alveolo w/o ext/quad
- [ ] D7450 Rem odontogenic cyst
- [ ] D7471 Rem exostosis
- [ ] D7510 I and D intraoral
- [ ] D7550 Sequestrectomy
- [ ] D7903 Pericoronitis tx
- [ ] D7910 Suture wound <5cm

Patient MRN # 5985911

 Proprietary Information - Not For Distribution - Copyrighted - Property of CoreCivic 12/08/10

**114**

### III. RESTORATIVE

- [ ] D2140 Amal. - one surface
- [ ] D2150 Amal. - two surfaces
- [ ] D2160 Amal. - three surfaces
- [ ] D2161 Amal. - four surfaces
- [ ] D2330 Resin-one surf., ant.
- [ ] D2331 Resin-two surf., ant.
- [ ] D2332 Resin-three surf., ant.
- [ ] D2335 Resin-four surf., ant.
- [ ] D2391 Resin-one surf., post.
- [ ] D2392 Resin-two surf., post.

### VI. PROSTHODONTICS

- [ ] D5110 Max com dtr (cd)
- [ ] D5120 Man com dtr (cd)
- [ ] D5211 Max pd-resin base
- [ ] D5212 Mand pd-resin base
- [ ] D5213 Max pd-cast metal
- [ ] D5214 Man pd-cast metal
- [ ] D5410 Adjust com dtr-max
- [ ] D5411 Adjust com dtr-man
- [ ] D5421 Adjust pd-max
- [ ] D5422 Adjust pd-man
- [ ] D5510 Repair com dtr base
- [ ] D5620 Replace broken tooth com dtr
- [ ] D5610 Repair partial dtr base

### XII ADJUNCT SERVICES

- [ ] D9110 Palliative Treatment
- [ ] D9210 Local anesthetic no procedure
- [ ] D9215 Local anesthesic
- [x] D9310 Consultation
- [ ] D9930 Post-op treatment
- [ ] D9951 Occ adj-limited

**WRITE-INS**

| |
|---|
| |

Inmate/Resident Name:  BOZKUS, SERHAT          Patient MRN #  5985911

  Proprietary Information - Not For Distribution - Copyrighted - Property of CoreCivic   12/08/2010

**115**

# Dental Treatment Plan



A B C D E F G H I J

| | PSR | |
|---|---|---|
| 3 | 3 | 3 |
| S1 | S2 | S3 |
| 3 | 4 | 3 |
| S6 | S5 | S4 |

T S R Q P O N M L K

**Circle one**

Gingiva: Normal  Inflamed  (Highly Inflamed)
Deposits: Slight  Moderate  (Heavy)
Stain: Slight  Moderate  (Heavy)
Prosthesis Present:  F/F  P/P
Prosthesis Needed: _None_

| Tooth # | Treatment Planned | Date Completed |
|---|---|---|
| Fill | 2 HHR OHI | 4/20/2022 |
| | Tx Plu | |
| 1 | Fill | |
| 30 | Fill ? | |
| 32 | Fill ? | |
| all | prophy | |
| | | |

| Head and Neck Exam | Normal | Abnormal | Comments |
|---|---|---|---|
| Lips | ✓ | | |
| Commissures | ✓ | | |
| Buccal Mucosa | ✓ | | |
| Pharynx | ✓ | | |
| Soft Palate | ✓ | | |
| Hard Palate | ✓ | | |
| Tongue | ✓ | | |
| Floor of Mouth | ✓ | | |
| TMJ | ✓ | | |
| Neck Nodes | ✓ | | |

COMMENTS: _____

Signature of Dentist: _____ Jackson, D., DDS

Date: 04/20/2022

### Legend
**Amalgam:** Outline and block in solidly with black/blue
**Composite/Glass Ionomer:** Outline in black or blue
**Gold:** Outline and inscribe horizontal parallel lines in black/blue
**Root Canal Filling:** Outline each canal filled and block in solidly
**Missing teeth:** Black/blue "X" on the root(s) of each tooth
**Extraction Indicated:** 2 red parallel vertical lines through tooth
**Unerupted tooth:** Outline tooth with a single oval
**Caries:** Outline and block in solidly in Red
**Radiolucency:** Outline size, location, and form in black/blue

Inmate/Resident Name: _Bozkus, Serhat_
Inmate/Resident #: _220 712 429_ R/S ____
Race: _O_  Sex: _M_
Date of Birth: _01/01/1992_
Facility: _Cibola County Correctional Center_

Detainee Speaks English? Yes or (No)
Staff Speaks Detainee's Language? Yes or (No)
Language Spoken: _Turkish_
Did you use the interpreter or language line?
(Yes) or No  Name/Number: _385387_

Proprietary Information - Not For Distribution - Copyright

12/08/10

116

## Dental Patient Medical History

Inmate/Resident Name **Bozkus, Serhat**  Inmate/Resident # **2207/2429**
Race **O**  Sex **M**  Date of Birth **01/01/1992**
Facility: **Cibola County Correctional Center**

Date **04/20/2022**

| Circle Yes or No for the following questions. If yes, please give details. | | |
|---|---|---|
| 1. Are you in good health? | YES | **NO** |
| 2. Has there been any change in your general health within the past year? | **YES** | NO |
| 3. Are you under any medical care? | **YES** | NO |
| 4. Have you had any serious illnesses or operations? If so, what was the problem? | YES | **NO** |
| 5. Are you taking any medicines or drugs (including over the counter drugs)? | **YES** | NO |
| 6. Are you allergic to any medicine or materials? | YES | **NO** |
| 7. Have you ever had a reaction to local anesthetic? | YES | **NO** |
| 8. Have you had any complication or illness following dental treatment? | YES | **NO** |
| 9. Women: Are you pregnant?  Circle Trimester 1   2   3 | YES | **NO** |

10. **Please draw a circle around any of the following that you have had in the past or presently have.**

| | | | |
|---|---|---|---|
| Rheumatic fever | Liver disease | Diabetes | Genital warts |
| Heart disease or condition | Jaundice (other than birth) | Stomach Ulcers | Psychiatric treatment |
| Heart Murmur | Hepatitis | Kidney trouble | Cancer |
| Artificial Heart Valves | History of IV drug abuse | Fainting or dizzy spells | Radiation Therapy |
| High Blood Pressure | Asthma | Epilepsy or seizures | Chemotherapy |
| Swollen ankles | Hay fever | HIV positive | Blood transfusion |
| Frequent chest pain | Emphysema | AIDS or AIDS-related complex | Sickle Cell Disease |
| Shortness of Breath | Tuberculosis (TB) | Venereal Disease (syphilis, | Hemophilia |
| Prosthetic (artificial) joint | Arthritis | gonorrhea, venereal warts) | Bruise easily |

Signature of Patient **X** _____  Date **04/20/2022**

---

Dentist's Comments _____

_____

_____

Signature of Dentist _____ Jackson, D., DDS  Date **4/20/2022**

UPDATE:
Health Changes/Current Medications _____

Signature of Dentist _____  Date _____

Detainee Speaks English? Yes  or  **No**
Staff Speaks Detainee's Language? Yes or **No**
Language Spoken: **Turkish**
Did you use the Interpreter or language line?.
**Yes** or No  Name/Number: **3853 87**

Proprietary Information – Not For Distribution – Copyrighted - Property of CoreCivic

12/08/10

117

## REFUSAL TO ACCEPT MEDICAL TREATMENT

I, (Name) _Bozkus, Sex hat_ (Number) _22021242 5_ at

(Facility) _Cibola County Correctional Center_

refuse to accept the following Dental/ Psychiatric/ Medical/ and/or Surgical services and/ or treatment recommended by this Facility's Dental/ Psychiatric/ Medical staff and/or a referred secondary care specialist: (list treatment(s)/service(s) in layman terminology)

_The Mental Illness_

I am refusing the above recommended treatment(s)/service(s) for the following reason(s):

_"I'm on Ramadan"_

I acknowledge that I have been informed of the risks and possible consequences which include, but are not limited to, the following, and which may be up to and including death:

_refused Counsel_

I understand the possible consequences and/or complications, listed above and still refuse recommended treatment. I understand that my failure to follow this advice may seriously affect my health or the health of the person under my guardianship.

I hereby release the Dental/ Psychiatric/ Medical staff and/or a referred secondary care specialist associated with this correctional facility, CoreCivic, any contract managed care company, and their employees and agents of all responsibility regarding this matter, and I am making this decision of my own free will.

_refused to sign_     _22021242 9_     _1/1/92_
Inmate/Resident Signature     Inmate/Resident #     DOB

**(This section to be completed by a staff member)**

        Tamara Bennett LPN
        Cibola     _1/29/22_

Qualified Health Care Professional Signature     Date/Time
*(Note: For CDCR inmates, must be an RN or higher credentialed QHCP)*

                      _1/29/22_

Witness Signature     Date/Time

12/8/14

Proprietary Information – Not For Distribution – Copyrighted - Property of CoreCivic



U.S. Immigration
and Customs
Enforcement

ICE | ERO

# COVID-19 Checklist
### for All ICE ERO Transfers, Removals, and Releases

DIRECTIONS: This checklist is intended to provide U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) and contracted staff with the minimum steps required prior to transferring, removing or releasing a noncitizen from ERO custody and/or further mitigate the spread of COVID-19.

**Reason for Detainee Transfer:**
- [ ] Medical Evaluation
- [ ] Medical Isolation/Quarantine
- [ ] Clinical Care
- [ ] Security Concerns
- [ ] Release or Removal
- [ ] Overcrowding
- [x] Other -- FOD Approved
  *Reason for Transfer (e.g., facility closure, etc.):* Bed Space

| | YES | NO | N/A |
|---|---|---|---|
| 1) Verify the detainee's current health status and exposure history. | x | | |
| 2) Has the detainee been tested for COVID-19 prior to transfer, removal (if required), or release? | x | | |
| 3) Detainee fully vaccinated? | | x | |
| 4) Is the detainee currently: | | | |
| • In medical isolation? | | x | |
| • Experiencing symptoms commonly associated with COVID-19? | | x | |
| • Awaiting COVID-19 test results? | | x | |
| • Cohorted due to COVID-19 exposure? | | x | |

For transfers and removals, if the answer to any of the four bulleted questions above is "Yes," do not transfer or remove and if the answer to all these questions is "No," proceed to Questions 5 and 6 only. For releases, if any answer is "Yes," complete 4a, 4b and the remaining questions and if the answers are "No," complete Questions 5 – 7.

| | | | | |
|---|---|---|---|---|
| a. For released detainees, discuss the release with the relevant state, local, tribal, and/or territorial public health department to coordinate continuation of care. Notate the public health department here, if applicable: | | | | x |
| b. Provide the health department with the released detainee's name, intended address, email address, all available telephone numbers, and planned mode of transportation to their intended destination. | | | | x |

| | YES | NO | N/A |
|---|---|---|---|
| 5) Before the detainee leaves the facility or is removed, do verbal symptom screening (fever, cough, shortness of breath or difficulty breathing, chills, muscle pain, sore throat, new loss of taste or smell) and a temperature check. Record temperature here: T. 98.0 04.18.2022 0800Ic | x | | |
| For transfers and removals only, if the detainee does not clear the screening process, delay the transfer or removal and follow the protocol for a suspected COVID-19 case. | | | x |
| For transfers and removals only, is the detainee medically cleared to travel? Record method of travel: Ground [ ] ICE Air [x] Commercial flight [x] | x | | |
| 6) Provide the detainee with the following forms and fact sheets in the detainee's preferred language, as available. | | | |
| a. Steps to Help Prevent the Spread of COVID-19 if You are Sick; and | x | | |
| b. Stop the Spread of Germs. | x | | |
| 7) For released noncitizens only, facilitate safe transport, continued shelter, and medical care, as part of release planning. Document what arrangements for transportation were made. | | | |
| a. Did ICE provide transportation? If yes, where was the noncitizen transported to? _____ | | | |
| b. Did a family member or friend provide transportation? | | | |
| c. Was the noncitizen provided with a personal protective equipment mask upon release? | | | |
| d. Was the noncitizen provided with information on or access to community resources to ensure continued shelter and medical care? | | | |
| e. Was the noncitizen advised to avoid public transportation, commercial ride sharing (e.g. Uber, Lyft), and taxis? | | | |

| NONCITIZEN'S PRINTED NAME | DATE | NONCITIZEN'S SIGNATURE |
|---|---|---|
| BOZKUS SERHAT | A220712429 | x _Si___ |

| OFFICER'S/CONTRACTED STAFF'S PRINTED NAME | OFFICER'S/CONTRACTED STAFF'S SIGNATURE | DATE |
|---|---|---|
| C. Rodriguez | | 4-18-2022 |

**U.S. Department of Justice**
**United States Marshals Service**

# Prisoner in Transit Medical Summary

## 1. IDENTIFYING INFORMATION

Name (Last, First, MI): BOZKUS, SERHAT,

Gender: ☒ M ☐ F   DOB: 01-01-1992   USMS #: A220712429

Departure Date: 04-18-2022   Departed From: Otero Processing Center

## 3. CURRENT MEDICAL ISSUES

Check all that apply to the prisoner and explain in the comments section:

☐ Hospitalizations within past month
☐ Contagious illness or quarantine within past month
☐ Seizure activity within past month
☐ Cardiac chest pain within past month
☐ Seizure disorder requiring medications
☐ Stroke within past month
☐ Limited mobility (crutches, wheelchair)
☐ Surgery within past month
☐ Has hard or air cast, splint or brace
☐ Diabetes requiring insulin or other medications
☐ Prescription narcotic pain medications dispensed for travel
☐ Suicide watch/psychiatric decompensation within past month   N/A

FEMALE PRISONERS: Is prisoner pregnant? ☐ NO ☐ YES   If yes, how many weeks? _____

## 5. LIST ALLERGIES (include drugs, foods, latex, etc.):

NKA

## 2. TUBERCULOSIS SCREENING

Tuberculosis Skin Test (TST) / PPD:

Date Placed: N/A   Date Read: N/A   Size in mm: N/A

Tuberculosis Blood Test / IGRA (if applicable):

☐ Positive ☐ Negative   Date:
☐ Indeterminate / Borderline

Chest x-ray done within past year (if indicated):

Date: 12-7-21   Results: NEG

Prisoner is cleared for transfer: ☐ NO ☒ YES

## 4. SICKLE CELL SCREENING

Prisoner has a history of (check appropriate box):

☐ Sickle Cell Disease   ☐ Sickle Cell Trait
☒ No History of Disease or Trait

If prisoner has disease or trait and is traveling by air, has JPATS Sickle Cell Protocol and Clearance been completed? ☐ NO ☐ YES

Attach clearance to transfer summary

## 6a. CURRENT MEDICAL DIAGNOSIS

## 6b. MEDICATIONS DISPENSED WITH PRISONER FOR TRANSPORT
(Should match medical diagnosis if applicable. Include dosage, route, and frequency.)

## 7. OTHER COMMENTS (If additional space is needed, write on back, attach separate sheet of paper, or check this box to create a second page: ☐ )

## 8. COVID SCREENING; TESTING, AND VACCINATIONS

### PRE-DEPARTURE COVID-19 SCREENING (Required)

Temperature: 98.0   Date/Time: 04.18.2022 - TL

☐ Fever/chills   ☐ New cough or difficulty breathing
☐ New body or muscle aches   ☐ New sore throat or congestion
☐ New loss of smell or taste   ☐ New headache
☐ New nausea or diarrhea

A temperature of ≥100.4°F or "Yes" to any of the above questions, the prisoner is NOT CLEARED for transfer. Prisoner must be assessed and cleared in Section 9 below by the "Certifying Health Authority".

#### COVID-19 VACCINATION (Selection required)

| Vaccine | 1st dose (date) | 2nd dose (date) | Booster (opt.) (date) |
|---|---|---|---|
| ☐ Moderna | | | |
| ☐ Pfizer | | | |
| ☐ Janssen (J&J) | | N/A | |
| ☒ Unvaccinated (refused OR vaccine unavailable) | | | |

NOTE: If vaccination started, all series required doses *must* be completed prior to movement!

### PRE-DEPARTURE COVID-19 TESTING (Required for USM Testing Hubs)

Type (or Name) of Test: COVID 19 Rapid Abbott

Test Date: 04.17.2022   Test Result: ☒ NEG ☐ POS

If already tested positive < 90 days from move, no pre-departure test required:

☐ Symptomatic (all cleared/improved)   ☐ Never symptomatic

Date Cleared from Isolation: _____

☐ 14-day Pre-Departure Quarantine Completed (if required)

Prisoners refusing testing at one of the USM testing hubs *must* be placed in a 14-day single cell quarantine. All information should be fully documented in comments.

### ADDITIONAL COVID COMMENTS

## 9. CERTIFYING HEALTH AUTHORITY - THIS PRISONER IS MEDICALLY CLEARED FOR TRAVEL

Name (Print): _____   Title: _____

I. Mardis, LVN

Signature: _____   Date: 04.17.2022   Phone Number: _____

Page 1 of 2

Form USM-553
Rev. 09/2021

120



**CoreCivic**

CIBOLA COUNTY CORRECTIONAL CENTER

Abbott ID NOW COVID-19 PCR Rapid Test

Date: ___04|18|22___

Inmate/Detainee Name: ___

A220712429
BOZKUS, SERHAT
DOB: 01/01/1992
ARD: 04/18/2022
Cibola County Correctional Center

DOB: _____

ID Number: _____

Result (Circle One):   (Negative)   Positive

Performed By: ___*FB umhruced*___

Medical Review Officer: ___*Keith Ivens mo*___

Keith W. Ivens, MD

121

BORREGO, ALEJANDRO
| NMOP | OTERO COUNTY
PROCESSING CENTER
26 MCGREGOR RANGE RD

CHAPARRAL, NM 880817753
  Acct #:

  NPI: 1770783391

BOZKUS, SERHAT

DOB:1/1/1992
SEX:M                AGE:30
U/FL:C4              WING:
ROOM:                BED: 46
  ID:  3611398    ALT·ID: A2207124
                          29

Specimen ID: 460920220417033504

Report Date: 4/17/2022 3:35
Date Received: 4/17/2022 1:34
Date Observed: 4/17/2022 14:02

NOTES:

## CLINICAL INFORMATION

FASTING:    N          Total Volume:              Source:

## CLINICAL REPORT

**Clinical Abnormalities Summary:**    (May not contain all abnormal results; narrative results may not have abnormal flags. Please review entire report.)

ABBOTT ID NOW RAPID MOLECULAR TEST

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|------|--------|----------|-----------|-------|--------|-----|
| ABBOTT ID NOW RAPID MOLECULAR TEST | NEGATIVE | | NEGATIVE | | | |

PERFORMING LAB

L = BELOW LOW NORMAL | LL = ALERT LOW | H = ABOVE HIGH NORMAL | HH = ALERT HIGH | < = PANIC LOW | > = PANIC HIGH | A = ABNORMAL |
AA = CRITICAL ABNORMAL | S = SUSCEPTIBLE | R = RESISTANT | I = INTERMEDIATE | NEG = NEGATIVE | POS = POSITIVE



**46112-CIBOLA COUNTY DETENTION CENTER**

SOUTHWEST REGION
3418 MIDCOURT ROAD
CARROLLTON, TX 75006
(800) 643-9729

2000 CIBOLA LOOP
MILAN, NM 870219998

| | | | | |
|---|---|---|---|---|
| Claim Number : | 36901901 | | | |
| Date of Service : | 04/29/2022 | **MRN** | 220712429 | |
| Patient Name : | BOZKUS, SERHAT | **DOB :** | 01/01/1992 | **Gender**   M |
| | | **Room::** | | |
| Ordering Provider: | KEITH WESLEY IVENS, MD - (NPI: 1932240421) | | | |
| Interpreting Physician: | NEAL P PASSANTE, MD - (NPI: 1437337458) | | | |
| Report Date: | 4/29/2022 5:26:27 PM | | | |

## *RADIOLOGY REPORT*

SPINE 1V

Results: AP and lateral views of the cervical spine demonstrate normal bone mineralization without acute fracture or dislocation. Vertebral body height and AP alignment are maintained. Intervertebral disc spaces are normal. No significant degenerative changes of the posterior elements. Prevertebral and paravertebral soft tissues are unremarkable. Visualized lung apices are normal.

Conclusion: No acute osseous abnormality or significant degenerative change.

Electronically signed by NEAL PATRICK PASSANTE, M.D. 4/29/2022 5:26:27 PM MDT.

T. Romero Peralta, ACNS-BC

**Statement Concerning use of Results:**
I have reviewed this diagnostic report and the results have or will be used in the treatment of the patient's medical condition.

Ordering Provider Signature: _____
KEITH WESLEY IVENS, MD - (NPI: 1932240421)

CONFIDENTIALITY NOTICE: This report (including any accompanying files or documents) is intended for the use of TridentCare or the intended recipient, and may contain information that is privileged or otherwise confidential. If you are not the intended recipient, or person responsible for delivering this report to the intend recipient, be advised that any review, dissemination, distribution, printing or copying of this report (including any accompanying files or documents) is strictly prohibited. If you received this report in error, please immediately notify the TridentCare Privacy Office toll free at 866.686.1717, and providing your name, telephone number and the date and destroy this report (including any accompanying files or documents).

*If you have questions regarding these results or would like to consult with a Rely Radiologist please call 972-468-3590*

123



Name: Boskus 97.9
Age:

P/PR: 110/170 ms — warning: sex not available, assumed male
QRS: 92 ms — sinus rhythm
QT/QTc: 344/411 ms — Normal ECG
P/QRS/T axis: 75/75/75 deg — Unconfirmed Report
Heart rate: 86 bpm

Name: e1
Age:

P/PR: 108/170 ms
QRS: 90 ms
QT/QTc: 322/415 ms
P/QRS/T axis: 62/68/62 deg
Heart rate: 100 bpm

Warning: sex not available; assumed male
sinus rhythm (rapid)
Normal ECG
Unconfirmed Report

T. Romero

25 mm/s          10 mm/mV Frequency Response: 0.5-35Hz 60Hz I-MOA≈on2.10.09          P/N 10535̸9          1907

Name: BOZKUS, SERHAT
Age:

P/PR: 110/184 ms
QRS: 100 ms
QT/QTc: 350/380 ms
P/QRS/T axis: 61/61/57 deg
Heart rate: 71 bpm

warning: sex not available, assumed male
sinus rhythm
Normal ECG
Unconfirmed Report

T. Romelo Peralta, ACNS-BC

25 mm/s    10 mm/mV Frequency Response [0.5-35] Hz 60 Hz Rel Version 2.10.09    P/N 105953

## REFUSAL TO ACCEPT MEDICAL TREATMENT

I, (Name) _Borkus, Serhat_ (Number) _22o 712 425_ at

(Facility) _Cibola County Correctional Center_ ,

refuse to accept the following Dental/ Psychiatric/ Medical/ and/or Surgical services and/ or treatment recommended by this Facility's Dental/ Psychiatric/ Medical staff and/or a referred secondary care specialist: (list treatment(s)/service(s) in layman terminology)

_Trileptal 100mg_

I am refusing the above recommended treatment(s)/service(s) for the following reason(s):

_I dont want This morning_

I acknowledge that I have been informed of the risks and possible consequences which include, but are not limited to, the following, and which may be up to and including death:

_refused counsel_

I understand the possible consequences and/or complications, listed above and still refuse recommended treatment. I understand that my failure to follow this advice may seriously affect my health or the health of the person under my guardianship.

I hereby release the Dental/ Psychiatric/ Medical staff and/or a referred secondary care specialist associated with this correctional facility, CoreCivic, any contract managed care company, and their employees and agents of all responsibility regarding this matter, and I am making this decision of my own free will.

_refused to sign_     _22o 712 425_     _1/1/92_
Inmate/Resident Signature     Inmate/Resident #     DOB

---

### (This section to be completed by a staff member)

Tamara Bennett LPN
Cibola

_[signature]_     _5/16/2c_
Qualified Health Care Professional Signature     Date/Time
(Note: For CDCR Inmates, must be an RN or higher credentialed QHCP)

_[signature]_     _5/16/2c_
Witness Signature     Date/Time

Proprietary Information – Not For Distribution – Copyrighted - Property of CoreCivic

## REFUSAL TO ACCEPT MEDICAL TREATMENT

I, (Name) _Boz Kus_ (Number) _2207124 29_ at

(Facility) _Cibola County Correctional Center_

refuse to accept the following Dental/ Psychiatric/ Medical/ and/or Surgical services and/ or treatment recommended by this Facility's Dental/ Psychiatric/ Medical staff and/or a referred secondary care specialist: (list treatment(s)/service(s) in layman terminology)

_Refuse meds oxcarbazepine 300 mg for Amdepe_

I am refusing the above recommended treatment(s)/service(s) for the following reason(s):

_Did not leave cell_

I acknowledge that I have been informed of the risks and possible consequences which include, but are not limited to, the following, and which may be up to and including death:

_Ramification for refusing meds as prescribed by provider_

I understand the possible consequences and/or complications, listed above and still refuse recommended treatment. I understand that my failure to follow this advice may seriously affect my health or the health of the person under my guardianship.

I hereby release the Dental/ Psychiatric/ Medical staff and/or a referred secondary care specialist associated with this correctional facility, CoreCivic, any contract managed care company, and their employees and agents of all responsibility regarding this matter, and I am making this decision of my own free will.

_Refuse_ _220712429_ _1-1-92_
Inmate/Resident Signature | Inmate/Resident # | DOB

### This section to be completed by a staff member

_[signature] RN_  _5-10-22 @ 0900_
Qualified Health Care Professional Signature | Date/Time
(Note: For CDCR inmates, must be an RN or higher credentialed QHCP)

_[signature]_  _5-10-22_
Witness Signature | Date/Time

Proprietary Information – Not For Distribution – Copyrighted - Property of CoreCivic

12/8/14

## REFUSAL TO ACCEPT MEDICAL TREATMENT

I, (Name) _Bozklu, Serbat_ (Number) _22U 212 423_ at

(Facility) _Cibola County Correctional Center_

refuse to accept the following Dental/ Psychiatric/ Medical/ and/or Surgical services and/ or treatment recommended by this Facility's Dental/ Psychiatric/ Medical staff and/or a referred secondary care specialist: (list treatment(s)/service(s) in layman terminology)

_Tailghal 15mg_

I am refusing the above recommended treatment(s)/service(s) for the following reason(s):

_refused because he is Ramadan_

I acknowledge that I have been informed of the risks and possible consequences which include, but are not limited to, the following, and which may be up to and including death:

_refused council_

I understand the possible consequences and/or complications, listed above and still refuse recommended treatment. I understand that my failure to follow this advice may seriously affect my health or the health of the person under my guardianship.

~~I hereby release the Dental/ Psychiatric/ Medical staff and/or a referred secondary care specialist~~ associated with this correctional facility, CoreCivic, any contract managed care company, and their employees and agents of all responsibility regarding this matter, and I am making this decision of my own free will.

_refused to sign_     _22 0714423_

Inmate/Resident Signature      Inmate/Resident #      DOB

### (This section to be completed by a staff member)

Tamare Bennett LPN
Cibola

Qualified Health Care Professional Signature     _4/28/20_

(Note: For CDCR inmates, must be an RN or higher credentialed QHCP)     Date/Time

Witness Signature      _4/28/20_

     Date/Time

Proprietary Information – Not For Distribution – Copyrighted - Property of CoreCivic

# Informed Consent - Tele-Health Services

| Facility Name | Cibola County Correctional Center |
|---|---|
| Inmate/Resident Name | BOZKUS, SERHAT |
| Inmate/Resident Number | A220712429 |
| Inmate/Resident DOB | 1/1/1992 |

Tele-Health Sevices is the practice of tele-health and/or telepsychiatry including, but not necessarily limited to, evaluation, diagnosis and treatment of medical/mental health conditions. It is performed by licensed independent practitioners at a remote site, by audio/visual communication equipment.

I acknowledge that the tele-health process was discussed with me and I was given the opportunity to ask questions.

I understand the process as explained and hereby give permission to this facility to render medical and/or mental health treatment using tele-health services.

I further acknowledge that other means of receiving medical/mental health, services at this facility were described to me during the new arrival orientation and that I have the opportunity to decline tele-health services by submitting a written request to the Health Services Department.

X _____     4/18/2022 _____     1700 _____
Inmate/Resident Signature            Date                   Time

**WITNESSED BY:**

_F. Burnherm_ _____     _LPN_ _____
Printed Name                          Title

_JBurnherm_ _____     4/18/2022 _____     1700 _____
Signature                            Date                   Time

2/19/15

Proprietary Information – Not For Distribution – Copyrighted – Property of CoreCivic

## HEALTH CARE SERVICES - GENERAL CONSENT (ICE facilities only)

The major purpose of the clinic is to provide you with medical care. Medical information obtained will be kept in a confidential medical record. You will be expected to undergo a medical examination to determine your current health status.

I,_BOZKUS,SERHAT_____(detainee name)A220712429_____ (agency #), hereby consent to medical screening and medical examination to determine my current health status, other medical evaluations, diagnostic procedures, routine care, and medical/dental treatments which the medical and professional staff of the clinic may deem necessary, advisable, or appropriate.

I authorize disclosure of my medical records to a hospital, if hospitalization is deemed necessary, advisable, or appropriate. I authorize disclosure of my medical records to federal and/or state reporting agencies for purposes of disease surveillance and control.

This form has been fully explained to me, and I understand its contents. I further understand that no guarantees have been made to me regarding the results of treatments or examinations performed in the clinic.

## SERVICIOS DE ATENCIÓN DE SALUD - CONSENTIMIENTO GENERAL

El propósito principal de la clínica es proporcionarle a usted con atención médica. Información médica obtenida se mantendrá en un registo médico confidencial. Usted tendra que someterse a un examen médico para determinar su estado actual de salud.

Yo, _____ (nombre del detenido) _____ (número de la Agencia), autorizo a someterme a una investigacion y examen médico para determinar mi estado de salud actual, otras evaluaciones médicas, procedimientos de diagnóstico, atención de rutina, y tratamientos médicos y dentales que el personal médico y profesional de la clínica estime necesario, conveniente o apropiado.

Autorizo revelación de mis archivos médicos a un hospital, Si hospitalización se considera necesario, conveniente o apropiado. Autorizo divulgación de mi registros médicos a agencias federales y/o estatales con fines de control y vigilancia de enfermedades.

Este formulario ha sido explicado plenamente a mí, y entiendo su contenido. Tengo entendido que ninguna garantía ha sido estendida a mí en relación con el resultado de tratamientos o exámenes realizados en la clínica.

| | 4/18/2022 | | 4/18/2022 |
|---|---|---|---|
| Signature of Detainee | Date | Signature of Witness | Date |
| Firma del detenido | Fecha | Firma del Testigo | Fecha |

| Detainee Name: (Last, First) BOZKUS, SERHAT | |
|---|---|
| DOB: 1/1/1992 | Detainee ICE # A220712429 |
| Nationality TURKE | Facility Cibola County Correctional Center |

Proprietary Information – Not for Distribution – Copyrighted – Property of CoreCivic



## Annual Influenza Vaccine Consent Form-FLU SHOT - 2020

### Section 1: Information about the person to Receive Vaccine (please print)

| NAME BOZKUS | (First)SERHAT | (M.I.) | DATE OF BIRTH 1/1/1992 |  |  |
|---|---|---|---|---|---|
|  |  |  | month | day | year |
| Agency Number A220712429 |  |  | AGE | GENDER M / F |  |
| Facility Cibola County Correctional Center |  |  |  |  |  |
|  |  |  |  |  |  |

### Section 2: Screening for Vaccine Eligibility

Were you vaccinated with the seasonal influenza vaccine after July 1, 2010?   YES   NO

The following questions will help us to know if you should get the seasonal influenza vaccine. If you answer "NO" to all four of the following questions, you can probably get the influenza vaccine. If you answer "YES" to one or more of the following four questions, you may be able to get the seasonal influenza vaccine, but we will contact you to discuss your options.
Please mark YES or NO for each question.

|  | YES | NO |
|---|---|---|
| 1. Do you have a serious allergy to eggs? |  |  |
| 2. Do you have any other serious allergies?   Please list: |  |  |
| 3. Have you ever had a serious reaction to a previous dose of flu vaccine? |  |  |
| 4. Have you ever had Guillain-Barré Syndrome (a type of temporary severe muscle weakness) within 6 weeks after receiving a flu vaccine? |  |  |

### Section 3: Consent

**CONSENT FOR VACCINATION:**

I have read or had explained to me the Vaccine Information Statement for the seasonal influenza vaccine and understand the risks and benefits.

☐ **I GIVE CONSENT** to CoreCivic and its staff to be vaccinated with this vaccine.

☐ **I DO NOT GIVE CONSENT** to CoreCivic and its staff to be vaccinated with this vaccine.

Signature _____

Date:  month 4_____ day 18_____ year 2022_____

### Section 5: Vaccination Record

FOR ADMINISTRATIVE USE ONLY

| Vaccine | Route | Date Dose Administered | Vaccine Manufacturer | Lot Number | Name and Title of Vaccine Administrator |
|---|---|---|---|---|---|
| Influenza | ☐ IM ☐ Intranasal | / / |  |  | *JB uhren* |

132

# Biovision Diagnostics

1616 Eastport Plaza Drive
Collinsville, IL 62234
P:618-690-9555 F:618-400-1220
Lab Director: Mary Mayo PhD CLIA #14D2218746

| Patient: | BOZKUS, SERHAT | MRN: | A220712429 | Accession: | 115587 |
| Patient #: | 42546 | Birth: | 1/1/1992 | | |
| Doctor: | WALKER, CARY | Age: | 30 years | Collection Date: | 7/19/2022 2:00 PM |
| Home Phone: | (303)739-8715 | Gender: | Male | Received Date: | 7/21/2022 11:56 AM EA |
| Organization: | The GEO Group Inc | | | | |

| Test Name | Result | Units | Flag | Reference Range/Cutoff |
|---|---|---|---|---|
| **SARS CoV2** | | | | *Run by KA on 7/21/2022 4:43:35 PM at Location: 1000* |
| SARS COV2 | POSITIVE | | POS | NEG |
| Notes: | This test has received Emergency Use Authorization (EUA) from the US Food and Drug Administration. | | | |

| **Location 1000:** | Biovision Diagnostics 1616 Eastport Plaza Drive Collinsville, IL 62234 P:618-690-9555 F:618-400-1220 Lab Director: Mary Mayo PhD CLIA #14D2218746 |
|---|---|

Reviewed By:_____ Date:_____

DR. CARY WALKER

JUL 2 2 2022

MEDICAL DIRECTOR

Originally Reported On: 7/21/2022 4:49 PM
Printed: 7/21/2022 4:49 PM
(UTC-06:00) Central Time (US & Canada)      STAT[S] Corrected [C] Amended [A]

Accession: 115587   Patient: #: 42546
Lab Results for: BOZKUS, SERHAT
Page: 1/1

133

**PLEASE COMPLETE THE COVID-19 SCREENING AND TESTING SECTION AS CLOSE AS POSSIBLE TO DEPARTURE AS FEASIBLE: SEE BOX 7**

U.S. Department of Justice
United States Marshal Service

# Prisoner in Transit Medical Summary

## 1. IDENTIFYING INFORMATION

Name (Last, First, MI): BOZKUS, SERHAT

Gender: M    DOB: 01/01/1992    USMS #: 220712429 - ICE

Departure Date: 07/19/2022    Departed From: CCCC

## 2. TUBERCULOSIS SCREENING

Tuberculosis Skin Test (TST) / PPD

Date Placed:    Date Read:    Size in mm:

Tuberculosis Blood Test/IGRA (if applicable)

☐ Positive    ☐ Negative    Date:
☐ Indeterminate/Borderline

Chest x-ray done within past year (if indicated):

Date: 12/7/2021    Result: neg

Prisoner is cleared for transfer: ☐ NO  ☑ YES

## 3. CURRENT MEDICAL ISSUES

Check All that apply to the prisoner and explain in the comments section:

☐ Hospitalizations within the past month
☐ Seizure activity withing the past month
☐ Seizure disorder requiring medications
☐ Limited mobility (crutches, wheelchair)
☐ Has hard or air cast, splint or brace
☐ Prescription narcotic pain medications dispensed for travel
☐ Suicide watch/psychiatric decompensation within past month

☐ Contagious illness or quarantine within past month
☐ Cardiac chest pain within past month
☐ Stroke within past month
☐ Surgery within past month
☐ Diabetes requiring insulin or other medications

FEMALE PRISONERS: Is prisoner pregnant? ☐ NO ☐ YES If yes, how many weeks?

## 4. SICKLE CELL SCREENING

Prisoner has history of (check appropriate box):

☐ Sickle Cell Disease    ☐ Sickle Cell Trait
☑ No History of Disease or Trait

If prisoner has disease or trait and is traveling by air, has JPATS Sickle Cell Protocol and Clearance been completed?

☐ NO    ☐ YES

Attach clearance to transfer summary

## 5. ALLERGIES (including drugs, foods, latex, etc.):

NKA

## 6a. OTHER MEDICAL PROBLEMS

dental pain
back pain
nausea
HTN

## 6b. MEDICATIONS DISPENSED WITH PRISONER FOR TRANSPORT

Amoxicillin 500mg BID until gone    Chlorphenermine 4mg BID
Clotrimazole cream BID    Ibuprofen 600mg BID    Lisinopril 20mg QD
Mirtazepine 15mg QHS    Naproxen 500mg Q12
Ondansterone 4mg BID PRN

## 7. COMMENTS: (If additional space is needed, write on back, attach separate sheet of paper, or check this box to create a second page) ☐

## 8. COVID SCREENING, TESTING AND VACCINATIONS

### PRE-DEPARTURE COVID-19 SCREENING

Temperature: 97.6    Date: 07/18/2022    Time: 2107

☐ Fever/Chills
☐ New body or muscle aches
☐ New loss of smell or taste
☐ New nausea or diarrhea
☐ New cough or difficulty breathing
☐ New sore throat or congestion
☐ New headache

If temperature is 100.4F or greater or answer is Yes to ANY other question, the prisoner is NOT CLEARED FOR TRANSER until evaluated and cleared by licensed independent practitioner who must complete section 8 below as the Certifying Health Authority.

### PRE-DEPARTURE COVID-19 TESTING (if required)

Type (or Name) of Test: Binax Now

Test Date: 07/18/2022    Test Result: ☑ NEG  ☐ POS

If already tested positive < 90 days from move, no pre-departure test required:
☐ Symptomatic (all cleared/improved)    ☐ Never Symptomatic

Date Cleared from Isolation:

☐ 14-day Pre-Departure Quarantine Completed (if required)

Prisoners refusing testing *must* be placed in a 14-day single cell quarantine. All information should be fully documented in comments.

### COVID VACCINATION (Selection Required)

| Vaccine | 1st Dose (date) | 2nd Dose (date) | Booster (Opt Dt) |
|---|---|---|---|
| ☐ Moderna | | | |
| ☐ Pfizer | | | |
| ☐ Janssen (J&J) | | N/A | |
| ☐ Unvaccinated (refused OR vaccine unavailable) | | | |

NOTE: If vaccination started, all series required doses must be completed prior to movement!

Additional Covid Comments:

## CERTIFYING HEALTH AUTHORITY: THIS PRISONER IS MEDICALLY CLEARED FOR TRAVEL

Signature: Bounds, Joey    Title: RN    Date: 07/18/2022    Phone

Form USM-553
Rev. 09/21

# Cibola County Correctional Facility

2000 Cibola Loop, P.O. Box 3540
Milan,NM 87021
(505) 285-4900

Patient: BOZKUS, SERHAT

CIBOL 100
C 207 L
Brentwood, TN 37027

Age/Sex/DOB: 30 yrs  M  01-Jan-1992
EMRN: 5985911
OMRN: 5985911
Home:
Work:

## Results

Lab Accession #   0001
Ordering Provider:   Romero-Peralta, Tiffany

Performing Location: On Site

Collected:   7/18/2022  8:55:00PM
Resulted:    7/18/2022  8:55:00PM
Verified By:  <Unverified>
Auto Verify: N

## COVID SARS-COV-2-IGG

Stage:      Final

| Test | Result | Units | Flag | Reference Range |
|------|--------|-------|------|-----------------|
| COVID SARS-COV-2-IGG | negative | | | |

Bozkus, Serhat
DO: 1/1/1992
220712429

**DO**
**Arrival Date:**

# INTAKE CHECK LIST

## *Initial in blanks when assigned duties have been completed or addressed*

COVID-19 testing: (circle)          (PCR) Tested/Refused (must have refusal) _____

If Rapid Testing:Results (Circle and document in Sapphire):  Neg  /  **Positive**

Vitals:  BP 130/92 Pulse 94 Resp 110 Temp 97. Weight 180 Height 10

**Females Only**: Pregnancy Test (Circle):  Neg/ Pos  -  Charted in Sapphire: Yes /  No          _____

*TB Screening*:     (CXR completed) or PPD  (must be within 12 hours or documented within last 12 months while in continuous custody):

**Intake Nurse**:                    Regular: _____ Chronic*: _____

If applicable:  Blood sugar_____    Peak Flow x3_____   _____  _____

Intake & PREA Completed by nurse**:          ES

CC/PREA on urgent list for next day:     (Yes /) No  /  (circle) If yes, scheduled: _____

Intake Nurse – initial when Intake Screening is complete: ES (retrieve form from Inmate/Detainee)

**Chronic Care Nurse**:

Intake coSigned by medical provider:          _____

Intake cosigned by MH provider:          _____

H&P Date Scheduled / Completed:          ___/___

H&P Co-Signed by MD if applicable:          _____

COVID-19 Vaccine: (circle)          Requested/Declined     *Circle*: Completed

Audited by AHSA and/or HSA:          N/A

136

PLEASE COMPLETE THE COVID-19 SCREENING AND TESTING SECTION AS CLOSE AS POSSIBLE TO DEPARTURE AS FEASIBLE: SEE BOX 7

U.S. Department of Justice
United States Marshal Service

**Prisoner in Transit Medical Summary**

| 1. IDENTIFYING INFORMATION | 2. TUBERCULOSIS SCREENING |
|---|---|

### 1. IDENTIFYING INFORMATION

Name (Last, First, MI): **BOZKUS, SERHAT**

Gender: M  DOB: 01/01/1992  USMS #: 220712429 - ICE

Departure Date: 07/19/2022  Departed From: CCCC

### 2. TUBERCULOSIS SCREENING

Tuberculosis Skin Test (TST) / PPD

Date Placed:  Date Read:  Size in mm:

Tuberculosis Blood Test/IGRA (if applicabale)

☐ Positive ☐ Negative  Date:
☐ Indeterminate/Borderline

Chest x-ray done within past year (if indicated):

Date: 12/7/2021  Result: neg

Prisoner is cleared for transfer:  ☐ NO ☑ YES

### 3. CURRENT MEDICAL ISSUES

Check All that apply to the prisoner and explain in the comments section:

☐ Hospitalizations within the past month
☐ Contagious illness or quarantine within past month
☐ Seizure activity withing the past month
☐ Cardiac chest pain within past month
☐ Seizure disorder requiring medications
☐ Stroke within past month
☐ Limited mobility (crutches, wheelchair)
☐ Surgery within past month
☐ Has hard or air cast, splint or brace
☐ Diabetes requiring insulin or other medications
☐ Prescription narcotic pain medications dispensed for travel
☐ Suicide watch/psychiatric decompensation within past month

FEMALE PRISONERS: Is prisoner pregnant?  ☐ NO ☐ YES  If yes, how many weeks?

### 4. SICKLE CELL SCREENING

Prisoner has history of (check appropriate box):

☐ Sickle Cell Disease  ☐ Sickle Cell Trait
☑ No History of Disease or Trait

If prisoner has diease or trait and is traveling by air, has JPATS Sickle Cell Protocol and Clearance been completed?  ☐ NO ☐ YES

Attach clearance to transfer summary

### 5. LIST ALLERGIES (Including drugs, foods, latex, etc.):

NKA

| 6a. OTHER MEDICAL PROBLEMS | 6b. MEDICATIONS DISPENSED WITH PRISONER FOR TRANSPORT |
|---|---|
| dental pain | Amoxicillin 500mg BID until gone  Chlorphenermine 4mg BID |
| back pain | Clortrimazole cream BID  Ibuprofen 600mg BID  Lisinopril 20mg QD |
| nausea | Mirtazepine 15mg QHS  Naproxen 500mg Q12 |
| HTN | Ondasterone 4mg BID PRN |
|  |  |
|  |  |

### 7. COMMENTS: (If addional space is needed, write on back , attach seperatre sheet of paper, or check this box to create a second page:

### 8 COVID SCREENING, TESTING, AND VACCINATIONS

**PRE-DEPARTURE COVID-19 SCREENING**

Temperature: 97.6  Date: 07/18/2022  Time: 2107

☐ Fever/Chills
☐ New cough or difficulty breathing
☐ New body or muscle aches
☐ New sore throat or congestion
☐ New loss of smell or taste
☐ New headache
☐ New nausea or diarrhea

If temperature is 100.4F or greater or answer is Yes to ANY other question, the prisoner is NOT CLEARED FOR TRANSER until evaluated and cleared by licensed independent practitioner who must complete section 8 below as the Certifying Health Authority.

**PRE-DEPARTURE COVID-19 TESTING (if required)**

Type (or Name) of Test: Binax Now

Test Date: 07/18/2022  Test Result: ☑ NEG ☐ POS

If already tested positive < 90 days from move, no pre-departure test required:
☐ Symptomatic (all cleared/improved)  ☐ Never Symptomatic

Date Cleared from Isolation:

☐ 14-day Pre-Departure Quarantine Completed (if required)

Prisoners refusing testing *mus* be placed in a 14-day single cell quarantine. All information should be fully documented in comments.

| COVID VACCINATION (Selection Required) | | | |
|---|---|---|---|
| Vaccine | 1st Dose (date) | 2nd Dose (date) | Booster (Opt Dt) |
| ☐ Moderna |  |  |  |
| ☐ Pfizer |  |  |  |
| ☐ Janssen (J&J) |  | N/A |  |

☐ Unvaccinated (refused OR vaccine unavailable)
NOTE: If vaccination started, all series required doses must be completed prior to movement!

Additional Covid Comments:

### 8. CERTIFYING HEALTH AUTHORITY - THIS PRISONER IS MEDICALLY CLEARED FOR TRAVEL

Signature: Bounds, Joey  Title: RN  Date 07/18/2022  Phone

Form USM-553
Rev. 09/21

Page 1 of 2

137

# Cibola County Correctional Facility

2000 Cibola Loop, P.O. Box 3540
Milan, NM 87021
(505) 285-4900

Patient: BOZKUS, SERHAT

CIBOL 100
C 207 L
Brentwood, TN 37027

| | |
|---|---|
| Age/Sex/DOB: | 30 yrs  M  01-Jan-1992 |
| EMRN: | 5985911 |
| OMRN: | 5985911 |
| Home: | |
| Work: | |

---

## Results

Lab Accession #        0001
Ordering Provider:    Romero-Peralta, Tiffany

Performing Location:  On Site

| | |
|---|---|
| Collected: | 7/18/2022   8:55:00PM |
| Resulted: | 7/18/2022   8:55:00PM |
| Verified By: | <Unverified> |
| Auto Verify: | N |

### COVID SARS-COV-2-IGG

Stage:        Final

| Test | Result | Units | Flag | Reference Range |
|---|---|---|---|---|
| COVID SARS-COV-2-IGG | negative | | | |

Detainee Sticker

A220712429
BOZKUS, SERHAT
DOB: 1/1/1992    Nation:     TURKEY
Arrival Date:          7/19/2022 15:30

# INTAKE CHECK LIST

## _Initial in blanks when assigned duties have been completed or addressed_

COVID-19 testing: (circle)          (PCR) Tested/Refused (must have refusal) _____

**If Rapid Testing:** Results (Circle and document in Sapphire):   Neg   /   Positive

Vitals:  BP _130/92_  Pulse _94_  Resp _15_  Temp _97_  Weight _150_ Height _72_

**Females Only:**  Pregnancy Test (Circle):  Neg/ Pos  -  Charted in Sapphire:  Yes /(No)

**TB Screening:**  (CXR completed) or PPD (must be within 12 hours or documented within last 12
months while in continuous custody): _12/21_          _____

**Intake Nurse:**

If applicable:  Blood sugar_____  Peak Flow x3_____      _____    Regular: _____  Chronic*: _____

Intake & PREA Completed by nurse**:          _____

CC/PREA on urgent list for next day:      Yes /  No  /  (circle) If yes, scheduled: _____

Intake Nurse – Initial when Intake Screening is complete: _____ (retrieve form from Inmate/Detainee)

**Chronic Care Nurse:**

Intake coSigned by medical provider:          _____

Intake cosigned by MH provider:          _____

H&P Date Scheduled / Completed:          ____/____

H&P Co-Signed by MD if applicable:          _____

COVID-19 Vaccine: (circle)          Requested/Declined      **Circle:** Completed

Audited by AHSA and/or HSA:          _____

139



**The GEO Group, Inc.**

## CORONAVIRUS (COVID-19)
## SWAB TESTING CONSENT FORM
### Detainee

By signing below, I give permission to **Aurora ICE Processing Center** to perform a COVID-19 test on me by appropriate staff, I understand the testing process and understand that:

- This is voluntary and I am not required to take this test.
- I might have pain or bruising where the test is conducted.
- There is a small chance of infection or bleeding.
- The accuracy of the results is not guaranteed.
- I might need additional testing in the future.
- Even if I have a positive or negative result now, I might still get COVID-19 in the future.
- I have had an opportunity to ask questions.
- CDC Fact Sheet for Patients provided.

By signing below, I give permission to the facility to receive my test results and give the results to me. I understand that positive COVID-19 results will be reported to the appropriate health authority.

Have you ever been tested for COVID-19?  Y / N  _____

    If yes, what was the date of the test? _____

    If yes, what was the result? _____

A220712429
BOZKUS, SERHAT
DOB: 1/1/1992   Nation:   TURKEY
Arrival Date:   7/19/2022 15:30

Name: _____ Date of Birth: _____

Signature: _____

Address: _____ County: _____ State: _____

For individuals under age 18 years, or unable to consent:

    Parent/Guardian Name: _____

    Signature: _____

Date: _____

Witness: _____

STEVE BYRNE PA
JUL 1 9 2022   11 AM
AURQR  ICE PC

5.2.2020: AIPC

140



**Male**

| | | | |
|---|---|---|---|
| Anniversary Date: | **7/19/2022** | TB Date & Result: | |
| Race | **S** | Language | **Unknown** |
| Lactation Flag | **False** | Alt Num | **0f65a4f1-ac93-46ad-a217-2cbf1a5f2cab** |
| Smoking Status | | Suicide Status | **N/A** |
| Height/Wt | **6'0"  139 lbs** | Pregnancy | **No** |

## Allergies

| Allergy | Onset Date | Severity | Onset Type |
|---|---|---|---|
| NO KNOWN DRUG ALLERGY | | N/A | N/A |

## Immunizations

No Immunizations indicated

## Medications

| Medication | DC Date | Start Date | Stop Date | Last Admin |
|---|---|---|---|---|
| **Active** | | | | |
| **Crackers** | | 9/1/2022 | 10/30/2022 | 9/6/2022 |
| *WALKER, CARY GOSSETT* | | | | |
| *GIVE 2 APPLICATION(S) ORAL TWICE DAILY* | | | | |
| **Ensure Liquid 237ml** | | 9/1/2022 | 10/1/2022 | 9/6/2022 |
| *WALKER, CARY GOSSETT* | | | | |
| *TAKE 1 APPLICATION(S) ORALLY TWICE DAILY* | | | | |
| **Sucralfate 1gm Tablet (CARAFATE)** | | 9/2/2022 | 9/15/2022 | 9/6/2022 |
| *WALKER, CARY GOSSETT* | | | | |
| *TAKE 1 TABLET(S) ORALLY THREE TIMES DAILY* | | | | |
| **Gabapentin 600mg Tablet (NEURONTIN)** | | 8/31/2022 | 11/28/2022 | 9/6/2022 |
| *WALKER, CARY GOSSETT* | | | | |
| *TAKE 1 TABLET(S) ORALLY THREE TIMES DAILY* | | | | |
| **Meclizine 12.5mg Tablet (ANTIVERT)** | | 8/18/2022 | 9/17/2022 | 9/6/2022 |
| *WALKER, CARY GOSSETT* | | | | |
| *TAKE 1 TABLET(S) ORALLY TWICE DAILY* | | | | |
| **Fluticasone 0.05% Nasal S (FLONASE)** | | 8/16/2022 | 9/15/2022 | 9/6/2022 |
| *WALKER, CARY GOSSETT* | | | | |
| *INSTILL 1 SPRAY(S) INTO EACH NOSTRIL ONCE DAILY* | | | | |
| **Mirtazapine 15mg Tablet (REMERON)** | | 8/9/2022 | 10/7/2022 | 9/5/2022 |
| *MCGUIRE, COLLEEN* | | | | |

**EHR Clinical Report**

| | |
|---|---|
| **Facility:** | COAI - AURORA ICE PROCESSING CENTER |
| **Created By:** | CINCOTTA, CYNTHIA |
| **Created On:** | 09/06/2022 10:22:05 AM |

*TAKE 1 TABLET(S) ORALLY AT BEDTIME*

| | | | |
|---|---|---|---|
| **Olanzapine 2.5mg Tablet (ZYPREXA)** | 8/9/2022 | 10/7/2022 | 9/5/2022 |

*MCGUIRE, COLLEEN*

*TAKE 1 TABLET(S) ORALLY AT BEDTIME*

| | | | |
|---|---|---|---|
| **Lisinopril 20mg Tablet (PRINIVIL)** | 8/4/2022 | 11/1/2022 | 9/6/2022 |

*WALKER, CARY GOSSETT*

*TAKE 1 TABLET(S) ORALLY ONCE DAILY*

| **Inactive** | | | | |
|---|---|---|---|---|
| **Mirtazapine 15mg Tablet (REMERON) DISCONTINUED - 7/26/2022 4:45:58 PM** | **7/26/2022 4:45:58 PM** | 7/19/2022 | 7/26/2022 | 7/26/2022 |

*WALKER, CARY GOSSETT*

*TAKE 1 TABLET(S) ORALLY AT BEDTIME*

| | | | | |
|---|---|---|---|---|
| **Meclizine 12.5mg Tablet (ANTIVERT) DISCONTINUED - 8/18/2022 11:25:07 AM** | **8/18/2022 11:25:07 AM** | 7/19/2022 | 8/18/2022 | 8/18/2022 |

*WALKER, CARY GOSSETT*

*TAKE 1 TABLET(S) ORALLY TWICE DAILY*

| | | | | |
|---|---|---|---|---|
| **Lisinopril 20mg Tablet (PRINIVIL) DISCONTINUED - 8/5/2022 1:46:55 AM** | **8/5/2022 1:46:55 AM** | 7/19/2022 | 8/18/2022 | 8/3/2022 |

*WALKER, CARY GOSSETT*

*TAKE 1 TABLET(S) ORALLY ONCE DAILY*

| | | | | |
|---|---|---|---|---|
| **Naproxen 500mg Tablet (NAPROSYN) DISCONTINUED - 7/20/2022 3:30:14 PM** | **7/20/2022 3:30:14 PM** | 7/19/2022 | 8/18/2022 | 7/20/2022 |

*WALKER, CARY GOSSETT*

*TAKE 1 TABLET(S) ORALLY TWICE DAILY*

| | | | | |
|---|---|---|---|---|
| **HydrOXYzine Pam 25mg Cap (VISTARIL) DISCONTINUED - 8/2/2022 12:55:05 PM** | **8/2/2022 12:55:05 PM** | 7/21/2022 | 8/4/2022 | 8/2/2022 |

*WALKER, CARY GOSSETT*

*TAKE 1 CAPSULE(S) ORALLY TWICE DAILY*

| | | | | |
|---|---|---|---|---|
| **Gabapentin 300mg Capsule (NEURONTIN) DISCONTINUED - 8/5/2022 1:45:56 AM** | **8/5/2022 1:45:56 AM** | 7/21/2022 | 8/20/2022 | 8/4/2022 |

*WALKER, CARY GOSSETT*

*TAKE 1 CAPSULE(S) ORALLY TWICE DAILY*

| | | | | |
|---|---|---|---|---|
| **Fluticasone 0.05% Nasal S (FLONASE) DISCONTINUED - 8/16/2022 10:36:26 AM** | **8/16/2022 10:36:26 AM** | 7/21/2022 | 8/20/2022 | 8/16/2022 |

*WALKER, CARY GOSSETT*

*INSTILL 1 SPRAY(S) INTO EACH NOSTRIL ONCE DAILY*

| | | | | |
|---|---|---|---|---|
| **Mirtazapine 15mg Tablet (REMERON) DISCONTINUED - 8/2/2022 12:54:26 PM** | **8/2/2022 12:54:26 PM** | 7/26/2022 | 8/25/2022 | 8/1/2022 |

*WALKER, CARY GOSSETT*

*TAKE 1 TABLET(S) ORALLY AT BEDTIME*

| | | | | |
|---|---|---|---|---|
| **Olanzapine 2.5mg Tablet (ZYPREXA) DISCONTINUED - 8/9/2022 12:45:51 PM** | **8/9/2022 12:45:51 PM** | 8/2/2022 | 9/30/2022 | 8/8/2022 |

---

**EHR Clinical Report**

**Facility:**  COAI - AURORA ICE PROCESSING CENTER

**Created By:**  CINCOTTA, CYNTHIA

**Created On:**  09/06/2022 10:22:05 AM

*MCGUIRE, COLLEEN*

*TAKE 1 TABLET(S) ORALLY AT BEDTIME*

| | | | | |
|---|---|---|---|---|
| **Mirtazapine 15mg Tablet (REMERON) DISCONTINUED - 8/9/2022 12:44:16 PM** | 8/9/2022 12:44:16 PM | 8/2/2022 | 9/30/2022 | 8/8/2022 |

*MCGUIRE, COLLEEN*

*TAKE 1 TABLET(S) ORALLY AT BEDTIME*

| | | | | |
|---|---|---|---|---|
| **HydrOXYzine Pam 25mg Cap (VISTARIL) DISCONTINUED - 8/9/2022 12:45:29 PM** | 8/9/2022 12:45:29 PM | 8/2/2022 | 9/30/2022 | 8/9/2022 |

*MCGUIRE, COLLEEN*

*TAKE 1 CAPSULE(S) ORALLY TWICE DAILY*

| | | | | |
|---|---|---|---|---|
| **Ensure Liquid 237ml DISCONTINUED - 9/1/2022 2:28:03 PM** | 9/1/2022 2:28:03 PM | 8/3/2022 | 9/2/2022 | 9/1/2022 |

*WALKER, CARY GOSSETT*

*TAKE 1 APPLICATION(S) ORALLY TWICE DAILY*

| | | | | |
|---|---|---|---|---|
| **Gabapentin 600mg Tablet (NEURONTIN) DISCONTINUED - 8/31/2022 10:34:53 AM** | 8/31/2022 10:34:53 AM | 8/4/2022 | 9/3/2022 | 8/30/2022 |

*WALKER, CARY GOSSETT*

*TAKE 1 TABLET(S) ORALLY THREE TIMES DAILY*

| | | | |
|---|---|---|---|
| **Ibuprofen 600mg Tablet (MOTRIN)** | 7/19/2022 | 7/26/2022 | 7/26/2022 |

*WALKER, CARY GOSSETT*

*TAKE 1 TABLET(S) ORALLY TWICE DAILY*

| | | | |
|---|---|---|---|
| **Ondansetron 4mg Tablet (ZOFRAN)** | 7/19/2022 | 8/2/2022 | 8/2/2022 |

*WALKER, CARY GOSSETT*

*TAKE 1 TABLET(S) ORALLY TWICE DAILY AS NEEDED*

| | | | |
|---|---|---|---|
| **Amoxicillin 500mg Capsule (AMOXIL)** | 7/19/2022 | 7/26/2022 | 7/26/2022 |

*WALKER, CARY GOSSETT*

*TAKE 1 CAPSULE(S) ORALLY TWICE DAILY*

| | | | |
|---|---|---|---|
| **Chlorpheniramine 4mg Tab (CHLOR-TRIMETON)** | 7/19/2022 | 7/29/2022 | 7/29/2022 |

*WALKER, CARY GOSSETT*

*TAKE 1 TABLET(S) ORALLY TWICE DAILY*

| | | |
|---|---|---|
| **Clotrimazole 1% Cream (LOTRIMIN) - KOP** | 7/19/2022 | 8/17/2022 |

*WALKER, CARY GOSSETT*

*APPLY CREAM TOPICALLY TWICE DAILY*

| | | |
|---|---|---|
| **CIPRO HC 0.2-1% OTIC SUSP - KOP** | 7/20/2022 | 7/26/2022 |

*WALKER, CARY GOSSETT*

*INSTILL 4 DROP(S) INTO THE LEFT EAR TWICE DAILY*

| | | | |
|---|---|---|---|
| **Ondansetron 4mg Tablet (ZOFRAN)** | 8/25/2022 | 8/29/2022 | 8/28/2022 |

*WALKER, CARY GOSSETT*

**EHR Clinical Report**

**Facility:**    COAI - AURORA ICE PROCESSING CENTER

**Created By:**    CINCOTTA, CYNTHIA

**Created On:**    09/06/2022 10:22:05 AM

*TAKE 1 TABLET(S) ORALLY TWICE DAILY AS NEEDED*

## Problem List

| Problem Description | Start Date | Diagnosed By | Resolved By | Stop Date |
|---|---|---|---|---|
| DSM-V- (309.81) - Posttraumatic stress disorder | 8/5/2022 | U- WILLSON, BRYCE | | |
| ICD-10- (F33.0) - Major depressive disorder, recurrent, mild | 8/2/2022 | DOC- MCGUIRE, COLLEEN | | |
| ICD-9- (401.1) - BENIGN ESSENTIAL HYPERTENSION | 7/20/2022 | DOC- WALKER, CARY | | |
| ICD-9- (300.00) - ANXIETY STATE UNSPECIFIED | 7/20/2022 | DOC- WALKER, CARY | | |
| ICD-10- (M54.16) - Radiculopathy, lumbar region | 7/20/2022 | DOC- WALKER, CARY | | |
| ICD-9- (784.91) - POSTNASAL DRIP | 7/20/2022 | DOC- WALKER, CARY | | |

## Lab Result Summary

| Service | Provider | Collected Date | Result Date |
|---|---|---|---|
| Microscopic Examination | WALKER, C | 08/02/2022 4:00A | 08/04/2022 13:08P |
| Urinalysis, Complete | WALKER, C | 08/02/2022 4:00A | 08/04/2022 13:08P |
| Request Problem | WALKER, C | 07/22/2022 4:00A | 07/29/2022 16:09P |
| Urinalysis, Complete | WALKER, C | 07/22/2022 4:00A | 07/29/2022 16:09P |
| Hemoglobin A1c | WALKER, C | 07/22/2022 4:00A | 07/25/2022 8:07A |
| Lipid Panel | WALKER, C | 07/22/2022 4:00A | 07/25/2022 8:07A |
| Comp. Metabolic Panel (14) | WALKER, C | 07/22/2022 4:00A | 07/25/2022 8:07A |
| CBC With Differential/Platelet | WALKER, C | 07/22/2022 4:00A | 07/25/2022 8:07A |
| TSH+Free T4 | WALKER, C | 07/22/2022 4:00A | 07/25/2022 8:07A |
| SARS CoV2 | WALKER, CARY | 07/19/2022 14:00P | 07/21/2022 16:43P |
| CHEST, SINGLE VIEW | WALKER, CARY | 07/21/2022 12:41P | 07/21/2022 12:41P |

## Vitals Summary

| Vitals Type Desc | Vital Inforamtion | Recorded By | Date Taken |
|---|---|---|---|
| BODY TEMPERATURE | 97.6 °F | WALKER, CARY | 9/1/2022 9:04:51 AM |
| BODY TEMPERATURE | 96.8 °F | Collyns, Amanda | 8/19/2022 11:35:15 PM |
| BODY TEMPERATURE | 97.9 °F | WALKER, CARY | 8/4/2022 4:26:36 PM |
| BODY TEMPERATURE | 97.2 °F | JOSHI, KRUSHNA | 7/24/2022 11:07:00 AM |
| BODY TEMPERATURE | 97.6 °F | JOSHI, KRUSHNA | 7/23/2022 11:44:00 AM |
| BODY TEMPERATURE | 97.6 °F | WALKER, CARY | 7/20/2022 1:43:58 PM |
| BODY TEMPERATURE | 97.6 °F | WALKER, CARY | 7/20/2022 1:41:08 PM |

---

**EHR Clinical Report**

**Facility:**     COAI - AURORA ICE PROCESSING CENTER

**Created By:**   CINCOTTA, CYNTHIA

**Created On:**   09/06/2022 10:22:05 AM

| BODY TEMPERATURE | 97.0 °F | Evangelist, Sharon | 7/19/2022 6:31:56 PM |
| PULSE RATE | 79 BPM | WALKER, CARY | 9/1/2022 9:04:51 AM |
| PULSE RATE | 98 BPM | Collyns, Amanda | 8/19/2022 11:35:15 PM |
| PULSE RATE | 101 BPM | WALKER, CARY | 8/4/2022 4:26:36 PM |
| PULSE RATE | 82 BPM | WALKER, CARY | 7/20/2022 1:43:58 PM |
| PULSE RATE | 82 BPM | WALKER, CARY | 7/20/2022 1:41:08 PM |
| PULSE RATE | 94 BPM | Evangelist, Sharon | 7/19/2022 6:31:56 PM |
| BLOOD PRESSURE | 127/86 mmHg | WALKER, CARY | 9/1/2022 9:04:51 AM |
| BLOOD PRESSURE | 120/67 mmHg | BANGALA, CATHERINE | 8/31/2022 9:34:30 AM |
| BLOOD PRESSURE | 115/87 mmHg | AZUMAH, DANIEL | 8/24/2022 1:20:49 PM |
| BLOOD PRESSURE | 135/94 mmHg | Collyns, Amanda | 8/19/2022 11:35:15 PM |
| BLOOD PRESSURE | 112/82 mmHg | CARSTENS, JEAN M | 8/17/2022 9:13:39 AM |
| BLOOD PRESSURE | 132/80 mmHg | AZUMAH, DANIEL | 8/10/2022 11:13:16 AM |
| BLOOD PRESSURE | 123/87 mmHg | WALKER, CARY | 8/4/2022 4:26:36 PM |
| BLOOD PRESSURE | 104/72 mmHg | BANGALA, CATHERINE | 8/3/2022 9:42:59 AM |
| BLOOD PRESSURE | 130/76 mmHg | BANGALA, CATHERINE | 8/1/2022 10:39:45 AM |
| BLOOD PRESSURE | 132/76 mmHg | BOATENG, DERICK | 7/29/2022 11:03:04 AM |
| BLOOD PRESSURE | 102/89 mmHg | VILLA, DEBRA | 7/27/2022 9:36:44 AM |
| BLOOD PRESSURE | 120/85 mmHg | WILLIS, HANNAH J | 7/25/2022 9:38:58 AM |
| BLOOD PRESSURE | 124/89 mmHg | AZUMAH, DANIEL | 7/22/2022 11:29:07 AM |
| BLOOD PRESSURE | 121/79 mmHg | WALKER, CARY | 7/20/2022 1:43:58 PM |
| BLOOD PRESSURE | 121/79 mmHg | WALKER, CARY | 7/20/2022 1:41:08 PM |
| BLOOD PRESSURE | 130/92 mmHg | Evangelist, Sharon | 7/19/2022 6:31:56 PM |
| RESPIRATORY RATE | 17 RPM | WALKER, CARY | 9/1/2022 9:04:51 AM |
| RESPIRATORY RATE | 16 RPM | Collyns, Amanda | 8/19/2022 11:35:15 PM |
| RESPIRATORY RATE | 17 RPM | WALKER, CARY | 8/4/2022 4:26:36 PM |
| RESPIRATORY RATE | 17 RPM | WALKER, CARY | 7/20/2022 1:43:58 PM |
| RESPIRATORY RATE | 17 RPM | WALKER, CARY | 7/20/2022 1:41:08 PM |
| RESPIRATORY RATE | 16 RPM | Evangelist, Sharon | 7/19/2022 6:31:56 PM |
| WEIGHT | 139 lbs | WALKER, CARY | 9/1/2022 9:04:51 AM |
| WEIGHT | 148 lbs | Collyns, Amanda | 8/19/2022 11:35:15 PM |
| WEIGHT | 146 lbs | WALKER, CARY | 8/4/2022 4:26:36 PM |
| WEIGHT | 145.5 lbs | NAT, PRABHDEEP | 8/2/2022 10:16:00 AM |

**EHR Clinical Report**

| | | |
|---|---|---|
| **Facility:** | COAI - AURORA ICE PROCESSING CENTER |
| **Created By:** | CINCOTTA, CYNTHIA |
| **Created On:** | 09/06/2022 10:22:05 AM |

| | | | |
|---|---|---|---|
| WEIGHT | 148 lbs | WALKER, CARY | 7/20/2022 1:43:58 PM |
| WEIGHT | 148 lbs | WALKER, CARY | 7/20/2022 1:41:08 PM |
| WEIGHT | 150 lbs | Evangelist, Sharon | 7/19/2022 6:31:56 PM |
| O2 SATS | 94 | WALKER, CARY | 9/1/2022 9:04:51 AM |
| O2 SATS | 100 | Collyns, Amanda | 8/19/2022 11:35:15 PM |
| O2 SATS | 98 | WALKER, CARY | 8/4/2022 4:26:36 PM |
| O2 SATS | 96 | WALKER, CARY | 7/20/2022 1:43:58 PM |
| O2 SATS | 96 | WALKER, CARY | 7/20/2022 1:41:08 PM |
| O2 SATS | 99 | Evangelist, Sharon | 7/19/2022 6:31:56 PM |
| EKG | yes | KANIKI, ANASTASIE | 8/3/2022 10:58:28 AM |
| WAIST CIRCUMFERENCE | 32 | WALKER, CARY | 8/4/2022 4:26:36 PM |
| WAIST CIRCUMFERENCE | 32 | WALKER, CARY | 7/20/2022 1:41:08 PM |
| HEIGHT | 6 ft/in | WALKER, CARY | 8/4/2022 4:26:36 PM |
| HEIGHT | 6/0 ft/in | CARSTENS, JEAN M | 8/3/2022 5:14:00 PM |
| HEIGHT | 6 ft/in | WALKER, CARY | 7/20/2022 1:43:58 PM |
| HEIGHT | 6 ft/in | WALKER, CARY | 7/20/2022 1:41:08 PM |
| HEIGHT | 6 ft/in | Evangelist, Sharon | 7/19/2022 6:31:56 PM |
| WEIGHT FROM SCALE | 150 | BANGALA, CATHERINE | 8/31/2022 9:34:35 AM |
| WEIGHT FROM SCALE | 148,2 | AZUMAH, DANIEL | 8/24/2022 1:24:17 PM |
| WEIGHT FROM SCALE | 147 | CARSTENS, JEAN M | 8/17/2022 1:19:24 PM |
| WEIGHT FROM SCALE | 147 | AZUMAH, DANIEL | 8/10/2022 3:13:54 PM |

**Next of Kin**

**Patient Note Summary**

| Description | Response Entered By Name | Date Created | Category Tag Names |
|---|---|---|---|
| Consent for GEO to treat I/D/R and for Interpreter to be discuss medical condition | Evangelist, Sharon | 7/19/2022 7:32:09 PM | Dental, Legal, Medical, Mental Health, Consent |
| GeoGroup - Keep On Person Medication Distribution Program Agreement | Evangelist, Sharon | 7/19/2022 7:33:14 PM | Consent |
| GEO - Immunization Consent/Declination | Evangelist, Sharon | 7/19/2022 7:52:54 PM | Immunizations, Consent |
| Intake screening for new arrivals | Evangelist, Sharon | 7/19/2022 8:31:56 PM | Intake |
| For use with patients who have a chronic condition and are seen in as part of the Chronic Clinic | WALKER, CARY | 7/20/2022 3:41:08 PM | Treatment Plans, Chronic Care Clinic |
| History and Physical for Nurses or Physician/NP/PA | WALKER, CARY | 7/20/2022 3:43:58 PM | Assessment, Physical Exam |
| SOAPE and Administrative note for Medical Providers or Nurses | WALKER, CARY | 7/20/2022 3:53:21 PM | Progress Note |
| Therapeutic Diet Order | CARDENAS MELENDREZ, ANGELICA | 7/21/2022 11:34:43 AM | Therapeutic Diets |

**EHR Clinical Report**

**Facility:**    COAI - AURORA ICE PROCESSING CENTER

**Created By:**   CINCOTTA, CYNTHIA

**Created On:**   09/06/2022 10:22:05 AM

| Description | Response Entered By Name | Date Created | Category Tag Names |
|---|---|---|---|
| SOAPE and Administrative note for Medical Providers or Nurses | KOPKEP, MARINETTE | 7/22/2022 8:27:32 AM | Progress Note |
| GepGroup - CONSENT FOR MENTAL HEALTH SERVICES | NAT, PRABHDEEP | 8/2/2022 12:41:24 PM | Mental Health, Consent |
| Psychiatric Medication Consent HS-190 | NAT, PRABHDEEP | 8/2/2022 12:41:36 PM | Consent, Psychiatric |
| Psychiatric evaluation for new intakes | MCGUIRE, COLLEEN | 8/2/2022 12:46:06 PM | Mental Health Evaluation |
| Scale to measure involuntary movement | NAT, PRABHDEEP | 8/2/2022 12:57:17 PM | AIMS, Assessment |
| Psychiatric Medication Consent HS-190 | NAT, PRABHDEEP | 8/2/2022 1:06:57 PM | Consent, Psychiatric |
| SOAPE and Administrative note for Medical Providers or Nurses | WALKER, CARY | 8/3/2022 5:50:15 PM | Progress Note |
| For use with patients who have a chronic condition and are seen in as part of the Chronic Clinic | WALKER, CARY | 8/4/2022 6:26:36 PM | Treatment Plans, Chronic Care Clinic |
| SOAPE and Administrative note for Medical Providers or Nurses | AKUESSON, DOSS | 8/5/2022 4:03:44 AM | Progress Note |
| GepGroup - CONSENT FOR MENTAL HEALTH SERVICES | WILLSON, BRYCE | 8/5/2022 5:19:03 PM | Mental Health, Consent |
| Initial Mental Health Evaluation for new intakes | WILLSON, BRYCE | 8/5/2022 6:14:07 PM | Mental Health Evaluation |
| Individual Treatment Plan with Medications - HS-159 | WILLSON, BRYCE | 8/5/2022 6:20:18 PM | IRP |
| Medical/Psychiatric Alert | WILLSON, BRYCE | 8/5/2022 6:21:29 PM | Medical, Psychiatric |
| SOAPE and Administrative note for Medical Providers or Nurses | WILLSON, BRYCE | 8/6/2022 11:03:15 PM | Progress Note |
| Telemental Health Progress Notes - HS-166.1 | MCGUIRE, COLLEEN | 8/9/2022 12:25:39 PM | Telemedicine, Mental Health |
| SOAPE and Administrative note for Medical Providers or Nurses | WILLSON, BRYCE | 8/11/2022 8:26:41 PM | Progress Note |
| SOAPE and Administrative note for Medical Providers or Nurses | WILLSON, BRYCE | 8/11/2022 8:27:38 PM | Progress Note |
| SOAPE and Administrative note for Medical Providers or Nurses | WILLSON, BRYCE | 8/19/2022 9:52:12 PM | Progress Note |
| GeoGroup - Nursing Assessment Protocol - Abdominal Pain | Collyns, Amanda | 8/20/2022 1:35:15 AM | Nursing Assessment |
| I/D/R in Transit Summary | ROSS-PEARSON, DEIDRE | 8/22/2022 1:04:17 PM | Transfer |
| SOAPE and Administrative note for Medical Providers or Nurses | BOATENG, DERICK | 8/25/2022 6:07:30 PM | Progress Note |
| SOAPE and Administrative note for Medical Providers or Nurses | WILLSON, BRYCE | 8/26/2022 9:07:58 PM | Progress Note |
| SOAPE and Administrative note for Medical Providers or Nurses | WALKER, CARY | 9/1/2022 11:04:51 AM | Progress Note |
| Therapeutic Diet Order | CARDENAS MELENDREZ, ANGELICA | 9/1/2022 2:31:41 PM | Therapeutic Diets |
| SOAPE and Administrative note for Medical Providers or Nurses | WILLSON, BRYCE | 9/2/2022 9:11:09 PM | Progress Note |

**Patient Messages**

No Messages indicated

---

**EHR Clinical Report**

**Facility:**     COAI - AURORA ICE PROCESSING CENTER

**Created By:**   CINCOTTA, CYNTHIA

**Created On:**   09/06/2022 10:22:05 AM



<table>
<tr><td>
**D O C T O R**

**WALKER, CARY**
28877 | COAI | AURORA ICE
PROCESSING CENTER
3130 NORTH OAKLAND STREET

AURORA, CO 80010
  Acct #:288^CMMS

  NPI: 58957
</td><td>
**P A T I E N T**

**BOZKUS, SERHAT**

DOB:1/1/1992
SEX:M                    AGE:30
U/FL:ICE                 WING: AS-NA-E
ROOM:NA-38               BED: L
  ID:  3893791    ALT ID: 220712429
</td><td>
**S A M P L E**

Specimen ID: 288118908

Report Date: 7/21/2022 12:41
Date Received: 7/21/2022 13:45
Date Observed:7/21/2022 12:41
</td></tr>
</table>

NOTES:

## CLINICAL INFORMATION

FASTING:              Total Volume:              Source:

## CLINICAL REPORT

**Clinical Abnormalities Summary:**   (May not contain all abnormal results; narrative results may not have abnormal flags. Please review entire report.)

**CHEST, SINGLE VIEW**

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|------|--------|----------|-----------|-------|--------|-----|
| 71045 - CHEST, SINGLE VIEW | Patient Report for: BOZKUS, SERHAT | | | | F | |

Patient Name: BOZKUS, SERHAT
Patient DOB: 01/01/1992
Facility: CXR - AURORA DETENTION CENTER
Location: 220712429
Date of Service: 07/21/2022
Clinical Information:
BENIGN ESSENTIAL HYPERTENSION
Test Procedure: 71045 CHEST, SINGLE VIEW
Findings:
CHEST, 1 VIEW
FINDINGS:
The lungs are clear.  Cardiomediastinal silhouette is within normal limits.  Bony thorax is unremarkable.
Impressions:
IMPRESSION:
No evidence of acute pulmonary disease.
Interpreting Radiology Company: Flex Telerad, LLC
Interpreting Doctor: Maximina  Boutselis  MD
Electronically Signed By: Maximina  Boutselis  MD
Signed Date: Physician electronically signed on - 07/21/2022 12:41:21 PM
Flex Telerad, LLC is Accredited by the Joint Commission

L = BELOW LOW NORMAL | LL = ALERT LOW | H = ABOVE HIGH NORMAL | HH = ALERT HIGH | < = PANIC LOW | > = PANIC HIGH | A = ABNORMAL |
AA = CRITICAL ABNORMAL | S = SUSCEPTIBLE | R = RESISTANT | I = INTERMEDIATE | NEG = NEGATIVE | POS = POSITIVE





| | | |
|---|---|---|
| **D O C T O R** | **WALKER, CARY**<br>28877 \| COAI \| AURORA ICE<br>PROCESSING CENTER<br>3130 NORTH OAKLAND STREET<br><br>AURORA, CO 80010<br>  **Acct #:**288^CMMS<br><br>        NPI: 58957 | |

| | |
|---|---|
| **P A T I E N T** | **BOZKUS, SERHAT**<br><br>**DOB:**1/1/1992<br>**SEX:**M          **AGE:** 30<br>**U/FL:**ICE      **WING:** AS-NA-E<br>**ROOM:**NA-38        **BED:** L<br>  **ID:**  3893791    **ALT ID:** 22071242<br>                              9 |

| | |
|---|---|
| **S A M P L E** | **Specimen ID:** 288118908<br><br><br>**Report Date:** 7/21/2022 12:41<br>**Date Received:** 7/21/2022 13:45<br>**Date Observed:**7/21/2022 12:41 |

| | | | | |
|---|---|---|---|---|
| 71045 - CHEST, SINGLE VIEW | https://medi matrix.cmmsx ray.net/ilin kh17/control ler? msg_id=ilink emr_images&h ardtoken=ExD 1Lu3QQO %2FOldfcB3uq FDUvsScgEhNQ d4OdMfz0mpaz jD5qVYnOO9z5 OWyIv0PckS8% 2Fq4WQVEY%3D | | | F |

**PERFORMING LAB**

- , , , , , ,

L = BELOW LOW NORMAL  | LL = ALERT LOW | H = ABOVE HIGH NORMAL | HH = ALERT HIGH | < = PANIC LOW | > = PANIC HIGH | A = ABNORMAL |
AA = CRITICAL ABNORMAL | S = SUSCEPTIBLE | R = RESISTANT | I = INTERMEDIATE | NEG = NEGATIVE | POS = POSITIVE

# FINAL REPORT

**DOCTOR**

WALKER, CARY
BV195ICE | COAI | AURORA ICE
PROCESSING CENTER
3130 NORTH OAKLAND STREET

AURORA, CO 80010
  Acct #:05000045

    NPI: 1003201120

**PATIENT**

BOZKUS, SERHAT

DOB:1/1/1992
SEX:M                    AGE:30
U/FL:ICE                 WING: AS-NA-E
ROOM:NA-38               BED: L
  ID:  3893791    ALT ID: 220712429

**SAMPLE**

Specimen ID: 115587

Report Date: 7/21/2022 16:43
Date Received: 7/21/2022 11:56
Date Observed:7/19/2022 14:00

NOTES:

## CLINICAL INFORMATION

FASTING:              Total Volume:              Source:

## CLINICAL REPORT

**Clinical Abnormalities Summary:**     (May not contain all abnormal results; narrative results may not have abnormal flags. Please review entire report.)

SARS COV2                      A

### SARS CoV2

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|------|--------|----------|-----------|-------|--------|-----|
| SARS COV2 | | POSITIVE A | NEG | | F | 1000 |
| | This test has received Emergency Use Authorization (EUA) from the US Food and Drug Administration. | | | | | |
| | This test has received Emergency Use Authorization (EUA) from the US Food and Drug Administration. | | | | | |

### PERFORMING LAB

1000 - Biovision Diagnostics, 1616 Eastport Plaza Drive, CollinsvilleIL, 62234 (618)690-9555, , ,   ,

L = BELOW LOW NORMAL | LL = ALERT LOW | H = ABOVE HIGH NORMAL | HH = ALERT HIGH | < = PANIC LOW | > = PANIC HIGH | A = ABNORMAL |
AA = CRITICAL ABNORMAL | S = SUSCEPTIBLE | R = RESISTANT | I = INTERMEDIATE | NEG = NEGATIVE | POS = POSITIVE

**150**

# PRELIMINARY REPORT

# FINAL REPORT

FINAL REPORT

| DOCTOR | | PATIENT | | SAMPLE | |
|---|---|---|---|---|---|

**DOCTOR**
WALKER, C
05000045 | COAI | AURORA ICE PROCESSING CENTER
3130 NORTH OAKLAND STREET
AURORA, CO 80010
Acct #:05000045
NPI: 1003201120

**PATIENT**
BOZKUS, SERHAT
DOB:1/1/1992
SEX:M                    AGE:30
U/FL:ICE               WING: AS-NA-E
ROOM:NA-38          BED: L
ID:  3893791        ALT ID: 220712429

**SAMPLE**
Specimen ID: 20416667800
Report Date: 7/25/2022 8:07
Date Received: 7/23/2022 0:00
Date Observed:7/22/2022 4:00

NOTES:

## CLINICAL INFORMATION

FASTING:                    Total Volume:                    Source:

## CLINICAL REPORT

### Clinical Abnormalities Summary:
(May not contain all abnormal results; narrative results may not have abnormal flags. Please review entire report.)

| A/G Ratio | H | BUN | H | Creatinine | H |
|---|---|---|---|---|---|

**TSH+Free T4**

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|---|---|---|---|---|---|---|
| TSH | 1.840 | | 0.450-4.500 | uIU/mL | F | 01 |
| T4,Free(Direct) | 1.52 | | 0.82-1.77 | ng/dL | F | 01 |

**CBC With Differential/Platelet**

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|---|---|---|---|---|---|---|
| WBC | 7.3 | | 3.4-10.8 | x10E3/uL | F | 01 |
| RBC | 5.63 | | 4.14-5.80 | x10E6/uL | F | 01 |
| Hemoglobin | 15.8 | | 13.0-17.7 | g/dL | F | 01 |
| Hematocrit | 46.5 | | 37.5-51.0 | % | F | 01 |
| MCV | 83 | | 79-97 | fL | F | 01 |
| MCH | 28.1 | | 26.6-33.0 | pg | F | 01 |
| MCHC | 34.0 | | 31.5-35.7 | g/dL | F | 01 |
| RDW | 12.3 | | 11.6-15.4 | % | F | 01 |
| Platelets | 224 | | 150-450 | x10E3/uL | F | 01 |
| Neutrophils | 52 | | Not Estab. | % | F | 01 |
| Lymphs | 37 | | Not Estab. | % | F | 01 |
| Monocytes | 8 | | Not Estab. | % | F | 01 |
| Eos | 2 | | Not Estab. | % | F | 01 |
| Basos | 1 | | Not Estab. | % | F | 01 |
| Immature Cells | | | | | F | 01 |
| Neutrophils (Absolute) | 3.7 | | 1.4-7.0 | x10E3/uL | F | 01 |
| Lymphs (Absolute) | 2.7 | | 0.7-3.1 | x10E3/uL | F | 01 |
| Monocytes(Absolute) | 0.6 | | 0.1-0.9 | x10E3/uL | F | 01 |
| Eos (Absolute) | 0.2 | | 0.0-0.4 | x10E3/uL | F | 01 |
| Baso (Absolute) | 0.1 | | 0.0-0.2 | x10E3/uL | F | 01 |
| Immature Granulocytes | 0 | | Not Estab. | % | F | 01 |
| Immature Grans (Abs) | 0.0 | | 0.0-0.1 | x10E3/uL | F | 01 |
| NRBC | | | | | F | 01 |
| Hematology Comments: | | | | | F | 01 |

L = BELOW LOW NORMAL | LL = ALERT LOW | H = ABOVE HIGH NORMAL | HH = ALERT HIGH | < = PANIC LOW  | > = PANIC HIGH | A = ABNORMAL |
AA = CRITICAL ABNORMAL | S = SUSCEPTIBLE | R = RESISTANT | I = INTERMEDIATE | NEG = NEGATIVE | POS = POSITIVE

**PRELIMINARY REPORT**      **FINAL REPORT**

<table>
<tr><td>
**D O C T O R**<br>
WALKER, C<br>
05000045 | COAI | AURORA ICE<br>
PROCESSING CENTER<br>
3130 NORTH OAKLAND STREET<br>
AURORA, CO 80010<br>
  Acct #:05000045<br>
    NPI: 1003201120
</td>
<td>
**P A T I E N T**<br>
BOZKUS, SERHAT<br>
DOB:1/1/1992<br>
SEX:M     AGE: 30<br>
U/FL:ICE   WING: AS-NA-E<br>
ROOM:NA-38   BED: L<br>
ID:  3893791   ALT ID: 22071242<br>
                          9
</td>
<td>
**S A M P L E**<br>
Specimen ID: 20416667800<br>
<br>
Report Date: 7/25/2022 8:07<br>
Date Received: 7/23/2022 0:00<br>
Date Observed:7/22/2022 4:00
</td>
</tr>
</table>

### Comp. Metabolic Panel (14)

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|------|--------|----------|-----------|-------|--------|-----|
| Glucose | 88 | | 65-99 | mg/dL | F | 01 |
| BUN | | 24 H | 6-20 | mg/dL | F | 01 |
| Creatinine | | 1.34 H | 0.76-1.27 | mg/dL | F | 01 |
| eGFR | 73 | | >59 | mL/min/1.73 | F | 01 |
| BUN/Creatinine Ratio | 18 | | 9-20 | | F | 01 |
| Sodium | 141 | | 134-144 | mmol/L | F | 01 |
| Potassium | 4.6 | | 3.5-5.2 | mmol/L | F | 01 |
| Chloride | 105 | | 96-106 | mmol/L | F | 01 |
| Carbon Dioxide, Total | 23 | | 20-29 | mmol/L | F | 01 |
| Calcium | 9.8 | | 8.7-10.2 | mg/dL | F | 01 |
| Protein, Total | 6.9 | | 6.0-8.5 | g/dL | F | 01 |
| Albumin | 4.8 | | 4.1-5.2 | g/dL | F | 01 |
| Globulin, Total | 2.1 | | 1.5-4.5 | g/dL | F | 01 |
| A/G Ratio | | 2.3 H | 1.2-2.2 | | F | 01 |
| Bilirubin, Total | 0.6 | | 0.0-1.2 | mg/dL | F | 01 |
| Alkaline Phosphatase | 60 | | 44-121 | IU/L | F | 01 |
| AST (SGOT) | 15 | | 0-40 | IU/L | F | 01 |
| ALT (SGPT) | 10 | | 0-44 | IU/L | F | 01 |

### Lipid Panel

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|------|--------|----------|-----------|-------|--------|-----|
| Cholesterol, Total | 161 | | 100-199 | mg/dL | F | 01 |
| Triglycerides | 130 | | 0-149 | mg/dL | F | 01 |
| HDL Cholesterol | 41 | | >39 | mg/dL | F | 01 |
| VLDL Cholesterol Cal | 23 | | 5-40 | mg/dL | F | 01 |
| LDL Chol Calc (NIH) | 97 | | 0-99 | mg/dL | F | 01 |
| Comment: | | | | | F | 01 |

### Hemoglobin A1c

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|------|--------|----------|-----------|-------|--------|-----|
| Hemoglobin A1c | 5.6 | | 4.8-5.6 | % | F | 01 |

.
Prediabetes: 5.7 - 6.4
Diabetes: >6.4
Glycemic control for adults with diabetes: <7.0

### PERFORMING LAB

01 - Labcorp Denver, 8490 Upland Drive, EnglewoodCO, 801127115 3037922600, MD, Collum, Earle MD S,

---

L = BELOW LOW NORMAL | LL = ALERT LOW | H = ABOVE HIGH NORMAL | HH = ALERT HIGH | < = PANIC LOW | > = PANIC HIGH | A = ABNORMAL |
AA = CRITICAL ABNORMAL | S = SUSCEPTIBLE | R = RESISTANT | I = INTERMEDIATE | NEG = NEGATIVE | POS = POSITIVE

# PRELIMINARY REPORT

# FINAL REPORT

**DOCTOR**

WALKER, C
05000045 | COAI | AURORA ICE
PROCESSING CENTER
3130 NORTH OAKLAND STREET

AURORA, CO 80010
  Acct #:05000045

  NPI: 1003201120

**PATIENT**

BOZKUS, SERHAT

DOB:1/1/1992
SEX:M                    AGE:30
U/FL:ICE                 WING: AS-NA-E
ROOM:NA-38               BED: L
  ID:  3893791     ALT ID: 22071242
                                    9

**SAMPLE**

Specimen ID: 20416667800

Report Date: 7/25/2022 8:07
Date Received: 7/23/2022 0:00
Date Observed:7/22/2022 4:00

NOTES:

## CLINICAL INFORMATION

FASTING:                Total Volume:                Source:

## CLINICAL REPORT

**Clinical Abnormalities Summary:**  (May not contain all abnormal results; narrative results may not have abnormal flags. Please review entire report.)

| A/G Ratio | H | BUN | H | Creatinine | H |
|---|---|---|---|---|---|

### TSH+Free T4

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|---|---|---|---|---|---|---|
| TSH | 1.840 | | 0.450-4.500 | uIU/mL | F | 01 |
| T4,Free(Direct) | 1.52 | | 0.82-1.77 | ng/dL | F | 01 |

### CBC With Differential/Platelet

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|---|---|---|---|---|---|---|
| WBC | 7.3 | | 3.4-10.8 | x10E3/uL | F | 01 |
| RBC | 5.63 | | 4.14-5.80 | x10E6/uL | F | 01 |
| Hemoglobin | 15.8 | | 13.0-17.7 | g/dL | F | 01 |
| Hematocrit | 46.5 | | 37.5-51.0 | % | F | 01 |
| MCV | 83 | | 79-97 | fL | F | 01 |
| MCH | 28.1 | | 26.6-33.0 | pg | F | 01 |
| MCHC | 34.0 | | 31.5-35.7 | g/dL | F | 01 |
| RDW | 12.3 | | 11.6-15.4 | % | F | 01 |
| Platelets | 224 | | 150-450 | x10E3/uL | F | 01 |
| Neutrophils | 52 | | Not Estab. | % | F | 01 |
| Lymphs | 37 | | Not Estab. | % | F | 01 |
| Monocytes | 8 | | Not Estab. | % | F | 01 |
| Eos | 2 | | Not Estab. | % | F | 01 |
| Basos | 1 | | Not Estab. | % | F | 01 |
| Immature Cells | | | | | F | 01 |
| Neutrophils (Absolute) | 3.7 | | 1.4-7.0 | x10E3/uL | F | 01 |
| Lymphs (Absolute) | 2.7 | | 0.7-3.1 | x10E3/uL | F | 01 |
| Monocytes(Absolute) | 0.6 | | 0.1-0.9 | x10E3/uL | F | 01 |
| Eos (Absolute) | 0.2 | | 0.0-0.4 | x10E3/uL | F | 01 |
| Baso (Absolute) | 0.1 | | 0.0-0.2 | x10E3/uL | F | 01 |
| Immature Granulocytes | 0 | | Not Estab. | % | F | 01 |
| Immature Grans (Abs) | 0.0 | | 0.0-0.1 | x10E3/uL | F | 01 |
| NRBC | | | | | F | 01 |
| Hematology Comments: | | | | | F | 01 |

L = BELOW LOW NORMAL | LL = ALERT LOW | H = ABOVE HIGH NORMAL | HH = ALERT HIGH | < = PANIC LOW | > = PANIC HIGH | A = ABNORMAL |
AA = CRITICAL ABNORMAL | S = SUSCEPTIBLE | R = RESISTANT | I = INTERMEDIATE | NEG = NEGATIVE | POS = POSITIVE

Page 1 of 2

**153**

# PRELIMINARY REPORT                    FINAL REPORT

<table>
<tr><td>D O C T O R</td><td>WALKER, C<br>05000045 | COAI | AURORA ICE<br>PROCESSING CENTER<br>3130 NORTH OAKLAND STREET<br><br>AURORA, CO 80010<br>Acct #:05000045<br><br>NPI: 1003201120</td></tr>
</table>

<table>
<tr><td>P A T I E N T</td><td>BOZKUS, SERHAT<br><br>DOB:1/1/1992<br>SEX:M<br>U/FL:ICE<br>ROOM:NA-38<br>ID:  3893791</td><td><br><br><br>AGE: 30<br>WING: AS-NA-E<br>BED: L<br>ALT ID: 22071242<br>9</td></tr>
</table>

<table>
<tr><td>S A M P L E</td><td>Specimen ID: 20416667800<br><br>Report Date: 7/25/2022 8:07<br>Date Received: 7/23/2022 0:00<br>Date Observed:7/22/2022 4:00</td></tr>
</table>

### Comp. Metabolic Panel (14)

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|------|--------|----------|-----------|-------|--------|-----|
| Glucose | 88 | | 65-99 | mg/dL | F | 01 |
| BUN | | 24 H | 6-20 | mg/dL | F | 01 |
| Creatinine | | 1.34 H | 0.76-1.27 | mg/dL | F | 01 |
| eGFR | 73 | | >59 | mL/min/1.73 | F | 01 |
| BUN/Creatinine Ratio | 18 | | 9-20 | | F | 01 |
| Sodium | 141 | | 134-144 | mmol/L | F | 01 |
| Potassium | 4.6 | | 3.5-5.2 | mmol/L | F | 01 |
| Chloride | 105 | | 96-106 | mmol/L | F | 01 |
| Carbon Dioxide, Total | 23 | | 20-29 | mmol/L | F | 01 |
| Calcium | 9.8 | | 8.7-10.2 | mg/dL | F | 01 |
| Protein, Total | 6.9 | | 6.0-8.5 | g/dL | F | 01 |
| Albumin | 4.8 | | 4.1-5.2 | g/dL | F | 01 |
| Globulin, Total | 2.1 | | 1.5-4.5 | g/dL | F | 01 |
| A/G Ratio | | 2.3 H | 1.2-2.2 | | F | 01 |
| Bilirubin, Total | 0.6 | | 0.0-1.2 | mg/dL | F | 01 |
| Alkaline Phosphatase | 60 | | 44-121 | IU/L | F | 01 |
| AST (SGOT) | 15 | | 0-40 | IU/L | F | 01 |
| ALT (SGPT) | 10 | | 0-44 | IU/L | F | 01 |

### Lipid Panel

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|------|--------|----------|-----------|-------|--------|-----|
| Cholesterol, Total | 161 | | 100-199 | mg/dL | F | 01 |
| Triglycerides | 130 | | 0-149 | mg/dL | F | 01 |
| HDL Cholesterol | 41 | | >39 | mg/dL | F | 01 |
| VLDL Cholesterol Cal | 23 | | 5-40 | mg/dL | F | 01 |
| LDL Chol Calc (NIH) | 97 | | 0-99 | mg/dL | F | 01 |
| Comment: | | | | | F | 01 |

### Hemoglobin A1c

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|------|--------|----------|-----------|-------|--------|-----|
| Hemoglobin A1c | 5.6 | | 4.8-5.6 | % | F | 01 |

.
Prediabetes: 5.7 - 6.4
Diabetes: >6.4
Glycemic control for adults with diabetes: <7.0

## PERFORMING LAB

01 - Labcorp Denver, 8490 Upland Drive, EnglewoodCO, 801127115 3037922600, MD, Collum, Earle MD S,

---

L = BELOW LOW NORMAL | LL = ALERT LOW | H = ABOVE HIGH NORMAL | HH = ALERT HIGH | < = PANIC LOW | > = PANIC HIGH | A = ABNORMAL |
AA = CRITICAL ABNORMAL | S = SUSCEPTIBLE | R = RESISTANT | I = INTERMEDIATE | NEG = NEGATIVE | POS = POSITIVE

# PRELIMINARY REPORT

# FINAL REPORT

**D O C T O R**

WALKER, C
05000045 | COAI | AURORA ICE
PROCESSING CENTER
3130 NORTH OAKLAND STREET

AURORA, CO 80010
  Acct #:05000045

    NPI: 1003201120

**P A T I E N T**

BOZKUS, SERHAT

DOB:1/1/1992
SEX:M                    AGE:30
U/FL:ICE                 WING: AS-NA-E
ROOM:NA-38               BED: L
  ID:  3893791    ALT ID: 22071242
                          9

**S A M P L E**

Specimen ID: 20416667800

Report Date: 7/25/2022 8:07
Date Received: 7/23/2022 0:00
Date Observed:7/22/2022 4:00

NOTES:

## CLINICAL INFORMATION

FASTING:              Total Volume:              Source:

## CLINICAL REPORT

**Clinical Abnormalities Summary:**    (May not contain all abnormal results; narrative results may not have abnormal flags. Please review entire report.)

| A/G Ratio | H | BUN | H | Creatinine | H |
|---|---|---|---|---|---|

### TSH+Free T4

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|---|---|---|---|---|---|---|
| TSH | 1.840 | | 0.450-4.500 | uIU/mL | F | 01 |
| T4,Free(Direct) | 1.52 | | 0.82-1.77 | ng/dL | F | 01 |

### CBC With Differential/Platelet

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|---|---|---|---|---|---|---|
| WBC | 7.3 | | 3.4-10.8 | x10E3/uL | F | 01 |
| RBC | 5.63 | | 4.14-5.80 | x10E6/uL | F | 01 |
| Hemoglobin | 15.8 | | 13.0-17.7 | g/dL | F | 01 |
| Hematocrit | 46.5 | | 37.5-51.0 | % | F | 01 |
| MCV | 83 | | 79-97 | fL | F | 01 |
| MCH | 28.1 | | 26.6-33.0 | pg | F | 01 |
| MCHC | 34.0 | | 31.5-35.7 | g/dL | F | 01 |
| RDW | 12.3 | | 11.6-15.4 | % | F | 01 |
| Platelets | 224 | | 150-450 | x10E3/uL | F | 01 |
| Neutrophils | 52 | | Not Estab. | % | F | 01 |
| Lymphs | 37 | | Not Estab. | % | F | 01 |
| Monocytes | 8 | | Not Estab. | % | F | 01 |
| Eos | 2 | | Not Estab. | % | F | 01 |
| Basos | 1 | | Not Estab. | % | F | 01 |
| Immature Cells | | | | | F | 01 |
| Neutrophils (Absolute) | 3.7 | | 1.4-7.0 | x10E3/uL | F | 01 |
| Lymphs (Absolute) | 2.7 | | 0.7-3.1 | x10E3/uL | F | 01 |
| Monocytes(Absolute) | 0.6 | | 0.1-0.9 | x10E3/uL | F | 01 |
| Eos (Absolute) | 0.2 | | 0.0-0.4 | x10E3/uL | F | 01 |
| Baso (Absolute) | 0.1 | | 0.0-0.2 | x10E3/uL | F | 01 |
| Immature Granulocytes | 0 | | Not Estab. | % | F | 01 |
| Immature Grans (Abs) | 0.0 | | 0.0-0.1 | x10E3/uL | F | 01 |
| NRBC | | | | | F | 01 |
| Hematology Comments: | | | | | F | 01 |

L = BELOW LOW NORMAL | LL = ALERT LOW | H = ABOVE HIGH NORMAL | HH = ALERT HIGH | < = PANIC LOW | > = PANIC HIGH | A = ABNORMAL |
AA = CRITICAL ABNORMAL | S = SUSCEPTIBLE | R = RESISTANT | I = INTERMEDIATE | NEG = NEGATIVE | POS = POSITIVE

**DOCTOR**

WALKER, C
05000045 | COAI | AURORA ICE
PROCESSING CENTER
3130 NORTH OAKLAND STREET

AURORA, CO 80010
  Acct #:05000045

  NPI: 1003201120

**PATIENT**

BOZKUS, SERHAT

DOB:1/1/1992
SEX:M       AGE: 30
U/FL:ICE      WING: AS-NA-E
ROOM:NA-38    BED: L
ID:  3893791
ALT ID: 22071242
  9

**SAMPLE**

Specimen ID: 20416667800

Report Date: 7/25/2022 8:07
Date Received: 7/23/2022 0:00
Date Observed:7/22/2022 4:00

## Comp. Metabolic Panel (14)

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|------|--------|----------|-----------|-------|--------|-----|
| Glucose | 88 | | 65-99 | mg/dL | F | 01 |
| BUN | | 24 H | 6-20 | mg/dL | F | 01 |
| Creatinine | | 1.34 H | 0.76-1.27 | mg/dL | F | 01 |
| eGFR | 73 | | >59 | mL/min/1.73 | F | 01 |
| BUN/Creatinine Ratio | 18 | | 9-20 | | F | 01 |
| Sodium | 141 | | 134-144 | mmol/L | F | 01 |
| Potassium | 4.6 | | 3.5-5.2 | mmol/L | F | 01 |
| Chloride | 105 | | 96-106 | mmol/L | F | 01 |
| Carbon Dioxide, Total | 23 | | 20-29 | mmol/L | F | 01 |
| Calcium | 9.8 | | 8.7-10.2 | mg/dL | F | 01 |
| Protein, Total | 6.9 | | 6.0-8.5 | g/dL | F | 01 |
| Albumin | 4.8 | | 4.1-5.2 | g/dL | F | 01 |
| Globulin, Total | 2.1 | | 1.5-4.5 | g/dL | F | 01 |
| A/G Ratio | | 2.3 H | 1.2-2.2 | | F | 01 |
| Bilirubin, Total | 0.6 | | 0.0-1.2 | mg/dL | F | 01 |
| Alkaline Phosphatase | 60 | | 44-121 | IU/L | F | 01 |
| AST (SGOT) | 15 | | 0-40 | IU/L | F | 01 |
| ALT (SGPT) | 10 | | 0-44 | IU/L | F | 01 |

## Lipid Panel

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|------|--------|----------|-----------|-------|--------|-----|
| Cholesterol, Total | 161 | | 100-199 | mg/dL | F | 01 |
| Triglycerides | 130 | | 0-149 | mg/dL | F | 01 |
| HDL Cholesterol | 41 | | >39 | mg/dL | F | 01 |
| VLDL Cholesterol Cal | 23 | | 5-40 | mg/dL | F | 01 |
| LDL Chol Calc (NIH) | 97 | | 0-99 | mg/dL | F | 01 |
| Comment: | | | | | F | 01 |

## Hemoglobin A1c

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|------|--------|----------|-----------|-------|--------|-----|
| Hemoglobin A1c | 5.6 | | 4.8-5.6 | % | F | 01 |

.
Prediabetes: 5.7 - 6.4
Diabetes: >6.4
Glycemic control for adults with diabetes: <7.0

## PERFORMING LAB

01 - Labcorp Denver, 8490 Upland Drive, EnglewoodCO, 801127115 3037922600, MD, Collum, Earle MD S,

L = BELOW LOW NORMAL | LL = ALERT LOW | H = ABOVE HIGH NORMAL | HH = ALERT HIGH | < = PANIC LOW | > = PANIC HIGH | A = ABNORMAL |
AA = CRITICAL ABNORMAL | S = SUSCEPTIBLE | R = RESISTANT | I = INTERMEDIATE | NEG = NEGATIVE | POS = POSITIVE

| D O C T O R | WALKER, C<br>05000045 \| COAI \| AURORA ICE<br>PROCESSING CENTER<br>3130 NORTH OAKLAND STREET<br><br>AURORA, CO 80010<br>　Acct #:05000045<br><br>　　NPI: 1003201120 | P A T I E N T | BOZKUS, SERHAT<br><br>DOB:1/1/1992<br>SEX:M<br>U/FL:ICE<br>ROOM:NA-38<br>　ID:　3893791 | <br><br>AGE:30<br>WING: AS-NA-E<br>BED: L<br>ALT ID: 22071242<br>　　　9 | S A M P L E | Specimen ID: 20416667800<br><br>Report Date: 7/25/2022 8:07<br>Date Received: 7/23/2022 0:00<br>Date Observed:7/22/2022 4:00 |

NOTES:

## CLINICAL INFORMATION

FASTING:　　　　　　　Total Volume:　　　　　　Source:

## CLINICAL REPORT

### Clinical Abnormalities Summary:　　(May not contain all abnormal results; narrative results may not have abnormal flags. Please review entire report.)

| A/G Ratio | H | BUN | H | Creatinine | H |

**TSH+Free T4**

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|------|--------|----------|-----------|-------|--------|-----|
| TSH | 1.840 | | 0.450-4.500 | uIU/mL | F | 01 |
| T4,Free(Direct) | 1.52 | | 0.82-1.77 | ng/dL | F | 01 |

**CBC With Differential/Platelet**

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|------|--------|----------|-----------|-------|--------|-----|
| WBC | 7.3 | | 3.4-10.8 | x10E3/uL | F | 01 |
| RBC | 5.63 | | 4.14-5.80 | x10E6/uL | F | 01 |
| Hemoglobin | 15.8 | | 13.0-17.7 | g/dL | F | 01 |
| Hematocrit | 46.5 | | 37.5-51.0 | % | F | 01 |
| MCV | 83 | | 79-97 | fL | F | 01 |
| MCH | 28.1 | | 26.6-33.0 | pg | F | 01 |
| MCHC | 34.0 | | 31.5-35.7 | g/dL | F | 01 |
| RDW | 12.3 | | 11.6-15.4 | % | F | 01 |
| Platelets | 224 | | 150-450 | x10E3/uL | F | 01 |
| Neutrophils | 52 | | Not Estab. | % | F | 01 |
| Lymphs | 37 | | Not Estab. | % | F | 01 |
| Monocytes | 8 | | Not Estab. | % | F | 01 |
| Eos | 2 | | Not Estab. | % | F | 01 |
| Basos | 1 | | Not Estab. | % | F | 01 |
| Immature Cells | | | | | F | 01 |
| Neutrophils (Absolute) | 3.7 | | 1.4-7.0 | x10E3/uL | F | 01 |
| Lymphs (Absolute) | 2.7 | | 0.7-3.1 | x10E3/uL | F | 01 |
| Monocytes(Absolute) | 0.6 | | 0.1-0.9 | x10E3/uL | F | 01 |
| Eos (Absolute) | 0.2 | | 0.0-0.4 | x10E3/uL | F | 01 |
| Baso (Absolute) | 0.1 | | 0.0-0.2 | x10E3/uL | F | 01 |
| Immature Granulocytes | 0 | | Not Estab. | % | F | 01 |
| Immature Grans (Abs) | 0.0 | | 0.0-0.1 | x10E3/uL | F | 01 |
| NRBC | | | | | F | 01 |
| Hematology Comments: | | | | | F | 01 |

L = BELOW LOW NORMAL | LL = ALERT LOW | H = ABOVE HIGH NORMAL | HH = ALERT HIGH | < = PANIC LOW | > = PANIC HIGH | A = ABNORMAL |
AA = CRITICAL ABNORMAL | S = SUSCEPTIBLE | R = RESISTANT | I = INTERMEDIATE | NEG = NEGATIVE | POS = POSITIVE

# PRELIMINARY REPORT

# FINAL REPORT

**DOCTOR**

WALKER, C
05000045 | COAI | AURORA ICE
PROCESSING CENTER
3130 NORTH OAKLAND STREET

AURORA, CO 80010
Acct #:05000045

NPI: 1003201120

**PATIENT**

BOZKUS, SERHAT

DOB:1/1/1992
SEX:M
U/FL:ICE
ROOM:NA-38
ID:  3893791

AGE: 30
WING: AS-NA-E
BED: L
ALT ID: 22071242
9

**SAMPLE**

Specimen ID: 20416667800

Report Date: 7/25/2022 8:07
Date Received: 7/23/2022 0:00
Date Observed:7/22/2022 4:00

## Comp. Metabolic Panel (14)

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|------|--------|----------|-----------|-------|--------|-----|
| Glucose | 88 | | 65-99 | mg/dL | F | 01 |
| BUN | | 24 H | 6-20 | mg/dL | F | 01 |
| Creatinine | | 1.34 H | 0.76-1.27 | mg/dL | F | 01 |
| eGFR | 73 | | >59 | mL/min/1.73 | F | 01 |
| BUN/Creatinine Ratio | 18 | | 9-20 | | F | 01 |
| Sodium | 141 | | 134-144 | mmol/L | F | 01 |
| Potassium | 4.6 | | 3.5-5.2 | mmol/L | F | 01 |
| Chloride | 105 | | 96-106 | mmol/L | F | 01 |
| Carbon Dioxide, Total | 23 | | 20-29 | mmol/L | F | 01 |
| Calcium | 9.8 | | 8.7-10.2 | mg/dL | F | 01 |
| Protein, Total | 6.9 | | 6.0-8.5 | g/dL | F | 01 |
| Albumin | 4.8 | | 4.1-5.2 | g/dL | F | 01 |
| Globulin, Total | 2.1 | | 1.5-4.5 | g/dL | F | 01 |
| A/G Ratio | | 2.3 H | 1.2-2.2 | | F | 01 |
| Bilirubin, Total | 0.6 | | 0.0-1.2 | mg/dL | F | 01 |
| Alkaline Phosphatase | 60 | | 44-121 | IU/L | F | 01 |
| AST (SGOT) | 15 | | 0-40 | IU/L | F | 01 |
| ALT (SGPT) | 10 | | 0-44 | IU/L | F | 01 |

## Lipid Panel

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|------|--------|----------|-----------|-------|--------|-----|
| Cholesterol, Total | 161 | | 100-199 | mg/dL | F | 01 |
| Triglycerides | 130 | | 0-149 | mg/dL | F | 01 |
| HDL Cholesterol | 41 | | >39 | mg/dL | F | 01 |
| VLDL Cholesterol Cal | 23 | | 5-40 | mg/dL | F | 01 |
| LDL Chol Calc (NIH) | 97 | | 0-99 | mg/dL | F | 01 |
| Comment: | | | | | F | 01 |

## Hemoglobin A1c

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|------|--------|----------|-----------|-------|--------|-----|
| Hemoglobin A1c | 5.6 | | 4.8-5.6 | % | F | 01 |

.
Prediabetes: 5.7 - 6.4
Diabetes: >6.4
Glycemic control for adults with diabetes: <7.0

## PERFORMING LAB

01 - Labcorp Denver, 8490 Upland Drive, EnglewoodCO, 801127115 3037922600, MD, Collum, Earle MD S,

L = BELOW LOW NORMAL | LL = ALERT LOW | H = ABOVE HIGH NORMAL | HH = ALERT HIGH | < = PANIC LOW | > = PANIC HIGH | A = ABNORMAL |
AA = CRITICAL ABNORMAL | S = SUSCEPTIBLE | R = RESISTANT | I = INTERMEDIATE | NEG = NEGATIVE | POS = POSITIVE

**DOCTOR**

WALKER, C
05000045 | COAI | AURORA ICE
PROCESSING CENTER
3130 NORTH OAKLAND STREET

AURORA, CO 80010
　Acct #:05000045

　　NPI: 1003201120

**PATIENT**

BOZKUS, SERHAT

DOB:1/1/1992
SEX:M　　　　　AGE:30
U/FL:ICE　　　　WING: AS-NA-E
ROOM:NA-38　　　BED: L
　ID:　3893791　　ALT ID: 22071242
　　　　　　　　　　　9

**SAMPLE**

Specimen ID: 20416667800

Report Date: 7/25/2022 8:07
Date Received: 7/23/2022 0:00
Date Observed:7/22/2022 4:00

NOTES:

## CLINICAL INFORMATION

FASTING:　　　　　　Total Volume:　　　　　　Source:

## CLINICAL REPORT

**Clinical Abnormalities Summary:**　(May not contain all abnormal results; narrative results may not have abnormal flags. Please review entire report.)

| A/G Ratio | H | BUN | H | Creatinine | H |
|---|---|---|---|---|---|

### TSH+Free T4

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|---|---|---|---|---|---|---|
| TSH | 1.840 | | 0.450-4.500 | uIU/mL | F | 01 |
| T4,Free(Direct) | 1.52 | | 0.82-1.77 | ng/dL | F | 01 |

### CBC With Differential/Platelet

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|---|---|---|---|---|---|---|
| WBC | 7.3 | | 3.4-10.8 | x10E3/uL | F | 01 |
| RBC | 5.63 | | 4.14-5.80 | x10E6/uL | F | 01 |
| Hemoglobin | 15.8 | | 13.0-17.7 | g/dL | F | 01 |
| Hematocrit | 46.5 | | 37.5-51.0 | % | F | 01 |
| MCV | 83 | | 79-97 | fL | F | 01 |
| MCH | 28.1 | | 26.6-33.0 | pg | F | 01 |
| MCHC | 34.0 | | 31.5-35.7 | g/dL | F | 01 |
| RDW | 12.3 | | 11.6-15.4 | % | F | 01 |
| Platelets | 224 | | 150-450 | x10E3/uL | F | 01 |
| Neutrophils | 52 | | Not Estab. | % | F | 01 |
| Lymphs | 37 | | Not Estab. | % | F | 01 |
| Monocytes | 8 | | Not Estab. | % | F | 01 |
| Eos | 2 | | Not Estab. | % | F | 01 |
| Basos | 1 | | Not Estab. | % | F | 01 |
| Immature Cells | | | | | F | 01 |
| Neutrophils (Absolute) | 3.7 | | 1.4-7.0 | x10E3/uL | F | 01 |
| Lymphs (Absolute) | 2.7 | | 0.7-3.1 | x10E3/uL | F | 01 |
| Monocytes(Absolute) | 0.6 | | 0.1-0.9 | x10E3/uL | F | 01 |
| Eos (Absolute) | 0.2 | | 0.0-0.4 | x10E3/uL | F | 01 |
| Baso (Absolute) | 0.1 | | 0.0-0.2 | x10E3/uL | F | 01 |
| Immature Granulocytes | 0 | | Not Estab. | % | F | 01 |
| Immature Grans (Abs) | 0.0 | | 0.0-0.1 | x10E3/uL | F | 01 |
| NRBC | | | | | F | 01 |
| Hematology Comments: | | | | | F | 01 |

L = BELOW LOW NORMAL | LL = ALERT LOW | H = ABOVE HIGH NORMAL | HH = ALERT HIGH | < = PANIC LOW | > = PANIC HIGH | A = ABNORMAL |
AA = CRITICAL ABNORMAL | S = SUSCEPTIBLE | R = RESISTANT | I = INTERMEDIATE | NEG = NEGATIVE | POS = POSITIVE

# PRELIMINARY REPORT                    FINAL REPORT

**DOCTOR**
WALKER, C
05000045 | COAI | AURORA ICE
PROCESSING CENTER
3130 NORTH OAKLAND STREET

AURORA, CO 80010
  Acct #:05000045

    NPI: 1003201120

**PATIENT**
BOZKUS, SERHAT

DOB:1/1/1992
SEX:M                    AGE: 30
U/FL:ICE                 WING: AS-NA-E
ROOM:NA-38               BED: L
ID:  3893791          ALT ID: 22071242
                              9

**SAMPLE**
Specimen ID: 20416667800

Report Date: 7/25/2022 8:07
Date Received:7/23/2022 0:00
Date Observed:7/22/2022 4:00

## Comp. Metabolic Panel (14)

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|------|--------|----------|-----------|-------|--------|-----|
| Glucose | 88 | | 65-99 | mg/dL | F | 01 |
| BUN | | 24 H | 6-20 | mg/dL | F | 01 |
| Creatinine | | 1.34 H | 0.76-1.27 | mg/dL | F | 01 |
| eGFR | 73 | | >59 | mL/min/1.73 | F | 01 |
| BUN/Creatinine Ratio | 18 | | 9-20 | | F | 01 |
| Sodium | 141 | | 134-144 | mmol/L | F | 01 |
| Potassium | 4.6 | | 3.5-5.2 | mmol/L | F | 01 |
| Chloride | 105 | | 96-106 | mmol/L | F | 01 |
| Carbon Dioxide, Total | 23 | | 20-29 | mmol/L | F | 01 |
| Calcium | 9.8 | | 8.7-10.2 | mg/dL | F | 01 |
| Protein, Total | 6.9 | | 6.0-8.5 | g/dL | F | 01 |
| Albumin | 4.8 | | 4.1-5.2 | g/dL | F | 01 |
| Globulin, Total | 2.1 | | 1.5-4.5 | g/dL | F | 01 |
| A/G Ratio | | 2.3 H | 1.2-2.2 | | F | 01 |
| Bilirubin, Total | 0.6 | | 0.0-1.2 | mg/dL | F | 01 |
| Alkaline Phosphatase | 60 | | 44-121 | IU/L | F | 01 |
| AST (SGOT) | 15 | | 0-40 | IU/L | F | 01 |
| ALT (SGPT) | 10 | | 0-44 | IU/L | F | 01 |

## Lipid Panel

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|------|--------|----------|-----------|-------|--------|-----|
| Cholesterol, Total | 161 | | 100-199 | mg/dL | F | 01 |
| Triglycerides | 130 | | 0-149 | mg/dL | F | 01 |
| HDL Cholesterol | 41 | | >39 | mg/dL | F | 01 |
| VLDL Cholesterol Cal | 23 | | 5-40 | mg/dL | F | 01 |
| LDL Chol Calc (NIH) | 97 | | 0-99 | mg/dL | F | 01 |
| Comment: | | | | | F | 01 |

## Hemoglobin A1c

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|------|--------|----------|-----------|-------|--------|-----|
| Hemoglobin A1c | 5.6 | | 4.8-5.6 | % | F | 01 |

.
Prediabetes: 5.7 - 6.4
Diabetes: >6.4
Glycemic control for adults with diabetes: <7.0

## PERFORMING LAB

01 - Labcorp Denver, 8490 Upland Drive, EnglewoodCO, 801127115 3037922600, MD, Collum, Earle MD S,

L = BELOW LOW NORMAL | LL = ALERT LOW | H = ABOVE HIGH NORMAL | HH = ALERT HIGH | < = PANIC LOW | > = PANIC HIGH | A = ABNORMAL |
AA = CRITICAL ABNORMAL | S = SUSCEPTIBLE | R = RESISTANT | I = INTERMEDIATE | NEG = NEGATIVE | POS = POSITIVE

# FINAL REPORT

**DOCTOR**

WALKER, C
05000045 | COAI | AURORA ICE
PROCESSING CENTER
3130 NORTH OAKLAND STREET

AURORA, CO 80010
Acct #:05000045

NPI: 1003201120

**PATIENT**

BOZKUS, SERHAT

DOB:1/1/1992
SEX:M
U/FL:ICE
ROOM:NA-38
ID:  3893791

AGE:30
WING: AS-NA-E
BED: L
ALT ID: 22071242
9

**SAMPLE**

Specimen ID: 20416667800

Report Date: 7/29/2022 16:09
Date Received:7/23/2022 0:00
Date Observed:7/22/2022 4:00

NOTES:

## CLINICAL INFORMATION

FASTING:            Total Volume:              Source:

## CLINICAL REPORT

**Clinical Abnormalities Summary:**    (May not contain all abnormal results; narrative results may not have abnormal flags. Please review entire report.)

### Urinalysis, Complete

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|------|--------|----------|-----------|-------|--------|-----|
| Specific Gravity | TNP | | | | F | 01 |
| | Test not performed. No urine specimen received. | | | | | |
| pH | TNP | | | | F | 01 |
| | Test not performed | | | | | |
| Urine-Color | | | | | F | 01 |
| Appearance | | | | | F | 01 |
| WBC Esterase | | | | | F | 01 |
| Protein | TNP | | | | F | 01 |
| | Test not performed | | | | | |
| Glucose | TNP | | | | F | 01 |
| | Test not performed | | | | | |
| Ketones | TNP | | | | F | 01 |
| | Test not performed | | | | | |
| Occult Blood | | | | | F | 01 |
| Bilirubin | | | | | F | 01 |
| Urobilinogen,Semi-Qn | | | | | F | 01 |
| Nitrite, Urine | | | | | F | 01 |
| Microscopic Examination | | | | | F | 01 |
| Microscopic Examination | | | | | F | 01 |

### Request Problem

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|------|--------|----------|-----------|-------|--------|-----|
| Request Problem | TNP | | | | F | 01 |
| | Test not performed. No urine specimen received. | | | | | |
| | TEST:  003772  Urinalysis, Complete | | | | | |

### PERFORMING LAB

01 - Labcorp Denver, 8490 Upland Drive, EnglewoodCO, 801127115 3037922600, MD, Collum, Earle MD S,

L = BELOW LOW NORMAL | LL = ALERT LOW | H = ABOVE HIGH NORMAL | HH = ALERT HIGH | < = PANIC LOW | > = PANIC HIGH | A = ABNORMAL |
AA = CRITICAL ABNORMAL | S = SUSCEPTIBLE | R = RESISTANT | I = INTERMEDIATE | NEG = NEGATIVE | POS = POSITIVE

# FINAL REPORT

**DOCTOR**

WALKER, C
05000045 | COAI | AURORA ICE
PROCESSING CENTER
3130 NORTH OAKLAND STREET

AURORA, CO 80010
    Acct #:05000045

        NPI: 1003201120

**PATIENT**

BOZKUS, SERHAT

DOB:1/1/1992
SEX:M                    AGE: 30
U/FL:ICE                 WING: AS-NA-E
ROOM:NA-38               BED: L
    ID:  3893791    ALT ID: 22071242
                             9

**SAMPLE**

Specimen ID: 20416667800

Report Date: 7/29/2022 16:09
Date Received: 7/23/2022 0:00
Date Observed:7/22/2022 4:00

NOTES:

## CLINICAL INFORMATION

FASTING:             Total Volume:              Source:

## CLINICAL REPORT

**Clinical Abnormalities Summary:**   (May not contain all abnormal results; narrative results may not have abnormal flags. Please review entire report.)

### Urinalysis, Complete

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|------|--------|----------|-----------|-------|--------|-----|
| Specific Gravity | TNP | | | | F | 01 |
| | Test not performed. No urine specimen received. | | | | | |
| pH | TNP | | | | F | 01 |
| | Test not performed | | | | | |
| Urine-Color | | | | | F | 01 |
| Appearance | | | | | F | 01 |
| WBC Esterase | | | | | F | 01 |
| Protein | TNP | | | | F | 01 |
| | Test not performed | | | | | |
| Glucose | TNP | | | | F | 01 |
| | Test not performed | | | | | |
| Ketones | TNP | | | | F | 01 |
| | Test not performed | | | | | |
| Occult Blood | | | | | F | 01 |
| Bilirubin | | | | | F | 01 |
| Urobilinogen,Semi-Qn | | | | | F | 01 |
| Nitrite, Urine | | | | | F | 01 |
| Microscopic Examination | | | | | F | 01 |
| Microscopic Examination | | | | | F | 01 |

### Request Problem

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|------|--------|----------|-----------|-------|--------|-----|
| Request Problem | TNP | | | | F | 01 |
| | Test not performed. No urine specimen received. | | | | | |
| | TEST:  003772  Urinalysis, Complete | | | | | |

## PERFORMING LAB

01 - Labcorp Denver, 8490 Upland Drive, EnglewoodCO, 801127115 3037922600, MD, Collum, Earle MD S,

L = BELOW LOW NORMAL | LL = ALERT LOW | H = ABOVE HIGH NORMAL | HH = ALERT HIGH | < = PANIC LOW | > = PANIC HIGH | A = ABNORMAL |
AA = CRITICAL ABNORMAL | S = SUSCEPTIBLE | R = RESISTANT | I = INTERMEDIATE | NEG = NEGATIVE | POS = POSITIVE

**FINAL REPORT**

| | |
|---|---|
| **D O C T O R** | **WALKER, C**<br>05000045 \| COAI \| AURORA ICE<br>PROCESSING CENTER<br>3130 NORTH OAKLAND STREET<br><br>AURORA, CO 80010<br> Acct #:05000045<br><br> NPI: 1003201120 |

| | |
|---|---|
| **P A T I E N T** | **BOZKUS, SERHAT**<br><br>DOB:1/1/1992<br>SEX:M          AGE: 30<br>U/FL:ICE        WING: AS-NA-E<br>ROOM:NA-38     BED: L<br> ID: 3893791   ALT ID: 22071242<br>                              9 |

| | |
|---|---|
| **S A M P L E** | Specimen ID: 21588132110<br><br>Report Date: 8/4/2022 13:08<br>Date Received: 8/4/2022 0:00<br>Date Observed:8/2/2022 4:00 |

NOTES:

## CLINICAL INFORMATION

FASTING:                    Total Volume:                    Source:

## CLINICAL REPORT

**Clinical Abnormalities Summary:**     (May not contain all abnormal results; narrative results may not have abnormal flags. Please review entire report.)

### Urinalysis, Complete

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|---|---|---|---|---|---|---|
| Specific Gravity | 1.016 | | 1.005-1.030 | | F | 01 |
| pH | 6.0 | | 5.0-7.5 | | F | 01 |
| Urine-Color | Yellow | | Yellow | | F | 01 |
| Appearance | Clear | | Clear | | F | 01 |
| WBC Esterase | Negative | | Negative | | F | 01 |
| Protein | Negative | | Negative/Trace | | F | 01 |
| Glucose | Negative | | Negative | | F | 01 |
| Ketones | Negative | | Negative | | F | 01 |
| Occult Blood | Negative | | Negative | | F | 01 |
| Bilirubin | Negative | | Negative | | F | 01 |
| Urobilinogen,Semi-Qn | 0.2 | | 0.2-1.0 | mg/dL | F | 01 |
| Nitrite, Urine | Negative | | Negative | | F | 01 |
| Microscopic Examination | | | | | F | 01 |
| | Microscopic follows if indicated. | | | | | |
| Microscopic Examination | See below: | | | | F | 01 |
| | Microscopic was indicated and was performed. | | | | | |

### Microscopic Examination

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|---|---|---|---|---|---|---|
| WBC | None seen | | 0 - 5 | /hpf | F | 01 |
| RBC | None seen | | 0 - 2 | /hpf | F | 01 |
| Epithelial Cells (non renal) | None seen | | 0 - 10 | /hpf | F | 01 |
| Epithelial Cells (renal) | | | | | F | 01 |
| Casts | None seen | | None seen | /lpf | F | 01 |
| Cast Type | | | | | F | 01 |
| Crystals | | | | | F | 01 |
| Crystal Type | | | | | F | 01 |
| Mucus Threads | | | | | F | 01 |
| Bacteria | None seen | | None seen/Few | | F | 01 |
| Yeast | | | | | F | 01 |
| Trichomonas | | | | | F | 01 |
| Comment | | | | | F | 01 |

L = BELOW LOW NORMAL | LL = ALERT LOW | H = ABOVE HIGH NORMAL | < = PANIC LOW | > = PANIC HIGH | A = ABNORMAL | AA = CRITICAL ABNORMAL | S = SUSCEPTIBLE | R = RESISTANT | I = INTERMEDIATE | NEG = NEGATIVE | POS = POSITIVE

# FINAL REPORT



PERFORMING LAB

01 - Labcorp Denver, 8490 Upland Drive, EnglewoodCO, 801127115 3037922600, MD, Collum, Earle MD S,

L = BELOW LOW NORMAL | LL = ALERT LOW | H = ABOVE HIGH NORMAL | HH = ALERT HIGH | < = PANIC LOW | > = PANIC HIGH | A = ABNORMAL |
AA = CRITICAL ABNORMAL | S = SUSCEPTIBLE | R = RESISTANT | I = INTERMEDIATE | NEG = NEGATIVE | POS = POSITIVE

# FINAL REPORT

**DOCTOR**
WALKER, C
05000045 | COAI | AURORA ICE PROCESSING CENTER
3130 NORTH OAKLAND STREET

AURORA, CO 80010
Acct #:05000045

NPI: 1003201120

**PATIENT**
BOZKUS, SERHAT

DOB:1/1/1992
SEX:M                    AGE:30
U/FL:ICE                 WING: AS-NA-E
ROOM:NA-38               BED: L
ID: 3893791              ALT ID: 22071242
                                        9

**SAMPLE**
Specimen ID: 21588132110

Report Date: 8/4/2022 13:08
Date Received: 8/4/2022 0:00
Date Observed:8/2/2022 4:00

NOTES:

## CLINICAL INFORMATION

FASTING:              Total Volume:              Source:

## CLINICAL REPORT

**Clinical Abnormalities Summary:** (May not contain all abnormal results; narrative results may not have abnormal flags. Please review entire report.)

### Urinalysis, Complete

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|------|--------|----------|-----------|-------|--------|-----|
| Specific Gravity | 1.016 | | 1.005-1.030 | | F | 01 |
| pH | 6.0 | | 5.0-7.5 | | F | 01 |
| Urine-Color | Yellow | | Yellow | | F | 01 |
| Appearance | Clear | | Clear | | F | 01 |
| WBC Esterase | Negative | | Negative | | F | 01 |
| Protein | Negative | | Negative/Trace | | F | 01 |
| Glucose | Negative | | Negative | | F | 01 |
| Ketones | Negative | | Negative | | F | 01 |
| Occult Blood | Negative | | Negative | | F | 01 |
| Bilirubin | Negative | | Negative | | F | 01 |
| Urobilinogen,Semi-Qn | 0.2 | | 0.2-1.0 | mg/dL | F | 01 |
| Nitrite, Urine | Negative | | Negative | | F | 01 |
| Microscopic Examination | | | | | F | 01 |
| | Microscopic follows if indicated. | | | | | |
| Microscopic Examination | See below: | | | | F | 01 |
| | Microscopic was indicated and was performed. | | | | | |

### Microscopic Examination

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|------|--------|----------|-----------|-------|--------|-----|
| WBC | None seen | | 0 - 5 | /hpf | F | 01 |
| RBC | None seen | | 0 - 2 | /hpf | F | 01 |
| Epithelial Cells (non renal) | None seen | | 0 - 10 | /hpf | F | 01 |
| Epithelial Cells (renal) | | | | | F | 01 |
| Casts | None seen | | None seen | /lpf | F | 01 |
| Cast Type | | | | | F | 01 |
| Crystals | | | | | F | 01 |
| Crystal Type | | | | | F | 01 |
| Mucus Threads | | | | | F | 01 |
| Bacteria | None seen | | None seen/Few | | F | 01 |
| Yeast | | | | | F | 01 |
| Trichomonas | | | | | F | 01 |
| Comment | | | | | F | 01 |

L = BELOW LOW NORMAL | LL = ALERT LOW | H = ABOVE HIGH NORMAL | HH = ALERT HIGH | < = PANIC LOW | > = PANIC HIGH | A = ABNORMAL | AA = CRITICAL ABNORMAL | S = SUSCEPTIBLE | R = RESISTANT | I = INTERMEDIATE | NEG = NEGATIVE | POS = POSITIVE

# FINAL REPORT



## PERFORMING LAB

01 - Labcorp Denver, 8490 Upland Drive, EnglewoodCO, 801127115 3037922600, MD, Collum, Earle MD S,

L = BELOW LOW NORMAL | LL = ALERT LOW | H = ABOVE HIGH NORMAL | HH = ALERT HIGH | < = PANIC LOW | > = PANIC HIGH | A = ABNORMAL |
AA = CRITICAL ABNORMAL | S = SUSCEPTIBLE | R = RESISTANT | I = INTERMEDIATE | NEG = NEGATIVE | POS = POSITIVE

## SOAPE/Administrative Note

**Encounter Type:**

☑ Face to Face

**Person Completing Note:**

☑ Mental Health

**Type of Note:**

☑ SOAPE

### SOAPE

**Purpose of encounter:**

**MENTAL HEATH / RTC**

**Subjective:**

This patient was seen today for a mental health RTC. He reported that he is still having difficulties with nightmares and eating/vomiting and continues to lose weight. His record indicates that he was seen yesterday by Dr. Walker who has ordered snacks with meds and an extra sack lunch. His record indicated that nursing / medical are following him closely regarding this issue with eating and vomiting. This patient continues to focus on things outside of his control, such as when he is going to be released. This clinician again worked with this patient on focusing on that which he can control and not focusing on things outside of his control. This clinician encouraged this patient to engaged in positive and purposeful thinking for for self-betterment. He stated that he would continue to try and do this. He reported to be taking his psychotropic medications as prescribed. His record corroborated his report. He denied any dangerous ideations at this time, nor any perceptual disturbance. He did not have anything further to process today. This clinician educated this patient to kite mental health if he needs to be seen and to alert security staff in case of mental health emergency.

**Objective:**

This patient presented as alert and oriented. He was disheveled with his hair and dressed in the appropriate uniform. His mood was anxious and his affect was tense. His mood and affect were congruent. He was cooperative and respectful towards this clinician. He stated that he has been vomiting at every meal and so he has not been eating much. However, he stated that he continues having nightmares, but is sleeping. He made no unusual movements during the course of this interview. He appeared to be goal-directed and logical in his thought process, with no evidence of thought disorder. His speech was of normal rhythm, rate, tone, volume, responsiveness, and prosody. His cognition (memory and concentration) appeared to be intact. He presented with good insight and judgment. His intelligence appeared to be average. He denied experience any dangerous ideations at this time (i.e., suicidal/homicidal), nor any perceptual disturbance. He made no reference to any PREA risk related issues at this time. He made no mention of feeling unsafe where he was currently housed and that no one is attempting to exploit them.

### Brief Mental Status Exam

**Appearance:**

☑ Appropriately dressed    ☑ Poorly groomed    ☑ Poor hygiene

**Eye Contact:**

☑ Good

**Attitude:**

☑ Calm and cooperative

**Behavior:**

☑ No unusual movements or psychomotor changes

**Appetite:**

☑ Decreased

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE **on** 09/02/2022 19:11:09

**Sleep:**
☑ WNL

**Speech:**
☑ Normal rate/tone/volume w/o pressure

**Affect:**
☑ Blunted

**Mood:**
☑ Anxious   ☑ Depressed

**Thought Process:**
☑ Goal-directed and logical

**Suicidal Ideation:**
☑ None

**Homicidal Ideation:**
☑ None

**Thought Content:**
☑ WNL

**Perception:**
☑ No hallucinations or delusions during interview

**Alert:**
☑ Fully

**Oriented to Time, Place, Person, and Situation:**
☑ Yes

**Memory/Concentration:**
☑ Short term intact   ☑ Long term intact

**Insight/Judgment:**
☑ Fair

**Estimated IQ:**
☑ Average

**Did patient refuse vitals:**
*NO ANSWER PROVIDED*

**Assessment/DSM-5 Diagnosis (include rationale for diagnosis):**

300.00 - ANXIETY STATE UNSPECIFIED - [WALKER, CARY] - 2022-07-20

F33.0 - MAJOR DEPRESSIVE DISORDER, RECURRENT, MILD - [MCGUIRE, COLLEEN] - 2022-08-02

309.81 - POSTTRAUMATIC STRESS DISORDER - [WILLSON, BRYCE] - 2022-08-05

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE on 09/02/2022 19:11:09

**168**

**Plan:**

**RECOMMENDATIONS:**

1.) This patient will be scheduled for a follow-up with mental health in 1 week to check on his well-being.

2.) This patient will continue with psychiatric clinic as already constituted.

3.) This patient will continue with this treatment plan as already constituted.

4.) This patient will kite mental health if he needs to be seen and will alert security staff in case of a mental health emergency.

5.) This patient is cleared for general population from a mental health standpoint.

6.) This patient will continue with nursing as already established regarding his inability to eat and vomiting every time he eats. NURSING PLEASE FOLLOW-UP WITHT HIS PATIENT REGARDING THIS ISSUE.

**Education:**

This patient was educated and/or previously educated with regard to the kite system and how to contact mental health, and to alert security staff in case of a mental health emergency. This patient was also given a Mental Health Card' with this clinician's name and title and instructions to show the card to security staff if he had a mental health emergency.

**Recommend placement under observation due to psychotic symptoms or other severe psychiatric symptoms without present suicide risk:**
☑ Not necessary

**Schedule follow-up with:**
☑ Mental Health

## Mental Health

**Timeframe for follow-up with Mental Health:**
☑ 7 Days

**Does Nursing need to review note for orders:**
☑ Yes

**Interpreter Needed:**
☑ Yes

**Interpreter Name and/or #:**
BROW

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE **on** 09/02/2022 19:11:09

## Save Log

| User Name | AuditDateAndTime |
|---|---|
| WILLSON, BRYCE, PHD | 09/02/2022 19:11:09 |
| WILLSON, BRYCE, PHD | 09/02/2022 18:17:15 |

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE **on** 09/02/2022 19:11:09

<u>Therapeutic Diet Order</u>

**Verified Documented Food Allergy (specify):**
*NO ANSWER PROVIDED*

**Diet Order (check one):**
*NO ANSWER PROVIDED*

**Comments:**
sack lunch x 30 days per MD Walker

**Interpreter Needed:**
*NO ANSWER PROVIDED*

==ICE Facilities Maximum 90 Days==

==All other clients Maximum 180 Days==

## Save Log

| User Name | AuditDateAndTime |
|---|---|
| CARDENAS MELENDREZ, ANGELICA, RN | 09/01/2022 12:31:41 |

---

**Therapeutic Diet Order**
Therapeutic Diet Order

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** CARDENAS MELENDREZ, ANGELICA **on**
09/01/2022 12:31:41

## SOAPE/Administrative Note

**Encounter Type:**

☑ Face to Face

**Person Completing Note:**

☑ Doctor

**Type of Note:**

☑ SOAPE

**Is this an OBGYN encounter:**

☑ N/A

### SOAPE

**Subjective:**

Pt is here today with c/o nausea after meals for the past 2 weeks. He will often vomit up his food. 10 pound weight loss since last visit noted. He has had this issue in the past , but now it is worse. He denies fevers, chills, abdominal pain, chest pain , or reflux

**Objective:**

NAD, A+Ox3

RRR, No M/G/R

CTAB, non-labored

appropriate affect

PERRLA, EOMI

normocephalic

Abd soft, non-tender, no hernias or masses

**Did patient refuse vitals:**

☑ No vitals refused

| Blood Pressure: | Temperature: | Pain Scale: |
|---|---|---|
| 127/86 | 97.6 | ☑ 0 |
| **Pulse:** | **Weight:** | |
| 79 | 139 | |
| **Respiratory Rate:** | **O2 SATS:** | |
| 17 | 94 | |

**Assessment:**

# Gastritis- suspect viral vs medication induced on empty stomache

# Recent 10 pound weight loss

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WALKER, CARY **on** 09/01/2022 09:04:51

**Plan:**

1. Ok for crackers with meds x 60 days

2. Start sack lunch x 30 days

3. Weekly weight checks x 30 days

4. Start sulcrafate 1gm POI TID x 14 days

5. f/u in 30 days

6. Renew ENSURE LIQUID 237ML -- [TAKE 1 APPLICATION(S) ORALLY TWICE DAILY] x 30 days

**Education:**

**Schedule follow-up with:**

Doctor

<u>Doctor Follow-up</u>

**Timeframe for follow-up with Medical Provider:**

30 Days

**Does Nursing need to review note for orders:**

Yes

**Interpreter Needed:**

☑Yes

**Interpreter Name and/or #:**

377236

## Save Log

| User Name | AuditDateAndTime |
|---|---|
| WALKER, CARY, DO | 09/01/2022 09:04:51 |
| CARDENAS MELENDREZ, ANGELICA, RN | 09/01/2022 08:46:42 |

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WALKER, CARY **on** 09/01/2022 09:04:51

## SOAPE/Administrative Note

**Encounter Type:**
☑ Face to Face

**Person Completing Note:**
☑ Mental Health

**Type of Note:**
☑ SOAPE

### SOAPE

**Purpose of encounter:**

**MENTAL HEALTH / RTC**

**Subjective:**

This patient was seen today for a mental health RTC. He reported that nothing has really changed and he is still having difficulties with nightmares and eating/vomiting.  Thus, he is still losing weight.  His record indicated that nursing / medical are following him closely regarding this issue with eating and vomiting.  This clinician will include nursing to be alerted in this note regarding this issue continuing to be a problem.  He did stated that he was eating a number of crackers and cookies throughout the day.  He stated that he continues to focus on things outside of his control, such as when he is going to be released. This clinician again worked with this patient on focusing on that which he can control and not focusing on things outside of his control. For example, this clinician encouraged this patient to not focus on the time when he will get out, nor on when others get out, but to focus on his daily routine and self-betterment. He stated that he would continue to try and do this. He reported to be taking his psychotropic medications as prescribed. His record corroborated his report. He denied any dangerous ideations at this time, nor any perceptual disturbance. He did not have anything further to process today. This clinician educated this patient to kite mental health if he needs to be seen and to alert security staff in case of mental health emergency.

**Objective:**

This patient presented as alert and oriented. He was disheveled with his hair and dressed in the appropriate uniform. His mood was anxious and his affect was tense. His mood and affect were congruent. He was cooperative and respectful towards this clinician. He stated that he has been vomiting at every meal and so he has not been eating much. However, he stated that he continues having nightmares, but is sleeping. He made no unusual movements during the course of this interview. He appeared to be goal-directed and logical in his thought process, with no evidence of thought disorder. His speech was of normal rhythm, rate, tone, volume, responsiveness, and prosody. His cognition (memory and concentration) appeared to be intact. He presented with good insight and judgment. His intelligence appeared to be average. He denied experience any dangerous ideations at this time (i.e., suicidal/homicidal), nor any perceptual disturbance. He made no reference to any PREA risk related issues at this time. He made no mention of feeling unsafe where he was currently housed and that no one is attempting to exploit them.

### Brief Mental Status Exam

**Appearance:**
☑ Appropriately dressed   ☑ Good hygiene   ☑ Poor hygiene

**Eye Contact:**
☑ Good

**Attitude:**
☑ Calm and cooperative

**Behavior:**
☑ No unusual movements or psychomotor changes

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE **on** 08/26/2022 19:07:58

**Appetite:**
☑ Decreased

**Sleep:**
☑ WNL  ☑ Other

    **Describe Sleep:**
    Nightmares.

**Speech:**
☑ Normal rate/tone/volume w/o pressure

**Affect:**
☑ Blunted

**Mood:**
☑ Anxious  ☑ Depressed

**Thought Process:**
☑ Goal-directed and logical

**Suicidal Ideation:**
☑ None

**Homicidal Ideation:**
☑ None

**Thought Content:**
☑ WNL

**Perception:**
☑ No hallucinations or delusions during interview

**Alert:**
☑ Fully

**Oriented to Time, Place, Person, and Situation:**
☑ Yes

**Memory/Concentration:**
☑ Short term intact  ☑ Long term intact

**Insight/Judgment:**
☑ Fair

**Estimated IQ:**
☑ Above average

**Did patient refuse vitals:**
*NO ANSWER PROVIDED*

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE **on** 08/26/2022 19:07:58

**Assessment/DSM-5 Diagnosis (include rationale for diagnosis):**

300.00 - ANXIETY STATE UNSPECIFIED - [WALKER, CARY] - 2022-07-20

F33.0 - MAJOR DEPRESSIVE DISORDER, RECURRENT, MILD - [MCGUIRE, COLLEEN] - 2022-08-02

309.81 - POSTTRAUMATIC STRESS DISORDER - [WILLSON, BRYCE] - 2022-08-05

**Plan:**

**RECOMMENDATIONS:**

1.) This patient will be scheduled for a follow-up with mental health in 1 week to check on his well-being.

2.) This patient will continue with psychiatric clinic as already constituted.

3.) This patient will continue with this treatment plan as already constituted.

4.) This patient will kite mental health if he needs to be seen and will alert security staff in case of a mental health emergency.

5.) This patient is cleared for general population from a mental health standpoint.

6.) **This patient will continue with nursing as already established regarding his inability to eat and vomiting every time he eats. NURSING PLEASE FOLLOW-UP WITHT HIS PATIENT REGARDING THIS ISSUE.**

**Education:**

This patient was educated and/or previously educated with regard to the kite system and how to contact mental health, and to alert security staff in case of a mental health emergency. This patient was also given a Mental Health Card' with this clinician's name and title and instructions to show the card to security staff if he had a mental health emergency.

**Recommend placement under observation due to psychotic symptoms or other severe psychiatric symptoms without present suicide risk:**

☑ Not necessary

**Schedule follow-up with:**
☑ Mental Health

<u>Mental Health</u>

**Timeframe for follow-up with Mental Health:**
☑ 7 Days

**Does Nursing need to review note for orders:**

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE **on** 08/26/2022 19:07:58

☑Yes

**Interpreter Needed:**

☑Yes

    **Interpreter Name and/or #:**

    218265

## Save Log

| User Name | AuditDateAndTime |
|---|---|
| WILLSON, BRYCE, PHD | 08/26/2022 19:07:58 |

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE **on** 08/26/2022 19:07:58

4 of 4

**177**

## SOAPE/Administrative Note

**Encounter Type:**

☑ Face to Face

**Person Completing Note:**

☑ Nurse

**Type of Note:**

☑ Administrative

### Administrative Note

**Administrative Note:**

Pt submitted sick call complaining of vomiting once attempted to eat, pt VS WNL and shows no signs of distress at the moment. Per Dr. Walker, place pt on Zofran 1 tablet 2times a day for 5days.

**Schedule follow-up with:**

☑ No follow-up needed

**Are there any orders that require Provider signoff:**

☑ No

**Interpreter Needed:**

☑ Yes

**Interpreter Name and/or #:**

110269

**Save Log**

| User Name | AuditDateAndTime |
|---|---|
| BOATENG, DERICK, LPN | 08/25/2022 16:07:30 |

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** BOATENG, DERICK **on** 08/25/2022 16:07:30

1 of 1

**178**

## Medical Transfer Form (USM553/BP-659)

### Tuberculosis Screening

| TB Test date read, result, and size: | Chest x-ray Results and Date: |
|---|---|
| None | 2022-07-22 - Normal |

**Symptom free from TB for 30 days:**

☑Yes

**I/D/R is cleared for transfer:**

☑Yes

**Specify medical equipment required:**

NONE

## Identifying Information

| Designated To: | Mode of Transport (Check all that apply): |
|---|---|
| MEDICAL SUMMARY | ☑Air ☑Ground |
| **Departure Date:** | **Departed From:** |
| 08/22/2022 | AIPC |

### Current Medical Information

**Check all that apply to the I/D/R:**

*NO ANSWER PROVIDED*

**Female I/D/Rs: Is I/D/R pregnant:**

*NO ANSWER PROVIDED*

**List Allergies (Include drugs, foods, latex, etc.):**

NO KNOWN DRUG ALLERGY

**Current Medications:**

FLUTICASONE 0.05% NASAL S -- [INSTILL 1 SPRAY(S) INTO EACH NOSTRIL ONCE DAILY] -- 2022-08-16--2022-09-15
GABAPENTIN 600MG TABLET -- [TAKE 1 TABLET(S) ORALLY THREE TIMES DAILY] -- 2022-08-04--2022-09-03
LISINOPRIL 20MG TABLET -- [TAKE 1 TABLET(S) ORALLY ONCE DAILY] -- 2022-08-04--2022-11-01
MECLIZINE 12.5MG TABLET -- [TAKE 1 TABLET(S) ORALLY TWICE DAILY] -- 2022-08-18--2022-09-17
MIRTAZAPINE 15MG TABLET -- [TAKE 1 TABLET(S) ORALLY AT BEDTIME] -- 2022-08-09--2022-10-07
OLANZAPINE 2.5MG TABLET -- [TAKE 1 TABLET(S) ORALLY AT BEDTIME] -- 2022-08-09--2022-10-07

**Medications Dispensed With I/D/R For Transport (Include dosage, route, frequency and total amount given.):**

FLUTICASONE 0.05% NASAL S -- [INSTILL 1 SPRAY(S) INTO EACH NOSTRIL ONCE DAILY] -- 2022-08-16--2022-09-15
GABAPENTIN 600MG TABLET -- [TAKE 1 TABLET(S) ORALLY THREE TIMES DAILY] -- 2022-08-04--2022-09-03
LISINOPRIL 20MG TABLET -- [TAKE 1 TABLET(S) ORALLY ONCE DAILY] -- 2022-08-04--2022-11-01
MECLIZINE 12.5MG TABLET -- [TAKE 1 TABLET(S) ORALLY TWICE DAILY] -- 2022-08-18--2022-09-17
MIRTAZAPINE 15MG TABLET -- [TAKE 1 TABLET(S) ORALLY AT BEDTIME] -- 2022-08-09--2022-10-07
OLANZAPINE 2.5MG TABLET -- [TAKE 1 TABLET(S) ORALLY AT BEDTIME] -- 2022-08-09--2022-10-07

**Medical Transfer Form (USM553/BP-659)**
I/D/R in Transit Summary

Patient Name: BOZKUS, SERHAT
Patient Number: 220712429
Location: ICE-AS-NA-E-NA-38-L
DOB: 1/1/1992
Facility: AURORA ICE PROCESSING CENTER
Electronically Signed By ROSS-PEARSON, DEIDRE on 08/22/2022
11:04:17

1 of 3

**179**

**Current Diagnoses:**

300.00 - ANXIETY STATE UNSPECIFIED - [WALKER, CARY] - 2022-07-20
401.1 - BENIGN ESSENTIAL HYPERTENSION - [WALKER, CARY] - 2022-07-20
784.91 - POSTNASAL DRIP - [WALKER, CARY] - 2022-07-20
F33.0 - Major depressive disorder, recurrent, mild - [MCGUIRE, COLLEEN] - 2022-08-02
M54.16 - Radiculopathy, lumbar region - [WALKER, CARY] - 2022-07-20
309.81 - Posttraumatic stress disorder - [WILLSON, BRYCE] - 2022-08-05

## Sickle Cell Screening

**I/D/R has a history of:**

☑ No History of Disease or Trait

**If I/D/R has disease or trait and is traveling by air, has JPATS Sickle Cell Protocol and Clearance been completed:**
*NO ANSWER PROVIDED*

**Comments:**
*NO ANSWER PROVIDED*

## Pre-departure COVID-19 Screening

**Temperature:**

97.6

**Date and time Temp taken:**

08/22/2022 11:01

**Does I/D/R present any of the following symptoms (check all that apply):**

*NO ANSWER PROVIDED*

*If temperature is greater OR ANY answer is checked other than "I/D/R does not have any of these symptoms present", the I/D/R is NOT CLEARED FOR TRANSFER until evaluated and cleared by a licensed independent practitioner.

## Pre-departure COVID-19 Testing (if required)

**Type (or Name) of Test:**

PCR

**Test Date:**

07/19/2022

**Test Result:**

☑ Negative

**If already tested positive less than 90 days from move, no pre-departure test required:**

*NO ANSWER PROVIDED*

I/D/Rs refusing testing ***must*** be placed in a 14-day single cell quarantine and testing offered daily prior to movement. All information should be fully documented in comments

## COVID-19 Vaccination (if available)

**Medical Transfer Form (USM553/BP-659)**
I/D/R in Transit Summary

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** ROSS-PEARSON, DEIDRE on 08/22/2022
11:04:17

**Immunization(s) administered:**

None

*NOTE: All doses must be completed prior to movement!*

**Immunization Exemption(s)/Refusal(s):**

None

**Additional Comments:**

BMI 20.07

**Interpreter Needed:**

*NO ANSWER PROVIDED*

## Save Log

| User Name | AuditDateAndTime |
|---|---|
| ROSS-PEARSON, DEIDRE, RN | 08/22/2022 11:04:17 |

---

**Medical Transfer Form (USM553/BP-659)**
I/D/R in Transit Summary

Patient Name: BOZKUS, SERHAT
Patient Number: 220712429
Location: ICE-AS-NA-E-NA-38-L
DOB: 1/1/1992
Facility: AURORA ICE PROCESSING CENTER
Electronically Signed By ROSS-PEARSON, DEIDRE on 08/22/2022
11:04:17

## Nursing Assessment Protocol - Abdominal Pain

### Subjective

**Is the patient being seen by an NP/PA:**

☑ No

**Chief Complaint:**

nausea after eating

**Sick Call:**

☑ Routine

| Date of onset: | Time of onset: | Activity at onset: |
|---|---|---|
| 2-3 months ago | *NO ANSWER PROVIDED* | *NO ANSWER PROVIDED* |

**Allergies:**

NO KNOWN DRUG ALLERGY

**History of (select all that apply):**

☑ Recent weight change (#lbs)

> **Recent weight change (#lbs)**
>
> 1

**After eating does pain:**

☑ Remain the same

**Current Medications:**

ENSURE LIQUID 237ML -- [TAKE 1 APPLICATION(S) ORALLY TWICE DAILY] -- 2022-08-03--2022-09-02
FLUTICASONE 0.05% NASAL S -- [INSTILL 1 SPRAY(S) INTO EACH NOSTRIL ONCE DAILY] -- 2022-08-16--2022-09-15
GABAPENTIN 600MG TABLET -- [TAKE 1 TABLET(S) ORALLY THREE TIMES DAILY] -- 2022-08-04--2022-09-03
LISINOPRIL 20MG TABLET -- [TAKE 1 TABLET(S) ORALLY ONCE DAILY] -- 2022-08-04--2022-11-01
MECLIZINE 12,5MG TABLET -- [TAKE 1 TABLET(S) ORALLY TWICE DAILY] -- 2022-08-18--2022-09-17
MIRTAZAPINE 15MG TABLET -- [TAKE 1 TABLET(S) ORALLY AT BEDTIME] -- 2022-08-09--2022-10-07
OLANZAPINE 2.5MG TABLET -- [TAKE 1 TABLET(S) ORALLY AT BEDTIME] -- 2022-08-09--2022-10-07

**Alleviating Factors:**

reports "salt helps the nausea but I cannot take it because I have high blood pressure" salty crackers

**Pain Character (Select all that apply):**

*NO ANSWER PROVIDED*

**Pain Intensity:**

☑ 0

**Pain Location:**

*NO ANSWER PROVIDED*

**Flatus:**

---

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** Collyns, Amanda **on** 08/19/2022 23:35:15

☑ Yes

**Describe Flatus:**

Reports passing gas with no issues.

**Radiation:**

☑ No

## Bowel Movement

**Last BM:**

08/19/2022

**Consistency:**

☑ Formed

**Amount:**

☑ Small

**Color:**

☑ Brown

**Blood in stool:**

☑ No

**Constipation:**

☑ No

**Heartburn or Indigestion:**

☑ None

**Urinary Frequency:**

normal

**During urination does patient experience:**

*NO ANSWER PROVIDED*

## Dietary Habits

| Fat Intake: | Alcohol Intake: | Caffeine Intake: |
|---|---|---|
| *NO ANSWER PROVIDED* | *NO ANSWER PROVIDED* | *NO ANSWER PROVIDED* |

**Describe Smoking Habits:**

*NO ANSWER PROVIDED*

## Objective

**Did patient refuse vitals:**

---

**Nursing Assessment Protocol - Abdominal Pain**
GeoGroup **-** Nursing Assessment Protocol - Abdominal Pain

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** Collyns, Amanda **on** 08/19/2022 23:35:15

☑ Some vitals Refused

## Vitals

| **Blood Pressure** | **Pulse Rate:** | **Is Pulse:** | **O2Sat:** |
|---|---|---|---|
| 135/94 | 98 | ☑ Normal | 100 |
| **Temperature:** | **Weight:** | | **Respiratory** |
| 96.8 | 148 | | 16 |

**Reason for Refusing vitals:**

all vitals taken

**Bowel Sounds:**

☑ Normal

**Present in all 4 quadrants:**

☑ Yes

**Guarding:**

☑ No

**Rebound Tenderness:**

☑ No

**Jaundice:**

☑ No

**Is patient more comfortable:**

*NO ANSWER PROVIDED*

**Skin Turgor:**

☑ Normal (warm & dry)

**Overall Appearance:**

☑ No acute distress

## Assessment:

**Assessment:**

Detainee reports "I am not eating at all. The food I eat makes me throw up every time. They gave me ensure and those were ok for a couple days. The only thing that helps is salty crackers and I am losing a lot of weight." Detainee arrived at this facility weighing 147 on 7/19/22 and today he weighs 148. Detainee reports "I threw up 4 days ago after eating. It hasn't happened again. I have no pain and I have no heart burn." Denies any blood in stool or vomit. VS stable, no pallor, not diaphoretic and skin turgor is normal. Tums administered 1x now and instructed detainee to go back to his room and try eating. Bucket given in case detainee vomits and instructed to alert corrections to alert medical to see vomit.

## Plan

**May offer choice of (select below):**

---

**Nursing Assessment Protocol - Abdominal Pain**
GeoGroup - Nursing Assessment Protocol - Abdominal Pain

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** Collyns, Amanda **on** 08/19/2022 23:35:15

☑ Antacid

> **Dose (Give according to label instructions):**
>
> 2 tums now
>
> *If fever above 100.4 F, nausea or vomiting accompanying blood in stool, all HIV and patients with diarrhea that lasts longer than 24 hours after treatment, or if patient does appear ill, and there is pain upon palpation, the MD/NP/PA must be notified for specific orders.*

**Are there any additional orders not listed in Plan Section above:**

☑ No

**Does a nurse need to review for orders:**

☑ No

## Education

**Education Provided**

☑ Instructed to avoid spicy foods, caffeine and high fat snacks. Chew slowly & thoroughly, and drink 6 to 8 glasses of water daily.

☑ Instructed not to lie down at least 2 hours after eating

☑ Instructed on stress relief measures, high fiber diet, and adequate exercise.

☑ Return if symptoms persist or worsen.

☑ Patient verbalized understanding of above instructions.

## Referral

**Is a referral needed:**

☑ No

**Is this an after hours emergency:**

☑ No

**Interpreter Needed:**

☑ Yes

> **Interpreter Name and/or #:**
>
> Janice

### Save Log

| User Name | AuditDateAndTime |
|---|---|
| Collyns, Amanda, | 08/19/2022 23:35:15 |
| Collyns, Amanda, | 08/19/2022 18:53:09 |

---

**Nursing Assessment Protocol - Abdominal Pain**
GeoGroup - Nursing Assessment Protocol - Abdominal Pain

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** Collyns, Amanda **on** 08/19/2022 23:35:15

## SOAPE/Administrative Note

**Encounter Type:**

☑ Face to Face

**Person Completing Note:**

☑ Mental Health

**Type of Note:**

☑ SOAPE

### SOAPE

**Purpose of encounter:**

**MENTAL HEALTH / RTC**

**Subjective:**

This patient was seen today for a mental health RTC. He reported that he was doing well and felt supported by his peers.  He stated they help him out and help remind him to shower and help him shower or to the shower.  He stated that he has been vomiting at every meal and so he has not been eating much.  He also reported that he has been continuing to experience nightmares and anxiety.  He continues to focus on things outside of his control, such as when he is going to be released.  This clinician again worked with this patient on focusing on that which he can control and not focusing on things outside of his control. For example, this clinician encouraged this patient to not focus on the time when he will get out, nor on when others get out, but to focus on his daily routine and self-betterment. He stated that he would continue to try and do this.  He reported to be taking his psychotropic medications as prescribed. His record corroborated his report. He denied any dangerous ideations at this time, nor any perceptual disturbance. He did not have anything further to process today. This clinician educated this patient to kite mental health if he needs to be seen and to alert security staff in case of mental health emergency.

**Objective:**

This patient presented as alert and oriented. He was disheveled with his hair and dressed in the appropriate uniform. His mood was anxious and his affect was tense. His mood and affect were congruent. He was cooperative and respectful towards this clinician. He stated that he has been vomiting at every meal and so he has not been eating much. However, he stated that he continues having nightmares. He made no unusual movements during the course of this interview. He appeared to be goal-directed and logical in his thought process, with no evidence of thought disorder. His speech was of normal rhythm, rate, tone, volume, responsiveness, and prosody. His cognition (memory and concentration) appeared to be intact. He presented with good insight and judgment. His intelligence appeared to be average. He denied experience any dangerous ideations at this time (i.e., suicidal/homicidal), nor any perceptual disturbance. He made no reference to any PREA risk related issues at this time. He made no mention of feeling unsafe where he was currently housed and that no one is attempting to exploit them.

### Brief Mental Status Exam

**Appearance:**

☑ Appropriately dressed   ☑ Poorly groomed   ☑ Poor hygiene

**Eye Contact:**

☑ Good

**Attitude:**

☑ Calm and cooperative

**Behavior:**

☑ No unusual movements or psychomotor changes

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE **on** 08/19/2022 19:52:12

**186**

**Appetite:**
☑ Decreased

**Sleep:**
☑ Decreased

**Speech:**
☑ Normal rate/tone/volume w/o pressure

**Affect:**
☑ Other

> **Describe Other Affect:**
> tense.

**Mood:**
☑ Anxious

**Thought Process:**
☑ Goal-directed and logical

**Suicidal Ideation:**
☑ None

**Homicidal Ideation:**
☑ None

**Thought Content:**
☑ WNL

**Perception:**
☑ No hallucinations or delusions during interview

**Alert:**
☑ Fully

**Oriented to Time, Place, Person, and Situation:**
☑ Yes

**Memory/Concentration:**
☑ Short term intact    ☑ Long term intact

**Insight/Judgment:**
☑ Good

**Estimated IQ:**
☑ Average

**Did patient refuse vitals:**
*NO ANSWER PROVIDED*

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

Patient Name: BOZKUS, SERHAT
Patient Number: 220712429
Location: ICE-AS-NA-E-NA-38-L
DOB: 1/1/1992
Facility: AURORA ICE PROCESSING CENTER
Electronically Signed By WILLSON, BRYCE on 08/19/2022 19:52:12

2 of 4

**187**

**Assessment/DSM-5 Diagnosis (include rationale for diagnosis):**

300.00 - ANXIETY STATE UNSPECIFIED - [WALKER, CARY] - 2022-07-20

F33.0 - MAJOR DEPRESSIVE DISORDER, RECURRENT, MILD - [MCGUIRE, COLLEEN] - 2022-08-02

309.81 - POSTTRAUMATIC STRESS DISORDER - [WILLSON, BRYCE] - 2022-08-05

**Plan:**

**RECOMMENDATIONS:**

1.) This patient will be scheduled for a follow-up with mental health in 1 week to check on his well-being.

2.) This patient will continue with psychiatric clinic as already constituted.

3.) This patient will continue with this treatment plan as already constituted.

4.) This patient will kite mental health if he needs to be seen and will alert security staff in case of a mental health emergency.

5.) This patient is cleared for general population from a mental health standpoint.

6.) This patient was referred directly to nursing staff regarding his inability to eat and vomiting every time he eats.

**Education:**

This patient was educated and/or previously educated with regard to the kite system and how to contact mental health, and to alert security staff in case of a mental health emergency. This patient was also given a Mental Health Card' with this clinician's name and title and instructions to show the card to security staff if he had a mental health emergency.

**Recommend placement under observation due to psychotic symptoms or other severe psychiatric symptoms without present suicide risk:**

☑ Not necessary

**Schedule follow-up with:**

☑ Mental Health

<u>Mental Health</u>

**Timeframe for follow-up with Mental Health:**

☑ 7 Days

**Does Nursing need to review note for orders:**

☑ Yes

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE on 08/19/2022 19:52:12

**Interpreter Needed:**

 Yes

| **Interpreter Name and/or #:**
| 388308

## Save Log

| User Name | AuditDateAndTime |
|---|---|
| WILLSON, BRYCE, PHD | 08/19/2022 19:52:12 |

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE **on** 08/19/2022 19:52:12

## SOAPE/Administrative Note

**Encounter Type:**

☑ Face to Face

**Person Completing Note:**

☑ Mental Health

**Type of Note:**

☑ Administrative

### Administrative Note

**Administrative Note:**

Turkish interpreter used for mental health encounter: 385387

**Schedule follow-up with:**

☑ No follow-up needed

**Does Nursing need to review note for orders:**

☑ No

**Interpreter Needed:**

☑ Yes

**Interpreter Name and/or #:**

385387

## Save Log

| User Name | AuditDateAndTime |
|---|---|
| WILLSON, BRYCE, PHD | 08/11/2022 18:27:38 |

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE **on** 08/11/2022 18:27:38

**190**

## SOAPE/Administrative Note

**Encounter Type:**

☑ Face to Face

**Person Completing Note:**

☑ Mental Health

**Type of Note:**

☑ SOAPE

### SOAPE

**Purpose of encounter:**

<u>**MENTAL HEALTH / RTC**</u>

**Subjective:**

This patient was seen today for a mental health RTC. This patient requested emergently to be seen. He reported that he was worried and stressed about being incarcerated for the past 10 months and not knowing when he was getting out. This clinician worked with this patient on focusing on that which he can control and not focusing on things outside of his control. For example, this clinician encouraged this patient to not focus on the time when he will get out, nor on when others get out, but to focus on his daily routine and self-betterment. He presented to calm down towards the ended of this session. He reported to be taking his psychotropic medications as prescribed. His record corroborated his report. He made no mention of any change in his appetite and/or sleep pattern. He indicated that he was getting along with others fine. He denied any dangerous ideations at this time, nor any perceptual disturbance. He did not have anything further to process today. This clinician educated this patient to kite mental health if he needs to be seen and to alert security staff in case of mental health emergency.

**Objective:**

This patient presented as alert and oriented. He was well groomed and dressed in the appropriate uniform. His mood was anxious and his affect was tense. His mood and affect were congruent. He was cooperative and respectful towards this clinician. He made no mention of any change in his sleep and/or appetite. However, he stated that he was having nightmares. He made no unusual movements during the course of this interview. He appeared to be goal-directed and logical in his thought process, with no evidence of thought disorder. His speech was of normal rhythm, rate, tone, volume, responsiveness, and prosody. His cognition (memory and concentration) appeared to be intact. He presented with good insight and judgment. His intelligence appeared to be average. He denied experience any dangerous ideations at this time (i.e., suicidal/homicidal), nor any perceptual disturbance. He made no reference to any PREA risk related issues at this time. He made no mention of feeling unsafe where he was currently housed and that no one is attempting to exploit them.

### Brief Mental Status Exam

**Appearance:**

☑ Appropriately dressed    ☑ Well groomed    ☑ Good hygiene

**Eye Contact:**

☑ Good

**Attitude:**

☑ Calm and cooperative

**Behavior:**

☑ No unusual movements or psychomotor changes

**Appetite:**

☑ Decreased

---

**SOAPE/Administrative Note**

SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE **on** 08/11/2022 18:26:41

1 of 3

**191**

**Sleep:**
☑ WNL  ☑ Other

> **Describe Sleep:**
> nightmares.

**Speech:**
☑ Normal rate/tone/volume w/o pressure

**Affect:**
☑ Normal range

**Mood:**
☑ Anxious

**Thought Process:**
☑ Goal-directed and logical

**Suicidal Ideation:**
☑ None

**Homicidal Ideation:**
☑ None

**Thought Content:**
☑ WNL

**Perception:**
☑ No hallucinations or delusions during interview

**Alert:**
☑ Fully

**Oriented to Time, Place, Person, and Situation:**
☑ Yes

**Memory/Concentration:**
☑ Short term intact  ☑ Long term intact

**Insight/Judgment:**
☑ Good

**Estimated IQ:**
☑ Average

**Did patient refuse vitals:**
*NO ANSWER PROVIDED*

**Assessment/DSM-5 Diagnosis (include rationale for diagnosis):**

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE **on** 08/11/2022 18:26:41

2 of 3

**192**

300.00 - ANXIETY STATE UNSPECIFIED - [WALKER, CARY] - 2022-07-20

F33.0 - MAJOR DEPRESSIVE DISORDER, RECURRENT, MILD - [MCGUIRE, COLLEEN] - 2022-08-02

309.81 - POSTTRAUMATIC STRESS DISORDER - [WILLSON, BRYCE] - 2022-08-05

**Plan:**

**RECOMMENDATIONS:**

1.) This patient will be scheduled for a follow-up with mental health in 1 week to check on his well-being.

2.) This patient will continue with psychiatric clinic as already constituted.

3.) This patient will continue with this treatment plan as already constituted.

4.) This patient will kite mental health if he needs to be seen and will alert security staff in case of a mental health emergency.

5.) This patient is cleared for general population from a mental health standpoint.

**Education:**

This patient was educated and/or previously educated with regard to the kite system and how to contact mental health, and to alert security staff in case of a mental health emergency. This patient was also given a Mental Health Card' with this clinician's name and title and instructions to show the card to security staff if he had a mental health emergency.

**Recommend placement under observation due to psychotic symptoms or other severe psychiatric symptoms without present suicide risk:**

☑ Not necessary

**Schedule follow-up with:**

☑ Mental Health

## Mental Health

**Timeframe for follow-up with Mental Health:**

☑ 7 Days

**Does Nursing need to review note for orders:**

☑ No

**Interpreter Needed:**

*NO ANSWER PROVIDED*

## Save Log

| User Name | AuditDateAndTime |
|---|---|
| WILLSON, BRYCE, PHD | 08/11/2022 18:26:41 |

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE **on** 08/11/2022 18:26:41

## Telemental Health Progress Notes - HS-166.1

**Is I/D/R refusing:**

☑ No

**Jurisdiction:**

☑ ICE/USMS

**Does the AIMS form need completed:**

☑ No

| | |
|---|---|
| **Date:** | **Time:** |
| 08/09/2022 | 09:26:08 |
| **Location (city, state) of telemental health provider which is provided to I/D/R at the beginning of the session:** | **Other staff member(s) participating in session:** |
| Littleton | Nat RN |

**Check each box below as reviewed with patient and/or completed:**

☑ The confidentiality of this visit    ☑ That this visit is not being taped and/or recorded

☑ A Mental Health Consent was signed and placed in Section 6 of the chart for the initial Appointment

**Reason for mental health encounter and objectives:**

psych follow-up

## Subjective

**Subjective:**

Patient seen, chart reviewed. For review he was started on zyprexa at the last visit. We reviewed labs. He states the zyprexa is helping with sleep though nothing else. He reports that he continues to drop weight. He reports that he is not eating well, he has ensure 2 times a day. He states that he is nauseated all of the time. We discussed taking crackers with his med though he is not interested in this. He reports feeling sad and depressed. He reports some dizziness that he thinks this is related to the medications, though we reviewed his intake of food and water which is not good. He is not sure what he wants to do with his medications. He does not want an increase. He has been reading and is reporting a hard time collecting his thoughts. We discussed continuing ensure.

-no suicidal thinking

-no reported a/v hallucinations

## Objective

**Current Medications:**

CLOTRIMAZOLE 1% CREAM -- [APPLY CREAM TOPICALLY TWICE DAILY] -- 2022-07-19--2022-08-17
ENSURE LIQUID 237ML -- [TAKE 1 APPLICATION(S) ORALLY TWICE DAILY] -- 2022-08-03--2022-09-02
FLUTICASONE 0.05% NASAL S -- [INSTILL 1 SPRAY(S) INTO EACH NOSTRIL ONCE DAILY] -- 2022-07-21--2022-08-20
GABAPENTIN 600MG TABLET -- [TAKE 1 TABLET(S) ORALLY THREE TIMES DAILY] -- 2022-08-04--2022-09-03
HYDROXYZINE PAM 25MG CAP -- [TAKE 1 CAPSULE(S) ORALLY TWICE DAILY] -- 2022-08-02--2022-09-30
LISINOPRIL 20MG TABLET -- [TAKE 1 TABLET(S) ORALLY ONCE DAILY] -- 2022-08-04--2022-11-01
MECLIZINE 12.5MG TABLET -- [TAKE 1 TABLET(S) ORALLY TWICE DAILY] -- 2022-07-19--2022-08-18
MIRTAZAPINE 15MG TABLET -- [TAKE 1 TABLET(S) ORALLY AT BEDTIME] -- 2022-08-02--2022-09-30
OLANZAPINE 2.5MG TABLET -- [TAKE 1 TABLET(S) ORALLY AT BEDTIME] -- 2022-08-02--2022-09-30

---

**Telemental Health Progress Notes - HS-166.1**

Telemental Health Progress Notes - HS-166.1

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** MCGUIRE, COLLEEN **on** 08/09/2022 10:25:39

## Brief Mental Status Exam

**Alert:**

☑ Tired/sleepy

**Oriented to Time, Place, Person, and Situation:**

☑ Yes

**Appearance:**

☑ Well groomed

**Eye Contact:**

☑ Good

**Attitude:**

☑ Calm and cooperative

**Behavior:**

☑ No unusual movements or psychomotor changes

**Appetite:**

☑ Decreased

**Sleep:**

☑ WNL

**Speech:**

☑ Normal rate/tone/volume w/o pressure

**Affect:**

☑ Blunted

**Mood:**

☑ Depressed

**Thought Process:**

☑ Goal-directed and logical

**Suicidal Ideation:**

☑ None

**Homicidal Ideation:**

☑ None

**Thought Content:**

☑ Other

> **Describe Other Thought Content:**
>
> unclear though better

---

Patient Name: BOZKUS, SERHAT
Patient Number: 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** MCGUIRE, COLLEEN **on** 08/09/2022 10:25:39

**Perception:**
☑ No hallucinations or delusions during interview

**Memory/Concentration:**
☑ Short term intact

**Insight/Judgment:**
☑ Fair

**Estimated IQ:**
☑ Average

## Assessment

**DSM-5 Diagnosis with Rationale:**

C - 309.81: Posttraumatic stress disorder
A - 300.00: ANXIETY STATE UNSPECIFIED
N - F33.0: Major depressive disorder, recurrent, mild

## Plan

**Treatment recommendations:**

Patient is not interested in increasing medications at this time

-stop hydroxyzine secondary to complaints of dizziness

-continue remeron 15 mg po qhs to target mood/appetite

-continue zyprexa 2.5 mg po qhs to target mood, unclear psychosis

-med orders for 60 days

**Do medications need adjusted:**
☑ Yes

   **Specify medications needing adjusted:**
   as per above

**Follow-up Needed:**

---

**Telemental Health Progress Notes - HS-166.1**
Telemental Health Progress Notes - HS-166.1

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** MCGUIRE, COLLEEN **on** 08/09/2022 10:25:39

☑ Yes

   **Follow-up needed with:**
   ☑ Psychiatry

      **Timeframe for follow-up with Psychiatry:**
      ☑ 30 Days

**Does Nursing need to review the form:**
☑ No

## Education

**I/D/R provided education on the following:**

   r/b of medications

   how to access Mh in case of emergency

**Interpreter Needed:**
☑ Yes

   **Interpreter Name and/or #:**
   357182

## Save Log

| User Name | AuditDateAndTime |
|---|---|
| MCGUIRE, COLLEEN, DO | 08/09/2022 10:25:39 |
| MCGUIRE, COLLEEN, DO | 08/09/2022 10:13:23 |
| MCGUIRE, COLLEEN, DO | 08/09/2022 09:59:27 |
| MCGUIRE, COLLEEN, DO | 08/09/2022 09:51:34 |
| MCGUIRE, COLLEEN, DO | 08/09/2022 09:35:54 |

## Signoff Comments List

| Approved By | Approved On | Signoff Note | Is Declined |
|---|---|---|---|
| MCGUIRE, COLLEEN, DO | 08/09/2022 10:25:39 | Form Processed Approval | False |

---

**Telemental Health Progress Notes - HS-166.1**
Telemental Health Progress Notes - HS-166.1

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** MCGUIRE, COLLEEN on 08/09/2022 10:25:39

## SOAPE/Administrative Note

**Encounter Type:**

☑ Face to Face

**Person Completing Note:**

☑ Mental Health

**Type of Note:**

☑ SOAPE

### SOAPE

**Purpose of encounter:**

**MENTAL HEALTH / REQUEST / RTC**

**Subjective:**

This patient was seen today for a mental health REQUEST RTC. He reported that he was recently moved today from the South dormitories to the north dormitory and placed in a small room with different individuals. He stated that he has panic and anxiety in small places. He stated that his friends are in and eight-man room and he would like to be moved to the man room in his dormitory. This clinician spoke with lieutenant Urey regarding this move. Said Lieut. will arrange this to happen. This patient stated that he did not have any other mental health concerns at this time and thanked this clinician for helping him with this matter. He indicated that he was getting along with others fine. He denied any dangerous ideations at this time, nor any perceptual disturbance. He did not have anything further to process today. This clinician educated this patient to kite mental health if he needs to be seen and to alert security staff in case of mental health emergency.

**Objective:**

This patient presented as alert and oriented. He was well groomed and dressed in the appropriate uniform. His mood was calm and his affect was calm. His mood and affect were congruent. He was cooperative and respectful towards this clinician. He made no mention of any change in his appetite or sleep pattern. He made no unusual movements during the course of this interview. He appeared to be goal-directed and logical in his thought process, with no evidence of thought disorder. His speech was of normal rhythm, rate, tone, volume, responsiveness, and prosody. His cognition (memory and concentration) appeared to be intact. He presented with good insight and judgment. His intelligence appeared to be average. He denied experience any dangerous ideations at this time (i.e., suicidal/homicidal), nor any perceptual disturbance. He made no reference to any PREA risk related issues at this time. He made no mention of feeling unsafe where he was currently housed and that no one is attempting to exploit them.

#### Brief Mental Status Exam

**Appearance:**

☑ Appropriately dressed   ☑ Well groomed   ☑ Good hygiene

**Eye Contact:**

☑ Good

**Attitude:**

☑ Calm and cooperative

**Behavior:**

☑ No unusual movements or psychomotor changes

**Appetite:**

☑ WNL

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE **on** 08/06/2022 21:03:15

**Sleep:**
  ☑ WNL

**Speech:**
  ☑ Normal rate/tone/volume w/o pressure

**Affect:**
  ☑ Normal range

**Mood:**
  ☑ Euthymic

**Thought Process:**
  ☑ Goal-directed and logical

**Suicidal Ideation:**
  ☑ None

**Homicidal Ideation:**
  ☑ None

**Thought Content:**
  ☑ WNL

**Perception:**
  ☑ No hallucinations or delusions during interview

**Alert:**
  ☑ Fully

**Oriented to Time, Place, Person, and Situation:**
  ☑ Yes

**Memory/Concentration:**
  ☑ Short term intact   ☑ Long term intact

**Insight/Judgment:**
  ☑ Good

**Estimated IQ:**
  ☑ Average

**Did patient refuse vitals:**
*NO ANSWER PROVIDED*

**Assessment/DSM-5 Diagnosis (include rationale for diagnosis):**

300.00 - ANXIETY STATE UNSPECIFIED - [WALKER, CARY] - 2022-07-20

F33.0 - MAJOR DEPRESSIVE DISORDER, RECURRENT, MILD - [MCGUIRE, COLLEEN] - 2022-08-02

309.81 - POSTTRAUMATIC STRESS DISORDER - [WILLSON, BRYCE] - 2022-08-05

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE **on** 08/06/2022 21:03:15

**Plan:**

**RECOMMENDATIONS:**

1.) This patient will be scheduled for a follow-up with mental health in 1 week to check on his well-being.

2.) This patient will continue with psychiatric clinic as already constituted.

3.) This patient will continue with this treatment plan as already constituted.

4.) This patient will kite mental health if he needs to be seen and will alert security staff in case of a mental health emergency.

5.) This patient is cleared for general population from a mental health standpoint.

6.) Security staff advised to move this patient into an eight man cell where his friends are in his dormitory to help him reduce his anxiety. Note: spoke to Lieut. Urey regarding this matter.

**Education:**

This patient was educated and/or previously educated with regard to the kite system and how to contact mental health, and to alert security staff in case of a mental health emergency. This patient was also given a Mental Health Card' with this clinician's name and title and instructions to show the card to security staff if he had a mental health emergency.

**Recommend placement under observation due to psychotic symptoms or other severe psychiatric symptoms without present suicide risk:**

☑ Not necessary

**Schedule follow-up with:**

☑ Mental Health



### Mental Health

**Timeframe for follow-up with Mental Health:**

☑ 7 Days

**Does Nursing need to review note for orders:**

☑ No

**Interpreter Needed:**

*NO ANSWER PROVIDED*

## Save Log

| User Name | AuditDateAndTime |
|---|---|
| WILLSON, BRYCE, PHD | 08/06/2022 21:03:15 |

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE **on** 08/06/2022 21:03:15

## ICE Health Service Corps - Medical/Psychiatric Alert

**The detainee named on this form has been examined and presents the following problem(s):**

☑ Psychiatric

**Select all that apply:**

☑ Other

> **Specify other:**
> Detainee should be psychiatrically cleared prior to being removed by ERO

**Remarks:**

Detainee should be psychiatrically cleared prior to being removed by ERO

History of suicidal ideation

309.81 - POSTTRAUMATIC STRESS DISORDER - [WILLSON, BRYCE] - 2022-08-05

F33.0 - MAJOR DEPRESSIVE DISORDER, RECURRENT, MILD - [MCGUIRE, COLLEEN] - 2022-08-02

300.00 - ANXIETY STATE UNSPECIFIED - [WALKER, CARY] - 2022-07-20

### Save Log

| User Name | AuditDateAndTime |
|-----------|------------------|
| WILLSON, BRYCE, PHD | 08/05/2022 16:21:29 |

### Signoff Comments List

| Approved By | Approved On | Signoff Note | Is Declined |
|-------------|-------------|--------------|-------------|
| WALKER, CARY, DO | 08/08/2022 14:56:27 | | False |

---

**Medical/Psychiatric Alert**
Medical/Psychiatric Alert

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE **on** 08/05/2022 16:21:29

**201**

## Individual Treatment Plan with Medications - HS-159

**DSM-5 Diagnosis (Please list each diagnosis, with primary diagnosis listed first):**

309.81 - POSTTRAUMATIC STRESS DISORDER - [WILLSON, BRYCE] - 2022-08-05

F33.0 - MAJOR DEPRESSIVE DISORDER, RECURRENT, MILD - [MCGUIRE, COLLEEN] - 2022-08-02

300.00 - ANXIETY STATE UNSPECIFIED - [WALKER, CARY] - 2022-07-20

**Medications:**

HYDROXYZINE PAM 25MG CAP (VISTARIL) -- [TAKE 1 CAPSULE(S) ORALLY TWICE DAILY] - (8/2/2022 - 9/30/2022)

MIRTAZAPINE 15MG TABLET (REMERON) -- [TAKE 1 TABLET(S) ORALLY AT BEDTIME] - (8/2/2022 - 9/30/2022)

OLANZAPINE 2.5MG TABLET (ZYPREXA) -- [TAKE 1 TABLET(S) ORALLY AT BEDTIME] - (8/2/2022 - 9/30/2022)

#### Problem description in behavioral terms (focus of treatment based on symptomology):

This patient is a 30-year-old, Turkish National, Male who is currently incarcerated at this facility secondary to seeking asylum, due to being persecuted and threatened with his life in his country. He reported to be experiencing the following psychiatric symptoms:

1. PTSD = Exposure to serious trauma, recurrent, flashbacks, nightmares, triggers (internal/external), efforts to avoid distressing things/trauma, negative cognitions and mood, problems with memory around trauma, exaggerated negative beliefs, self-blame or blame others, fear, horror, anger, guilt, shame, diminished interest, feeling detachment, inability for positive feelings, hypervigilance, exaggerated startle response, problems with concentration, sleep disturbance.

2. DEPRESSION = depressed mood, sad, empty, hopeless, helpless, worthless, tearful, irritable, diminished interest, weight change, appetite change, sleep changes, agitation/restless, fatigue, loss of energy, guilt, difficulty concentrating, indecisiveness, thoughts of death, suicidal ideation (passive).

3. ANXIETY / PANIC = excessive anxiety, worry, restlessness, easily fatigued, difficulty concentrating, irritability, muscle tension, sleep disturbance, restless / heart palpitations, racing heart, sweating, shortness of breath or smothering, feelings of choking, chest pain, nausea, abdominal distress, feeling dizzy, chills or heat sensations, paresthesias (numbness or tingling sensations), Derealization (feelings of unreality) or depersonalization (being detached from oneself), fear of losing control or "going crazy", fear of dying, worry about additional panic attacks, maladaptive behaviors.

4. Suicide Prevention Plan = thoughts and/or behaviors associated with suicide.

This patient denied any current dangerous ideations (i.e., suicidal / homicidal). However, he reported that he occasionally experiences perceptual disturbance (i.e., hallucinations / delusions) such as a voice that tells him that he should live. He reported that he would like follow-up with mental health and psychiatry to address the aforementioned symptoms. He will be scheduled accordingly. He was also educated with regard to the kite system and how to contact mental health, and to alter security staff in case of a mental health emergency.

This patient reported a history suicidal ideations. In Turkey, he reported that he would think sometimes of not being alive when he lived, due to being persecuted by the Turkish government. While in the New Mexico detention center in May of 2022, he reported that he was placed on a suicide watch as well for experiencing thoughts of fear of cutting his throat. He reported that he was placed on suicide alert for 48 hours. He reported that he periodically has fear of thoughts of wanting to not be alive. He stated that he does not want these thoughts, but the just come to him periodically. He reported that last time he suffered from this type of thinking was about two weeks ago. He denied any homicidal ideations and

**Individual Treatment Plan with Medications - HS-159**
Individual Treatment Plan with Medications - HS-159

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE **on** 08/05/2022 16:20:18

1 of 6

**202**

attempts thereof. He reported a history of self-mutilation in that he occasionally punches the wall. He reported a history of perceptual disturbance (i.e., hallucinations, delusions, and/or though disorder) such as a voice that tells him "you should live". He denied a history of inpatient psychiatric treatment. However, he reported a history of outpatient psychiatric treatment. For example, he reported that he began receiving mental health and psychiatric treatment in New Mexico detention center starting in May of 2022. He reported that he was receiving psychotropic medications including Dioxepine and other medications for depression and anxiety. He reported that he was placed on a suicide watch as well for experiencing thoughts of fear of cutting his throat. He reported that he was placed on suicide alert for 48 hours. He reported that he was recently seen by psychiatry at this facility and is currently taking:

* HYDROXYZINE PAM 25MG CAP (VISTARIL) -- [TAKE 1 CAPSULE(S) ORALLY TWICE DAILY] - (8/2/2022 - 9/30/2022)

* MIRTAZAPINE 15MG TABLET (REMERON) -- [TAKE 1 TABLET(S) ORALLY AT BEDTIME] - (8/2/2022 - 9/30/2022)

*OLANZAPINE 2.5MG TABLET (ZYPREXA) -- [TAKE 1 TABLET(S) ORALLY AT BEDTIME] - (8/2/2022 - 9/30/2022)

This patient denied any history of violence towards others on his part. However, he reported a history of violence towards him by others. This patient reported that he was persecuted in his home country of Turkey his entire life. He stated that he has been beaten, sexually assaulted, and has see many people killed and/or blown up.

This patient denied a history of alcohol use. He denied a history of alcohol related treatment. He denied a history of drug use. He denied a history of drug related treatment.

This patient reported a history of head injury. He reported that at the age of 10 or 11 he was knocked unconscious. He denied any history of seizures, learning disability, and educational difficulties (i.e., special education). He reported having attended through 4 years of university and has a degree in civil engineering. He denied the ability to read and write in English. He denied being suspended from school, due to acting out / fighting. He denied losing work, due to acting out/fighting.

**Additional Problems to list:**
*NO ANSWER PROVIDED*

**Interventions (e.g., individual psychotherapy, psychotropic medication):**

1.Through individual counseling via an integrative and adaptive approach drawing upon various evidence-based therapeutic approaches (i.e., Person Centered, Gestalt, CBT, ACT, REBT, Behavioral, Existential, Choice Theory, IFS (Internal Family Systems), Solution Focused, and Narrative therapy techniques/interventions) and psychopharmacotherapy (as prescribed by patient's PCP / Psychiatrist) work towards alleviation of symptoms of Post-Traumatic Stress Disorder, and return to previous level of effective psychological, social, occupational, and family functioning. This is to be achieved through reducing and/or extinguishing intrusive memories, reducing and/or extinguishing avoidance of ques/stimuli/situations/thoughts/etc. surrounding the traumatic event(s), and developing the ability to actively, willingly, and openly revisit and discuss traumas without eliciting psychological and/or physiological distress. The goal is for your symptoms to reduce to a level that is manageable while you are in this facility.Once every 1-8 weeks and/or PRN as indicated by patient; also psychiatric clinic as scheduled.

2.Through individual counseling via an integrative and adaptive approach drawing upon various evidence-based therapeutic approaches (i.e., Person Centered, Gestalt, CBT, ACT, REBT, Behavioral, Existential, Choice Theory, IFS (Internal Family Systems), Solution Focused, and Narrative therapy techniques/interventions) and psychopharmacotherapy (as prescribed by patient's PCP / Psychiatrist) work towards alleviation of symptoms of depression, and return to previous levels of effective functioning. Prevent relapse into mood related problems by developing healthy thinking/cognitive patterns and beliefs about self and others (i.e., regarding past and present interactions and experiences). Establish positive and supportive relationships empathic to emotional needs. Develop positive coping strategies and problem-solving skills. Learn to accept things outside one's control through mindfulness and finding meaning through suffering. The goal is for your symptoms to reduce to a level that is manageable while you are in this facility.Once every 1-8 weeks and/or PRN as indicated by patient; also psychiatric clinic as scheduled.

3.Through individual counseling via an integrative and adaptive approach drawing upon various evidence-based therapeutic approaches (i.e.,

---

**Individual Treatment Plan with Medications - HS-159**
Individual Treatment Plan with Medications - HS-159

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE on 08/05/2022 16:20:18

2 of 6

**203**

Person Centered, Gestalt, CBT, ACT, REBT, Behavioral, Existential, Choice Theory, IFS (Internal Family Systems), Solution Focused, and Narrative therapy techniques/interventions) and psychopharmacotherapy (as prescribed by patient's PCP / Psychiatrist) work towards alleviation of symptoms of Anxiety, and return to previous level of effective functioning. Alleviation of symptoms of anxiety, return to previous level of effective functioning, and prevent relapse into anxiety related problems by developing healthy, rational, realistic, and positive thinking/cognitive patterns and beliefs about self and others (i.e., regarding past and present interactions, worries, and experiences), establish positive and supportive relationships empathic to emotional needs, develop positive coping strategies and problem solving skills, and learn to accept things outside one's control through mindfulness and finding meaning through suffering. The goal is for your symptoms to reduce to a level that is manageable while you are in this facility.Once every 1-8 weeks and/or PRN as indicated by patient; also psychiatric clinic as scheduled.

4.This patient will kite mental health if he needs to be seen promptly. If he has a mental health emergency such as suicidal / homicidal ideation, he will alert security staff to immediately bring him down to medical for evaluation. His case will be staffed with the suicide prevention committee. He will be seen in 72 hours post-suicide alert discharge. He will be seen as frequently as psychiatrically indicated thereafter. During each mental health follow-up counseling encounter, your mental health clinician will ask you if you are experiencing dangerous ideations. If you answer "Yes", an initial suicide risk assessment will be completed to determine your level of risk and whether or not you should be placed on suicide alert. Ongoing

**Session Frequency:**

1 - 8 weeks depending on need.

**Schedule Follow-up:**

☑Yes

    **Schedule follow-up with:**

     ☑Mental Health   ☑Psychiatry

      **Follow-up Appointment with Mental Health:**

       ☑14 days

      **Follow-up Appointment with Psychiatry:**

       ☑14 Days

**Additional Interventions to list:**

*NO ANSWER PROVIDED*

**Treatment Goal (in SMART terms: Specfic, Measurable, Achievable, Relevant, Timely):**

1.Alleviate symptoms of PTSD and return to normal level of functioning.

a.)Develop a positive therapeutic rapport.

b.)Empathically and genuinely explore the client's experienced trauma(s), history and current symptomology, and historic and current impact of such on this client's functioning.

c.)Identify trauma triggers, irrational fears, vulnerabilities, negative cognitions, negative feelings (e.g., anger, shame, guilt), avoidance surrounding the trauma(s). If appropriate, use IFS techniques to identify fragmented parts-of-self associated with these and parts-of-self that are functional, and begin negotiating with these different parts changes necessary for them to take on a different role to allow the client to more effectively cope and function in their daily living.

d.)Identify negative narratives and cognitions about the client regarding the trauma(s) and facilitate this client to re-story narratives and develop cognitions that are helpful, positive, and promoting. Have the client practice rehearsing these narratives and cognitions to alleviate PTSD symptoms and promote a positive self-appraisal and image.

**Individual Treatment Plan with Medications - HS-159**
Individual Treatment Plan with Medications - HS-159

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE on 08/05/2022 16:20:18

e.)Encourage the use of breathing techniques and mindfulness to assuage anxiety/negative activation associated with PTSD flashbacks.

f.)Encourage the client (Note: if no restrictions by PCP) to develop and engage in physical activity to increase the presence of positive endorphins and reduced levels of activation and anxiety associated with PTSD.

g.)Assess the client's level of insight and level of motivation for change, and work with this client towards more effectively and actively facing the trauma.

h.)Refer this client to psychiatry for possible pharmacological intervention / medication evaluation and management, and monitor medication compliance.

--

2. Alleviate symptoms of Depression and return to normal level of functioning.

a.)Develop a positive therapeutic rapport.

b.)Empathically and genuinely explore the client's experienced depression and current impact of such on this client's functioning.

c.)Identify depression triggers (i.e., negative cognitions and negative feelings) and challenge and change these to more positive, realistic, and helpful ones to allow the client to more effectively cope and function in their daily living.

d.)Identify negative narratives and cognitions about the client regarding their depression and facilitate this client to re-story narratives and develop cognitions that are helpful, positive, and promoting. Have the client practice rehearsing these narratives and cognitions to alleviate depression symptoms and promote a positive self-appraisal and image.

e.)Encourage the client (Note: if no restrictions by PCP) to develop and engage in physical activity to increase the presence of positive endorphins to reduce levels of depression and increase positive self-image.

f.)Assess the client's level of insight and level of motivation for change, and work with this client towards more effectively and actively facing the depression.

g.)Refer this client to psychiatry for possible pharmacological intervention / medication evaluation and management, and monitor medication compliance. Identify negative cognitions and feelings associated with depression, and develop more positive and helpful cognitions and feelings to alleviate symptoms of depression.

h.)Actively engage socially (healthy relationships) to develop positive support to assuage symptoms of depression.

i.)Work towards letting go or perceived and/or real past set-backs, mistakes, failures, develop forgiveness for self and others, and begin moving forward in the present towards a positive future to assuage symptoms of depression.

j.)Develop goals and a consistent daily calendar of activities to promote a sense of purpose to alleviate symptoms of depression.

--

3.Alleviate symptoms of Anxiety and return to normal level of functioning.

a.)Develop a positive therapeutic rapport.

b.)Empathically and genuinely explore the client's experienced anxiety and current impact of such on this client's functioning.

c.)Identify anxiety triggers (i.e., negative cognitions and negative feelings) and challenge and change these to more positive, realistic, and helpful ones to allow the client to more effectively cope and function in their daily living.

d.)Identify negative narratives and cognitions about the client regarding their anxiety and facilitate this client to re-story narratives and develop cognitions that are helpful, positive, and promoting. Have the client practice rehearsing these narratives and cognitions to alleviate anxiety symptoms and promote a positive self-appraisal and image.

e.)Encourage the use of breathing techniques and mindfulness to assuage anxiety.

f.)Encourage the client (Note: if no restrictions by PCP) to develop and engage in physical activity to increase the presence of positive endorphins to reduce levels of anxiety and increase positive self-image.

g.)Assess the client's level of insight and level of motivation for change, and work with this client towards more effectively and actively facing the anxiety.

**Individual Treatment Plan with Medications - HS-159**
Individual Treatment Plan with Medications - HS-159

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE on 08/05/2022 16:20:18

4 of 6

**205**

h.)Refer this client to psychiatry for possible pharmacological intervention / medication evaluation and management, and monitor medication compliance.

i.)Identify negative cognitions and feelings associated with anxiety, and develop more positive and helpful cognitions and feelings to alleviate symptoms of anxiety.

j.)Actively engage socially (healthy relationships) to develop positive support to assuage symptoms of anxiety.

k.)Work towards letting go or perceived and/or real past set-backs, mistakes, failures, develop forgiveness for self and others, and begin moving forward in the present towards a positive future to assuage symptoms of anxiety.

l.)Develop goals and a consistent daily calendar of activities to promote a sense of purpose to alleviate symptoms of anxiety.

--

5.Suicide Risk Prevention through continued monitoring, therapeutic follow-up, and education. Patient to gain mastery over his dangerous thoughts and behaviors, and further develop positive coping and daily functioning.

**Additional Goals to list:**
*NO ANSWER PROVIDED*

**Does Nursing need to review the form:**
Yes

**Interpreter Needed:**
Yes

**Interpreter Name and/or #:**
209488

---

**Individual Treatment Plan with Medications - HS-159**
Individual Treatment Plan with Medications - HS-159

Patient Name: BOZKUS, SERHAT
Patient Number: 220712429
Location: ICE-AS-NA-E-NA-38-L
DOB: 1/1/1992
Facility: AURORA ICE PROCESSING CENTER
Electronically Signed By WILLSON, BRYCE on 08/05/2022 16:20:18

## Signatures



BOZKUS, SERHAT - (PATIENT)
Captured On: 08/05/22 16:20:18



Bryce C. Willson, PhD, Licensed Psychologist - (WITNESS)
Captured On: 08/05/22 16:20:18

### Save Log

| User Name | AuditDateAndTime |
|---|---|
| WILLSON, BRYCE, PHD | 08/05/2022 16:20:18 |

### Signoff Comments List

| Approved By | Approved On | Signoff Note | Is Declined |
|---|---|---|---|
| MCGUIRE, COLLEEN, DO | 08/09/2022 11:47:41 | | False |

**Individual Treatment Plan with Medications - HS-159**
Individual Treatment Plan with Medications - HS-159

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE **on** 08/05/2022 16:20:18

6 of 6

**207**

## Mental Health Evaluation - HS-158

**Encounter Type:**

 Face to Face

**Is this form being completed as a result of:**

☑ Staff Referral

**Is I/D/R refusing:**

☑ No

### Ask the Patient the Following Questions

**What is today's date:**

8/5/2022

**What is the name of this facility:**

Aurora ICE, Denver, Colorado

**What is your name:**

BOZKUS, SERHAT

**Have you ever been hospitalized for an emotional or nervous problem:**

☑ No

**Have you ever received counseling or outpatient mental health treatment:**

 Yes

**When did you receive counseling or outpatient mental health treatment:**

This patient reported that he began receiving mental health and psychiatric treatment in New Mexico detention center starting in May of 2022. He reported that he was receiving psychotropic medications including Dioxepine and other medications for depression and anxiety. He reported that he was placed on a suicide watch as well for experiencing thoughts of fear of cutting his throat. He reported that he was placed on suicide alert for 48 hours. He reported that he was recently seen by psychiatry at this facility and is currently taking:

* HYDROXYZINE PAM 25MG CAP (VISTARIL) -- [TAKE 1 CAPSULE(S) ORALLY TWICE DAILY] - (8/2/2022 - 9/30/2022)

* MIRTAZAPINE 15MG TABLET (REMERON) -- [TAKE 1 TABLET(S) ORALLY AT BEDTIME] - (8/2/2022 - 9/30/2022)

*OLANZAPINE 2.5MG TABLET (ZYPREXA) -- [TAKE 1 TABLET(S) ORALLY AT BEDTIME] - (8/2/2022 - 9/30/2022)

**Where did you receive counseling or outpatient mental health treatment:**

This patient reported that he began receiving mental health and psychiatric treatment in New Mexico detention center starting in May of 2022. He reported that he was receiving psychotropic medications including Dioxepine and other medications for depression and anxiety. He reported that he was placed on a suicide watch as well for experiencing thoughts of fear of cutting his throat. He reported that he was placed on suicide alert for 48 hours. He reported that he was recently seen by psychiatry at this facility and is currently taking:

* HYDROXYZINE PAM 25MG CAP (VISTARIL) -- [TAKE 1 CAPSULE(S) ORALLY TWICE DAILY] - (8/2/2022 - 9/30/2022)

* MIRTAZAPINE 15MG TABLET (REMERON) -- [TAKE 1 TABLET(S) ORALLY AT BEDTIME] - (8/2/2022 - 9/30/2022)

---

**Mental Health Evaluation - HS-158**
Initial Mental Health Evaluation for new intakes

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE on 08/05/2022 16:14:07

**BOZKUS, SERHAT**  #220712429            DOB: 1/1/1992 (30y)  Location: ICE-AS-NA-E-NA-38-L

*OLANZAPINE 2.5MG TABLET (ZYPREXA) -- [TAKE 1 TABLET(S) ORALLY AT BEDTIME] - (8/2/2022 - 9/30/2022)

**Why did you receive counseling or outpatient mental health treatment:**

This patient reported that he began receiving mental health and psychiatric treatment in New Mexico detention center starting in May of 2022. He reported that he was receiving psychotropic medications including Dioxepine and other medications for depression and anxiety. He reported that he was placed on a suicide watch as well as experiencing thoughts of fear of cutting his throat. He reported that he was placed on suicide alert for 48 hours. He reported that he was recently seen by psychiatry at this facility and is currently taking:

* HYDROXYZINE PAM 25MG CAP (VISTARIL) -- [TAKE 1 CAPSULE(S) ORALLY TWICE DAILY] - (8/2/2022 - 9/30/2022)

* MIRTAZAPINE 15MG TABLET (REMERON) -- [TAKE 1 TABLET(S) ORALLY AT BEDTIME] - (8/2/2022 - 9/30/2022)

*OLANZAPINE 2.5MG TABLET (ZYPREXA) -- [TAKE 1 TABLET(S) ORALLY AT BEDTIME] - (8/2/2022 - 9/30/2022)

**Have you ever taken any medication for a nervous condition:**

 Yes

**Current Medications for nervous condition (if already in chart, drag and drop from Presriptions drawer on the right):**

This patient reported that he began receiving mental health and psychiatric treatment in New Mexico detention center starting in May of 2022. He reported that he was receiving psychotropic medications including Dioxepine and other medications for depression and anxiety. He reported that he was placed on a suicide watch as well as experiencing thoughts of fear of cutting his throat. He reported that he was placed on suicide alert for 48 hours. He reported that he was recently seen by psychiatry at this facility and is currently taking:

* HYDROXYZINE PAM 25MG CAP (VISTARIL) -- [TAKE 1 CAPSULE(S) ORALLY TWICE DAILY] - (8/2/2022 - 9/30/2022)

* MIRTAZAPINE 15MG TABLET (REMERON) -- [TAKE 1 TABLET(S) ORALLY AT BEDTIME] - (8/2/2022 - 9/30/2022)

*OLANZAPINE 2.5MG TABLET (ZYPREXA) -- [TAKE 1 TABLET(S) ORALLY AT BEDTIME] - (8/2/2022 - 9/30/2022)

## Medication #1

| Name and dosage of medication (1): | Who prescribed the medication (1): |
|---|---|
| HYDROXYZINE PAM 25MG CAP (VISTARIL) -- TAKE 1 CAPSULE(S) ORALLY TWICE DAILY - (8/2/2022 - 9/30/2022) | MIRTAZAPINE 15MG TABLET (REMERON) -- TAKE 1 TABLET(S) ORALLY AT BEDTIME - (8/2/2022 - 9/30/2022) |

| How often are you to take the medication (1): | How long have you been taking the medication (1): |
|---|---|
| OLANZAPINE 2.5MG TABLET (ZYPREXA) -- TAKE 1 TABLET(S) ORALLY AT BEDTIME - (8/2/2022 - 9/30/2022) | *NO ANSWER PROVIDED* |
| | **Add Medication #2:** |
| | *NO ANSWER PROVIDED* |

---

**Mental Health Evaluation - HS-158**
Initial Mental Health Evaluation for new intakes

Patient Name: BOZKUS, SERHAT
Patient Number: 220712429
Location: ICE-AS-NA-E-NA-38-L
DOB: 1/1/1992
Facility: AURORA ICE PROCESSING CENTER
Electronically Signed By WILLSON, BRYCE on 08/05/2022 16:14:07

2 of 8

**209**

**Do you use any of the following:**
☑ None of these

**Have you ever used illegal drugs:**
☑ No

**Have you ever been treated for drug abuse:**
☑ No

**Have you ever attempted suicide:**
☑ No

**Have you ever thought about suicide:**
☑ Yes

> **When was the last time you thought about suicide:**
>
> In Turkey, he reported that he would think sometimes of not being alive when he lived, due to being persecuted by the Turkish government. While in the New Mexico detention center in May of 2022, he reported that he was placed on a suicide watch as well for experiencing thoughts of fear of cutting his throat. He reported that he was placed on suicide alert for 48 hours. He reported that he periodically has fear of thoughts of wanting to not be alive. He stated that he does not want these thoughts, but the just come to him periodically. He reported that last time he suffered from this type of thinking was about two weeks ago.
>
> **Do you think about suicide:**
> ☑ Sometimes

**Have you ever hurt yourself without wanting to die:**
☑ Yes

> **When was the last time you thought about hurting yourself without wanting to die:**
> Sometimes If find myself punching the walls. He reported that the last time he did this was yesterday. It's not very hard to where he harms his hands.
>
> **Do you think about hurting yourself without wanting to die:**
> ☑ Sometimes

**Do you have a suicide plan:**
☑ No

**Have you ever lost a job because of a fight:**
☑ No

**Have you ever had a seizure:**
☑ No

**Have you ever had a head injury:**
☑ Yes

---

**Mental Health Evaluation - HS-158**
Initial Mental Health Evaluation for new intakes

Patient Name: BOZKUS, SERHAT
Patient Number: 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE **on** 08/05/2022 16:14:07

**When did the head injury occur:**

This patient reported that age 10 or 11 he was knocked unconscious.

**What grade did you complete in school:**

Completed high school and four years of university.  This patient reported that he has a degree in civil engineering.

**Have you ever been suspended from school:**

☑ No

**Were you in any special education classes:**

☑ No

**Are you able to read and write English:**

☑ No

**Have you ever been convicted of a violent crime, domestic violence, or sexual abuse:**

☑ No

**Have you ever been a victim of of a violent crime, domestic violence, or sexual abuse:**

☑ Yes

**When were you victimized:**

This patient reported that he was persecuted in his home country of Turkey his entire life.  He stated that he has been beaten, sexually assaulted, and has see many people killed and/or blown up.

**Where were you victimized:**

This patient reported that he was persecuted in his home country of Turkey his entire life. He stated that he has been beaten, sexually assaulted, and has see many people killed and/or blown up.

**Do people consider you a violent person:**

☑ No

**Do you have a history of sexual aggression or sexual assault:**

☑ No

**Have you ever been convicted of a sexual offense:**

☑ No

**How do you feel about your incarceration:**

Depressed and anxious, because he has been incarcerated for the past 8 months.

## After a clinical interview and review of available records, the following recommendations are made

**Housing:**

☑ General Population

**Job Assignment:**

**Mental Health Evaluation - HS-158**
Initial Mental Health Evaluation for new intakes

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE **on** 08/05/2022 16:14:07

**211**

☑ Routine

**Program Participation:**

☑ Routine Programming   ☑ Psychology Department   ☑ Psychiatrist

## Brief Mental Status Exam

**Appearance:**

☑ Appropriately dressed   ☑ Well groomed   ☑ Good hygiene

**Eye Contact:**

☑ Good

**Attitude:**

☑ Calm and cooperative

**Behavior:**

☑ No unusual movements or psychomotor changes

**Appetite:**

☑ Decreased

**Sleep:**

☑ Decreased

**Speech:**

☑ Normal rate/tone/volume w/o pressure

**Affect:**

☑ Depressed

**Mood:**

☑ Anxious   ☑ Elevated

**Thought Process:**

☑ Goal-directed and logical

**Suicidal Ideation:**

☑ None

**Homicidal Ideation:**

☑ None

**Thought Content:**

☑ WNL

**Perception:**

☑ Other

**Specify Other Perception:**

This patient reported that he sometimes hears a voice telling him "You should be alive."

---

**Mental Health Evaluation - HS-158**
Initial Mental Health Evaluation for new intakes

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE **on** 08/05/2022 16:14:07

**Alert:**
☑ Fully

**Oriented to Time, Place, Person, and Situation:**
☑ Yes

**Memory/Concentration:**
☑ Short term intact  ☑ Long term intact

**Insight/Judgment:**
☑ Good

**Estimated IQ:**
☑ Above average

**Comments:**

<u>**MENTAL HEALTH EVALUATION**</u>

This patient is a 30-year-old, Turkish National, Male who is currently incarcerated at this facility secondary to seeking asylum, due to being persecuted and threatened with his life in his country. He reported to be experiencing the following psychiatric symptoms:

1. PTSD = Exposure to serious trauma, recurrent, flashbacks, nightmares, triggers (internal/external), efforts to avoid distressing things/trauma, negative cognitions and mood, problems with memory around trauma, exaggerated negative beliefs, self-blame or blame others, fear, horror, anger, guilt, shame, diminished interest, feeling detachment, inability for positive feelings, hypervigilance, exaggerated startle response, problems with concentration, sleep disturbance.

2. DEPRESSION = depressed mood, sad, empty, hopeless, helpless, worthless, tearful, irritable, diminished interest, weight change, appetite change, sleep changes, agitation/restless, fatigue, loss of energy, guilt, difficulty concentrating, indecisiveness, thoughts of death, suicidal ideation (passive).

3. ANXIETY / PANIC = excessive anxiety, worry, restlessness, easily fatigued, difficulty concentrating, irritability, muscle tension, sleep disturbance, restless / heart palpitations, racing heart, sweating, shortness of breath or smothering, feelings of choking, chest pain, nausea, abdominal distress, feeling dizzy, chills or heat sensations, paresthesias (numbness or tingling sensations), Derealization (feelings of unreality) or depersonalization (being detached from oneself), fear of losing control or "going crazy", fear of dying, worry about additional panic attacks, maladaptive behaviors.

4. Suicide Prevention Plan = thoughts and/or behaviors associated with suicide.


This patient denied any current dangerous ideations (i.e., suicidal / homicidal). However, he reported that he occasionally experiences perceptual disturbance (i.e., hallucinations / delusions) such as a voice that tells him that he should live. He reported that he would like follow-up with mental health and psychiatry to address the aforementioned symptoms. He will be scheduled accordingly. He was also educated with regard to the kite system and how to contact mental health, and to alter security staff in case of a mental health emergency.


This patient reported a history suicidal ideations. In Turkey, he reported that he would think sometimes of not being alive when he lived, due to being persecuted by the Turkish government. While in the New Mexico detention center in May of 2022, he reported that he was placed on a suicide watch as well for experiencing thoughts of fear of cutting his throat. He reported that he was placed on suicide alert for 48 hours. He reported that he periodically has fear of thoughts of wanting to not be alive. He stated that he does not want these thoughts, but the just come to him periodically. He reported that last time he suffered from this type of thinking was about two weeks ago. He denied any homicidal ideations and attempts thereof. He reported a history of self-mutilation in that he occasionally punches the wall. He reported a history of perceptual disturbance (i.e., hallucinations, delusions, and/or though disorder) such as a voice that tells him "you should live". He denied a history of inpatient psychiatric treatment. However, he reported a history of outpatient psychiatric treatment. For example, he reported that he began receiving mental health and psychiatric treatment in New Mexico detention center starting in May of 2022. He reported that he was receiving psychotropic medications including Dioxepine and other medications for depression and anxiety. He reported that he was placed on a suicide watch as well for experiencing thoughts of fear of cutting his throat. He reported that he was placed on suicide alert for 48 hours. He reported that he was recently seen by psychiatry at this facility and is currently taking:

* HYDROXYZINE PAM 25MG CAP (VISTARIL) -- [TAKE 1 CAPSULE(S) ORALLY TWICE DAILY] - (8/2/2022 - 9/30/2022)

* MIRTAZAPINE 15MG TABLET (REMERON) -- [TAKE 1 TABLET(S) ORALLY AT BEDTIME] - (8/2/2022 - 9/30/2022)

**Mental Health Evaluation - HS-158**
Initial Mental Health Evaluation for new intakes

Patient Name: BOZKUS, SERHAT
Patient Number: 220712429
Location: ICE-AS-NA-E-NA-38-L
DOB: 1/1/1992
Facility: AURORA ICE PROCESSING CENTER
Electronically Signed By WILLSON, BRYCE on 08/05/2022 16:14:07

**213**

*OLANZAPINE 2.5MG TABLET (ZYPREXA) -- [TAKE 1 TABLET(S) ORALLY AT BEDTIME] - (8/2/2022 - 9/30/2022)

This patient denied any history of violence towards others on his part. However, he reported a history of violence towards him by others. This patient reported that he was persecuted in his home country of Turkey his entire life. He stated that he has been beaten, sexually assaulted, and has see many people killed and/or blown up.

This patient denied a history of alcohol use. He denied a history of alcohol related treatment. He denied a history of drug use. He denied a history of drug related treatment.

This patient reported a history of head injury. He reported that at the age of 10 or 11 he was knocked unconscious. He denied any history of seizures, learning disability, and educational difficulties (i.e., special education). He reported having attended through 4 years of university and has a degree in civil engineering. He denied the ability to read and write in English. He denied being suspended from school, due to acting out / fighting. He denied losing work, due to acting out/fighting.

**RECOMMENDATIONS:**

1.) This patient will be scheduled for a follow-up with mental health 1 month check on his well-being.

2.) This patient will continue with psychiatric clinic for medication evaluation and management as already constituted.

3.) This patient will have a treatment plan developed to address his psychiatric treatment needs.

4.) This patient will kite mental health if he needs to be seen and will alert security staff in case of a mental health emergency.

5.) This patient is cleared for general population from a mental health standpoint.

**DSM-5 Diagnosis (include rationale for diagnosis):**

309.81 - POSTTRAUMATIC STRESS DISORDER - [WILLSON, BRYCE] - 2022-08-05

F33.0 - MAJOR DEPRESSIVE DISORDER, RECURRENT, MILD - [MCGUIRE, COLLEEN] - 2022-08-02

300.00 - ANXIETY STATE UNSPECIFIED - [WALKER, CARY] - 2022-07-20

**Appropriate for General Population:**
Yes

**Refer to psychiatrist:**
Yes

    **Timeframe for Psychiatry referral:**
    ☑ 14 days

**Recommend placement under observation due to increased suicide risk:**
☑ Not necessary

**Recommend placement under observation due to psychotic symptoms or other severe psychiatric symptoms without present suicide risk:**
☑ Not necessary

---

**Mental Health Evaluation - HS-158**
Initial Mental Health Evaluation for new intakes

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE **on** 08/05/2022 16:14:07

**Recommended follow-up:**

Yes

> **Timeframe for follow-up:**
> ☑ 14 days

**Education provided related to current assessment:**

This patient was educated and/or previously educated with regard to the kite system and how to contact mental health, and to alert security staff in case of a mental health emergency. This patient was also provided a mental health card to show medical if he needs to be brought to see mental health immediately.

**I certify that I have reviewed the risk and benefits of the MH consent and I/D/R verbalized understanding:**

☑ Yes

**Interpreter Needed:**

☑ Yes

> **Interpreter Name and/or #:**
> 209488

## Save Log

| User Name | AuditDateAndTime |
|---|---|
| WILLSON, BRYCE, PHD | 08/05/2022 16:14:07 |
| WILLSON, BRYCE, PHD | 08/05/2022 16:13:02 |
| WILLSON, BRYCE, PHD | 08/05/2022 15:55:04 |

**Mental Health Evaluation - HS-158**
Initial Mental Health Evaluation for new intakes

Patient Name: BOZKUS, SERHAT
Patient Number: 220712429
Location: ICE-AS-NA-E-NA-38-L
DOB: 1/1/1992
Facility: AURORA ICE PROCESSING CENTER
Electronically Signed By WILLSON, BRYCE on 08/05/2022 16:14:07

8 of 8

**215**

## CONSENT FOR MENTAL HEALTH SERVICES

**Encounter Type:**

☑ Face to Face

TO THE PATIENT: You have the right, as a patient, to be informed about your mental and physical condition, the recommended mental and physical procedures to be used for finding out about your problems, and the benefits, risks and hazards involved in the treatment provided to you by the staff at this unit. This disclosure and consent form is not meant to scare or alarm you, but is simply a method to better inform you about your recommended treatment.

TREATMENT BY MEDICATION: Treatment with psychiatric medications will be based on decisions made by a doctor. The method of giving the drugs and the amount of drugs will be monitored by the treating doctor. You will be informed by the doctor or his/her assistants of the following:
1. The expected results of the medicines and the side effects, hazards, and risks involved with taking those medicines
2. The benefit or good effects that you will receive from taking the medications
3. Treatment with these kinds of medications may be forced on you if two doctors agree that you are a danger to yourself or others, or that you are unable to care for your basic needs.

TREATMENT BY COUNSELING: A treatment plan will be developed by your treatment team under your doctor's guidance. Your treatment plan will consist of treatment therapies, recommended by your treatment team, to help your current mental condition. You will be assigned a mental health professional who will inform you of the following:
1. The different treatment programs that have been recommended for you (such as talk groups, one-to-one counseling, etc.)
2. The good effects of active participation
3. The hazards and risks involved

You have the right to refuse all of your treatment with the exception of Item 3 in the "Treatment by Medication" paragraph.

LIMITS OF CONFIDENTIALITY: The contents of a counseling, interview, or assessment session are considered confidential. Both verbal information and written records about you cannot be shared with another party without your written consent or the written consent of your legal guardian. Exceptions to these limits of confidentiality are as follows:
1. When you disclose intentions or a plan to harm yourself or another person, or to participate in activity which may jeopardize the safety of the facility, the clinician is required by law to report this information to the appropriate authorities.
2. If you state or suggest that a child or vulnerable adult is in danger of abuse, the clinician is required to report this information to the appropriate authorities.
3. In the event of your death, your spouse or parents may have a right to access your health records after the proper paperwork is submitted in accordance with policies and procedures.
4. The GEO Group, Inc. is required to release your records if a court orders the release of your records.
5. Information about you may be disclosed to other healthcare professionals to provide you the best possible treatment.
6. Other Health Services staff have access to the information contained in your health records.
7. The Facility Administrator/designee may have access to your health records in the event of a legitimate need.
8. Contracting jurisdictional officials and their designees have access to your health records in the event of a legitimate need.

**I CERTIFY THIS FORM HAS BEEN FULLY EXPLAINED TO ME, THAT I HAVE READ IT, OR HAD IT READ TO ME, AND THAT I UNDERSTAND ITS CONTENTS.**

☑ Yes

**I CERTIFY THAT I HAVE REVIEWED THE BENEFITS AND RISKS OF TREATMENT IDENTIFIED ABOVE, WITH THE I/D/R.**

☑ Yes

**I/D/R UNABLE/UNWILLING TO SIGN**

☑ No

**Information provided in patient's language, Patient understands:**

☑ Yes

**Interpreter Needed:**

---

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE **on** 08/05/2022 15:19:03

☑ Yes

  **Interpreter Name and/or #:**
    209488

## Signatures



BOZKUS, SERHAT - (PATIENT)
Captured On: 08/05/22 15:19:03



Bryce C. Willson, PhD, Licensed Psychologist - (WITNESS)
Captured On: 08/05/22 15:19:03

### Save Log

| User Name | AuditDateAndTime |
|---|---|
| WILLSON, BRYCE, PHD | 08/05/2022 15:19:03 |

### Signoff Comments List

| Approved By | Approved On | Signoff Note | Is Declined |
|---|---|---|---|
| WILLSON, BRYCE, PHD | 08/05/2022 15:19:03 | Form Processed Approval | False |

**CONSENT FOR MENTAL HEALTH SERVICES**
GepGroup - CONSENT FOR MENTAL HEALTH SERVICES

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE on 08/05/2022 15:19:03

2 of 2

**217**

## SOAPE/Administrative Note

**Encounter Type:**

☑ Face to Face

**Person Completing Note:**

☑ Nurse

**Type of Note:**

☑ Administrative

### Administrative Note

**Administrative Note:**

EKG done

**Schedule follow-up with:**

☑ No follow-up needed

**Are there any orders that require Provider signoff:**

☑ No

**Interpreter Needed:**

*NO ANSWER PROVIDED*

<div align="center">

**Save Log**

</div>

| User Name | AuditDateAndTime |
|---|---|
| AKUESSON, DOSS, LPN | 08/05/2022 02:03:44 |

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** AKUESSON, DOSS **on** 08/05/2022 02:03:44

## Chronic Care Treatment Plan

**Encounter Type:**

☑ Face to Face

**Allergies:**

NO KNOWN DRUG ALLERGY

**Are you discontinuing any clinics at this time:**

☑ No

**Chronic Disease(s) (check all that apply):**

☑ Follow-up Hypertension

BOP: Health Management Resources

**CVD Risk Summary (if applicable):**

n/a

**Current Medications:**

CLOTRIMAZOLE 1% CREAM -- [APPLY CREAM TOPICALLY TWICE DAILY] -- 2022-07-19--2022-08-17
ENSURE LIQUID 237ML -- [TAKE 1 APPLICATION(S) ORALLY TWICE DAILY] -- 2022-08-03--2022-09-02
FLUTICASONE 0.05% NASAL S -- [INSTILL 1 SPRAY(S) INTO EACH NOSTRIL ONCE DAILY] -- 2022-07-21--2022-08-20
GABAPENTIN 300MG CAPSULE -- [TAKE 1 CAPSULE(S) ORALLY TWICE DAILY] -- 2022-07-21--2022-08-20
HYDROXYZINE PAM 25MG CAP -- [TAKE 1 CAPSULE(S) ORALLY TWICE DAILY] -- 2022-08-02--2022-09-30
LISINOPRIL 20MG TABLET -- [TAKE 1 TABLET(S) ORALLY ONCE DAILY] -- 2022-07-19--2022-08-18
MECLIZINE 12.5MG TABLET -- [TAKE 1 TABLET(S) ORALLY TWICE DAILY] -- 2022-07-19--2022-08-18
MIRTAZAPINE 15MG TABLET -- [TAKE 1 TABLET(S) ORALLY AT BEDTIME] -- 2022-08-02--2022-09-30
OLANZAPINE 2.5MG TABLET -- [TAKE 1 TABLET(S) ORALLY AT BEDTIME] -- 2022-08-02--2022-09-30

**Medication Compliant:**

☑ Yes

### Subjective

**Subjective Notes:**

14 day chronic care follow up for hypertension and lab review. He is asking for something stringer for his chronic back pain.

**Cough for more than 2 weeks:**

☑ No

**Coughing up blood:**

☑ No

**Recently lost weight without trying:**

☑ No

**Frequent fevers or night sweats:**

☑ No

**Smoking History:**

☑ Non-smoker

---

**Chronic Care Treatment Plan**
For use with patients who have a chronic condition and are seen in as part of the Chronic Clinic

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WALKER, CARY **on** 08/04/2022 16:26:36

**Current Exercise:**

**Recent Canteen/Commissary Food Purchases:**

n/a

## Objective

**Objective Notes:**

NAD, A+Ox3

RRR, No M/G/R

CTAB, non-labored

appropriate affect

PERRLA, EOMI

normocephalic

Abd soft, non-tender, no hernias or masses

**Did patient refuse vitals:**

☑ No vitals Refused

## Vital Signs

| | |
|---|---|
| **Temperature:** | **Weight:** |
| 97.9 | 146 |
| **Pulse Rate:** | **Height:** |
| 101 | 6 |
| **Respiratory Rate:** | **O2 SATS:** |
| 17 | 98 |
| **Blood Pressure:** | **Waist Circumference:** |
| 123/87 | 32 |

BMI Calculator

## Color Vision

**Ishihara Test Results - Number Correct:**

*NO ANSWER PROVIDED*

**out of:**

*NO ANSWER PROVIDED*

**Snellen exam results:**

*NO ANSWER PROVIDED*

---

**Chronic Care Treatment Plan**
For use with patients who have a chronic condition and are seen in as part of
the Chronic Clinic

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WALKER, CARY **on** 08/04/2022 16:26:36

**Is I/D/R experiencing pain:**

☑ Yes

    **Pain Scale:**

    ☑ 3

    **Pain Location:**

    thoracic back pain

## General

**Skin:**

☑ Normal

**Ears:**

☑ Normal

**Eyes:**

☑ Normal    ☑ EOMI    ☑ PERRLA

    **Is Fundoscopic Exam being done:**

    ☑ Yes

        **Fundoscopic Exam (check all that apply):**

        ☑ Disc Margins are Sharp    ☑ Normal Location and Size of Macula    ☑ Color is Normal

        ☑ No Exudates or Hemorrhages Noted

        **Additional Fundoscopic Exam Notes:**

        none

**Mouth:**

☑ Good Dentition

**Throat:**

☑ Normal

**Neck:**

☑ Normal

**Heart:**

☑ Regular Rate and Rhythm

**Lungs:**

☑ Clear to Auscultation

**Abdomen:**

☑ Soft, Non-tender

---

**Chronic Care Treatment Plan**
For use with patients who have a chronic condition and are seen in as part of
the Chronic Clinic

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WALKER, CARY **on** 08/04/2022 16:26:36

**GU:**
☑ Not Clinically Indicated

**Rectal:**
☑ Not Clinically Indicated

**Extremities:**
☑ Normal

**Neurological:**
☑ Normal

## Assessment

**Assessment Notes:**

# Stage 1 HTN

# h/o herniated disk

## Lab Results

**Cholesterol:**

161

**HDL:**

41

**LDL:**

97

**Triglycerides:**

130

**Creatinine:**

1.34

**Additional Applicable Lab Results**

## Degree of Control

**Hypertension Degree of Control:**

☑ Good

## Clinical Status

**Hypertension Clinical Status:**

---

**Chronic Care Treatment Plan**
For use with patients who have a chronic condition and are seen in as part of
the Chronic Clinic

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WALKER, CARY **on** 08/04/2022 16:26:36

☑ Improved

## Plan

**Plan Notes:**

1. Increase gabapentin to 600mg PO TID x 30 days

2. FLUTICASONE 0.05% NASAL S (FLONASE) -- [INSTILL 1 SPRAY(S) INTO EACH NOSTRIL ONCE DAILY] - (7/21/2022 - 8/20/2022)

3. HYDROXYZINE PAM 25MG CAP (VISTARIL) -- [TAKE 1 CAPSULE(S) ORALLY TWICE DAILY] - (8/2/2022 - 9/30/2022)

4. LISINOPRIL 20MG TABLET (PRINIVIL) -- [TAKE 1 TABLET(S) ORALLY ONCE DAILY]  x 90 days

5. Decrease BP checks to once weekly

**Does Nursing need to review this form for any orders:**
☑ Yes

### Patient Discussion

**Discussed Housing:**
 No

**Additional Comments on Housing:**
not performed

**Discussed Work Assignments:**
 No

**Additional Comments on Work Assignments:**
not performed

**Discussed Medical Seg/Disciplinary Measures:**
☑ No

**Additional Comments on Medical Seg/Disciplinary Measures:**
not performed

**Discussed Academic/Vocational Education:**
☑ No

**Additional Comments on Academic/Vocational Education:**
not performed

**Discussed Religious Activities:**
 No

**Additional Comments on Religious Activities:**

---

**Chronic Care Treatment Plan**
For use with patients who have a chronic condition and are seen in as part of the Chronic Clinic

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WALKER, CARY **on** 08/04/2022 16:26:36

5 of 8

**223**

not performed

**Discussed Recreational Activities:**
 No

**Additional Comments on Recreational Activities:**
not performed

**Discussed Self-Improvement Activities:**
 No

**Additional Comments on Self-Improvement Activities:**
not performed

**Discussed Court Appearance(s):**
☑ No

**Additional Comments on Court Appearance(s):**
not performed

**Type of Short-term Goal(s):**
☑ Decreased Sodium

### Decreased Sodium

| Intervention (Decreased Sodium): | Frequency (Decreased Sodium): | Target Date (Decreased Sodium): |
|---|---|---|
| low sodium diet | daily | 90 days |

**Type of Long-term Goal(s):**
 BP Reduction

### BP Reduction:

| Intervention (BP Reduction): | Frequency (BP Reduction): | Target Date (BP Reduction): |
|---|---|---|
| med compliance | daily | 90 days |

**Immunizations given during Chronic Clinic:**
 No

    **Does I/D/R need scheduled to receive any immunizations:**
     No

**Change(s) in Medication:**
 Yes

    <mark>Enter Medication order(s) via quick bar at the top of the page. Drag and drop new/changed order(s) into textbox below.</mark>

---

**Chronic Care Treatment Plan**
For use with patients who have a chronic condition and are seen in as part of the Chronic Clinic

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WALKER, CARY **on** 08/04/2022 16:26:36

**Medication Order(s):**
as above

**Order ECG (12-lead):**
☑ Yes

**Order Follow-up Diagnostics:**
☑ No

**Order Cardiac/Hypertension Labs:**
☑ No

**Does I/D/R need a special diet order added:**
☑ No

**Referrals needed:**
*NO ANSWER PROVIDED*

**Schedule Follow-up Outside of Chronic Clinic with Nurse or Doctor:**
☑ Follow-up PRN

**Schedule Next Chronic Clinic Visit:**
☑ Schedule Next Appointment with Prescriber

    **Days to Next CC Visit with Prescriber:**
    ☑ 90 Days

## Education

**Education given (check all that apply):**
☑ Disease process

☑ Treatment options

☑ Diet

☑ Medication Compliance

☑ Lab results

☑ Lifestyle modifications

**Adaptation to Correctional Environment:**
☑ Good

**Patient acknowledged and expressed understanding of education received; all questions were answered:**
☑ Yes

**Interpreter Needed:**

---

**Chronic Care Treatment Plan**
For use with patients who have a chronic condition and are seen in as part of the Chronic Clinic

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WALKER, CARY **on** 08/04/2022 16:26:36

 Yes

  **Interpreter Name and/or #:**
    358482

## Save Log

| User Name | AuditDateAndTime |
|---|---|
| WALKER, CARY, DO | 08/04/2022 16:26:36 |
| CARDENAS MELENDREZ, ANGELICA, RN | 08/04/2022 16:07:25 |

**Chronic Care Treatment Plan**
For use with patients who have a chronic condition and are seen in as part of
the Chronic Clinic

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WALKER, CARY **on** 08/04/2022 16:26:36

8 of 8

**226**

## SOAPE/Administrative Note

**Encounter Type:**
☑ Administrative Contact

**Person Completing Note:**
☑ Doctor

**Type of Note:**
☑ Administrative

### Administrative Note

**Administrative Note:**
Start weekly weight checks and ensure protein shakes BID x 30 days

**Schedule follow-up with:**
☑ No follow-up needed

**Does Nursing need to review note for orders:**
☑ Yes

**Interpreter Needed:**
*NO ANSWER PROVIDED*

### Save Log

| User Name | AuditDateAndTime |
|---|---|
| WALKER, CARY, DO | 08/03/2022 15:50:15 |
| WALKER, CARY, DO | 08/02/2022 10:54:19 |

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WALKER, CARY **on** 08/03/2022 15:50:15

## Psychiatric Medication Consent HS-190

**Psychiatric Medication type:**

☑ Miscellaneous Antidepressant Medication  ☑ Hydroxyzine

I hereby authorize the doctor or his/her relief (designee), to prescribe medication to me and continue said medication as is recommended for my psychiatric treatment.

**Provider Name:**

Dr. Colleen McGuire

### Miscellaneous Antidepressant Medication

**Select Miscellaneous Antidepressant Medication:**

☑ mirtazapine (Remeron)

1. This medication is useful because it has been found to be effective in treating depression and its associated symptoms including sadness, fatigue, hopelessness, sleeplessness, increase of appetite, loss of interests, loss of concentration, suicide, or self-harm ideation. This medication may also be effective in treating other disorders, such as obsessive-compulsive disorders, panic disorders, or insomnia.

2. This medication may improve your condition by relieving all or some of the symptoms mentioned above when taken as prescribed. The medical staff cannot guarantee the effectiveness of the medication, as responses are patient specific.

3. Common side effects to this medication include, but are not limited to dry mouth, blurred vision, constipation, tremor, drowsiness, dizziness, headache, tiredness, insomnia, nausea, fast or irregular heartbeats, increased appetite, weight loss or weight gain, and increased sweating. These effects are frequently temporary or can be controlled with a change in dosage. Less common complaints include, lack of energy, sleep disturbances, hallucinations, flushing, and decreased sex drive. Patients taking bupropion have had increases in their blood pressure. Patients taking Mirtazapine have had incidences of lowered white blood cell counts. When taking bupropion and mirtazapine, there is a chance of seizures. Priapism (painful, prolonged erection) is an uncommon side effect of trazodone. If you have conditions such as liver or kidney function impairment, a history of seizures, or a history of mania, it may be preferable to use other medication. There is an increased risk of suicidal ideation within the first few months of treatment. Potential side effects will be monitored accordingly.

If any of the above symptoms occur, you should notify the Health Services staff as soon as possible, especially any sudden changes in mood, behavior, thoughts, or feelings.

4. Medications are not always necessary in the treatment of depression; however, not taking this medication as prescribed by the physician may lead to a worsening of symptoms. Abrupt discontinuation of this medication may result in adverse effects. The risk of suicide may be increased by not taking this medication.

5. Other treatment options include other medication with similar benefits. Other drugs may cause some of the same side effects you might experience with this medication. Other treatments may not include any medication, but may include counseling by a psychologist or other medical professional.

### Hydroxyzine

1. This medication is useful because it has been found to be effective in assisting with the management of anxiety disorders and their associated symptoms including, but not limited to, restlessness, irritability, and sleep disorder.

2. This medication may improve your condition by relieving all or some of the symptoms mentioned above when taken as prescribed. The medical staff cannot guarantee the effectiveness of the medication, as responses are patient-specific.

3. Common side effects to this medication may include, but are not limited to, drowsiness, nausea, excitement, dizziness or lightheadedness, headache, tiredness, or nervousness. These effects are frequently temporary or can be controlled with a change in dosage.

If any of the above symptoms occur, you should notify the Health Services staff as soon as possible.

4. Alternative treatments may not include any medication, but may involve counseling by a psychologist or other medical professional.

**Based upon interview, assessment, and medical record review, it is my opinion that this patient is:**

☑ Competent to give consent.

---

**Psychiatric Medication Consent HS-190**
Psychiatric Medication Consent HS-190

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** NAT, PRABHDEEP **on** 08/02/2022 11:06:57

**Other issues discussed:**
*NO ANSWER PROVIDED*

The patient certifies that he/she has read the foregoing, or has had it explained in a language they understand, hereby consents to treatment and has no additional questions. Lines 1-5 above have been explained to the patient and based upon interview, assessment, and medical record review, it is the opinion that this patient understands the proposed treatment, and is competent to give consent. The patient may stop taking this medication at any time by contacting the physician; however, discontinuing the medication abruptly is generally not advisable.

The patient certifies that he/she has read the foregoing, or has had it explained in a language they understand, hereby consents to treatment and has no additional questions. Line 1-4 above have been explained to the patient and based upon interview, assessment, and medical review, it is the opinion that this patient understands the proposed treatment, and is competent to give consent. The patient may stop taking this medication at any time by contacting the physician; however, discontinuing the medication abruptly is generally not advisable.

**Information provided in patient's language; Patient understands:**

 Yes

**Interpreter Needed:**

 Yes

    **Interpreter Name and/or #:**

    385387

## Signatures



BOZKUS, SERHAT - (PATIENT)
Captured On: 08/02/22 11:06:57

### Save Log

| User Name | AuditDateAndTime |
|---|---|
| NAT, PRABHDEEP, RN | 08/02/2022 11:06:57 |

### Signoff Comments List

| Approved By | Approved On | Signoff Note | Is Declined |
|---|---|---|---|
| MCGUIRE, COLLEEN, DO | 08/02/2022 13:45:37 | | False |

---

**Psychiatric Medication Consent HS-190**
Psychiatric Medication Consent HS-190

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** NAT, PRABHDEEP **on** 08/02/2022 11:06:57

## Abnormal Involuntary Movement Scale (AIMS) - HS-102

<mark>**To Be Completed Only by Trained LIPs, PAs, ARNPs, and RNs**</mark>

**Scoring Procedure:** For the movement ratings (the 1st three categories below), rate the highest severity observed: 0 = none, 1 = minimal (may be extreme normal), 2 = mild, 3 = moderate, and 4 = severe. According to the original AIMS instructions, one point is subtracted if movements are seen **only on activation**, but not all investigators follow that convention.

Ratings: 0 = None 1 = Minimal 2 = Mild 3 = Moderate 4 = Severe

### Examination Procedure

Either before or after completing the examination, observe the patient unobtrusively, at rest (e.g., in waiting room). The chair to be used in this examination should be a hard and firm one without arms.

1. Ask inmate/detainee/resident (I/D/R) whether there is anything in his/her mouth (i.e., gum, candy, etc.) and if there is, to remove it.
2. Ask I/D/R about the current condition of his/her teeth. Ask I/D/R if he/she wears dentures. Ask I/D/R if teeth or dentures bother him/her now.
3. Ask I/D/R whether he/she notices any movements in mouth, face, hands, or feet. If yes, ask him/her to describe them, and to what extent they currently bother or interfere with his/her activities.
4. Have I/D/R sit in the chair with hands on knees, legs slightly apart, and feet flat on the floor. (Look at entire body movements while in position.)
5. Ask I/D/R to sit with hands hanging unsupported between legs. (Observe hands and other body areas.)
6. Ask I/D/R to open mouth. (Observe tongue at rest within mouth.) Do this twice.
7. Ask I/D/R to protrude tongue. (Observe abnormalities of tongue movement.) Do this twice.
8. Ask I/D/R to tap thumb, with each finger, as rapidly as possible for 10-15 seconds; separately with right hand, then with left hand. (Observe facial and leg movements.)
9. Flex and extend I/D/R's left and right arm (one at a time). (Note any rigidity and rate it.)
10. Ask I/D/R to stand up. (Observe in profile; observe all body areas again, hip included.)
11. Ask I/D/R to extend both arms outstretched in front with palms down. (Observe trunk, legs, and mouth.)
12. Have I/D/R walk a few paces, turn, and walk back to chair. (Observe hands and gait.) Do this twice.

### Facial and Oral Movements

**Muscle of Facial Expression (e.g. movement of forehead, eyebrows, periorbital area, cheeks. Include frowning, blinking, smiling, grimacing.):**

☑0

**Lips and Perioral Area (e.g. puckering, pouting, smacking):**

☑0

**Jaw (e.g. biting, clenching, mouth opening, lateral movement):**

☑0

**Tongue (Rate only increases in movement both in and out of mouth, not ability to sustain movement):**

☑0

### Extremity Movements

**Upper (Arms, Wrists, Hands, Fingers) Include choreic movements (e.g., rapid, objectively purposeless, irregular, spontaneous). DO NOT include tremor (e.g., repetitive, regular, rhythmic):**

☑0

**Lower (Legs, Knees, Ankles, Toes) e.g., lateral knee movement, foot tapping, heel dropping, foot squirming, inversion and inversion of foot:**

☑0

---

**Abnormal Involuntary Movement Scale (AIMS) - HS-102**
Scale to measure involuntary movement

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** NAT, PRABHDEEP **on** 08/02/2022 10:57:17

## Trunk Movements

**Neck, Shoulders, Hips e.g., rocking, twisting, squirming, pelvic gyrations:**

☑ 0

## Global Judgments

**Severity of Abnormal Movements:**

☑ 0

**Incapacity Due to Abnormal Movements**

☑ 0

**Patient's Awareness of Abnormal Movements (0 = No Awareness, 1 = Aware, No Distress, 2 = Aware, Mild Distress, 3 = Moderate Distress, 4 = Aware, Severe Distress):**

☑ 0

## Dental

**Current Problems with Teeth and/or Dentures:**

☑ 0 - No

**Patient Usually Wears Dentures:**

☑ 0 - No

**Additional Comments**

Baseline AIMS assessment completed. No abnormal movement reported and noted.

**Interpreter Needed:**

☑ Yes

**Interpreter Name and/or #:**

387663

## Save Log

| User Name | AuditDateAndTime |
|---|---|
| NAT, PRABHDEEP, RN | 08/02/2022 10:57:17 |

---

**Abnormal Involuntary Movement Scale (AIMS) - HS-102**
Scale to measure involuntary movement

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** NAT, PRABHDEEP **on** 08/02/2022 10:57:17

## Initial Psychiatric Evaluation HS-906

**Medications:**

CLOTRIMAZOLE 1% CREAM -- [APPLY CREAM TOPICALLY TWICE DAILY] -- 2022-07-19--2022-08-17
FLUTICASONE 0.05% NASAL S -- [INSTILL 1 SPRAY(S) INTO EACH NOSTRIL ONCE DAILY] -- 2022-07-21--2022-08-20
GABAPENTIN 300MG CAPSULE -- [TAKE 1 CAPSULE(S) ORALLY TWICE DAILY] -- 2022-07-21--2022-08-20
HYDROXYZINE PAM 25MG CAP -- [TAKE 1 CAPSULE(S) ORALLY TWICE DAILY] -- 2022-07-21--2022-08-04
LISINOPRIL 20MG TABLET -- [TAKE 1 TABLET(S) ORALLY ONCE DAILY] -- 2022-07-19--2022-08-18
MECLIZINE 12.5MG TABLET -- [TAKE 1 TABLET(S) ORALLY TWICE DAILY] -- 2022-07-19--2022-08-18
MIRTAZAPINE 15MG TABLET -- [TAKE 1 TABLET(S) ORALLY AT BEDTIME] -- 2022-07-26--2022-08-25
ONDANSETRON 4MG TABLET -- [TAKE 1 TABLET(S) ORALLY TWICE DAILY AS NEEDED] -- 2022-07-19--2022-08-02

**Is I/D/R refusing:**

 No

### Subjective

**Reason for Referral (Patient's self-reported presenting problem):**

Patient seen, chart reviewed. He presents on remeron and hydroxyzine. He reports that he is doing poorly. He states he has felt like this for the past few months. He states that he has had symptoms for 2-3 years, and then also since 2 years old?  He does not think the medications are working. He states he is not feeling the effect  of the medications. Difficult conversation, did not disclose much information, distracted. He states he is not eating at all. He reports he is having nausea. He states he is only sleeping 4-5 hours. No history of a/v hallucinations. Denies paranoia. He states he feels like all doctors just change the doses of his meds and do not address the issue. We discussed low dose of zyprexa to start, extensive discussion about this.

-mood is reported as bad

-anxiety is reported as high

-sleep: 4-5 hours a night

-no active safety concerns

**Patient seen via:**

☑ Tele-Medicine

**Chart Reviewed:**

☑ Yes

### Objective

**Psychiatric History (inpatient/outpatient including past medications tried and failed):**

-hx of being on remeron and hydroxyzine

-unclear if he has been on other medications

-no history of Ip psych

-hx of SI, though no SA-did not elaborate

**Pertinent Medical History (Head Injury/Seizure):**

denies

**Substance Abuse History:**

denies

---

**Initial Psychiatric Evaluation HS-906**
Psychiatric evaluation for new intakes

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** MCGUIRE, COLLEEN **on** 08/02/2022 10:46:06

**Pertinent Personal/Family History (inmate/detainee/residents sentence):**

-from Turkey

-no FH of psych issues

**Orientation:**
☑Person

**Rapport:**
☑Evasive ☑Distant ☑Inattentive

**Appearance:**
☑Appropriately Dressed

**Mood:**
☑Depressed

**Affect:**
☑Depressed

**Speech:**
☑Coherent

**Appetite:**
☑Decreased

**Sleep:**
☑Decreased

**Thought Content and Process:**
☑Appropriate

**Insight:**
☑Fair

**Judgment:**
☑Fair

**Cognitive:**
☑No Gross Cognitive Impairment

**Psychomotor Activity:**
☑Retardation

**Immediate Memory:**
☑Fair

**Recent Memory:**
☑Fair

**Remote Memory:**
☑Fair

---

**Initial Psychiatric Evaluation HS-906**
Psychiatric evaluation for new intakes

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** MCGUIRE, COLLEEN **on** 08/02/2022 10:46:06

2 of 5

**233**

**Institutional Adjustment (current placement):**

feels safe in the facility

## Suicide/Violence Risk Assessment

**Suicidal Ideation (check all that apply):**

 Past Suicidal Ideation/Attempts

### Past Suicidal Ideation/Attempts

**Describe Past Suicidal Ideation/Attempts (include date[s] and method[s]):**

SI in the past-did not elaborate

**Violent/Assaultive Ideas/Behavior:**

☑ No Current or Past Violent/Assaultive Ideas/Behavior

**Past Self-injurious behavior:**

☑ No

## Assessment

**DSM-5 Diagnosis:**

A - 300.00: ANXIETY STATE UNSPECIFIED
N - F33.0: Major depressive disorder, recurrent, mild

## Plan

**Treatment Plan (including Rx, target symptoms, labs, and special housing):**

Unclear if patient is psychotic? secondary to translation issues?, Slightly concrete and disorganized. Will talk with the medical team about this patient as well with regards to his nutrition. Wonder if he has schizophrenia?

Difficult interview, continual asking questions, then states he never wants to see this author again, though then apologizes

Discussed that med management is voluntary. Discussed policy about seeing psychiatry regularly if on psychotropic medications. Discussed hydration, exercise, and diet.

Kite for medical issues, or sooner appointment

R/b of medications discussed with patient. Informed consent obtained including 1. describing the proposed intervention, 2. emphasizing the patient's role in decision making, 3. discussing alternatives to the proposed intervention, and assessing the patient's understanding of 1-3 as listed above. Need potential cholesterol check if he stays on the zyprexa .

---

**Initial Psychiatric Evaluation HS-906**

Psychiatric evaluation for new intakes

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** MCGUIRE, COLLEEN **on** 08/02/2022 10:46:06

AIMS today, weight today

-start zyprexa 2.5 mg po qhs to target mood, disorganization, etc

-continue hydroxyzine and remeron at current doses

-med orders for 60 days

-r/b discussed with him, labs reviewed

-discussed with medical team about weight

**Timeframe for Mental Health Provider Follow-up:**
☑ 7 Days

**Schedule follow up with:**
*NO ANSWER PROVIDED*

**Does Nursing need to review the form:**
☑ No

**Medications adjusted:**
☑ Yes

**Specify medications adjustments:**
add zyprexa

## Education

**Education Provided:**

☑ Discussed symptoms of mental illness being treated and frequency of follow-up.

☑ Discussed medications being prescribed and potential side effects.   ☑ Medication consent form(s) reviewed and signed by patient

☑ Explained how to access mental health services routinely and in case of emergency.

**I certify that I have reviewed the risk and benefits of the MH consent and I/D/R verbalized understanding:**
☑ Yes

**Interpreter Needed:**
☑ Yes

**Interpreter Name and/or #:**
383784, 387663

---

**Initial Psychiatric Evaluation HS-906**
Psychiatric evaluation for new intakes

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** MCGUIRE, COLLEEN **on** 08/02/2022 10:46:06

## Save Log

| User Name | AuditDateAndTime |
|-----------|------------------|
| MCGUIRE, COLLEEN, DO | 08/02/2022 10:46:06 |
| MCGUIRE, COLLEEN, DO | 08/02/2022 10:26:44 |
| MCGUIRE, COLLEEN, DO | 08/02/2022 10:23:21 |
| MCGUIRE, COLLEEN, DO | 08/02/2022 10:20:15 |

**Initial Psychiatric Evaluation HS-906**
Psychiatric evaluation for new intakes

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** MCGUIRE, COLLEEN on 08/02/2022 10:46:06

## Psychiatric Medication Consent HS-190

**Psychiatric Medication type:**

☑ Atypical Antipsychotic Medication

I  hereby authorize the doctor or his/her relief (designee), to prescribe medication to me and continue said medication as is recommended for my psychiatric treatment.

**Provider Name:**

Dr. Colleen McGuire

### Atypical Antipsychotic Medication

**Select Atypical Antipsychotic Medication:**

☑ Zyprexa

1. This medication is useful because it has been found to be effective in treating psychosis and its associated symptoms including sensory isolation, withdrawal, from reality, delusions, disorganized or confused thinking, anxiety, agitation, unusual sensory perceptions (voices, smells, or visions), a frightening or disturbing ideas, hallucinations, or feelings of violence or losing control. These medications may be especially useful in the treatment of certain drug-induced movement disorders. These medications may also be utilized in mood disorders.

2. This medication may improve your condition by relieving all or some of the symptoms mentioned above when taken as prescribed. The medical staff cannot guarantee the effectiveness of the medication, as responses are patient specific.

3. Common side effects to this medication may include, but are not limited to, somnolence (drowsiness), dizziness, constipation, fatigue, akathesia (motor restlessness), and extra pyramidal disorders (movement disorders). These effects are frequently temporary or can be controlled with a change in dosage. Less common complaints include dry mouth, abdominal pain, dyspepsia (indigestion), nasal congestion, insomnia. A general class effect of all of the atypical antipsychotics are increased risk of mortality in elderly patients with dementia related psychosis; leukopenia (decrease in white blood cells), neutropenia (decrease in neutrophils), and agranulocytosis; Neuroleptic Malignant Syndrome; hyperglycemia and diabetes mellitus; suicidality; seizures; tardive dyskinesia, orthostatic hypotension; and cognitive motor impairment. You should report symptoms of increased thirst, increased appetite, and excessive urination to health services. This may or may not resolve upon stopping the medication. If you have diabetes before taking this medication, your diabetes medications may need to be adjusted. **Zyprexa and Seroquel** can cause an increase in your lipid levels. **Saphris, Zyprexa, and Seroquel** can cause weight gain. **Zyprexa, Risperidone, and Invega** can cause hyperprolactinemia. **Saphris, Fanapt, Invega, and Geodon** can all cause QT prolongation. **Invega, Risperidone, and Fanapt** can cause priapism. **Zyprexa** can cause disturbances in body temperature regulation. Atypical antipsychotic medication in general may cause photosensitivity or exposure to the sun for as little as 30 to 60 minutes can cause an allergic skin rash, severe sunburn, nausea and vomiting, flushed or pale skin, and confusion and fainting. This medication may inhibit the body's ability to sweat which may cause you to feel overheated. It is important to report this to medical staff as soon as possible should you experience these potential side effects. Abilify can cause a difficulty in swallowing leading to aspiration and choking. **Clozapine** has the potential to cause agranulocytosis. This is characterized by a sudden and extreme lowering of the white blood cell count which may lead to serious infections or even death. This occurs in less than 2% of all patients and is closely monitored with mandatory regular blood tests. This side-effect is usually reversible by stopping the medicine. Signs of agranulocytosis are fever and prolonged sore throat.

Your provider will periodically screen for signs of these conditions and adjust or discontinue your medication appropriately.

If any of the above symptoms occur, you should notify the Health Services staff as soon as possible, especially sudden changes in mood, behavior, thoughts, or feelings.

4. Not taking this medication as prescribed by the physician's instruction may lead to a worsening of symptoms. Though rare, some symptoms of psychosis and related disorders may get better or even go away without taking medication. More probable is the progression of psychosis. The risk of suicide may be increased by not taking this medication. Abrupt discontinuation of this medication may result in adverse effects.

5. Other treatment options may include other medication with similar benefits that may cause some of the same side effects you may experience with this medication. Other non-drug treatments may involve counseling by a psychologist or other medical professional.

**Based upon interview, assessment, and medical record review, it is my opinion that this patient is:**

☑ Competent to give consent.

**Other issues discussed:**

*NO ANSWER PROVIDED*

The patient certifies that he/she has read the foregoing, or has had it explained in a language they understand, hereby consents to treatment and has

---

**Psychiatric Medication Consent HS-190**
Psychiatric Medication Consent HS-190

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** NAT, PRABHDEEP **on** 08/02/2022 10:41:36

no additional questions. Lines 1-5 above have been explained to the patient and based upon interview, assessment, and medical record review, it is the opinion that this patient understands the proposed treatment, and is competent to give consent. The patient may stop taking this medication at any time by contacting the physician; however, discontinuing the medication abruptly is generally not advisable.

**Information provided in patient's language; Patient understands:**

☑Yes

**Interpreter Needed:**

☑Yes

    **Interpreter Name and/or #:**

    387663

## Signatures



BOZKUS, SERHAT - (PATIENT)
Captured On: 08/02/22 10:41:36

## Save Log

| User Name | AuditDateAndTime |
| --- | --- |
| NAT, PRABHDEEP, RN | 08/02/2022 10:41:36 |

## Signoff Comments List

| Approved By | Approved On | Signoff Note | Is Declined |
| --- | --- | --- | --- |
| MCGUIRE, COLLEEN, DO | 08/02/2022 13:45:32 | | False |

**Psychiatric Medication Consent HS-190**
Psychiatric Medication Consent HS-190

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** NAT, PRABHDEEP **on** 08/02/2022 10:41:36

## CONSENT FOR MENTAL HEALTH SERVICES

**Encounter Type:**

☑ Face to Face

TO THE PATIENT: You have the right, as a patient, to be informed about your mental and physical condition, the recommended mental and physical procedures to be used for finding out about your problems, and the benefits, risks and hazards involved in the treatment provided to you by the staff at this unit. This disclosure and consent form is not meant to scare or alarm you, but is simply a method to better inform you about your recommended treatment.

TREATMENT BY MEDICATION: Treatment with psychiatric medications will be based on decisions made by a doctor. The method of giving the drugs and the amount of drugs will be monitored by the treating doctor. You will be informed by the doctor or his/her assistants of the following:
1. The expected results of the medicines and the side effects, hazards, and risks involved with taking those medicines
2. The benefit or good effects that you will receive from taking the medications
3. Treatment with these kinds of medications may be forced on you if two doctors agree that you are a danger to yourself or others, or that you are unable to care for your basic needs.

TREATMENT BY COUNSELING: A treatment plan will be developed by your treatment team under your doctor's guidance. Your treatment plan will consist of treatment therapies, recommended by your treatment team, to help your current mental condition. You will by assigned a mental health professional who will inform you of the following:
1. The different treatment programs that have been recommended for you (such as talk groups, one-to-one counseling, etc.)
2. The good effects of active participation
3. The hazards and risks involved

You have the right to refuse all of your treatment with the exception of Item 3 in the "Treatment by Medication" paragraph.

LIMITS OF CONFIDENTIALITY: The contents of a counseling, interview, or assessment session are considered confidential. Both verbal information and written records about you cannot be shared with another party without your written consent or the written consent of your legal guardian. Exceptions to these limits of confidentiality are as follows:
1. When you disclose intentions or a plan to harm yourself or another person, or to participate in activity which may jeopardize the safety of the facility, the clinician is required by law to report this information to the appropriate authorities.
2. If you state or suggest that a child or vulnerable adult is in danger of abuse, the clinician is required to report this information to the appropriate authorities.
3. In the event of your death, your spouse or parents may have a right to access your health records after the proper paperwork is submitted in accordance with policies and procedures.
4. The GEO Group, Inc. is required to release your records if a court orders the release of your records.
5. Information about you may be disclosed to other healthcare professionals to provide you the best possible treatment.
6. Other Health Services staff have access to the information contained in your health records.
7. The Facility Administrator/designee may have access to your health records in the event of a legitimate need.
8. Contracting jurisdictional officials and their designees have access to your health records in the event of a legitimate need.

**I CERTIFY THIS FORM HAS BEEN FULLY EXPLAINED TO ME, THAT I HAVE READ IT, OR HAD IT READ TO ME, AND THAT I UNDERSTAND ITS CONTENTS.**

☑ Yes

**I CERTIFY THAT I HAVE REVIEWED THE BENEFITS AND RISKS OF TREATMENT IDENTIFIED ABOVE, WITH THE I/D/R.**

☑ Yes

**I/D/R UNABLE/UNWILLING TO SIGN**

☑ No

**Information provided in patient's language, Patient understands:**

☑ Yes

**Interpreter Needed:**

---

**CONSENT FOR MENTAL HEALTH SERVICES**
GepGroup - CONSENT FOR MENTAL HEALTH SERVICES

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** NAT, PRABHDEEP **on** 08/02/2022 10:41:24

☑ Yes

**Interpreter Name and/or #:**

387663

## Signatures



BOZKUS, SERHAT - (PATIENT)
Captured On: 08/02/22 10:41:24

### Save Log

| User Name | AuditDateAndTime |
|---|---|
| NAT, PRABHDEEP, RN | 08/02/2022 10:41:24 |

### Signoff Comments List

| Approved By | Approved On | Signoff Note | Is Declined |
|---|---|---|---|
| WILLSON, BRYCE, PHD | 08/03/2022 15:28:48 | | False |

**CONSENT FOR MENTAL HEALTH SERVICES**
GepGroup - CONSENT FOR MENTAL HEALTH SERVICES

Patient Name: BOZKUS, SERHAT
Patient Number: 220712429
Location: ICE-AS-NA-E-NA-38-L
DOB: 1/1/1992
Facility: AURORA ICE PROCESSING CENTER
Electronically Signed By NAT, PRABHDEEP on 08/02/2022 10:41:24

2 of 2

**240**

## SOAPE/Administrative Note

**Encounter Type:**

☑ Face to Face

**Person Completing Note:**

☑ Nurse

**Type of Note:**

☑ Administrative

### Administrative Note

**Administrative Note:**

Pt was seated, procedure explained to pt, venipuncture performed in right a.c. space using aseptic technique, gauze placed with pressure on venipuncture site until hemostasis observed, site clean and dry, no redness or swelling observed, bandage placed, pt voiced no concerns

**Schedule follow-up with:**

☑ No follow-up needed

**Are there any orders that require Provider signoff:**

☑ No

**Interpreter Needed:**

*NO ANSWER PROVIDED*

### Save Log

| User Name | AuditDateAndTime |
|---|---|
| KOPKEP, MARINETTE, LPN | 07/22/2022 06:27:32 |

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** KOPKEP, MARINETTE **on** 07/22/2022 06:27:32

## Therapeutic Diet Order

**Verified Documented Food Allergy (specify):**
*NO ANSWER PROVIDED*

**Diet Order (check one):**
☑ DFH (Diet For Health) (Diabetic/Low Fat/Low Sodium/Low Cholesterol)

   | 2000-2400 calories

**Comments:**
*NO ANSWER PROVIDED*

**Interpreter Needed:**
*NO ANSWER PROVIDED*

<mark>**ICE Facilities Maximum 90 Days**</mark>

<mark>**All other clients Maximum 180 Days**</mark>

### Save Log

| User Name | AuditDateAndTime |
|---|---|
| CARDENAS MELENDREZ, ANGELICA, RN | 07/21/2022 09:34:43 |

**Therapeutic Diet Order**
Therapeutic Diet Order

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** CARDENAS MELENDREZ, ANGELICA **on** 07/21/2022 09:34:43

1 of 1

**242**

## SOAPE/Administrative Note

**Encounter Type:**

☑ Administrative Contact

**Person Completing Note:**

☑ Doctor

**Type of Note:**

☑ Administrative

### Administrative Note

**Administrative Note:**

Please order dental referral for tooth in fection

**Schedule follow-up with:**

☑ No follow-up needed

**Does Nursing need to review note for orders:**

☑ Yes

**Interpreter Needed:**

*NO ANSWER PROVIDED*

## Save Log

| User Name | AuditDateAndTime |
|-----------|------------------|
| WALKER, CARY, DO | 07/20/2022 13:53:21 |

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

Patient Name: BOZKUS, SERHAT
Patient Number: 220712429
Location: ICE-AS-NA-E-NA-38-L
DOB: 1/1/1992
Facility: AURORA ICE PROCESSING CENTER
Electronically Signed By WALKER, CARY on 07/20/2022 13:53:21

## Medical History and Physical Assessment

**Is I/D/R refusing:**

☑ No

**Encounter Type:**

☑ Face to Face

**Initial or Annual Assessment:**

☑ Initial

**Patient Jurisdiction:**

☑ ICE/USM

**Type of Assessment:**

☑ Physician/NP/PA

**Patient Gender:**

☑ Male

**Allergies:**

NO KNOWN DRUG ALLERGY

**Have all of the following steps been completed:**

☑ Intake screening Reviewed

### Mental Health Assessment

**Orientation to person, place, and time:**

☑ WNL

**General appearance:**

☑ WNL

**Motor behavior, mannerisms:**

☑ WNL

**Affect (mood):**

☑ WNL

**Content of thought, history of suicide, present thoughts of suicide:**

☑ WNL

### Health Assessment

**Sex:**

M

**Race:**

---

**Medical History and Physical Assessment - HS-136**
History and Physical for Nurses or Physician/NP/PA

Patient Name: BOZKUS, SERHAT
Patient Number: 220712429
Location: ICE-AS-NA-E-NA-38-L
DOB: 1/1/1992
Facility: AURORA ICE PROCESSING CENTER
Electronically Signed By WALKER, CARY on 07/20/2022 13:43:58

Asian

**Pain Scale:**

☑ 0

**Height:**

6

**Weight:**

148

**Build:**

☑ Slender

**Did patient refuse vitals:**

☑ No vitals Refused

## Vital Signs

| Temperature: | Blood Pressure: | Peak flow #1 (when indicated): |
|---|---|---|
| 97.6 | 121/79 | *NO ANSWER PROVIDED* |
| **Pulse:** | **O2 Sat (when indicated):** | **Peak flow #2 (when indicated):** |
| 82 | 96 | *NO ANSWER PROVIDED* |
| **Respiratory Rate:** | **Blood sugar (when indicated):** | **Peak flow #3 (when indicated):** |
| 17 | *NO ANSWER PROVIDED* | *NO ANSWER PROVIDED* |

**Did you perform a Visual Acuity test:**

☑ No

**Did you perform a Color Vision test:**

☑ No

**Additional Health Assessment Notes:**

HTN

## Clinical Evaluation

**Neuro Exam:**

☑ WNL

**Head Exam:**

☑ WNL (Normocephalic)

**Face Exam:**

☑ WNL

**Eye Exam:**

---

**Medical History and Physical Assessment - HS-136**
History and Physical for Nurses or Physician/NP/PA

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WALKER, CARY **on** 07/20/2022 13:43:58

2 of 6

**245**

☑ WNL

| Visual Acuity OD: | Visual Acuity OS: |
|---|---|
| *NO ANSWER PROVIDED* | *NO ANSWER PROVIDED* |

**Ophthalmoscopic Exam:**
☑ WNL

**Ocular Motility (Associated parallel movements nystagmus):**
☑ WNL

**Ear exam:**
☑ WNL

**Ear Drums Exam:**
☑ WNL

**Nose Exam:**
☑ WNL

**Throat Exam:**
☑ WNL

**Neck Exam:**
☑ WNL

**Chest/Breasts Exam:**
☑ WNL

**Lungs Exam:**
☑ WNL

**Heart Exam:**
☑ WNL

**Vascular System (Varicosities, etc):**
☑ WNL

**Abdomen Exam:**
☑ WNL

**GU Exam:**
☑ I/D/R Refused

**Extremities Exam:**
☑ WNL

**Anal Exam (Hemorrhoids, Fistula):**
☑ I/D/R Refused

**Genital Exam:**

**Medical History and Physical Assessment - HS-136**
History and Physical for Nurses or Physician/NP/PA

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WALKER, CARY **on** 07/20/2022 13:43:58

3 of 6

**246**

☑ I/D/R Refused

**Digital Rectal Exam (if clinically indicated):**
☑ I/D/R Refused

**Endocrine System Exam:**
☑ WNL

**Feet Exam:**
☑ WNL

**Spine, Other Musculoskeletal Exam:**
☑ WNL

**Identifying body Marks, Scars, Tattoos:**
☑ No

**Psychiatric**
☑ Personality Normal

**Additional Clinical Evaluation Notes:**
anxious

## Lab Results
**Pertinent Past Test Results Only**
**Urinalysis:**
☑ No clinically significant abnormal values noted

**CBC:**
☑ No clinically significant labs noted

**TST:**
None

**Chest X-Ray:**
None

**Syphilis Serolory:**
☑ Not Clinically Indicated

**HIV Status:**
☑ Not Clinically Indicated

## Patient History

**Current Medications:**
AMOXICILLIN 500MG CAPSULE -- [TAKE 1 CAPSULE(S) ORALLY TWICE DAILY] -- 2022-07-19--2022-07-26
CHLORPHENIRAMINE 4MG TAB -- [TAKE 1 TABLET(S) ORALLY TWICE DAILY] -- 2022-07-19--2022-07-29

---

**Medical History and Physical Assessment - HS-136**
History and Physical for Nurses or Physician/NP/PA

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WALKER, CARY **on** 07/20/2022 13:43:58

CLOTRIMAZOLE 1% CREAM -- [APPLY CREAM TOPICALLY TWICE DAILY] -- 2022-07-19--2022-08-17
IBUPROFEN 600MG TABLET -- [TAKE 1 TABLET(S) ORALLY TWICE DAILY] -- 2022-07-19--2022-07-26
LISINOPRIL 20MG TABLET -- [TAKE 1 TABLET(S) ORALLY ONCE DAILY] -- 2022-07-19--2022-08-18
MECLIZINE 12.5MG TABLET -- [TAKE 1 TABLET(S) ORALLY TWICE DAILY] -- 2022-07-19--2022-08-18
MIRTAZAPINE 15MG TABLET -- [TAKE 1 TABLET(S) ORALLY AT BEDTIME] -- 2022-07-19--2022-07-26
NAPROXEN 500MG TABLET -- [TAKE 1 TABLET(S) ORALLY TWICE DAILY] -- 2022-07-19--2022-08-18
ONDANSETRON 4MG TABLET -- [TAKE 1 TABLET(S) ORALLY TWICE DAILY AS NEEDED] -- 2022-07-19--2022-08-02

**History of smoking:**

☑ No

**History of alcohol:**

☑ No

**History of drug abuse:**

☑ No

**History of Sexually Transmitted or Communicable Disease:**

☑ No

**Summary of defects:**

none above

**Hospitalizations/Surgeries:**

☑ No

**Is Examinee Qualified for Regular Duty, Regular Housing, Food Service, and Programs to include recreation, education, etc.:**

☑ Yes

**Assessment:**

HTN

**Plan:**

☑ Follow up, as needed, in Medical via Sick Call for any future problems

☑ Medical will follow I/D/R up in the following clinics

    **Clinics to follow-up with I/D/R:**

    ☑ Hypertension

**Additional Comments:**

    **Is Preventive Health Risk Assessment being done:**

    ☑ No

**Are immunizations being given during clinic:**

☑ No

---

**Medical History and Physical Assessment - HS-136**
History and Physical for Nurses or Physician/NP/PA

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WALKER, CARY **on** 07/20/2022 13:43:58

**Does I/D/R need scheduled to receive any immunizations:**

☑No

**Is I/D/R cleared for Food Service/Barbershop work:**

☑No

**Does the patient need a follow-up appointment in 1 year:**

☑Yes

Note: The patient will need to follow-up as needed.

**Standby (same-gender chaperone):**

☑No

**Does Nursing need to review the form for orders:**

☑Yes

**Interpreter Needed:**

☑Yes

**Interpreter Name and/or #:**

209700

## Save Log

| User Name | AuditDateAndTime |
|---|---|
| WALKER, CARY, DO | 07/20/2022 13:43:58 |
| CARDENAS MELENDREZ, ANGELICA, RN | 07/20/2022 13:08:29 |

## Signoff Comments List

| Approved By | Approved On | Signoff Note | Is Declined |
|---|---|---|---|
| WALKER, CARY, DO | 07/20/2022 13:43:58 | Form Processed Approval | False |

**Medical History and Physical Assessment - HS-136**
History and Physical for Nurses or Physician/NP/PA

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WALKER, CARY **on** 07/20/2022 13:43:58

## Chronic Care Treatment Plan

**Encounter Type:**

☑ Face to Face

**Allergies:**

NO KNOWN DRUG ALLERGY

**Are you discontinuing any clinics at this time:**

☑ No

**Chronic Disease(s) (check all that apply):**

☑ Initial Hypertension

[BOP: Health Management Resources](#)

**CVD Risk Summary (if applicable):**

n/a

**Current Medications:**

AMOXICILLIN 500MG CAPSULE -- [TAKE 1 CAPSULE(S) ORALLY TWICE DAILY] -- 2022-07-19--2022-07-26
CHLORPHENIRAMINE 4MG TAB -- [TAKE 1 TABLET(S) ORALLY TWICE DAILY] -- 2022-07-19--2022-07-29
CLOTRIMAZOLE 1% CREAM -- [APPLY CREAM TOPICALLY TWICE DAILY] -- 2022-07-19--2022-08-17
IBUPROFEN 600MG TABLET -- [TAKE 1 TABLET(S) ORALLY TWICE DAILY] -- 2022-07-19--2022-07-26
LISINOPRIL 20MG TABLET -- [TAKE 1 TABLET(S) ORALLY ONCE DAILY] -- 2022-07-19--2022-08-18
MECLIZINE 12.5MG TABLET -- [TAKE 1 TABLET(S) ORALLY TWICE DAILY] -- 2022-07-19--2022-08-18
MIRTAZAPINE 15MG TABLET -- [TAKE 1 TABLET(S) ORALLY AT BEDTIME] -- 2022-07-19--2022-07-26
NAPROXEN 500MG TABLET -- [TAKE 1 TABLET(S) ORALLY TWICE DAILY] -- 2022-07-19--2022-08-18
ONDANSETRON 4MG TABLET -- [TAKE 1 TABLET(S) ORALLY TWICE DAILY AS NEEDED] -- 2022-07-19--2022-08-02

**Medication Compliant:**

☑ Yes

## Subjective

**Subjective Notes:**

initial chronic care follow up for hypertension. Pt has taken lisinopril for 1 week without issues. He is c/o a tooth infection and a L ear TM rupture with discharge. He denies fever, chills, SOB, chest pain, or fatigue.

**Cough for more than 2 weeks:**

☑ No

**Coughing up blood:**

☑ No

**Recently lost weight without trying:**

☑ No

**Frequent fevers or night sweats:**

☑ No

**Smoking History:**

☑ Non-smoker

---

**Chronic Care Treatment Plan**
For use with patients who have a chronic condition and are seen in as part of the Chronic Clinic

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WALKER, CARY **on** 07/20/2022 13:41:08

**Current Exercise:**

**Recent Canteen/Commissary Food Purchases:**

n/a

## Objective

**Objective Notes:**

NAD, A+Ox3

RRR, No M/G/R

CTAB, non-labored

appropriate affect

PERRLA, EOMI

L TM rupture with yellow discharge

Abd soft, non-tender, no hernias or masses

**Did patient refuse vitals:**

☑ No vitals Refused

## Vital Signs

| Temperature: | Weight: |
|---|---|
| 97.6 | 148 |
| **Pulse Rate:** | **Height:** |
| 82 | 6 |
| **Respiratory Rate:** | **O2 SATS:** |
| 17 | 96 |
| **Blood Pressure:** | **Waist Circumference:** |
| 121/79 | 32 |

BMI Calculator

## Color Vision

**Ishihara Test Results - Number Correct:**

8

**out of:**

8

**Snellen exam results:**

see H & P

---

**Chronic Care Treatment Plan**
For use with patients who have a chronic condition and are seen in as part of
the Chronic Clinic

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WALKER, CARY **on** 07/20/2022 13:41:08

**Is I/D/R experiencing pain:**
☑ Yes

    **Pain Scale:**
    ☑ 2

    **Pain Location:**
    tooth pain

## General

**Skin:**
☑ Normal

**Ears:**
☑ Normal

**Eyes:**
☑ Normal   ☑ EOMI   ☑ PERRLA

    **Is Fundoscopic Exam being done:**
    ☑ Yes

        **Fundoscopic Exam (check all that apply):**
        ☑ Disc Margins are Sharp   ☑ Normal Location and Size of Macula   ☑ Color is Normal
        ☑ No Vessels Noted Around Macula   ☑ No Exudates or Hemorrhages Noted

        **Additional Fundoscopic Exam Notes:**
        none

**Mouth:**
☑ Good Dentition

**Throat:**
☑ Normal

**Neck:**
☑ Normal

**Heart:**
☑ Regular Rate and Rhythm

**Lungs:**
☑ Clear to Auscultation

**Abdomen:**
☑ Soft, Non-tender

---

**Chronic Care Treatment Plan**
For use with patients who have a chronic condition and are seen in as part of
the Chronic Clinic

Patient Name: BOZKUS, SERHAT
Patient Number: 220712429
Location: ICE-AS-NA-E-NA-38-L
DOB: 1/1/1992
Facility: AURORA ICE PROCESSING CENTER
Electronically Signed By WALKER, CARY on 07/20/2022 13:41:08

**GU:**
☑ Not Clinically Indicated

**Rectal:**
☑ Not Clinically Indicated

**Extremities:**
☑ Normal

**Neurological:**
☑ Normal

## Assessment

**Assessment Notes:**

\# Stage 1 HTN

\# L TM rupture- poss. otitis externa

\# Anxiety

\# Lumbar radiculopathy

\# Allergic rhinitis

### Lab Results

**Cholesterol:**
*NO ANSWER PROVIDED*

**HDL:**
*NO ANSWER PROVIDED*

**LDL:**
*NO ANSWER PROVIDED*

**Triglycerides:**
*NO ANSWER PROVIDED*

**Creatinine:**
*NO ANSWER PROVIDED*

**Additional Applicable Lab Results**
not yet performed

### Degree of Control

**Hypertension Degree of Control:**
☑ Fair

---

**Chronic Care Treatment Plan**
For use with patients who have a chronic condition and are seen in as part of
the Chronic Clinic

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WALKER, CARY **on** 07/20/2022 13:41:08

## Clinical Status

**Hypertension Clinical Status:**
☑ N/A

## Plan

**Plan Notes:**

1. Order baseline CBC, CMP, fasting lipid panel, UA, HbA1c, TSH with T4
2. Follow up in 14 days
3. Order Baseline EKG
4. Order baseline CXR
5. Fundoscopic exam performed
6. Flu vaccine not available
7. Monitor BP MWF x 30 days
8. LISINOPRIL 20MG TABLET (PRINIVIL) -- [TAKE 1 TABLET(S) ORALLY ONCE DAILY] x 90 days
9. Start hydroxyzine 25mg PO BID x 14 days
10. MH referral for anxiety
11. Start gabapentin 300mg PO BID x 30 days
12. Start flonase 1 spray in each nostril daily x 30 days

**Does Nursing need to review this form for any orders:**
☑ Yes

## Patient Discussion

**Discussed Housing:**
☑ No

**Additional Comments on Housing:**
none

**Discussed Work Assignments:**
☑ No

**Additional Comments on Work Assignments:**
none

**Discussed Medical Seg/Disciplinary Measures:**
☑ No

**Additional Comments on Medical Seg/Disciplinary Measures:**

---

**Chronic Care Treatment Plan**
For use with patients who have a chronic condition and are seen in as part of
the Chronic Clinic

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WALKER, CARY **on** 07/20/2022 13:41:08

**Discussed Academic/Vocational Education:**
☑ No

**Additional Comments on Academic/Vocational Education:**
none

**Discussed Religious Activities:**
☑ No

**Additional Comments on Religious Activities:**
none

**Discussed Recreational Activities:**
☑ No

**Additional Comments on Recreational Activities:**
none

**Discussed Self-Improvement Activities:**
☑ No

**Additional Comments on Self-Improvement Activities:**
none

**Discussed Court Appearance(s):**
☑ No

**Additional Comments on Court Appearance(s):**
none

**Type of Short-term Goal(s):**
☑ Decreased Sodium

### Decreased Sodium

| Intervention (Decreased Sodium): | Frequency (Decreased Sodium): | Target Date (Decreased Sodium): |
| --- | --- | --- |
| DFH | daily | 90 days |

**Type of Long-term Goal(s):**
☑ BP Reduction

### BP Reduction:

| Intervention (BP Reduction): | Frequency (BP Reduction): | Target Date (BP Reduction): |
| --- | --- | --- |
| med compliance | daily | 90 days |

---

**Chronic Care Treatment Plan**
For use with patients who have a chronic condition and are seen in as part of the Chronic Clinic

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WALKER, CARY **on** 07/20/2022 13:41:08

**Immunizations given during Chronic Clinic:**
☑ No

    **Does I/D/R need scheduled to receive any immunizations:**
    ☑ No

**Change(s) in Medication:**
☑ Yes

    <mark>**Enter Medication order(s) via quick bar at the top of the page. Drag and drop new/changed order(s) into textbox below.**</mark>
    **Medication Order(s):**
    as above

**Order ECG (12-lead):**
☑ Yes

**Order Follow-up Diagnostics:**
☑ Yes

**Order Cardiac/Hypertension Labs:**
☑ Yes

**Does I/D/R need a special diet order added:**
☑ Yes

    **Diet Order being added:**
    ☑ DFH (Diet For Health) 2000-2400 calories not on the Healthy Menu

**Referrals needed:**
*NO ANSWER PROVIDED*

**Schedule Follow-up Outside of Chronic Clinic with Nurse or Doctor:**
☑ Follow-up PRN

**Schedule Next Chronic Clinic Visit:**
☑ Schedule Next Appointment with Prescriber

    **Days to Next CC Visit with Prescriber:**
    ☑ Other

        **Specify Other Timeframe for Next CC Visit with Prescriber:**
        14 days

---

**Chronic Care Treatment Plan**
For use with patients who have a chronic condition and are seen in as part of the Chronic Clinic

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WALKER, CARY **on** 07/20/2022 13:41:08

## Education

**Education given (check all that apply):**

☑ Disease process

☑ Triggers

☑ Treatment options

☑ Diet

☑ Medication Compliance

☑ Exercise

☑ Lab results

☑ Lifestyle modifications

**Adaptation to Correctional Environment:**

☑ Good

**Patient acknowledged and expressed understanding of education received; all questions were answered:**

☑ Yes

**Interpreter Needed:**

☑ Yes

> **Interpreter Name and/or #:**
> 209700

## Save Log

| User Name | AuditDateAndTime |
|---|---|
| WALKER, CARY, DO | 07/20/2022 13:41:08 |
| WALKER, CARY, DO | 07/20/2022 13:27:22 |
| CARDENAS MELENDREZ, ANGELICA, RN | 07/20/2022 13:07:53 |

**Chronic Care Treatment Plan**
For use with patients who have a chronic condition and are seen in as part of the Chronic Clinic

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WALKER, CARY **on** 07/20/2022 13:41:08

8 of 8

**257**

## Intake Screening HS-168

**Is I/D/R refusing:**

☑ No

**Have the forms HS-118 Consent for Medical, Dental, Mental Health Services, and Medical Interpretation and HS-144 KOP Agreement been completed:**

☑ No

> **Which form still needs to be completed:**
> ☑ HS-118 - Consent for Medical, Dental, Mental Health Services, and Medical Interpretation  ☑ HS-144 KOP Agreement

**Do you have any allergies to medication, food, or latex:**

☑ No

**Did patient refuse vitals:**

☑ No vitals Refused

## Vital Signs

| Temperature: | Blood Pressure: | Weight: |
|---|---|---|
| 97.0 | 130/92 | 150 |
| **Pulse Rate:** | **O2 Sat:** | |
| 94 | 99 | |
| **Respiratory Rate:** | **Height:** | |
| 16 | 6 | |

## I/D/R Information

**I/D/R Jurisdiction:**

☑ ICE

**Completing form at Joe Corley Processing Center:**

☑ Yes

| Sex: | Facility Name: |
|---|---|
| M | AURORA ICE PROCESSING CENTER |
| **DOB:** | **Date/Time of Arrival:** |
| 01/01/1992 | 07/19/2022 15:30 |

**Country of Origin:**

☑ TR Turkey

**What language do you speak:**

☑ Other

---

**Intake Screening and Education - HS-168 - HS-143**
Intake screening for new arrivals

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** Evangelist, Sharon **on** 07/19/2022 18:31:56

**Specify Other language spoken:**

turkish

**Interpreter needed:**

 No

**Is I/D/R unconscious or have obvious pain, bleeding, injuries, or other symptoms suggesting need for emergency medical referral:**

☑ Yes

**Explain reason for needing emergency medical referral:**

detainee has a perforated ear drum that has been giving him problems for the past 4 months.  He is on ABT therapy for dental reasons and has been experiencing nauseas and some dizziness.  He has high blood pressure as well.

**I/D/R was identified by (source):**

☑ Picture   ☑ Verbally

**Is I/D/R Male or Female:**

☑ Male

**Was I/D/R transferred from another facility:**

 Yes

**Did medical transfer summary accompany the I/D/R:**

☑ Yes

**Did I/D/R arrive with medications:**

☑ Yes

**Specify Medication(s) that arrived with I/D/R:**

Naproxen 500 mg 1 tab BID , IBU 600 mg 1 tab BID, Meclizine 12.5 mg 1 tab BID, Zofran  4 mg 1 tab bid prn, Lisinopril 20mg 1 tab qd. Amox 500mg 1 cap BID.  Athletes foot, apply as directe, CTM as well and Remeron 15mg 1 tab every night

**Medications Verified:**

 Yes

## Medical Screening

**Have you previously been diagnosed with COVID-19:**

☑ No

**Have you had a fever and/or respiratory illness with onset in the past 14 days:**

 No

**Had close contact with anyone diagnosed (laboratory-confirmed) with COVID-19 illness within the last 14 days:**

☑ No

---

**Intake Screening and Education - HS-168 - HS-143**
Intake screening for new arrivals

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** Evangelist, Sharon **on** 07/19/2022 18:31:56

**Have you traveled from, or through, any of the locations identified by the CDC as increasing epidemiologic risk within the last 14 days:**

☑ No

**Was I/D/R offered COVID-19 vaccine:**

☑ Yes

**Does the I/D/R report past positive TB result (taken within previous 12 months):**

☑ No

> **Does patient need TB plant and read and/or Chest X-Ray per policy:**
> ☑ No TB Plant/Read or Chest X-Ray needed at this time

**How do you feel today:**

I feel bad...im sick

**How do you feel about being incarcerated:**

I feel very bad about it.

**Have you fainted recently or have you ever had a head injury with loss of consciousness:**

☑ No

**Do you have a chronic condition or have you been seen or treated for a chronic condition in the last 5 years:**

☑ Yes (Schedules Next Day appointment for H&P)

> **Do you have any of the following chronic conditions (generates referral for I/D/R to be seen w/in 1 day):**
> ☑ HTN   ☑ Currently Taking Psychiatric Meds

**What surgeries have you had:**

**Do you have a history of or current communicable illness:**

☑ No History of or Current Communicable Illness

**In the last year have you had any of the following conditions:**

☑ None of these apply

> **I/D/R has not had any of the following in the last year:**
>
> - **Persistent and Productive cough for more than 3 weeks**
> - **Chest Pain**
> - **Coughed up blood**
> - **Persistent Fever**
> - **Persistent Chills**
> - **Persistent Night Sweats**
> - **Unexplained loss of appetite**
> - **Unexplained weight loss**
> - **Back Pain**
> - **Blood in Urine**

**Intake Screening and Education - HS-168 - HS-143**
Intake screening for new arrivals

Patient Name: BOZKUS, SERHAT
Patient Number: 220712429
Location: ICE-AS-NA-E-NA-38-L
DOB: 1/1/1992
Facility: AURORA ICE PROCESSING CENTER
Electronically Signed By Evangelist, Sharon on 07/19/2022 18:31:56

**Do you take any medications on a regular basis, including over-the-counter and/or herbal medications:**

☑ Yes

    **List the Medications you take on a regular basis:**

    Naproxen 500 mg 1 tab BID , IBU 600 mg 1 tab BID, Meclizine 12.5 mg 1 tab BID, Zofran 4 mg 1 tab bid prn, Lisinopril 20mg 1 tab qd. Amox 500mg 1 cap BID. Athletes foot, apply as directe, CTM as well and Remeron 15mg 1 tab every night

    **Are any of the above psychiatric medications:**

    ☑ Yes

**Does the I/D/R identify himself/herself as transgender:**

☑ No

**Does I/D/R need a special diet:**

☑ No

**Any significant medical problems not discussed:**

 none

**Any significant family history:**

 none

## Substance Use/Abuse Screening

**Do you now or have you ever used tobacco, alcohol or drugs:**

☑ Tobacco

### Tobacco Use

**Did you smoke cigarettes/cigars and/or smokeless tobacco:**

☑ Smoked cigarettes/cigars

### Smoked Cigarettes/Cigars

| How long have you smoked: | How many cigarettes/cigars per day: | When did you last smoke: |
|---|---|---|
| 9 years | 2 packs per day | 8 months ago |

## Mental Health Screening

**(ICE/USM) Have you ever received counseling, been hospitalized, and/or received medication for mental health difficulties:**

☑ Received Counseling (schedules next day appointment)    ☑ Received Medication (schedules next day appointment)

    **Describe having received counseling for mental health difficulties:**

    detainee states he has received counseling for PTSD, ANXIETY, Panic attacks and suicide attempt.

    **Specify medication(s) received for mental health difficulties:**

    Remeron 15mg

---

**Intake Screening and Education - HS-168 - HS-143**
Intake screening for new arrivals

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** Evangelist, Sharon **on** 07/19/2022 18:31:56



**Do you have any learning disabilities:**

☑ No

**Were you in any special education classes:**

☑ No

**Do you now or have you ever heard voices that other people don't hear; seen things or people that others don't see; or felt others were trying to harm you for no logical reason:**

☑ Yes

> **Describe hearing voices/seeing things or people/feeling like others are trying to harm you:**
>
> sometimes he states he hears voices.

**Have you ever tried to kill yourself:**

☑ Yes

> **How many times have you tried to kill yourself:**
>
> 1 time
>
> **When did the suicide attempts occur:**
>
> 5/26/22. Detaine stated he attempted to slit his throat with a razor, but decided against it at the last minute at the last facility he was at.
>
> **Method(s) used in suicide attempt(s):**
>
> ☑ Cutting Skin

**Are you currently thinking about killing or harming yourself:**

☑ No

**Have you ever been a victim of physical or sexual abuse:**

☑ No

**Do you have a history of sexual aggression or sexual assault:**

☑ No

**Do you feel that you are currently in danger of being physically or sexually assaulted:**

☑ No

**Do you have a history of assaulting or attacking others, or have you ever been locked up for fighting while in jail or prison:**

☑ No

**Do you know of someone in this facility whom you wish to attack:**

☑ No

**Do you know of someone in this facility who wishes to harm you:**

☑ No

---

**Intake Screening and Education - HS-168 - HS-143**
Intake screening for new arrivals

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** Evangelist, Sharon **on** 07/19/2022 18:31:56

**Are you currently having any pain:**

☑ Yes

| | |
|---|---|
| **Character of pain:** | **Duration of pain:** |
| sharp | 4 days |
| **Location of pain:** | **Intensity of pain:** |
| teeth | ☑ 6 |

**What relieves your pain or makes it worse:**

pain medication

**Do you have any dental problems:**

☑ Yes

**Dental problems reported by I/D/R:**

needs a root canal

**Was a visualization of the mouth, teeth and gums complete:**

☑ Yes

**Were any dental problems noted during visual exam:**

☑ No

**Do you have any medical, dental, or mental health issues we have not discussed:**

☑ No

## Trauma Assessment

**Have you ever experienced, witnessed, or been confronted with an event that involved actual or threatened death or serious injury:**

☑ Yes

**Have any of the events included:**

☑ Violent personal assault (domestic violence, sexual assault, robbery, mugging, kidnapping, and/or trafficking)

☑ Diagnosed with a serious illness, mental illness, and/or medical trauma

☑ Witness to a violent assault or observed the serious injury or unnatural death of a person due to violent assault

☑ Learning about the unexpected death, serious harm, or threat of death experienced by a family member or close associate

☑ War, terrorism, political violence inside or outside the United States

**(Violent personal assault) Was your response to this event intense fear, helplessness or horror:**

☑ Moderate

---

**Intake Screening and Education - HS-168 - HS-143**
Intake screening for new arrivals

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** Evangelist, Sharon **on** 07/19/2022 18:31:56

**(Violent personal assault) Has the experience caused significant distress or impairment in your life:**
☑ Moderate

**(Violent personal assault) Has it affected your interpersonal relationships, occupational or other areas of functioning:**
☑ Moderate

**(Violent personal assault) Is this experience currently causing significant distress or impairment in your life:**
☑ Moderate

**(Diagnosed w/ a serious illness, mental illness, medical trauma) Was your response to this event intense fear, helplessness or horror:**
☑ Moderate

**(Diagnosed w/ a serious illness, mental illness, medical trauma) Has the experience caused significant distress or impairment in your life:**
☑ Moderate

**(Diagnosed w/ a serious illness, mental illness, medical trauma) Has it affected you interpersonal relationships, occupational or other areas of functioning:**
☑ Moderate

**(Diagnosed w/ a serious illness, mental illness, medical trauma) Is this experience currently causing significant distress or impairment in your life:**
☑ Moderate

**(Witness a violent assault) Was your response to this event intense fear, helplessness or horror:**
☑ Moderate

**(Witness a violent assault) Has the experience caused significant distress or impairment in your life:**
☑ Moderate

**(Witness a violent assault) Has it affected you interpersonal relationships, occupational or other areas of functioning:**
☑ Moderate

**(Witness a violent assault) Is this experience currently causing significant distress or impairment in your life:**
☑ Moderate

**(Learning about a family member) Was your response to this even intense fear, helplessness or horror:**
☑ Moderate

**(Learning about a family member) Has the experience caused significant distress or impairment in your life:**
☑ Moderate

**(Learning about a family member) Has it affected your interpersonal relationships, occupational or other areas of**

---

**Intake Screening and Education - HS-168 - HS-143**
Intake screening for new arrivals

Patient Name: BOZKUS, SERHAT
Patient Number: 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** Evangelist, Sharon **on** 07/19/2022 18:31:56

functioning:

☑ Moderate

**(Learning about a family member) Is this experience currently causing significant distress or impairment in your life:**

☑ Moderate

**(War, terrorism, political violence) Was your response to this even intense fear, helplessness or horror:**

☑ Moderate

**(War, terrorism, political violence) Has the experience caused significant distress or impairment in your life:**

☑ Moderate

**(War, terrorism, political violence) Has it affected your interpersonal relationships, occupational or other areas of functioning:**

☑ Moderate

**(War, terrorism, political violence) Is this experience currenlty causing significant distress or impairment in your life:**

☑ Moderate

## Learning/Cultural/Religious Assessment

**Can you read:**

☑ Yes

**Can you write:**

☑ Yes

**What was the highest grade completed in school:**

college

**Is there anything important to know about your religious or cultural beliefs that are of concern to you while in detention:**

☑ No

## Screener's Observations

**Is I/D/R oriented to person, place and time:**

☑ Yes

**I/D/R appears to have normal physical appearance, emotional characteristics, and no barriers to communication:**

☑ Yes

**I/D/R appears to present with low level of intellectual functioning based on history and/or current presentation:**

☑ No

---

**Intake Screening and Education - HS-168 - HS-143**
Intake screening for new arrivals

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** Evangelist, Sharon **on** 07/19/2022 18:31:56

**Does the I/D/R's behavior or physical appearance suggest the risk of suicide or assault on staff or other inmates:**
☑ No

**Check all that apply to observations:**
☑ None of the following apply    ☑ Body deformity

**Additional Comments on Observations:**
right pinky finger amputation when he was two years old

**Initial Health Screening Completed:**
☑ Yes

**Open the Health Summary for Classification form:**
☑ No

**Disposition:**
☑ General Population

**Was care given during this intake screening:**
☑ No

**Referrals needed:**
☑ Physician    ☑ Psychiatry

     **Type of Physician Referral:**
     ☑ Routine

     **Type of Psychiatry Referral:**
     ☑ Routine

==**Check above for any already scheduled appointments**==
**Does I/D/R need a dental referral:**
☑ Yes

     **Type of Dental Referral:**
     ☑ 7 Day Appointment

## Intake Education HS-143

**Intake Education Provided:**
☑ Yes

     MY SIGNATURE BELOW INDICATES THAT I HAVE RECEIVED VERBAL AND WRITTEN INSTRUCTIONS ON THE FOLLOWING TOPICS DURING INTAKE:
     a. Access to Healthcare Services, Sick Call and Medical Grievance process
     b. Personal Hygiene
     c. Dental Care

---

**Intake Screening and Education - HS-168 - HS-143**
Intake screening for new arrivals

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** Evangelist, Sharon **on** 07/19/2022 18:31:56

d. Prevention of Communicable Diseases
e. Nutrition
f. Substance Abuse
g. Sexually Transmitted Diseases
h. Effects of Smoking and Smoking Cessation
i. Family Planning
j. Self-Care for Chronic Conditions
k. Self-examination for Breast and Testicular Cancer
l. Bloodborne Pathogens
m. Benefits of Physical Fitness
n. HIV and AIDS
o. Hepatitis A, B, and C
p. Prevention of Sexual and Other Physical Violence
q. "Keep on Person" Medications
r. Dangers of Self-Medication
s. MRSA
t. Lice and Scabies
u. Advance Directives
v. Mental Health Issues
w. Influenza and Pneumococcal Disease

**Information provided in I/D/R's language; I/D/R understands:**

*NO ANSWER PROVIDED*

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** Evangelist, Sharon **on** 07/19/2022 18:31:56

## Signatures



BOZKUS, SERHAT - (PATIENT)
Captured On: 07/19/22 18:31:56



se - (WITNESS)
Captured On: 07/19/22 18:31:56

### Save Log

| User Name | AuditDateAndTime |
|---|---|
| Evangelist, Sharon, | 07/19/2022 18:31:56 |

### Signoff Comments List

| Approved By | Approved On | Signoff Note | Is Declined |
|---|---|---|---|
| WALKER, CARY, DO | 07/20/2022 09:38:00 | | False |
| WILLSON, BRYCE, PHD | 07/20/2022 20:08:12 | | False |

**Intake Screening and Education - HS-168 - HS-143**
Intake screening for new arrivals

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** Evangelist, Sharon **on** 07/19/2022 18:31:56

11 of 11

**268**

## Immunization Consent/Declination

**Encounter Type:**

☑ Face to Face

### Vaccines

**Available Vaccines:**

☑ Influenza   ☑ SARS-CoV-2 (COVID-19)

**Type of SARS-CoV-2 (COVID-19):**

☑ Moderna

### Influenza

#### Consent of Vaccination

The Seasonal Influenza Vaccination has been fully explained to me by the Medical Department. I understand the benefits and risks associated with the vaccination. Briefly stated, they are:
☐ Benefits: Reduce the risk of acquiring the seasonal flu
☐ Risks - Mild: Redness, soreness, bruising, and/or infection at the injection site may occur
 Risks - Severe:ʌ
1) Acute allergic reaction would occur within a few minutes of the shot
2) Guillain-Barre Syndrome - progressive muscle weakness and paralysis may occur a
week after the vaccine – (occurs no more than 1-2 cases per million persons vaccinated)

**\*Do not get this vaccine if you are allergic to eggs or have had a serious reaction to the seasonal flu vaccine in the past\***

I have been provided an opportunity to ask questions about the disease and the treatment. I understand the risks and benefits of the vaccination. I understand that the vaccination that I am about to receive is a single shot and it will not be fully effective for approximately two weeks. As with all vaccines however, there is no guarantee that I will become immune or that I will not experience side effects. I understand that I should not receive this vaccine if I am allergic to eggs, have had a severe reaction to a previous Influenza vaccine, or am allergic to components of the vaccine.

**Consent to Influenza Vaccine:**

☑ Decline

#### Declination of Vaccination

I understand that I may be at risk of acquiring the Seasonal Flu. I have been given the opportunity to be vaccinated.

If in the future I want to be vaccinated with the refused vaccines, I can receive the vaccination at no charge to me.

### Moderna - SARS-CoV-2 (COVID-19) mRNA Vaccine

The SARS-CoV-2 Vaccination has been fully explained to me by the Medical Department. I understand the benefits and risks associated with the vaccination. Briefly stated, these include:

• Benefits: Reduce the risk of acquiring SARS-CoV-2 (COVID-19)
☐ Risks - Mild: Fatigue, headache, joint pain, redness, soreness, bruising, and/or infection at the injection site may occur
• Risks - Severe:
       o Acute allergic reaction would occur within a few minutes of the shot

Do not get this vaccine if you had a severe allergic reaction after a previous dose of this vaccine in the past or had a severe allergic reaction to any ingredients of this vaccine (See provided Fact Sheet for list of ingredients).

**Immunization Consent/Declination**
GEO - Immunization Consent/Declination

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** Evangelist, Sharon **on** 07/19/2022 17:52:54

1 of 2

**269**

I have been provided an opportunity to ask questions about the virus and the treatment. I understand the risks and benefits of the vaccination. I understand that the vaccination that I am about to receive is shot #1 of a series of 2 shots and the second one will be given in 28 days. As with all vaccines however, there is no guarantee that I will develop immunity or that I will not experience side effects. I understand that I should not receive this vaccine if I have had a severe reaction to a previous SARS-CoV-2 vaccine or am allergic to components of the vaccine.

**Consent to have Moderna - SARS-CoV-2 (COVID-19) mRNA Vaccine:**

☑ Decline

**Declination Of Sars-Cov-2 (Covid-19) Vaccine**

I understand that I may be at risk of acquiring SARS-CoV-2 (COVID-19). I have been given the opportunity to be vaccinated with the SARS-CoV-2 (COVID-19) vaccine.

I decline the SARS-CoV-2 (COVID-19) vaccine at this time. If in the future I want to be vaccinated with the SARS-CoV-2 (COVID-19) vaccine, I can receive the vaccination at no charge

**Information provided in patient's language; Patient understands:**
*NO ANSWER PROVIDED*

**Interpreter Needed:**
*NO ANSWER PROVIDED*

## Signatures



BOZKUS, SERHAT - (PATIENT)
Captured On: 07/19/22 17:52:54



se - (WITNESS)
Captured On: 07/19/22 17:52:54

### Save Log

| User Name | AuditDateAndTime |
|---|---|
| Evangelist, Sharon, | 07/19/2022 17:52:54 |

**Immunization Consent/Declination**
GEO - Immunization Consent/Declination

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** Evangelist, Sharon **on** 07/19/2022 17:52:54

## Keep-On-Person Medication Distribution Program Agreement

I have the privilege to participate in the Keep-On-Person Medication Program. I will receive up to a one-month supply of some of my medication to keep as a part of my property. I may still need to come to the pill line for certain medications, which are not a part of the Keep-On-Person Medication Program.

By signing this form, I acknowledge I have received instructions for taking medications under the Keep-On-Person (KOP) program. I understand that it is my responsibility to see that my medication is not lost or stolen. I understand that participation in the program is a privilege and if my medication is lost, stolen, or otherwise misused, I may be withdrawn from the program. I understand that I will be monitored for compliance with the KOP rules. The medications will have my name, identification number, medication name, dose, directions, start date, stop date, and expiration date printed on the label. I understand that the medications I am given may be provided to me in the form of a non-childproof blister pack. I am responsible for bringing in the refill sticker to the medical staff prior to the prescription expiring for renewal of the prescription if necessary. I understand that any unused medications, past the expiration of the order, must be returned to the nursing staff, and that any medications kept longer, without the knowledge of the medical staff, will be considered contraband. The medication(s) that I receive have no street value or potential for abuse.

**My responsibilities are:**

. **Take medications as directed on the package label**

☐ **Keep medications in the original package or container**

☐ **Do not sell medications**

☐ **Do not share medications**

☐ **Keep medications secure**

☐ **Report any stolen, lost, damaged, or missing medication to the medical staff immediately**

☐ **Request refills when there are 4-7 days of medication left**

☐ **Pick up medication refills before running out of medications**

**I understand my failure to strictly abide by the rules of this program will result in loss of this privilege and possible disciplinary action.**

**Information provided in patient's language; Patient understand:**
*NO ANSWER PROVIDED*

**Interpreter Needed:**
*NO ANSWER PROVIDED*

---

**Keep On Person Medication Distribution Program Agreement HS-144**
GeoGroup - Keep On Person Medication Distribution Program Agreement

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** Evangelist, Sharon **on** 07/19/2022 17:33:14

## Signatures



BOZKUS, SERHAT - (PATIENT)
Captured On: 07/19/22 17:33:14



se - (WITNESS)
Captured On: 07/19/22 17:33:14

### Save Log

| User Name | AuditDateAndTime |
|---|---|
| Evangelist, Sharon, | 07/19/2022 17:33:14 |

**Keep On Person Medication Distribution Program Agreement HS-144**
GeoGroup - Keep On Person Medication Distribution Program Agreement

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** Evangelist, Sharon **on** 07/19/2022 17:33:14

2 of 2

**272**

## Consent to Medical, Dental, Mental Health Services and Medical Interpretation - HS-118

**Consent to Medical, Dental, Mental Health Services and Medical Interpretation**

I acknowledge that the process for obtaining the medical, dental, and psychiatric services offered at this facility has been explained to me both verbally and in writing, and I hereby authorize GEO and the Health Services staff to treat me as may be medically necessary.

**Consent for Medical Interpretation**

I acknowledge that I am in need of an interpreter to discuss my medical condition. I authorize the Health Services staff to share confidential information with the interpreter in an effort to completely explain my medical condition to me. I understand the interpreter has agreed to keep all of my medical information confidential.

**Interpreter Needed:**

*NO ANSWER PROVIDED*

## Signatures



BOZKUS, SERHAT - (PATIENT)
Captured On: 07/19/22 17:32:09

se - (WITNESS)
Captured On: 07/19/22 17:32:09

### Save Log

| User Name | AuditDateAndTime |
|---|---|
| Evangelist, Sharon, | 07/19/2022 17:32:09 |

**Consent to Medical, Dental, Mental Health Services and Medical Interpretation - HS-118**
Consent for GEO to treat I/D/R and for Interpreter to be discuss medical condition

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-AS-NA-E-NA-38-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** Evangelist, Sharon **on** 07/19/2022 17:32:09

1 of 1

**273**

**BOZKUS, SERHAT**                    #220712429                    Location: ICE - AS-NA-E - NA-38 - L                    DOB: 1/1/1992 (30y)

No Patient Activity Restrictions Available.

**Patient Activity Restrictions Report**

| | |
|---|---|
| **Facility:** | COAI - AURORA ICE PROCESSING CENTER |
| **Created By:** | CINCOTTA, CYNTHIA |
| **Created On:** | 09/06/2022 10:22:05 AM |

No TB Results Indicated

| Document Date | Document Name | Group | Category | Created By |
|---|---|---|---|---|
| 8/11/2022 4:35:15 PM | COVID-19 CHECKLIST | Medical | Medical | CINCOTTA, CYNTHIA, MRC |
| 7/20/2022 11:22:36 AM | COVID-19 SWAB TESTING CONSENT FORM | Category 1 | Consent, Authorization | CINCOTTA, CYNTHIA, MRC |
| 7/20/2022 5:09:49 PM | intake checklist | Medical | Intake, Medical, Screening | GAYESKI, MARIZA, MRC |
| 7/20/2022 5:12:11 PM | TRANSFER SUMMARY - u.s. department of justice cibola county correctional facility | Medical | Transfer | GAYESKI, MARIZA, MRC |
| 7/21/2022 6:28:17 PM | intake check list | Medical | Intake, Medical, Screening | GAYESKI, MARIZA, MRC |
| 7/21/2022 6:41:14 PM | TRANSFER SUMMARY - u.s. department of justice united states marshals service | Medical | Transfer | GAYESKI, MARIZA, MRC |
| 7/22/2022 11:05:33 AM | Covid-19 test result-positive | Medical | Laboratory | CINCOTTA, CYNTHIA, MRC |
| 8/8/2022 1:23:53 PM | ECG results | Category 5 | Diagnostics | CINCOTTA, CYNTHIA, MRC |
| 8/5/2022 12:14:19 PM | ECG results | Category 5 | Diagnostics | CINCOTTA, CYNTHIA, MRC |
| 8/17/2022 10:05:56 AM | detainee requested medical records be sent to his attorney, advised that he needs to fill out and sign ROI form and return to nurse | Medical | Sick Call | CINCOTTA, CYNTHIA, MRC |

**Patient Document Upload Summary**

**Facility:**     COAI - AURORA ICE PROCESSING CENTER

**Created By:**  CINCOTTA, CYNTHIA

**Created On:**  9/6/2022 10:22:05 AM

**276**



# REQUEST FOR HEALTH SERVICES
# SOLICITUD PARA SERVICIOS MEDICOS

☒ **Psychological Complaint**
   **Queja Psicológica**

☒ **Medical Complaint**
   **Queja Medica**

☐ **Dental Complaint**
   **Queja Dental**

**Print:** Serhat Bozkus          2207126_9  B3107
Inmate/Detainee/Resident's (I/D/R) Name          Number          Housing Location          Duty Hours
Nombre de Identificación          Numero          Lugar de Vivienda          Horas de Trabajo

Briefly state the reason for your request; you will receive a response to your request. Please allow several days for your request to be submitted, answered, and returned. A copy of your request will be filed in your medical record.

Explique brevemente la razón de su solicitud; recibirá respuesta a su solicitud. Por favor permita varios dias para que su solicitud sea procesada. Una copia de su solicitud será archivada en su récord médico.

**PROBLEM/QUEJA:** I want to my medical and psychological record for court. Can you take me please. If it possible please send my lawyer.

_____          **08/16/2022**
I/D/R's Signature/Firma          Date of Request / Fecha de Solicitud

➔ STAFF ONLY - DO NOT WRITE BELOW THIS LINE/EMPLEADOS SOLAMENTE - NO ESCRIBA DEBAJO DE ESTA LINEA ◄

Face to Face Triage
**Date/Time Received:** 8/6/22
          Date          Time
**Date/Time Triaged:** Nur @ 200
          Nurse

☐ ROUTINE
☐ URGENT **

☑ **Written Response (see below)**   ☑ **Referred To:** Medical records   ☐ **Appointment Made**

**Triage Nurse: (Signature/Title Stamp)** [signature]

**ACTION TAKEN:** Request has been sent to medical records. your medical records will be in your property.

To send records to your attorney, you need to sign a release of information and provide the attorney's contact information. name, phone # or email address.

[signature]          8/16/22          Cindy Cincotta, MRC  8/17/22
**Medical Staff Signature/Stamp**          Date

Rev 2/11, 6/11, 1/13, 1/15, 5/17          HS-154 (Dual)



# COVID-19 Checklist
### for All ICE ERO Transfers, Removals, and Releases

**U.S. Immigration and Customs Enforcement**

ICE | ERO

**DIRECTIONS:** This checklist is intended to provide U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) and contracted staff with the minimum steps required prior to transferring, removing, or releasing a noncitizen from ERO custody and to further mitigate the spread of COVID-19.

**Reason for Detainee Transfer:**
- ☐ Medical Evaluation
- ☐ Medical Isolation/Quarantine
- ☐ Clinical Care
- ☐ Security Concerns
- ☒ Release or Removal
- ☐ Overcrowding
- ☒ Other – FOD Approved

Reason for Transfer (e.g. facility closure, etc.):

| | YES | NO | N/A |
|---|---|---|---|
| 1) Verify the detainee's current health status and exposure history. | X | | |
| 2) Has the detainee been tested for COVID-19 prior to transfer, removal (if required), or release? | X | | |
| 3) Detainee fully vaccinated? | | X | |
| 4) Is the detainee currently: | | | |
| • In medical isolation? | | X | |
| • Experiencing symptoms commonly associated with COVID-19? | | X | |
| • Awaiting COVID-19 test results? | | X | |
| • Cohorted due to COVID-19 exposure? | | X | |

For **transfers and removals**, if the answer to any of the four bulleted questions above is "Yes," do not transfer or remove and if the answer to all these questions is "No," proceed to Questions 5 and 6 only. For **releases**, if any answer is "Yes," complete 4a, 4b and the remaining questions and if the answers are "No," complete Questions 5 – 7.

| | YES | NO | N/A |
|---|---|---|---|
| a. For released detainees, discuss the release with the relevant state, local, tribal, and/or territorial public health department to coordinate continuation of care. Notate the public health department here, if applicable: | X | | |
| b. Provide the health department with the released detainee's name, intended address, email address, all available telephone numbers, and planned mode of transportation to their intended destination. | X | | |
| 5) Before the detainee leaves the facility or is removed, do verbal symptom screening (fever, cough, shortness of breath or difficulty breathing, chills, muscle pain, sore throat, new loss of taste or smell) and a temperature check. Record temperature here: _97.6_ | X | | |
| For **transfers and removals only**, if the detainee does not clear the screening process, delay the transfer or removal and follow the protocol for a suspected COVID-19 case. | | X | |
| For **transfers and removals only**, is the detainee medically cleared to travel? | X | | |

Record method of travel: Ground ☒    ICE Air ☒    Commercial flight ☐

| 6) Provide the detainee with the following forms and fact sheets in the detainee's preferred language, as available. | YES | NO | N/A |
|---|---|---|---|
| a. _Steps to Help Prevent the Spread of COVID-19 if You are Sick_; and | X | | |
| b. _Stop the Spread of Germs_. | X | | |

| 7) For **released noncitizens** only, facilitate safe transport, continued shelter, and medical care, as part of release planning. Document what arrangements for transportation were made. | YES | NO | N/A |
|---|---|---|---|
| a. Did ICE provide transportation? If yes, where was the noncitizen transported to? _Torrance_ | X | | |
| b. Did a family member or friend provide transportation? | | X | |
| c. Was the noncitizen provided with a personal protective equipment mask upon release? | X | | |
| d. Was the noncitizen provided with information on or access to community resources to ensure continued shelter and medical care? | | | X |
| e. Was the noncitizen advised to avoid public transportation, commercial ride sharing (e.g. Uber, Lyft), and taxis? | | | X |

| NONCITIZEN'S PRINTED NAME | A# | NONCITIZEN'S SIGNATURE |
|---|---|---|
| BOZKUS,SERHAT | 220712429 | _[signature]_ |

| OFFICER'S/CONTRACTED STAFF'S PRINTED NAME | OFFICER'S/CONTRACTED STAFF'S SIGNATURE | DATE |
|---|---|---|
| _[handwritten]_ | _[signature]_ | 07/18/22 |

278





Bozku, **Serhat**
ID: Z1712429

01/01/1 92
30 Year

Male

08/04/2022  22:23:27
AURORA ICE PROCESSING SOUTH
BLDG

Location: 43015
Room:
Order Number:
Indication:
Medication 1:
Medication 2:
Medication 3:

**81** bpm

-- / -- mmHg

| QRS | 90 ms |
| QT / QTcBaz | 332 / 385 ms |
| PR | - ms |
| P | - ms |
| RR / PP | 740 / 740 ms |
| P / QRS / T | - / 148 / 150 degrees |

Normal sinus rhythm
Left posterior fascicular block
Abnormal ECG

Technician: COMPUMED NO OVERREAD
Ordering Ph:
Referring Ph:
Attending Ph:

DR, CARY WALKER

AUG - 5 2022

MEDICAL DIRECTOR

aVR    V1    V4

aVL    V2    V5

aVF    V3    V6

Unconfirmed

GE  MAC2000  1.1  12SL™ v241  25 mm/s  10 mm/mV  ADS  0.56-40 Hz  60 Hz  4x2.5x3_25_R1  1/1

**BURDICK**  BURDICK REORDER NO REF 716-0237-00

280



**Male**

| | | | |
|---|---|---|---|
| Anniversary Date: | **7/19/2022** | TB Date & Result: | |
| Race | **S** | Language | **Unknown** |
| Lactation Flag | **False** | Alt Num | **0f65a4f1-ac93-46ad-a217-2cbf1a5f2cab** |
| Smoking Status | | Suicide Status | **N/A** |
| Height/Wt | **6'0"  132 lbs** | Pregnancy | **No** |

## Allergies

| Allergy | Onset Date | Severity | Onset Type |
|---|---|---|---|
| NO KNOWN DRUG ALLERGY | | N/A | N/A |

## Immunizations

No Immunizations indicated

## Medications

| Medication | DC Date | Start Date | Stop Date | Last Admin |
|---|---|---|---|---|
| **Active** | | | | |
| **Olanzapine 5mg Tablet (ZYPREXA)** | | 9/22/2022 | 9/23/2022 | 9/22/2022 |
| *WALKER, CARY GOSSETT* | | | | |
| *TAKE 1 TABLET(S) ORALLY ONCE DAILY STAT DOSE TAKE NOW  [***STAT DOSE GIVE ONE DOSE NOW***]* | | | | |
| **Metoclopramide 5mg Tablet (REGLAN)** | | 9/23/2022 | 9/30/2022 | |
| *WALKER, CARY GOSSETT* | | | | |
| *TAKE 1 TABLET(S) ORALLY THREE TIMES DAILY* | | | | |
| **Mirtazapine 30mg Tablet (REMERON)** | | 9/23/2022 | 11/21/2022 | |
| *MCGUIRE, COLLEEN* | | | | |
| *TAKE 1 TABLET(S) ORALLY AT BEDTIME* | | | | |
| **Olanzapine 5mg Tablet (ZYPREXA)** | | 9/23/2022 | 11/21/2022 | |
| *MCGUIRE, COLLEEN* | | | | |
| *TAKE 1 TABLET(S) ORALLY AT BEDTIME* | | | | |
| **Ondansetron 4mg Tablet (ZOFRAN)** | | 9/22/2022 | 9/25/2022 | 9/23/2022 |
| *WALKER, CARY GOSSETT* | | | | |
| *TAKE 2 TABLET(S) ORALLY THREE TIMES DAILY* | | | | |
| **Omeprazole 20mg Dr Tab (PRILOSEC)** | | 9/20/2022 | 10/20/2022 | 9/23/2022 |
| *WALKER, CARY GOSSETT* | | | | |
| *TAKE 1 TABLET(S) ORALLY ONCE DAILY* | | | | |
| **Fluticasone 0.05% Nasal S (FLONASE)** | | 9/20/2022 | 10/20/2022 | 9/23/2022 |
| *WALKER, CARY GOSSETT* | | | | |

| **EHR Clinical Report** | | |
|---|---|---|
| | **Facility:** | COAI - AURORA ICE PROCESSING CENTER |
| | **Created By:** | CINCOTTA, CYNTHIA |
| | **Created On:** | 09/23/2022 11:49:05 AM |

*INSTILL 1 SPRAY(S) INTO EACH NOSTRIL ONCE DAILY*

**Hemorrhoidal Ointment (PREPARATION-H)**                                          9/19/2022        9/25/2022

*WALKER, CARY GOSSETT*

*APPLY 1 APPLICATION(S) RECTALLY ONCE DAILY AS NEEDED*

**Senna 8.6mg Tablet (SENOKOT)**                                          9/19/2022        10/19/2022        9/23/2022

*WALKER, CARY GOSSETT*

*TAKE 1 TABLET(S) ORALLY ONCE DAILY*

**HydrOXYzine Pam 25mg Cap (VISTARIL)**                                          9/14/2022        10/14/2022        9/23/2022

*WALKER, CARY GOSSETT*

*TAKE 1 CAPSULE(S) ORALLY TWICE DAILY*

**Crackers**                                          9/1/2022        10/30/2022        9/23/2022

*WALKER, CARY GOSSETT*

*GIVE 2 APPLICATION(S) ORAL TWICE DAILY*

**Ensure Liquid 237ml**                                          9/1/2022        10/1/2022        9/23/2022

*WALKER, CARY GOSSETT*

*TAKE 1 APPLICATION(S) ORALLY TWICE DAILY*

**Lisinopril 20mg Tablet (PRINIVIL)**                                          8/4/2022        11/1/2022        9/23/2022

*WALKER, CARY GOSSETT*

*TAKE 1 TABLET(S) ORALLY ONCE DAILY*

## Problem List

| Problem Description | Start Date | Diagnosed By | Resolved By | Stop Date |
|---|---|---|---|---|
| ICD-10- (Z72.4) - Inappropriate diet and eating habits | 9/21/2022 | U- CARDENAS MELENDREZ, ANGELICA | | |
| DSM-V- (309.81) - Posttraumatic stress disorder | 8/5/2022 | U- WILLSON, BRYCE | | |
| ICD-10- (F33.0) - Major depressive disorder, recurrent, mild | 8/2/2022 | DOC- MCGUIRE, COLLEEN | | |
| ICD-9- (401.1) - BENIGN ESSENTIAL HYPERTENSION | 7/20/2022 | DOC- WALKER, CARY | | |
| ICD-9- (300.00) - ANXIETY STATE UNSPECIFIED | 7/20/2022 | DOC- WALKER, CARY | | |
| ICD-10- (M54.16) - Radiculopathy, lumbar region | 7/20/2022 | DOC- WALKER, CARY | | |
| ICD-9- (784.91) - POSTNASAL DRIP | 7/20/2022 | DOC- WALKER, CARY | | |

## Lab Result Summary

| Service | Provider | Collected Date | Result Date |
|---|---|---|---|
| Urinalysis Macroscopic | WALKER, CARY | 09/22/2022 9:00A | 09/22/2022 20:41P |
| Basic Metabolic Panel (8) | WALKER, C | 09/21/2022 12:00P | 09/21/2022 16:09P |
| CBC With Differential/Platelet | WALKER, C | 09/21/2022 12:00P | 09/21/2022 16:09P |

**EHR Clinical Report**          **Facility:**     COAI - AURORA ICE PROCESSING CENTER

**Created By:**     CINCOTTA, CYNTHIA

**Created On:**     09/23/2022 11:49:05 AM

| Service | Provider | Collected Date | Result Date |
|---|---|---|---|
| Urinalysis Macroscopic | WALKER, CARY | 09/21/2022 10:00A | 09/21/2022 15:39P |
| Urinalysis Macroscopic | WALKER, CARY | 09/21/2022 0:40A | 09/21/2022 2:58A |
| Occult Blood | WALKER, CARY | 09/18/2022 11:30A | 09/18/2022 13:53P |
| Occult Blood | WALKER, CARY | 09/13/2022 12:00P | 09/13/2022 14:20P |

## Vitals Summary

| Vitals Type Desc | Vital Inforamtion | Recorded By | Date Taken |
|---|---|---|---|
| BODY TEMPERATURE | 98.0 °F | Ralph, Kiahna | 9/22/2022 10:20:00 PM |
| BODY TEMPERATURE | 98.9 °F | Ralph, Kiahna | 9/22/2022 7:06:26 PM |
| BODY TEMPERATURE | 97.1 °F | DOMINGUEZ, LIZETH | 9/22/2022 4:06:16 PM |
| BODY TEMPERATURE | 98.0 °F | Ralph, Kiahna | 9/21/2022 8:26:47 PM |
| BODY TEMPERATURE | 96.6 °F | DOMINGUEZ, LIZETH | 9/21/2022 1:17:59 PM |
| BODY TEMPERATURE | 97.3 °F | Harvey, Ebony | 9/20/2022 9:29:02 PM |
| BODY TEMPERATURE | 98.0 °F | LEBOEUF, MICHAEL | 9/19/2022 1:31:10 PM |
| BODY TEMPERATURE | 97.1 °F | CARSTENS, JEAN M | 9/19/2022 12:38:07 PM |
| BODY TEMPERATURE | 98.3 °F | WALKER, CARY | 9/14/2022 12:42:46 PM |
| BODY TEMPERATURE | 97.8 °F | BANGALA, CATHERINE | 9/12/2022 2:59:47 PM |
| BODY TEMPERATURE | 97.6 °F | WALKER, CARY | 9/1/2022 9:04:51 AM |
| PULSE RATE | 100 BPM | Ralph, Kiahna | 9/22/2022 10:20:00 PM |
| PULSE RATE | 116 BPM | Ralph, Kiahna | 9/22/2022 7:06:26 PM |
| PULSE RATE | 87 BPM | DOMINGUEZ, LIZETH | 9/22/2022 4:06:16 PM |
| PULSE RATE | 89 BPM | Ralph, Kiahna | 9/21/2022 8:26:47 PM |
| PULSE RATE | 88 BPM | DOMINGUEZ, LIZETH | 9/21/2022 1:17:59 PM |
| PULSE RATE | 115 BPM | Harvey, Ebony | 9/20/2022 9:29:02 PM |
| PULSE RATE | 112 BPM | LEBOEUF, MICHAEL | 9/19/2022 1:31:10 PM |
| PULSE RATE | 102 BPM | WALKER, CARY | 9/14/2022 12:42:46 PM |
| PULSE RATE | 89 BPM | BANGALA, CATHERINE | 9/12/2022 2:59:47 PM |
| PULSE RATE | 79 BPM | WALKER, CARY | 9/1/2022 9:04:51 AM |
| BLOOD PRESSURE | 124/88 mmHg | Ralph, Kiahna | 9/22/2022 10:20:00 PM |
| BLOOD PRESSURE | 101/73 mmHg | Ralph, Kiahna | 9/22/2022 7:06:26 PM |
| BLOOD PRESSURE | 89/64 mmHg | DOMINGUEZ, LIZETH | 9/22/2022 4:06:16 PM |
| BLOOD PRESSURE | 120/85 mmHg | Ralph, Kiahna | 9/21/2022 8:26:47 PM |
| BLOOD PRESSURE | 97/71 mmHg | DOMINGUEZ, LIZETH | 9/21/2022 1:17:59 PM |

**EHR Clinical Report**

**Facility:**          COAI - AURORA ICE PROCESSING CENTER

**Created By:**      CINCOTTA, CYNTHIA

**Created On:**     09/23/2022 11:49:05 AM

| BLOOD PRESSURE | 97/71 mmHg | AZUMAH, DANIEL | 9/21/2022 10:12:03 AM |
|---|---|---|---|
| BLOOD PRESSURE | 118/83 mmHg | Harvey, Ebony | 9/20/2022 9:29:02 PM |
| BLOOD PRESSURE | 114/77 mmHg | LEBOEUF, MICHAEL | 9/19/2022 1:31:10 PM |
| BLOOD PRESSURE | 114/76 mmHg | WALKER, CARY | 9/14/2022 12:42:46 PM |
| BLOOD PRESSURE | 130/79 mmHg | BANGALA, CATHERINE | 9/14/2022 10:34:25 AM |
| BLOOD PRESSURE | 132/92 mmHg | BANGALA, CATHERINE | 9/12/2022 2:59:47 PM |
| BLOOD PRESSURE | 101/73 mmHg | McNeal, Katrina | 9/7/2022 1:11:48 PM |
| BLOOD PRESSURE | 127/86 mmHg | WALKER, CARY | 9/1/2022 9:04:51 AM |
| RESPIRATORY RATE | 22 RPM | Ralph, Kiahna | 9/22/2022 10:20:00 PM |
| RESPIRATORY RATE | 18 RPM | Ralph, Kiahna | 9/22/2022 7:06:26 PM |
| RESPIRATORY RATE | 16 RPM | DOMINGUEZ, LIZETH | 9/22/2022 4:06:16 PM |
| RESPIRATORY RATE | 16 RPM | Ralph, Kiahna | 9/21/2022 8:26:47 PM |
| RESPIRATORY RATE | 16 RPM | DOMINGUEZ, LIZETH | 9/21/2022 1:17:59 PM |
| RESPIRATORY RATE | 16 RPM | Harvey, Ebony | 9/20/2022 9:29:02 PM |
| RESPIRATORY RATE | 20 RPM | LEBOEUF, MICHAEL | 9/19/2022 1:31:10 PM |
| RESPIRATORY RATE | 16 RPM | CARSTENS, JEAN M | 9/19/2022 12:38:07 PM |
| RESPIRATORY RATE | 17 RPM | WALKER, CARY | 9/14/2022 12:42:46 PM |
| RESPIRATORY RATE | 16 RPM | BANGALA, CATHERINE | 9/12/2022 2:59:47 PM |
| RESPIRATORY RATE | 17 RPM | WALKER, CARY | 9/1/2022 9:04:51 AM |
| WEIGHT | 131.9 lbs | Ralph, Kiahna | 9/22/2022 10:20:00 PM |
| WEIGHT | 131.9 lbs | Ralph, Kiahna | 9/22/2022 7:13:00 PM |
| WEIGHT | 131 lbs | DOMINGUEZ, LIZETH | 9/22/2022 4:06:16 PM |
| WEIGHT | 132 lbs | DOMINGUEZ, LIZETH | 9/21/2022 1:17:59 PM |
| WEIGHT | 00 lbs | Harvey, Ebony | 9/20/2022 9:29:02 PM |
| WEIGHT | 133 lbs | LEBOEUF, MICHAEL | 9/20/2022 9:32:00 AM |
| WEIGHT | 130 lbs | LEBOEUF, MICHAEL | 9/19/2022 1:31:10 PM |
| WEIGHT | 130 lbs | CARSTENS, JEAN M | 9/19/2022 12:38:07 PM |
| WEIGHT | 138 lbs | WALKER, CARY | 9/14/2022 12:42:46 PM |
| WEIGHT | 139 lbs | BANGALA, CATHERINE | 9/12/2022 2:59:47 PM |
| WEIGHT | 139 lbs | BANGALA, CATHERINE | 9/6/2022 10:10:08 AM |
| WEIGHT | 139 lbs | WALKER, CARY | 9/1/2022 9:04:51 AM |
| O2 SATS | 99 | Ralph, Kiahna | 9/22/2022 10:20:00 PM |
| O2 SATS | 99 | Ralph, Kiahna | 9/22/2022 7:06:26 PM |

**EHR Clinical Report**

| | |
|---|---|
| **Facility:** | COAI - AURORA ICE PROCESSING CENTER |
| **Created By:** | CINCOTTA, CYNTHIA |
| **Created On:** | 09/23/2022 11:49:05 AM |

| O2 SATS | 97 | DOMINGUEZ, LIZETH | 9/22/2022 4:06:16 PM |
|---|---|---|---|
| O2 SATS | 97 | Ralph, Kiahna | 9/21/2022 8:26:47 PM |
| O2 SATS | 98 | DOMINGUEZ, LIZETH | 9/21/2022 1:17:59 PM |
| O2 SATS | 95 | Harvey, Ebony | 9/20/2022 9:29:02 PM |
| O2 SATS | 98 | LEBOEUF, MICHAEL | 9/19/2022 1:31:10 PM |
| O2 SATS | 95 | CARSTENS, JEAN M | 9/19/2022 12:38:07 PM |
| O2 SATS | 96 | WALKER, CARY | 9/14/2022 12:42:46 PM |
| O2 SATS | 95 | BANGALA, CATHERINE | 9/12/2022 2:59:47 PM |
| O2 SATS | 94 | WALKER, CARY | 9/1/2022 9:04:51 AM |
| URINE ANALYSIS | completed | VILLA, DEBRA | 9/22/2022 11:04:28 AM |
| URINE ANALYSIS | completed | VILLA, DEBRA | 9/21/2022 1:35:12 PM |
| BLOOD PRESSURE LYING | 118/82 mmHg | CARSTENS, JEAN M | 9/19/2022 12:38:07 PM |
| BLOOD PRESSURE SITTING | 118/81 mmHg | CARSTENS, JEAN M | 9/19/2022 12:38:07 PM |
| BLOOD PRESSURE STANDING | 116/78 mmHg | CARSTENS, JEAN M | 9/19/2022 12:38:07 PM |
| PULSE RATE LYING | 92 BPM | CARSTENS, JEAN M | 9/19/2022 12:38:07 PM |
| PULSE RATE SITTING | 95 BPM | CARSTENS, JEAN M | 9/19/2022 12:38:07 PM |
| PULSE RATE STANDING | 96 BPM | CARSTENS, JEAN M | 9/19/2022 12:38:07 PM |
| POWERADE/GATORADE | C | AZUMAH, DANIEL | 9/22/2022 10:32:40 AM |
| GI (NAUSEA AND VOMITING) | large | FLORES, AURELIA | 9/21/2022 1:02:50 AM |
| WEIGHT FROM SCALE | 131 | VILLA, DEBRA | 9/22/2022 11:04:23 AM |
| WEIGHT FROM SCALE | 132 | VILLA, DEBRA | 9/21/2022 1:35:13 PM |
| WEIGHT FROM SCALE | 139 | BANGALA, CATHERINE | 9/14/2022 11:49:09 AM |
| WEIGHT FROM SCALE | 139.2 | McNeal, Katrina | 9/7/2022 1:09:01 PM |
| OUTPUT | 150 urine | DOMINGUEZ, LIZETH | 9/22/2022 5:50:00 PM |
| OUTPUT | 300 | DOMINGUEZ, LIZETH | 9/22/2022 2:00:00 PM |
| OUTPUT | 580 | Ralph, Kiahna | 9/22/2022 6:20:00 AM |
| OUTPUT | 250 | DOMINGUEZ, LIZETH | 9/21/2022 5:50:00 PM |
| OUTPUT | 0 | DOMINGUEZ, LIZETH | 9/21/2022 4:10:00 PM |
| OUTPUT | 300 CC | DOMINGUEZ, LIZETH | 9/21/2022 10:00:00 AM |
| INPUT | 600ml | DOMINGUEZ, LIZETH | 9/22/2022 5:50:00 PM |
| INPUT | 600 | DOMINGUEZ, LIZETH | 9/22/2022 5:11:00 PM |
| INPUT | 236 | DOMINGUEZ, LIZETH | 9/22/2022 9:00:00 AM |
| INPUT | 280 | Ralph, Kiahna | 9/22/2022 6:20:00 AM |

**EHR Clinical Report**

| | | |
|---|---|---|
| **Facility:** | COAI - AURORA ICE PROCESSING CENTER |
| **Created By:** | CINCOTTA, CYNTHIA |
| **Created On:** | 09/23/2022 11:49:05 AM |

| INPUT | 473 | DOMINGUEZ, LIZETH | 9/21/2022 5:50:00 PM |
| INPUT | 354 | DOMINGUEZ, LIZETH | 9/21/2022 4:10:00 PM |
| INPUT | 266 water | DOMINGUEZ, LIZETH | 9/21/2022 10:00:00 AM |
| Oral Intake | 8 oz | FLORES, AURELIA | 9/21/2022 1:02:25 AM |
| Urine Output | 500 ml | Harvey, Ebony | 9/21/2022 1:05:50 AM |
| Emesis Output | 240mL | VILLA, DEBRA | 9/22/2022 1:51:04 PM |

## Next of Kin

## Patient Note Summary

| Description | Response Entered By Name | Date Created | Category Tag Names |
|---|---|---|---|
| SOAPE and Administrative note for Medical Providers or Nurses | WALKER, CARY | 9/1/2022 11:04:51 AM | Progress Note |
| Therapeutic Diet Order | CARDENAS MELENDREZ, ANGELICA | 9/1/2022 2:31:41 PM | Therapeutic Diets |
| SOAPE and Administrative note for Medical Providers or Nurses | WILLSON, BRYCE | 9/2/2022 9:11:09 PM | Progress Note |
| Telemental Health Progress Notes - HS-166.1 | MCGUIRE, COLLEEN | 9/6/2022 2:54:40 PM | Telemedicine, Mental Health |
| SOAPE and Administrative note for Medical Providers or Nurses | WILLSON, BRYCE | 9/9/2022 9:05:50 PM | Progress Note |
| GEO Group-Constipation Protocol (Mack Example) | BANGALA, CATHERINE | 9/12/2022 4:59:47 PM | Nursing Assessment |
| SOAPE and Administrative note for Medical Providers or Nurses | WALKER, CARY | 9/14/2022 2:42:46 PM | Progress Note |
| Visual Acuity - HS-188 | CARDENAS MELENDREZ, ANGELICA | 9/14/2022 2:47:02 PM | Optometry |
| GEO Group - Nursing Assessment Protocol - Dizziness/Fainting/Loss of Consciousness | CARSTENS, JEAN M | 9/19/2022 2:38:07 PM | Nursing Assessment |
| SOAPE and Administrative note for Medical Providers or Nurses | LEBOEUF, MICHAEL | 9/19/2022 3:31:10 PM | Progress Note |
| For Nurse use in documenting telephone orders received from providers | ROSS-PEARSON, DEIDRE | 9/20/2022 4:55:25 PM | Orders |
| SOAPE and Administrative note for Medical Providers or Nurses | WALKER, CARY | 9/20/2022 6:48:10 PM | Progress Note |
| Medical Observation Nursing Progress Record - HS-142.6 | Harvey, Ebony | 9/20/2022 11:29:02 PM | Progress Note, Medical Observation |
| SOAPE and Administrative note for Medical Providers or Nurses | VILLA, DEBRA | 9/21/2022 11:31:45 AM | Progress Note |
| SOAPE and Administrative note for Medical Providers or Nurses | WALKER, CARY | 9/21/2022 12:56:01 PM | Progress Note |
| Medical Observation Nursing Progress Record - HS-142.6 | DOMINGUEZ, LIZETH | 9/21/2022 3:17:59 PM | Progress Note, Medical Observation |
| SOAPE and Administrative note for Medical Providers or Nurses | DOMINGUEZ, LIZETH | 9/21/2022 3:43:02 PM | Progress Note |
| SOAPE and Administrative note for Medical Providers or Nurses | DOMINGUEZ, LIZETH | 9/21/2022 7:46:19 PM | Progress Note |
| SOAPE and Administrative note for Medical Providers or Nurses | DOMINGUEZ, LIZETH | 9/21/2022 7:59:57 PM | Progress Note |
| SOAPE and Administrative note for Medical Providers or Nurses | WILLSON, BRYCE | 9/21/2022 9:31:40 PM | Progress Note |
| Medical Observation Nursing Progress Record - HS-142.6 | Ralph, Kiahna | 9/21/2022 10:26:47 PM | Progress Note, Medical Observation |

## EHR Clinical Report

**Facility:**     COAI - AURORA ICE PROCESSING CENTER

**Created By:**   CINCOTTA, CYNTHIA

**Created On:**   09/23/2022 11:49:05 AM

| Description | Response Entered By Name | Date Created | Category Tag Names |
|---|---|---|---|
| SOAPE and Administrative note for Medical Providers or Nurses | VILLA, DEBRA | 9/22/2022 3:50:36 PM | Progress Note |
| Medical Observation Nursing Progress Record - HS-142.6 | DOMINGUEZ, LIZETH | 9/22/2022 6:06:16 PM | Progress Note, Medical Observation |
| SOAPE and Administrative note for Medical Providers or Nurses | DOMINGUEZ, LIZETH | 9/22/2022 8:01:54 PM | Progress Note |
| SOAPE and Administrative note for Medical Providers or Nurses | DOMINGUEZ, LIZETH | 9/22/2022 8:38:34 PM | Progress Note |
| Medical Observation Nursing Progress Record - HS-142.6 | Ralph, Kiahna | 9/22/2022 9:06:26 PM | Progress Note, Medical Observation |

**Patient Messages**

No Messages indicated

---

**EHR Clinical Report**

| | | |
|---|---|---|
| **Facility:** | COAI - AURORA ICE PROCESSING CENTER |
| **Created By:** | CINCOTTA, CYNTHIA |
| **Created On:** | 09/23/2022 11:49:05 AM |

| D O C T O R | WALKER, CARY |
|---|---|
| | COAI \| AURORA ICE PROCESSING CENTER |
| | 3130 NORTH OAKLAND STREET |
| | AURORA, CO 80010 |
| | Acct #: |
| | NPI: 1003201120 |

| P A T I E N T | BOZKUS, SERHAT | |
|---|---|---|
| | DOB:1/1/1992 | |
| | SEX:M | AGE: 30 |
| | U/FL:ICE | WING: ME-NA-NA |
| | ROOM:522-01 | BED: L |
| | ID: 3893791 | ALT ID: 220712429 |

| S A M P L E | Specimen ID: 3581420220913142041 |
|---|---|
| | Report Date: 9/13/2022 14:20 |
| | Date Received: 9/13/2022 12:20 |
| | Date Observed:9/13/2022 12:00 |

NOTES:

## CLINICAL INFORMATION

FASTING:     N                Total Volume:                    Source:

## CLINICAL REPORT

**Clinical Abnormalities Summary:**   (May not contain all abnormal results; narrative results may not have abnormal flags. Please review entire report.)

Occult Blood                    Positive A

### Occult Blood

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|---|---|---|---|---|---|---|
| Occult Blood | | Positive A | NEGATIVE | | | |
| Occult Blood 2 | | | NEGATIVE | | | |
| Occult Blood 3 | | | NEGATIVE | | | |

**PERFORMING LAB**

L = BELOW LOW NORMAL | LL = ALERT LOW | H = ABOVE HIGH NORMAL | HH = ALERT HIGH | < = PANIC LOW | > = PANIC HIGH | A = ABNORMAL | AA = CRITICAL ABNORMAL | S = SUSCEPTIBLE | R = RESISTANT | I = INTERMEDIATE | NEG = NEGATIVE | POS = POSITIVE

Manual Entry
3130 NORTH OAKLAND STREET | AURORA, CO | 80010 |

**288**
Page 1 of 1

| D O C T O R | WALKER, CARY<br> \| COAI \| AURORA ICE PROCESSING CENTER<br>3130 NORTH OAKLAND STREET<br><br>AURORA, CO 80010<br>  Acct #:<br><br>    NPI: 1003201120 |

**BOZKUS, SERHAT**

**DOB:** 1/1/1992
**SEX:** M          **AGE:** 30
**U/FL:** ICE        **WING:** ME-NA-NA
**ROOM:** 522-01     **BED:** L
**ID:** 3893791      **ALT ID:** 22071242 9

**Specimen ID:** 358142022091813530 4

**Report Date:** 9/18/2022 13:53
**Date Received:** 9/18/2022 11:52
**Date Observed:** 9/18/2022 11:30

NOTES:

## CLINICAL INFORMATION

FASTING:   N              Total Volume:              Source:

## CLINICAL REPORT

### Clinical Abnormalities Summary:    (May not contain all abnormal results; narrative results may not have abnormal flags. Please review entire report.)

Occult Blood 2                    Positive A

**Occult Blood**

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|------|--------|----------|-----------|-------|--------|-----|
| Occult Blood |  |  | NEGATIVE |  |  |  |
| Occult Blood 2 |  | Positive A | NEGATIVE |  |  |  |
| Occult Blood 3 |  |  | NEGATIVE |  |  |  |

**PERFORMING LAB**

L = BELOW LOW NORMAL | LL = ALERT LOW | H = ABOVE HIGH NORMAL | HH = ALERT HIGH | < = PANIC LOW | > = PANIC HIGH | A = ABNORMAL |
AA = CRITICAL ABNORMAL | S = SUSCEPTIBLE | R = RESISTANT | I = INTERMEDIATE | NEG = NEGATIVE | POS = POSITIVE

Manual Entry
3130 NORTH OAKLAND STREET | AURORA, CO | 80010 |
**289**
Page 1 of 1

| D O C T O R | WALKER, CARY<br> \| COAI \| AURORA ICE PROCESSING CENTER<br>3130 NORTH OAKLAND STREET<br><br>AURORA, CO 80010<br> Acct #:<br> NPI: 1003201120 |

| P A T I E N T | BOZKUS, SERHAT<br><br>DOB:1/1/1992<br>SEX:M  AGE:30<br>U/FL:ICE  WING:ME-NA-NA<br>ROOM:522-01  BED:L<br> ID: 3893791  ALT ID:220712429 |

| S A M P L E | Specimen ID:4321320220921025855<br><br>Report Date: 9/21/2022 2:58<br>Date Received:9/21/2022 0:42<br>Date Observed:9/21/2022 0:40 |

NOTES:

## CLINICAL INFORMATION

FASTING:  N  Total Volume:  Source:

## CLINICAL REPORT

**Clinical Abnormalities Summary:**  (May not contain all abnormal results; narrative results may not have abnormal flags. Please review entire report.)

| Bilirubin, Urine | small A | Ketone, Urine | 40 mg/dL A | Sp. Gravity, Urine | 1.025 H |

### Urinalysis Macroscopic

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|------|--------|----------|-----------|-------|--------|-----|
| Sp. Gravity, Urine | | 1.025 H | 1.010 - 1.020 | | | |
| pH, Urine | 6.0 | | 6.5 - 7.5 | | | |
| Glucose, Urine | Negative | | NEG | | | |
| Ketone, Urine | | 40 mg/dL A | NEG | | | |
| Nitrate, Urine | negative | | NEG | | | |
| Bilirubin, Urine | | small A | NEG | | | |
| Protein, Urine | negative | | NEG | | | |
| Leukocyte Esterase, Urine | negative | | NEG | | | |
| Blood, Urine | negative | | NEG | | | |
| Urobilinogen, Urine | 1.0 | | 0.2 - 1.0 | | | |
| COLOR | Yellow | | | | | |
| APPEARANCE | Clear | | | | | |

### PERFORMING LAB

L = BELOW LOW NORMAL | LL = ALERT LOW | H = ABOVE HIGH NORMAL | HH = ALERT HIGH | < = PANIC LOW | > = PANIC HIGH | A = ABNORMAL | AA = CRITICAL ABNORMAL | S = SUSCEPTIBLE | R = RESISTANT | I = INTERMEDIATE | NEG = NEGATIVE | POS = POSITIVE

Manual Entry
3130 NORTH OAKLAND STREET | AURORA, CO | 80010 |

**290**
Page 1 of 1

| D O C T O R | WALKER, CARY<br>  \| COAI \| AURORA ICE PROCESSING CENTER<br>3130 NORTH OAKLAND STREET<br><br>AURORA, CO 80010<br>  Acct #:<br><br>  NPI: 1003201120 |

| P A T I E N T | BOZKUS, SERHAT<br><br>DOB:1/1/1992<br>SEX:M          AGE:30<br>U/FL:ICE        WING: ME-NA-NA<br>ROOM:522-01      BED: L<br>  ID:  3893791   ALT ID: 220712429 |

| S A M P L E | Specimen ID: 2901920220921153954<br><br>Report Date: 9/21/2022 15:39<br>Date Received: 9/21/2022 13:36<br>Date Observed:9/21/2022 10:00 |

NOTES:

## CLINICAL INFORMATION

FASTING:     N            Total Volume:              Source:

## CLINICAL REPORT

**Clinical Abnormalities Summary:**     (May not contain all abnormal results; narrative results may not have abnormal flags. Please review entire report.)

### Urinalysis Macroscopic

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|------|--------|----------|-----------|-------|--------|-----|
| Sp. Gravity, Urine | 1.030 | | 1.010 - 1.020 | | | |
| pH, Urine | 5.5 | | 6.5 - 7.5 | | | |
| Glucose, Urine | Negative | | NEG | | | |
| Ketone, Urine | Negative | | NEG | | | |
| Nitrate, Urine | Negative | | NEG | | | |
| Bilirubin, Urine | Negative | | NEG | | | |
| Protein, Urine | Negative | | NEG | | | |
| Leukocyte Esterase, Urine | Negative | | NEG | | | |
| Blood, Urine | NEGATIVE | | NEG | | | |
| Urobilinogen, Urine | 0.2 | | 0.2 - 1.0 | | | |
| COLOR | cLEAR | | | | | |
| APPEARANCE | dARK YELLOW | | | | | |

**PERFORMING LAB**

L = BELOW LOW NORMAL | LL = ALERT LOW | H = ABOVE HIGH NORMAL | HH = ALERT HIGH | < = PANIC LOW | > = PANIC HIGH | A = ABNORMAL |
AA = CRITICAL ABNORMAL | S = SUSCEPTIBLE | R = RESISTANT | I = INTERMEDIATE | NEG = NEGATIVE | POS = POSITIVE

Manual Entry                                                                                                    **291**
3130 NORTH OAKLAND STREET | AURORA, CO | 80010 |                                                Page 1 of 1

# FINAL REPORT

| DOCTOR | PATIENT | SAMPLE |
|---|---|---|
| WALKER, C<br>05000045 \| COAI \| AURORA ICE PROCESSING CENTER<br>3130 NORTH OAKLAND STREET<br>AURORA, CO 80010<br>Acct #:05000045<br>NPI: 1003201120 | BOZKUS, SERHAT<br>DOB:1/1/1992<br>SEX:M  AGE:30<br>U/FL:ICE  WING:ME-NA-NA<br>ROOM:522-01  BED:L<br>ID: 3893791  ALT ID: 220712429 | Specimen ID: 26402700180<br>Report Date: 9/21/2022 16:09<br>Date Received: 9/21/2022 0:00<br>Date Observed:9/21/2022 12:00 |

**NOTES:**   FAXED RESULTS. 09.21.22 13.45 RLM

## CLINICAL INFORMATION

FASTING:              Total Volume:              Source:

## CLINICAL REPORT

**Clinical Abnormalities Summary:**  (May not contain all abnormal results; narrative results may not have abnormal flags. Please review entire report.)

| RBC | H |
|---|---|

### CBC With Differential/Platelet

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|---|---|---|---|---|---|---|
| WBC | 4.4 | | 3.4-10.8 | x10E3/uL | F | 01 |
| RBC | | 5.85 H | 4.14-5.80 | x10E6/uL | F | 01 |
| Hemoglobin | 16.5 | | 13.0-17.7 | g/dL | F | 01 |
| Hematocrit | 49.4 | | 37.5-51.0 | % | F | 01 |
| MCV | 84 | | 79-97 | fL | F | 01 |
| MCH | 28.2 | | 26.6-33.0 | pg | F | 01 |
| MCHC | 33.4 | | 31.5-35.7 | g/dL | F | 01 |
| RDW | 13.0 | | 11.6-15.4 | % | F | 01 |
| Platelets | 184 | | 150-450 | x10E3/uL | F | 01 |
| Neutrophils | 56 | | Not Estab. | % | F | 01 |
| Lymphs | 33 | | Not Estab. | % | F | 01 |
| Monocytes | 7 | | Not Estab. | % | F | 01 |
| Eos | 3 | | Not Estab. | % | F | 01 |
| Basos | 1 | | Not Estab. | % | F | 01 |
| Immature Cells | | | | | F | 01 |
| Neutrophils (Absolute) | 2.5 | | 1.4-7.0 | x10E3/uL | F | 01 |
| Lymphs (Absolute) | 1.4 | | 0.7-3.1 | x10E3/uL | F | 01 |
| Monocytes(Absolute) | 0.3 | | 0.1-0.9 | x10E3/uL | F | 01 |
| Eos (Absolute) | 0.1 | | 0.0-0.4 | x10E3/uL | F | 01 |
| Baso (Absolute) | 0.0 | | 0.0-0.2 | x10E3/uL | F | 01 |
| Immature Granulocytes | 0 | | Not Estab. | % | F | 01 |
| Immature Grans (Abs) | 0.0 | | 0.0-0.1 | x10E3/uL | F | 01 |
| NRBC | | | | | F | 01 |
| Hematology Comments: | | | | | F | 01 |

L = BELOW LOW NORMAL | LL = ALERT LOW | H = ABOVE HIGH NORMAL | HH = ALERT HIGH | < = PANIC LOW | > = PANIC HIGH | A = ABNORMAL |
AA = CRITICAL ABNORMAL | S = SUSCEPTIBLE | R = RESISTANT | I = INTERMEDIATE | NEG = NEGATIVE | POS = POSITIVE



**WALKER, C**
05000045 | COAI | AURORA ICE PROCESSING CENTER
3130 NORTH OAKLAND STREET

AURORA, CO 80010
  Acct #:05000045

  NPI: 1003201120

**BOZKUS, SERHAT**

**DOB:**1/1/1992
**SEX:**M                    **AGE:**30
**U/FL:**ICE                **WING:** ME-NA-NA
**ROOM:**522-01             **BED:** L
  **ID:**  3893791     **ALT ID:** 22071242
                                9

Specimen ID: 26402700180

Report Date: 9/21/2022 16:09
Date Received: 9/21/2022 0:00
Date Observed:9/21/2022 12:00

Basic Metabolic Panel (8)

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|------|--------|----------|-----------|-------|--------|-----|
| Glucose | 74 | | 65-99 | mg/dL | F | 01 |
| | **Effective September 26, 2022 Glucose reference** interval will be changing to: 70 - 99 | | | | | |
| BUN | 15 | | 6-20 | mg/dL | F | 01 |
| Creatinine | 1.26 | | 0.76-1.27 | mg/dL | F | 01 |
| eGFR | 79 | | >59 | mL/min/1.73 | F | 01 |
| BUN/Creatinine Ratio | 12 | | 9-20 | | F | 01 |
| Sodium | 142 | | 134-144 | mmol/L | F | 01 |
| Potassium | 4.1 | | 3.5-5.2 | mmol/L | F | 01 |
| Chloride | 103 | | 96-106 | mmol/L | F | 01 |
| Carbon Dioxide, Total | 26 | | 20-29 | mmol/L | F | 01 |
| Calcium | 10.0 | | 8.7-10.2 | mg/dL | F | 01 |

**PERFORMING LAB**

01 - Labcorp Denver, 8490 Upland Drive, EnglewoodCO, 801127115 3037922600, MD, Collum, Earle MD S,

L = BELOW LOW NORMAL | LL = ALERT LOW | H = ABOVE HIGH NORMAL | HH = ALERT HIGH | < = PANIC LOW | > = PANIC HIGH | A = ABNORMAL |
AA = CRITICAL ABNORMAL | S = SUSCEPTIBLE | R = RESISTANT | I = INTERMEDIATE | NEG = NEGATIVE | POS = POSITIVE

# FINAL REPORT

**DOCTOR**

WALKER, C
05000045 | COAI | AURORA ICE PROCESSING CENTER
3130 NORTH OAKLAND STREET

AURORA, CO 80010
Acct #:05000045

NPI: 1003201120

**PATIENT**

BOZKUS, SERHAT

DOB:1/1/1992
SEX:M                    AGE:30
U/FL:ICE                 WING:ME-NA-NA
ROOM:522-01              BED:L
ID:  3893791     ALT ID: 22071242
                          9

**SAMPLE**

Specimen ID: 26402700180

Report Date: 9/21/2022 16:09
Date Received: 9/21/2022 0:00
Date Observed:9/21/2022 12:00

NOTES:    FAXED RESULTS. 09.21.22 13.45 RLM

## CLINICAL INFORMATION

FASTING:              Total Volume:              Source:

## CLINICAL REPORT

**Clinical Abnormalities Summary:**   (May not contain all abnormal results; narrative results may not have abnormal flags. Please review entire report.)

RBC                          H

### CBC With Differential/Platelet

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|------|--------|----------|-----------|-------|--------|-----|
| WBC | 4.4 | | 3.4-10.8 | x10E3/uL | F | 01 |
| RBC | | 5.85 H | 4.14-5.80 | x10E6/uL | F | 01 |
| Hemoglobin | 16.5 | | 13.0-17.7 | g/dL | F | 01 |
| Hematocrit | 49.4 | | 37.5-51.0 | % | F | 01 |
| MCV | 84 | | 79-97 | fL | F | 01 |
| MCH | 28.2 | | 26.6-33.0 | pg | F | 01 |
| MCHC | 33.4 | | 31.5-35.7 | g/dL | F | 01 |
| RDW | 13.0 | | 11.6-15.4 | % | F | 01 |
| Platelets | 184 | | 150-450 | x10E3/uL | F | 01 |
| Neutrophils | 56 | | Not Estab. | % | F | 01 |
| Lymphs | 33 | | Not Estab. | % | F | 01 |
| Monocytes | 7 | | Not Estab. | % | F | 01 |
| Eos | 3 | | Not Estab. | % | F | 01 |
| Basos | 1 | | Not Estab. | % | F | 01 |
| Immature Cells | | | | | F | 01 |
| Neutrophils (Absolute) | 2.5 | | 1.4-7.0 | x10E3/uL | F | 01 |
| Lymphs (Absolute) | 1.4 | | 0.7-3.1 | x10E3/uL | F | 01 |
| Monocytes(Absolute) | 0.3 | | 0.1-0.9 | x10E3/uL | F | 01 |
| Eos (Absolute) | 0.1 | | 0.0-0.4 | x10E3/uL | F | 01 |
| Baso (Absolute) | 0.0 | | 0.0-0.2 | x10E3/uL | F | 01 |
| Immature Granulocytes | 0 | | Not Estab. | % | F | 01 |
| Immature Grans (Abs) | 0.0 | | 0.0-0.1 | x10E3/uL | F | 01 |
| NRBC | | | | | F | 01 |
| Hematology Comments: | | | | | F | 01 |

L = BELOW LOW NORMAL | LL = ALERT LOW | H = ABOVE HIGH NORMAL | HH = ALERT HIGH | < = PANIC LOW | > = PANIC HIGH | A = ABNORMAL |
AA = CRITICAL ABNORMAL | S = SUSCEPTIBLE | R = RESISTANT | I = INTERMEDIATE | NEG = NEGATIVE | POS = POSITIVE



Basic Metabolic Panel (8)

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|------|--------|----------|-----------|-------|--------|-----|
| Glucose | 74 | | 65-99 | mg/dL | F | 01 |
| | **Effective September 26, 2022 Glucose reference** interval will be changing to: 70 - 99 | | | | | |
| BUN | 15 | | 6-20 | mg/dL | F | 01 |
| Creatinine | 1.26 | | 0.76-1.27 | mg/dL | F | 01 |
| eGFR | 79 | | >59 | mL/min/1.73 | F | 01 |
| BUN/Creatinine Ratio | 12 | | 9-20 | | F | 01 |
| Sodium | 142 | | 134-144 | mmol/L | F | 01 |
| Potassium | 4.1 | | 3.5-5.2 | mmol/L | F | 01 |
| Chloride | 103 | | 96-106 | mmol/L | F | 01 |
| Carbon Dioxide, Total | 26 | | 20-29 | mmol/L | F | 01 |
| Calcium | 10.0 | | 8.7-10.2 | mg/dL | F | 01 |

**PERFORMING LAB**

01 - Labcorp Denver, 8490 Upland Drive, EnglewoodCO, 801127115 3037922600, MD, Collum, Earle MD S,

L = BELOW LOW NORMAL | LL = ALERT LOW | H = ABOVE HIGH NORMAL | HH = ALERT HIGH | < = PANIC LOW | > = PANIC HIGH | A = ABNORMAL |
AA = CRITICAL ABNORMAL | S = SUSCEPTIBLE | R = RESISTANT | I = INTERMEDIATE | NEG = NEGATIVE | POS = POSITIVE

Page 2 of 2

295

| D O C T O R | WALKER, CARY<br>  \| COAI \| AURORA ICE PROCESSING CENTER<br>3130 NORTH OAKLAND STREET<br><br>AURORA, CO 80010<br>  Acct #:<br><br>     NPI: 1003201120 |

| P A T I E N T | BOZKUS, SERHAT<br><br>DOB:1/1/1992<br>SEX:M                    AGE: 30<br>U/FL:ICE              WING: ME-NA-NA<br>ROOM:522-01            BED: L<br>   ID:  3893791      ALT ID: 220712429 |

| S A M P L E | Specimen ID: 2901920220922204142<br><br>  Report Date: 9/22/2022 20:41<br>Date Received: 9/22/2022 18:40<br>Date Observed:9/22/2022 9:00 |

NOTES:

## CLINICAL INFORMATION

FASTING:     N            Total Volume:              Source:

## CLINICAL REPORT

**Clinical Abnormalities Summary:**     (May not contain all abnormal results; narrative results may not have abnormal flags. Please review entire report.)

### Urinalysis Macroscopic

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|------|--------|----------|-----------|-------|--------|-----|
| Sp. Gravity, Urine | 1.025 | | 1.010 - 1.020 | | | |
| pH, Urine | 6.0 | | 6.5 - 7.5 | | | |
| Glucose, Urine | Negative | | NEG | | | |
| Ketone, Urine | Negative | | NEG | | | |
| Nitrate, Urine | Negative | | NEG | | | |
| Bilirubin, Urine | Negative | | NEG | | | |
| Protein, Urine | negative | | NEG | | | |
| Leukocyte Esterase, Urine | negative | | NEG | | | |
| Blood, Urine | Negative | | NEG | | | |
| Urobilinogen, Urine | 0.2 | | 0.2 - 1.0 | | | |
| COLOR | Dark yellow | | | | | |
| APPEARANCE | clear | | | | | |

**PERFORMING LAB**

L = BELOW LOW NORMAL | LL = ALERT LOW | H = ABOVE HIGH NORMAL | HH = ALERT HIGH | < = PANIC LOW | > = PANIC HIGH | A = ABNORMAL | AA = CRITICAL ABNORMAL | S = SUSCEPTIBLE | R = RESISTANT | I = INTERMEDIATE | NEG = NEGATIVE | POS = POSITIVE

Manual Entry                                                                                                          **296**
3130 NORTH OAKLAND STREET | AURORA, CO | 80010 |                                                         Page 1 of 1

## Medical Observation Nursing Progress Record - HS-142.6

### Subjective

**Is this an admission to the MOU:**

☑ No

> **Is this a continuation of the 24-hour observation:**
>
> ☑ Yes

**Is this a telephone round in the MOU:**

☑ No

**Subjective:**

*NO ANSWER PROVIDED*

**Chest pain:**

☑ No

**Abdominal pain:**

☑ No

**Other pain:**

☑ Yes

> **Pain scale**
>
> ☑ 5
>
> **Describe Other pain:**
>
> flank pain and " liver" pain

**Nausea/vomiting:**

☑ Yes

> **Describe Nausea/vomiting:**
>
> Pt vomited at 1846 about 100 cc of what looked like to be his previous meal.

**Cough/SOB:**

☑ No

**Urinary Symptoms:**

☑ No

### Observation

**Did patient refuse vitals:**

---

**Medical Observation Nursing Progress Record - HS-142.6**
Medical Observation Nursing Progress Record - HS-142.6

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** Ralph, Kiahna **on** 09/22/2022 19:06:26

☑ Some vitals Refused

## Vital Signs

| Temperature: | Respiratory Rate: | O2 Sat: |
|---|---|---|
| 98.9 | 18 | 99 |
| **Pulse Rate:** | **Blood Pressure:** | **Weight:** |
| 116 | 101/73 | *NO ANSWER PROVIDED* |

**Reason for Refusing vitals:**
weight not obtained

**Alert & Oriented x 3:**
☑ Yes

**Speech slurred:**
☑ No

**Skin temperature (Cold, hot, warm, normal):**
normal

**Skin:**
☑ Normal

**Heart- Regular Rate and Rhythm:**
☑ No

> **Describe Irregular Rate and Rhythm:**
> Patients rhythm is normal however his rate is elevated to 115bpm

**Lung sounds (bilaterally):**
clear

**Oxygen use:**
☑ No

**Abdomen- Normal:**
☑ Yes

**Bowel sounds:**
☑ Normal

**Last BM:**
*NO ANSWER PROVIDED*

**Last stool appearance (Color, consistency):**
☑ Normal

---

**Medical Observation Nursing Progress Record - HS-142.6**
Medical Observation Nursing Progress Record - HS-142.6

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** Ralph, Kiahna **on** 09/22/2022 19:06:26

**Self-void:**

☑ Yes

**Foley:**

☑ No

**Incontinence of urine:**

☑ No

**Does the I/D/R have a wound:**

☑ No

**Edema:**

☑ No

**Does the I/D/R have an IV:**

☑ No

**Is I/D/R on Hunger Strike:**

☑ No

**Comments:**

Pt observed in his room vomiting by this nurse. Pt states that he received his meal at 1700 and finished eating his meal at 1830 and states that he vomited again . Pt states that he doesn't eat because he feels better when he doesn't eat. Pt informed of his pulse rate and informed that he needs to make sure that he is replacing the fluid and nutrients that he is losing during his vomiting episodes or he's going to continue to feel weak and his condition can gets worse. Pt states that he has no problem drinking but starts to vomit when he eats. Pt informed by this nurse to eat at least 1 pack of crackers that this nurse will give him and to drink the entire pitcher of water that this nurse is going to refill for him. Pt states that he will try. Pt is currently having 5/10 pain in bilateral flank areas and in his " liver" .

## Assessment

**Assessment:**

Pt observed in his room vomiting by this nurse. Pt states that he received his meal at 1700 and finished eating his meal at 1830 and states that he vomited again . Pt states that he doesn't eat because he feels better when he doesn't eat. Pt informed of his pulse rate and informed that he needs to make sure that he is replacing the fluid and nutrients that he is losing during his vomiting episodes or he's going to continue to feel weak and his condition can gets worse. Pt states that he has no problem drinking but starts to vomit when he eats. Pt informed by this nurse to eat at least 1 pack of crackers that this nurse will give him and to drink the entire pitcher of water that this nurse is going to refill for him. Pt states that he will try. Pt is currently having 5/10 pain in bilateral flank areas and in his " liver" .

## Plan and Education

**Plan:**

continue to encourage fluids and food.

**Education:**

educate patient on the importance of trying to eat and drink to better his condition and prevent further weakness.

**Is this a discharge from the MOU:**

☑ No

---

**Medical Observation Nursing Progress Record - HS-142.6**
Medical Observation Nursing Progress Record - HS-142.6

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** Ralph, Kiahna **on** 09/22/2022 19:06:26

**Interpreter Needed:**
*NO ANSWER PROVIDED*

## Save Log

| User Name | AuditDateAndTime |
|---|---|
| Ralph, Kiahna, | 09/22/2022 19:06:26 |

## Signoff Comments List

| Approved By | Approved On | Signoff Note | Is Declined |
|---|---|---|---|
| WALKER, CARY, DO | 09/23/2022 08:42:54 | | False |

**Medical Observation Nursing Progress Record - HS-142.6**
Medical Observation Nursing Progress Record - HS-142.6

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** Ralph, Kiahna **on** 09/22/2022 19:06:26

4 of 4

**300**

## SOAPE/Administrative Note

**Encounter Type:**

☑Face to Face

**Person Completing Note:**

☑Nurse

**Type of Note:**

☑Administrative

### Administrative Note

**Administrative Note:**

Detainee ate entire sack lunch. Pt. reported he drank 600ml of water. Output- 150ml of urine. Pt asking when he will be returning to dorm. Pt instructed once he feels better and is able to tolerate his food.

**Schedule follow-up with:**

☑No follow-up needed

**Are there any orders that require Provider signoff:**

☑No

**Interpreter Needed:**

*NO ANSWER PROVIDED*

## Save Log

| User Name | AuditDateAndTime |
|---|---|
| DOMINGUEZ, LIZETH, RN | 09/22/2022 18:38:34 |

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** DOMINGUEZ, LIZETH **on** 09/22/2022 18:38:34

## SOAPE/Administrative Note

**Encounter Type:**

☑ Face to Face

**Person Completing Note:**

☑ Nurse

**Type of Note:**

☑ Administrative

### Administrative Note

**Administrative Note:**

Detainee states he ate 1/2 sack lunch and 1/4 of lunch tray today.

**Schedule follow-up with:**

☑ No follow-up needed

**Are there any orders that require Provider signoff:**

☑ No

**Interpreter Needed:**

*NO ANSWER PROVIDED*

### Save Log

| User Name | AuditDateAndTime |
|---|---|
| DOMINGUEZ, LIZETH, RN | 09/22/2022 18:01:54 |

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** DOMINGUEZ, LIZETH **on** 09/22/2022 18:01:54

## Medical Observation Nursing Progress Record - HS-142.6

### Subjective

**Is this an admission to the MOU:**

☑ No

**Is this a continuation of the 24-hour observation:**

☑ Yes

**Is this a telephone round in the MOU:**

☑ No

**Subjective:**

Assessment completed at approximately 0850.

**Chest pain:**

☑ No

**Abdominal pain:**

☑ No

**Other pain:**

☑ No

**Nausea/vomiting:**

☑ No

**Cough/SOB:**

☑ No

**Urinary Symptoms:**

☑ No

### Observation

**Did patient refuse vitals:**

☑ No vitals Refused

### Vital Signs

| Temperature: | Respiratory Rate: | O2 Sat: |
|---|---|---|
| 97.1 | 16 | 97 |
| **Pulse Rate:** | **Blood Pressure:** | **Weight:** |
| 87 | 89/64 | 131 |

**Alert & Oriented x 3:**

**Medical Observation Nursing Progress Record - HS-142.6**
Medical Observation Nursing Progress Record - HS-142.6

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** DOMINGUEZ, LIZETH on 09/22/2022 16:06:16

1 of 3

**303**

☑ Yes

**Speech slurred:**

☑ No

**Skin temperature (Cold, hot, warm, normal):**

Normal

**Skin:**

☑ Normal

**Heart- Regular Rate and Rhythm:**

☑ Yes

**Lung sounds (bilaterally):**

CTA

**Oxygen use:**

☑ No

**Abdomen- Normal:**

☑ Yes

**Bowel sounds:**

☑ Normal

**Last BM:**

couple days states due to him not eating

**Last stool appearance (Color, consistency):**

☑ Normal

**Self-void:**

☑ Yes

**Foley:**

☑ No

**Incontinence of urine:**

☑ No

**Does the I/D/R have a wound:**

☑ No

**Edema:**

☑ No

**Does the I/D/R have an IV:**

☑ No

---

**Medical Observation Nursing Progress Record - HS-142.6**
Medical Observation Nursing Progress Record - HS-142.6

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** DOMINGUEZ, LIZETH **on** 09/22/2022 16:06:16

**Is I/D/R on Hunger Strike:**

☑ No

**Comments:**

*NO ANSWER PROVIDED*

## Assessment

**Assessment:**

Inmate laying down; sleeping before assessment. BP 89/64. Pt. weight is 131 today. Urine analysis completed (see results). Pt. reports nausea.

## Plan and Education

**Plan:**

Continue to monitor as ordered.

**Education:**

Fluids and food was encouraged.

**Is this a discharge from the MOU:**

☑ No

**Interpreter Needed:**

☑ Yes

**Interpreter Name and/or #:**

379615

### Save Log

| User Name | AuditDateAndTime |
|---|---|
| DOMINGUEZ, LIZETH, RN | 09/22/2022 16:06:16 |

### Signoff Comments List

| Approved By | Approved On | Signoff Note | Is Declined |
|---|---|---|---|
| WALKER, CARY, DO | 09/23/2022 08:57:39 | | False |

---

**Medical Observation Nursing Progress Record - HS-142.6**
Medical Observation Nursing Progress Record - HS-142.6

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** DOMINGUEZ, LIZETH **on** 09/22/2022 16:06:16

## SOAPE/Administrative Note

**Encounter Type:**

☑ Face to Face

**Person Completing Note:**

☑ Nurse

**Type of Note:**

☑ SOAPE

**Is this an OBGYN encounter:**

☑ No

### SOAPE

**Subjective:**

Detainee observation

**Objective:**

Detainee emesis

**Did patient refuse vitals:**

*NO ANSWER PROVIDED*

**Assessment:**

Detainee reported he had thrown up. Detainee had a tub containing 240mL of emesis. Emesis was tan in color with a chunky consistency. Detainee encouraged to try and eat small bites of crackers and continue drinking fluids.

**Plan:**

Continue medical observation as ordered.

**Education:**

Eat small bites of crackers, drink fluids. Notify medical staff of any persistent or worsening symptoms.

**Schedule follow-up with:**

☑ No follow-up needed

**Are there any orders that require Provider signoff:**

☑ No

**Interpreter Needed:**

*NO ANSWER PROVIDED*

### Save Log

| User Name | AuditDateAndTime |
|---|---|
| VILLA, DEBRA, | 09/22/2022 13:50:36 |

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** VILLA, DEBRA **on** 09/22/2022 13:50:36

## Medical Observation Nursing Progress Record - HS-142.6

### Subjective

**Is this an admission to the MOU:**

☑ No

**Is this a continuation of the 24-hour observation:**

☑ Yes

**Is this a telephone round in the MOU:**

☑ No

**Subjective:**

med obs rounds assessment

**Chest pain:**

☑ No

**Abdominal pain:**

☑ No

**Other pain:**

☑ Yes

**Pain scale**

☑ 2

**Describe Other pain:**

states pain in bilateral kidney areas and "liver"

**Nausea/vomiting:**

☑ Yes

**Describe Nausea/vomiting:**

pt denied any vomiting however states that he is nauseated and has had nausea constantly. denies abdominal pain on palpation.

**Cough/SOB:**

☑ No

**Urinary Symptoms:**

☑ No

### Observation

**Did patient refuse vitals:**

---

**Medical Observation Nursing Progress Record - HS-142.6**
Medical Observation Nursing Progress Record - HS-142.6

Patient Name: BOZKUS, SERHAT
Patient Number: 220712429
Location: ICE-ME-NA-NA-522-01-L
DOB: 1/1/1992
Facility: AURORA ICE PROCESSING CENTER
Electronically Signed By Ralph, Kiahna on 09/21/2022 20:26:47

1 of 4

**307**

☑ Some vitals Refused

## Vital Signs

| | | |
|---|---|---|
| **Temperature:** | **Respiratory Rate:** | **O2 Sat:** |
| 98.0 | 16 | 97 |
| **Pulse Rate:** | **Blood Pressure:** | **Weight:** |
| 89 | 120/85 | *NO ANSWER PROVIDED* |

**Reason for Refusing vitals:**
weight not obtained

**Alert & Oriented x 3:**
☑ Yes

**Speech slurred:**
☑ No

**Skin temperature (Cold, hot, warm, normal):**
normal

**Skin:**
☑ Normal

**Heart- Regular Rate and Rhythm:**
☑ Yes

**Lung sounds (bilaterally):**
clear

**Oxygen use:**
☑ No

**Abdomen- Normal:**
☑ Yes

**Bowel sounds:**
☑ Normal

**Last BM:**
9/21/22

**Last stool appearance (Color, consistency):**
☑ Normal

**Self-void:**
☑ Yes

**Foley:**

---

**Medical Observation Nursing Progress Record - HS-142.6**
Medical Observation Nursing Progress Record - HS-142.6

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** Ralph, Kiahna **on** 09/21/2022 20:26:47

☑ No

**Incontinence of urine:**

☑ No

**Does the I/D/R have a wound:**

☑ No

**Edema:**

*NO ANSWER PROVIDED*

**Does the I/D/R have an IV:**

*NO ANSWER PROVIDED*

**Is I/D/R on Hunger Strike:**

☑ No

**Comments:**

Pt denies any vomit however states that he is nauseated and is scared to eat for fear of vomiting. Pt informed that he had some medication that he has been prescribed to help with his nausea and informed to attempt to try and replenish some of the electrolytes he lost from his previous emesis episodes by drinking some of the Gatorade prepare for him and eating 1 or half a pack of crackers. .

## Assessment

**Assessment:**

Pt appears to be slightly lethargic, his lips are dry and his breath is malodorous. Pt looks disheveled however he is walking around independently and appears to have no signs of medical distress at this time. Pt does appear to have some fatigue, and is requesting long sleeves or a jacket due to being " cold". Pt vitals are stable and he is afebrile. Pt has clear lung, bowel and heart sounds. Pt complains of pain to bilateral flank areas and to his : liver" pt has no pain on palpation of his abdomen or his flank areas. Pt has not been eating due to fear of vomiting , pt educated on his sx and the pain that he is experiencing and informed that he has medication to help with his nausea and the vomiting and informed that he may start to feel a little better if he tries to eat something and if he tried to drink plenty of water. Pt verbalized understanding of information and states to this nurse that he will attempt to eat something and drink as much as he can and let me know if he has any issues.

## Plan and Education

**Plan:**

drink plenty of water and attempt to eat a snack or something

**Education:**

educated on important of drinking plenty of fluids to replace electrolytes lost from vomiting.

**Is this a discharge from the MOU:**

☑ No

**Interpreter Needed:**

☑ Yes

**Interpreter Name and/or #:**

388308

---

**Medical Observation Nursing Progress Record - HS-142.6**
Medical Observation Nursing Progress Record - HS-142.6

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** Ralph, Kiahna **on** 09/21/2022 20:26:47

## Save Log

| User Name | AuditDateAndTime |
|---|---|
| Ralph, Kiahna, | 09/21/2022 20:26:47 |

## Signoff Comments List

| Approved By | Approved On | Signoff Note | Is Declined |
|---|---|---|---|
| WALKER, CARY, DO | 09/22/2022 14:37:18 | | False |

**Medical Observation Nursing Progress Record - HS-142.6**
Medical Observation Nursing Progress Record - HS-142.6

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** Ralph, Kiahna **on** 09/21/2022 20:26:47

4 of 4

**310**

## SOAPE/Administrative Note

**Encounter Type:**
☑ Face to Face

**Person Completing Note:**
☑ Mental Health

**Type of Note:**
☑ SOAPE

### SOAPE

**Purpose of encounter:**

**MENTAL HEATH / RTC**

**Subjective:**

This patient was seen today for a mental health RTC. As with his previous encounters, he reported that he is still having difficulties with nightmares and eating/vomiting and continues to lose weight. A review of his records indicated that he has ordered snacks with meds and an extra sack lunch. His record indicated that nursing / medical are following him closely regarding this issue with eating and vomiting. This patient reported that he has been working on engaging in purposeful activities such as writing a book about his experience, journaling his ideas, and playing chess to keep his mind occupied and sharp. This clinician played a game of chess with this patient to build rapport and reduce anxiety, which this patient really liked. This clinician encouraged this patient to continue to eat with purpose to give him energy and food for his brain. He stated that he would continue to try and do this. His record indicated that he was taking his psychotropic medications as prescribed. He denied any dangerous ideations at this time, nor any perceptual disturbance. He did not have anything further to process today.

**Objective:**

This patient presented as alert and oriented. He was disheveled with his hair and dressed in the appropriate uniform. His mood was anxious and his affect was calm / blunted. His mood and affect were congruent. He was cooperative and respectful towards this clinician. He stated that he has been vomiting at every meal and so he has not been eating much. He stated that he continues having nightmares, which is disruptive to his sleep, but he is sleeping. He made no unusual movements during the course of this interview. He appeared to be goal-directed and logical in his thought process, with no evidence of thought disorder. His speech was of normal rhythm, rate, tone, volume, responsiveness, and prosody. His cognition (memory and concentration) appeared to be intact. He presented with good insight and judgment. His intelligence appeared to be average. He denied experience any dangerous ideations at this time (i.e., suicidal/homicidal), nor any perceptual disturbance. He made no reference to any PREA risk related issues at this time. He made no mention of feeling unsafe where he was currently housed and that no one is attempting to exploit them.

### Brief Mental Status Exam

**Appearance:**
☑ Appropriately dressed   ☑ Poorly groomed   ☑ Poor hygiene

**Eye Contact:**
☑ Good

**Attitude:**
☑ Calm and cooperative

**Behavior:**
☑ No unusual movements or psychomotor changes

**Appetite:**

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

Patient Name: BOZKUS, SERHAT
Patient Number: 220712429
Location: ICE-ME-NA-NA-522-01-L
DOB: 1/1/1992
Facility: AURORA ICE PROCESSING CENTER
Electronically Signed By WILLSON, BRYCE on 09/21/2022 19:31:40

1 of 4

**311**

☑Decreased

**Sleep:**
☑Other

>    **Describe Sleep:**
>    disturbed by nightmares.

**Speech:**
☑Normal rate/tone/volume w/o pressure

**Affect:**
☑Normal range

**Mood:**
☑Depressed

**Thought Process:**
☑Goal-directed and logical

**Suicidal Ideation:**
☑None

**Homicidal Ideation:**
☑None

**Thought Content:**
☑WNL

**Perception:**
☑No hallucinations or delusions during interview

**Alert:**
☑Fully

**Oriented to Time, Place, Person, and Situation:**
☑Yes

**Memory/Concentration:**
☑Short term intact   ☑Long term intact

**Insight/Judgment:**
☑Good

**Estimated IQ:**
☑Average

**Did patient refuse vitals:**
*NO ANSWER PROVIDED*

**Assessment/DSM-5 Diagnosis (include rationale for diagnosis):**

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE **on** 09/21/2022 19:31:40

309.81 - POSTTRAUMATIC STRESS DISORDER - [WILLSON, BRYCE] - 2022-08-05

F33.0 - MAJOR DEPRESSIVE DISORDER, RECURRENT, MILD - [MCGUIRE, COLLEEN] - 2022-08-02

300.00 - ANXIETY STATE UNSPECIFIED - [WALKER, CARY] - 2022-07-20

**Plan:**

**RECOMMENDATIONS:**

1.) This patient will be scheduled for a follow-up with mental health in 72 hours to check on his well-being.

2.) This patient will continue with psychiatric clinic as already constituted.

3.) This patient will continue with this treatment plan as already constituted.

4.) This patient will kite mental health if he needs to be seen and will alert security staff in case of a mental health emergency.

5.) This patient is currently housed in medical and will need to be cleared for general population from medical standpoint. He is cleared for GP from a mental health standpoint.

6.) This patient will continue with medical and nursing as already established regarding his inability to eat and vomiting every time he eats. NURSING PLEASE FOLLOW-UP WITHT HIS PATIENT REGARDING THIS ISSUE.

**Education:**

This patient was educated and/or previously educated with regard to the kite system and how to contact mental health, and to alert security staff in case of a mental health emergency. This patient was also previously given a Mental Health Card' with this clinician's name and title and instructions to show the card to security staff if he had a mental health emergency.

**Recommend placement under observation due to psychotic symptoms or other severe psychiatric symptoms without present suicide risk:**

☑ Not necessary

**Schedule follow-up with:**

☑ Mental Health

<u>Mental Health</u>

**Timeframe for follow-up with Mental Health:**

☑ Next Day

**Does Nursing need to review note for orders:**

☑ Yes

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE on 09/21/2022 19:31:40

**Interpreter Needed:**

Yes

    **Interpreter Name and/or #:**

    388308

## Save Log

| User Name | AuditDateAndTime |
|---|---|
| WILLSON, BRYCE, PHD | 09/21/2022 19:31:40 |
| WILLSON, BRYCE, PHD | 09/21/2022 18:47:49 |

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE **on** 09/21/2022 19:31:40

## SOAPE/Administrative Note

**Encounter Type:**
☑ Face to Face

**Person Completing Note:**
☑ Nurse

**Type of Note:**
☑ Administrative

### Administrative Note

**Administrative Note:**
At approximately 1430 results received via fax and were forwarded to Dr. Walker for review.

**Schedule follow-up with:**
☑ No follow-up needed

**Are there any orders that require Provider signoff:**
☑ No

**Interpreter Needed:**
*NO ANSWER PROVIDED*

### Save Log

| User Name | AuditDateAndTime |
|-----------|------------------|
| DOMINGUEZ, LIZETH, RN | 09/21/2022 17:59:57 |

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** DOMINGUEZ, LIZETH on 09/21/2022 17:59:57

## SOAPE/Administrative Note

**Encounter Type:**

☑Face to Face

**Person Completing Note:**

☑Nurse

**Type of Note:**

☑Administrative

### Administrative Note

**Administrative Note:**

At approximately 1610 detainee states he drank 12 oz of water and no urine output (urinal was empty at this time). Will continue to monitor I&O.

**Schedule follow-up with:**

☑No follow-up needed

**Are there any orders that require Provider signoff:**

☑No

**Interpreter Needed:**

*NO ANSWER PROVIDED*

### Save Log

| User Name | AuditDateAndTime |
|---|---|
| DOMINGUEZ, LIZETH, RN | 09/21/2022 17:46:19 |

### Notes List

| Created On | Description | Category Name | Created By |
|---|---|---|---|
| 2022-09-21 17:58:40 | Detainee encouraged to drink fluids. Pt. smiles and say Ok. Pt. instructed to try and eat something at least ensure. Pt. missed three meals today. | ADDENDUM | DOMINGUEZ, LIZETH, RN |

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** DOMINGUEZ, LIZETH on 09/21/2022 17:46:19

1 of 1

**316**

## SOAPE/Administrative Note

**Encounter Type:**

☑ Face to Face

**Person Completing Note:**

☑ Nurse

**Type of Note:**

☑ Administrative

### Administrative Note

**Administrative Note:**

Blood drawn from right AC using a 23g butterfly needle at approximately 1150 for stat BMP and CBC. One lavender and one gel tube collected. Site covered with gauze and tape. Detainee tolerated well. Labcorp called for STAT lab pickup with confirmation number 2264EOC.

**Schedule follow-up with:**

☑ No follow-up needed

**Are there any orders that require Provider signoff:**

☑ No

**Interpreter Needed:**

*NO ANSWER PROVIDED*

### Save Log

| User Name | AuditDateAndTime |
|---|---|
| DOMINGUEZ, LIZETH, RN | 09/21/2022 13:43:02 |

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** DOMINGUEZ, LIZETH **on** 09/21/2022 13:43:02

## Medical Observation Nursing Progress Record - HS-142.6

### Subjective

**Is this an admission to the MOU:**

☑ No

**Is this a continuation of the 24-hour observation:**

☑ Yes

**Is this a telephone round in the MOU:**

☑ No

**Subjective:**

Assessment completed at approximately 0945.

**Chest pain:**

☑ No

**Abdominal pain:**

☑ No

**Other pain:**

☑ Yes

**Pain scale**

☑ 4

**Describe Other pain:**

states "kidney, liver pain".

**Nausea/vomiting:**

☑ No

**Cough/SOB:**

☑ No

**Urinary Symptoms:**

☑ No

### Observation

**Did patient refuse vitals:**

☑ No vitals Refused

### Vital Signs

| Temperature: | Respiratory Rate: | O2 Sat: |
|---|---|---|

---

**Medical Observation Nursing Progress Record - HS-142.6**
Medical Observation Nursing Progress Record - HS-142.6

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** DOMINGUEZ, LIZETH **on** 09/21/2022 13:17:59

| 96.6 | 16 | 98 |
|------|----|----|
| **Pulse Rate:** | **Blood Pressure:** | **Weight:** |
| 88 | 97/71 | 132 |

**Alert & Oriented x 3:**

☑ Yes

**Speech slurred:**

☑ No

**Skin temperature (Cold, hot, warm, normal):**

Normal

**Skin:**

☑ Normal

**Heart- Regular Rate and Rhythm:**

☑ Yes

**Lung sounds (bilaterally):**

CTA

**Oxygen use:**

☑ No

**Abdomen- Normal:**

☑ Yes

**Bowel sounds:**

☑ Normal

**Last BM:**

3 to 4 days ago

**Last stool appearance (Color, consistency):**

☑ Normal

**Self-void:**

☑ Yes

**Foley:**

☑ No

**Incontinence of urine:**

☑ No

**Does the I/D/R have a wound:**

---

**Medical Observation Nursing Progress Record - HS-142.6**
Medical Observation Nursing Progress Record - HS-142.6

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** DOMINGUEZ, LIZETH **on** 09/21/2022 13:17:59

☑ No

**Edema:**

☑ No

**Does the I/D/R have an IV:**

☑ No

**Is I/D/R on Hunger Strike:**

☑ No

**Comments:**

Pt. has not ate breakfast. States he does not want to eat because he does not want to throw up. Pt. was encouraged to try to eat small amounts of food.

## Assessment

**Assessment:**

Inmate laying in bed before entering room. Detainee cooperative with assessment. VSS. UA dipstick completed- SG 1.030, ketones are now negative. Pt. reports "kidney, liver pain" pointing to lower back. Clear fluid and food particles noted in basin (pt. reports was from 8pm last night).

## Plan and Education

**Plan:**

Will continue to monitor as ordered.

**Education:**

Pt. educated that we are monitoring input and output. Pt. has a urinal and he emptied 300cc.

**Is this a discharge from the MOU:**

☑ No

**Interpreter Needed:**

Yes

**Interpreter Name and/or #:**

383944

### Save Log

| User Name | AuditDateAndTime |
|---|---|
| DOMINGUEZ, LIZETH, RN | 09/21/2022 13:17:59 |

### Signoff Comments List

| Approved By | Approved On | Signoff Note | Is Declined |
|---|---|---|---|
| WALKER, CARY, DO | 09/21/2022 14:53:20 | | False |

---

**Medical Observation Nursing Progress Record - HS-142.6**
Medical Observation Nursing Progress Record - HS-142.6

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** DOMINGUEZ, LIZETH **on** 09/21/2022 13:17:59

## SOAPE/Administrative Note

**Encounter Type:**

☑ Administrative Contact

**Person Completing Note:**

☑ Doctor

**Type of Note:**

☑ Administrative

### Administrative Note

**Administrative Note:**

Please give gatorade packets daily x 14 days. Please order BMP stat.

**Schedule follow-up with:**

☑ No follow-up needed

**Does Nursing need to review note for orders:**

☑ Yes

**Interpreter Needed:**

*NO ANSWER PROVIDED*

### Save Log

| User Name | AuditDateAndTime |
|---|---|
| WALKER, CARY, DO | 09/21/2022 10:56:01 |

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WALKER, CARY **on** 09/21/2022 10:56:01

## SOAPE/Administrative Note

**Encounter Type:**

☑ Administrative Contact

**Person Completing Note:**

☑ Nurse

**Type of Note:**

☑ Administrative

### Administrative Note

**Administrative Note:**

Detainee was observed by nurse Carstens eating his dinner yesterday 06/20/2022 at approximately 1630. Nurse Carstens informed this writer that she stood at detainee's door and watched him eat a sandwich and stated that he ate his sandwich rapidly as if he had not eaten in a long time. She also reported having seen him eating a bag of chips by the bathroom area in his room with no evidence of emesis afterword.

**Schedule follow-up with:**

☑ No follow-up needed

**Are there any orders that require Provider signoff:**

☑ No

**Interpreter Needed:**

*NO ANSWER PROVIDED*

### Save Log

| User Name | AuditDateAndTime |
|---|---|
| VILLA, DEBRA, | 09/21/2022 09:31:45 |

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** VILLA, DEBRA **on** 09/21/2022 09:31:45

## Medical Observation Nursing Progress Record - HS-142.6

### Subjective

**Is this an admission to the MOU:**

☑ No

    **Is this a continuation of the 24-hour observation:**

    ☑ Yes

**Is this a telephone round in the MOU:**

☑ No

**Subjective:**

*NO ANSWER PROVIDED*

**Chest pain:**

☑ No

**Abdominal pain:**

☑ No

**Other pain:**

☑ No

**Nausea/vomiting:**

☑ Yes

    **Describe Nausea/vomiting:**

    Detainee complaining of nausea and report one episode of emesis

**Cough/SOB:**

☑ No

**Urinary Symptoms:**

☑ No

### Observation

**Did patient refuse vitals:**

☑ No vitals Refused

### Vital Signs

| Temperature: | Respiratory Rate: | O2 Sat: |
|---|---|---|
| 97.3 | 16 | 95 |
| **Pulse Rate:** | **Blood Pressure:** | **Weight:** |

---

**Medical Observation Nursing Progress Record - HS-142.6**
Medical Observation Nursing Progress Record - HS-142.6

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** Harvey, Ebony **on** 09/20/2022 21:29:02

| 115 | 118/83 | 00 |

**Alert & Oriented x 3:**

☑ Yes

**Speech slurred:**

☑ No

**Skin temperature (Cold, hot, warm, normal):**

warm

**Skin:**

☑ Normal

**Heart- Regular Rate and Rhythm:**

☑ Yes

**Lung sounds (bilaterally):**

Clear

**Oxygen use:**

☑ No

**Abdomen- Normal:**

☑ Yes

**Bowel sounds:**

☑ Normal

**Last BM:**

12-3 days ago

**Last stool appearance (Color, consistency):**

☑ Normal

**Self-void:**

☑ Yes

**Foley:**

☑ No

**Incontinence of urine:**

☑ No

**Does the I/D/R have a wound:**

☑ No

**Edema:**

---

**Medical Observation Nursing Progress Record - HS-142.6**
Medical Observation Nursing Progress Record - HS-142.6

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** Harvey, Ebony **on** 09/20/2022 21:29:02

☑ No

**Does the I/D/R have an IV:**

☑ No

**Is I/D/R on Hunger Strike:**

☑ No

**Comments:**

Client was standing in room upon entrance in the room

## Assessment

**Assessment:**

Detainee complained of nausea at the time of the assessment and reported one episode of emesis following his last assessment. Client reports urinating x1 since arrival to medical observation and last bowel movement was 2-3 days ago.

## Plan and Education

**Plan:**

Monitor I&O's; daily weight; and collect specimen for UA.

**Education:**

Educated Detainee on using urinal to collect urine for specimen and measurement; using pink basin when vomiting to measure; take small sips of liquid when hydrating to prevent vomiting; and encouraged to eat smaller more frequent meals throughout the day to prevent vomiting

**Is this a discharge from the MOU:**

 No

**Interpreter Needed:**

 Yes

**Interpreter Name and/or #:**

218265

### Save Log

| User Name | AuditDateAndTime |
|---|---|
| Harvey, Ebony, | 09/20/2022 21:29:02 |

### Signoff Comments List

| Approved By | Approved On | Signoff Note | Is Declined |
|---|---|---|---|
| WALKER, CARY, DO | 09/21/2022 15:06:39 | | False |

---

**Medical Observation Nursing Progress Record - HS-142.6**
Medical Observation Nursing Progress Record - HS-142.6

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** Harvey, Ebony **on** 09/20/2022 21:29:02

## SOAPE/Administrative Note

**Encounter Type:**

☑ Administrative Contact

**Person Completing Note:**

☑ Doctor

**Type of Note:**

☑ Administrative

### Administrative Note

**Administrative Note:**

Pt brought down to MOU for recent 15 pound weight loss and medical claims of severe nose bleeds and N/V with meals. Orders as follows:

1. Keep in MOU with vitals qshift

2. Daily weight checks x 14 days

3. Daily UAs-> Notify provider if ketones present

4. Pt educated to show evidence of vomiting or nose bleeds. basin given

5. Record all missed meals

6. Strict Is and Os ( including % meal eaten. If none eaten record the missed meal.

7. OK for TV room and TV in room

8. CIPRO HC 0.2-1% OTIC SUSP -- [INSTILL 4 DROP(S) INTO THE LEFT EAR TWICE DAILY] - (9/14/2022 - 9/20/2022)

CRACKERS -- [GIVE 2 APPLICATION(S) ORAL TWICE DAILY] - (9/1/2022 - 10/30/2022)

ENSURE LIQUID 237ML -- [TAKE 1 APPLICATION(S) ORALLY TWICE DAILY] - (9/1/2022 - 10/1/2022)

FLUTICASONE 0.05% NASAL S (FLONASE) -- [INSTILL 1 SPRAY(S) INTO EACH NOSTRIL ONCE DAILY] - (9/20/2022 - 10/20/2022)

GABAPENTIN 600MG TABLET (NEURONTIN) -- [TAKE 1 TABLET(S) ORALLY THREE TIMES DAILY] - (8/31/2022 - 11/28/2022)

HEMORRHOIDAL OINTMENT (PREPARATION-H) -- [APPLY 1 APPLICATION(S) RECTALLY ONCE DAILY AS NEEDED] - (9/19/2022 - 9/25/2022)

HYDROXYZINE PAM 25MG CAP (VISTARIL) -- [TAKE 1 CAPSULE(S) ORALLY TWICE DAILY] - (9/14/2022 - 10/14/2022)

LISINOPRIL 20MG TABLET (PRINIVIL) -- [TAKE 1 TABLET(S) ORALLY ONCE DAILY] - (8/4/2022 - 11/1/2022)

MECLIZINE 12.5MG TABLET (ANTIVERT) -- [TAKE 1 TABLET(S) ORALLY TWICE DAILY] - (9/19/2022 - 10/19/2022)

OLANZAPINE 5MG TABLET (ZYPREXA) -- [TAKE 1 TABLET(S) ORALLY AT BEDTIME] - (9/16/2022 - 11/14/2022)

OMEPRAZOLE 20MG DR TAB (PRILOSEC) -- [TAKE 1 TABLET(S) ORALLY ONCE DAILY] - (9/20/2022 - 10/20/2022)

SENNA 8.6MG TABLET (SENOKOT) -- [TAKE 1 TABLET(S) ORALLY ONCE DAILY] - (9/19/2022 - 10/19/2022)

**Schedule follow-up with:**

 ☑ Doctor

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WALKER, CARY **on** 09/20/2022 16:48:10

## Doctor Follow-up

**Timeframe for follow-up with Medical Provider:**

☑ Next Day

**Does Nursing need to review note for orders:**

☑ Yes

**Interpreter Needed:**

☑ Yes

**Interpreter Name and/or #:**

377645

## Save Log

| User Name | AuditDateAndTime |
|---|---|
| WALKER, CARY, DO | 09/20/2022 16:48:10 |

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WALKER, CARY **on** 09/20/2022 16:48:10

## Verbal Order

**Medication Order(s) as reported by patient:**

  VO: Admitted medical.  Monitor following: QD vital signs, weight, UA, # of emisis, & nose bleeds. Also, difficulty swallowing liquids.

**Orders Received from Provider:**

  Dr. Walker

**Orders read back and verified x 2:**

  ☑ Yes

**Follow-up needed:**

  ☑ Follow-up as needed

### Save Log

| User Name | AuditDateAndTime |
|---|---|
| ROSS-PEARSON, DEIDRE, RN | 09/20/2022 14:55:25 |

### Signoff Comments List

| Approved By | Approved On | Signoff Note | Is Declined |
|---|---|---|---|
| WALKER, CARY, DO | 09/21/2022 15:10:12 | | False |

---

**Verbal Order**

For Nurse use in documenting telephone orders received from providers

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** ROSS-PEARSON, DEIDRE **on** 09/20/2022 14:55:25

## SOAPE/Administrative Note

**Encounter Type:**

☑ Face to Face

**Person Completing Note:**

☑ Nurse

**Type of Note:**

☑ SOAPE

**Is this an OBGYN encounter:**

☑ No

### SOAPE

**Subjective:**

Patient presents with c/o SOB, N/V, dizziness, and difficulty getting up and walking.

**Objective:**

Calm and cooperative with assessment. A&Ox3. Poor skin turgor. Pale complexion. Mild distress.

**Did patient refuse vitals:**

☑ No vitals refused

| Blood Pressure: | Temperature: | Pain Scale: |
|---|---|---|
| 114/77 | 98.0 | ☑ 0 |
| **Pulse:** | **Weight:** | |
| 112 | 130 | |
| **Respiratory Rate:** | **O2 SATS:** | |
| 20 | 98 | |

**Assessment:**

Patient presents with c/o N/V. States he has been experiencing N/V for about a month. More recently he has been vomiting any liquid he consumes, since yesterday at about lunch time. Patient appears anxious.

**Plan:**

Referred to PA Byrne. Patient to be sent to North medical for further assessment per PA Byrne.

**Education:**

Patient informed that he will be seen in North medical for further assessment.

**Schedule follow-up with:**

☑ No follow-up needed

**Are there any orders that require Provider signoff:**

☑ No

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** LEBOEUF, MICHAEL **on** 09/19/2022 13:31:10

**Interpreter Needed:**
*NO ANSWER PROVIDED*

## Save Log

| User Name | AuditDateAndTime |
|---|---|
| LEBOEUF, MICHAEL, RN | 09/19/2022 13:31:10 |
| LEBOEUF, MICHAEL, RN | 09/19/2022 11:19:26 |

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** LEBOEUF, MICHAEL **on** 09/19/2022 13:31:10

2 of 2

**330**

## Nursing Assessment Protocol - Dizziness

### Subjective

**\*If patient is unconscious, obtain above pertinent information from witness.**

**Is the patient being seen by an NP/PA:**

☑ Yes

**Chief Complaint (acute symptoms):**

"I feel like I could throw up.  I'm also so dizzy"

**Date at onset:**

09/18/22

**Time at onset:**

*NO ANSWER PROVIDED*

**Activity at onset:**

*NO ANSWER PROVIDED*

**Sick Call:**

*NO ANSWER PROVIDED*

**Allergies:**

NO KNOWN DRUG ALLERGY

**Pain Intensity:**

*NO ANSWER PROVIDED*

**Frequency:**

☑ Constant

**Contributing factors(i.e. hot room, sudden position change, current illness, recent injury or head trauma, sun exposure):**

*NO ANSWER PROVIDED*

**Medication (current or discontinued):**

AMOXICILLIN 500MG CAPSULE -- [TAKE 1 CAPSULE(S) ORALLY TWICE DAILY] -- 2022-09-14--2022-09-21
CIPRO HC 0.2-1% OTIC SUSP -- [INSTILL 4 DROP(S) INTO THE LEFT EAR TWICE DAILY] -- 2022-09-14--2022-09-20
CRACKERS -- [GIVE 2 APPLICATION(S) ORAL TWICE DAILY] -- 2022-09-01--2022-10-30
ENSURE LIQUID 237ML -- [TAKE 1 APPLICATION(S) ORALLY TWICE DAILY] -- 2022-09-01--2022-10-01
GABAPENTIN 600MG TABLET -- [TAKE 1 TABLET(S) ORALLY THREE TIMES DAILY] -- 2022-08-31--2022-11-28
HEMORRHOIDAL OINTMENT -- [APPLY 1 APPLICATION(S) RECTALLY ONCE DAILY AS NEEDED] -- 2022-09-19--2022-09-25
HYDROXYZINE PAM 25MG CAP -- [TAKE 1 CAPSULE(S) ORALLY TWICE DAILY] -- 2022-09-14--2022-10-14
LISINOPRIL 20MG TABLET -- [TAKE 1 TABLET(S) ORALLY ONCE DAILY] -- 2022-08-04--2022-11-01
MECLIZINE 12.5MG TABLET -- [TAKE 1 TABLET(S) ORALLY TWICE DAILY] -- 2022-09-19--2022-10-19
MECLIZINE 12.5MG TABLET -- [TAKE 1 TABLET(S) ORALLY ONCE DAILY] -- 2022-09-19--2022-09-20
MIRTAZAPINE 30MG TABLET -- [TAKE 1 TABLET(S) ORALLY AT BEDTIME] -- 2022-09-16--2022-11-14
OLANZAPINE 5MG TABLET -- [TAKE 1 TABLET(S) ORALLY AT BEDTIME] -- 2022-09-16--2022-11-14
SENNA 8.6MG TABLET -- [TAKE 1 TABLET(S) ORALLY ONCE DAILY] -- 2022-09-19--2022-10-19

**Loss of consciousness (how long):**

*NO ANSWER PROVIDED*

**Is fainting/dizziness related to movement of head-body:**

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** CARSTENS, JEAN M **on** 09/19/2022 12:38:07

☑ No

**Loss of hearing:**
☑ No loss of hearing

**Ringing in ears:**
☑ No Ringing in Ears

**Ear pain:**
☑ No Ear Pain

**Similar past problems:**
☑ Yes

> **Describe past problem(s):**
> Has had other issues with dizziness, nausea and multiple other issues

**What makes it worse:**
*NO ANSWER PROVIDED*

## Objective

**Did patient refuse vitals:**
☑ No vitals Refused

## Vitals

| | | |
|---|---|---|
| **Lying Blood Pressure:** | **O2Sat:** | **Standing Pulse Rate:** |
| 118/82 | 95 | 96 |
| **Lying Pulse Rate:** | **Sitting Blood Pressure:** | **Body Temp:** |
| 92 | 118/81 | 97.1 |
| **Respiratory Rate:** | **Sitting Pulse Rate:** | |
| 16 | 95 | |
| **Weight:** | **Standing Blood Pressure:** | |
| 130 | 116/78 | |

**Glucometer result (normal range 60-125):**
*NO ANSWER PROVIDED*

**Overall appearance of distress:**
☑ Moderate distress

**Respiratory rhythm:**
☑ Even

---

**Nursing Assessment Protocol - Dizziness**
GEO Group - Nursing Assessment Protocol - Dizziness/Fainting/Loss of
Consciousness

Patient Name: BOZKUS, SERHAT
Patient Number: 220712429
Location: ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** CARSTENS, JEAN M **on** 09/19/2022 12:38:07

2 of 5

**332**

**Heart sounds:**

☑ Regular

**Mental Status:**

Alert

**Orientation:**

x 4

## Pupils

### Right Pupil

| Size (mm): | Shape: | Reactivity: |
|---|---|---|
| *NO ANSWER PROVIDED* | *NO ANSWER PROVIDED* | *NO ANSWER PROVIDED* |

### Left Pupil

| Size (mm): | Shape: | Reactivity: |
|---|---|---|
| *NO ANSWER PROVIDED* | *NO ANSWER PROVIDED* | *NO ANSWER PROVIDED* |

**Gait:**

☑ Slightly unsteady

**Hand grips:**

☑ Equal

**Pedal pulses:**

☑ Yes

**Skin:**

☑ Pale

**Edema:**

☑ No

**Skin turgor:**

☑ normal

**Keep Mucosa moist:**

☑ Yes

**Right Ear:**

☑ Normal

**Left Ear:**

☑ Normal

**Tympanic membranes intact bilaterally:**

---

**Nursing Assessment Protocol - Dizziness**
GEO Group - Nursing Assessment Protocol - Dizziness/Fainting/Loss of
Consciousness

Patient Name: BOZKUS, SERHAT
Patient Number: 220712429
Location: ICE-ME-NA-NA-522-01-L
DOB: 1/1/1992
Facility: AURORA ICE PROCESSING CENTER
Electronically Signed By CARSTENS, JEAN M on 09/19/2022 12:38:07

3 of 5

**333**

☑Yes

## Assessment

**Assessment:**

Slightly unsteady when walking, Hair very messy. Also c/o nausea, stated he was going to vomit but didn't. States he can't squeeze his left hand "like other people can" Hand grasps strong and equal. After giving Antivert 12.5mg PO, detainee requested to go back to his room

## Plan

**Plan:**

*NO ANSWER PROVIDED*

**Passes/referrals given:**

☑No

**Are there any additional orders not listed in the Plan Section above:**

☑Yes

    **Specify additional orders:**

    Antivert reordered and given

**Does a nurse need to review for orders:**

☑No

## Education

**Education Provided:**

☑Instructed patient to return to medical if symptoms persist or worsen.

☑Patient verablized understanding of above instructions.

## Referral

**Is a referral needed:**

☑No

**Is this an after hours emergency:**

☑No

**Interpreter Needed:**

☑Yes

    **Interpreter Name and/or #:**

    382286

---

**Nursing Assessment Protocol - Dizziness**
GEO Group - Nursing Assessment Protocol - Dizziness/Fainting/Loss of Consciousness

Patient Name: BOZKUS, SERHAT
Patient Number: 220712429
Location: ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** CARSTENS, JEAN M **on** 09/19/2022 12:38:07

**\*If patient is unconscious, obtain below pertinent information from witness.**

## Save Log

| User Name | AuditDateAndTime |
|---|---|
| CARSTENS, JEAN M, RN | 09/19/2022 12:38:07 |

**Nursing Assessment Protocol - Dizziness**
GEO Group - Nursing Assessment Protocol - Dizziness/Fainting/Loss of Consciousness

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** CARSTENS, JEAN M **on** 09/19/2022 12:38:07

## Visual Acuity - HS-188

**Date:**

09/14/2022

**Select Jurisdiction:**

☑ ICE/USMS

## Distant Vision

| **OD:** | **OS:** | **OU:** |
|---|---|---|
| 20/40 | 20/40 | 20/50 |

## Near Vision

| **OD:** | **OS:** | **OU:** |
|---|---|---|
| *NO ANSWER PROVIDED* | *NO ANSWER PROVIDED* | *NO ANSWER PROVIDED* |

## Distant Vision with glasses

| **OD:** | **OS:** | **OU:** |
|---|---|---|
| *NO ANSWER PROVIDED* | *NO ANSWER PROVIDED* | *NO ANSWER PROVIDED* |

## Near Vision with glasses

| **OD:** | **OS:** | **OU:** |
|---|---|---|
| *NO ANSWER PROVIDED* | *NO ANSWER PROVIDED* | *NO ANSWER PROVIDED* |

**Refer to MD/PA/NP for possible Optometry Consult:**

☑ Yes

**Interpreter Needed:**

*NO ANSWER PROVIDED*

## Save Log

| User Name | AuditDateAndTime |
|---|---|
| CARDENAS MELENDREZ, ANGELICA, RN | 09/14/2022 12:47:02 |

**Visual Acuity - HS-188**
Visual Acuity - HS-188

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** CARDENAS MELENDREZ, ANGELICA **on** 09/14/2022 12:47:02

1 of 1

**336**

## SOAPE/Administrative Note

**Encounter Type:**

☑ Face to Face

**Person Completing Note:**

☑ Doctor

**Type of Note:**

☑ SOAPE

**Is this an OBGYN encounter:**

☑ N/A

### SOAPE

**Subjective:**

Pt is here for ongoing vision problems as well as L ear pain. He has noted h/o L TM rupture 2 weeks PTA. He also says he is extremely anxious.

**Objective:**

NAD, A+Ox3

RRR, No M/G/R

CTAB, non-labored

appropriate affect

PERRLA, EOMI

L ear with TM rupture and white purulent drainage.

Abd soft, non-tender, no hernias or masses

L eye 20/50 ,  R eye 20/50 ,  both 20/40

**Did patient refuse vitals:**

☑ No vitals refused

| Blood Pressure: | Temperature: | Pain Scale: |
|---|---|---|
| 114/76 | 98.3 | ☑ 0 |
| **Pulse:** | **Weight:** | |
| 102 | 138 | |
| **Respiratory Rate:** | **O2 SATS:** | |
| 17 | 96 | |

**Assessment:**

# Poor vision

# L otitis externa

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WALKER, CARY **on** 09/14/2022 12:42:46

# Anxiety

**Plan:**

1. Start hydroxyzine 25mg PO BID x 30 days

2. Start AMOXICILLIN 500MG CAPSULE (AMOXIL) -- [TAKE 1 CAPSULE(S) ORALLY TWICE DAILY] - (9/14/2022 - 9/21/2022)

3. Start CIPRO HC 0.2-1% OTIC SUSP -- [INSTILL 4 DROP(S) INTO THE LEFT EAR TWICE DAILY] - (9/14/2022 - 9/20/2022)

4. Stop weight checks

5. f/u in 14 days

**Education:**

**Schedule follow-up with:**

☑ Doctor

### Doctor Follow-up

**Timeframe for follow-up with Medical Provider:**

☑ 14 Days

**Does Nursing need to review note for orders:**

☑ Yes

**Interpreter Needed:**

☑ Yes

**Interpreter Name and/or #:**

385387

## Save Log

| User Name | AuditDateAndTime |
|---|---|
| WALKER, CARY, DO | 09/14/2022 12:42:46 |
| CARDENAS MELENDREZ, ANGELICA, RN | 09/14/2022 12:20:06 |

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WALKER, CARY **on** 09/14/2022 12:42:46

## Nursing Assessment Protocol - Constipation

### Subjective

**Is the patient being seen by an NP/PA:**

☑ No

**Date:**

09/12/2022

**Chief Complaint:**

Constipation

**Allergies:**

NO KNOWN DRUG ALLERGY

**Current Medications:**

CRACKERS -- [GIVE 2 APPLICATION(S) ORAL TWICE DAILY] -- 2022-09-01--2022-10-30
ENSURE LIQUID 237ML -- [TAKE 1 APPLICATION(S) ORALLY TWICE DAILY] -- 2022-09-01--2022-10-01
FLUTICASONE 0.05% NASAL S -- [INSTILL 1 SPRAY(S) INTO EACH NOSTRIL ONCE DAILY] -- 2022-08-16--2022-09-15
GABAPENTIN 600MG TABLET -- [TAKE 1 TABLET(S) ORALLY THREE TIMES DAILY] -- 2022-08-31--2022-11-28
LISINOPRIL 20MG TABLET -- [TAKE 1 TABLET(S) ORALLY ONCE DAILY] -- 2022-08-04--2022-11-01
MECLIZINE 12.5MG TABLET -- [TAKE 1 TABLET(S) ORALLY TWICE DAILY] -- 2022-08-18--2022-09-17
MIRTAZAPINE 15MG TABLET -- [TAKE 1 1/2 TABLET(S) ORALLY AT BEDTIME TOTAL 22.5MG @ HS] -- 2022-09-06--2022-11-04
OLANZAPINE 5MG TABLET -- [TAKE 1 TABLET(S) ORALLY AT BEDTIME] -- 2022-09-06--2022-11-04
SUCRALFATE 1GM TABLET -- [TAKE 1 TABLET(S) ORALLY THREE TIMES DAILY] -- 2022-09-02--2022-09-15

**History of:**

*NO ANSWER PROVIDED*

**Pain:**

☑ No

**Flatus:**

☑ No

### Bowel Movement

| **Last BM:** | **Amount:** |
| --- | --- |
| 09/10/2022 | small |
| **Consistency:** | **Description of Stool:** |
| hard | *NO ANSWER PROVIDED* |

**Liquid diarrhea noted when attemtping BM?**

☑ No

**Blood in Stool:**

☑ Yes

    **Describe color:**

    *NO ANSWER PROVIDED*

---

**Nursing Assessment Protocol - Constipation**
GEO Group-Constipation Protocol (Mack Example)

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** BANGALA, CATHERINE **on** 09/12/2022 14:59:47

**How much:**

per detainee : "small amount of blood noted when swiping".

**Hemoccult Results:**

Card given

**Nausea:**

☑ No

**Vomiting:**

☑ No

**Urinary frequency:**

Normal

**Low back pain:**

☑ No

## Dietary Habits

**Fat Intake:**

*NO ANSWER PROVIDED*

**Alcohol Intake:**

*NO ANSWER PROVIDED*

**Caffeine Intake:**

n/a

**Smoking Habits:**

n/a

## Objective

**Did patient refuse vitals:**

☑ No vitals Refused

## Vitals

| Blood Pressure: | Pulse Rate: | Respiratory Rate: |
|---|---|---|
| 132/92 | 89 | 16 |
| **Temperature:** | **Weight:** | **SaO2:** |
| 97.8 | 139 | 95 |

**Bowel Sounds:**

☑ Normal

---

**Nursing Assessment Protocol - Constipation**
GEO Group-Constipation Protocol (Mack Example)

Patient Name: BOZKUS, SERHAT
Patient Number: 220712429
Location: ICE-ME-NA-NA-522-01-L
DOB: 1/1/1992
Facility: AURORA ICE PROCESSING CENTER
Electronically Signed By BANGALA, CATHERINE on 09/12/2022 14:59:47

**Guarding:**

☑ No

**Palpate abdomen distended:**

☑ No

**Rebound Tenderness:**

*NO ANSWER PROVIDED*

**Jaundice:**

☑ No

**More Comfortable:**

☑ Sitting

**Able to sit still:**

☑ Yes

**Skin Turgor:**

☑ Normal

**Evidence of dehydration/GI Bleeding:**

☑ No

**Overall Appearance:**

☑ No acute distress

## Assessment

**Assessment:**

Detainee c/o constipation. Detainee verbalized seeing blood in stool. Hem occult card give. Referral to be made if Positive hem occult cart.

## Plan

**Plan:**

☑ 1. Patient given Dulcolax

☑ 2. Patient given Colace

☑ 3. Patient given Milk of Magnesia

**Are there any additional orders not listed in Plan Section above:**

☑ No

**Does a nurse need to review for orders:**

☑ No

---

**Nursing Assessment Protocol - Constipation**
GEO Group-Constipation Protocol (Mack Example)

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** BANGALA, CATHERINE **on** 09/12/2022 14:59:47

## Education

**Education Provided:**

☑ 1. Increase fluid intake (unless on fluid instructed diet)

☑ 2. Choose high fiber food i.e. salad, fruits, vegetables, whole grain bread.

☑ 3. Try to set a regular time for BM.

☑ 4. Encourage activity/exercise.

☑ 5. Patient verbalized understanding of above instructions.

## Referral

**Is a referral needed:**

☑ No

**Is this an after hours emergency:**

☑ No

**Interpreter Needed:**

*NO ANSWER PROVIDED*

## Save Log

| User Name | AuditDateAndTime |
|---|---|
| BANGALA, CATHERINE, LPN | 09/12/2022 14:59:47 |

**Nursing Assessment Protocol - Constipation**
GEO Group-Constipation Protocol (Mack Example)

Patient Name: BOZKUS, SERHAT
Patient Number: 220712429
Location: ICE-ME-NA-NA-522-01-L
DOB: 1/1/1992
Facility: AURORA ICE PROCESSING CENTER
Electronically Signed By BANGALA, CATHERINE on 09/12/2022 14:59:47

4 of 4

**342**

## SOAPE/Administrative Note

**Encounter Type:**

☑ Face to Face

**Person Completing Note:**

☑ Mental Health

**Type of Note:**

☑ SOAPE

### SOAPE

**Purpose of encounter:**

**MENTAL HEATH / RTC**

**Subjective:**

This patient was seen today for a mental health RTC.  As with his previous encounters, he reported that he is still having difficulties with nightmares and eating/vomiting and continues to lose weight. A review of his records indicated that he has ordered snacks with meds and an extra sack lunch. His record indicated that nursing / medical are following him closely regarding this issue with eating and vomiting. As with previous encounters, this patient continues to focus on things outside of his control, such as when he is going to be released, and comparing himself to others who have already been released. This clinician again worked with this patient on focusing on that which he can control and not focusing on things outside of his control. This clinician encouraged this patient to engaged in positive and purposeful thinking for for self-betterment. This clinician also encouraged him to apply this to his eating.  He stated that he would continue to try and do this. He reported to be taking his psychotropic medications as prescribed. His record corroborated his report. He denied any dangerous ideations at this time, nor any perceptual disturbance. He did not have anything further to process today. This clinician educated this patient to kite mental health if he needs to be seen and to alert security staff in case of mental health emergency.

**Objective:**

This patient presented as alert and oriented. He was disheveled with his hair and dressed in the appropriate uniform. His mood was anxious and his affect was tense. His mood and affect were congruent. He was cooperative and respectful towards this clinician. He stated that he has been vomiting at every meal and so he has not been eating much. However, he stated that he continues having nightmares, but is sleeping. He made no unusual movements during the course of this interview. He appeared to be goal-directed and logical in his thought process, with no evidence of thought disorder. His speech was of normal rhythm, rate, tone, volume, responsiveness, and prosody. His cognition (memory and concentration) appeared to be intact. He presented with good insight and judgment. His intelligence appeared to be average. He denied experience any dangerous ideations at this time (i.e., suicidal/homicidal), nor any perceptual disturbance. He made no reference to any PREA risk related issues at this time. He made no mention of feeling unsafe where he was currently housed and that no one is attempting to exploit them.

### Brief Mental Status Exam

**Appearance:**

☑ Appropriately dressed   ☑ Poorly groomed

**Eye Contact:**

☑ Good

**Attitude:**

☑ Calm and cooperative

**Behavior:**

☑ No unusual movements or psychomotor changes

**Appetite:**

☑ Decreased

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE **on** 09/09/2022 19:05:50

**Sleep:**
- ☑ Decreased    ☑ Other

    **Describe Sleep:**
       continued nightmares.

**Speech:**
- ☑ Normal rate/tone/volume w/o pressure

**Affect:**
- ☑ Constricted

**Mood:**
- ☑ Anxious    ☑ Depressed

**Thought Process:**
- ☑ Goal-directed and logical

**Suicidal Ideation:**
- ☑ None

**Homicidal Ideation:**
- ☑ None

**Thought Content:**
- ☑ WNL

**Perception:**
- ☑ No hallucinations or delusions during interview

**Alert:**
- ☑ Fully

**Oriented to Time, Place, Person, and Situation:**
- ☑ Yes

**Memory/Concentration:**
- ☑ Short term intact    ☑ Long term intact

**Insight/Judgment:**
- ☑ Good

**Estimated IQ:**
- ☑ Average

**Did patient refuse vitals:**
*NO ANSWER PROVIDED*

**Assessment/DSM-5 Diagnosis (include rationale for diagnosis):**

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE **on** 09/09/2022 19:05:50

F33.0 - MAJOR DEPRESSIVE DISORDER, RECURRENT, MILD - [MCGUIRE, COLLEEN] - 2022-08-02

309.81 - POSTTRAUMATIC STRESS DISORDER - [WILLSON, BRYCE] - 2022-08-05

**Plan:**

**RECOMMENDATIONS:**

1.) This patient will be scheduled for a follow-up with mental health in 1 week to check on his well-being.

2.) This patient will continue with psychiatric clinic as already constituted.

3.) This patient will continue with this treatment plan as already constituted.

4.) This patient will kite mental health if he needs to be seen and will alert security staff in case of a mental health emergency.

5.) This patient is cleared for general population from a mental health standpoint.

6.) This patient will continue with nursing as already established regarding his inability to eat and vomiting every time he eats. NURSING PLEASE FOLLOW-UP WITHT HIS PATIENT REGARDING THIS ISSUE.

**Education:**

This patient was educated and/or previously educated with regard to the kite system and how to contact mental health, and to alert security staff in case of a mental health emergency. This patient was also given a Mental Health Card' with this clinician's name and title and instructions to show the card to security staff if he had a mental health emergency.

**Recommend placement under observation due to psychotic symptoms or other severe psychiatric symptoms without present suicide risk:**
☑ Not necessary

**Schedule follow-up with:**
☑ Mental Health

> ### Mental Health
>
> **Timeframe for follow-up with Mental Health:**
> ☑ 14 Days

**Does Nursing need to review note for orders:**
☑ Yes

**Interpreter Needed:**
☑ Yes

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE on 09/09/2022 19:05:50

**Interpreter Name and/or #:**

395568

## Save Log

| User Name | AuditDateAndTime |
|---|---|
| WILLSON, BRYCE, PHD | 09/09/2022 19:05:50 |

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE **on** 09/09/2022 19:05:50

## Telemental Health Progress Notes - HS-166.1

**Is I/D/R refusing:**

☑ No

**Jurisdiction:**

☑ ICE/USMS

**Does the AIMS form need completed:**

☑ No

| | |
|---|---|
| **Location (city, state) of telemental health provider which is provided to I/D/R at the beginning of the session:** | **Other staff member(s) participating in session:** |
| Littleton | Nat RN |

**Check each box below as reviewed with patient and/or completed:**

☑ The confidentiality of this visit    ☑ That this visit is not being taped and/or recorded    ☑ A Mental Health Consent was signed

**Reason for mental health encounter and objectives:**

f/u

### Subjective

**Subjective:**

Patient seen, chart reviewed. he reports that he is doing ok, thinks that his mood is better with the meds, though still depressed. He states his "conscious is always awake." He reports that he is feeling sad and anxious. He has spoken to his family though has not talked to them about his current situation-mood issues. He states he is not having suicidal thoughts. He states he is talking to himself. He is interested in a med increase to target his on and off mood issues. He states his appetite is low, he HAS lost weight, does have ensure 2 times a day. he reports that he feels nauseated when he eats.

-no med SE

-no new medical issues besides above


-no safety concerns

### Objective

**Current Medications:**

CRACKERS -- [GIVE 2 APPLICATION(S) ORAL TWICE DAILY] -- 2022-09-01--2022-10-30
ENSURE LIQUID 237ML -- [TAKE 1 APPLICATION(S) ORALLY TWICE DAILY] -- 2022-09-01--2022-10-01
FLUTICASONE 0.05% NASAL S -- [INSTILL 1 SPRAY(S) INTO EACH NOSTRIL ONCE DAILY] -- 2022-08-16--2022-09-15
GABAPENTIN 600MG TABLET -- [TAKE 1 TABLET(S) ORALLY THREE TIMES DAILY] -- 2022-08-31--2022-11-28
LISINOPRIL 20MG TABLET -- [TAKE 1 TABLET(S) ORALLY ONCE DAILY] -- 2022-08-04--2022-11-01
MECLIZINE 12.5MG TABLET -- [TAKE 1 TABLET(S) ORALLY TWICE DAILY] -- 2022-08-18--2022-09-17
MIRTAZAPINE 15MG TABLET -- [TAKE 1 TABLET(S) ORALLY AT BEDTIME] -- 2022-08-09--2022-10-07
OLANZAPINE 2.5MG TABLET -- [TAKE 1 TABLET(S) ORALLY AT BEDTIME] -- 2022-08-09--2022-10-07
SUCRALFATE 1GM TABLET -- [TAKE 1 TABLET(S) ORALLY THREE TIMES DAILY] -- 2022-09-02--2022-09-15

#### Brief Mental Status Exam

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** MCGUIRE, COLLEEN **on** 09/06/2022 12:54:40

**Alert:**
☑ Fully

**Oriented to Time, Place, Person, and Situation:**
☑ Yes

**Appearance:**
☑ Well groomed

**Eye Contact:**
☑ Poor

**Attitude:**
☑ Calm and cooperative

**Behavior:**
☑ No unusual movements or psychomotor changes

**Appetite:**
☑ Decreased

**Sleep:**
☑ Decreased

**Speech:**
☑ Normal rate/tone/volume w/o pressure

**Affect:**
☑ Normal range

**Mood:**
☑ Anxious

**Thought Process:**
☑ Goal-directed and logical

**Suicidal Ideation:**
☑ None

**Homicidal Ideation:**
☑ None

**Thought Content:**
☑ WNL

**Perception:**
☑ No hallucinations or delusions during interview

**Memory/Concentration:**
☑ Short term intact

---

**Telemental Health Progress Notes - HS-166.1**
Telemental Health Progress Notes - HS-166.1

Patient Name: BOZKUS, SERHAT
Patient Number: 220712429
Location: ICE-ME-NA-NA-522-01-L
DOB: 1/1/1992
Facility: AURORA ICE PROCESSING CENTER
Electronically Signed By MCGUIRE, COLLEEN on 09/06/2022 12:54:40

**348**

**Insight/Judgment:**
☑ Fair

**Estimated IQ:**
☑ Average

## Assessment

**DSM-5 Diagnosis with Rationale:**

C - 309.81: Posttraumatic stress disorder
A - 300.00: ANXIETY STATE UNSPECIFIED
N - F33.0: Major depressive disorder, recurrent, mild

## Plan

**Treatment recommendations:**

-increase remeron to 22.5 mg po qhs to target mood and appetite

-increase zyprexa to 5 mg po qhs to target mood and appetite

-will remind medical team of this situation with his weight, though they are aware and treating

-med orders for 60 days

-labs reviewed

-no abnormal movements on report or interview

-monitor weight and appetite

-encouraged increase in food intake, and hydration

**Curent suicidal ideation:**
☑ No

**Recommend placement under continuous observation in approved cell due to suicide risk (Level 1):**
☑ No

**Do medications need adjusted:**
☑ Yes

    **Specify medications needing adjusted:**

---

**Telemental Health Progress Notes - HS-166.1**
Telemental Health Progress Notes - HS-166.1

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** MCGUIRE, COLLEEN on 09/06/2022 12:54:40

as per above

**Follow-up Needed:**

☑Yes

    **Follow-up needed with:**

    ☑Psychiatry

        **Timeframe for follow-up with Psychiatry:**

        ☑14 Days

**Does Nursing need to review the form:**

☑No

## Education

**I/D/R provided education on the following:**

-r/b of medications discussed-including increasing

-how to access Mh in case of emergency

**Interpreter Needed:**

☑Yes

    **Interpreter Name and/or #:**

    385205

## Save Log

| User Name | AuditDateAndTime |
|---|---|
| MCGUIRE, COLLEEN, DO | 09/06/2022 12:54:40 |
| MCGUIRE, COLLEEN, DO | 09/06/2022 12:42:17 |

## Signoff Comments List

| Approved By | Approved On | Signoff Note | Is Declined |
|---|---|---|---|
| MCGUIRE, COLLEEN, DO | 09/06/2022 12:54:40 | Form Processed Approval | False |

---

**Telemental Health Progress Notes - HS-166.1**

Telemental Health Progress Notes - HS-166.1

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** MCGUIRE, COLLEEN on 09/06/2022 12:54:40

## SOAPE/Administrative Note

**Encounter Type:**

☑ Face to Face

**Person Completing Note:**

☑ Mental Health

**Type of Note:**

☑ SOAPE

### SOAPE

**Purpose of encounter:**

**MENTAL HEATH / RTC**

**Subjective:**

This patient was seen today for a mental health RTC. He reported that he is still having difficulties with nightmares and eating/vomiting and continues to lose weight. His record indicates that he was seen yesterday by Dr. Walker who has ordered snacks with meds and an extra sack lunch. His record indicated that nursing / medical are following him closely regarding this issue with eating and vomiting. This patient continues to focus on things outside of his control, such as when he is going to be released. This clinician again worked with this patient on focusing on that which he can control and not focusing on things outside of his control. This clinician encouraged this patient to engaged in positive and purposeful thinking for for self-betterment. He stated that he would continue to try and do this. He reported to be taking his psychotropic medications as prescribed. His record corroborated his report. He denied any dangerous ideations at this time, nor any perceptual disturbance. He did not have anything further to process today. This clinician educated this patient to kite mental health if he needs to be seen and to alert security staff in case of mental health emergency.

**Objective:**

This patient presented as alert and oriented. He was disheveled with his hair and dressed in the appropriate uniform. His mood was anxious and his affect was tense. His mood and affect were congruent. He was cooperative and respectful towards this clinician. He stated that he has been vomiting at every meal and so he has not been eating much. However, he stated that he continues having nightmares, but is sleeping. He made no unusual movements during the course of this interview. He appeared to be goal-directed and logical in his thought process, with no evidence of thought disorder. His speech was of normal rhythm, rate, tone, volume, responsiveness, and prosody. His cognition (memory and concentration) appeared to be intact. He presented with good insight and judgment. His intelligence appeared to be average. He denied experience any dangerous ideations at this time (i.e., suicidal/homicidal), nor any perceptual disturbance. He made no reference to any PREA risk related issues at this time. He made no mention of feeling unsafe where he was currently housed and that no one is attempting to exploit them.

### Brief Mental Status Exam

**Appearance:**

☑ Appropriately dressed  ☑ Poorly groomed  ☑ Poor hygiene

**Eye Contact:**

☑ Good

**Attitude:**

☑ Calm and cooperative

**Behavior:**

☑ No unusual movements or psychomotor changes

**Appetite:**

☑ Decreased

---

**SOAPE/Administrative Note**

SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE **on** 09/02/2022 19:11:09

**Sleep:**
☑ WNL

**Speech:**
☑ Normal rate/tone/volume w/o pressure

**Affect:**
☑ Blunted

**Mood:**
☑ Anxious    ☑ Depressed

**Thought Process:**
☑ Goal-directed and logical

**Suicidal Ideation:**
☑ None

**Homicidal Ideation:**
☑ None

**Thought Content:**
☑ WNL

**Perception:**
☑ No hallucinations or delusions during interview

**Alert:**
☑ Fully

**Oriented to Time, Place, Person, and Situation:**
☑ Yes

**Memory/Concentration:**
☑ Short term intact    ☑ Long term intact

**Insight/Judgment:**
☑ Fair

**Estimated IQ:**
☑ Average

**Did patient refuse vitals:**
*NO ANSWER PROVIDED*

**Assessment/DSM-5 Diagnosis (include rationale for diagnosis):**

300.00 - ANXIETY STATE UNSPECIFIED - [WALKER, CARY] - 2022-07-20

F33.0 - MAJOR DEPRESSIVE DISORDER, RECURRENT, MILD - [MCGUIRE, COLLEEN] - 2022-08-02

309.81 - POSTTRAUMATIC STRESS DISORDER - [WILLSON, BRYCE] - 2022-08-05

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE **on** 09/02/2022 19:11:09

**Plan:**

**RECOMMENDATIONS:**

1.) This patient will be scheduled for a follow-up with mental health in 1 week to check on his well-being.

2.) This patient will continue with psychiatric clinic as already constituted.

3.) This patient will continue with this treatment plan as already constituted.

4.) This patient will kite mental health if he needs to be seen and will alert security staff in case of a mental health emergency.

5.) This patient is cleared for general population from a mental health standpoint.

6.) This patient will continue with nursing as already established regarding his inability to eat and vomiting every time he eats. NURSING PLEASE FOLLOW-UP WITHT HIS PATIENT REGARDING THIS ISSUE.

**Education:**

This patient was educated and/or previously educated with regard to the kite system and how to contact mental health, and to alert security staff in case of a mental health emergency. This patient was also given a Mental Health Card' with this clinician's name and title and instructions to show the card to security staff if he had a mental health emergency.

**Recommend placement under observation due to psychotic symptoms or other severe psychiatric symptoms without present suicide risk:**

☑ Not necessary

**Schedule follow-up with:**

☑ Mental Health

### Mental Health

**Timeframe for follow-up with Mental Health:**

☑ 7 Days

**Does Nursing need to review note for orders:**

☑ Yes

**Interpreter Needed:**

☑ Yes

**Interpreter Name and/or #:**

BROW

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE **on** 09/02/2022 19:11:09

3 of 4

**353**

## Save Log

| User Name | AuditDateAndTime |
|---|---|
| WILLSON, BRYCE, PHD | 09/02/2022 19:11:09 |
| WILLSON, BRYCE, PHD | 09/02/2022 18:17:15 |

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WILLSON, BRYCE **on** 09/02/2022 19:11:09

## Therapeutic Diet Order

**Verified Documented Food Allergy (specify):**

*NO ANSWER PROVIDED*

**Diet Order (check one):**

*NO ANSWER PROVIDED*

**Comments:**

  sack lunch x 30 days per MD Walker

**Interpreter Needed:**

*NO ANSWER PROVIDED*

<mark>ICE Facilities Maximum 90 Days</mark>

<mark>All other clients Maximum 180 Days</mark>

<div align="center">

## Save Log

</div>

| User Name | AuditDateAndTime |
|---|---|
| CARDENAS MELENDREZ, ANGELICA, RN | 09/01/2022 12:31:41 |

**Therapeutic Diet Order**
Therapeutic Diet Order

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** CARDENAS MELENDREZ, ANGELICA **on**
09/01/2022 12:31:41

1 of 1

**355**

## SOAPE/Administrative Note

**Encounter Type:**

☑ Face to Face

**Person Completing Note:**

☑ Doctor

**Type of Note:**

☑ SOAPE

**Is this an OBGYN encounter:**

☑ N/A

### SOAPE

**Subjective:**

Pt is here today with c/o nausea after meals for the past 2 weeks. He will often vomit up his food. 10 pound weight loss since last visit noted. He has had this issue in the past , but now it is worse. He denies fevers, chills, abdominal pain, chest pain , or reflux

**Objective:**

NAD, A+Ox3

RRR, No M/G/R

CTAB, non-labored

appropriate affect

PERRLA, EOMI

normocephalic

Abd soft, non-tender, no hernias or masses

**Did patient refuse vitals:**

☑ No vitals refused

| **Blood Pressure:** | **Temperature:** | **Pain Scale:** |
|---|---|---|
| 127/86 | 97.6 | ☑ 0 |
| **Pulse:** | **Weight:** | |
| 79 | 139 | |
| **Respiratory Rate:** | **O2 SATS:** | |
| 17 | 94 | |

**Assessment:**

# Gastritis- suspect viral vs medication induced on empty stomache

# Recent 10 pound weight loss

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WALKER, CARY **on** 09/01/2022 09:04:51

1 of 2

**356**

**Plan:**

1. Ok for crackers with meds x 60 days

2. Start sack lunch x 30 days

3. Weekly weight checks x 30 days

4. Start sulcrafate 1gm POI TID x 14 days

5. f/u in 30 days

6. Renew ENSURE LIQUID 237ML -- [TAKE 1 APPLICATION(S) ORALLY TWICE DAILY] x 30 days

**Education:**

**Schedule follow-up with:**

Doctor

### Doctor Follow-up

**Timeframe for follow-up with Medical Provider:**

☑ 30 Days

**Does Nursing need to review note for orders:**

☑ Yes

**Interpreter Needed:**

☑ Yes

**Interpreter Name and/or #:**

377236

## Save Log

| User Name | AuditDateAndTime |
|---|---|
| WALKER, CARY, DO | 09/01/2022 09:04:51 |
| CARDENAS MELENDREZ, ANGELICA, RN | 09/01/2022 08:46:42 |

---

**SOAPE/Administrative Note**
SOAPE and Administrative note for Medical Providers or Nurses

**Patient Name:** BOZKUS, SERHAT
**Patient Number:** 220712429
**Location:** ICE-ME-NA-NA-522-01-L
**DOB:** 1/1/1992
**Facility:** AURORA ICE PROCESSING CENTER
**Electronically Signed By** WALKER, CARY **on** 09/01/2022 09:04:51

No Patient Activity Restrictions Available.

**Patient Activity Restrictions Report**

**Facility:**    COAI - AURORA ICE PROCESSING CENTER
**Created By:**    CINCOTTA, CYNTHIA
**Created On:**    09/23/2022 11:49:05 AM

1 of 1

358

No TB Results Indicated

**Patient TB Report**

Facility: COAI - AURORA ICE PROCESSING CENTER

Created By: CINCOTTA, CYNTHIA

Created On: 09/23/2022 11:49:05 AM

1 of 1

**359**

| Document Date | Document Name | Group | Category | Created By |
|---|---|---|---|---|
| 9/20/2022 11:26:21 AM | MEDICAL RECORDS REQUESTED, EMAILED TO REQUESTING ATTORNEY 148 pages | Medical | Medical | CINCOTTA, CYNTHIA, MRC |
| 9/21/2022 7:12:58 PM | KOP MEDICATION SIGN OUT SHEET - SEE ATTACHED LIST OF MEDICATIONS | Medical | Medication | GAYESKI, MARIZA, MRC |
| 9/22/2022 10:26:13 AM | Labcorp results | Medical | Laboratory | CINCOTTA, CYNTHIA, MRC |

**Patient Document Upload Summary**

**Facility:**     COAI - AURORA ICE PROCESSING CENTER

**Created By:**   CINCOTTA, CYNTHIA

**Created On:**   9/23/2022 11:49:05 AM

**360**

## Patient Report



**Specimen ID:** 264-027-0018-0
**Control ID:** 341127

**Acct #:** 05000045    **Phone:** (303) 361-6612    **Rte:** SD

AURORA DETENTION CENTER ICE
11901 East 30TH AVE
Aurora CO 80010

**BOZKUS, SERHAT**
3130 NORTH OAKLAND STREET
AURORA CO 80010
(303) 739-6652

| Patient Details | Specimen Details | Physician Details |
|---|---|---|
| **DOB:** 01/01/1992 | **Date collected:** 09/21/2022 1200 Local | **Ordering:** C WALKER |
| **Age(y/m/d):** 030/08/20 | **Date received:** 09/21/2022 | **Referring:** |
| **Gender:** M | **Date entered:** 09/21/2022 | **ID:** |
| **Patient ID:** 3893791 | **Date reported:** 09/21/2022 0000 ET | **NPI:** 1003201120 |

**General Comments & Additional Information**
Alternate Control Number: 341127                                Alternate Patient ID: 220712429

**Ordered Items**
CBC With Differential/Platelet; Basic Metabolic Panel (8); Travel Fee; Stat Service

| TESTS | RESULT | FLAG | UNITS | REFERENCE INTERVAL | LAB |
|---|---|---|---|---|---|
| **CBC With Differential/Platelet** | | | | | |
| WBC | 4.4 | | x10E3/uL | 3.4-10.8 | 01 |
| **RBC** | **5.85** | **High** | x10E6/uL | 4.14-5.80 | 01 |
| Hemoglobin | 16.5 | | g/dL | 13.0-17.7 | 01 |
| Hematocrit | 49.4 | | % | 37.5-51.0 | 01 |
| MCV | 84 | | fL | 79-97 | 01 |
| MCH | 28.2 | | pg | 26.6-33.0 | 01 |
| MCHC | 33.4 | | g/dL | 31.5-35.7 | 01 |
| RDW | 13.0 | | % | 11.6-15.4 | 01 |
| Platelets | 284 | | x10E3/uL | 150-450 | 01 |
| Neutrophils | 56 | | % | Not Estab. | 01 |
| Lymphs | 33 | | % | Not Estab. | 01 |
| Monocytes | 7 | | % | Not Estab. | 01 |
| Eos | 3 | | % | Not Estab. | 01 |
| Basos | 1 | | % | Not Estab. | 01 |
| Neutrophils (Absolute) | 2.5 | | x10E3/uL | 1.4-7.0 | 01 |
| Lymphs (Absolute) | 1.4 | | x10E3/uL | 0.7-3.1 | 01 |
| Monocytes(Absolute) | 0.3 | | x10E3/uL | 0.1-0.9 | 01 |
| Eos (Absolute) | 0.1 | | x10E3/uL | 0.0-0.4 | 01 |
| Baso (Absolute) | 0.0 | | x10E3/uL | 0.0-0.2 | 01 |
| Immature Granulocytes | 0 | | % | Not Estab. | 01 |
| Immature Grans (Abs) | 0.0 | | x10E3/uL | 0.0-0.1 | 01 |
| **Basic Metabolic Panel (8)** | | | | | |
| Glucose | 74 | | mg/dL | 65-99 | 01 |

**Effective September 26, 2022 Glucose reference**
interval will be changing to:
70 - 99

| | | | | | |
|---|---|---|---|---|---|
| BUN | 15 | | mg/dL | 6-20 | 01 |
| Creatinine | 1.26 | | mg/dL | 0.76-1.27 | 01 |
| eGFR | 79 | | mL/min/1.73 | >59 | |

*Signature: DR. CARY WALKER — SEP 21 2022 — MEDICAL DIRECTOR*

---

This document contains private and confidential health information protected by state and federal law.
If you have received this document in error, please call 303-792-2600

© 1995-2022 Laboratory Corporation of America® Holdings
All Rights Reserved - Enterprise Report Version: 1.00

**361**

# Patient Report



**Patient: BOZKUS, SERHAT**
**DOB:** 01/01/1992          **Patient ID:** 3893791          **Control ID:** 341127          **Specimen ID:** 264-027-0018-0
**Date collected:** 09/21/2022  1200 Local

| TESTS | RESULT | FLAG | UNITS | REFERENCE INTERVAL | LAB |
|-------|--------|------|-------|--------------------|-----|
| BUN/Creatinine Ratio | 12 | | | 9-20 | |
| Sodium | 142 | | mmol/L | 134-144 | 01 |
| Potassium | 4.1 | | mmol/L | 3.5-5.2 | 01 |
| Chloride | 103 | | mmol/L | 96-106 | 01 |
| Carbon Dioxide, Total | 26 | | mmol/L | 20-29 | 01 |
| Calcium | 10.0 | | mg/dL | 8.7-10.2 | 01 |

| 01 | DV | Labcorp Denver | Dir: Earle Collum, MD |
|----|----|----|----|
| | | 8490 Upland Drive, Englewood, CO 80112-7115 | |

For Inquiries, the physician may contact **Branch: 303-792-2600 Lab: 303-792-2600**

This document contains private and confidential health information protected by state and federal law.          © 1995-2022 Laboratory Corporation of America® Holdings
If you have received this document in error, please call 303-792-2600          All Rights Reserved - Enterprise Report Version: 1.00

362



**The GEO Group, Inc.**

Inmate Name: Barkos, Sefnit

Inmate Number: 2207/2429

| Date | Medication | Quantity | Inmate Signature | Nurse Signature |
|------|-----------|----------|------------------|-----------------|
| 09/16/17 | Cipo HC Otic 10ml drop Instill 4 drops into left ear twice daily | 1 | | |
| — | | | | |
| — | | | | |
| — | | | | |
| — | | | | |
| — | | | | |
| — | | | | |
| — | | | | |
| — | | | | |

# DEPARTMENT OF HOMELAND SECURITY
## U.S. Immigration and Customs Enforcement
## PRIVACY WAIVER AUTHORIZING DISCLOSURE TO A THIRD PARTY

Use this form to authorize the U.S. Department of Homeland Security ("DHS") to disclose information and/or records about you to a third party. Taking this action is entirely voluntary; you are under no obligation to consent to the release of your information to any third party. **Authority:** Privacy Act of 1974 (5 U.S.C. § 552a); DHS Privacy Act Regulations (6 C.F.R. § 5.21(d)).

| STEP 1 | Provide information about yourself and identify the third party that you intend to receive your information and/or records (the "Recipient"). |
| --- | --- |

| Your Full Name:<br>Serhat BOZKUS | Your Alien Registration Number (if applicable):<br>220-712-429 |
| --- | --- |
| Your Current Address:<br>3130 North Oakland St., Aurora, CO 80010 | Date of Birth:  01/07/1992<br><br>Country of Birth:  Turkey |
| Recipient's Name:<br>William B. Shipley, Esq. Metin Serbest, Esq. | Recipient's Phone Number:<br>312-473-5500 |
| Recipient's Mailing Address (required if requesting disclosure by mail):<br>2200 E. Devon Ave., Suite 358, Des Plaines, IL   60018 | |
| Recipient's Organization, if the waiver will apply to it (e.g. news media, congressional office, law firm):<br>Law Offices of Metin Serbest, 2200 E. Devon Ave., Suite 358, Des Plaines, IL 60018 | |

| STEP 2 | Specify what information and/or records DHS is authorized to share with the Recipient. |
| --- | --- |

☒ Identifying Data (Date of Birth, etc.)    ☒ Family Data    ☒ Travel/Border Crossing

☒ Immigration Case    ☒ Detention Information    ☒ Medical Information

☒ Alien File (A-File)    ☒ Criminal History    ☒ Criminal Case

**AND**

☒ The following information/records (describe): Any and all records and documentation relating to any deportation/removal proceedings and any evidence/documentation of actual deportation/removal by any U.S. Government Agency.

**OR**

☒ ALL information and/or Records Requested by the Recipient

**For Aliens Only:** If you have applied for or received any of the immigration benefits below, you are legally entitled to confidentiality. (See reverse for more information.) If you want DHS to share information about these benefits with the Recipient, you must waive your confidentiality rights by checking the appropriate boxes below. Waiver of these rights is not required; however, if you do not waive these rights DHS may be unable to disclose to the Recipient some or all of the information you identified above.

**I waive my right to confidentiality and authorize disclosure to the Recipient regarding these immigration benefits:**

☒ Temporary Protected Status (TPS)    ☒ T Visa (for trafficking victims)    ☒ U Visa (for victims of certain crimes)

☒ Seasonal Agricultural Worker    ☒ Battered Spouse/Child Seeking Hardship Waiver    ☒ Violence Against Women Act (VAWA)

☒ Asylum
(confidentially applies even if petition is denied)

| STEP 3 | Sign the statement below authorizing DHS to disclose your information and/or records to the Recipient. |
| --- | --- |

I certify under penalty of perjury that the information above is accurate. I authorize DHS, its components, offices, employees, contractors, agents, and assignees, to disclose the information or records specified above to the Recipient. I understand this may include and is not limited to reports, evaluations, and notes of any kind, contained in any record keeping system maintained by or on behalf of DHS; that DHS retains the discretion to decide if particular records or information are within the scope of this Waiver; and that DHS has no control over how the Recipient will use or disseminate my information. I agree to release and hold harmless DHS, its components, offices, employees, contractors, agents, and assignees, from any and all claims of action or damages of any kind arising from, or in any way connected to, the release or use of any information or records pursuant to this Waiver.

| Your Signature: | Witness Signature: |
| --- | --- |
| Date: 24/08/2022 | Witness Name: Berker Caner |

*Privacy Waiver is valid for ~~90 days from date of signature~~
5 years from date of signature _____

*Witness may not be the Recipient or employed by Recipient's employer

ICE Form 60-001 (2/11)     Initial     Page 1 of 2

## Explanation of Immigrant Benefits

If you have applied for or received any of the immigration benefits below, you may be legally entitled to confidentiality regarding these benefits. An explanation of these benefits is provided below to help you identify whether you have applied for such benefits. If you have applied for or received these benefits and you want DHS to share information about these benefits with the Recipient, you must waive your confidentiality rights by checking the appropriate boxes in Step 2 of this form (reverse). You are not required to waive confidentiality regarding these benefits; however, if you do not waive these rights DHS may be unable to disclose to the Recipient some or all of the information you identified above.

Temporary Protected Status (TPS) - 8 U.S.C. § 1254a(c)(6). TPS is for foreign nationals currently residing in the U.S. whose homeland conditions are recognized by the U.S. government as being temporarily unsafe or overly dangerous to return to (e.g., war, earthquake, flood, drought, or other extraordinary and temporary conditions). ICE may disclose information related to TPS to a third party with the consent of the alien.

T Visas and U Visas - Public Law 106-386, Section 701(c)(1)(C). A T visa allows certain victims of human trafficking to remain in the United States for a period of time. A U visa allows certain victims of crimes to remain in the United States for a period of time. ICE may disclose information related to T and U visas to third parties with the consent of the alien.

Legalization Claims, including Seasonal Agricultural Worker (SAW) Claims - 8 U.S.C. § 1255a(c)(4) and (5) and 8 U.S.C. § 1160(b)(5) and (6). Individuals who have applied for legalization, including those individuals employed in agricultural work of a seasonal or temporary nature who have made SAW Claims, may permit ICE to disclose information related to their claim to a third party with the individual's consent.

Battered Spouse or Child Information - 8 U.S.C. § 1186a(c)(4)(C). This provision applies to a battered alien or child who has applied for a hardship waiver from removal under the INA. ICE may disclose information the alien provided to ICE in support his or her request for waiver to a third party with consent of the alien.

Information Relating to Violence Against Women Act (VAWA) Claimants - 8 U.S.C. § 1367(a)(2). This provision applies to a person who has filed a claim under the VAWA. ICE may disclose information related to a person's claim to a third party with the consent of the person.

Asylum Information - 8 C.F.R. § 208.6. This provision applies to individuals who have applied for asylum, and confidentiality regarding the asylum claim applies even if the claim is ultimately denied. ICE may disclose information related to an individual's asylum claim to a third party with the consent of the person.

## Revocation of Privacy Waiver

This Privacy Waiver is valid for 90 days from the date of signature unless you have otherwise specified on this form. You may revoke this Privacy Waiver at any time by contacting the ICE Privacy Office (202-732-3300 or ICEPrivacy@dhs.gov) or the relevant ICE office handing this matter or case. Certain information about you may be requested to confirm your identity and you may be asked to revoke the waiver in writing.

**D**

Metin Serbest, Esq.                                              **DETAINED**

Law Office of Metin Serbest
2200 E Devon Ave., Ste 358
Des Plaines, IL 60018

<div align="center">

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**BOARD OF IMMIGRATION APPEALS**
**FALLS CHURCH, VIRGINIA**

</div>

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | In Removal Proceedings |
| **BOZKUS, SERHAT** | ) | Before the Honorable |
| **A# 220-712-429** | ) | Immigration Judge Ralph E. Girvin |
| RESPONDENT | ) | Chaparral, New Mexico |

<div align="center">

**MOTION FOR EXPEDITED DECISION**

</div>

Metin Serbest, Esq.                                                    **DETAINED**
Law Office of Metin Serbest
2200 E Devon Ave., Ste 358
Des Plaines, IL 60018

<div align="center">

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**BOARD OF IMMIGRATION APPEALS**
**FALLS CHURCH, VIRGINIA**

</div>

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | In Removal Proceedings |
| **BOZKUS, SERHAT** | ) | Before the Honorable |
| **A# 220-712-429** | ) | Immigration Judge Ralph E. Girvin |
| RESPONDENT | ) | Chaparral, New Mexico |

<div align="center">

**MOTION FOR EXPEDITED DECISION FROM**
**THE BOARD OF IMMIGRATION APPEALS**

</div>

**COMES NOW** the Respondent, SERHAT BOZKUS before the Board of Immigration Appeals
(BIA), by and through his undersigned attorney, pursuant to Chapter 6.4(a) of the BIA Practice
Manual, submits the following Motion for Expedited Decision from the BIA with respect to
Respondent's appeals, in support of which Motion Respondent states as follows:

**Respondent's Detention and Repeated Requests for Redetermination of Custody**

1. Respondent's appeal of his asylum and withholding of removal claims on the basis of the well-
   documented history of past persecution by Turkish police and Turkish security forces of
   Respondent and Respondent's politically active family, as well as the well-documented pattern
   and practice of persecution in his home country of Turkey of persons of Kurdish ethnicity like
   himself, is presently before the Board; Exhibit 1.

2. The Immigration Court denied Respondent's asylum and withholding of removal claims on
   April 12, 2022. For reasons outlined in Respondent's brief, this decision was replete with
   substantive and procedural errors which are the basis of his appeal for which supporting legal
   briefs were timely filed before the Board on June 7th, 2022, and which are pending the Board's
   further consideration for decision, *ibid*.

3. In the meantime, Respondent has been detained since November 2021, initially at the DHS-operated El Paso Processing Center in El Paso, Texas on December 3rd; subsequently at the Otero Detention Center in Otero, New Mexico; at the Cibola County Correctional Center in Milan, New Mexico from April 18th, 2022 to July 19th, 2022, and at the Denver Contract Detention Facility in Aurora, Colorado as of July 19th, 2022.

4. Respondent was unilaterally moved without explanation or prior notice to the Denver Detention Center in Aurora, Colorado on July 19th, 2022 after months of neglect of his acute medical needs, and after finally receiving assurances from the Warden of Cibola County Correctional Center ("CCCC") and Respondent's Supervisory Detention and Deportation Officer ("SDDO") of the Enforcement and Removal Operations ("ERO") of Immigration and Customs Enforcement ("ICE") that he would obtain the medical interventions that he so direly needs. Respondent was moved notwithstanding the aforementioned assurances that he would finally receive at least some of the emergency medical care that he is long overdue to receive for multiple acute mental and physical health needs outlined further below.

5. Counsel to Respondent has been unable to confer with Respondent or access his medical records or consult with medical staff at the new facility since that time, due in part to the lack of coordination between the Aurora Colorado facility and the Milan, New Mexico facility, despite the fact that, to the best of Respondent's knowledge, both are owned and operated by the same private prison contractor housing detainees under contract to ICE.

6. On March 9th, 2022, Respondent had a bond hearing to determine and evaluate the appropriateness of his being held in DHS / ICE custody pending the outcome of his asylum and withholding of removal claims and proceedings. Two U.S. citizen sponsors offered to care for Respondent pending the outcome of his removal proceedings, including a family friend and clinical psychologist employed by the State of Ohio for over 20 years; see Exhibit 2 (Respondent's bond memorandum and related exhibits in support of bond proceeding).

7. Notwithstanding the requirement under 8 C.F.R. § 1003.19(d) that custody determinations be "separate and apart from" removal proceedings, those proceedings themselves provided the **only** evidence upon which DHS relied in arguing Respondent was a flight risk; Exhibit 3. Notwithstanding the fact that Respondent's entry without inspection was for the expressed purpose of applying for asylum – the subject of these same removal proceedings – and notwithstanding Respondent's attempts to flee persecution in Turkey and his very real fear of

being persecuted if removed there, which the Court was aware of at the time of those proceedings; notwithstanding the lack of any evidence indicating Respondent posed any risk to U.S. persons or property, including Respondent's lack of any criminal record, no prior attempts to unlawfully enter the United States, no prior immigration proceedings of any kind; notwithstanding the availability of multiple sponsors willing to house and care for Respondent and ensure his care and his continued compliance with his immigration proceedings; notwithstanding all these facts, Respondent's request for bond was denied by the Immigration Court on the basis that he was deemed a "flight risk;" Exhibit 3, Order of March 9th, 2022.

8. On June 3rd, 2022, Respondent filed a motion requesting a custody redetermination hearing to ameliorate the circumstances of his custody on the basis of his materially changed circumstances, specifically his multiple mental health conditions diagnosed in May 2022; the extant evidence indicating Respondent's confinement in detention was seriously exacerbating these conditions; medical research evidence indicating Respondent's worsening mental health symptoms are entirely consistent with the detrimental impacts prolonged detention has on the mental health and well-being of asylum-seekers such as Respondent; and the disregard DHS had shown for Respondent's multiple serious physical health conditions which require immediate surgical intervention but which remain untreated; see Exhibits 4-6 (Motion for Custody Redetermination Hearing and Supporting Exhibits).

9. Respondent's additional medical records provided further support for his motion as they indicated an increasingly serious impact of his continued detention on his mental and physical health; an alarming acuity of his mental and physical health symptoms indicating the need for his immediate release from detention and immediate provision of adequate medical care; and a blatant disregard for Respondent's acute medical and physical health care needs shown by ICE and Cibola County Correctional Center; see Exhibit 7 (Supplemental Medical Evidence). The lack of adequate care risks permanent impairment to Respondent's ability to hear and to walk, among other extremely serious and potentially irreparable harms Respondent now faces as a result of his unnecessary prolonged detention

10. Despite Respondent's detention then entering its eighth month; despite Respondent's medical records and expert medical evidence indicating both newly-diagnosed mental health conditions as well as alarming declines in his mental and physical health; notwithstanding (again) the lack of any evidence Respondent poses a risk to public safety or any evidence he constitutes a flight

risk, other than the mere fact of his removal proceedings, which proceedings are to be "wholly separate and apart from" the aforementioned removal proceedings per the applicable regulation 8 C.F.R. §1003.19(d); notwithstanding the availability of a third sponsor willing to house and care for Respondent; Respondent's motion for a hearing to redetermine the circumstances of his custody was denied, on the basis of "lack of jurisdiction and/or no change;" Exhibit 8 (Immigration Court Order of June 9th, 2022).

11. Respondent is now in his ninth month of detention. Meanwhile DHS and ICE insist on continuing to maintain Respondent in detention despite their abject failure to ensure Respondent received adequate emergency medical care for multiple acute physical and mental health needs whose inadequate treatment risks irreparable harm to Respondent, and despite their flagrant and blatant disregard for ensuring a minimally adequate standard of medical care and treatment of Respondent in detention, and despite their blatant disregard for the need to accommodate Respondent's multiple physical and mental impairments that have worsened as an account of ICE's grossly negligent custody of Respondent.

12. Respondent's health has deteriorated to such a degree that Respondent's ability to maintain essential life functions have been compromised, deteriorating to a degree far below what human dignity and the U.S. Constitution require, and to a degree far below the standard that a civilized society should require of itself; see Exhibit 7 (medical records documenting Respondent's decline); Exhibit 9 (Respondent's contemporaneous notes documenting his custody in detention, his declining state of physical and mental health, and his growing desperation as he becomes gradually more disabled); Exhibit 10 (Fifteen Witness Statements from Detainees Evidencing the Blatant Disregard Shown for Respondent's Care).

13. The multiple and mutually-reinforcing degenerative conditions aggravated by Respondent's continued detention and lack of adequate care now risk rendering him permanently disabled and unable to meet even his basic and essential life functions as a result of mandatory detention which is completely unnecessary, unwarranted, unjustified, and entirely unsupported by any factual evidence on the record other than the mere fact of Respondent's removal proceedings and the developments in those proceedings. Respondent's removal proceedings are insufficient justification for his continued detention when this detention is having an extreme detrimental impact on Respondent's physical and mental health to the point of risking irreparable harm to Respondent, *ibid*.

**Respondent's Worsening Medical Conditions, Inadequate Care, and Inadequate Accommodation for his Impairments Require Immediate Medical Intervention, Immediate Release from Custody and/or Immediate Decision by the BIA on His Pending Appeal**

14. Respondent suffers from the following debilitating physical health conditions which are causing him extreme pain and suffering, and which require immediate emergency care that DHS has, for many months now, failed to authorize or to provide:

   a. A perforated eardrum (tympanic membrane) occasioning serious pain in his ear and neck, as well as risking permanent loss of hearing in that ear (if he has not already) absent the surgery to repair his ruptured eardrum that ICE has not provided, and which DHS claims is a "pre-existing condition" which entirely ignores both the acuity of this condition and the risk to Respondent of his permanent loss of hearing as a result of continued non-treatment; Exhibits 7 at pp. 4-5, 11 .

   b. A herniated disc in his neck which is causing neurological damage, including increasing loss of sensation and motor functions on his right side, and additional pain in his neck, which also may result in permanent damage if not properly and promptly treated, *ibid*.,

   c. Chronic pharyngitis in his throat which is increasingly painful and makes it difficult for Respondent to swallow or to speak, another condition whose risk of permanent damage to Respondent's larynx grows with every passing day.

   d. Serious dental problems, including multiple inadequate fillings resulting in tooth decay in the molars on both sides of his mouth, as well as a possible abscess from a missing tooth, which have now worsened to the point where Respondent requires not only fillings, but several root canals.

   e. High blood pressure and possible heart palpitations occasioned by chronic high anxiety and panic attacks related to his mental health.

15. Following the Immigration Court's denial of Respondent's asylum and withholding of removal claims, Respondent was diagnosed with multiple serious mental health conditions in May 2021 by the mental health clinician Dr. Anne Ortiz at Cibola County Correctional Center, including:

   a. Chronic Post-Traumatic Stress Disorder ("PTSD") which manifests itself in unwanted experiences of Respondent's past traumas both when asleep and while awake, when Respondent's circumstances trigger certain traumatic memories, as well as chronic anxiety

around these same experiences resulting in panic attacks, relating breathing and heart problems from the same, including hyperventilation, heart palpitations, and tightness in his chest, and other serious impacts on physical health.

b. "Major Depression – recurrent," resulting in feelings of hopelessness, helplessness, and uncertainty around when he will be released from detention, as well as concern for the impact of his continued detention on his immediate family members, in particular his mother and his fiancé, and his worries about its impact on their well-being.

c. "Mood problem" (unclear what exactly this means though may be related to an as-yet-undiagnosed mood disorder); see Exhibits 5 and 7.

16. The fact of these conditions, and the need for them to be immediately treated, were brought to ICE's repeated attention. Respondent's Deportation Officer Bryant replied to Respondent's counsel's paralegal via email, but neither he nor the ICE Supervisory Detention and Deportation Officer or other officials at the ICE ERO El Paso Field Office ever replied in writing to Respondent's counsel's request for adequate medical care for Respondent, or for formal individualized consideration of Respondent's eligibility for compassionate release and/or alternatives to detention, nor for consideration for Respondent's eligibility for consideration for release for health reasons pursuant to the civil action *Freihat et al. v. U.S. Immigration and Customs Enforcement et al.* Case No. 19-cv-01546 before the U.S. District Court for the Central District of California – Eastern Division. With the exception of the aforementioned email, other than occasional and infrequent discussions with medical staff, these requests for medical intervention with respect to Respondent's multiple conditions were ignored; see Exhibits 12-16 (communications with CCCC and ICE on Respondent's behalf requesting medical intervention between April 2022 and July 2022) and attachments to the communication of July 14, 2022 Exhibits 16A-16B (leading medical research indicating the detrimental impact of detention on the mental health of asylum seekers, including the specific conditions from which Respondent suffers, including PTSD, depression, and anxiety) and Exhibit 16C (a redacted memo of recommendations for improvement to the mental and physical health care and procedures at Cibola County Correctional Center from March 5th, 2020).

17. In addition to Respondent's attempts to secure medical care and compassionate release through counsel through direct negotiations with ICE and CCCC, all of which were ultimately futile,

Respondent continued to request medical care individually while in detention, in person with ICE officials, with CCCC prison officials, through the medical staff at CCCC, and through written requests for medical care through the CCCC's forms and procedures established for that purpose; see e.g. Exhibit 7 at pp. 4-5; Exhibit 9; Exhibit 10. Respondent submitted over a dozen requests for medical care, all of which were repeatedly ignored; notwithstanding Cibola County Correctional Center's own medical staff repeatedly submitting sufficient clinical justification for immediate intervention; *ibid*.

18. Respondent still has a dire need for surgery on an emergency basis on his perforated tympanic membrane; treatment and assessment for possible surgery for his herniated disc and related neurological condition; and the dire need to actively treat his chronic pharyngitis; all of which were totally and completely ignored for months. Other detainees at the same facility noticed an abject inattention to Respondent's medical needs as compared to other detainees, remarking that the facility and ICE officers seemed to demonstrate a flagrant disregard for Respondent's care that was below that which was shown to other detainees at the same facility; see Exhibit 10. This observed behavior evidences the disregard shown to Respondent which was below the standard of care shown to other detainees at the same facility and evidences animus and retaliation on the part of those officers against Respondent in punishment for his advocating on his own behalf; see Exhibits 9 and 10.

19. Respondent's state of physical and mental health declined precipitously as a result of inadequate medical care and mistreatment while in custody at Cibola County Correctional Center. This flagrant disregard for Respondent's mental and physical health care needs combined in ways that further compromised his health and safety, and further putting Respondent's very ability to maintain his basic and essential life functions at risk. Specifically:

    a. Respondent's chronic pharyngitis in combination with his perforated eardrum and herniated disc result in extreme pain in Respondent's neck and renders it difficult for him to swallow cold water, or to think, sleep, to exercise even if only by walking, and to meet his basic life functions; see Exhibit 7, Exhibit 9, Exhibit 11.

    b. This throat pain and difficulty swallowing is further aggravated by Respondent's inability to chew solid food on both sides of his mouth due to inadequate dental care. As a result, it became increasingly difficult for Respondent to eat and stay hydrated.

c. Respondent's eardrum in combination with the herniated disc and his PTSD symptoms make it impossible for Respondent to shower, because the steam from the shower triggers his PTSD symptoms which, in combination with his dizziness and disorientation from his extreme pain and his damaged eardrum, as well as his decreased motor functions on one side, has resulted in him falling on at least on occasion, resulting in further injury to himself, after which point Respondent was unable to shower; *ibid*., see also Exhibit 15.

d. Respondent's inability to shower was not accommodated in any way at his detention facility, resulting in increasingly poor hygiene which placed further stress on both his physical and mental health, and further aggravating the detrimental impacts of his prolonged detention on both; Exhibits 9, 11.

e. Respondent's prolonged detention also aggravated his PTSD symptoms, resulting in increasingly frequent and severe panic attacks, which further aggravated his blood pressure, chest pains, and heart condition, and his lack of sleep due to his insomnia, or inadequate sleep due to his night terrors, which lack of sleep further contributed to the deterioration of his physical health; Exhibits 9, 11.

f. Respondent's perforated eardrum in combination with his herniated disk often rendered Respondent dizzy, making it difficult for him to walk or undertake basic exercise without increasing his risk of falling and injuring himself. This further compromised his ability to be outside whenever possible, which further aggravated his declining mental health; see Exhibit 7.

g. Respondent's loss of hearing, sense of isolation, feelings of being ignored by lack of adequate response to his repeated requests for care in light of the growing severity and acuity of his symptoms, the danger of his hearing and nerve damage becoming permanent, and the inconsistent access to clinicians or to his prescribed medication, all aggravated Respondent's depression due to increased feelings of hopelessness, such that he was placed on suicide watch at least once; see Exhibit 5, Exhibit 7, Exhibit 9, Exhibits 10-16.

20. The collective result of these is that Respondent was and is increasingly unable to eat, drink, sleep, or properly bathe himself, while being reduced to a state of abject misery and hopelessness which severely and unnecessarily increased his sense of desperation and his risk

of suicide. Nor was Respondent able to effectuate any meaningful care for his symptoms or change in his standard of care, which engendered extreme and completely unnecessary risks to his mental health and well-being, including life-threatening depression, increasingly severe anxiety attacks and PTSD, and a general feeling of hopelessness. DHS' filing in opposition to Respondent's motion for a custody redetermination hearing was the only affirmative response provided to any of Respondent's multiple and repeated requests for medical intervention, and typified DHS' general disregard for Respondent's well-being, *ibid*.

21. As a result of Respondent's prolonged detention, the wholly inadequate response to his health care needs, and the enhanced detrimental impact of each of these conditions on each other, Respondent's mental and physical health conditions worsened considerably while in detention between April and June, 2022; see Exhibits 5 (Respondent's mental health records of May 11th and May 17th), Exhibit 7 – Respondent's supplemental medical records from CCCC submitted June 7th, 2022), Exhibit 11 – Respondent's Reply to DHS Opposition from June 9th 2022, see especially ¶¶ 3-4, 12-16, and 18-26 (documenting the increasing acuity of Respondent's multiple health conditions) and ¶ 5-11 (documenting the inconsistencies between Respondent's medical records and DHS's characterization of that record); Exhibit 10 (Fifteen Witness Statements corroborating Respondent's substandard care and mistreatment in detention). Respondent's exhibits in support of this Motion document the following facts:

    a. Respondent's perforated eardrum remained untreated despite his repeated requests for emergency care both personally through written requests submitted at the facility as well as multiple times through his counsel; see Exhibit 7 at pp. 4-5 (showing requests for authorization for perforated ear drum surgery not provided by ICE while medical reasons justifying this authorization have been); Exhibits 9 at p. 48; Exhibits 12-16 (letters and emails to ICE and CCCC requesting immediate care for respondent's health conditions, as well as consideration for his eligibility for release). Despite the serious risk of immediate and permanent hearing loss due to this same condition, and despite his "busted ear drum" having been diagnosed, ICE did not grant authorization, presumably on the basis that this was a "pre-existing condition;" see Exhibits 7 and 18 (DHS Opposition to Respondent's Motion for Custody Redetermination Hearing) at pp. 2-3.

    b. Respondent's pharyngitis remained untreated and has resulted in an increasing inability of Respondent to swallow or to speak properly without occasioning considerable pain.

c.  Respondent's need for replacement fillings went untreated, and his tooth decay significantly worsened as a result, resulting in extreme pain that made it difficult to eat.

d.  Respondent's herniated disc remained untreated, resulting in increasing numbness and loss of motor function on his right side, and, alongside his untreated ear and chronic pharyngitis, as well as the insufficient treatment of his dental care, resulted in an increasing inability to swallow or chew, as well as increased dizziness and general disorientation.

e.  From evaluations on May 11th and May 17th subsequent to his panic attacks and suicidality, Respondent's psychological problems were diagnosed by mental health clinician Dr. Anne Ortiz as "chronic PTSD" and "Major Depression – recurrent" as well as a "Mood problem." Respondent was prescribed medications for these disorders, but this medication was inconsistently provided to Respondent.

f.  Respondent suffered from increasingly severe and frequent panic attacks, as well as increasingly severe night terrors, both of which are functions of his chronic PTSD symptoms which are aggravated by both the fact of his detention and the circumstances of his detention, specifically the jail conditions and the showers which were similar to sites where Respondent suffered abuse in his home country.

g.  Respondent cannot easily move his right side now on account of the further degeneration of his herniated disc.

h.  Respondent is unable to sleep through the night on account of insomnia, or wakes up repeatedly due to his PTSD symptoms, specifically night terrors – that is, Respondent is unable to sleep until very late at night, and when he does finally manage to sleep, that sleep is disrupted by repeated nightmares of his past traumas in Turkey or concerns about threats to himself and his loved ones; see Respondent's Medical Records and Motion for Hearing for Redetermination of Custody.

i.  This inconsistent administration of his medication resulted from inadequate accommodation of his mental health symptoms – specifically its being administered early in the morning when Respondent suffered from chronic insomnia and inconsistent sleep due to his night terrors, due to which Respondent was unable to fall asleep until 4 or 5 AM, and so was not awake at 9 AM when the facility attempted to administer his medications to him; see Exhibit 9 at pp. 50-51 (Respondent's record of the administration of his

pharmaceuticals), Exhibit 11 (Respondent's Reply to DHS Opposition to Motion for Custody Redetermination Hearing)

22. The only response ever provided by DHS to these requests was in opposition to Respondent's motion for a second custody redetermination hearing, in which DHS claimed that Respondent's condition was pre-existing, which disregards the permanent nature of the harm Respondent would suffer in the event his perforated eardrum was not properly treated, specifically, an improper healing that would scar his eardrum and prevent him from ever properly recovering his hearing; see Exhibit 18.

23. Additionally, Respondent's need for immediate dental care has been disregarded since that was diagnosed upon his intake to the CCCC facility in April 2022, whereas such care has been provided to other detainees; Exhibit 10.

24. Respondent is also suffering extreme physical pain on account of these untreated conditions (his perforated eardrum, his deteriorated fillings, and his chronic pharyngitis), and as such he cannot easily chew, eat, or swallow cold water; Exhibit 9.

25. Despite this, and with the full knowledge of the facility as to Respondent's conditions, the only water with which Respondent was provided on multiple occasions was a cup of un-melted ice to drink, or no water at all; *ibid*.

26. Finally, Respondent cannot easily move his right side now on account of the further degeneration of his herniated disc and pinched nerve. Respondent is unable to sleep through the night on account of insomnia, or wakes up repeatedly due to his PTSD symptoms, specifically night terrors – that is, Respondent is unable to sleep until very late at night, and when he does finally manage to sleep, that sleep is disrupted by repeated nightmares of his past traumas in Turkey or concerns about threats to himself and his loved ones; *ibid*., see also Exhibit 4 (Motion for Hearing for Redetermination of Custody), Exhibits 5 and 7 (Respondent's Medical Records), and Exhibit 9 (Respondent's account of symptoms).

27. With respect to Respondent's mental health conditions, Respondent's PTSD is triggered by the circumstances of his confinement resulting in increasingly frequent and severe panic attacks, chest pains, and heart palpitations, in addition to the aforementioned night terrors. Respondent suffers from insomnia and sleeplessness occasioned by night terrors, whose frequency and intensity are also aggravated by his continued detention, *ibid*.

28. Respondent has been placed on suicide watch on at least one occasion on account of the Depression which is also aggravated by the circumstances of his confinement: *ibid*.

29. Respondent has made repeated requests for medical intervention over a period of months that have been ignored. Respondent has not received an adequate amount of water on a daily basis, or he has been provided with a bottle of ice which water he cannot drink because of the severity of his pain in his throat which is also aggravated by his health conditions; Exhibit 9

30. Finally, Respondent is unable to shower in the facility because the steam from the shower triggers his PTSD, as it occasions dizziness, aural hallucinations, symptoms of disassociation arising from his chronic PTSD as his trauma was suffered under circumstances paralleling those of his detention; see Exhibits 5, 7, and 9.

31. No alternative accommodation has been provided by the facility to allow Respondent to bathe himself absent the use of showers which causes him extreme pain in his ear and trigger his PTSD symptoms and risk a repeat of accidents from which he has already suffered. As such, it has been many weeks if not months since Respondent has been able to properly bathe, *ibid*.

32. Respondent's inability to bathe himself combined with the inability or unwillingness of DHS or the facility acting on its behalf to reasonably accommodate his disabilities constitutes discrimination against respondent on the basis of his mental and physical disabilities.

33. Beyond Respondent's initial intake in April 2022; his evaluation following his loss of consciousness in the shower in April or May of 2022; his consultation with CCCC's mental health clinician Dr. Ortiz on May 11th and May 17th, 2022; the prescription of psychotropic and pain medication which has been unevenly administered to Respondent; Respondent has not received any reasonably necessary medical care sufficient to treat his conditions or to appropriately address his ongoing and severe mental and physical health needs, despite repeated direct requests by Respondent and Respondent's counsel for the same, all of which have been denied, ignored, or otherwise insufficiently attended to.

34. The gravity and acuity of these conditions have increased to such degree that Respondent now bears a very serious, immediate, unnecessary, and unacceptable risk of irreversible harm, including death from suicide or hunger strike, if he is not immediately issued a positive decision on his case granting asylum and/or released from custody and provided with adequate medical care; see Exhibit 9, Exhibits 15-16. Respondent's fundamental right to life and his ability to maintain his essential life functions are put at unnecessary risk by any further delay

in the resolution of his proceedings and by the failure to release him from custody pending the outcome of those proceedings.

**Lack of Any Basis in Evidence to Justify Respondent's Continued Detention**

35. No provision has been made with respect to alternatives to detention for Respondent or with respect to alleviating the circumstances of his confinement in detention that impair Respondent's ability to meet his basic human life functions or the fact of his confinement which is further aggravated by his continued detention.

36. To the best of Respondent's knowledge at the time of this filing, there is no timeline of care for Respondent's emergency physical and mental health care needs, or alternatives to detention being actively considered that would allow for his continued compliance with his immigration proceedings in a way that does not compromise his basic human needs, his physical and mental health, or his right to life and security of his person and his right not to be subjected to cruel and unusual punishment which the circumstances of his detention effectively amount to.

37. Respondent's requests for accommodation to allow him to properly bathe himself have also been denied, ignored, or are otherwise unavailable at the facility, as it lacks any alternative to showers that, for the reasons explained, are insufficient and inadequate to accommodate Respondent's physical needs.

38. Every health condition from which Respondent suffers has worsened over the course of his detention, resulting in extreme hardship to Respondent under circumstances that amount to cruel and unusual punishment unless Respondent is immediately released, granted bond, or granted his appeal, or both.

39. Respondent's experience parallels that of comprehensive medical research and expert opinion concerning the detrimental impacts of detention on the mental health of asylum-seekers; see Exhibit 6 (Public Comment from the American Psychological Association); Exhibit 16A (research on the mental health of asylum-seekers, based on asylum-seekers in detention in the United States); Exhibit 16B (meta-analysis of research on the mental health impacts of detention on detainees in multiple countries including the United States, the United Kingdom, Australia, Canada, the Netherlands, Germany, and elsewhere).

40. Given the demonstrated extreme negative impact of continued and prolonged detention on Respondent's life, health, security, and basic life functions; given DHS's demonstrated

inability to accommodate Respondent's impairments and disabilities, or to meet his minimum basic human needs including his ability to bathe, swallow, walk, exercise, and sleep; and in light of the inability of DHS to accommodate Respondent's impairments and disabilities which are increasingly aggravated by the fact of his detention and the circumstances of his detention, to the point of risking those impairments and disabilities becoming permanent; and given alternative forms of detention or supervision are available to DHS that would spare Respondent the irreparable harm, unnecessary hardship, extreme cruelty, and inhumane treatment that continued detention would impose on Respondent, DHS bears the burden of showing why detention under these circumstances is necessary.

41. Respondent was unreasonably deprived of the opportunity to present evidence on these points by the arbitrary denial of his request for a hearing; see Exhibits 4-6 (Respondent's Motion for a Custody Redetermination Hearing), Exhibit 7 (Respondent's supplemental medical evidence in support of the motion) Exhibit 18 (DHS Opposition to that Motion), Exhibit 11 (Respondent's Reply to DHS' opposition); Exhibit 8 (Motion denied by Immigration Court).

42. Any further delay in the resolution of Respondent's claims will clearly and predictably result in the continued degradation of Respondent's physical and mental health; see Exhibits 6, 7, 9, Exhibit 16A-Exhibit 16B.

43. There is no justifiable reason for which Respondent remains in custody or any evidence supporting any contention that Respondent is a danger to anyone or a flight risk. Indeed, Respondent now suffers from impairments that qualify as disabilities pursuant to Section 504 of the Rehabilitation Act, which disabilities still have not been accommodated in any meaningful way, with further detrimental impact to Respondent as a result. Respondent has no desire to return to the persecution from which he has fled in Turkey, where he faces a real risk of arrest upon his return due to his military service obligation. Nor does Respondent have any desire to evade his immigration proceedings in light of his very reasonable and justifiable belief in the sufficiency of his asylum and withholding of removal claims and his objectively demonstrable need for asylum which qualifies him as a "refugee" under the INA.

44. Respondent has significant community ties, including three sponsors: a relative in Ohio, an actual physician willing to sponsor him who is also employed by the State of Ohio for decades who was willing to care for him in lieu of subjecting him to detention, and another family friend in California willing to sponsor him. Instead, Respondent was kept in detention, and

was subjected to a hellish experience where he was subjected to increasingly severe PTSD and panic attacks; forced to slowly suffer the gradual loss of his hearing, his ability to swallow, his motor functions on his right side, the decaying of his teeth and his pharynx; denied water for days; denied the ability to bathe himself for weeks; being forced to endure repeated false promises of medical care that was never forthcoming, and a growing sense of hopelessness and further depression that this engendered; all of which were aggravated by the social isolation he continued to experience in detention; see Exhibits 9 and 10.

## Emergency Arising from the Acuity of Respondent's Health Care Needs and Respondent's Growing Desperation

45. In early July, after repeated failures by DHS and the ICE detention facility to address his health care needs or meet his basic human needs (including his inability to sleep, eat, drink, or properly bathe himself), Respondent undertook the extreme measure of a hunger strike to demand immediate medical care be provided. Counsel to Respondent made multiple attempts to contact appropriate staff at the Cibola County Correctional Center and was able to speak directly with Cibola County Correctional Center Warden Mark Gallegos who assured him that he would take immediate steps to ensure that Respondent's medical care needs were addressed if counsel to Respondent could also assist in de-escalating the situation; Exhibits 9, 15, 16.

46. On the morning of Wednesday, July 13th, following coordinated interventions by Respondent's counsel with Respondent's family members in Turkey, Respondent agreed to suspend his hunger strike.

47. In the later afternoon and early evening of Wednesday July 13th, and with the assistance of several Turkish-language interpreters, a telephonic conference was held between CCCC Warden Mark Gallegos, SDDO Azucena Sanchez of the ICE-ERO El Paso Field Office, and other staff at CCCC met with Respondent (in person) and with Respondent's counsel (telephonically) to discuss Respondent's acute health care needs and the need for immediate intervention in acknowledgement of the severity of Respondent's circumstances and acute health needs. Respondent's counsel reported Respondent's discontinuance of his hunger strike pending immediate provision of medical care, and Cibola County Correctional Center promised to undertake a good-faith effort to provide care and immediately re-assess Respondent's physical and mental health care needs, after which, ICE SDDO provided

assurances that she would use that re-assessment as a basis to follow-up on Respondent's prior requests for consideration for Respondent's eligibility for release on humanitarian parole; *ibid*.

48. In a follow-up email on Thursday, July 14th, 2022, counsel to Respondent requested a progress report on what care had been provided to Respondent, and requested copies of any replies from the letter of April 19th, 2022 to DHS-ICE Deportation Officer Dean King, or the follow-up email to DHS-ICE Deportation Officer Paul C. Bryant of May 3rd, 2022, advising them of the need for immediate attention to Respondent's multiple physical and mental health conditions and requesting consideration for his immediate release pending appeal in light of these conditions; Exhibits 15, 16, 16A, 16B, and 16C.

49. DHS has shown no evidence why these requests should be denied, other than the fact of Respondent's immigration proceedings, which in and of themselves are not proof of the basis upon which bond determinations should be made, pursuant to 8 C.F.R. §1003.19, and in particular § 1003.19(d) which clearly states that "an application or request of a respondent regarding custody or bond under this section shall be separate and apart from, ***and shall form no part of***, any deportation or removal hearing or proceeding." (Emphasis added).

50. For these reasons, pursuant to Section 6.4 of the *BIA Practice Manual*, Respondent requests that the Bureau of Immigration Appeals:

1) Expedite its consideration of Respondent's appeal before the Board and render a decision on the substance of Respondent's appeal of his asylum claim as soon as feasibly possible, on the basis of the good cause shown here for the immediate need to resolve these issues.

2) In the alternative, if the Board determines that the asylum claims must be remanded for whatever reason, then grant Respondent's Motion for a Bond Redetermination Hearing whose denial is also on appeal before the Board, grant Respondent's immediate release into the care of one of his sponsors or on his own recognizance under humanitarian parole, pending that appeal and/or conclusion of Respondent's proceedings.

3) Order ICE and DHS authorize emergency medical care to be provided for Respondent's perforated eardrum, his pharyngitis, his herniated disc, his degenerative neurological conditions resulting from the same (including physical therapy, if necessary) and reasonable accommodation for his multiple impairments and disabilities.

4) Order ICE and DHS show good cause why they should not be sanctioned for:

(a) their repeated refusal to authorize adequate emergency medical care for Respondent despite Respondent's multiple requests, and despite having clinicians at their contracted facilities confirm the need for immediate emergency care and/or provide him with adequate care consistent with that which should be required not to subject Respondent to cruel and unusual punishment in the form of a slow degeneration of his mental health and basic and essential life functions including the ability to bathe, eat, and swallow;

(b) their repeated failure to provide any written reply to Respondent's repeated requests for individual consideration for eligibility for release under *Fraihat*, subject to humanitarian parole pursuant to 8 C.F.R. § 212.5 or any other appropriate mechanism, as non-cooperation discourages the reasonable resolution of disputes outside of the mechanisms of litigation through the EOIR or Federal Court, wasting valuable and very limited judicial resources.

(c) their disparate treatment of Respondent as a result of this advocacy which amounted to a form of retaliation for Respondent's asserting his right not to be permanently harmed as a result of his disabilities or the health conditions that required immediate intervention; and

(d) the blatant violation of Respondent's 5th Amendment right to counsel through their unilateral transfer of Respondent to a new facility on July 19th, 2022, in the middle of serious attempts to secure appropriate, much-needed, and long-overdue care for Respondent, and without providing any advanced notice or coordination whatsoever with the medical unit of the receiving facility, further delaying the provision of care they are well aware Respondent needs, following Respondent's notice to the facility and to ICE of their legal obligations to accommodate Respondent's disabilities under Section 504 of the Rehabilitation Act and from the same Deportation Officer whose actions were scrutinized.

5) Order whatever other measures may be necessary and appropriate and within the Board's authority to grant to properly ensure Respondent's health, safety, and adequate treatment, and to adequately treat Respondent for the additional suffering he has been required to endure, which are a clear violation of Respondent's right not to be harmed by the intentional withdrawal or denial of necessary medical care, and of Respondent's right not to be subjected to cruel and unusual punishment.

6) Clarify the issue of the proper application of 8 C.F.R. 1003.19(d), specifically the appropriateness of referring custody determination proceedings pending appeal of a

Respondent's removal proceedings to the very same Immigration Court and Immigration Judge whose decision is being appealed.

Respectfully submitted this 27th Day of July, 2022

_____

Metin Serbest, Esq.

Counsel for Respondent

**Law Office of Metin Serbest**
**2200 E Devon Ave Ste 358**
**Des Plaines IL 60018**
**312-473-5500**

**773-337-5544 fax**

**contact @Serbestlaw.com**

| Exhibit | **Exhibits Supporting Motion for Expedited BIA Decision** | Pgs |
|---------|-----------------------------------------------------------|-----|
| Exhibit 1 | Respondent's Appeal Brief of Immigration Court Decision of April 12th, 2022, filed on June 7th, 2022 | 1-24 |
| Exhibit 2 | Respondent's bond memorandum and related exhibits in support of bond proceeding including his asylum application Form I-589, filed March 8th, 2022 | 25-47 |
| Exhibit 3 | Immigration Court Order of March 9th, 2022 | 48-49 |
| Exhibit 4 | Respondent's Motion for Hearing for Redetermination of Custody, June 3rd, 2022. | 50-54 |
| Exhibit 5 | Respondent's mental health records of May 11th and May 17th, 2022 (being Exhibit 1 of Respondent's Motion for Hearing for Redetermination of Custody). | 55-64 |
| Exhibit 6 | Public Comment from the American Psychological Association (being Exhibit 2 of Respondent's Motion for Redetermination of Custody) | 65-68 |
| Exhibit 7 | Respondent's Supplemental Medical Evidence in support of Motion for Custody Redetermination Hearing submitted June 7th, 2022 | 69- 146 |
| Exhibit 8 | Immigration Court Order of June 9th, 2022 | 147 |
| Exhibit 9 | Respondent's contemporaneous notes documenting his custody in detention, his declining state of physical and mental health, and his growing desperation as he becomes gradually more disabled | 148-202 |
| Exhibit 10 | Fifteen Witness Statements from Detainees Evidencing the Blatant Disregard Shown for Respondent's Care, May-June 2022 | 203-212 |
| Exhibit 11 | Respondent's Reply to DHS' Opposition to Respondent Motion for Custody Redetermination Hearing, filed June 9th, 2022. | 213-221 |
| Exhibit 12 | Respondent's letter to ICE Officer Dean King of April 19th, 2022 reporting physical and mental health conditions exacerbated by detention and requesting additional care and/or release on bond | 222-223 |
| Exhibit 13 | Email exchange of April 19th, 2022 with ICE Deportation Officer Paul Bryant | 224-226 |
| Exhibit 14 | Email on Respondent's behalf of May 3rd, 2022 to DHS / ICE Deportation Officer Paul C. Bryant requesting medical assistance be provided and requesting individualized consideration for release or other accommodation pursuant to Fraihat v. ICE U.S.C.D. Cal. No. 19-cv-01546 | 227-228 |
| Exhibit 15 | Email on Respondent's behalf of July 14th, 2022 to DHS ICE SDDO Azucena Sanchez and Cibola County Correctional Center Warden Mark Gallegos requesting immediate medical intervention and to confirm ICE ERO's individualized consideration of Respondent's eligibility for release | 229-231 |
| Exhibit 16 | Email on Respondent's behalf of July 18th, 2022 to DHS ICE SDDO Azucena Sanchez and Cibola County Correctional Center Warden Mark Gallegos requesting immediate medical intervention and to confirm ICE ERO's individualized consideration of Respondent's eligibility for release | 232-239 |

| Exhibit 16A | Keller et al, "Mental Health of detained asylum seekers" *Lancet* 2003:362 at 1721 | 240-242 |
|---|---|---|
| Exhibit 16B | Verhülsdonk et al., "Prevalence of psychiatric disorders among refugees and migrants in immigration detention: systematic review with meta-analysis" (2021) | 243-250 |
| Exhibit 16C | DHS CRCL ICE Memo re Cibola County Correctional Center (redacted) dated March 5th, 2020 | 251-269 |
| Exhibit 17 | DHS Form I-830E Notice of Transfer of Respondent to Denver Contract Detention Facility dated July 18th, 2022 authorized by ICE D.O. Bryant | 270 |
| Exhibit 18 | DHS Opposition to Respondent's Motion for Hearing for Redetermination of Custody, filed June 7th, 2022 | 271-278 |



**U.S. Department of Justice**

Executive Office for Immigration Review

*Board of Immigration Appeals*
*Office of the Clerk*

*5107 Leesburg Pike, Suite 2000*
*Falls Church, Virginia 22041*

Serbest, Metin
Law Offices of Metin Serbest
2200 E. Devon Ave Suite 358
Des Plaines, IL 60018

DHS/ICE Office of Chief Counsel - OTO
8915 Montana Avenue, Suite O
El Paso, TX 79936

Name: BOZKUS, SERHAT                     A 220-712-429

Type of Proceeding: Removal             Date of this notice: 5/17/2022

Type of Appeal: Case Appeal             Filed By: <u>Alien</u>

### NOTICE -- BRIEFING SCHEDULE

o   Enclosed is a copy of the decision of the Immigration Judge.

o   Enclosed is a copy of the transcript of the testimony of record.

o   Appealing party is granted until 6/7/2022          to submit a brief to the Board of Immigration Appeals.  The brief must be **RECEIVED** at the Board on or before this date.

o   Opposing party is granted until 6/7/2022          to submit a brief to the Board of Immigration Appeals.  The brief must be **RECEIVED** at the Board on or before this date.

**WARNING:**  If you indicate on the Notice of Appeal (Form EOIR-26) that you will file a brief or statement, you are expected to file a brief or statement in support of your appeal.  If you fail to file a brief or statement within the time set for filing in this briefing schedule, the Board may summarily dismiss your appeal.  See 8 C.F.R. § 1003.1(d)(2)(i)(E).

If you are an alien and you received this notice, you are not represented by an attorney or accredited representative.  An attorney or accredited representative must file a Notice of Entry of Appearance (Form EOIR-27) to represent you.  8 C.F.R. §§ 1003.3(a)(3) and 1003-38(g).  Until a Form EOIR-27 is received, you are responsible for submitting a brief, and any submissions by anyone other than you will be rejected.

**NOTICE TO PARTIES – DHS/ICE prosecutorial discretion**:  The Board is aware that DHS has issued memoranda regarding its enforcement priorities and framework to exercise prosecutorial discretion (memoranda are available on U.S. Immigration and Customs Enforcement (ICE) website at www.ice.gov).  See EOIR PM 21-25, Effect of Department of Homeland Security Enforcement Priorities, available at www.justice.gov/eoir.  The parties may wish to assess whether this matter remains an enforcement priority and whether the exercise of prosecutorial discretion is warranted. However, as there are prohibitions on DHS's authority to exercise its prosecutorial discretion (e.g., individuals subject to mandatory detention pursuant to sections 236(c) and 241 of the Immigration and Nationality Act, 8 U.S.C. 1222(c) and1231, all inquiries regarding an individual respondent/applicant's eligibility for prosecutorial discretion must be made directly to DHS/ICE.  If the parties jointly agree to

the exercise of prosecutorial discretion, otherwise intends to exercise some form of prosecutorial discretion, a motion should be filed with the Board to this effect and it should clearly contain the caption "EXERCISE OF PROSECUTORIAL DISCRETION" on the front of the motion.

**FILING INSTRUCTIONS -- In General.**

**IMPORTANT: The Board of Immigration Appeals has included two copies of this notice. Please attach one copy of this notice to the front of your brief when you mail or deliver it to the Board, and keep one for your records. Thank you for your cooperation.**

A fee is not required for the filing of a brief. Your brief must be RECEIVED at the Clerk's Office at the Board of Immigration Appeals within the prescribed time limits. It is NOT sufficient simply to mail the brief and assume your brief will arrive on time. We strongly urge the use of an overnight courier service to ensure the timely filing of your brief.

Use of an over-night courier service is strongly encouraged to ensure timely filing.

If the alien is represented by counsel at the appeal level, a Notice of Entry of Appearance as Attorney or Representative before the Board of Immigration Appeals (Form EOIR-27) must be filed with the Board.

If you have any questions about how to file something at the Board, you should review the Board's Practice Manual at www.justice.gov/eoir.

Proof of service on the opposing party at the address above is required for ALL submissions to the Board of Immigration Appeals -- including correspondence, forms, briefs, motions, and other documents. If you are the Respondent or Applicant, the "Opposing Party" is the District Counsel for the DHS or the Director for HHS/ORR at the address shown above. Your certificate of service must clearly identify the document sent to the opposing party, the opposing party's name and address, and the date it was sent to them. Any submission filed with the Board without a certificate of service on the opposing party will be rejected.

**FILING ADDRESS:**

>Board of Immigration Appeals
>Clerk's Office
>5107 Leesburg Pike, Suite 2000
>Falls Church, VA 22041

>Business hours: Monday through Friday, 8:00 a.m. to 4:30 p.m.

Use of an overnight courier service is strongly encouraged to ensure timely filing.

**FILING INSTRUCTIONS -- Extension Request.**

Unless you receive a Board Notice granting your extension request, your brief will remain due on the date stated above.

Extensions of briefing time will only be granted for good cause. All extension requests must be in writing. Telephonic or fax requests will not be accepted.

Extension requests must be **RECEIVED** at the Board on or before the expiration of the initial briefing schedule. Requests for extension of briefing time received after expiration of the initial briefing schedule, will not be granted.

The policy of the Board is that no additional extensions will be granted.

**Userteam:**

**Metin Serbest, Esq.**                                                                                    **DETAINED**

**Law Office of Metin Serbest**

 **2200 E Devon Ave., Ste 358**

**Des Plaines, IL 60018**

### UNITED STATES DEPARTMENT OF JUSTICE
### EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
### BOARD OF IMMIGRATION APPEALS
### FALLS CHURCH, VIRGINIA

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | In Removal Proceedings |
| **BOZKUS, SERHAT** | ) | Before the Honorable |
| **A# 220-712-429** | ) | Immigration Judge Ralph E. Girvin |
| RESPONDENT | ) | Chaparral, New Mexico |

<br/>

### <u>RESPONDENT'S BRIEF IN SUPPORT OF APPEAL</u>

Metin Serbest, Esq.                                                    **DETAINED**

Law Office of Metin Serbest

2200 E Devon Ave., Ste 358

Des Plaines, IL 60018

## UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## BOARD OF IMMIGRATION APPEALS
## FALLS CHURCH, VIRGINIA

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | In Removal Proceedings |
| **BOZKUS, SERHAT** | ) | Before the Honorable |
| **A# 220-712-429** | ) | Immigration Judge Ralph E. Girvin |
| RESPONDENT | ) | Chaparral, New Mexico |

### RESPONDENT'S BRIEF IN SUPPORT OF APPEAL

#### Introduction

        Respondent is a 30-year-old ethnic Kurd and Turkish Citizen born in the province of Diyarbakir, a historically Kurdish region, on January 1st, 1992. He is an active supporter of Kurdish Political Party, the People's Democratic Party (HDP, Halklarin Demokratik Partisi).[1] The pro-Kurdish political activism of Respondent's family is long-standing and well-known, in light of that fact that his father co-founded of a non-violent Kurdish nationalist political party in the late 1970s (the KUK, or "Freedom Fighters for a National Kurdistan").[2] Mr. Bozkus partook in many non-violent activities of HDP including but not limited to campaigning by passing out fliers, attending peaceful demonstrations, and party meetings and rallies.[3] Even though the activities were legal, because these gatherings indicated a political opinion not in alignment with the agenda of Turkey's ruling party, the AKP, police routinely intervene with force to stop these gatherings, and oftentimes arrest and detain participants.[4] Respondent has been detained multiple times by Turkish police and was harmed on multiple occasions while in the custody of police because of his involvement with the Kurdish political party, HDP, or because of his participation in Kurdish-language support groups, student organizations, and cultural events, or both.[5] The Respondent and his family still support the HDP and remain politically active in the region.

        Additionally, Respondent's Kurdish identity has been historically ridiculed, insulted and persecuted in Turkey.[6] As a result, Respondent, his family, and his friends and fellow community members have historically been persecuted and oppressed on account of their Kurdish ancestry and their cultural, ethnic, and linguistic identity. Respondent became aware of the negative racial attitudes against him and his family and friends from a young age, from the persecution of Turkish security forces who burned Kurdish villages, destroyed educational institutions instructing students in their native Kurdish language. Respondent and his friends experienced abuse from Turkish students, teachers, and administrators in Turkish language educational institutions, and were frequently subject to detention,

---

[1] See Respondent's I-589 Application for Asylum and for Withholding of Removal.
[2] *Ibid.* Transcript of the Merits hearing on March 15, 2022, pg. [hereinafter "Transcript"]
[3] See Respondent's I-589 Application for Asylum and for Withholding of Removal.
[4] See Merits Hearing Ex. 4, U.S. State Department, Country Reports on Human Rights Practices (2020).
[5] As Kurdish cultural gatherings are often used as opportunities for political mobilization around Kurdish civil rights issues, and suppressed for this reason, in particular, celebrations around the holiday of Nevroz; see Ex.
[6] See Supplement in Support of Merits Hearing for Respondent's Application for Asylum [Ex. 5

harassment, and physical, verbal, and mental abuse by Turkish police and security forces due to their ethnic Kurdish identity, and due to their political and social activism through the HDP and the "Kurdish movement" for civil rights. Turkish police and security authorities typically equate this pro-Kurdish non-violent activism with violent extremism and terrorism, specifically equating the HDP, a non-violent political party that participates in Turkish elections, with the Kurdistan Worker's Party (PKK), a violent separatist group currently classified as a terrorist organization that does not participate in elections or recognize the authority of the Turkish state.[7] They also routinely attach and destroy Kurdish cultural institutions, including those in Respondent's hometown of Yalaza where, in April 2017, a 4-storey Kurdish-language school was destroyed by Turkish security forces,[8] less than three years after it was built, and 23 years after a massacre in the nearby town of Lice.[9] Respondent has suffered at the hands of Turkish security forces on account of his identity and political beliefs.[10]

Respondent has suffered persecution from the Turkish government for both of these reasons.[11] Respondent's earliest memories include an incident in approximately 1995 or 1996 where all male members of his town, including his uncles and grandfather, were rounded up and beaten by Turkish security forces in their local school,[12] just the first of many traumatic incidents Respondent experienced, which also included bullying, discrimination, and violence from Turkish teachers at schools in Turkey. Over time, Respondent was constantly harassed, physically harmed, and psychologically traumatized due to the constant oppression by the security forces in Turkey against Kurds during Kurdish cultural celebrations and the HDP. Turkey braces for political unrest particularly during Newroz, as Kurds forge ahead with celebrations made illegal over "terrorism" concerns that amount to prohibitions on peaceful collective gatherings geared towards celebrating their shared cultural traditions and mobilizing Kurdish citizens politically to peacefully and publicly advocate for their civil rights in Turkey.[13]

Doctors, lawyers, and human rights activists face detention, prosecution, intimidation, harassment, and prison sentences on "terrorism" charges, including the president of Amnesty International Turkey,[14] and 14 provincial bar association presidents.[15] The Bar Association President in Respondent's home province of Diyarbakir was murdered while attempting to bring justice to the victims of a previous massacre having taken place in the nearby town of Lice.[16] Human rights and judicial institutions do not function properly or independently, so there is little accountability for, or investigation of, numerous human rights abuses, disappearances, and torture, particularly in the southeast, where reports of torture are more prevalent.[17] Corroborated reports of torture of suspects at the Antiterror Branch in Diyarbakir and violent raids of homes of HDP members have taken place within the last two years in the largely Kurdish city of Diyarbakir, the largest city in the province bearing the same name, where Respondent lived before fleeing to the U.S.[18] There is also impunity for the rape of Kurdish women by Turkish soldiers, and for massacres of Kurds by Turkish security forces,[19] including a historic

---

[7] See Merits Hearing Ex. 4 Turkey Human Rights Report (2020)

[8] See Merits Hearing Ex. 7, at Pg. 10 ("News Article on destruction of a school in the Village of Yalaza").

[9] Ibid.

[10] See I-589 Application, Pg. 5; Transcript, Pg. 38.

[11] See Merits Hearing Ex. 4, Country Condition Reports on Human Rights Practices (2020),

[12] See I-589 Application, Pg. 5; Transcript, Pg. 28

[13] See Hearing Ex. 5, Respondent Supplement in Support of Asylum Application and Merits Hearing, at Pgs. 80-89 (reporting on violent government crackdowns of Newroz celebrations in cities throughout Turkey and the arrest of HDP officials during the same).

[14] Ibid. at 47-48.

[15] Ibid. at 14.

[16] See Ex. 7, at Pgs. 14-16 (BIA News Desk, "Lice Massacre Witness: 'We Will Burn Down Lice Today', Soldier Says: Hearing of Lice trial has been held for the first time without the presence of the murdered Diyarbakır Bar President Tahir Elçi", Izmir, Turkey, 25 December 2015).

[17] Ibid. at 7, 67-69.

[18] Respondent's I-589 Application for Asylum and for Withholding of Removal; Ex. 5, Pg. 99-107 ("Police Torture to be probed on disciplinary grounds," Human Rights Watch, "Police, watchmen involved in Torture, Ill-Treatment").

[19] Ibid.

massacre in the city of Lice, only several miles from Respondent's town of Yalaza, in the 1990s following nearby clashes with the PKK.[20] Over two decades later, the impunity for the massacre continues, with the lawyer championing the only legal proceedings on behalf of the Kurdish victims himself murdered, and the appropriate judicial authorities in Turkey ruling that under extant Turkish legal decrees, they need written permission from the military authorities responsible for the massacre before proceeding forward with the case against them.[21]

Respondent also experienced psychological trauma witnessing harm to family and friends. In 1997, Respondent's friend Hulya was beaten by her teacher with a book on her head.[22] In 2000/2001, Respondent's friend Siyar was burned to death during the Nevruz celebration.[23] In 2010, Respondent was beaten by Turkish police with batons because he attended a Kurdish cultural event in Diyarbakır.[24] Respondent was attacked by Turkish forces because he was working in support of the students at the school destroyed by authorities. In 2016/2017, Respondent's brother, Rohat Bozkus, was detained because of his ethnicity and was beaten, injured, and treated as a terrorist suspect by Turkish security forces.[25] In 2017, Respondent was detained unlawfully in Lice/Diyarbakır while delivering invitations with his cousin to his cousin's wedding.[26] In 2019, Turkish forces raided multiple homes of Respondent's family, including his older brother, Felat Bozkus, breaking their door and traumatizing his brother's children. Respondent's brothers were beaten, detained, and threatened by Turkish forces.[27] Additionally, in 1996, Respondent's cousin, Ali Tanriverdi, was taken into custody because he had a long beard. And in 2009, Respondent was insulted by Turkish police simply for having attended an event at the Kurdish Cultural Center.[28]

Respondent has been threatened on multiple occasions by police attempting to coerce him into becoming an informant on his fellow Kurds, Kurdish student groups, and Kurdish cultural organizations. For all these reasons, Respondent has become psychologically depressed, with sleeplessness, anxiety, and nightmares, and he suffers from post-traumatic stress disorder.[29] Respondent has avoided military service after his brothers were mistreated following their summonses to complete military service.[30] Respondent has sought asylum after entering without inspection from Mexico in late November, 2021, and is subject to Removal Proceedings. He insists on expressing his beliefs and identity more fervently which will expose him to violent reprimands and official persecution, inevitably leading to further mental and physical torture.

**Standard of Law**

**ASYLUM**

Under 8 C.F.R.. § 1208.13(b)(1), INA § 208(b)(1), asylum may be granted to any applicant who qualifies as a refugee. A refugee is defined as "any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well- founded fear of

---

[20] See Merits Hearing Ex. 5, at 90-92 ("Former sergeant not jailed despite receiving 10-year jail term for raping Kurdish woman," December 3, 2021).
[21] See Merits Hearing Ex. 7, at Pgs. 14-16 (*BIA News Desk*, "Lice Massacre Witness: 'We Will Burn Down Lice Today', Soldier Says: Hearing of Lice trial has been held for the first time without the presence of the murdered Diyarbakır Bar President Tahir Elçi", 25 December 2015); Hearing Transcript at Pg. 92-93.
[22] See Respondent's I-589 Application for Asylum and for Withholding of Removal.
[23] *Ibid.*
[24] *Ibid.*
[25] *Ibid.*
[26] See Respondent's I-589 Application for Asylum and for Withholding of Removal; Transcript at Pg.
[27] *Ibid.*, See also Transcript, Pg. 84, 96, 113.
[28] See Respondent's I-589 Application for Asylum and for Withholding of Removal
[29] See Respondent's May 2022 Medical Reports, attached as an additional exhibit to this Brief.
[30] See Respondent's I-589 Application for Asylum and for Withholding of Removal;

persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." INA § 101(a)(42)(A).

For applications filed on or after May 11, 2005, the *REAL ID Act* of 2005 created a new standard, requiring that an applicant establish that "race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant." 8 U.S.C. § 1158(b)(1)(B)(i); INA § 208(b)(1)(B)(i).

Upon the applicant's showing of persecution suffered in the past, the applicant is entitled to a rebuttable presumption in his favor of a well-founded fear of future persecution, thereby shifting the burden to the government to demonstrate by a preponderance of the evidence that (1) there has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution, or (2) that the applicant could avoid future persecution by relocating to another part of the applicant's country of nationality or, if stateless, another part of the applicant's country of last habitual residence, and that under all the circumstances, it would be reasonable to expect the applicant to do so. 8 C.F.R. § 1208.13(b)(1)(i).

An applicant can further demonstrate a well-founded fear of future persecution if: (A) he has a fear of persecution in his country; (B) there is a reasonable possibility of suffering such persecution; and (C) he is unable or unwilling to return to that country because of such fear. *See* 8 C.F.R. § 1208.13(b)(2)(i). In the analysis of likelihood of future persecution, courts have held that the applicant for asylum must establish that there is at least a 10% possibility of suffering future persecution. (See *INS v. Cardozo-Fonseca*, 480 U.S. 421 (1987)). To establish the objective reasonableness of suffering such persecution, an applicant must establish either that there is a reasonable probability he will be singled out individually for persecution **or** that there is a pattern or practice of persecution in his country of last habitual residence, of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 C.F.R. § 1208.13(b)(2)(iii).

## WITHHOLDING OF REMOVAL DUE TO THREATS TO LIFE OR FREEDOM

An alien may not be removed if his or her "life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." § 241(b)(3) of the INA, 8 C.F.R. § 1240(8)(d). The applicant must show that "it is more likely than not that he would be subject to persecution" if he returns to his home country. (See *INS v. Stevic*, 467 U.S. 407, 430 (1984)).

## WITHHOLDING OF REMOVAL UNDER THE CONVENTION AGAINST TORTURE AND OTHER CRUEL, INHUMAN OR DEGRADING TREATMENT OR PUNISHMENT (CAT)

An applicant is also entitled to withholding of removal under Article 3 of the *Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment* ("CAT") which requires that no state party to the Convention expel, return, or extradite a person to another country where there are substantial grounds to believe he would be subjected to torture. Under the Convention, torture is defined as: "An act by which severe pain and suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity."

Under 8 C.F.R § 1208.18(a) (1) an applicant for CAT relief must also establish that facts and circumstances make it "more likely than not" that the applicant would be tortured if removed to the proposed country of removal. If an applicant meets the statutory test for withholding of removal, then he or she cannot be deported to the country in which persecution is claimed. *See Flores v. INS, 784 F.2d*

5

Filed At BIA 7/27/2022 at 04:02 p.m. Central Daylight Time

*885*, 887 (9th Cir. 1985).

<div align="center">

**Argument**

</div>

**1. Respondent's Proceedings Lacked Due Process Sufficient for a Fair Hearing**

The Immigration Judge's decision to deny Respondent's application for asylum and withholding of removal rests primarily upon the consequences of his adverse credibility determination with respect to alleged inconsistencies in Respondent's testimony. However, as a procedural matter, Respondent must first address the due process implications arising from the prejudicial and problematic nature of the Court's proceedings concerning the translation of the questions posed to Respondent, and the translation of Respondent's answers. These doubts are further compromised by significant gaps in the Court's principal record of the proceedings, the transcript of the Merits hearing held March 15th, 2022. The substantial translation issues cast serious doubt on the reliability and fairness of the Immigration Court's proceedings, as well the accuracy of the evidence upon which it based its adverse credibility determination. These issues are further aggravated by gaps in the record which prejudice Respondent's ability to defend his own asylum claim and his own credibility on appeal. See *Niania v. Gonzales, supra*, citing *Kheireddine v. Gonzales*, 427 F.3d 80, 84 (1st Cir. 2005). These deficiencies are detailed below.

**A. Inadequate Translation Prejudices Respondent's Right to be Heard and Understood**

As part of its adverse credibility determination against Respondent, the Court states that Respondent was inconsistent in failing to provide "a consistent overview of how many incidents of harm he faced," while simultaneously acknowledging that "there were challenges with the respondent's translation, and in particular confusion over what constituted a 'harm' versus what constituted an 'incident…'"[31] The confusion engendered by these translation issues were so serious that the Immigration Judge characterized them as leading to a "fluctuating definition of what constituted a 'harm' [that] created a chaotic [asylum] application and testimony that contributed to this negative credibility determination."[32] The record also indicates the interpreter did not always completely and fully translate Respondent's answers.[33] It further indicates the Immigration Judge had trouble understanding the interpreter even with respect to short words or phrases,[34] and that the Court's interpreter struggled to translate basic direct questions repeatedly asking Respondent's counsel[35] and government's counsel to repeat their question.[36]

The "totality of the circumstances" the Court is required to consider in making an adverse credibility determination include "any other relevant factor" with respect to Respondent's testimony.[37] As the Respondent bears the burden of proving his claims to the Court through his evidence and testimony, such relevant factors no doubt include circumstances for which the Court is wholly responsible that may negatively impact Respondent's ability to understand the proceedings, to accurately answer the Court's questions, and to have his answers accurately understood by the Court through its interpreter, and recorded by the Court through its record of the proceedings. See *Solomon v. Gonzales*, 454 F. 3d 1160, 1163 (10th Cir. 2006); *Uanreroro v. Gonzales*, F.3d 1197, 1205 (10th Cir. 2006); *Niania v. Gonzales*, 222 F. App'x 684 (10th Cir. 2007). With respect to the application of the Real ID Act with respect to adverse credibility determinations in the context of an asylum application and withholding of removal for fear of future

---

[31] Written Decision of the Immigration Judge, Ralph Girvin, April 12, 2022, pg. 13, para. 8.

[32] *Ibid.*

[33] *Ibid.* at Pg. 149 ([DHS Counsel] "...Who is the first person you would have to encounter when you went back to Turkey?" [Respondent to DHS Counsel] "I directly went to my home." [Judge to Interpreter] "What did he say?" [Interpreter to Judge] "I directly went to home, *and I never met anyone.*") [emphasis added].

[34] Transcript, Pg. 152 at 21-25; Pg. 153 at 1-3 ([Judge] "How long did you stay in Mexico?" [Respondent] "It was around one week." [Judge to Interpeter] "Around what?" [Interpreter] "'Around one week.'")

[35] Interpreter repeatedly asked Respondent's counsel to repeat his question for Respondent; see Transcript of the Merits hearing on March 15, 2022, pg. 47 at lines 24-25; 53 at 16-17; 54 at 25 to 55 at 1; 58 at 13-14; 78 at 3-4; 79 at 7-8; 79 at 22-23; and 91 at 7-8); an additional request to repeat the question attributed to Respondent may have been attributable to the interpreter; see Pg. 40 at 14-21.

[36] *Ibid.* at Pg. 107 at 15-16; 126 at 16-19; 133 at 18-19; 140 at 6-7; 148 at 23-24; 165 at 24-24; 170 at 8-9 [7 times]

[37] See *Immigration and Nationality Act*, 8 U.S.C. §1158(b)(1)(B)(iii).

persecution based on political belief, Judge Posner of the 7th Circuit Court of Appeals noted in *Kadia v. Gonzales*, 501 F.3d 817, 821 (7th Cir. 2007) that any credibility findings must be read in the full context of the relevant statute: "The immigration judge may consider inaccuracies or falsehoods that do not go to the heart of the asylum applicant's claim, but he can do so only as part of his consideration of the totality of the circumstances, and all relevant factors." *Ibid.* at 822, citing 8 U.S.C. §1158(b)(1)(B)(iii). *Ibid.* "[I]f the immigration judge made a number of mistakes, uncorrected by the Board, in his assessment of the evidence," and if "[the Court] cannot be confident that had [the immigration judge] not made those mistakes he still would have disbelieved the petitioner," then "it cannot save the day for the government in [that] case." *Kadia* at 821.

While there is no constitutional right to asylum, due process requires that non-citizens threatened with deportation have a meaningful opportunity to be heard, at the very least; see *Niania v. Gonzales*, 222 F. App'x 686, 687 (10th Cir. 2007) *Hadjimehdigholi v. I.N.S*, 49 F.3d 642 (10th Cir. 1995). Questions concerning the sufficiency of translation and interpretation are constitutional questions of law in this context; see *U.S. v. Leiva*, 821 F.3d 808, 818 (7th Cir. 2016) (Wood, C.J.).[38] While *Leiva* addressed the sufficiency of translation as a matter of law as it concerned a criminal defendant's due process rights in trial proceedings, Respondent's asylum and withholding of removal proceedings are sufficiently similar to the criminal proceedings in *Leiva* for the purpose of this due process analysis, given the adversarial nature of the proceedings in the finding of fact, the adjudication of proceedings subject to established laws and procedures, and Respondent's right to appeal aspects of the fact finding that implicate Respondent's substantive rights in this matter which are no less serious or fundamental than that of a defendant in a criminal trial. These include Respondent's personal liberty interest (as he is held in custody and subject to deportation and possible rendition to torture against his will), his right to counsel (both at the hearing and on appeal); and his right to a meaningful hearing with respect to his proceedings, among which is the right to a complete record of all testimony and evidence produced at the proceeding, and for which it is the government's "duty to prepare a reasonably accurate, reasonably complete transcript." 8 U.S.C. § 1229(b)(4)(C); *Niania* at 686. These procedural rights in turn implicate Respondent's substantive right to life and to security of the person under applicable asylum and refugee laws and treaties (seeking asylum from persecution on account of his race, ethnicity, and political activities, and to avoid future persecution and possible torture). The process due is also necessary to uphold and affirm the United States' concomitant international obligations to uphold and affirm the foreign policy of the United States, specifically, its international human rights treaty obligations under the 1951 *Refugee Convention* with respect to Respondent's asylum claim,[39] and its non-refoulement obligation under Article 33 of the *Refugee Convention*, and Article 3 of the *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*[40] with respect to respondent's withholding of removal claims; see *Innovation Law Lab v. McAleenan*, 924 F.3d 503 (9th Cir. 2019). Per *Leiva*, with respect to judicial hearings bearing on Respondent's fundamental rights, he has a right both to understand and to be understood, particularly with respect to key terms, as these are related aspects of Respondent's right to be heard and to understand the proceedings sufficient to offer testimony in support of his case, as well as his right to confer with and communicate effectively with his legal counsel, and to appeal any adverse findings on the basis of a sufficient record. *Ibid.*

As Respondent bears the burden of establishing his claims in evidence before the Court, such a

---

[38] "As a threshold matter, we note that Leiva had a constitutional right to competent translation of his testimony at trial," as well as a "due process right to be understood," for which purpose "testimony is effectively translated, so that he may be understood," and to ensure he can comprehend the proceedings and communicate effectively with counsel.

[39] Art. I, *Protocol Relating to the Status of Refugees*, 606 U.N.T.S. 267, (signed Jan. 31, 1967, entered into force 4 October 1967) 19 U.S.T. 6223, 6225, 6276 (binding the United States to comply with Article 33 of the 1951 *Convention relating to the Status of Refugees*, 189 U.N.T.S. 137 (entered into force 22 April 1954).

[40] Dec. 10, 1984, S. Treaty Doc. No. 100-20, at 20 (1988)

"fluctuating definition" is at least a relevant factor that the Court should have considered with respect to its own proceedings and Respondent's testimony. Yet the Court did not consider the adverse impacts this "fluctuating definition" of harm may have had on Respondent's ability to clearly answer questions or establish his claims in evidence through the provision of oral testimony before the Court. If the Court lacks confidence in the accuracy of the definition of the word "harm" or "incidents of harm" in its proceedings, then it should have assessed whether Respondent's testimony with respect to that harm was accurately translated and relayed to the Court, before considering that testimony and alleged gaps in that testimony as a basis for an adverse credibility determination. An inaccurate translation of any of Respondent's testimony relating to "harm," "incidents of harm," and the definition of "harm," as well as other key facts, are not a substantial basis upon which the Court can reasonably rely in making its findings.[41] Any deference shown to the Immigration Court's factual findings and credibility determinations on questions of harm on appeal would not be warranted if there is a serious risk the Immigration Court was unable to properly and correctly ascertain Respondent's testimony on these central questions, which are, in turn, foundational to Respondent's ability to establish his eligibility for asylum and withholding of removal. Yet the Court failed to recognize or consider the prejudicial impact on Respondent of the Court's admittedly inconsistent translation of terms essential to Respondent's asylum and withholding of removal applications, including, "in particular" (in the Court's words) a "fluctuating definition of what constituted a 'harm.'"[42]

Here, the Court makes an adverse credibility determination despite admittedly lacking confidence in the accuracy of the translation of the proceedings on such central questions as "harm" and "incidents of harm" that Respondent experienced. Without a comprehensive recording of the non-English audio translation provided to Respondent, the Court cannot know how accurately or completely Respondent's testimony was offered in Turkish by the interpreter to the Respondent, nor how accurately or completely the interpreter's translation of Respondent's account, but these circumstances cast significant doubt on the reliability of the Court's administration of Respondent's proceedings.[43] But numerous instances of the so-called inconsistencies in Respondent's testimony are possibly attributable to inconsistencies and inaccuracies in the translation, and in particular, the Court's acknowledged "fluctuating definition" of harm as relayed to Respondent. At the very least, such difficulties in interpretation should not be attributable to Respondent nor weigh against Respondent's credibility, but that is exactly what the Court does, finding that its own translation problems should weigh *against* Respondent's credibility with respect to the questions posed to him around the harm he suffered, as relayed by the interpreter.[44] Not only does the Court fail to weigh these factors negatively impacting Respondent in these proceedings, but it inexplicably faults Respondent for its own translation problems, deeming these a significant factor in its adverse credibility determination against him.[45]

Similarly, translation issues undermine the Court's assessment of Respondent's demeanor and his alleged evasiveness in answering questions,[46] or "a lack of accuracy and precision" in the Court's assessment of his account, as the need to clarify may have at least as much to do with poor translation as it does to what the Court calls "evad[ing] answering questions, due to its having to "[admonish Respondent] several times to directly answer the questions asked," or his alleged "failing to answer the questions directly," when these purported prevarications by Respondent could be due to Respondent's

---

[41] Just as an example, in addition to problems translating "harm" and "incidents of harm," the interpreter mistranslated Respondent's wrist sprain from a police beating as "sprinkles"; see Decision, Page. 12, para. 2; Hearing Transcript, Pg. 46, Lines 7-22.

[42] Ibid.

[43] It is worth further noting that Respondent's mother tongue is actually Kurdish, but Respondent agreed to hear and provide answers to the Court's questions in Turkish to accommodate the Court's interpreter, who speaks Turkish, the official language of Respondent's country of origin (Turkey). During the proceedings, interpreter had to ask 18 times for Counsel to Respondent and to DHS, and the Immigration Judge, to repeat their question.

[44] Ibid.

[45] See Decision, Pg. 12, para. 2.

[46] See IJ Decision, Pg. 14, para. 14

difficulties understanding the interpreter, or the interpreter's inadequate translation of Respondent's answers.[47] This "fluctuating definition" attributable to the Court's interpretation of Respondent's testimony detrimentally impacted Respondent's procedural due process rights, and seriously impugns the fairness, integrity, and public reputation of these judicial proceedings.[48] The Court's finding that problems arising from its translation "challenges" was a relevant factor that "significantly contributed" to its negative credibility determination against Respondent was in error and should be reversed, along with the adverse credibility finding which failed to consider the "totality of the circumstances" in making its determinations, specifically, the reliability of its translation of key terms.

The Court's findings with respect to these translation questions, especially on the definition of "harm," raise serious questions about the Court's ability to properly weigh and assess Respondent's oral testimony, or to weigh Respondent's testimony against other factors relevant to the Court's factual determinations. The Respondent should not bear the onus of the detrimental impact from this chaos and confusion around the Court's own variable translations to him of the definition of "harm," or of the substance of his testimony relating to that harm. If anything, confusion arising from this poor translation presented an unfair burden to Respondent's ability to make himself clearly understood to the Court while attempting to attest to the nature and scope of the persecution and harms he suffered.

**B. Inadequacy of Translation Is Aggravated by Significant Gaps in the Record**

The "confusion," "chaotic application and testimony," and "fluctuating definition of 'harm'" occasioned by the inept translation provided to Respondent is exacerbated by a court record of proceedings which is missing, faulty, or incomplete, with respect to the very same allegedly inconsistent descriptions of Respondent's harm and persecution which serve as the basis of the Court's adverse credibility determination. These significant translation problems are aggravated by numerous omissions from the Court's transcription of Respondent's testimony at his March 15th, 2022 Merits hearing (marked "[indiscernable]"), presumably because either the Court's recording device failed to properly record the interpreter, the Court's interpreter failed to audibly relay Respondent's testimony, because some other noise or interruptions overlapped with the recording, or because the Court's transcriber could not understand the interpreter's English-language responses. Respondent offered abundant testimony concerning the harm and persecution suffered by himself, his family, his friends, and his community, on dozens of occasions over several decades, and the volume and frequency of this harm over time makes it necessary for Respondent to have meaningful access to his own testimony, and to ensure that it was properly and accurately relayed to the Court, particularly when the accuracy of key terms is called into question by the Court on the basis of incompetent translation. As a result, Respondent's testimony absented by the Court's incomplete and inaccurate record of the proceedings now precludes Respondent's ability to scrutinize the very same subject-matter for which the Immigration Court now deems Respondent not to be credible, and to defend the consistency and cogency of his own testimony before the Immigration Court on appeal.

Among these key factual details from Respondent's hearing testimony that are missing from the Court's transcript that specifically relate to the basis for the Court's adverse credibility finding against Respondent include Respondent's initial answer as to why he was unable to provide an exact date for each of the dozens of incidents he relayed in his testimony;[49] Respondent's differential treatment in the issuance

---

[47] See IJ Decision, Pg. 14, para. 13; Transcript, Pg. 87, Lines 5-25, and Pg. 88, Lines 1-7 ([Respondent's Counsel] "So, what's the worst thing ever happen to you?" [Respondent] "When I was alone, I was in the zone of Kosuyolu" [Interpretor for the Record] "Kosuyolu is K-O-S-U-Y-O-L-U." [Judge] "Clarification, sir. Did the police officer shoot at you, or did your body actually impact with the bullet from a police gun?" [Respondent] "In fact, I was alone on the street, and they shoot me direct." [Judge] "They shot you -- bullet, it hit your body?" [Respondent] "No" [Judge] "So they shot in your direction -- is that what you're saying? [Respondent] It's they had gun. [Judge] Thank you for the clarification.")

[48] See *United States v. Leiva*, 821 F.3d 808, 811 (7th Cir. 2016) (Wood, C.J.) (treating accuracy of interpretation as an issue of law).

[49] Transcript, Pg. 95, Lines 4-11 ("Sir, according to your 589 and all the testimony you gave in court today, there were many, many instances that allegedly happened to you. Can you please explain why you weren't able to

of his passport by Turkish authorities;[50] how he crossed into Iraq in 2017 and the nature of the border controls there;[51] how his government ID made him identifiable as Kurdish by Turkish authorities;[52] his explanation to the Immigration Judge of the reasons Turkish authorities gave him as to why he was targeted, detained, and interrogated by them at the airport the final time he left Turkey to seek asylum on November 18th, 2021;[53] including why Respondent suspected, but could not know, what aspects of his clothing and appearance led Turkish authorities to apprehend him at the airport, and the reasons why they "tried to terrorize me";[54] whether Respondent was entitled to postpone his military service,[55] what exactly Turkish military authorities told Respondent when "[t]hey were asking me for military service" after Respondent attempted to report for that service;[56] further questions concerning the consequences of his avoiding military service, the specific penalties applied to him for the same, and whether the evidence presented indicated he was a "draft evader" or (in the Judge's words) a "draft dodger";[57] the problems Respondent's brother had with his own compulsory military service, why they resembled Respondent's, and why this motivated him to leave Turkey;[58] the details of when Respondent was stopped and interrogated by police about he and his friends who they accused of carrying bombs;[59] details of incident(s) when Respondent was brought by police to a deserted place and beaten;[60] the details of another incident

---

provide a month, date, and in many circumstances, actual year of when these events occurred?" [Respondent] [indiscernible] because of the reason of the I [sic] live in a location that is very political, and also my family's political affiliations, and also the instance that happened maybe harmed and that -- because of those reasons, it's difficult for me to remember sometimes the dates.")

[50] Transcript at pg. 29, Line 15 ("Normally you can obtain a Turkish passport in a week, but my passport [indiscernible].") Compare to Immigration Court Decision, Pg. 6 ("He testified that he had received his passport in October 2021, and that it had taken a month whereas usually it takes only a week...") Compare to IJ Decision at Pg. 13, paras.

[51] Transcript at Pg. 149 at 22-25; Pg. 150 at 1-6

[52] Transcript, Pg. 125 at 23-25 and Pg. 126 at 1-3.

[53] Transcript, Pg. 31, Lines 3-14 ("[Counsel to Respondent] Who else wears let's say that kind of clothes? Can you tell? Does it have any meaning to the Turkish security forces? [Respondent] I think because of my dress they tried to terrorize me. [Immigration Judge] Sir, that's exactly what I pointed out earlier. I want you to tell me an answer that you know. You said, 'You think,' [Respondent] Exactly, I don't know, because they [indiscernible]. [Judge] Thank you, sir.") Compare to Immigration Court Decision, Pg. 12, where the Judge's skepticism of Respondent's answers on these questions form a significant basis of his adverse credibility determination; and Pg. 24, where the Judge asserts that Respondent "failed to offer a direct response to the Court's question" on this point as a basis for denying Respondent's withholding of removal claim.

[54] *Ibid.*

[55] Transcript at Pg. 31, Lines 22-25, Pg. 32, Lines 1-13

[56] Transcript. Pg. 158 at 9-25, Pg. 159 at 1-18. Again, compare to the Judge's reasoning for the adverse credibility determination; IJ Decision, Pg. 12.

[57] Transcript. Pg. 158 at 9-25, Pg. 159 at 1-18 ([DHS Counsel] "And this is regards to a letter that you received stating that you were a draft evader in the records of the ministry of national defense?" [Respondent] [indiscernible] there's a penalty, and I'm paying that." [Judge to Interpreter] "He had to pay a fine? Is that what you said?" [Interpreter to Judge] "Yes. He's paying a fine." [Judge to Interpreter] "Okay." [DHS Counsel] "And sir, does that cure your ability to be conscripted into the military, if you pay a fine?" [Respondent] I'm still -- not an excuse to not make the military service." [Judge to Respondent] "Sir, how do you get a passport if you're a draft dodger in Turkey?" [Respondent to Judge] "In fact, it is not meant to me, but the Turkish government is applying different conditions for this kind of events." [Respondent to Judge] [sic] "[indiscernible]." [Judge to Respondent] "So you're saying, now, that the country of Turkey does not have mandatory conscription?" [Judge to Interpreter] He said that's right?" [Interpreter to Judge] "Yes. Correct." [Judge to Respondent] "When did that change, sir?" [Respondent] "I don't know exactly, but it [indiscernible] long time ago, and before that it was mandatory.")

[58] Transcript, Pg. 154, at 4-12 ([Counsel to DHS] "And sir, can you please explain why -- well, according to your -- 589 application, the last time anything happened to you is in 2018. Yet today, you mentioned something that happened in 2019, regarding elections. Can you please explain why you waited two years or two-and-a-half years before leaving Turkey?" [Respondent] "In fact, it remains true. I tried to leave my country, Turkey, and during this period my youngest brother had some problem in military service, also same problems happen [indiscernible]. As a result of those, I decided to escape.")

[59] Compare IJ Decision, Pg. 3, para. 8 and Pg. Transcript, Pg. 43, Lines 2-15

[60] Transcript, Pg. 44, Lines 20-22 ("I attended a protest and police cars came into the area, and there was a brawl there. And I was harmed there. [indiscernible]. And also another incident in 2018 police cars brought me to a deserted place, and also they hit me there.")

where police took Respondent on a lengthy car ride and subsequently interrogated and threatened him;[61] the dates of the incidents of harm Respondent suffered in Manisa;[62] Respondent's length of residence in Manisa;[63] the reasons for which Respondent was unable to seek medical care such that proof of his injuries could be corroborated, and the attributability of the reason for the lack of that corroboration to anti-Kurdish animus against Respondent,[64] the reason Respondent traveled to Iraq in addition to obtaining employment;[65] the basis for Respondent's fear of the Turkish individual who had invited him to interview for an engineering position in Iraq which led him to abandon his professional opportunity there, including possibly his relationship to the Turkish government;[66] among others which, for the sake of brevity, are not fully listed here.[67] Respondent suggests that given the volume of such lacunae in its transcript, the Court transcriber should note at the very least the specific reason why a portion of testimony is "indiscrenable" as additional context for the purposes of reviewing its accuracy (for example, noting the time and duration within audio records of the hearing they were unable to discern, and/or the reasons why). Regardless of the reason(s) for the Court's inability to discern Respondent's testimony (or the interpreter's translation of those responses), these lapses in the Court record happen to touch on many of the factual findings that formed the basis of the Court's adverse credibility determination against Respondent, as well as its substantial factual findings. Almost every aspect of the burden of proof Respondent must bear to meet to establish his eligibility for asylum through the provision of written and oral testimony is impacted by this lack of clarity regarding the harms Respondent suffered impact. See 8 U.S.C. §1208.13. The Court itself has acknowledged the poor quality of the Court interpreter's translation of that testimony and distinctions by the Court (or lack thereof) between incidents involving threats from Turkish police, security forces, bigots, and nationalist partisans, and those specific incidents that resulted in forms of harm to Respondent, indicating this led to "confusion" and "a chaotic application and testimony."[68]

### C. These Collectively Deprive Respondent of Due Process Rights and Right to Counsel on Appeal

On the basis of this record here (or the lack thereof) it's reasonably likely, if not probable, that these irregularities deprived Respondent of his due process rights to be understood by his Counsel and the government, to be understood by the Court by ensuring it accurately understands his testimony, and to have the Court correctly and properly ascertain Respondent's complete oral testimony. See *Leiva, supra* at 818. While we cannot know for sure without a more thorough review of the non-English portions of the recorded proceedings by a more-competent Turkish translator, there is enough doubt from the extant record of these irregularities to establish a deprivation to Respondent's ability to understand and to be understood in the proceedings. These irregularities also indicate a substantial risk that the Court deprived Respondent of his right to have the Court understand his answers in order to ascertain them properly against the extant written record, and his right to be heard with respect to meaningful follow-up and clarifying questions that serve to correct any misunderstandings or misapprehensions of Respondent's evidence and testimony by the Court (particularly if those could lead to a denial of his

---

[61] Transcript, Pg. 49

[62] Transcript, Pg. 48, Line 8

[63] Transcript, Pg. 48, Lines 22-24 ("I stayed for only one year in Manisa from September 2012 to January [indiscernible]"; compare to IJ Decision at Pg.

[64] Transcript, Pg. 52, Lines 11-20 ("[Judge to Respondent] Did you -- do you have any medical records for any of your injuries? [Respondent] It's almost impossible to get a medical report, especially in Manisa people is -- people are racist. They are against Kurdish, so [indiscernible] is almost impossible to get at -- [Judge] Once again, sir, do you have any medical records? Yes or no. [Respondent to Judge] No.")

[65] See Transcript, Pg. 145, at 8-11 and Pg. 147 at 17-20; context from his subsequent answers suggest his motivations also included fleeing his persecution in Turkey, but due to the gap in the transcript, this cannot be definitively verified; see Pg. 147 at 23-24 ("The surest way to flee from Turkey is to get the job in Iraq, so I accept that.")

[66] See Transcript, Pg. 145, 148, Lines 17-19 ("Since he works for Turkey, and I didn't like the type of the questions, and also the [indiscernible], because of all these reasons I refused to get the job.") Compare to Immigration Court Decision at p. 23

[67] See all instances of "[indiscernable]," *ibid.*

[68] Immigration Court Decision at Pg. 12, para. 2

claims or an adverse credibility determination against him). Further, the gaps in the record also undermine Respondent's right to effective counsel on appeal, as they deprive Respondent of any meaningful opportunity to review contested facts and adverse credibility determinations on appeal.

The evidence missing from the Court record is not only foundational to Respondent's ability to meet his burden of proof for his asylum and withholding of removal claims, but also to appeal the Court's adverse credibility determination that Respondent's account of these incidents was inconsistent or incomplete. Unfortunately, the Court's own translation and transcription of the proceedings with respect to Respondent's testimony in general, and in particular, with respect to its definition of "harm" and "instances of harm," were also inconsistent and incomplete. It is the Immigration Court's "duty to prepare a reasonably accurate, reasonably complete transcript." *Niania v. Gonzales*, 222 F. App'x 684 (10th Cir. 2007) citing *Ortiz Solas v. INS*, 992 F.2d 105, 106 (7th Cir. 1993). It clearly failed in its duty to do so here. This substantial prejudice to Respondent's due process rights at the hearing are further aggravated on appeal by the gaps in the Court's record of the Court's instructions to Respondent and questioning of Respondent, the proceedings concerning Respondent's testimony concerning his harm and the nature of that harm, at least one objection by Respondent's counsel concerning the government's questioning around this harm, and the Respondent's replies to the Court's specific questions that led the Court to doubt the accuracy of Respondent's testimony. Because the Court's record does not contain or reflect the entirety of Respondent's oral testimony before the Immigration Court on these key factual details, it prevents sufficient review of the substantive record of contested facts on appeal, including specific harms, to specific persons, from specific persecutors or groups, including the specific threats against Respondents from Turkish police and other state authorities.

Omissions in the Court's record of Respondent's testimony on topics that also served as the basis for the Court's adverse credibility determination, as well as the credibility of the foundational aspects of his asylum and withholding of removal claims, which prejudices Respondent's ability to defend against this adverse credibility determination on appeal, and deny Respondent and Respondent's counsel a reasonable opportunity to demonstrate the sufficiency and consistency of the evidence proffered by Respondent within the context of the "chaotic" testimony occasioned by the Court's translation problems. Errors and omissions in the Court record are therefore extremely prejudicial to Respondent's ability to establish his claims by demonstrating the nature and breadth of his harm, as well as the consistency and cogency of his testimony with respect to them. See *Niania, supra*.

The transcript has further gaps specifically bearing on the Court's own due process with respect to its administration of Respondent's proceedings which fatally undermine Respondent's ability to address the Court's conduct of its own proceedings and certain evidence offered during those proceedings on appeal. The transcript failed to reflect or include the complete instructions the IJ gave to Respondent on how to answer questions during the proceedings.[69] It also failed to completely or accurately record objections by Respondent's Counsel during questioning by government counsel, questions whose answers later served as part of the adverse credibility determination against him by the Immigration Court.[70] Finally, it failed to record Respondent's complete answers to questions the government may attempt to use in future to deny Respondent's application for withholding of removal, specifically questions about any possible encounters or dealings with PKK, a violent Kurdish political party and militia that has been designated as a terrorist organization, during Respondent's extremely brief time spent in Iraq in 2017.[71]

Collectively, these irregularities call into question the adequacy of the proceedings with respect to Respondent's translation and interpretation, the adequacy of the Court's factual and adverse credibility determinations, and whether a reasonable fact-finder under these circumstances would have a sufficient or adequate basis in evidence from which to draw any reliable conclusions. These irregularities may

---

[69] Hearing pg. 25, lines 22-23 ("Listen to the question, and then think about your answer, and then give [indiscernible]. Okay?")

[70] See Transcript, Pg. 146, Lines 2-25 and Pg. 147, line 1

[71] See Transcript, Pg. 150 at ;

A#220-712-429

further and consequentially deprive Respondent of his fundamental right to life, freedom, and security in his flight from past and future persecution and possible torture, depending on the outcome of these proceedings, as well as his right to counsel on appeal with respect to these proceedings.

For these reasons, the Immigration Court's findings with respect to the alleged inconsistencies in Respondent's testimony are in error and should be reversed, both with respect to his adverse credibility determination, and with respect to any further factual determinations based on alleged inconsistencies in Respondent's testimony. These irregularities provide no reasonable basis upon which Respondent may challenge on appeal the findings made under these circumstances. Counsel to Respondent cannot adequately defend Respondent's alleged lack of specificity on appeal when the Court's record lacks the specifics of Respondent's answers to the Court on numerous items essential to the Court's credibility findings, factual findings, and Respondent's asylum claim. Nor is it clear from the record how any appellate body reviewing the facts in evidence, with the Court's possibly mistranslated questions and definitional standards, can substantially review the Court's findings. the remedy for these due process issues should include a *de novo* re-examination by the BIA of the Immigration Court's credibility determinations and factual findings and Respondent's evidence (as it presently stands) with the presumptions to which Respondent would otherwise be entitled absent the adverse credibility determination made under the proceedings of the Immigration Court.

Should the BIA remand the case for a re-hearing, it should do so with an order vacating the Judge's factual and credibility determinations against Respondent, and a requirement that the Immigration Court, when conducting the re-hearing, take additional safeguards to ensure the competence of its interpreters and the adequacy of its records with respect to Respondent's testimony (including the use of a different interpreter and an affirmative showing of the specific standards the Court required of the interpreter to be used in Respondent's subsequent hearing to establish their competence as translators and interpreters), with specific additional instructions to Respondent concerning his testimony with respect to key terms (specifically the distinction between Respondent's harm and incidents of physical and mental harm, and the nature and scope of the types of experiences – both physical and mental – that qualify as "harm"), as well as measures adequate to ensure the Court delivers a complete and accurate record of Respondent's any objections by Respondent's counsel to the questioning and testimony offered, or, in the event any parts of the record is "indiscernable," a description by the transcriber of the reasons for which the record is "indiscernable" so that Counsel to Respondent can discern what aspects of Respondent's testimony were "indiscernable" and why, and recording and preserving an audible audio recording of the entire proceedings.

## II. The Immigration Judge failed to address the materiality and deliberateness requirements in its credibility determination.

In the event the BIA looks past the due process irregularities and the clear and obvious errors in the Court's decision, Respondent also notes that the Judge did not properly determine why the allegedly inconsistent evidence was, in fact, materially inconsistent, or properly weigh the evidence or assess all relevant factors when making its determinations with respect to Respondent's credibility, need for corroboration, and past and future persecution. We have already noted the lack of support for the Judge's assertion as to the alleged unreliability of Respondent's memory, as well as its failure to weight the impact of the "chaotic" and "fluctuating definition of harm" presented to Respondent while giving his testimony. Unfortunately for Respondent, the Immigration Judge's errors with respect to the alleged inconsistencies leading to his adverse credibility determination did not stop there. In weighing further alleged inconsistencies, he failed to take into consideration the materiality and deliberateness requirements or the totality of all circumstances relevant to the evidence presented, including the country conditions, or other evidence of harm suffered by the Respondent's family members. We will address these in turn.

## A. The Court does not properly assess the evidence in making its adverse credibility determination with respect to Past Persecution

Among other reversible errors or mistakes are occasions when "[t]he immigration judge fail[s] to distinguish between material lies, on the one hand, and innocent mistakes, trivial inconsistencies, and harmless exaggerations, on the other hand." *Kadia v. Gonzales*, 501 F.3d 821 (7th Cir. 2007). The Judge routinely fails to do so here. While it repeatedly finds fault in minor details of Respondent's application – such as his failure to list addresses while attending college in other cities when it's clear from the record that Respondent's moves to these cities were never permanent, and Respondent never denied living there – these are the kind of innocent mistakes for which Respondent should not be faulted.[72] Similarly, in the context of dozens and dozens of incidents over several decades, Respondent's inability to remember exact dates is no indication that he is lying or prevaricating about anything. Respondent may not have a memory for exact calendar dates, but that does not make his memory of traumatic events any less salient.

As Judge Posner of the 7th Circuit Court of Appeals noted with respect to the application of the Real ID Act with respect to adverse credibility determinations in the context of an asylum application and withholding of removal for fear of future persecution based on political belief in *Kadia v. Gonzales*, 501 F.3d 817, 821 (7th Cir. 2007) (Posner, J.), any credibility findings must be read in the full context of the relevant statute: "The immigration judge may consider inaccuracies or falsehoods that do not go to the heart of the asylum applicant's claim, but he can do so only as part of his consideration of the totality of the circumstances, and all relevant factors." *Ibid.* at 822, citing 8 U.S.C. §1158(b)(1)(B)(iii). *Ibid.* On appeal, Courts must look at the adverse credibility determinations "to ensure that they were appropriately based on inconsistent statements, contradictory evidence, and inherently improbable testimony in view of the background evidence on country conditions." See *Touré v. Attorney General of U.S.*, 297 F. App'x 175 (3d Cir. 2008). "[I]f the immigration judge made a number of mistakes, uncorrected by the Board, in his assessment of the evidence," and if "[the Court] cannot be confident that had [the immigration judge] not made those mistakes he still would have disbelieved the petitioner," then "it cannot save the day for the government in [that] case." *Kadia* at 821. Here, as in *Kadia*, the inconsistencies the judge notes "are trivial — the sort of innocent mistake that a person testifying about events that had occurred years earlier would be likely to make," and "the mistakes that witnesses make in all innocence must be distinguished from slips that, whether or not they go to the core of the witness's testimony, show that the witness is a liar or his memory completely unreliable." *Ibid.*

## 1. The Court's assessment of Respondent's evidence of past persecution fails to properly weigh Respondent's evidence with respect to Respondent's past persecution

In several parts of the decision, the Court purports to make a finding that it does not, in fact make, concerning Respondent's memories of past persecution, and the reliability of his memory of that persecution. The Court does not make the finding it purports to make regarding "respondent's claim that he was able to reliably remember harms going back to the 1990s."[73] In the remainder of the paragraph purportedly supporting its finding that Respondent has an "apparently imprecise memory," the Court observed that "respondent simultaneously claimed when asked by the Court that he remembered these events in the 1990s, while also claiming he could recall what year he was first interdicted by the police as an adolescent."[74] The Court offers no contradiction of these facts to support its assertion that Respondent has an "apparently imprecise memory," merely dismissing Respondent's ability to recall memories of these incidents without any support or explanation as to his reasons for this conclusion. This is a failure of the Judge's deliberateness requirement with respect to the reliability of Respondent's memory of past

---

[72] See Immigration Court Decision at Pg. 12, para. 6
[73] See IJ Decision, Pg. 12, para. 2: "The Court notes at the outset that it does not find the respondent's claim that he was able to reliably remember harms going back to the 1990s." [sic]
[74] *Ibid.*

persecution. The Judge's reasoning here also compels the opposite conclusion: if Respondent claims to have an early memory of persecution, as well as recall of the year of his first instance of persecution, then that provides support for the opposite conclusion: that Respondent's memory of his persecution in early childhood is reliable.[75] The Court's conclusions concerning Respondent's memory of past persecution are unsubstantiated, in error, and should be reversed.

### 2. The Immigration Judge Mistakenly Relies Upon Non-Material Facts in Determining Respondent's Credibility with respect to Past Persecution

The Immigration Judge repeatedly mischaracterizes Respondent's failure to document every single incidence of harm throughout his entire lifetime on his Form I-589 as a material omission that constitutes an inconsistency casting doubt on Respondent's past persecution, even when simultaneously acknowledging that Respondent had attempted to supplement his 589 form with 14 handwritten pages outlining many further incidents which were not submitted into evidence only because the Respondent was unable to get them translated in time.[76] He also criticizes respondent for not being able to put exact dates on every incident, when there are dozens of incidents documented. In the full context of these proceedings, taking into account the totality of the circumstances, these minor inconsistencies are not material to Respondent's claims of past harm. Here, the Judge finds the respondent not credible simply because he did not have the presence of mind, while testifying as to repeated incidents of trauma over several decades and in multiple cities, to mentally categorize, with a holistic chronology, exact dates of literally dozens of incident of harm which he suffered including beatings and harm by Turkish police and security forces, which are trivial aspects of Respondent's past persecution. See *Kadia* at 821.

These are innocent mistakes on the part of Respondent who made a good faith effort to list as many instances of harm that he experienced throughout his lifetime in his application form. The Immigration Judge's own decision listed several dozen specific instances of harm Respondent detailed in his I-589 application form,[77] while indicating further support in Respondent's additional supplements.[78] Respondent provided an explanation as to his attempts to document further incidents supporting his contentions that he had over 50, or possibly hundreds, of negative encounters with police, and incidents of harassment, racism, and discrimination with non-Kurdish Turks and Turkish authorities, and the Judge had a reasonable explanation as to why these were not included (because they were not translated). The Judge invited Respondent to testify with respect to incidents that were not on the record because they were not translated in time to be admitted into evidence.[79] Then he used that against Respondent by calling his additional testimony "inconsistent" simply because of Respondent's non-inclusion of every single incident of harm he has ever suffered in his entire life with exact dates and times and precise details, about which he encouraged Respondent to testify.[80] This is neither fair, nor reasonable. Furthermore, Respondent supplied an explanation as to why he was unable to supplement the record for his asylum application by offering additional oral testimony to substitute for the 14 pages of handwritten testimony he intended to supplement his Form I-589 submission with but was unable to for lack of translation assistance is not an "inconsistency."[81] Additionally, the insufficiency of the Court record prevents Respondent from pointing to the specific cogent answers he provided to government

---

[75] IJD, p. 12, para. 2
[76] See Transcript, Pg. 102-103
[77] See Immigration Court Decision, Pg. 2-5
[78] See IJ Decision, Pg. 14-16.
[79] See Transcript, Pg. 103 ([Judge to Respondent] "Okay, sir. Well, you understand, and you understood the rules from the inception that if [the handwritten pages with which you attempted to supplement your 589 application] is not in the English language or properly translated, we can't accept it. Like your lawyer said, that's probably why it's not submitted. But you can testify to what you know about it since you wrote it. If the government asks you a question about it, then feel free to answer it.")
[80] See Immigration Court Decision.
[81] See Transcript, Pg. 102-103

A#220-712-429

counsel as to why he had difficulties discerning the different dates listed on his application.[82] The Judge should consider the reasons given by Respondent why he could not corroborate aspects of his claim that are material. See *Diallo v. Gonzales*, 447 F.3d 1274, 1283 (10th Circ. 2006).

Further, the Court's decision does not identify what Respondent allegedly failed to establish with respect to the aggregate of Respondent's harms and/or incidents of harm, making it impossible for Respondent to challenge this non-existent finding which serves as a principal basis for the Judge's subsequent finding regarding Respondent's alleged failure to establish past persecution. When finding Respondent did not meet his burden to establish past persecution despite facing "'hundreds' of incidents, or alternatively faced 'harm' on 'at least 50' occasions" (keeping in mind, again, that it's unclear from the record what Respondent understood in distinguishing between "harm" and "incidents" or how this distinction was translated or explained to him), "the Court finds that [these cumulative instances of past harm] did not establish."[83] [sic] The Court does not state here what Respondent's did not establish. Nor is this a material aspect of the facts underlying each incident. The Court does not point to ways in which Respondent's inability to put a number on his experiences – at the Court's insistence – call into question any underlying facts with respect to each incident of past persecution. This is a clear error that should be reversed.

Additionally, Respondent suffers from post-traumatic stress disorder, and provides additional evidence not available at the time of the hearing to supplement the record on this point.[84] Given the impacts of trauma on memory, holding an asylum-seeker such as Respondent to such a high mnemonic standard is grossly unfair and unreasonable.[85] Requiring persons suffering repeat incidents of trauma and violent discrimination over many decades to have total recall of every single incidence of that trauma is simply not a realistic standard for credibility determinations, because that is not a standard most persons subjected to such trauma could be reasonably expected to meet. Respondent could not even recall the exact date of his time of entry mere months before he was detained for these proceedings, which is no doubt a memorable experience that Respondent readily admitted to, and about which, after admitting it at his first hearing, he had no incentive to mislead the Court.[86] His inability to remember the exact date he entered several months ago does not make his memories around entering less reliable or credible.

Trivial or irrelevant aspects of Respondent's testimony are not material. Inconsistencies concerning an inability to remember exact dates, or to put a total number on a lifetime of traumatic experiences, are not material. Even if it were material and relevant to these proceedings, the Court asking about "harm" or about "incidents of harm," when this definition was "fluctuating" throughout the proceedings, casts doubt on any of the Court's findings with respect to Respondent alleged inconsistencies on this point.

## 2. The Judge applied the wrong standard for establishing past persecution by requiring Respondent meet a minimum severity requirement for his injuries

The Court imposed a severity requirement on Respondent's for each individual instance of harm for the purpose of establishing persecution and then adds an irrelevant standard for clearing this probative bar by stating that the fact of whether medical treatment was needed was material to establishing whether these incidents, in the aggregate, rise to the level of persecution.[87] Per the very decision cited, this is not a material requirement that Respondent is required to establish. In *Matter of O-Z- & I-Z-, 22 I&N Dec. 23* (BIA 1998), the case cited by the Judge, an alien who suffered repeated beatings and received multiple

---

[82] See Transcript, Pg. 96 at 4-11.
[83] See IJ Decision, Pg. 22
[84] See Supplemental Exhibit, Respondent's Medical Evaluations from May 11, 2022 and May 17, 2022.
[85] See Supplemental Exhibit, Public Comment from the American Psychology Association.
[86] See Hearing Transcript of January 5th, 2022
[87] IJ Decision at Pg. 22

handwritten anti-Semitic threats, whose apartment was vandalized by anti-Semitic nationalists, and whose son was subjected to degradation and intimidation on account of his Jewish faith, established that the harm he suffered, in the aggregate, rose to the level of persecution under the *Immigration and Nationality Act*. *O-Z- & I-Z-* establishes that even a "minor beating" (such as the ones resulted in bruising and sprains) or, for that matter, any physical degradation designed to cause pain, humiliation, or other suffering, rises to the level of persecution if it occurred in the context of an arrest or detention on the basis of a protected ground. Respondent's facts in evidence more than meets this standard.

The Immigration Judge concluded that there was nexus between the harm suffered and Respondent's ethnic identity, but erred in his assessment that the harm Respondent suffered alone or cumulatively did not rise to the level of persecution.[88] The Immigration Judge acknowledged that the harm Respondent suffered was on account of Respondent's imputed political opinion and his Kurdish ancestry, and therefore, erred in its assessment that the Respondent did not meet his burden to show that the harm he suffered rises to the level of persecution. The Immigration Judge found that "the respondent's alleged incidents of physical harm (beatings by police and by nationalist groups) are insufficient to constitute past persecution, particularly because they did not require formal medical treatment."[89] However, as previously this misapplies the standards of the INA, which do not require a minimum level of severity for cumulative harm which confirms that there was a pattern or practice of a systematic persecution.

Also, as previously mentioned, the Court failed to consider, and the Court transcript failed to record, Respondent's testimony as to why he was unable to obtain medical evidence as corroboration, which the Judge now claims he should provide. The Judge erred in failing to consider the reasons given by Respondent for his inability to provide medical records, and the gaps in the Court's record prevent Respondent from speaking to this point on appeal. For these reasons, the decision by the Immigration Judge is in error and should be reversed.

### 3. Immigration Judge Failed to Give Proper Weight to Past Persecution of Respondent's Family

The Immigration Judge did not give proper weight to the harm suffered by the respondent and his family members. The Respondent's, his brothers and father's mistreatment, detention and imprisonment indicate the authorities' unwillingness to protect the Respondent. (See *Pan v. Holder*, 777 F.3d 540 (2d Cir. 2015)) and that the Respondent was being targeted because of his family members' role within the Kurdish movement. See *Matter of N-M*, 25 I & N Dec.526,530 (BIA 2011). Further, the Judge mistakenly concludes that the receipt of Respondent's family for compensation for the past destruction of their home was inconstant with Respondent's testimony on this point.[90] However, the supplemental evidence on record with respect to the destruction of Kurdish villages and educational institutions both in the 1990s and in 2017 indicates that the Turkish government attributed the destruction it perpetuated to the PKK, and thus that the compensation received was for the same incident.[91] This finding is in error and should be reversed. Respondent's testimony and application do not contradict these facts, but are consistent with the fact that the Turkish government blamed the PKK for its own destruction of Kurdish villages in the 1990s, then entitled some victims to compensation through a fund dedicated to victims of the PKK. This provides further evidence of the lengths to which the Turkish government will go to disavow its responsibility for past instances of persecution against its Kurdish citizens, even those perpetuated on a wide scale

The Immigration Judge not only failed to recognize a pattern and practice of persecution but failed to apply the correct standard of law to the facts of this case. Respondent provides abundant examples of

---

[88] See IJ Decision, Pg. 19-22.

[89]

[90] See Immigration Court Decision, Pg. 13, para. 7.

[91] See Merits Hearing Ex. 7, Pg. 12-17

friends and family members being detained, threatened, raided, arrested, and otherwise harmed or persecuted by police. When taken into consideration cumulatively, the persecutions suffered by Respondent's family alone would be sufficient to establish past persecution as there is a clear nexus as the Respondent shares the same characteristics which motivated the persecutors to harm his family members. In addition, the Respondent was also within the zone of risk as his family members were harmed. (See *Jiang v. Gonzales*, 500 F.3d 137, 141 (2d Cir. 2007)) Respondent's evidence clearly establishes a pattern and practice of persecution with respect to both ethnic Kurds and HDP party members and supporters.

The Immigration Judge not only failed to recognize a pattern of persecution but failed to apply the correct standard of law to the facts of this case. As stated in *Matter of O-Z- & I-Z-*, an applicant may be able to claim past persecution based solely on harm that was inflicted on a family member. The Judge ignores the evidence offered by Respondent with respect to the discrimination faced by his brother while in military service, where he was deprived of a weapon and harassed due to his Kurdish ethnicity, and his other brother's "similar problems" for which the record is incomplete with respect to Respondent's answer as to why his problems were similar and why these motivated him to flee Turkey.[92] The finding also disregards the aversion to military service that may arise from a community that has faced significant persecution from Turkish military and security forces in the past, as was the case in evidence here,[93] as well as the efforts to recruit Respondent to spy and inform on friends and members of the Kurdish community.[94]

Finally, the word "persecution"…should be read to require that the government in the home country has fallen so far short of adequate protection as to have breached its basic duty to protect its citizens, or else to have actively harmed them or condoned such harm. *In re A.B.*, 28 I&N Dec. 199 (B.I.A. 2021) at 204. The Judge disregards country evidence without explanation, and then concludes without support that the rampant and widespread human rights abuses and torture, including against ethnic Kurds and HDP supporters both in his home community and throughout Turkey, "[fail] to demonstrate that [Respondent] would be targeted upon return to the country," even when Respondent was targeted for questioning upon his departure from Turkey while en route to the United States via Mexico, and even when there are credible accounts of torture in facilities maintained by Turkish security forces in Diyarbakir on the record.[95] For these reasons, the Judge's decision was in error and should be reversed.

### III. The Immigration Judge erred in its assessment that Respondent did not have well-founded fear of future persecution and that he did not meet his burden

#### A. Respondent has met his burden of establishing past persecution and thus enjoys a presumption of a well-founded fear of future persecution

As the facts of the Respondent's case establish past persecution, a regulatory presumption arises that the applicant has a well-founded fear of future persecution on the basis of his original claim.[96] The burden is on the DHS to rebut the "presumption if it establishes by a preponderance of the evidence that the applicant's fear is no longer well-founded due to a fundamental change in circumstances or because the applicant could avoid future persecution by relocating to another part of the country and that it would be reasonable to expect him to do so. Respondents' well-founded fear of future persecution is reasonable and consistent with the country conditions in Turkey as threats and attacks on Kurds are occurring daily throughout the country. Respondent has been detained and harmed and relocating Respondent is not reasonable for several reasons: first, there is no possible way of hiding Respondent's identifications to

---

[92] See Transcript, Pg. 154, at 9-12
[93] See Merits Hearing Ex. 5, Ex. 7
[94] See I-589 Application.
[95] See IJ Decision, Pg. 24; Transcript at Pg. 32-33;
[96] *Matter of D-I-M-*, 24 I&N Dec. 448, 451 (BIA 2008)

relocate Respondent to avoid persecution as the persecutor is the Turkish government and government-sponsored nationalists. Additionally, Respondent is from a known as Kurdish city with multiple notorious instances of past persecution from Turkish security forces. Finally, Respondent has an on-going case against him in Turkey and therefore will likely be flagged as soon as he is returned to Turkey or relocated to any other city.

Respondent repeats his due process arguments hear that the gaps in the record with respect to Respondent's testimony concerning his subjective fear of persecution from Turkish authorities and the specific reasons for which he was targeted by them in numerous instances, gaps that unreasonably deprive Respondent of the ability to prove he has met his burden of proof on this point, and which render it impossible for Respondent to contest the Court's denial of the evidence he presented on this question on appeal. Aside from these gaps, Respondent presented specific testimony concerning the reasons for which his family is well-known politically, why he was targeted in the past, and is likely to be targeted in the future,[97] in addition to country conditions evidence of similarly situated persons to respondent (ethnic Kurds and HDP supporters). This evidence on record is more than enough to establish that Respondent and his family suffered repeated persecution in the past, and thus, entitles Respondent to the presumption that he is likely to do so in the future. 8 U.S.C. 1208.13(b). For these reasons, the Court's findings with respect to Respondent's past and future persecution are in error and should be reversed, and his asylum and withholding of removal claims granted.

**B. The Judge applies the wrong standard for demonstrating Respondent's Fear of Future Persecution Based on Patterns and Practices of Past Persecution of Similarly Situated Persons**

Contrary to the Judge's mischaracterization of Respondent's corroborating evidence,[98] the supplemental evidence speaks not only to the persecution of ethnic Kurds and HDP supporters generally, but also provides corroboration for Respondent's claims of past persecution individually and specifically, including credible reports of torture in Diyarbakir and impunity for the same,[99] past government crackdowns his home village, government crackdowns against Kurdish cultural celebrations across Turkey,[100] and the impunity for the destruction of Lice, a Kurdish village in close proximity to where Respondent and Respondent's family live, as well as the destruction of the Kurdish language school in Respondent's town,[101] in addition to Respondent's memories of physical harm publicly perpetrated against his uncles and grandfather, which was discussed by Respondent in both his I-589 application and his testimony.[102]

Here, the Judge applies an additional and inappropriate standard to his analysis of Respondent's requirement for establishing a well-founded fear of future persecution, requiring Respondent to link evidence of persecution of persons similarly situated to Respondent to Respondent himself and his own individual circumstances, and requiring him to prove that "he either was in fact or would be perceived by Turkish society as a politically active individual in these various political causes."[103] The Judge faults Respondent for failing to meet a non-existent requirement that Respondent demonstrate with respect to his political asylum claim and withholding of removal for fear of future persecution, "that he was a lawmaker, an executive, or event explicitly testif[ying] to being a party member" to meet a specific "risk profile" to prove a minimum degree of political activity to establish he is similarly situated to those who

---

[97] See Transcript, Pg.
[98] See IJ Decision, Pg. 16-17
[99] See Merits Hearing Ex. 5 at Pg. 96-107.
[100] See Merits Hearing Ex. 6 at Pg. 85-89
[101] See Merits Hearing Ex. 5
[102] Respondent I-589 Application, Pg. 15, Transcript, Pg. 38
[103] See IJ Decision, Pg. 24.

face routine persecution in Turkey because of their support of the HDP.[104] Further, the Court incorrectly states that "there has been no evidence submitted that any of these groups are relevant to the respondent."[105] Respondent's fear of future persecution is objectively reasonable and subjectively genuine as evidence in record is consistent with the country conditions.

While the Court often cites issues with Respondent's military service obligation as a basis for his findings, questions about harms from the Turkish government that Respondent may or may not face are inherently speculative in nature, and Respondent should not be faulted for his inability to state with certainty what the consequences are or could be with respect to his lack of military service. Indeed, this is a complex question that depends on the application of Turkish law to respondent's individual circumstances. In order to further clarify this issue, Respondent attaches a supplemental exhibit attaching a translation of what Respondent believes to be the relevant portions of Turkish law with respect to his military service.[106] Respondent's answers amount to, "it depends." Respondent can have his military service obligation waived or postponed while pursuing his education. In this context, the Turkish security forces' threats to prevent him from pursuing take on new weight and added meaning – specifically, that upon graduation Respondent could be forced to fulfill his military service obligation. Similarly, the Judge did not consider the past harm suffered by Respondent's brother while in military service, or the significance of another brother having significant problems of the type described by Respondent (for which, again, Respondent's exact answer is not available due to an incomplete record and possibly inadequate translation).

The Court labels Respondent's abundant evidence with respect to the risk of persecution faced by individuals in Turkey similarly situated to respondent – specifically, ethnic Kurds and supporters of the HDP political party – as "unpersuasive" without specifying why. By requiring that Respondent additionally "demonstrate what the similarly situated groups would be," beyond Respondent's "heritage as a Kurd," his membership in "a politically prominent Kurdish family (which the Court does not recognize as a cognizable social group,)" and as a "politically active Kurd," the Court appears to impose on Respondent an additional burden to further establish from what is already in evidence – that Respondent is Kurdish and an HDP supporter – into some form of particular social group as a precondition for its acceptance of the probity of Respondent's evidence as to Turkey's treatment of persons similarly situated to Respondent, namely, ethnic Kurds and supporters of the HDP political party.

A nexus between past persecution and fear of future persecution requires proof that the persecutor knew or believed that the applicant one of the protected grounds (race, religion, nationality, membership in a particular social group, or political opinion), and that knowledge or belief motivated the persecutors' harmful actions against the applicant. *INS v. Elias-Zacarias,* 502 U.S. 478, 482 (1992). To establish the necessary nexus, the protected ground: (1) must be a but-for cause of the wrongdoer's act; and (2) must play more than a minor role—in other words, it cannot be incidental or tangential to another reason for the act. See *Matter of LE-A-,* 27 I&N Dec. 40, 43-44 (BIA 2017), aff'd in relevant part, 27 I&N Dec. 581, 584-85 (A.G. 2019) ("*Matter of L-E-A- II*"). Nothing in the statute requires Respondent to meet any of these additional evidentiary burdens the Judge imposes on Respondent here as a precondition of accepting the relevance or probity of Respondent's evidence with respect to his well-founded fear of future persecution. Because the Judge offers no other reasons as to why he us not "persuaded" by the evidence presented, his conclusions on this point impose unreasonable and non-existent evidentiary burdens on Respondent, are in error, and should be reversed. The Court's findings that these instances do not establish past persecution or a well-founded fear of future persecution are in error and should be reversed, with a finding that Respondent has established sufficient basis to claim past persecution on account of his Kurdish ethnicity and political activism, specifically, his support

---

[104] IJ Decision, Pg. 24
[105] IJ Decision, Pg. 24.
[106] See BIA Supplemental Exhibit

A#220-712-429

volunteering for and attending meetings of the HDP.

### IV. The Immigration Judge erred in concluding the persecution suffered by the Respondent did not constitute torture in the light of regulations and the CAT

If returned to Turkey, the Respondent is "more likely than not" to be arrested due to his existing summons for military service for which he was previously detained. Respondent has spoken to the discrimination and persecution his brothers faced when in similar circumstances (completing their compulsory military services). Respondent has provided abundant examples of past persecution for his Kurdish ethnicity and his public support of the HDP, persecution going back decades, for which there was no substantial basis in the record to doubt the reliability of Respondent's memory of this persecution, or the accuracy of his account. On the contrary, multiple aspects of his account have been corroborated with supporting evidence, or with reasons explaining why this evidence was not available. Respondent has also presented evidence that similar persons to Respondent have been beaten and tortured by police and Turkish security forces, for which there is near-total impunity in Turkey for victims of this torture, including in cities where Respondent lives. Further, there is no safe place to relocate in Turkey, because the persecution against Kurds is extreme and nationwide. Respondent also asserts that he is morally opposed to war, but Turkey does not recognize the legitimacy of this opposition, even though international human rights standards applicable to Turkey require that it do so. Given the previous mistreatments of the Respondent and his family by Turkish police as highlighted by both the Immigration Judge and the U.S. Department of State Human Rights Report (Turkey 2020), it is likely that the Respondent will endure torture. The systematic abuse within prisons also establishes acquiescence of government officials. See *Khouzam v. Ashcroft,* 361 F.3d 161, 171 (2 Cir. 2004)

### Conclusion

For the reasons cited above, the decision of the Immigration Judge should be reversed, and the Respondent granted asylum, withholding of removal, and withholding and protection under Convention Against Torture. In the alternative, this matter should be remanded pursuant to the arguments made herein.

Respectfully Submitted,

Metin Serbest, Esq.

## CERTIFICATE OF SERVICE

**BOZKUS, Serhat**

A# 220-712-429

*I, Metin Serbest, do herby certify that I have served a true and correct copy of the attached Motion upon the following via E-service portal of DHS/ICE:*
*El Paso Office of Chief Counsel, 11541 Montana Avenue Suite O, El Paso, TX, 79936*

*This 6th day of June, 2022*

Metin Serbest, Esq.

Counsel for Respondent

**Law Office of Metin Serbest**
**2200 E Devon Ave Ste 358 Des**
**Plaines IL 60018**
**312-473-5500**

**773-337-5544 fax**

**contact @Serbestlaw.com**

Metin Serbest, Esquire
Law Office of Metin Serbest
2200 E. Devon Ave. Suite 358
Des Plaines, Illinois 60018

**DETAINED**

### UNITED STATES DEPARTMENT OF JUSTICE
### EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
### IMMIGRATION COURT
### OTERO, NM

In the Matter of:                                    )
**BOZKUS, SERHAT**                          )          File No. A# **220-712-429**
Respondent In Removal Proceedings   )
                                                             )

**Immigration Judge:  GIRVIN, RALPH E.**          **Hearing Date:  03/7/2022**

### SUPPLEMENT IN SUPPORT OF CUSTODY HEARING

BOIR ± δfof4523

1

# TABLE OF CONTENTS

**TABS**                                                              **PAGES**

|              |                                      |     |
|--------------|--------------------------------------|-----|
|              | Certificate of Service               | 1   |
|              | Bond Memorandum and i-589            | 2   |
| **EXHIBIT A** | SPONSOR'S DOCUMENTS                  |     |
|              | Sponsor's Declaration                | 16  |
|              | Sponsor's Financial Documents        | 17  |

Metin Serbest, Esquire                                    <span>DETAINED</span>
Law Office of Metin Serbest
2200 E. Devon Ave. Suite 358
Des Plaines, Illinois 60018

<div align="center">

## UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## IMMIGRATION COURT
## OTERO, NM

</div>

In the Matter of:                    )
**BOZKUS, SERHAT**                   )          File No. A# **220-712-429**
Respondent In Removal Proceedings    )
                                     )

**Immigration Judge: GIRVIN, RALPH E.**              **Hearing Date: 03/7/2022**

<div align="center">

### SUPPLEMENT IN SUPPORT OF CUSTODY HEARING

</div>

     **COMES NOW** the Respondent, SERHAT BOZKUS, by and through the undersigned counsel, respectfully submits this supplement in support of the respondent's custody hearing scheduled before this honorable court.

                    Respectfully submitted this 8ˢᵗ day of March 2022

                               Metin Serbest, Esq.

EOIR - 3 - 8f0f4523

A#220-712-429
BOZKUS, SERHAT

## CERTIFICATE OF SERVICE

On March 8, 2022, I, Metin Serbest, served a copy of this Supplement in support of Custody Redetermination in the above titled matter to the Department of Homeland Security, Office of Chief Counsel via ICE e-service El-Paso Portal.

Respectfully Submitted,

Metin Serbest, Esq.

N.Y. Bar #5030366
2200 E Devon Ave Suite 358
Des Plaines IL 60018
P: (312) 473-5500

# RESPONDENT'S BOND MEMORANDUM

**Respondent's:**

| | |
|---|---|
| **Name, age, citizenship:** | BOZKUS, SERHAT, 29, Turkey |
| **A#** | 220-712-429 |
| **Ethnicity:** | **Kurdish** |
| **Birthplace:** | **Diyarbakir,** Turkey |
| **Date of entry into the United States:** | **TBC** |
| **Immigration Status:** | No status |
| **Marital Status:** | **SINGLE** |
| **Children:** | **NONE** |
| **Family in the United States:** | YES |
| **Prior Immigration history:** | NONE |
| **Employment History the United States:** | NONE |
| | |
| **Property in the United States:** | NONE |
| **Criminal History:** | NONE |

**Sponsor's:**

| | |
|---|---|
| **Name:** | **MUJGAN INCILER** |
| **Immigration Status:** | **U.S CITIZEN** |
| **Relationship to Respondent:** | **FAMILY FRIEND** |
| **Address:** | **5841 HAMILTON MASON RD LIBERTY TWP, OHIO 45011 513-910-3054** |

BOIR 5 5fc4523

Department of Homeland Security
U.S. Citizenship and Immigration Services

U.S. Department of Justice
Executive Office for Immigration Review

OMB No. 1615-0067; Expires 07/31/2022

## I-589, Application for Asylum and for Withholding of Removal

**START HERE** - Type or print in black ink. See the instructions for information about eligibility and how to complete and file this application. There is no filing fee for this application.

**NOTE:** ☒ Check this box if you also want to apply for withholding of removal under the Convention Against Torture.

### Part A.I. Information About You

| 1. Alien Registration Number(s) (A-Number) *(if any)* | 2. U.S. Social Security Number *(if any)* | 3. USCIS Online Account Number *(if any)* |
|---|---|---|
| **220-712-429** | | |

| 4. Complete Last Name | 5. First Name | 6. Middle Name |
|---|---|---|
| **BOZKUS** | **SERHAT** | |

**7. What other names have you used *(include maiden name and aliases)?***
**MEHMETCAN**

**8. Residence in the U.S. *(where you physically reside)***

| Street Number and Name | Apt. Number |
|---|---|
| **26 MCGREGOR RANGE RD** | |

| City | State | Zip Code | Telephone Number |
|---|---|---|---|
| **CHAPARRAL** | **NM** | **80881** | ( ) |

**9. Mailing Address in the U.S. *(if different than the address in Item Number 8)***

| In Care Of *(if applicable)*: | Telephone Number |
|---|---|
| **LAW OFFICES OF METIN SERBEST** | **( 312 ) 4735500** |

| Street Number and Name | Apt. Number |
|---|---|
| **26 MCGREGOR RANGE RD** | |

| City | State | Zip Code |
|---|---|---|
| **DESPLAINES** | **IL** | **60018** |

| 10. Gender: ☒ Male ☐ Female | 11. Marital Status: ☒ Single ☐ Married ☐ Divorced ☐ Widowed |
|---|---|

| 12. Date of Birth *(mm/dd/yyyy)* | 13. City and Country of Birth |
|---|---|
| **01/01/1992** | **DIYARBAKIR/TURKEY** |

| 14. Present Nationality *(Citizenship)* | 15. Nationality at Birth | 16. Race, Ethnic, or Tribal Group | 17. Religion |
|---|---|---|---|
| **TURKISH** | **TURKISH** | **KURDISH** | **ISLAM** |

**18. Check the box, a through c, that applies:** a. ☐ I have never been in Immigration Court proceedings.

b. ☒ I am now in Immigration Court proceedings.   c. ☐ I am not now in Immigration Court proceedings, but I have been in the past.

**19. Complete 19 a through c.**

a. When did you last leave your country? *(mm/dd/yyyy)* **11/18/2021**   b. What is your current I-94 Number, if any?

c. List each entry into the U.S. beginning with your most recent entry. *List date (mm/dd/yyyy), place, and your status for each entry.* *(Attach additional sheets as needed.)*

| Date **11/27/2021** | Place **EL PASO/TX** | Status **EWI** | Date Status Expires |
|---|---|---|---|
| Date | Place | Status | |
| Date | Place | Status | |

| 20. What country issued your last passport or travel document? | 21. Passport Number **N/A** | 22. Expiration Date *(mm/dd/yyyy)* |
|---|---|---|
| **TURKEY** | Travel Document Number **N/** | **N/A** |

| 23. What is your native language *(include dialect, if applicable)*? | 24. Are you fluent in English? ☐ Yes ☒ No | 25. What other languages do you speak fluently? |
|---|---|---|
| **KURDISH** | | **TURKISH** |

| For EOIR use only. | For USCIS use only. | Action: Interview Date: _____ Asylum Officer ID No.: _____ | Decision: Approval Date: _____ Denial Date: _____ Referral Date: _____ |
|---|---|---|---|

Form I-589 (Rev. 08/25/20)

Filed Uploaded on 2/23/2022 at 09:50:23 p.m. (Central Standard Time)    Base City: OTO

## Part A.II. Information About Your Spouse and Children

Your spouse   [X] I am not married. (Skip to Your Children below.)

| 1. Alien Registration Number (A-Number) (if any) | 2. Passport/ID Card Number (if any) | 3. Date of Birth (mm/dd/yyyy) | 4. U.S. Social Security Number (if any) |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Other names used (include maiden name and aliases) |
| 9. Date of Marriage (mm/dd/yyyy) | 10. Place of Marriage | 11. City and Country of Birth | |
| 12. Nationality (Citizenship) | 13. Race, Ethnic, or Tribal Group | | 14. Gender [ ] Male  [ ] Female |

15. Is this person in the U.S.?
 [ ] Yes (Complete Blocks 16 to 34.)   [ ] No (Specify location):

| 16. Place of last entry into the U.S. | 17. Date of last entry into the U.S. (mm/dd/yyyy) | 18. I-94 Number (if any) | 19. Status when last admitted (Visa type, if any) |
|---|---|---|---|
| 20. What is your spouse's current status? | 21. What is the expiration date of his/her authorized stay, if any? (mm/dd/yyyy) | 22. Is your spouse in Immigration Court proceedings? [ ] Yes [ ] No | 23. If previously in the U.S., date of previous arrival (mm/dd/yyyy) |

24. If in the U.S., is your spouse to be included in this application? (Check the appropriate box.)
 [ ] Yes (Attach one photograph of your spouse in the upper right corner of Page 9 on the extra copy of the application submitted for this person.)
 [ ] No

Your Children. List all of your children, regardless of age, location, or marital status.

[X] I do not have any children. (Skip to Part A.III., Information about your background.)

[ ] I have children.   Total number of children: _____

(NOTE: Use Form I-589 Supplement A or attach additional sheets of paper and documentation if you have more than four children.)

| 1. Alien Registration Number (A-Number) (if any) | 2. Passport/ID Card Number (if any) | 3. Marital Status (Married, Single, Divorced, Widowed) | 4. U.S. Social Security Number (if any) |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth (mm/dd/yyyy) |
| 9. City and Country of Birth | 10. Nationality (Citizenship) | 11. Race, Ethnic, or Tribal Group | 12. Gender [ ] Male  [ ] Female |

13. Is this child in the U.S. ?   [ ] Yes (Complete Blocks 14 to 21.)   [ ] No (Specify location):

| 14. Place of last entry into the U.S. | 15. Date of last entry into the U.S. (mm/dd/yyyy) | 16. I-94 Number (If any) | 17. Status when last admitted (Visa type, if any) |
|---|---|---|---|
| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any? (mm/dd/yyyy) | 20. Is your child in Immigration Court proceedings? [ ] Yes [ ] No | |

21. If in the U.S., is this child to be included in this application? (Check the appropriate box.)
 [ ] Yes (Attach one photograph of your child in the upper right corner of Page 9 on the extra copy of the application submitted for this person.)
 [ ] No

EOIR 7 of 45
EOIR - 7 of 23

4

3 417

## Part A.II. Information About Your Spouse and Children (Continued)

| 1. Alien Registration Number (A-Number) (if any) | 2. Passport/ID Card Number (if any) | 3. Marital Status (Married, Single, Divorced, Widowed) | 4. U.S. Social Security Number (if any) |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth (mm/dd/yyyy) |
| 9. City and Country of Birth | 10. Nationality (Citizenship) | 11. Race, Ethnic, or Tribal Group | 12. Gender ☐ Male ☐ Female |

13. Is this child in the U.S. ?  ☐ Yes (Complete Blocks 14 to 21.)  ☐ No (Specify location): _____

| 14. Place of last entry into the U.S. | 15. Date of last entry into the U.S. (mm/dd/yyyy) | 16. I-94 Number (If any) | 17. Status when last admitted (Visa type, if any) |
|---|---|---|---|
| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any? (mm/dd/yyyy) | 20. Is your child in Immigration Court proceedings? ☐ Yes ☐ No | |

21. If in the U.S., is this child to be included in this application? (Check the appropriate box.)
☐ Yes (Attach one photograph of your spouse in the upper right corner of Page 9 on the extra copy of the application submitted for this person.)
☐ No

| 1. Alien Registration Number (A-Number) (if any) | 2. Passport/ID Card Number (if any) | 3. Marital Status (Married, Single, Divorced, Widowed) | 4. U.S. Social Security Number (if any) |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth (mm/dd/yyyy) |
| 9. City and Country of Birth | 10. Nationality (Citizenship) | 11. Race, Ethnic, or Tribal Group | 12. Gender ☐ Male ☐ Female |

13. Is this child in the U.S. ?  ☐ Yes (Complete Blocks 14 to 21.)  ☐ No (Specify location): _____

| 14. Place of last entry into the U.S. | 15. Date of last entry into the U.S. (mm/dd/yyyy) | 16. I-94 Number (If any) | 17. Status when last admitted (Visa type, if any) |
|---|---|---|---|
| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any? (mm/dd/yyyy) | 20. Is your child in Immigration Court proceedings? ☐ Yes ☐ No | |

21. If in the U.S., is this child to be included in this application? (Check the appropriate box.)
☐ Yes (Attach one photograph of your spouse in the upper right corner of Page 9 on the extra copy of the application submitted for this person.)
☐ No

| 1. Alien Registration Number (A-Number) (if any) | 2. Passport/ID Card Number (if any) | 3. Marital Status (Married, Single, Divorced, Widowed) | 4. U.S. Social Security Number (if any) |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth (mm/dd/yyyy) |
| 9. City and Country of Birth | 10. Nationality (Citizenship) | 11. Race, Ethnic, or Tribal Group | 12. Gender ☐ Male ☐ Female |

13. Is this child in the U.S. ?  ☐ Yes (Complete Blocks 14 to 21.)  ☐ No (Specify location): _____

| 14. Place of last entry into the U.S. | 15. Date of last entry into the U.S. (mm/dd/yyyy) | 16. I-94 Number (If any) | 17. Status when last admitted (Visa type, if any) |
|---|---|---|---|
| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any? (mm/dd/yyyy) | 20. Is your child in Immigration Court proceedings? ☐ Yes ☐ No | |

21. If in the U.S., is this child to be included in this application? (Check the appropriate box.)
☐ Yes (Attach one photograph of your spouse in the upper right corner of Page 9 on the extra copy of the application submitted for this person.)
☐ No

## Part A.III. Information About Your Background

1. List your last address where you lived before coming to the United States. If this is not the country where you fear persecution, also list the last address in the country where you fear persecution. *(List Address, City/Town, Department, Province, or State and Country.)*
   *(NOTE: Use Form I-589 Supplement B, or additional sheets of paper, if necessary.)*

| Number and Street *(Provide if available)* | City/Town | Department, Province, or State | Country | Dates From *(Mo/Yr)* | To *(Mo/Yr)* |
|---|---|---|---|---|---|
| SEHITLIK MAH. 41 SK | YENISEHIR | DIYARBAKIR | TURKEY | 06/1994 | 09/2021 |
| SERDAR APT NO 2 KAT 2 | | | | | |

2. Provide the following information about your residences during the past 5 years. List your present address first.
   *(NOTE: Use Form I-589 Supplement B, or additional sheets of paper, if necessary.)*

| Number and Street | City/Town | Department, Province, or State | Country | Dates From *(Mo/Yr)* | To *(Mo/Yr)* |
|---|---|---|---|---|---|
| 26 MCGREGOR RANGE | CHAPARRAL | NM | USA | 11/2021 | |
| SEHITLIK MAH. 41. SK | YENISEHIR | DIYARBAKIR | TURKEY | 06/1994 | 09/2021 |
| SERDAR APT NO 2 KAT 2 | | | | | |
| | | | | | |
| | | | | | |

3. Provide the following information about your education, beginning with the most recent school that you attended.
   *(NOTE: Use Form I-589 Supplement B, or additional sheets of paper, if necessary.)*

| Name of School | Type of School | Location *(Address)* | Attended From *(Mo/Yr)* | To *(Mo/Yr)* |
|---|---|---|---|---|
| CELAL BEYAR UNIVERSITESI | UNIVERSITY | MANISA/TURKEY | 05/2012 | 06/2013 |
| MERSIN UNIVERSITESI | UNIVERSITY | MERSIN/TURKEY | 11/2013 | 06/2017 |
| ANADOLU UNIVERSITESI | UNIVERSITY | ESKISEHIR/TURKEY | 09/2015 | 06/2019 |
| ERZURUM ATATURK UNIVERSITESI | UNIVERSITY | ERZURUM/TURKEY | 09/2020 | |

4. Provide the following information about your employment during the past 5 years. List your present employment first.
   *(NOTE: Use Form I-589 Supplement B, or additional sheets of paper, if necessary.)*

| Name and Address of Employer | Your Occupation | Dates From *(Mo/Yr)* | To *(Mo/Yr)* |
|---|---|---|---|
| CEYSA INSAAT / DIYARBAKIR/TURKEY | CONSTRUCTION ENGINEER | 11/2018 | 04/2019 |
| ASUR INSAAT / DIYARBAKIR/TURKEY | CONSTRUCTION ENGINEER | 12/2019 | 03/2021 |
| RUZGAR KURUYEMIS / DIYARBAKIR/TURKEY | WHOLESALE | 12/2020 | |

5. Provide the following information about your parents and siblings (brothers and sisters). Check the box if the person is deceased.
   *(NOTE: Use Form I-589 Supplement B, or additional sheets of paper, if necessary.)*

| Full Name | City/Town and Country of Birth | Current Location |
|---|---|---|
| *Mother* HALISE BOZKUS | DIYARBAKIR/TURKEY | ☐ Deceased DIYARBAKIR/TURKEY |
| *Father* SEVKET BOZKUS | DIYARBAKIR/TURKEY | ☒ Deceased |
| *Sibling* ZUHAT BOZKUS | DIYARBAKIR/TURKEY | ☐ Deceased DIYARBAKIR/TURKEY |
| *Sibling* FELAT BOZKUS | DIYARBAKIR/TURKEY | ☐ Deceased DIYARBAKIR/TURKEY |
| *Sibling* NIHAL BOZKUS | DIYARBAKIR/TURKEY | ☐ Deceased DIYARBAKIR/TURKEY |
| *Sibling* FIRAT BOZKUS | DIYARBAKIR/TURKEY | ☐ Deceased DIYARBAKIR/TURKEY |

## Part B. Information About Your Application

*(NOTE: Use Form I-589 Supplement B, or attach additional sheets of paper as needed to complete your responses to the questions contained in Part B.)*

When answering the following questions about your asylum or other protection claim (withholding of removal under 241(b)(3) of the INA or withholding of removal under the Convention Against Torture), you must provide a detailed and specific account of the basis of your claim to asylum or other protection. To the best of your ability, provide specific dates, places, and descriptions about each event or action described. You must attach documents evidencing the general conditions in the country from which you are seeking asylum or other protection and the specific facts on which you are relying to support your claim. If this documentation is unavailable or you are not providing this documentation with your application, explain why in your responses to the following questions.

Refer to Instructions, Part 1. Filing Instructions, Section II., Basis of Eligibility, Parts A. - D., Section V., Completing the Form, Part B.; and Section VII. Additional Evidence That You Should Submit, for more information on completing this section of the form.

I.  Why are you applying for asylum or withholding of removal under section 241(b)(3) of the INA, or for withholding of removal under the Convention Against Torture? Check the appropriate box(es) below and then provide detailed answers to questions A and B below.

I am seeking asylum or withholding of removal based on:

[X] Race                      [X] Political opinion

[ ] Religion                  [ ] Membership in a particular social group

[X] Nationality               [X] Torture Convention

A.  Have you, your family, or close friends or colleagues ever experienced harm or mistreatment or threats in the past by anyone?

[ ] No          [X] Yes

If "Yes," explain in detail:
1. What happened;
2. When the harm or mistreatment or threats occurred;
3. Who caused the harm or mistreatment or threats; and
4. Why you believe the harm or mistreatment or threats occurred.

```
Yes, during 1995-1996 the army had come to our town yalaza, diyarbakir to harm the men in the
town. in 1996 my cousin, ali tanriverdi, was taken into custody because he had a long beard was
tried as a terrorist. in 1997, my friend hulya was beaten by her teacher with a book on her
head. in 2000/2001 my friend siyar was burned to death during the nevruz celebration and was
covered up. in 2002 during a nevruz celebration my friend, Mehmet, was stripped and his clothes
were burned and left. in 2003/2004 the police beat my friends and i because we watched Kurdish
movies. in 2006 the police had stopped my friends and i on a routine checkpoint and we didn't
have our ID's and treated us like terrorists. in 2007 the police had stopped us and taken us
into custody because they thought we had bombs, they slapped my friend and then let us go. in
2008 a planned attacked happened in front of a school where my sister was because of.....
```

B.  Do you fear harm or mistreatment if you return to your home country?

[ ] No          [X] Yes

If "Yes," explain in detail:
1. What harm or mistreatment you fear;
2. Who you believe would harm or mistreat you; and
3. Why you believe you would or could be harmed or mistreated.

```
Yas, i fear mistreatment and harm if I were to return to Turkey because of everything that I
have lived when i was younger as I grew up. I fear harm from the nationalists and Turkish
security forces because of my ethnicity and political involvement. I fear that I would be
harmed, imprisoned or even killed.
```

Form I-589 (Rev. 08/25/20)  Page 5

## Part B. Information About Your Application (Continued)

2. Have you or your family members ever been accused, charged, arrested, detained, interrogated, convicted and sentenced, or imprisoned in any country other than the United States (including for an immigration law violation)?

☐ No        ☒ Yes

If "Yes," explain the circumstances and reasons for the action.

> Yes, my friends, family members and myself have been questioned and detained on several occasions as mentioned in question 1A.

3.A. Have you or your family members ever belonged to or been associated with any organizations or groups in your home country, such as, but not limited to, a political party, student group, labor union, religious organization, military or paramilitary group, civil patrol, guerrilla organization, ethnic group, human rights group, or the press or media?

☐ No        ☒ Yes

If "Yes," describe for each person the level of participation, any leadership or other positions held, and the length of time you or your family members were involved in each organization or activity.

> My family and I support and volunteer for the people's democratic party, HDP. We support them since 2013. We family and I do not hold any positions within the party out of fear.

3.B. Do you or your family members continue to participate in any way in these organizations or groups?

☐ No        ☒ Yes

If "Yes," describe for each person your or your family members' current level of participation, any leadership or other positions currently held, and the length of time you or your family members have been involved in each organization or group.

> Yes we continue to support HDP regardless of pressure.

4. Are you afraid of being subjected to torture in your home country or any other country to which you may be returned?

☐ No        ☒ Yes

If "Yes," explain why you are afraid and describe the nature of torture you fear, by whom, and why it would be inflicted.

> Yes, I fear that if I were to return I would be imprisoned, harmed or even killed because of my Kurdish ethnicity, my involvement with the people's democratic party, HDP, and involvement with the Kurdish movement.

## Part C. Additional Information About Your Application

(NOTE: *Use Form I-589 Supplement B, or attach additional sheets of paper as needed to complete your responses to the questions contained in Part C.*)

1.  Have you, your spouse, your child(ren), your parents or your siblings ever applied to the U.S. Government for refugee status, asylum, or withholding of removal?

    [X] No      [ ] Yes

    If "Yes," explain the decision and what happened to any status you, your spouse, your child(ren), your parents, or your siblings received as a result of that decision.  Indicate whether or not you were included in a parent or spouse's application.  If so, include your parent or spouse's A-number in your response.

    If you were previously denied asylum by USCIS, an immigration judge, or the Board of Immigration Appeals, describe any change(s) in conditions in your country or your own personal circumstances since the date of the denial that may affect your eligibility for asylum.

2.A.  After leaving the country from which you are claiming asylum, did you or your spouse or child(ren) who are now in the United States travel through or reside in any other country before entering the United States?

    [ ] No      [X] Yes

2.B.  Have you, your spouse, your child(ren), or other family members, such as your parents or siblings, ever applied for or received any lawful status in any country other than the one from which you are now claiming asylum?

    [X] No      [ ] Yes

    If "Yes" to either or both questions (2A and/or 2B), provide for each person the following: the name of each country and the length of stay, the person's status while there, the reasons for leaving, whether or not the person is entitled to return for lawful residence purposes, and whether the person applied for refugee status or for asylum while there, and if not, why he or she did not do so.

    Mexico

3.  Have you, your spouse or your child(ren) ever ordered, incited, assisted or otherwise participated in causing harm or suffering to any person because of his or her race, religion, nationality, membership in a particular social group or belief in a particular political opinion?

    [X] No      [ ] Yes

    If "Yes," describe in detail each such incident and your own, your spouse's, or your child(ren)'s involvement.

Form I-589 (Rev. 08/25/20)  Page 7

## Part C. Additional Information About Your Application (Continued)

4. After you left the country where you were harmed or fear harm, did you return to that country?

   [X] No          [ ] Yes

   If "Yes," describe in detail the circumstances of your visit(s) (for example, the date(s) of the trip(s), the purpose(s) of the trip(s), and the length of time you remained in that country for the visit(s).)

5. Are you filing this application more than 1 year after your last arrival in the United States?

   [X] No          [ ] Yes

   If "Yes," explain why you did not file within the first year after you arrived. You must be prepared to explain at your interview or hearing why you did not file your asylum application within the first year after you arrived. For guidance in answering this question, see Instructions, **Part 1. Filing Instructions, Section V. Completing the Form, Part C.**

6. Have you or any member of your family included in the application ever committed any crime and/or been arrested, charged, convicted, or sentenced for any crimes in the United States (including for an immigration law violation)?

   [X] No          [ ] Yes

   If "Yes," for each instance, specify in your response: what occurred and the circumstances, dates, length of sentence received, location, the duration of the detention or imprisonment, reason(s) for the detention or conviction, any formal charges that were lodged against you or your relatives included in your application, and the reason(s) for release.

   If you have been arrested in the United States, you must submit a certified copy of all arrest reports, court dispositions, sentencing documents, and any other relevant documents.

## Part D. Your Signature

I certify, under penalty of perjury under the laws of the United States of America, that this application and the evidence submitted with it are all true and correct. Title 18, United States Code, Section 1546(a), provides in part: Whoever knowingly makes under oath, or as permitted under penalty of perjury under Section 1746 of Title 28, United States Code, knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document containing any such false statement or which fails to contain any reasonable basis in law or fact - shall be fined in accordance with this title or imprisoned for up to 25 years. I authorize the release of any information from my immigration record that U.S. Citizenship and Immigration Services (USCIS) needs to determine eligibility for the benefit I am seeking.

| |
|---|
| Staple your photograph here or the photograph of the family member to be included on the extra copy of the application submitted for that person. |

**WARNING:** Applicants who are in the United States unlawfully are subject to removal if their asylum or withholding claims are not granted by an asylum officer or an immigration judge. Any information provided in completing this application may be used as a basis for the institution of, or as evidence in, removal proceedings even if the application is later withdrawn. Applicants determined to have knowingly made a frivolous application for asylum will be permanently ineligible for any benefits under the Immigration and Nationality Act. You may not avoid a frivolous finding simply because someone advised you to provide false information in your asylum application. If filing with USCIS, unexcused failure to appear for an appointment to provide biometrics (such as fingerprints) and your biographical information within the time allowed may result in an asylum officer dismissing your asylum application or referring it to an immigration judge. Failure without good cause to provide DHS with biometrics or other biographical information while in removal proceedings may result in your application being found abandoned by the immigration judge. See sections 208(d)(5)(A) and 208(d)(6) of the INA and 8 CFR sections 208.10, 1208.10, 208.20, 1003.47(d) and 1208.20.

| Print your complete name. | Write your name in your native alphabet. |
|---|---|
| Serhat Bozkus | Serhat Bozkus |

Did your spouse, parent, or child(ren) assist you in completing this application?   [X] No   [ ] Yes *(If "Yes," list the name and relationship.)*

| _____ | _____ | _____ | _____ |
|---|---|---|---|
| *(Name)* | *(Relationship)* | *(Name)* | *(Relationship)* |

Did someone other than your spouse, parent, or child(ren) prepare this application?   [ ] No   [X] Yes *(If "Yes," complete Part E.)*

Asylum applicants may be represented by counsel. Have you been provided with a list of persons who may be available to assist you, at little or no cost, with your asylum claim?   [ ] No   [X] Yes

Signature of Applicant *(The person in Part A.I.)*

➡ [ _____ ]          02/09/2022

Sign your name so it all appears within the brackets          Date of signature (mm/dd/yyyy)

## Part E. Declaration of Person Preparing Form, if Other Than Applicant, Spouse, Parent, or Child

I declare that I have prepared this application at the request of the person named in Part D, that the responses provided are based on all information of which I have knowledge, or which was provided to me by the applicant, and that the completed application was read to the applicant in his or her native language or a language he or she understands for verification before he or she signed the application in my presence. I am aware that the knowing placement of false information on the Form I-589 may also subject me to civil penalties under 8 U.S.C. 1324c and/or criminal penalties under 18 U.S.C. 1546(a).

| Signature of Preparer | Print Complete Name of Preparer |
|---|---|
| Serbest | Law Offices of Metin Serbest |

| Daytime Telephone Number | Address of Preparer: Street Number and Name |
|---|---|
| (312) 473 5600 | 2200 E Devon Ave |

| Apt. Number | City | State | Zip Code |
|---|---|---|---|
| Ste: 358 | Des Plaines | IL | 60018 |

| To be completed by an attorney or accredited representative (if any). | [ ] Select this box if Form G-28 is attached. | Attorney State Bar Number (if applicable) | Attorney or Accredited Representative USCIS Online Account Number (if any) |
|---|---|---|---|
| | | | |

Form I-589 (Rev. 08/25/20) Page 9

## Part F. To Be Completed at Asylum Interview, if Applicable

**NOTE:** *You will be asked to complete this part when you appear for examination before an asylum officer of the Department of Homeland Security, U.S. Citizenship and Immigration Services (USCIS).*

I swear (affirm) that I know the contents of this application that I am signing, including the attached documents and supplements, that they are ☐ all true or ☐ not all true to the best of my knowledge and that correction(s) numbered _____ to _____ were made by me or at my request. Furthermore, I am aware that if I am determined to have knowingly made a frivolous application for asylum I will be permanently ineligible for any benefits under the Immigration and Nationality Act, and that I may not avoid a frivolous finding simply because someone advised me to provide false information in my asylum application.

Signed and sworn to before me by the above named applicant on:

_____          _____
Signature of Applicant                                    Date *(mm/dd/yyyy)*

_____          _____
Write Your Name in Your Native Alphabet              Signature of Asylum Officer

## Part G. To Be Completed at Removal Hearing, if Applicable

**NOTE:** *You will be asked to complete this Part when you appear before an immigration judge of the U.S. Department of Justice, Executive Office for Immigration Review (EOIR), for a hearing.*

I swear (affirm) that I know the contents of this application that I am signing, including the attached documents and supplements, that they are ☐ all true or ☐ not all true to the best of my knowledge and that correction(s) numbered _____ to _____ were made by me or at my request. Furthermore, I am aware that if I am determined to have knowingly made a frivolous application for asylum I will be permanently ineligible for any benefits under the Immigration and Nationality Act, and that I may not avoid a frivolous finding simply because someone advised me to provide false information in my asylum application.

Signed and sworn to before me by the above named applicant on:

_____          _____
Signature of Applicant                                    Date *(mm/dd/yyyy)*

_____          _____
Write Your Name in Your Native Alphabet              Signature of Immigration Judge

| A-Number *(If available)* | Date |
|---|---|
| Applicant's Name | Applicant's Signature |

## List All of Your Children, Regardless of Age or Marital Status
*(NOTE: Use this form and attach additional pages and documentation as needed, if you have more than four children)*

| 1. Alien Registration Number (A-Number) *(if any)* | 2. Passport/ID Card Number *(if any)* | 3. Marital Status *(Married, Single, Divorced, Widowed)* | 4. U.S. Social Security Number *(if any)* |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth *(mm/dd/yyyy)* |
| 9. City and Country of Birth | 10. Nationality *(Citizenship)* | 11. Race, Ethnic, or Tribal Group | 12. Gender ☐ Male   ☐ Female |

13. Is this child in the U.S. ?  ☐ Yes *(Complete Blocks 14 to 21.)*  ☐ No *(Specify location):* _____

| 14. Place of last entry into the U.S. | 15. Date of last entry into the U.S. *(mm/dd/yyyy)* | 16. I-94 Number *(If any)* | 17. Status when last admitted *(Visa type, if any)* |
|---|---|---|---|
| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any? *(mm/dd/yyyy)* | 20. Is your child in Immigration Court proceedings? ☐ Yes   ☐ No | |

21. If in the U.S., is this child to be included in this application? *(Check the appropriate box.)*
☐ Yes *(Attach one photograph of your child in the upper right corner of Page 9 on the extra copy of the application submitted for this person.)*
☐ No

| 1. Alien Registration Number (A-Number) *(if any)* | 2. Passport/ID Card Number *(if any)* | 3. Marital Status *(Married, Single, Divorced, Widowed)* | 4. U.S. Social Security Number *(if any)* |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth *(mm/dd/yyyy)* |
| 9. City and Country of Birth | 10. Nationality *(Citizenship)* | 11. Race, Ethnic, or Tribal Group | 12. Gender ☐ Male   ☐ Female |

13. Is this child in the U.S. ?  ☐ Yes *(Complete Blocks 14 to 21.)*  ☐ No *(Specify location):* _____

| 14. Place of last entry into the U.S. | 15. Date of last entry into the U.S. *(mm/dd/yyyy)* | 16. I-94 Number *(If any)* | 17. Status when last admitted *(Visa type, if any)* |
|---|---|---|---|
| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any? *(mm/dd/yyyy)* | 20. Is your child in Immigration Court proceedings? ☐ Yes   ☐ No | |

21. If in the U.S., is this child to be included in this application? *(Check the appropriate box.)*
☐ Yes *(Attach one photograph of your child in the upper right corner of Page 9 on the extra copy of the application submitted for this person.)*
☐ No

Supplement B, Form I-589

## Additional Information About Your Claim to Asylum

| A-Number (if available) | Date |
|---|---|
| 220-712-429 | 02/09/2022 |

| Applicant's Name | Applicant's Signature |
|---|---|
| Serhat Bozkus | |

**NOTE:** *Use this as a continuation page for any additional information requested. Copy and complete as needed.*

Part _____

Question _____

SEHITLIK LISESI, HIGH SCHOOL, DIYARBAKIR/TURKEY, 09/2005- 06/2009
MEHMET AKIF ERSOY ILK OGRETIM OKULU, MIDDLE SCHOOL, DIYARBAKIR/TURKEY, 09/2001-06/2005
MEHMET AKIF ERSOY ILK OGRETIM OKULU, GRADE SCHOOL, DIYARBAKIR/TURKEY, 09/1997-06/2001


ZELAL BOZKUS, DIYARBAKIR/TURKEY, DIYARBAKIR/TURKEY
ROHAT BOZKUS, ISTANBUL/TURKEY, ISTANBUL/TURKEY


of this my sister was afraid to go to school. in 2009 i had attended a kurdish cultural center and because of this the police intercepted our path and tried to scare us. in 2010 i attended a meeting in diyarbakir, i was beaten by police by batons. in 2011 i attended a peaceful protest of roboski, the police again surrounded us and again beat us with batons. in 2012 i was mistreated while applying to Celal Beyar's dormitory because of my ethnicity and because I spoke Kurdish. Guards at the school threatened me to become an ear for the Kurds. The guards also made me do things against my free will. in 2013/2014 i attended a meeting in diyarbakir where the police had attacked us and i endured a baton beating and my friend was covered in blood. In 2014 the Turkish government paid a fine for burning our home down in the 1990's at the Yalaza village. in 2014 ultranationalists had attacked me and my friends because we had organized a stand to help the Kurdish people at school, during the attack I had sprained my wrist. In 2015 at the campus, my friends and I were attacked again at the stand by nationalists and my friend was knived, they had thrown a chair at my head, and other were hurt. in 2014 in ankara i kept getting pulled over and questioned if i was turkish or kurdish, when i had said i was kurdish the police insulted me. in 2014 after the presidents speach, we organized a peaceful protest in Diyarbakir. When I attended, I had endured pepper gas. When I tried to go home with others, the police at shot fires towards us. in mersin 2015 the nationalists had insulted and attacked us on campus and i had sprained my ankle. After this attacked the guards had threatened us with our safety. in 2016 at campus cafeteria nationalists had thrown a trash bag full of glass towards me and i had cuts on my hand. in 2016/2017 my brother rohat bozkus, was taken into custody because the police thought he was a terrorist. the police had severely beaten him and had bruises all over his legs. the police then raided our home a day later. in 2016 my friends were all jailed for being members and supporters of the HDP, there was also a Kurdish center by our home and most members were jailed. I was forced to go back to Diyarbakir as my life was in danger. During the end of 2016, the police had shot plastic bullets at a peaceful protest on campus. in 2016 in our village in diyarbakir, a helicopter passing by had shot down an entire street. in 2017 my brother felat bozkus and i went to the precinct, the turkish security forces had taken my brother without any say. we did not hear from him for 2 weeks. he was insulted and severely beaten while gone. 1 day later, a raid was organized for his home, the home in our village, and our home in downtown. my brothers children were frightened for going out of the home. in 2017/2018, the first Kurdish school in Diyarbakir/ Turkey was demolished by the Turkish army. in 2017 i went to Iraq to start an engineering position and my boss had questioned and mistreated me because of this I was afraid and fled back home. in 2018 while I was hanging out my cousins wedding invitation in Lice/Diyarbakir, the police had stopped us on the way back and threatened me for being a spy or that they would hold me for as long as they could. in 2018 on our way back with my cousin, from lice to downtown, the police had detained us and took our phones unlawfully. in 07/2019, the police had raided my brother's home, felat bozkus, and broke the door. in 2019, my friends had gone to Batman with my car, my friends were pulled

friends were pulled over and jailed because tried them as terrorists, because they support HDP. In 2018 there was a soldier operation in Yalaza, Diyarba The soldiers used me as a ploy because I did not so military service and used me against the village to show that I was on their side. While I came to Mexico November of 2021, the airport police at Istanbul airport had treated me as a terrorist, taken me aside and held me for over 1 hr. Since 2015, I am unable to sleep at pea in any home. My brother, Rohat Bozkus, was mistreated and not treated the same as other military men, he was not even given a gun during his military service. Since 2012 I have been taken to deserted areas and threatened by police every once in a while. My friend, Tarik, had been taken to court because he attended a peaceful protest on campus. I am unable to use any sort of smart phone because I am being followed by police. In 2018 the police had questioned a neighbor of ours about our involvement with PKK. In 2017 our village of Yalaza was blocked and officially recognized as a "non entry" area. Due to this the people and myself were not allowed to bring in or out any food or goods.



EOIR #919 of 523

SERHAT BOZKUS
A# 220-712-429

I, COMERT KURDISTAN, hereby declare as follow:

1. I am submitting my documents in support of his bond hearing.

2. I am a naturalized United States Citizen.

3. SERHAT BOZKUS is a distant relative of mine.

4. I am self-employed, owner of the LEYLA Mediterranean Kurdish restaurant in Cincinnati, OH.

5. I Asked my dear friend doctor Mujgan to sponsor SERHAT as restaurant industry income decreased due to Covid-19.

6. As a Kurd who was born in Kurdistan, I am involved with the Kurdish community in north America as I sympathize with the cause.

7. I promise that I will take any necessary steps to ensure that SERHAT make it to any and all court hearings or interviews.

8. Attached hereto are true and correct copies of my proper Identifications and financial documents. Your honor, please contact me should you have any questions or concerns at my cell phone below.

I declare under penalty of perjury that the foregoing statements made by me are true and correct and I further acknowledge that I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: 2/11/2021          Signature: _____

COMERT KURDISTAN

Phone: 513-655-8989

3

SIGNATURE OF BEARER / SIGNATURE DU TITULAIRE / FIRMA DEL TITULAR

UNITED STATES OF AMERICA

Type / Type / Tipo
P

Code / Code / Código
USA

Passport No. / No du Passeport / No. de Pasaporte
645125709

Surname / Nom / Apellidos
KURDISTAN

Given Names / Prénoms / Nombres
COMERT

Nationality / Nationalité / Nacionalidad
UNITED STATES OF AMERICA

Date of birth / Date de naissance / Fecha de nacimiento
03 Sep 1978

Sex / Sexe / Saxo
M

Place of birth / Lieu de naissance / Lugar de nacimiento
TURKEY

Date of issue / Date de délivrance / Fecha de expedición
18 Oct 2019

Authority / Autorité / Autoridad
United States
Department of State

Date of expiration / Date d'expiration / Fecha de caducidad
17 Oct 2029

Endorsements / Mentions Spéciales / Anotaciones
SEE PAGE 27

PASSPORT
PASSEPORT
PASAPORTE

USA

USA

220-712-429

BOZKUS, SERHAT

I, MUJGAN INCILER, hereby declare as follow:

1. I am submitting my documents in support of SERHAT BOZKUS's bond hearing.

2. I am a naturalized United States Citizen.

3. I reside at 5841 Hamilton Mason Rd, Liberty Twp, Ohio 45011-9723 and I have been employed by THE STATE OF OHIO for over 20 years now.

4. I was asked by Serhat's relative Mr. Comert, a good friend mine for over 10 years, to sponsor serhat to get released from Immigration Detention Center.

5. I will be more than happy to sponsor Serhat so that he could get et prepared for his immigration case.

6. I have never sponsored anyone else, and I am not getting paid in any way for sponsoring him.

7. Serhat could stay with me at our family home as long as needed. Furthermore, I promise that I will take any necessary steps to ensure that Serhat is safe and sound and makes it to all court hearings or interviews.

8. Attached hereto are true and correct copies of my proper Identifications and financial documents. Your honor, please contact me should you have any questions or concerns at my cell phone below.

I declare under penalty of perjury that the foregoing statements made by me are true and correct and I further acknowledge that I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated:02/05/2022

Signature: _____

MUJGAN INCILER

Phone: 513-910-3054

Form **W-2 Wage and Tax Statement** 2021

| 7 Social security tips | 1 Wages, tips, other comp. | 2 Federal income tax withheld |
|---|---|---|
| | 94884.58 | 9087.11 |

c Employer's name, address, and ZIP code
STATE OF OHIO
30 E BROAD ST 28TH FLOOR
COLUMBUS OH 43215-3430

| 8 Allocated tips | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| 9 | 5 Medicare wages and tips | 6 Medicare tax withheld |
| | 119630.43 | 1734.64 |
| 10 Dependent care benefits | 11 Nonqualified plans | 12a See instructions for box 12 |
| | | C 178.71 |

e Employee's name, address, and ZIP code
M INCILER-STRUNK
5841 HAMILTON MASON RD
LIBERTY TWP OH 45011-9723

| 13 Statutory employee / Retirement plan ✓ / Third-party sick pay | 14 Other | 12b |
|---|---|---|
| | SLW$511 4368.00 | G 12800.00 |
| b Employer identification number (EIN) 31-6402047 | UNFEE 2002.92 | 12c DD 25600.04 |
| a Employee's social security no. | RETIRE 11945.85 | 12d |

| 15 State | Employer's state I.D. no. | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| OH | 51164428 | 94884.58 | 2938.07 | | | |

Copy B To Be Filed With Employee's FEDERAL Tax Return

This information is being furnished to the Internal Revenue Service.
OMB No. 1545-0008

**Dept. of the Treasury - IRS**
Visit the IRS Web Site at www.irs.gov/efile

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

Form **W-2 Wage and Tax Statement** 2021

| 7 Social security tips | 1 Wages, tips, other comp. | 2 Federal income tax withheld |
|---|---|---|
| | 94884.58 | 9087.11 |

c Employer's name, address, and ZIP code
STATE OF OHIO
30 E BROAD ST 28TH FLOOR
COLUMBUS OH 43215-3430

| 8 Allocated tips | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| 9 | 5 Medicare wages and tips | 6 Medicare tax withheld |
| | 119630.43 | 1734.64 |
| 10 Dependent care benefits | 11 Nonqualified plans | 12a See instructions for box 12 |
| | | C 178.71 |

e Employee's name, address, and ZIP code
M INCILER-STRUNK
5841 HAMILTON MASON RD
LIBERTY TWP OH 45011-9723

| 13 Statutory employee / Retirement plan ✓ / Third-party sick pay | 14 Other | 12b |
|---|---|---|
| | SLW$511 4368.00 | G 12800.00 |
| b Employer identification number (EIN) 31-6402047 | UNFEE 2002.92 | 12c DD 25600.04 |
| a Employee's social security no. | RETIRE 11945.85 | 12d |

| 15 State | Employer's state I.D. no. | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| OH | 51164428 | 94884.58 | 2938.07 | | | |

Copy C For EMPLOYEE'S RECORDS (See Notice to Employee on back of Copy B)

OMB No. 1545-0008

**Dept. of the Treasury - IRS**

Form **W-2 Wage and Tax Statement** 2021

| 7 Social security tips | 1 Wages, tips, other comp. | 2 Federal income tax withheld |
|---|---|---|
| | 94884.58 | 9087.11 |

c Employer's name, address, and ZIP code
STATE OF OHIO
30 E BROAD ST 28TH FLOOR
COLUMBUS OH 43215-3430

| 8 Allocated tips | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| 9 | 5 Medicare wages and tips | 6 Medicare tax withheld |
| | 119630.43 | 1734.64 |
| 10 Dependent care benefits | 11 Nonqualified plans | 12a |
| | | C 178.71 |

e Employee's name, address, and ZIP code
M INCILER-STRUNK
5841 HAMILTON MASON RD
LIBERTY TWP OH 45011-9723

| 13 Statutory employee / Retirement plan ✓ / Third-party sick pay | 14 Other | 12b |
|---|---|---|
| | SLW$511 4368.00 | G 12800.00 |
| b Employer identification number (EIN) 31-6402047 | UNFEE 2002.92 | 12c DD 25600.04 |
| a Employee's social security no. | RETIRE 11945.85 | 12d |

| 15 State | Employer's state I.D. no. | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| OH | 51164428 | 94884.58 | 2938.07 | | | |

Copy 2 To Be Filed With Employee's State, City, or Local Income Tax Return

OMB No. 1545-0008

**Dept. of the Treasury - IRS**

Form **W-2 Wage and Tax Statement** 2021

| 7 Social security tips | 1 Wages, tips, other comp. | 2 Federal income tax withheld |
|---|---|---|
| | 94884.58 | 9087.11 |

c Employer's name, address, and ZIP code
STATE OF OHIO
30 E BROAD ST 28TH FLOOR
COLUMBUS OH 43215-3430

| 8 Allocated tips | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| 9 | 5 Medicare wages and tips | 6 Medicare tax withheld |
| | 119630.43 | 1734.64 |
| 10 Dependent care benefits | 11 Nonqualified plans | 12a |
| | | C 178.71 |

e Employee's name, address, and ZIP code
M INCILER-STRUNK
5841 HAMILTON MASON RD
LIBERTY TWP OH 45011-9723

| 13 Statutory employee / Retirement plan ✓ / Third-party sick pay | 14 Other | 12b |
|---|---|---|
| | SLW$511 4368.00 | G 12800.00 |
| b Employer identification number (EIN) 31-6402047 | UNFEE 2002.92 | 12c DD 25600.04 |
| a Employee's social security no. | RETIRE 11945.85 | 12d |

| 15 State | Employer's state I.D. no. | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| OH | 51164428 | 94884.58 | 2938.07 | | | |



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**OTERO IMMIGRATION COURT**

Respondent Name:

BOZKUS, SERHAT

To:

Serbest, Metin
2200 E. Devon Ave Suite 358
Des Plaines, IL 60018

A-Number:

 220712429

Riders:

In Custody Redetermination Proceedings

Date:

03/09/2022

**ORDER OF THE IMMIGRATION JUDGE**

The respondent requested a custody redetermination pursuant to 8 C.F.R. § 1236.  After full consideration of the evidence presented, the respondent's request for a change in custody status is hereby ordered:

☒ Denied, because

    flight risk

☐ Granted. It is ordered that Respondent be:

    ☐ released from custody on his own recognizance.

    ☐ released from custody under bond of $

    ☐ other:

☐ Other:

Immigration Judge: Girvin, Ralph  03/09/2022

Appeal:   Department of Homeland Security:   ☒ waived   ☐ reserved
          Respondent:                       ☒ waived   ☐ reserved


Appeal Due:

## Certificate of Service

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service

To: [  ] Noncitizen | [  ] Noncitizen c/o custodial officer | [ E ] Noncitizen's atty/rep. | [ E ] DHS

By:  Castillo, Irene , Court Staff

Date:  03/09/2022

Metin Serbest, Esquire                                        **DETAINED**
Law Office of Metin Serbest
2200 E. Devon Ave. Suite 358
Des Plaines, Illinois 60018


### UNITED STATES DEPARTMENT OF JUSTICE
### EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
### OTERO IMMIGRATION COURT
### 26 MCGREGOR RANGE ROAD
### CHAPARRAL, NEW MEXICO


In the Matter of:                          )
BOZKUS, SERHAT                             )          File No. A# 220-712-429
Respondent In Removal Proceedings  )
                                           )


### MOTION FOR BOND REDETERMINATION HEARING

**COMES NOW** the Respondent BOZKUS, SERHAT   by and through his undersigned attorney and
moves this court to set bond in this matter pursuant to 8 C.F.R. § 1003.19 and in support thereof,
states:

Pursuant to 8 C.F.R. 1003.14(a), we request review by an Immigration Judge of the custody and
bond determination made by the Department of Homeland Security (DHS) regarding the above-
named individual.

The regulation clearly provides that, after an initial custody determination by DHS, the
respondent may request **amelioration of the conditions** under which he or she may be released.
The Immigration Judge has the authority to detain the person in custody or order release and
determine the amount of bond, if any, under which the person may be released.  8 C.F.R. §§
1236.1(d),  1003.19.

Under 8 C.F.R. § 1003.19(c), applications for the exercise of the authority to review bond
determinations are to be made first, if the person is detained, to the Immigration Court having
jurisdiction over the place of detention.   Under 8 CFR §1003.19(d), this Court's
reconsideration of DHS custody of Respondent is to be considered separately and apart from
any deportation or removal hearing or proceeding.

In this case:

1. Respondent, BOZKUS, SERHAT is currently in removal proceedings and being held in custody at the Cibola County Correctional Center.

2. Respondent has applied for asylum and for withholding of removal. The Court denied Respondent's application on April 12th, 2022. This denial is pending further proceedings before the BIA.

3. Respondent is being held in custody without bond being set and requests that an Immigration Judge redetermine this decision pending the outcome of his proceedings.

4. Respondent has been diagnosed with chronic post-traumatic stress disorder ("PTSD") and his mental health diagnoses include "Major depression, recurrent," a "Mood problem," from which he is suffering increasingly acute symptoms as a result of his confinement [see Exhibit 1, medical evaluation reports from Dr. Anne Ortiz, Cibola County Correctional Center, dated May 11, 2022, and May 17, 2022].

5. Respondent's circumstances of confinement are exacerbating his PTSD symptoms. As Respondent recounts in his medical evaluation, his circumstances of confinement in a correctional facility call to mind traumatic and unwanted memories of repeated incidents of trauma experienced at the hands of Turkish police and security forces in jails there [see Initial Mental Health Visit Report of May 11th, 2022, Exhibit 1 at p. 4 of 5]. These symptoms include heightened anxiety, nightmares, sleeplessness, and chest pain [Ex. 1, May 11th Initial Visit, pp. 1 and 4 of 5, and May 17th Follow-Up Visit, pp. 1 and 4 of 5].

6. Respondent has been treated with psychotropic medication, but this medication has not diminished or relieve his symptoms due to the aforementioned circumstances of confinement that call forth past instances of trauma Respondent suffered in Turkey. As Respondent states, as relayed by Dr. Ortiz in Respondent's initial mental health evaluation, "I cannot sleep at night. I have nightmares and I am depressed. I cannot even relax with the others. I walk around until 4 or 5 AM. The medication helps but when I do finally sleep I will have 4 or 5 nightmares about being in Jail or my family in Turkey being harmed." [Ex. 1, Initial Visit p. 4 of 5].

7. These symptoms are consistent with the harms that can be suffered by persons having experienced past trauma in their home countries while being detained in the United States awaiting processing of their immigration proceedings [See Exhibit 2, Public Comment from the American Psychological Association dated May 25th, 2022. In its public comment on pending changes to guidelines and procedures for the evaluation of asylum claims for persons such as Respondent who are in detention and subject to removal proceedings, the APA "cannot underscore enough the importance of considering the mental health of the detainees and the strong possibility that the longer individuals are held, the more likely their mental health will suffer...." [Ex. 2, at p. 3]. The APA stresses "the importance of limiting detention or at least limiting the amount of time individuals are held" and which "should be minimized to avoid creating greater stress for the immigrants and worsening their mental health conditions." [Ex. 2, pp. 1, 3]. Respondent's worsening

mental health condition is consistent with the risks described by the APA for which sufficient precautions must be taken by authorities exercising custody over Respondent.

8. The fact that Respondent was recalled for his follow-up visit after only six days when follow-up was originally indicated to take place after one month suggests Respondent's symptoms are worsening, which also constitutes a further material change in the circumstances of Respondent's conditions while in detention [Ex. 1].

9. Furthermore, Respondent has a serious physical health issue requiring intervention without which he may suffer ***irreparable harm***. Specifically, his **high *blood pressure in combination with an untreated herniated disc in his neck is resulting in* hearing loss which may become permanent if left untreated** [Ex. 1]. Respondent was advised by medical doctors at Cibola that he needed immediate medical attention that is not available at that facility, without which he could suffer hearing loss.

10. Respondent is suffering 70% hearing loss in his left ear, indicating this his condition is at an acute stage, and further reinforcing Respondent's need for immediate medical treatment unavailable to him at the Cibola County Correctional Facility due to the serious risk he now faces of a total loss of hearing in his left ear [Ex. 1].

11. Respondent presents no danger to the community at large as he has not committed any crime anywhere in the world. He was recently issued a Turkish passport and allowed to leave Turkey which is an indication that he is not wanted for any crime.

12. Respondent has a Sponsor willing to house him. Due to his medical conditions, his need for further treatment, and his extreme fear of returning to Turkey, Respondent is not a flight risk. Respondent will continue to report his presence to immigration authorities in conjunction with his Sponsor, Selcuk Morsumbul, a friend residing at 1116 Capuchino Ave. #3 in Burlingame, CA who has known Respondent's family for many years and is a good friend of Respondent's brother for a very long time.

13. For reasons of these recent material changes in Respondent's circumstances, namely, his deteriorating state of physical and mental health due to his continued confinement in the Cibola County Correctional Center for which Respondent bears a considerable and unreasonable risk of irreparable harm due to the circumstances of his custody under DHS, Respondent respectfully requests this honorable Court calendar a Custody Redetermination Hearing at the Court's earliest convenience to redetermine DHS custody of Respondent.

Respectfully submitted this 3rd day of June, 2022

By: _____

Metin Serbest, Esq.

## Exhibits in Support of Respondent Motion for Redetermination of Custody Hearing

Exhibit 1 – Medical Evaluation Reports of Respondent by Dr. Anne Ortiz, Cibola County Correctional Facility dated May 11th (Initial Evaluation) and May 17th (Follow-up Evaluation) [10 pages total]

Exhibit 2 – May 25th 2022 Public Comment of the American Psychological Association to DHS Docket No. USCIS-2021-0012, *Comments on Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers* [4 pages]

## CERTIFICATE OF SERVICE

On June 3rd, 2022, I, Metin Serbest, served a copy of this Motion for Reconsideration of Custody Hearing in the above-titled matter to the Department of Homeland Security, Office of Chief Counsel via ICE e-service, El-Paso portal.

Respectfully Submitted,

Metin Serbest, Esq.

## Mental Health – Initial or Follow-Up Visit

**Inmate/Resident Name:** SERHAT BOZKUS   **Number** 220712429 – ICE   **DOB** 01/01/1992

**Facility:** Cibola County Correctional Facility   **Date:** 05/17/2022

### SUBJECTIVE (Check all that apply.)

1) Reason for this visit: ☐ Initial   ☒ Follow-up

2) Referral source:
☐ Sick Call   ☐ Intake   ☐ Medical staff   ☐ Security   ☒ Follow-up

3) Chief complaint:
☒ Depression   ☒ Anxiety   ☐ Psychosis   ☐ Irritability
☐ Fear   ☐ Anger   ☒ Sleeplessness   ☐ Decrease energy
☐ Thoughts of self-injury   ☐ Drug withdrawal   ☐ Change in appetite   ☐ Poor concentration
☐ Other

4) Please describe current signs and symptoms and/or responses to treatment:

Continued to Last Page

### OBJECTIVE (Check all that apply)

5) Please check all that apply

| | | | | | |
|---|---|---|---|---|---|
| Appearance: | ☒ Neat | ☐ Disheveled | ☐ Bizarre | ☒ Tense | ☐ Poised | ☒ Appropriate |
| Behavior: | ☒ Calm | ☐ Agitated | ☐ Paranoid | ☐ Restless | ☒ Cooperative | |
| Mood: | ☒ Depressed | ☐ Anxious | ☐ Labile | ☐ Euthymic | ☐ Frightened | |
| Affect: | ☐ Blunted | ☒ Within Normal Limits | ☐ Flat | ☐ Constricted | |
| Speech: | ☐ Rapid | ☐ Pressured | ☐ Mumbled | ☐ Soft | ☒ Normal | |
| Perception: | ☐ Hallucinations | ☐ Illusions | ☒ No Abnormalities | | |
| Thought process: | ☒ Organized | ☐ Racing | ☐ Loose Associations | ☐ Flight of Ideas | |
| Thought content: | ☐ Suicidal | ☐ Homicidal | ☐ Delusions | ☐ Paranoia | ☐ Phobias |

6) Oriented to person, place, and time:   ☒ Yes   ☐ No   Specify

7) Concentration intact:   ☒ Yes   ☐ No   Memory intact:   ☒ Yes   ☐ No

8) Abstract thinking intact:   ☒ Yes   ☐ No   Insight and judgment intact:   ☒ Yes   ☐ No

9) Reliable history and information:   Record ☒ Yes   ☐ No   From patient:   ☒ Yes   ☐ No

**Signature:** Anne Ortiz, M.D.; May 17 2022 2:22PM MST (Author)

## OBJECTIVE *(continued)* (Check all that apply)

10) For new patients check all that apply:

☐ Prior mental health treatment      ☐ Recent suicidal/homicidal ideations
☐ History of psychiatric hospitalization      ☒ Current treatment with psychotropics
☐ Prior suicide attempt

11) Comments regarding result of AIMS assessment (if receiving antipsychotics / neuroleptics /phenothiazines):

12) Current Medications: ☒ Reviewed    Compliant with current medication regimen and/or treatment? ☒ No  ☐Yes
   ** It is unacceptable to document "See MAR."     Medication name, Dosage and Frequency must be completed

Medication: Dose and Frequency

         Doxepin HCl - 10 MG Oral Capsule #30 Capsule, TAKE 1 CAPSULE BEDTIME, 2 refills
         OXcarbazepine 300 MG Oral Tablet #30 Tablet, 1QHS, 2 refills

Have medications or dosages changed over the past 8 weeks? ☒ No  ☐Yes, Specify:

AM Medication Non-Compliance

Medication Allergies? ☐ No  ☒Yes, List:

No Known Allergies

## ASSESSMENT

13) Diagnosis:

Continued to Last Page

Name: SERHAT BOZKUS           Inmate/Resident # 220712429 - ICE

Signature: Anne Ortiz, M.D.; May 17 2022 2:22PM MST (Author)

## Plan

14) **Plan:** Include new meds prescribed and/or dosage changes

Trileptal 300mg po qhs-Mood
Doxepin 10mg po qhs-Depression and PTSD caused sleep disturbance

  *** Female offenders must have a pregnancy test prior to initiation of psychotropic medications

15) Follow-up:

16) Education:
| | | | | | |
|---|---|---|---|---|---|
| Counseled on Medication Effects & S/E | ☑ Yes | ☐ No | Counseled on Medication Compliance | ☑ Yes | ☐ No |
| Counseled on Signs of Toxicity | ☑ Yes | ☐ No | Informed Consent for Medications | ☑ Yes | ☐ No |

17) Return visit: ☐ 2 weeks  ☑ 1 month  ☐ 3 months  ☐ other

  (Order(s) must be written for next scheduled visit, to include laboratory testing, diet, medications, or other therapies)

**Name:** SERHAT  BOZKUS          **Inmate/Resident #** 220712429 - ICE

Signature: Anne Ortiz, M.D.; May 17 2022  2:22PM MST (Author)

Page 3 of 5

*Please use this page to comment on findings from previous pages*

Continued from Subj 4 signs-symptoms-tx - "I am still having 4-5 nightmares every night after pacing in until 4 or 5 am.
That is why I wasn't getting up to take the am medication. Taking the am medication and not having enough sleep makes me
too sleepy in the day. So it is better not to take am medication. Being in jail here bring up all my fears of being put
in jail and tortured. My stress keeps me from being able to watch TV or Spend time with others here. Even the officers
ask how I am and say they are sorry that I am feeling so bad."

Continued from Assess 13 Diagnosis text - Chest wall pain
Chronic post-traumatic stress disorder (PTSD)
Major depression, recurrent
Mood problem
Neck pain
Perforation of tympanic membrane

**Name:** SERHAT BOZKUS

**Inmate/Resident #** 220712429 - ICE

**Signature:** Anne Ortiz, M.D.; May 17 2022 2:22PM MST (Author)

*Please use this page to comment on findings from previous pages*

**Name:** SERHAT   BOZKUS                    **Inmate/Resident #** 220712429 - ICE

**Signature:** Anne Ortiz, M.D.; May 17 2022  2:22PM MST (Author)

## Mental Health – Initial or Follow-Up Visit

**Inmate/Resident Name:** SERHAT BOZKUS     **Number** 220712429 – ICE    **DOB** 01/01/1992

**Facility:** Cibola County Correctional Facility     **Date:** 05/11/2022

### SUBJECTIVE (Check all that apply.)

1) Reason for this visit:   ☒ Initial    ☐ Follow-up

2) Referral source:
   ☐ Sick Call    ☒ Intake    ☐ Medical staff    ☐ Security    ☐ Follow-up

3) Chief complaint:
| | | | |
|---|---|---|---|
| ☒ Depression | ☒ Anxiety | ☐ Psychosis | ☐ Irritability |
| ☐ Fear | ☐ Anger | ☒ Sleeplessness | ☐ Decrease energy |
| ☐ Thoughts of self-injury | ☐ Drug withdrawal | ☐ Change in appetite | ☐ Poor concentration |
| ☐ Other | | | |

4) Please describe current signs and symptoms and/or responses to treatment:

Continued to Last Page

### OBJECTIVE (Check all that apply)

5) Please check all that apply

| | | | | | | |
|---|---|---|---|---|---|---|
| Appearance: | ☒ Neat | ☐ Disheveled | ☐ Bizarre | ☒ Tense | ☐ Poised | ☒ Appropriate |
| Behavior: | ☐ Calm | ☐ Agitated | ☐ Paranoid | ☐ Restless | ☐ Cooperative | |
| Mood: | ☒ Depressed | ☒ Anxious | ☐ Labile | ☐ Euthymic | ☐ Frightened | |
| Affect: | ☐ Blunted | ☐ Within Normal Limits | ☐ Flat | ☒ Constricted | | |
| Speech: | ☐ Rapid | ☐ Pressured | ☐ Mumbled | ☐ Soft | ☒ Normal | |
| Perception: | ☐ Hallucinations | ☐ Illusions | ☒ No Abnormalities | | | |
| Thought process: | ☒ Organized | ☐ Racing | ☐ Loose Associations | | ☐ Flight of Ideas | |
| Thought content: | ☐ Suicidal | ☐ Homicidal | ☐ Delusions | ☐ Paranoia | ☐ Phobias | |

6) Oriented to person, place, and time:   ☒ Yes    ☐ No    Specify

7) Concentration intact:   ☒ Yes    ☐ No    Memory intact:   ☒ Yes    ☐ No

8) Abstract thinking intact:   ☒ Yes    ☐ No    Insight and judgment intact:   ☒ Yes    ☐ No

9) Reliable history and information:   Record ☒ Yes    ☐ No    From patient:   ☒ Yes    ☐ No

**Signature:** Anne Ortiz, M.D.; May 17 2022 1:53PM MST (Author)

## OBJECTIVE *(continued)* (Check all that apply)

10) For new patients check all that apply:

- ☐ Prior mental health treatment
- ☐ History of psychiatric hospitalization
- ☐ Prior suicide attempt
- ☐ Recent suicidal/homicidal ideations
- ☒ Current treatment with psychotropics

11) Comments regarding result of AIMS assessment (if receiving antipsychotics / neuroleptics /phenothiazines):

12) Current Medications: ☒ Reviewed    Compliant with current medication regimen and/or treatment? ☒ No    ☐Yes
   ** It is unacceptable to document "See MAR."    Medication name, Dosage and Frequency must be completed

Medication: Dose and Frequency

OXcarbazepine 300 MG Oral Tablet #30 Tablet, 1QHS, 2 refills

Have medications or dosages changed over the past 8 weeks? ☒ No    ☐Yes, Specify:
Patient states he has not been AM compliant on Trileptal because it causes am drowsiness, but wants pm dose

Medication Allergies?   ☐ No   ☒Yes,  List:
No Known Allergies

## ASSESSMENT

13) Diagnosis:

Continued to Last Page

Name: SERRAT  BOZKUS                                 Inmate/Resident # 220712429 - ICE

Signature:  Anne Ortiz, M.D.; May 17 2022  1:53PM MST (Author)

## Plan

14) **Plan:** Include new meds prescribed and/or dosage changes

Trileptal 300mg po qhs-Mood
Doxepin 10mg po qhs-Depression
Verbally consented for medication and AM medication that made him sleepy in the am was discontinued

   *** Female offenders must have a pregnancy test prior to initiation of psychotropic medications

15) Follow-up:

16) Education:

| | | | | | |
|---|---|---|---|---|---|
| Counseled on Medication Effects & S/E | ☒ Yes | ☐ No | Counseled on Medication Compliance | ☒ Yes | ☐ No |
| Counseled on Signs of Toxicity | ☒ Yes | ☐ No | Informed Consent for Medications | ☒ Yes | ☐ No |

17) Return visit: ☐ 2 weeks  ☒ 1 month  ☐ 3 months  ☐ other

   (Order(s) must be written for next scheduled visit, to include laboratory testing, diet, medications, or other therapies)

Name: SERHAT BOZKUS                    Inmate/Resident # 220712429 - ICE

Signature: Anne Ortiz, M.D.; May 17 2022  1:53PM MST (Author)

*Please use this page to comment on findings from previous pages*

Continued from Subj 4 signs-symptoms-tx - Discussed AM Medication NON-Compliance: Trileptal 300mg [1/2 Tablet] po BID: Patient explained that medication makes him sleepy in the day, but does want it for the night.
"I am a Kurd.  My dad was killed by the government when I was 2 y/o. My father was giving Kurdish classes for Kurdish people at a time the Government made speaking in Kurdish illegal.  My father also celebrated the Kurdish Holiday Newroz which the Government also banded.  Even saying Kurdish was banded.  My 3 brothers were jailed and tortured by the police and military working together.  One of my brothers was tortured so severely he could not walk afterwards. The police and military said of one of my 3 y/o neices would grow up to be a prostitute.  I have almost died several times in Turkey. Just walking down the street a police man tried to shoot me.  I have feared the police and soldiers since I was 3 y/o until now at 30 y/o.  My university friends were arrested and detained in jail and tortured. The police would ask my friends my whera I was and if I was a terrorist. The Police and military picked me up several times, but did not take me to the Police Station.  They took me instead to random place where there was nobody and threatened me.  I was studying Civil Engineering and Justice and because I had to move around so much to not be found I would not have completed my two degrees without the help from my professors.  I even signed up for a third degree, but I had to flee from Turkey. I finished my Justice degree with honors.  I had to escape and leave without telling  my sick mother and fiance whose mother had just died and they both tell me I have left them.  I don't understand, would they want me to be put in jail and tortured and killed just to be in Turkey.  Their logic is that I am in jail here anyway, but if I was in Turkey they woul be able to see me.  I have only called my mom 4 or 5 times in 6 months because I don't want her to cry.  My mom has diabetes, urinary incontinence and I don't want to hurt her heart by being here.  I cannot sleep at night.  I have nightmares and I am depressed.  I cannot even relax with the others.  I walk around until 4 or 5am.  The medication helps but when I do finally sleep I will have 4 or 5 nightmares about being in Jail or my family in Turkey being harmed.  I actually cannot hear well out of my Left ear and have an old C-spine disc herniation and HTN.

Continued from Assess 13 Diagnosis text - Chest wall pain
Chronic post-traumatic stress disorder (PTSD)
Mood problem
Neck pain
Perforation of tympanic membrane

---

**Name:** SERHAT  BOZKUS     **Inmate/Resident #** 220712429 - ICE

**Signature:** Anne Ortiz, M.D.; May 17 2022  1:53PM MST (Author)

*Please use this page to comment on findings from previous pages*

**Name:** SERHAT   BOZKUS          **Inmate/Resident #** 220712429 - ICE

**Signature:** Anne Ortiz, M.D.; May 17 2022  1:53PM MST (Author)

Page 5 of 5



May 25, 2022


Submitted via https://www. regulations.gov


Rená Cutlip-Mason
Chief
Division of Humanitarian Affairs
Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
5900 Capital Gateway Drive
Camp Springs, MD 20588

RE: DHS Docket No. USCIS-2021-0012, Comments on Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers

Dear Ms. Cutlip-Mason,

The American Psychological Association (APA), the leading scientific and professional organization representing psychology in the United States, with more than 133,000 researchers, educators, clinicians, consultants and students as its members, submits these comments in response to the Department of Homeland Security's (DHS) proposed interim final rule, DHS Docket No. USCIS-2021-0012, on Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers. We applaud the Administration's willingness to revise the proposed rule to improve the system for immigrants entering the country.

While we emphasize the importance of psychological expertise, we also want to mention the importance of limiting detention or at least limiting the amount of time individuals are held. While we appreciate the Department's emphasis on making the process more efficient, the expedited timeline should allow for sufficient time to allow immigrants to prepare for their hearings and proceedings. Also, we wish to emphasize the psychological importance of keeping families together.

**Importance of Psychological Expertise**

Border patrol officers, immigration enforcement officers, adjudicators and immigration judges are rarely trained to make educated assessments of credible or reasonable fear when dealing with immigrants applying for immigration relief.[1] Assessment of fear is a complex area of psychological expertise. Psychologists assessing credible fear utilize specialized methods and instruments that together with their cultural competence training helps them understand the individual's psychological picture. For instance, it is not unusual that when recounting traumatic experiences, an individual engages in self-protective strategies which may include minimization, dissociation of emotions, forgetfulness, resistance, or emotional disorganization that may confuse an untrained observer and lead them to misunderstand, understate, or ignore bona fide symptoms of credible fear to return to their country.[2]

In particular, these self-protective mechanisms can limit clear memory of traumatic events and make it difficult for such individuals to reveal their experience in a coherent fashion. Many refugees suffer from post-traumatic stress disorder, depression, anxiety, or other mental health difficulties in addition to the fact that they are in the process of making sense of the new country and the strangers with whom they are interacting.[3] These are all important factors to consider when the immigrants are being evaluated. The role of psychologists during this process cannot be forgotten either. Given these considerations, we would recommend having as many mental health experts available as possible during these proceedings.

**Expedited Timeline**

The expedited timeline proposed by the Department is problematic and may lead to streamlined removals because it demands the applicant proceed in an organized and systematic manner to relate their fears and experiences that prevent them from returning to their country safely. This process does not seem to take into consideration the manner in which trauma effects interfere with memory.[4] If an individual is forced to narrate their fears and experiences of trauma before they have had time to heal, it is likely that the asylum applicant may not be able to communicate effectively with officials and service providers, inadvertently omitting key events that are essential to the finding of credible or reasonable fear. One of the key elements of a trauma diagnosis is the avoidance of reminders of past trauma.[5] This is particularly challenging for young adults because the biological development of the brain, particularly those areas related to

---

[1] Filone, S. & DeMatteo, D. (2017) Assessing "credible fear": A psychometric examination of the Trauma Symptom Inventory-2 in the context of immigration court evaluations. *Psychological Assessment,* 29 (6), 701-709.
[2] Filone, S.
[3] Filone, S.
[4] Scott, J., et al., (2015) A Quantitative Meta-Analysis of Neurocognitive Functioning in Posttraumatic Stress Disorder, 141 Psych. Bulletin 105.
[5] Pechtel P. & Pizzagalli, D., (2010), Effects of early life stress on cognitive and affective function: An integrated review of human literature, 214 Psychopharmacology 55.

cognition, memory, and executive functioning, continues beyond the age of 18 and into the mid- or late-20s.[6]

## Holding Time and Psychological Impacts

We appreciate the Department's efforts to limit the amount of time immigrants are held in detention. The mental health problems that children and families experience as a result of family detention are well documented.

It is important for the mental health of immigrants to avoid detention during the credible and reasonable fear process. Unless there are extreme circumstances, detention should be minimized to avoid creating greater stress for the immigrants and worsening their mental health conditions. Many immigrants have experienced some form of trauma, but trauma affects a person in a variety of ways.[7] Because many immigrants experience traumatic and stressful events throughout the migration journey, they may not demonstrate any symptoms or experience the scope of their emotions, including credible and reasonable fear to return to their country, until they are in a safe environment.[8] Detention may not always make the immigrant feel safe and immigrants may present with blunted affect and suppression of their emotions due to the stress of their detention. It is important not to equate a blunted affect, suppression of symptoms, or personal minimization, with an underestimation of the impact of their traumatic experiences and fear.[9]

If it is absolutely necessary to detain immigrants, we cannot underscore enough the importance of considering the mental health of the detainees and the strong possibility that the longer individuals are held, the more likely their mental health will suffer – this is especially the case for children.[10] Prolonged family detention could also damage the primary relationship between parents and children because a child has many non-parental authority figures in detention centers.[11] Not only is the child likely to disregard the parents as strong authority figures the longer the period of detention, but this is also true for the parents' view of themselves. Meaningful access to trauma-informed mental health care is critical to ensure that both adult and child survivors of trauma heal and ultimately achieve self-sufficiency. The longer survivors go without such desperately needed services, the more challenging the healing process may be.[12]

[6] Pechtel, P.

[7] Bailey, C.A., McIntyre., E., Arreola, A., & Venta, A. (2019). What are we missing? A glance at immigrant narratives in two languages. *Journal of Child and Adolescent Trauma.* https://doi.org/10.1007/s40653-019-00263-3.

[8] Venta, A., (2016). Migration experiences interview (unpublished manuscript). Department of Psychology & Philosophy, Sam Houston State University.

[9] Evans, F.B. & Hass, G. (2018). Forensic Psychological Assessment in Immigration Court: A Guidebook for Evidenced Based and Ethical Practice. New York: Routledge.

[10] Cervantes, W. (2015). Family detention: The harmful impact on children, *First Focus,* https://firstfocus.org/wp-content/uploads/2015/07/Family-Detention.pdf.

[11] Cervantes, W., (2015).

[12] Barbash, E., Overcoming sexual assault: Symptoms and recovery. *Psychology Today.* April 18, 2017. https://www.psychologytoday.com/us/blog/trauma-and-hope/201704/overcoming-sexual-assault-symptoms-recovery

**Family Separation**

We would also like to highlight the importance of keeping families together during this process. Based on evidence of the psychological harm of parent-child separation, we appreciate and urge the Department's continued commitment to the humane policy of keeping families together to protect immigrants from further trauma.

Decades of psychological research have determined that it is in the best interest of the child and parents to keep families together. Families fleeing their homeland to seek sanctuary in the United States are already under a tremendous amount of stress.[13] Sudden and unexpected family separation, such as separating families during immigration proceedings, can add to that stress, leading to emotional trauma for children.[14] Research also suggests that the longer children and parents are separated, the greater the reported symptoms of anxiety and depression are for children.[15] Therefore, continuing the practice of keeping families together is vital to their mental health.

Thank you for the opportunity to comment on this important issue. Should you have any questions, please feel free to contact Serena Dávila at sdavila@apa.org.

Sincerely,

Katherine B. McGuire
Chief Advocacy Officer
American Psychological Association

---

[13] Chaundry, A. (2011). Children in the aftermath of immigration enforcement. *The Journal of the History of Childhood and Youth*, 4 (1), 137-154.

[14] Dreby, J. (2012). The burden of deportation on children in Mexican immigrant families. *Journal of Marriage and Family*, 74, 829- 845. doi:10:1111/j.1741-3737.2012.00989x.

[15] Suárez-Orozco, C., Bang, H.J. & Kim, H.Y. (2010). I felt like my heart was staying behind: Psychological implications of family separations and reunifications for immigrant youth. *Journal of Adolescent Research*, 26 (2), 222-257.

Metin Serbest, Esquire
Law Office of Metin Serbest
2200 E. Devon Ave. Suite 358
Des Plaines, Illinois 60018

DETAINED

## UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## IMMIGRATION COURT
## OTERO, NM

In the Matter of:                                )
BOZKUS, SERHAT                           )          File No. **A#** 220-712-429
Respondent In Removal Proceedings   )
                                                    )

**Immigration Judge:**                                    **Hearing Date:**

## RESPONDENT'S SUPPLEMENT IN SUPPORT OF CUSTODY HEARING

EOIR 451c6f478

Metin Serbest, Esquire                                                          <span style="background-color: #cccccc">**DETAINED**</span>
Law Office of Metin Serbest
2200 E. Devon Ave. Suite 358
Des Plaines, Illinois 60018

## UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## IMMIGRATION COURT
## OTERO, NM

In the Matter of:                              )
BOZKUS, SERHAT                          **)**            File No. **A# 220-712-429**
Respondent In Removal Proceedings     )
                                               )

**Immigration Judge:**                                      **Hearing Date:**

## RESPONDENT'S SUPPLEMENT IN SUPPORT OF CUSTODY HEARING

**COMES NOW** the Respondent BOZKUS, SERHAT   by and through his undersigned attorney respectfully submits Medical Records in support of Respondent's custody Redetermination.

Respectfully submitted this 7th day of June 2022

By:_____
                    Metin Serbest, Esq.

EOIR + 0f0f578

## CERTIFICATE OF SERVICE

On June 7, 2022, I, Metin Serbest, served a copy of this Supplement in the above titled matter to the Department of Homeland Security, Office of Chief Counsel via ICE e-service EL-Paso portal.

Respectfully Submitted,

Metin Serbest, Esq.

\

## *Progress Note v11*

## Cibola County Correctional Facility
### 2000 Cibola Loop P.O. Box 3540
### Milan, NM 87021
### (505) 285-4900

| | |
|---|---|
| Inmate: | SERHAT BOZKUS |
| Inmate ID: | 5985911 |
| Age/DOB: | 30/Jan 01, 1992 |
| Agency No: | 220712429 - ICE |

### Allergies
- No Known Allergies

### Vitals
**Vital Signs**
\*\* Printed in Appendix #1 below.

### Current Meds
1. Doxepin HCl - 10 MG Oral Capsule; TAKE 1 CAPSULE BEDTIME;
   Therapy: 17May2022-18Aug2022; Last Rx:17May2022 Ordered
2. OXcarbazepine 300 MG Oral Tablet; 1QHS;
   Therapy: 17May2022-18Aug2022; Last Rx:17May2022 Ordered

### Subjective
Patient presents for follow up L TM perforation and ear/neck pain
Interpreter 385388 Was used for the visit.

He states that before he left Turkey he was receiving treatment for his ruptured TM and was told he needed surgery but ran away from Turkey and thought he would just get it done here but it has now been 7 months and he has not had the surgery and his hearing is almost completely gone in that ear.
He reported pain in the ear and that radiates to his neck.

### Objective
WDWN male in NAD
A/O x 4
Steady Gait
Using Agnes Otoscope, B TMs were evaluated
Right TM and canal with no erythma; All landmarks on TM were clearly visible.
L canal with erythema and TM perforation noted at 2:00. No drainage noted in canal.
S1S2 no MRG
CTA B

### Plan.
#### Perforation of tympanic membrane
- Miscellaneous Consult Offsite Miscellaneous Consult-Offsite Offsite Status:
Unauthorized - Requires Authorization Requested for: 01Jun2022
Support for Order : 30 YO male with large perforation of TM on Left; per pt was diagnosed
in Turkey 7 months ago and was scheduled for surgery but left the country before his
surgery. Was evaluated in ortero County and TM was still perforated; pt was seen in clinic
a few weeks ago and perf remained; still large TM and significant hearing loss.
Type of Consult : ENT
Due to length of time of perforation and hearing loss, consult for ENT was completed today.

Pt was provided with extensive education regarding keeping the ear canal dry by using cotton and a/d ointment when he showers. He denied vertigo but was advised that if vertigo occurs, to advise medical. Sit and rest while

File loaded on: 6/27/2022 at 9:56:46 p.m. (Central Daylight Time)   Base City: OTO

## *Progress Note v11*

Inmate:      SERHAT BOZKUS
Inmate ID:   5985911
Age/DOB:     30/Jan 01, 1992
Agency No:   220712429 - ICE

vertigo passes and do not walk while dizzy. he verbalized understanding.
Patient denied need for further pain medication at this time.
Will F/U after ENT and PRN for change in sx or new issues or concerns. patient verbalized understanding and
agreed with plan of care.

### Signatures
Electronically signed by : Tiffany Romero-Peralta, ACNS-BC; Jun 1 2022 10:36AM MST (Author)

73459

Uploaded on: 6/7/2022 at 10:56:40 a.m. (Central Daylight Time)   Base City: OTO

# Progress Note v11

Inmate: SERHAT BOZKUS
Inmate ID: 5985911
Age/DOB: 30/Jan 01, 1992
Agency No: 22071429 - ICE

Appendix #1

**Vital Signs**
Patient: BOZKUS, SERHAT; DOB: 1/1/1992; MRN: 5985911

| | Recorded: 01Jun2022 10:16AM | Recorded: 26May2022 06:02AM | Recorded: 20May2022 11:12AM | Recorded: 26Apr2022 11:45AM |
|---|---|---|---|---|
| Weight | 148 lb | | | |
| BMI Calculated | 20.27 kg/m2 | | | |
| BSA Calculated | 1.87 | | | |
| Systolic | 148 | | | |
| Diastolic | 105 | | | |
| Respiration | 20 | | | |
| Temperature | 96.9 F | | | |
| Heart Rate | 99 | | | |
| O2 Saturation | 95 | | | |
| Pulse Quality | | Normal | | |
| Systolic Lying | | | 137 | |
| Diastolic Lying | | | 98 | |
| Height | | | | 182 cm |
| Pain Scale | | | | |

Printed By: Julie Griego          3 of 3          Jun 2 2022  1:20PM

Uploaded on: 6/7/2022 at 10:56:40 a.m. (Central Daylight Time)  Base City: OTO

**Allscripts**

## Cibola County Correctional Facility

2000 Cibola Loop, P.O. Box 3540
Milan, NM 87021
(505) 285-4900

Patient: BOZKUS, SERHAT

**Age/DOB:** 30 years  January 01, 1992

Home:
Work:

EMRN: 5985911
OMRN: 5985911

### Active Problems

| Problem Description | Managed By | Category Severity | Impression |
|---|---|---|---|
| Chest wall pain | | | |
| Chronic post-traumatic stress disorder (PTSD) | | | |
| Major depressive disorder | | | |
| Mood problem | | | |
| Neck pain | | | |
| Perforation of tympanic membrane | | | |
| Suicide ideation | | | |

Report - Problem List

Page 1 of 1

Griego, Julie  2-Jun-2022  1:20PM

Copyright © 2022 Allscripts Healthcare Solutions, Inc. and/or its affiliates. All rights reserved.

# *Clinic Note v11*

## **Cibola County Correctional Facility**
**2000 Cibola Loop  P.O. Box 3540**
**Milan, NM 87021**
(505) 285-4900

Inmate:          SERHAT BOZKU
Inmate ID:     - 5985911.
Age/DOB:      30/Jan.01, 1992
Agency No:    220712429 - ICE

### Notes

upon arrival inmate was in s supine position with eye closed breathing normally. responded his name he was transported to medical, VS: 130/98, 98% on room air, pulse 104, temp 98.0, PERRLA.

### Signatures
Electronically signed by : Felicia Hamilton, ; May 27 2022  7:20PM MST (Author)

EXH 7 of 578

7462

## *Progress Note v11*

## Cibola County Correctional Facility
### 2000 Cibola Loop  P.O. Box 3540
### Milan, NM 87021
(505) 285-4900

| | |
|---|---|
| Inmate: | SERHAT BOZKUS |
| Inmate ID: | 5985911 |
| Age/DOB: | 30/Jan 01, 1992 |
| Agency No: | 220712429 - ICE |

### Allergies
- No Known Allergies

### Vitals
### Vital Signs
** Printed in Appendix #1 below.

### Current Meds
1. Doxepin HCl - 10 MG Oral Capsule; TAKE 1 CAPSULE BEDTIME;
   Therapy: 17May2022-18Aug2022; Last Rx:17May2022 Ordered
2. OXcarbazepine 300 MG Oral Tablet; 1QHS;
   Therapy: 17May2022-18Aug2022; Last Rx:17May2022 Ordered

### Objective
received orders from Dr. Ortiz to complete all suicide orders.

### Signatures
Electronically signed by : Nicolas Arias, LPN; May 27 2022  1:09PM MST (Author)

BOZR 8. 9 of 45 78

Uploaded on: 6/7/2022 at 10:56:40 a.m. (Central Daylight Time)   Base City: OTO

## Progress Note v11

Inmate: SERHAT BOZKUS
Inmate ID: 5985911
Age/DOB: 30/Jan 01, 1992
Agency No: 22071 2429 - ICE

Appendix #1

**Vital Signs**
Patient: BOZKUS, SERHAT; DOB: 1/1/1992; MRN: 5985911

| | Recorded: 26May2022 06:02AM | Recorded: 20May2022 11:12AM | Recorded: 26Apr2022 11:45AM | Recorded: 22Apr2022 07:23PM |
|---|---|---|---|---|
| Systolic | 124, Sitting | | | |
| Diastolic | 76, Sitting | | | |
| Heart Rate | 78 | | | |
| Pulse Quality | Normal | | | |
| O2 Saturation | 98, Nasal Cannula | | | |
| Weight | | 149 lb | | |
| BMI Calculated | | 20.4 kg/m2 | | |
| BSA Calculated | | 1.87 | | |
| Systolic Lying | | 137 | | |
| Diastolic Lying | | 98 | | |
| Respiration | | 20 | | |
| Temperature | | 97.5 F | | |
| Height | | | 182 cm | |
| Pain Scale | | | | 8 |

Printed By: Julie Griego                2 of 2                Jun 2 2022 1:20PM

Uploaded on: 6/27/2022 at 9:56:46 p.m. (Central Daylight Time)    Base City: OTO

## *Progress Note v11*

### Cibola County Correctional Facility
**2000 Cibola Loop  P.O. Box 3540**
**Milan, NM 87021**
(505) 285-4900

| | |
|---|---|
| Inmate: | SERHAT BOZKUS |
| Inmate-ID: | 5985911 |
| Age/DOB: | 30/Jan 01, 1992 |
| Agency No: | 220712429 - ICE |

**Allergies**
- No Known Allergies

**Vitals**
**Vital Signs**
** Printed in Appendix #1 below.

**Current Meds**
1. Doxepin HCl - 10 MG Oral Capsule; TAKE 1 CAPSULE BEDTIME;
   Therapy: 17May2022-18Aug2022; Last Rx:17May2022 Ordered
2. OXcarbazepine 300 MG Oral Tablet; 1QHS;
   Therapy: 17May2022-18Aug2022; Last Rx:17May2022 Ordered

**Subjective**
I want to kill myself I can't take It any more. i can't sleep. i can't be here any more, I have been here six month and my mom is sick.

**Objective**
A&O X3 patient is sad and has tears in his eyes. Patient is speaking very softly. Patient making good eye contact.

**Assessment**
Suicidal Ideation

**Plan**
Called DR. Ortiz, patient placed on 1:1 constant watch.

79465

Uploaded on: 6/7/2022 at 10:56:40 a.m. (Central Daylight Time)    Base City: OTO

# Progress Note v11

| Inmate: | SERHAT BOZKUS |
|---|---|
| Inmate ID: | 5985911 |
| Age/DOB: | 30/Jan 01, 1992 |
| Agency No: | 220712429 - ICE |

## Appendix #1

**Vital Signs**
Patient: BOZKUS, SERHAT; DOB: 1/1/1992; MRN: 5985911

| | Recorded: 26May2022 03:02AM | Recorded: 20May2022 11:12AM | Recorded: 26Apr2022 11:15AM | Recorded: 22Apr2022 07:23PM |
|---|---|---|---|---|
| Systolic | 124, Sitting | | | |
| Diastolic | 76, Sitting | | | |
| Heart Rate | 78 | | | |
| Pulse Quality | Normal | | | |
| O2 Saturation | 98, Nasal Cannula | | | |
| Weight | | 149 lb | | |
| BMI Calculated | | 20.4 kg/m2 | | |
| BSA Calculated | | 1.87 | | |
| Systolic Lying | | 137 | | |
| Diastolic Lying | | 98 | | |
| Respiration | | 20 | | |
| Temperature | | 97.5 F | | |
| Height | | | 182 cm | |
| Pain Scale | | | | 8 |

Printed By: Julie Griego    2 of 2    Jun 2 2022 1:20PM

# *Progress Note v11*

## Cibola County Correctional Facility
### 2000 Cibola Loop P.O. Box 3540
### Milan, NM 87021
### (505) 285-4900

Inmate:        SERHAT BOZKUS
Inmate ID:     5985911
Age/DOB:       30/Jan 01, 1992
Agency No:     220712429 - ICE

### Allergies
- No Known Allergies

### Vitals
**Vital Signs**
\*\* Printed in Appendix #1 below.

### Current Meds
1. OXcarbazepine 300 MG Oral Tablet (Trileptal); Take half of tab BID;
   Therapy: 24Apr2022-27Jul2022; Last Rx:24Apr2022 Ordered

### Subjective
I have neck pain, high blood pressure and pain in my right ear. I can't drink more than a liter of water because its too cold and I felt dizzy just now and fell to the ground. I have been here for 6 month, my mother is sick and I need to go home. Can you release the information about my health to my attorney The doctor here told me that they can't do anything to help me, that i would have to be treated on the outside.

### Objective
A&0X3, patient responded to sternal rub immediately when he was laying on another detainee lap on the floor. No acute deformities or injury found or reported.

### Assessment
Anxiety
Requesting assistance to be released

### Plan
Patient has mental health follow up and medical follow up scheduled. Patient educated of how to get his medical records to his attorney..

### Education
Patient educated of how to get his medical records to his attorney..

Uploaded on: 8/7/2022 at 10:56:40 a.m. (Central Daylight Time)   Base City: OTO

*Progress Note v11*

Inmate:        SERHAT BOZKUS
Inmate ID:     5985911
Age/DOB:       30/Jan 01, 1992
Agency No:     220712429 - ICE

Appendix #1

**Vital Signs**
Patient: BOZKUS, SERHAT; DOB: 1/1/1992; MRN: 5985911

| | Recorded: 08May2022 12:07AM | Recorded: 28Apr2022 12:16PM | Recorded: 28Apr2022 08:58AM | Recorded: 26Apr2022 11:45AM |
|---|---|---|---|---|
| Systolic | 154, Supine | | | |
| Diastolic | 88, Supine | | | |
| Heart Rate | 62 | | | |
| Pulse Quality | Normal | | | |
| O2 Saturation | 96, RA | | | |
| Temperature | | 98 F | | |
| Weight | | | 154 lb | |
| BMI Calculated | | | 21.09 kg/m2 | |
| BSA Calculated | | | 1.9 | |
| Respiration | | | 20 | |
| Height | | | | 182 cm |
| Pain Scale | | | | |

Printed By: Julie Griego                2 of 2                Jun  2 2022  1:20PM

# *Progress Note v11*

## Cibola County Correctional Facility
### 2000 Cibola Loop  P.O. Box 3540
### Milan, NM 87021
(505) 285-4900

| | |
|---|---|
| Inmate: | SERHAT BOZKUS |
| Inmate ID: | 5985911 |
| Age/DOB: | 30/Jan 01, 1992 |
| Agency No: | 220712429 - ICE |

**Allergies**
- No Known Allergies

**Vitals**
**Vital Signs**
** Printed in Appendix #1 below.

**Current Meds**
1. OXcarbazepine 300 MG Oral Tablet (Trileptal); Take half of tab BID; Therapy: 24Apr2022-27Jul2022; Last Rx:24Apr2022 Ordered

83469

Filed at BIA on: 7/27/2022 at 9:54:16 p.m. Central Daylight Time

Uploaded on 6/7/2022 at 10:56:40 a.m. (Central Daylight Time)    Base City: OTO

# *Progress Note v11*

Inmate:         SERHAT BOZKUS
Inmate ID:      5985911
Age/DOB:        30/Jan 01, 1992
Agency No:      220712429 - ICE

## Appendix #1

**Vital Signs**
Patient: BOZKUS, SERHAT; DOB: 1/1/1992; MRN: 5985911

| | Recorded: 08May2022 12:67AM | Recorded: 28Apr2022 12:16PM | Recorded: 28Apr2022 08:53AM | Recorded: 26Apr2022 11:45AM |
|---|---|---|---|---|
| Systolic | 154, Supine | | | |
| Diastolic | 88, Supine | | | |
| Heart Rate | 62 | | | |
| Pulse Quality | Normal | | | |
| O2 Saturation | 96, RA | | | |
| Temperature | | 98 F | | |
| Weight | | | 154 lb | |
| BMI Calculated | | | 21.09 kg/m2 | |
| BSA Calculated | | | 1.9 | |
| Respiration | | | 20 | |
| Height | | | | 182 cm |
| Pain Scale | | | | |

Printed By: Julie Griego          2 of 2          Jun  2 2022  1:20PM

## *Clinic Note v11*

## **Cibola County Correctional Facility**
**2000 Cibola Loop  P.O. Box 3540**
**Milan, NM 87021**
(505) 285-4900

| | |
|---|---|
| Inmate: | SERHAT BOZKUS |
| Inmate ID: | 5985911 |
| Age/DOB: | 30/Jan 01, 1992 |
| Agency No: | 220712429 - ICE |

BDOBR 16 pdf of5 78

# *Clinic Note v11*

## Cibola County Correctional Facility
### 2000 Cibola Loop  P.O. Box 3540
### Milan, NM 87021
### (505) 285-4900

Inmate:         SERHAT BOZKUS
Inmate ID:      5985911
Age/DOB:        30/Jan 01, 1992
Agency No:      220712429 - ICE

**Notes**

Patient brought down at the request of HSA Mr. Gober to discuss his mental and medical health care needs and concerns. He reports he is fine except that he met with Dr. Ortiz last week and she told him that she would write a note about his mental health and a nurse would give it to him. He was most concerned as to why he had not received that document. I informed him that that note was not available to me, that it would have to be given by the medical records department and signed for, he verbalized understanding of that information. I informed him that he would be seeing both mental health and the medical provider on 5/17/22 to go over his medical and mental health needs and concern. He reported he is really looking forward to seeing the medical provider to start taking care of his medical issues. He accepted all information well.

864 72

# *Clinic Note v11*

## Cibola County Correctional Facility
### 2000 Cibola Loop  P.O. Box 3540
### Milan, NM 87021
### (505) 285-4900

| | |
|---|---|
| Inmate: | SERHAT BOZKUS |
| Inmate ID: | 5985911 |
| Age/DOB: | 30/Jan 01, 1992 |
| Agency No: | 220712429 - ICE |

**Notes**

IM brought to medical c/o of chest pain. Language lline called for help with translation. V/s:
EKG completed which was normal. He was told by interpreter that his EKG was normal. She stated that he
refused to believe what was being said and stated he wanted to see a Doctor. He was told there were no
providers available to see him at this time. He didn't have any s/s of distress or pain at this time. Im taken back to
his unit. Will schedule the next available appt. for him with provider.

# *Clinic Note v11*

## Cibola County Correctional Facility
### 2000 Cibola Loop  P.O. Box 3540
### Milan, NM 87021
(505) 285-4900

| | |
|---|---|
| Inmate: | SERHAT BOZKUS |
| Inmate ID: | 5985911 |
| Age/DOB: | 30/Jan 01, 1992 |
| Agency No: | 220712429 - ICE |

### Notes

Medical officer called medical to indicating patient was having difficulty breathing. Arrived at housing unit patient sitting at table in day room, no acute respiratory distress observed. Vital 124/86, 75, 16, 97.6, 98%RA. Nurse will ask Dr. Ortiz to assess for anxiety and panic attacks.

# *Progress Note v11*

## Cibola County Correctional Facility
### 2000 Cibola Loop  P.O. Box 3540
### Milan, NM 87021
(505) 285-4900

| | |
|---|---|
| Inmate: | SERHAT BOZKUS |
| Inmate ID: | 5985911 |
| Age/DOB: | 30/Jan 01, 1992 |
| Agency No: | 220712429 - ICE |

### Allergies
- No Known Allergies

### Vitals
### Vital Signs

| | Recorded: 22Apr2022 07:23PM |
|---|---|
| Systolic | 129, LUE, Sitting |
| Diastolic | 81, LUE, Sitting |
| Respiration | 18 |
| Temperature | 97.1 F, Oral |
| Heart Rate | 86, L Radial |
| Pulse Quality | Normal, L Radial |
| O2 Saturation | 97 |
| Pain Scale | 8 |

### Objective
1855 pm : pt states chest pain mid sternal , stated 2 month period of chest pain 5-8/10 to mid sternal area. Pt taken to medical area whereupon EKG performed cramping sensation voiced; NSR in 80s only repolarization observed in most leads States per translator line chest pain increases when breathing expiration and inspiration and cardiologist in Turkey and left arm cramping and stated history of cramping to left arm occasionally; stress induced chest pain states diagnosed from cardiologist in Turkey. Pt states mid sternal to left sternal pain varying between 5-8 ; states nausea and pain to upper thoracic area to arm left on occasion weakness to left arm. Presents with clear breathe bilaterally no adventious breathe sounds noted. States no respiratory problems at this time. States no liver problems. Confirmed with Turkish translator , pain in chest reproducible and worsens with
· · Notified Dr. Leon with EKG results, Clinical signs and symptoms reviewed with Dr. Leon. Order for tylenol 1gm bid po , 1 st dose now. Reviewed with patient to notifiy staff if pain increases , nausea or vomiting or no relief from tylenol. Verbalized understanding . Pt returns to area with CO

# Initial Intake Screening

| Facility Name: | | Today's Date: | 04/19/2022 | Time: | 06:38:54 AM |
|---|---|---|---|---|---|
| Inmate/Detainee Name: | BOZKUS, SERHAT | #: 220712429 - ICE | | DOB: | 01/01/1992 |

Gender ☐ Male ☐ Female ☐ Transgender    If transgender, document history of transition-related care in Comments section

Primary Language: _____    Communication Barrier:    ○ Yes    ○ No

If Yes how resolved: _____

**NEXT OF KIN:**

Name: _____    Relationship: _____    Phone #: _____

**ARRIVED WITH:**

Transfer Form ○ Yes ○ No    Medical Record ○ Yes ○ No    Adv Directives/Living Will: ○ Yes ○ No

**VITALS:**

Ht: _____    Wt: _____    T: _____    P: _____    R: _____

*B/P: _____    *FOR BLOOD PRESSURE OVER 140/90, REFER FOR URGENT PROVIDER EVALUATION

Diabetic? ○ Yes ○ No    If yes, BS Reading _____    FOR BELOW 60 OR ABOVE 250, REFER TO PROVIDER

**NURSING OBSERVATION/INMATE REPORTS OF: (CHECK ALL THAT APPLY)**

☐ Slurred Speech ☐ Tremors ☐ Aggressive ☐ Disheveled ☐ Not Oriented to Time/Place/Person
☐ Sick Now ☐ Agitated ☐ Anxious ☐ Nausea/Vomiting ☐ Movement Limitations
☐ Reports Recent Injury ☐ Sweating Profusely ☐ Dilated or Pinpoint Pupils ☐ Difficulty Breathing - 02 Sat

**If any symptoms above checked, refer to RN or LIP immediately**

**SKIN CONDITIONS:** ☐ Trauma Markings ☐ Bruises ☐ Jaundice ☐ Rashes ☐ Infestations ☐ Lesions
(CHECK ALL THAT APPLY) ☐ Recent Tattoos ☐ Needle Marks other Indications of Drug Abuse ☐ Other: _____

**INMATE/DETAINEE INQUIRY:**

1. Do you have any allergies or medication sensitivites? ○ Yes ○ No

   If YES, list: _____

2. Do you have any physical deformities? ○ Yes ○ No

   If YES, please describe: _____

3. Do you have any prosthetic devices? ○ Yes ○ No *If YES - check all that apply

   ☐ Glasses ☐ Hearing Aids ☐ Wheelchair ☐ Walker ☐ Orthopedic Brace ☐ Other: _____

4. Do you have a history of alcohol/tobacco/drug use? ○ Yes ○ No *If YES - check all that apply

   ☐ Cigarettes ☐ Chewing Tobacco ☐ Marijuana ☐ Heroin ☐ Methamphetamine ☐ Cocaine
   ☐ Cigars ☐ Alcohol ☐ IV Drugs ☐ Other: _____

   List amount, mode, frequency, and most recent use:

   Problems when ceasing use? ○ Yes ○ No *If YES list: _____

5. Do you have any special health care needs or current medical complaints? ○ Yes ○ No *If YES - check all that apply:

   ☐ Diabetes ☐ Seizures ☐ Hepatitis A ☐ Hepatitis B ☐ Hepatitis C ☐ Heart Condition
   ☐ Asthma ☐ Liver Disease ☐ STD ☐ HIV ☐ High Blood Pressure ☐ Stomach Problems
   ☐ Gunshot Wound ☐ Active TB (You or a Family Member) ☐ Accident/Head Injury w/ LOC
   ☐ Alcohol/Drug Withdrawal Symptoms ☐ Other: _____

   History of chicken pox, shingles, or vaccination? ○ Yes ○ No *If YES, when? _____

   Are you currently receiving physician care or are enrolled in a chronic care clinic for items checked above? ○ Yes ○ No

6. Have you ever been hospitalized or had an operation/surgery within the last 6 months? ○ Yes ○ No

   *If YES, please describe type/date: _____

7. Have you been seen or were you scheduled to be seen by a specialist/physician? ○ Yes ○ No

   *If YES, please describe: _____

8. Are you having any pain? ○ Yes ○ No *If YES, rate intensity (1-10, 10=max) _____

   *If YES describe location: _____

| Signature: | Abeita, Kateri | Title: | | Date: | 04/19/2022 | Time: | 06:38:54 AM |
|---|---|---|---|---|---|---|---|

Uploaded on: 6/2/2022 at 9:58:46 a.m. (Central Daylight Time)  Base City: OTO

13-50A

| Inmate/Detainee | BOZKUS, SERHAT | | Number | 220712429 - ICE | DOB | 01/01/1992 |
|---|---|---|---|---|---|---|
| Facility Name | | | | Today's Date: | 04/19/2022 | |

**INMATE/DETAINEE INQUIRY CONTINUED:**

9. Are you currently taking any medications?  ○ Yes  ○ No If YES, list below. If more than 12, list in Comment Section.

| Name | Dose | Frequency | Name | Dose | Frequency |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

10. Do you have any medications that you keep on your person?  ○ Yes  ○ No *If YES, list below:
☐ Inhaler  ☐ Nitroglycerin  ☐ Other

11. Do you have any skin problems or concerns, such as:  ○ Yes  ○ No *If YES - check all that apply
☐ Lesions  ☐ Rashes  ☐ Infestations  ☐ Bruises  ☐ Scars  ☐ Recent Tattoos  ☐ Other:
*If YES, describe:

12. Have you been prescribed a special diet(s)?  ○ Yes  ○ No
*If YES, describe:
**Refer to LIP if weight and chronic illness/disease places inmate at nutritional risk**

13. Do you have any dental issues?  ○ Yes  ○ No *If YES, list below:
☐ Cavities  ☐ Toothache  ☐ Missing/Broken Teeth  ☐ Swelling  ☐ Gum Disease  ☐ Braces
☐ Full Dentures  ☐ Partial Dentures  ☐ Other:  **Refer dental problems to dental staff**

14.  **This question applies to female inmates only**
Are you pregnant?  ○ Yes  ○ No Date of Last Period:  **UA RESULTS:**  ○ POS  ○ NEG
Currently on birth control?  ○ Yes  ○ No  If YES, list type:
Total Number of Pregnancies:  Number of Live Births:
*Describe pregnancy complications in comment section

## MENTAL HEALTH

If the inmate is disoriented or YES is marked on ANY of the questions below the inmate MUST be referred to Mental Health. **AT ANY TIME, YOU MAY UPGRADE URGENT AND ROUTINE REFERRALS LISTED BELOW BASED ON INMATE RESPONSES AND/OR PRESENTATION**

| EMERGENT - | URGENT - | ROUTINE - |
|---|---|---|
| Ensure patient safety needs are met and consult immediately with mental health staff. | Ensure patient's safety needs are met. Phone consulation with mental health staff must occur within 24 hours. Face-to-face assessment by mental health staff must be completed by end of next business day. | Refer to assessment of Intervention. Face-to-face assessment by mental health staff must occur within 7 to 14 days. |

15. Are you currently thinking/planning about harming or killing yourself or someone else?  ○ Yes  ○ No  EMERGENT

16. Are you currently having hallucinations (i.e. hearing or seeing things other people don't)?  ○ Yes  ○ No  EMERGENT

What?

17 Observation:  Does the inmate appear to have difficulty understanding the questions or in making appropriate responses to them?  ○ Yes  ○ No  URGENT

18. Have you ever had thoughts, made plans, or attempted to harm or kill yourself?  ○ Yes  ○ No  URGENT
When?  Type of attempt(s)?  If YES, detail below:

**IF THE INMATE HAS CONSIDERED, BUT NOT TRIED SUICIDE, NOTE THIS IN THE COMMENT SECTION**

| Signature: | Abeita, Kateri | Title: | | Date: | 04/19/2022 | Time: | 06:38:54 AM |
|---|---|---|---|---|---|---|---|

Proprietary Information - Not For Distribution - Copyrighted - Property of CoreCivic  12/18/2018

# Initial Health Screening Form

13-50A

| Inmate/Detainee | BOZKUS, SERHAT | | Number | 220712429 - ICE | DOB | 01/01/1992 |
|---|---|---|---|---|---|---|
| Facility Name | | | | | Today's Date: | 04/19/2022 |

**INMATE/DETAINEE INQUIRY CONTINUED:**

19. Are you currently experiencing any serious problems (i.e. bad news, significant loss, close friend/family committing suicide) that you would like to discuss with mental health staff? ○ Yes ○ No **URGENT**

20. Do you have a mental health problem or have you ever been treated for mental illness? ○ Yes ○ No **ROUTINE**

When? [ ] Where? [ ] For? [ ]

21. Have you ever been placed in a special education class? ○ Yes ○ No **ROUTINE**

22. Have you ever been the perpetrator of a sex offense? ○ Yes ○ No **ROUTINE**

When? [ ]

23. Have you ever been the victim of a sex offense? ○ Yes ○ No **ROUTINE**

When? [ ]

24. Have you ever had hallucinations (i.e. heard or seen things other people didn't)? ○ Yes ○ No **ROUTINE**

When? [ ] What? [ ]

25. Have you ever been admitted to a state or private mental hospital by a psychiatrist or other mental health professional for emotional problems, nerves, or substance abuse treatments? ○ Yes ○ No **ROUTINE**

When? [ ] Where? [ ]

**ADDITIONAL COMMENTS:**

Intake completed on paper 4/18/2022@1645 Burnham LPN

**REFERRALS: (CHECK ALL THAT APPLY) E= Emergent / U= Urgent / R= Routine**

Excluding Mental Health, referrals are as follows (MH referrals are described in the Mental Health section):

| Emergent- | Urgent- | Routine- |
|---|---|---|
| Immediate consultation with or referral to an LIP | Referral to an LIP within 24 hours | Referral to an LIP within 2-14 days |

☐ RN: ☐ E ☐ U ☐ R    To (name): [ ]    ☐ Special Needs: ☐ E ☐ U ☐ R
☐ LIP: ☐ E ☐ U ☐ R    To (name): [ ]    ☐ Mental Health: ☐ E ☐ U ☐ R
☐ Chronic Clinic Type: [ ]    ☐ Dental: ☐ E ☐ U ☐ R

**DISPOSITION: (CHECK ALL THAT APPLY):**

☐ Emergency Care   ☐ Suicide Precaution   ☐ Mental Health Observation   ☐ Med Observation
☐ Segregation   ☐ Infirmary   ☐ General Population

**SCREENER INFORMATION:**

| Signature: | Abeita, Kateri | Title: | | Date: | 04/19/2022 | Time: | 06:38:54 AM |
|---|---|---|---|---|---|---|---|

Proprietary Information - Not For Distribution - Copyrighted - Property of CoreCivic   12/18/2018

92478

## Intake and Annual Symptom Screening

13-50C

CoreCivic:

**Inmate/Resident Name:**

(Facility)

BOZKUS, SERHAT

Date: 04/19/2022

**Inmate/Resident Number:**

220712429 - ICE

## I.

○ TB Intake          ○ TB Annual

### Symptom Screening

*(Annual screening to be completed only for those with positive PPD history)*

| | | |
|---|---|---|
| Have you ever been tested for TB in the last 12 months? - (Applies only to | intake screening) | ○ Yes  ○ No |
| What was the result of your last TB test? - (Applies only to | intake screening) ○ Positive  ○ Negative | |
| Have you ever taken TB medication before? - (Applies to | intake and annual screening) | ○ Yes  ○ No |

Medication [                    ]    When [          ]    Where [                    ]

*If therapy was not completed, refer to medical provider for history of inadequate treatment.

**Complete the Chart below:**

| Any current complaint of: | Yes | No | | Yes | No |
|---|---|---|---|---|---|
| Productive, prolonged cough (lasting three weeks or more) | ○ Yes | ○ No | Chest pain | ○ Yes | ○ No |
| Coughing up blood | ○ Yes | ○ No | Night sweats | ○ Yes | ○ No |
| Unexplained fatigue | ○ Yes | ○ No | Fever, chills | ○ Yes | ○ No |
| Unexplained weight loss | ○ Yes | ○ No | HIV Positive | ○ Yes | ○ No |

*If an inmate/resident has positive or negative PPD history and presently has pulmonary TB symptoms accompanied by general systemic symptoms of fever, chills, and night sweats, place in respiratory isolation and call medical provider immediately.

*Inmates/residents known to have HIV infection should have a chest x-ray taken as part of the initial screening-regardless of their tuberculin skin-test status.

## II.

### Intake MRSA Screening

Do you have any open or draining sores?          ○ Yes  ○ No

Do you have any bites (i.e., spider, mosquito, etc.)?          ○ Yes  ○ No

Do you have any areas of skin infection?          ○ Yes  ○ No

If yes to any of the above, list where [                    ]

*If an inmate/resident has any open draining sores, isolation in Medical Observation is indicated until the LIP clears the inmate/resident for general population

**Examiner's Name:** Abeita, Kateri          Title: [          ]          Date: 04/19/2022

     Proprietary Information - Not For Distribution - Copyrighted - Property of CoreCivic          12/18/2018

93479

## SUBJECTIVE

## OBJECTIVE

## ASSESSMENT

## PLAN

| **Name:** | BOZKUS, SERHAT | | **Inmate/Resident#** | 220712429 - ICE |

| **Signature:** | Abeita, Kateri | **Title:** | | **Date:** 04/19/2022 | **Time** 06:38:54 AM |

Proprietary Information - Not For Distribution - Copyrighted - Property of CoreCivic
12/18/2018

9480

13-50A

# INITIAL INTAKE SCREENING

| Facility Name: | Cibola County Correctional Center | Date: | 4/18/22 | Time: | 1645 | ☐ AM ☒ PM |
|---|---|---|---|---|---|---|
| Inmate/Detainee Name: | BOZKUS SERHat | Number: | A22-0 11 | DOB: | 1/1 4 | |

| Gender: | ☒ Male | ☐ Female | ☐ Transgender* | *If transgender, document history of transition-related care in the Comments section |
|---|---|---|---|---|

| Primary Language: | Turkum | Communication barrier? | ☐ Yes ☐ No | If "Yes" how resolved? |
|---|---|---|---|---|

**NEXT OF KIN:**

| Name: | | Relationship: | | Phone#: | |
|---|---|---|---|---|---|

**ARRIVED WITH:**

| Transfer Form? | ☒ Yes ☐ No | Medical Record? | ☐ Yes ☒ No | Adv Directive/Living Will? | ☐ Yes ☒ No |
|---|---|---|---|---|---|

**VITALS:**

| Height: | 6' | Weight: | 157 | Temp: | 98² | Pulse: | 79 | Resp: | 18/18 | B.P.: | 134/99 |
|---|---|---|---|---|---|---|---|---|---|---|---|

**FOR BLOOD PRESSURE OVER 140/90, REFER FOR URGENT PROVIDER EVALUATION

| Diabetic? | ☐ Yes ☒ No | If YES, BS Reading? | | *Normal: 70-100; for below 60 or above 100, refer to provider* |
|---|---|---|---|---|

**NURSING OBSERVATION – INMATE/DETAINEE REPORTS OF:** (CHECK ALL THAT APPLY)

| ☐ Slurred Speech | ☐ Tremors | ☐ Aggressive | ☐ Disheveled | ☐ Not Oriented to Time/Place/Person |
|---|---|---|---|---|
| ☐ Sick Now | ☐ Agitated | ☐ Anxious | ☐ Nausea/Vomiting | ☐ Movement Limitations |
| ☐ Reports Recent Injury | ☐ Sweating Profusely | ☐ Dilated or Pinpoint Pupils | ☐ Difficulty Breathing – 02 Sat 96 |

**If any symptoms above are checked, refer to RN or LIP immediately**

**Skin Condition:** ☐ Trauma Markings ☐ Bruises ☐ Jaundice ☐ Rashes ☐ Infestations ☐ Lesions
☐ Recent Tattoos ☐ Needle Marks or other indications of Drug Abuse ☒ Other: (L) Earpen

**INMATE/DETAINEE INQUIRY:**

| 1. Do you have any allergies or medication sensitivities? | ☐ Yes ☒ No | If "YES" list: |
|---|---|---|

| 2. Do you have any physical deformities? | ☐ Yes ☒ No | If "YES", describe: |
|---|---|---|

| 3. Do you have any prosthetic devices? | ☐ Yes* ☒ No | *If "YES" -- check all that apply |
|---|---|---|

☐ Glasses ☐ Hearing Aids ☐ Wheelchair ☐ Walker ☐ Orthopedic Brace ☐ Other:

| 4. Do you have a history of alcohol/tobacco/drug use? | ☐ Yes* ☒ No | *If "YES" -- check all that apply |
|---|---|---|

☐ Cigarettes ☐ Chewing Tobacco ☐ Marijuana ☐ Heroin ☐ Methamphetamine ☐ Cocaine ☐ IV Drugs
☐ Cigars ☐ Alcohol ☐ Other:

List amount, mode, frequency, and most recent use:

Problems when ceasing use? ☐ Yes* ☒ No *If "YES" list:

| 5. Do you have any special health care needs or current medical complaints? | ☐ Yes* ☒ No | *If "YES" – check all that apply |
|---|---|---|

☐ Diabetes ☐ Seizures ☐ Hepatitis A ☐ Hepatitis B ☐ Hepatitis C ☐ Heart Condition ☐ Asthma ☐ Liver Disease
☐ STD ☐ HIV ☐ High Blood Pressure ☐ Stomach Problems ☐ Gunshot Wound ☐ Active TB (You or a Family Member)
☐ Accident/Head Injury w/LOC ☐ Alcohol/Drug Withdrawal Symptoms ☐ Other:
☐ History of chicken pox, shingles, or vaccination? ☐ Yes* ☐ No *If "YES", when?
Are you currently receiving physician care or are enrolled in a chronic care clinic for items checked above? ☐ Yes ☒ No

| 6. Have you ever been hospitalized or had an operation/surgery within the last 6 months? | ☐ Yes* ☒ No |
|---|---|

*If "YES", describe type/date:

| 7. Have you been seen or were you scheduled to be seen by a specialist/physician? | ☐ Yes* ☒ No |
|---|---|

*If "YES", describe:

| 8. Are you experiencing any pain right now? | ☐ Yes* ☒ No |
|---|---|

*If "YES", rate intensity (1-10, 10=max): *If "YES" describe location:

| 9. Are you currently taking any medication? | ☐ Yes* ☒ No | *If "YES", list below; if more than 12, list in Comments section |
|---|---|---|

| NAME | DOSE | FREQUENCY | NAME | DOSE | FREQUENCY |
|---|---|---|---|---|---|
| 1 | | | 7 | | |
| 2 | | | 8 | | |
| 3 | | | 9 | | |
| 4 | | | 10 | | |
| 5 | | | 11 | | |
| 6 | | | 12 | | |

Filed at BIA on 7/27/2022 at 5:54:16 p.m. (Central Daylight Time)
Uploaded on 6/7/2022 at 10:54:40 a.m. (Central Daylight Time)   Base City: OTO

# INITIAL INTAKE SCREENING

Inmate/Detainee Name: __Brozicus Senebat__  Number: __ __  DOB: __ __

Facility Name: __Cibola County Correctional Center__   Date: __4/18/22__

## INMATE/DETAINEE INQUIRY *continued*:

| 10. | Do you have any medications that you keep on your person? | ☐ Yes* ☑ No  *If "YES", list below |
|---|---|---|

☐ Inhaler ☐ Nitroglycerin ☐ Other: __ __

| 11. | Do you have any skin problems or concerns, such as: | ☐ Yes* ☑ No  *If "YES" -- check all that apply |
|---|---|---|

☐ Lesions ☐ Rashes ☐ infestations ☐ Bruises ☐ Scars ☐ Recent Tattoos ☐ Other: __ __

*If "YES", describe: __ __

| 12. | Have you been prescribed a special diet(s)? | ☐ Yes* ☑ No  * If "YES", list below |
|---|---|---|

*If "YES", describe: __ __

**Refer to LIP if weight and chronic illness/disease places inmate/detainee at nutritional risk**

| 13. | Do you have any dental issues? | ☐ Yes* ☑ No  *If "YES", list below |
|---|---|---|

☐ Cavities ☐ Toothache ☐ Missing/Broken Teeth ☐ Swelling ☐ Gum Disease ☐ Braces
☐ Full Dentures ☐ Partial Dentures Other: __ __   **Refer dental problems to dental staff**

| 14. | This question applies to female inmates/detainees only. |
|---|---|

Are you pregnant? ☐ Yes ☑ No   Date of Last Period: __ __   UA RESULTS: ☐ Positive ☐ Negative
Currently on birth control? ☐ Yes* ☐ No  *If "YES", list type: __ __
Total Number of Pregnancies: __ __   Number of Live Births: __ __   *Describe pregnancy complications in Comments section

### MENTAL HEALTH

If the inmate/detainee is disoriented or "YES" is marked on ANY of the questions below, the inmate/detainee MUST be referred to Mental Health. **AT ANY TIME YOU MAY UPGRADE URGENT AND ROUTINE REFERRALS** LISTED BELOW BASED ON INMATE/DETAINEE RESPONSES AND/OR PRESENTATION.

| **EMERGENT** – Ensure patient safety needs are met and consult immediately with mental health staff. | **URGENT** – Ensure patient safety needs are met. Phone consultation with mental health staff must occur within 24 hours. Face-to-face assessment by mental health staff must be completed by end of next business day. | **ROUTINE** – Refer to assessment of intervention. Face-to-face assessment by mental health staff must occur within 7 to 14 days. | |
|---|---|---|---|
| 15. | Are you currently thinking/planning about harming or killing yourself or someone else? | ☐ Yes ☑ No | EMERGENT |
| 16. | Are you currently having hallucinations (i.e. hearing or seeing other people don't)? | ☐ Yes ☑ No | EMERGENT |
| | What? | | |
| 17. | OBSERVATION: Does the inmate/detainee appear to have difficulty understanding the questions or in making appropriate responses to them? | ☐ Yes ☐ No | URGENT |
| 18. | Have you ever had thoughts, made plans, or attempted to harm or kill yourself? | ☐ Yes ☐ No  If "YES", list below | URGENT |
| | When? __ __  Type attempt(s)? __ __ | | |
| | **IF THE INMATE/DETAINEE HAS CONSIDERED, BUT NOT TRIED SUICIDE, NOTE THIS IN THE COMMENTS SECTION** | | |
| 19. | Are you currently experiencing any serious problems (i.e. bad news, significant loss, close friend/family committing suicide) that you would like to discuss with mental health staff? | ☐ Yes ☐ No | URGENT |
| 20. | Do you have a mental health problem or have you ever been treated for mental illness? | ☐ Yes ☐ No | ROUTINE |
| | When? __ __  Where? __ __  For? __ __ | | |
| 21. | Have you ever been placed in a special education class? | ☐ Yes ☑ No | ROUTINE |
| 22. | Have you ever been the perpetrator of a sex offense? | ☐ Yes ☐ No | ROUTINE |
| | When? __ __ | | |
| 23. | Have you ever been the victim of a sex offense? | ☐ Yes ☐ No | ROUTINE |
| | When? __ __ | | |
| 24. | Have you ever had hallucinations (i.e. heard or seen things other people didn't)? | ☐ Yes ☐ No | ROUTINE |
| | When? __ __  What? __ __ | | |
| 25. | Have you ever been admitted to a state or private mental hospital by a psychiatrist or other mental health professional for emotional problems, nerves or substance abuse treatment? | ☐ Yes ☐ No  If "YES", list below | ROUTINE |
| | When? __ __  Where? __ __ | | |

## ADDITIONAL COMMENTS:

Proprietary Information – Not for Distribution   Copyrighted

EOIR - 27 of 45
EOIR - 28 of 78

# INITIAL INTAKE SCREENING

13-50A

ADDITIONAL COMMENTS *continued*:

REFERRALS: (CHECK ALL THAT APPLY)   E = Emergent / U = Urgent / R = Routine
Excluding Mental Health, referrals are as follows (in the Mental Health section):

| EMERGENT - immediate consultation with or referral to an LIP | URGENT - Referral to an LIP within 24 hours | ROUTINE - Referral to LIP within 2-14 days |
|---|---|---|
| ☐ RN - ☐ E ☐ U ☐ R - To (name) : | ☐ LIP - ☐ E ☐ U ☐ R - To (name) : | |
| ☐ Mental Health - ☐ E ☐ U ☐ R | ☐ Dental - ☐ E ☐ U ☐ R | |
| ☐ Special Needs - ☐ E ☐ U ☐ R | ☐ Chronic Clinic - Type: | |

DISPOSITION: (CHECK ALL THAT APPLY)
☐ Emergency Care  ☐ Suicide Precaution  ☐ Seg  ☑ Gen. Population  ☐ Med Observation  ☐ MH Observation  ☐ Infirmary

SCREENER INFORMATION:

| Signature: | Butler | Title: | LPN | Date: | 4/18/2 |

B019. 28 of 46 78

Restricted Information - Not for Distribution - Copyrighted - Property of CoreCivic

## Health Services Progress Notes

**IMMEDIATE HEALTH SERVICES PRE-SCREENING – COMPLETE PRIOR TO BOOKING**

| Facility Name | Cibola County Correctional Center |
|---|---|

Inmate/Resident Name: BOZKUS, SERHAT

Inmate/Resident # A220712429          Inmate/Resident DOB: 1/1/1992

Allergies:
☐ NKA
☑ Yes, List below:.
NO

| Facility Arrival | | Notes |
|---|---|---|
| Date & Time | | ☑ No ☐ Yes Screening could *NOT* be completed due to language barrier – PRI-LB |
| 4/18/2022  1498 | | ☐ No ☑ Yes Was the detainee appropriately identified? |
| Medical Screen | | If No, why not? |
| Date & Time | | ☐ No ☐ Yes Did the detainee transfer from another correctional facility? |
| 4/18/2022  1649 | | If yes, from where? |

Interpreter Used:
☐ No ☑ Yes
If yes,
Language
Turkish
Interpreter #
58-39-85-2
1349 9  1645

**ASK DETAINEE/RESIDENT:**
☑ No ☐ Yes Do you have a current illness or health problem? Ear
☑ No ☐ Yes Are you taking medications? If yes, be sure to verify medications
☐ No ☑ Yes Are you currently in pain?
☑ No ☐ Yes Have you recently used alcohol or drugs in the last 48-72 hours?
☐ No ☐ Yes Are you afraid someone will hurt you?
☑ No ☐ Yes Do you currently want to hurt yourself?
☑ No ☐ Yes Females only: Do you think you may be pregnant? ☐ N/A

982
77
96
157
6'0"

**STAFF OBERVATIONS OF THE DETAINEE/RESIDENT: (some abnormal findings are listed beside each item as examples) any abnormal findings below will be a at least one of the priorities (PRI-E, 1, or 2)**

☑ Normal ☐ Abnormal Appearance (e.g., sweating, tremors, anxious)
☑ Normal ☐ Abnormal Behavior (e.g., uncooperative, inappropriate, insensible)
☑ Normal ☐ Abnormal State of Consciousness (e.g., cognition appears impaired, disoriented, lethargic)
☑ Normal ☐ Abnormal Ease of movement (e.g., poor gait, use of assistive devices)
☑ Normal ☐ Abnormal Breathing (e.g., persistent cough, respiratory distress)
☑ Normal ☐ Abnormal Skin (e.g. acute rash, infestations)

**DISPOSITION:**
☐ PRI-E Priority Level E – Emergency – sent to hospital or ER immediately
☐ PRI-1 Priority Level 1 – Urgent, time-sensitive medical needs. Immediate referral
Referred to:
☐ PRI-2 Priority Level 2 – Non-urgent, non-time-sensitive medical needs. Prioritized screening
☐ PRI-LB – Language Barrier *UNABLE* to conduct questions at pre-screening.
Prioritized Screening – Full receiving screening immediately using interpretation services
☑ Routine healthy, no medical or mental health concerns were observed or reported.
**COMMENTS:**

Evaluated by (Print name and title): F. Burdue
Signature:

12/08/10

Proprietary Information – Not For Distribution – Copyrighted - Property of CoreCivic

98484

## CIBOLA COUNTY CORRECTIONAL CENTER

### CORECIVIC

## Discharge/Release Medication

Clinical Solutions strongly supports and encourages the use of child resistant containers in homes with young children. You will be taking home medication in non-child resistant packaging. Please take the necessary precautions when arriving home to keep your medication secure and out of reach of children.

I understand that my release/parole/discharge medicines are not in child resistant packaging and that it is my responsibility to ensure the medications are kept out of the reach of children.

Inmate Name (print)_BOZKUS, SERHAT_____

Signature: _____

Date__4/18/2022_____

Witness: _____

## Entrega de Medicamentos

La Farmacia Clinical Solutions recominda y utiliza constantemente envases con medicamentos que sean resistentes para los niños pequeños. Usted llevara medicinas en envases que no son resistentes para los niños. Por favor tome las precauciones necesarias cuando llegue a su casa para que su medicamento este seguro y fuera del alcance de los niños.

Yo entiendo que mi salida/bajo palabra/el remplazo de medicina no vendra en envases resistentes y que es mi responsabilidad asegurar el medicamento y que no este al alcance de los niños.

Nombre del residente (imprimir): _____

Firma: _____

Fecha: __4/18/2022_____

Testigo: _____

Uploaded on: 6/27/2022 at 9:56:46 a.m. (Central Daylight Time)  Base City: OTO


**CoreCivic**

**Cibola County Correctional Center**

**Intake Education Packet**

**Formas Medicas para Admisiones**

**English/Espanol**

**X** Nutrition

**X** Hygiene

**X** Dental

**X** HIV and AIDS/SIDA y VIH

**X** Hepatitis

**X** Tuberculosis (PPD)

**X** Boils

**X** Substance Abuse

**X** Sexual Assault Prevention

**X** Sleep Hygiene

**X** Keep on Person Medications/Auto administracion de medicamentos

**X** Inmate/Detainee Grievances

**X** COVID-19

**By signing below I acknowledge that I have received all the above information/ Al firmar a continuacion, reconozco que he recibido toda la informacion anterior:**

| Offender Signature/Firma del Confinado | Witness/Tesigo |
|---|---|

| Inmate/Detainee Name **BOZKUS, SERHAT** |
|---|
| Inmate/Detainee #: **A220712429** |
| Date: **4/18/2022** |

Published on: 6/7/2022 at 9:54:46 p.m. (Central Daylight Time)    Base City: OTO

13-40A

# Inmate/Resident Health Appraisal

| Arrival at Facility: | Date 4/18/22 | Inmate/Resident Name: SERBAT BOZKUS |
| --- | --- | --- |
| ☑ Initial Appraisal: | Date 4/26/22 | Inmate/Resident Number: 220712429 - ICE |
| ☐ Periodic Appraisal: | Date_____ | DOB: 01/01/1992 |

| Date: 04/26/2022 | Facility: Cibola County | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Height: 71.653 IN | Weight: 169.753 LB | Access to Care Understood? ☑ Yes ☐ No | Respiration: 18 | Pulse: 66 | Temp: 97.3 F | BP: 126 / 81 |

**PRESENT COMPLAINTS: Describe any current symptoms or complaints**

Continued to Overflow

**MEDICAL/SURGICAL HISTORY: Include any current or previously diagnosed medical or surgical conditions and any previous hospitalizations**

Neck pain Dx in Turkey: possible herniated c spine disk
Perforated ear drum: occurred in Turkey continues now
Anxiety and on/off chest pain due to anxiety; per pt he was seen by cardiology in Turkey and was cleared from cardiac conditions.
right 5th digit amputation at age 2

**SOCIAL HISTORY: Include history of drug, alcohol or tobacco use. Document intravenous drug use history.**

Drugs: denied use
ETOH: denied use
Tobacco: 1-2 PPD x 10 years

**FAMILY HISTORY: Parents and siblings.**

Mother: Alive with no medical problems
Father: with herniated neck and also with heart problems
Siblings: x 6 all alive and well

**CURRENT MEDICATIONS:**

Amoxicillin 500 MG Oral Capsule #20 Capsule, TAKE 1 CAPSULE TWICE DAILY, NO REFILLS
OXcarbazepine 300 MG Oral Tablet #30 Tablet, Take half of tab BID, 2 refills

**ALLERGIES OR MEDICATION SENSITIVITIES:**

No Known Allergies

10/10/12

Proprietary Information – Not For Distribution – Copyrighted - Property of CoreCivic

13-40A

# Inmate/Resident Health Appraisal

## HISTORY/REVIEW OF SYSTEMS (Check All Applicable)

| HEAD | EYE | EAR | NOSE | THROAT |
|---|---|---|---|---|
| ☐ Injury | ☐ Inflammation | ☑ Pain | ☐ Injury | ☐ Tonsillitis |
| ☐ Headaches | ☐ Impaired Vision | ☑ Discharge | ☐ Obstruction | ☐ Hoarseness |
| ☐ Sinus pain | ☐ Glasses | ☑ Deafness | ☐ Nose bleeds | ☐ Sore throat |
| ☐ Dizziness | ☐ Other | ☐ Ringing in ears | ☐ Postnasal Drip | ☐ Speech defect |
| ☐ Other | | ☐ Other | ☐ Other | ☐ Other |

| MOUTH | NECK | CHEST/HEART | LUNGS | |
|---|---|---|---|---|
| ☐ Teeth | ☐ Enlarged glands | ☑ Chest pain or pressure | ☐ Asthma | ☐ Tuberculosis |
| ☐ Lips | ☐ Thyroid disease | ☐ Heart Palpitations | ☐ Hay fever | ☐ SOB |
| ☐ Gums | ☑ Other | ☐ Swelling | ☐ Pain | |
| ☐ Tongue | | ☐ Shortness of breath | ☐ Cough | ☐ Other |
| ☐ Other | | ☐ Difficulty with exertion | ☐ Night sweats | |
| | | or exercise | ☐ Pneumonia | |
| | | ☐ Other | | |

### ABDOMEN/GASTRO-INTESTINAL

| | | | DIABETES |
|---|---|---|---|
| ☐ Gas, belching | ☐ Pain on swallowing | ☐ Constipation | ☐ High blood sugar |
| ☐ Nausea | ☐ Pain or burning after eating | ☐ Diarrhea | ☐ Low blood sugar |
| ☐ Vomiting | ☐ Ulcer | ☐ Hernia | ☐ Insulin |
| ☐ Jaundice | ☐ Vomiting blood | ☐ Other | ☐ Oral medication |
| ☐ Gallstones | ☐ Black stools | | ☐ Frequent urination |

### GENITO-URINARY/RECTAL

| | | | WEIGHT |
|---|---|---|---|
| ☐ Painful urination | ☐ Getting up at night | ☐ Hemorrhoids | ☐ Recent weight loss |
| ☐ Frequent urination | ☐ History of venereal | ☐ Other | ☐ Recent weight gain |
| ☐ Blood in urine | disease | | |
| ☐ Kidney stones | ☐ Rectal bleeding | | |

| NEUROLOGICAL/SPINE | MUSCULOSKELTAL | PSYCHIATRIC |
|---|---|---|
| ☐ Dizziness | ☐ Muscle pain | ☐ Suicide attempt |
| ☐ Fainting | ☐ Muscle weakness | ☐ Psychiatric hospitalization |
| ☐ Blackouts/loss of | ☐ Muscle twitching | ☐ Anxiety |
| consciousness | ☐ Joint pain | ☐ Depression |
| ☐ Numbness or tingling | ☐ Arthritis | ☐ Anger difficulties |
| ☐ Pain | ☐ Deformities | ☐ Hear voices/hallucinations |
| ☐ Epilepsy/seizure | ☐ Paralysis | ☐ Other |
| ☐ Other | ☐ Other | |

### COMMENTS

Inmate Name: SERHAT BOZKUS

Inmate Number: 220712429 - ICE

10/10/12

Proprietary Information – Not For Distribution – Copyrighted - Property of CoreCivic

Uploaded On: 6/2/2022 at 9:56:46 a.m. (Central Daylight Time)    Base City: OTO

13-40A

# Inmate/Resident Health Appraisal

**GENERAL IMPRESSION:** (To include identifying marks, scars and tattoos)

Continued to Overflow

| Physical Exam | WNL | Abnormal Findings |
|---|---|---|
| 1. Head | WNL | |
| 2. Eyes | WNL | |
| 3. Ears | | Left ear with extensive erythma to the canal and large perforation noted at 2:00 |
| 4. Nose | WNL | |
| 5. Mouth | WNL | |
| 6. Neck | WNL | ful ROM without crepitus |
| 7. Chest | WNL | |
| 8. Lungs | WNL | |
| 9. Heart | WNL | S1S2 no MRG |
| 10. Vessels | WNL | |
| 11. Abdomen | WNL | |
| 12. Hernia | | not indicated pt denied sx |
| 13. Rectal | | not indicated pt denied sx |
| 14. Genital | | not indicated pt denied sx |
| 15. Upper Ext. | WNL | right hand missing 5th digit |
| 16. Lower Ext. | WNL | |
| 17. Spine | WNL | |
| 18. Neurological | WNL | |
| 19. Psychiatric (Mental Status) Psychiatric Consult Indicated? | Yes | on meds in clinic |

| Visual Acuity | | Visual Acuity (corrected) | | Hearing Aid | | Prosthesis | Housing Limitations |
|---|---|---|---|---|---|---|---|
| Right | Left | Right | Left | Yes | No | | |
| | | | | | ✓ | none | none |

**PROBLEM LIST**

Chest wall pain
Anxiety
Neck pain
Perforation of tympanic membrane

**PLAN OF CARE**

see orders

**LABORATORY/DIAGNOSTIC TESTS ORDERED (LIST):** see orders

**IMMUNIZATIONS?** ◯ Yes or ⦿ No List:

**CHRONIC CARE REFERRAL?** ◯ Yes or ⦿ No      IF YES, DATE OF REFERRAL:

**DATE OF FULL REVIEW OF MEDICAL RECORD:** 4/26/22

**MEDICAL FOLLOW-UP VISIT SCHEDULED?** ⦿ Yes or ◯ No    IF YES, DATE OF APPT: 2 weeks

**CIRCUMSTANCES PRECLUDING USE OF FORCE AGENTS/DEVICES:** none

**RECOMMENDATIONS FOR HOUSING, JOB ASSIGNMENT, PROGRAMMING:** none

Inmate Name: SERRAT BOZKUS          Inmate Number: 220712429 - ICE

Tiffany Romero-Peralta, ACNS-BC; Apr 26 2022 12:17PM MST (Author)    Date:

10/10/12

Proprietary Information – Not For Distribution – Copyrighted - Property of CoreCivic

103489

## Health Appraisal

13-40A

*Please use this page to comment on findings from previous pages*

Continued from GeneralImpression - wdwn male in NAD
A/O x 4
Steady Gait
No tattoos noted

Continued from PresentComplaints - Patient c/o chest tightness. He states he is not having any chest tightness right now, but it happens when he sometimes has anxiety. He states he was seen by a cardiologist in Turkey and he was told that he has no cardiac abnormalities. EKG was done last night and reviewed and found to be WNL. He states he knows he is normal because he was told that in Turkey but he wants to get rid of his anxiety to stop the chest tightness.
Also C/O x 2 "neck hernias". he states when he saw the cardiologist in Turkey they did some type of test and he was told his neck was herniated. he states the hernias cause him neck pain and shoulder pain. Attempts to determine if he was referring to a herniated disk were unsuccessful as the patient was not sure they were the same thing.
Also C/O Left ear pain. he states when he was in Otero Camp he was told he had a hole in the ear drum but he had not received any treatment. he states his hearing is also decreased in that ear. After further discussion he advised that this issue has been going on since Turkey and he was thinking about having surgery in Turkey to have a patch placed.

Name: SERHAT  BOZKUS                    Inmate/Resident # 220712429 - ICE

Signature: Tiffany Romero-Peralta, ACNS-BC; Apr 26 2022 12:17PM MST (Author)

Proprietary Information – Not For Distribution – Copyrighted - Property of CoreCivic

10490

## Health Appraisal                                                                13-40A

*Please use this page to comment on findings from previous pages*

New intake/or annual health appraisal completed today with the help of interpreter 381467
Pt with large perforation in TM: started on ABX and given petroleum jelly and cotton and was advised to keep it dry at all times. Shown
how to make a barrier with the Vaseline when he showers. Keep it covered 24/7 until follow up. VSS. Pt with decreased hearing in that ear.
Pt verbalized understanding end was able to demonstrate how to cover ear. If he develops fever chills nv or change in sx RTC right away.
Continue taking any and all psyc medications if applicable and follow up with mental health as needed. Referral to mental health for
evaluation if positive psyc history.
Discussed diet, encouraged diet low in fat and sodium.
Encouraged daily exercise as tolerated
Covid 19 status x 2 biotech
C spine x rays ordered for eval of herniated disks.
F/U: 2 weeks
Instructed inmate on procedure to complete and turn in sick call request if needed
Counseled inmate on NOT getting any tattoos while in prison due to high risk of HCV and HIV
All questions and concerns were addressed. Pt denied further questions and verbalized understanding of plan of care. If new issues or
concerns arise before next visit, RTC PRN.
>45 minuets was spent face to face with the patient.

**Name:**   SERHAT BOZKUS                          **Inmate/Resident #** 220712429 - ICE

**Signature:**   Tiffany Romero-Peralta, ACNS-BC; Apr 26 2022 12:17PM MST (Author)

      Proprietary Information – Not For Distribution – Copyrighted - Property of CoreCivic

13-71A14

## EARACHE

| Inmate Name: | BOZKUS, SERHAT | | Inmate #: | 220712429 - | DOB: | 01/01/1992 |
|---|---|---|---|---|---|---|
| Facility Name: | CCCC | | Date: | 05/20/2022 | Time: | 11:14:29 AM |

*ATTENTION: IF A PROFESSIONAL JUDGMENT IS REQUIRED BEYOND YOUR SCOPE OF PRACTICE SET FORTH BY THE NURSING PRACTICE ACT OF YOUR STATE OR YOU HAVE QUESTIONS ABOUT HOW TO PROCEED, YOU MUST CONSULT WITH A HIGHER DISCIPLINE.*

### SUBJECTIVE (Check all that apply)

**NOTE: IF A PATIENT/INMATE PRESENTS WITH FOREIGN BODY, SUSPECTED TRAUMA, OR BLEEDING FROM THE EAR IMMEDIATELY REFER TO AN LIP**

*In cases of emergency call EMS - document all findings for an emergency on the Emergency Flowsheet 13-34A1*

**NOTE: If patient presents with obvious ear trauma/injury refer to HEAD TRAUMA/INJURY Protocol and notify LIP immediately.*

1) Chief Complaint: (in patients own words)

I have 3 problems i have high BP, ear pain, and hernia. c/o throat being swollen

2) Onset of Symptoms: 1   ○ hour(s)   ○ day(s)   ○ week(s)   ⊙ month(s)

   ○ other
   ⊙ New   ○ Recurrent   ○ Chronic

3) Are you allergic to anything (e.g. medications, bee stings)?   ⊙ No   ○ Yes

   If yes, describe:

4) Location:   ○ Right ear   ⊙ Left ear   ○ Both ears

5) Description of injury: has busted eardrum   (document on the anatomical form)

   Cause of injury:

   (If injury has security implications/issues, notify shift supervisor or designee)

6) Do you have history of the following?   ☐ Nausea   ☐ TMJ   ☐ Vertigo/dizziness   ☐ Sinus problem   ☐ Tinnitus
   ☐ Headaches   ☐ Recent cold/flu symptoms

   ☐ Recent trauma/foreign body in ear - describe:
   ☐ Other:

7) Are you experiencing any of the following?   ☐ Ear pressure   ☐ Decreased hearing   ☐ Popping   ☐ Ringing in ears
   ☐ Cold symptoms   ☐ Cough   ☐ Fever   ☐ Runny/stuffy nose   ☐ Sneezing   ☐ Jaw pain   ☐ Stiff neck
   ☐ discharge - describe
   ☐ Pain: On scale (1 - 10)   ____   Is there anything that worsens the pain?   ○ No   ○ Yes
   If yes, describe:

SUBJECTIVE FINDINGS (continued):

**FINDINGS REQUIRING IMMEDIATE CONSULTATION WITH LICENSED INDEPENDENT PROVIDER (LIP):**

   ☐ Recent trauma, acute decreased/loss of hearing, severe pain, stiff neck, swelling/bruising behind ear

| Signature: | Abeita, Kateri | Title: | RN | Date: | 05/20/2022 | Time: | 11:14:29 AM |
|---|---|---|---|---|---|---|---|

Page 1 of 4   Proprietary Information - Not For Distribution - Copyrighted - Property of CoreCivic   04/04/18

EARACHE continued:

OBJECTIVE (Check all that apply. Use space below for additional comments)

8) Vital Signs:   B/P: 145/105   Pulse: 70   Respirations: 20   Temperature: 97.5
   Ht:   Wt:

9) Appearance (neck/ear external):   ☐ Swelling behind the ear   ☐ bruising
   ☐ Other:

10) Ear drum/canal:   Normal ☑ R ☐ L   Red ☐ R ☐ L   Pearly gray ☐ R ☐ L   Dull ☐ R ☐ L
    Foreign Body - ☐ R ☐ L   describe:

11) Wax:   None ☑ R ☑ L   Present ☐ R ☐ L   Canal occluded ☐ R ☐ L

12) Drainage:   None ☐ R ☐ L   Bloody ☐ R ☐ L   Pus present ☐ R ☐ L   Clear ☐ R ☐ L
    Other: ☐ R ☐ L

13) Neck Glands: ☑ Normal   ☐ Swollen   ☐ Enlarged Tonsils

14) Throat: ☑ Normal   ☐ Redness   ☐ Swollen   ☐ White Patches

15) Gait: ☑ Steady   ☐ Unsteady   ☐ Unable to stand

16) Is patient being followed in Chronic Care?   ◉ No   ○ Yes
    If yes, list:

17) Has the patient been seen previously at sick call for this complaint?   ○ No   ◉ Yes
    If yes, list date(s):
    (Note: if the patient has been seen two or more times for this same complaint, referral to an LIP is necessary)

18) Current Medications:   ☐ Reviewed with patient -   ◉ no issues
                           ○ issues

OBJECTIVE FINDINGS (continued):

FINDINGS REQUIRING IMMEDIATE CONSULTATION WITH LICENSED INDEPENDENT PROVIDER (LIP):

☐ Temp < 96F or > 101F   ☐ Resp. < 14 or > 24   ☐ Pulse < 50 or > 110   ☐ BP: sys < 90 or > 160 / dia > 100

☐ Any abnormal findings noted in # 8 - 17 above

If LPN instructed to follow nursing intervention plan of care, consulted with: Name
                                                                    Title:

Medical Provider/RN Notified Date:   Time:   ○ AM   ○ PM
Emergency department notification time:   Transport time:
Inmate Name: BOZKUS, SERHAT   Inmate #: 220712429 -   DOB: 01/01/1992
Signature: Abeita, Kateri   Title: RN   Date: 05/20/2022   Time: 11:14:29 AM

## EARACHE (continued)

**ASSESSMENT:**

**EXPLAIN ASSESSMENT DECISION RELATED TO CLINICAL FINDINGS, TO INCLUDE PHYSICAL ASSESSMENT:**

Inmate

**Findings requiring immediate consultation with Licensed Independent Provider (LIP)**

- [ ] Recent trauma, acute decreased loss of hearing, severe pain, stiff neck, swelling/bruising behind ear

- [ ] Temp < 96F or > 101F      [ ] Resp. < 14 or > 24      [ ] Pulse < 50 or > 110      [ ] BP: sys < 90 or > 160 / dia > 100

- [ ] Any abnormal findings noted in # 8 - 17 in objective section

**Findings requiring urgent consultation with Licensed Independent Provider (LIP)**

- [ ] tinnitus   [ ] vertigo   [ ] erythema and/or swelling of the external ear (auricle)

**Findings requiring routine consultation with Licensed Independent Provider (LIP)**

- [ ] decreased/loss of hearing over time

- [ ] ear canal remains occluded with wax after nursing intervention per nursing protocol

**PLAN:**

- [ ] Consulted with: Name _____   Title: _____

- [ ] Orders received -   ○ No   ○ Yes

  If yes, list: _____

- [ ] **CONFIRMED INTACT EARDRUM -**   *(only complete the following if you can visualize an intact eardrum) -*

  - [ ] Irrigate affected ear(s) gently with room temperature water, till clear (This will require an order from the medical provider)

  - [ ] If above ineffective, instill Debrox (Carbamide Peroxide 6.5% in Anhydrous glycerol), 3-5 drops in affected ear(s) twice a day for 2 days, then repeat irrigation as above. (This will require an order from the medical provider)

- [x] **Disposition -**

  - ○ Emergent referral (immediately)   ○ Urgent referral (within 24 hrs)   ○ Routine referral (within 2 - 14 days)

  - [x] Scheduled with Provider: Name  LIP                   Title: _____

  - [ ] Return to clinic if symptoms worsen        [ ] None

- [x] **Patient Education -**

  - [x] Instructed not to insert Q-tips or other objects into ear,

  - [ ] medication use,

  - [x] Follow-up sick call if no improvement within 4 days.

  - [x] Inmate verbalizes understanding of instructions.

- [x] OTC Medication(s) [name, dose, route, frequency, duration]:

  - [ ] Acetaminophen 500- 650 mg by mouth for pain two to three times a day for 3 days

  - [x] Ibuprofen 200 - 400 mg by mouth for pain two to three times a day for 3 days

  - [ ] Other: _____

**PLAN (continued)**

refer to LIP
to take BP 2daily for BP

| | | |
|---|---|---|
| **Inmate Name:** BOZKUS, SERHAT | **Inmate #:** 220712429 - ICE | **DOB:** 01/01/1992 |
| **Signature:** Abeita, Kateri | **Title:** RN    **Date:** 05/20/2022 | **Time:** 11:14:29 AM |

Proprietary Information - Not For Distribution - Copyrighted - Property of CoreCivic

04/04/18

BDEF: 39 of 45 18

108494

## SUBJECTIVE

NA

## OBJECTIVE

NA

## ASSESSMENT

NA

## PLAN

NA

| Inmate Name: | BOZKUS, SERHAT | | Inmate #: | 220712429 - | DOB: | 01/01/1992 |
| --- | --- | --- | --- | --- | --- | --- |
| Signature: | Abeita, Kated | Title: RN | Date | 05/20/2022 | Time: | 11:14:29 AM |

Proprietary Information - Not For Distribution - Copyrighted - Property of CoreCivic

04/04/18

109495

Uploaded Beacon: 6/27/2022 at 9:56:46 p.m. (Central Daylight Time)   Base City: OTO

13-71A14

## EARACHE

| Inmate Name: | BOZKUS, SERHAT | | Inmate #: | 220712429-105 | DOB: | 01/01/1992 |
|---|---|---|---|---|---|---|
| Facility Name: | CCCC | | Date: | 04/28/2022 | Time: | 09:09:37 AM |

*ATTENTION: IF A PROFESSIONAL JUDGMENT IS REQUIRED BEYOND YOUR SCOPE OF PRACTICE SET FORTH BY THE NURSING PRACTICE ACT OF YOUR STATE OR YOU HAVE QUESTIONS ABOUT HOW TO PROCEED, YOU MUST CONSULT WITH A HIGHER DISCIPLINE.*

**SUBJECTIVE (Check all that apply)**

**\*\*NOTE: IF A PATIENT/INMATE PRESENTS WITH FOREIGN BODY, SUSPECTED TRAUMA, OR BLEEDING FROM THE EAR IMMEDIATELY REFER TO AN LIP\*\***

*In cases of emergency call EMS - document all findings for an emergency on the Emergency Flowsheet 13-34A1*

**\*\*NOTE:** *If patient presents with obvious ear trauma/injury refer to HEAD TRAUMA/INJURY Protocol and notify LIP immediately.*

1) Chief Complaint: (in patients own words)

I have a busted ear drum for a long time and i cant hear that well.

2) Onset of Symptoms: [____]   ○ hour(s)   ○ day(s)   ○ week(s)   ○ month(s)

　　　○ other [____]
　　　○ New   ◉ Recurrent   ○ Chronic

3) Are you allergic to anything (e.g. medications, bee stings)?   ◉ No   ○ Yes

　　　If yes, describe: [____]

4) Location:   ○ Right ear   ◉ Left ear   ○ Both ears

5) Description of injury: [Left ear]   (document on the anatomical form)

　　Cause of injury: [assult when a child]

　　(If injury has security implications/issues, notify shift supervisor or designee)

6) Do you have history of the following?   ☐ Nausea   ☐ TMJ   ☐ Vertigo/dizziness   ☐ Sinus problem   ☐ Tinnitus
　　　☐ Headaches   ☐ Recent cold/flu symptoms
　　　☐ Recent trauma/foreign body in ear - describe: [____]
　　　☐ Other: [____]

7) Are you experiencing any of the following?   ☐ Ear pressure   ☑ Decreased hearing   ☐ Popping   ☐ Ringing in ears
　　　☐ Cold symptoms   ☐ Cough   ☐ Fever   ☐ Runny/stuffy nose   ☐ Sneezing   ☐ Jaw pain   ☐ Stiff neck
　　　☑ discharge - describe [____]
　　　☑ Pain: On scale (1 - 10) [____]   Is there anything that worsens the pain?   ○ No   ○ Yes
　　　If yes, describe: [____]

SUBJECTIVE FINDINGS (continued):

FINDINGS REQUIRING IMMEDIATE CONSULTATION WITH LICENSED INDEPENDENT PROVIDER (LIP):
　　☐ Recent trauma, acute decreased/loss of hearing, severe pain, stiff neck, swelling/bruising behind ear

| Signature: | Abeita, Kateri | Title: | RN | Date: | 04/28/2022 | Time: | 09:09:37 AM |
|---|---|---|---|---|---|---|---|

Page 1 of 4   Proprietary Information - Not For Distribution - Copyrighted - Property of CoreCivic   04/04/18

EARACHE continued:

OBJECTIVE (Check all that apply. Use space below for additional comments)

8) Vital Signs:   B/P: 145/107    Pulse: 94    Respirations: 20    Temperature: 98.3
                  Ht:              Wt: 154

9) Appearance (neck/ear external):   ☐ Swelling behind the ear    ☐ bruising
                                     ☐ Other:

10) Ear drum/canal:   Normal ☑ R ☐ L    Red ☐ R ☐ L    Pearly gray ☐ R ☐ L    Dull ☐ R ☐ L
                      Foreign Body - ☐ R ☐ L   describe:

11) Wax:   None ☑ R ☑ L    Present ☐ R ☐ L    Canal occluded ☐ R ☐ L

12) Drainage:   None ☐ R ☐ L    Bloody ☐ R ☐ L    Pus present ☐ R ☐ L    Clear ☐ R ☐ L
                Other: ☐ R ☑ L  greenish

13) Neck Glands:  ☑ Normal   ☐ Swollen   ☐ Enlarged Tonsils

14) Throat:  ☑ Normal   ☐ Redness   ☐ Swollen   ☐ White Patches

15) Gait:  ☑ Steady   ☐ Unsteady   ☐ Unable to stand

16) Is patient being followed in Chronic Care?    ○ No    ⦿ Yes
    If yes, list:

17) Has the patient been seen previously at sick call for this complaint?    ○ No    ⦿ Yes
    If yes, list date(s):
    (Note: if the patient has been seen two or more times for this same complaint, referral to an LIP is necessary)

18) Current Medications:   ☐ Reviewed with patient -   ⦿ no issues
                           ○ issues

OBJECTIVE FINDINGS (continued):

FINDINGS REQUIRING IMMEDIATE CONSULTATION WITH LICENSED INDEPENDENT PROVIDER (LIP):

☐ Temp < 96F or > 101F    ☐ Resp. < 14 or > 24    ☐ Pulse < 50 or > 110    ☐ BP: sys < 90 or > 160 / dia > 100

☐ Any abnormal findings noted in # 8 - 17 above

---

If LPN instructed to follow nursing intervention plan of care, consulted with: Name
                                                                    Title:
Medical Provider/RN Notified Date:              Time:              ○ AM   ○ PM
Emergency department notification time:              Transport time:
Inmate Name:  BOZKUS, SERHAT          Inmate #: 220712429 -    DOB: 01/01/1992
Signature:  Abeita, Kateri    Title: RN    Date: 04/28/2022   Time: 09:09:37 AM

11497

EARACHE (continued)

**ASSESSMENT:**

**EXPLAIN ASSESSMENT DECISION RELATED TO CLINICAL FINDINGS, TO INCLUDE PHYSICAL ASSESSMENT:**
Left ear slight inflammed inmate on ABT and was seen by provider for ear. LIP will f/u with inmate in 2 weeks.

**Findings requiring immediate consultation with Licensed Independent Provider (LIP)**
- ☐ Recent trauma, acute decreased/loss of hearing, severe pain, stiff neck, swelling/bruising behind ear
- ☐ Temp < 96F or > 101F      ☐ Resp. < 14 or > 24      ☐ Pulse < 50 or > 110      ☐ BP: sys < 90 or > 160 / dia > 100
- ☐ Any abnormal findings noted in # 8 - 17 in objective section

**Findings requiring urgent consultation with Licensed Independent Provider (LIP)**
- ☐ tinnitus  ☐ vertigo  ☐ erythema and/or swelling of the external ear (auricle)

**Findings requiring routine consultation with Licensed Independent Provider (LIP)**
- ☐ decreased/loss of hearing over time
- ☐ ear canal remains occluded with wax after nursing intervention per nursing protocol

**PLAN:**

☐ Consulted with: Name [                    ]  Title: [      ]

☐ Orders received -  ○ No  ○ Yes

If yes, list: [                    ]

☐ **CONFIRMED INTACT EARDRUM -**  *(only complete the following if you can visualize an intact eardrum) -*
- ☐ Irrigate affected ear(s) gently with room temperature water, till clear (This will require an order from the medical provider)
- ☐ If above ineffective, instill Debrox (Carbamide Peroxide 6.5% in Anhydrous glycerol), 3-5 drops in affected ear(s) twice a day for 2 days, then repeat irrigation as above. (This will require an order from the medical provider)
- ☐ Disposition -
  - ○ Emergent referral (immediately)  ○ Urgent referral (within 24 hrs)  ○ Routine referral (within 2 - 14 days)
  - ☐ Scheduled with Provider: Name [              ]  Title: [      ]
  - ☐ Return to clinic if symptoms worsen      ☐ None

☑ Patient Education -
  - ☐ Instructed not to insert Q-tips or other objects into ear,
  - ☑ medication use,
  - ☑ Follow-up sick call if no improvement within 4 days.
  - ☑ Inmate verbalizes understanding of instructions.

☐ OTC Medication(s) [name, dose, route, frequency, duration]:
- ☐ Acetaminophen 500- 650 mg by mouth for pain two to three times a day for 3 days
- ☐ Ibuprofen 200 - 400 mg by mouth for pain two to three times a day for 3 days
- ☐ Other: [            ]

**PLAN (continued)**

| Inmate Name: | BOZKUS, SERHAT | Inmate #: | 220712429 - ICE | DOB: | 01/01/1992 |
|---|---|---|---|---|---|
| Signature: | Abeita, Kateri | Title: | RN | Date: | 04/28/2022 | Time: | 09:09:37 AM |

## SUBJECTIVE

NA

## OBJECTIVE

NA

## ASSESSMENT

NA

## PLAN

NA

| Inmate Name: | BOZKUS, SERHAT | | Inmate #: | 220712429 - | DOB: | 01/01/1992 |
| --- | --- | --- | --- | --- | --- | --- |
| Signature: | Abeita, Katen | Title: | | Date | 04/28/2022 | Time: | 09:09:37 AM |

Proprietary Information - Not For Distribution - Copyrighted - Property of CoreCivic

04/04/18

# *Mental Health Note v11*

## **Cibola County Correctional Facility**
**2000 Cibola Loop  P.O. Box 3540**
**Milan, NM 87021**
(505) 285-4900

Inmate:         SERHAT BOZKUS
Inmate ID:      5985911
Age/DOB:        30/Jan 01, 1992
Agency No:      220712429 - ICE

### Subjective
"I feeling good, but I have concerns. Last week I was put on watch because it was a misunderstanding. I talked to ICE and yes I told them every I wanted, but I don't know if they got it."

### Objective
No Apparent distress

### Assessment
Mood Stable, patient remains concerned about getting asylum.

### Plan
Continue Doxepin 10mg po qhs-Depression
Continue Trileptal 300mg po qhs-Mood
Continue Close Follow up

### Signatures
Electronically signed by : Anne Ortiz, M.D.; Jun  1 2022 10:51AM MST (Author)

BOIR 4548-4578

# *Dental Note v11*

## Cibola County Correctional Facility
### 2000 Cibola Loop  P.O. Box 3540
### Milan, NM 87021
(505) 285-4900

| | |
|---|---|
| Inmate: | SERHAT BOZKUS |
| Inmate ID: | 5985911 |
| Age/DOB: | 30/Jan 01, 1992 |
| Agency No: | 220712429 - ICE |

### Subjective
Pt. presents for Initial Dental Intake Exam.

### Objective
Initial Dental Intake Exam.

### Assessment
No, Pt. has not had a Dental Exam within the past year. No, Pt. has no Dental complaints. Informed Pt. teeth #1, #30 & #31 all have decay. Pt. states pain is a 4 out of 10 on the pain scale.

### Plan
Exam, Reviewed PMH,
OHI, Charting & Probing.
13-13A -- Medical Hx was taken and reviewed.
13-13B - Dental Exam was completed. RH&N Exam - WNL.
13-13C - Dental Treatment Plan was developed.
1) Restoration #1.
2) restoration #30.
3) Restoration #32.
4) Prophylaxis.

Next Visit: Prophylaxis.

### Education
OHI

Informed Pt. on how to access Dental Care.

### Signatures
Electronically signed by : Dennis Jackson, DDS; Apr 20 2022 2:55PM MST (Author)

## Dental Examination

13-13B

| | |
|---|---|
| Inmate/Resident Name | BOZKUS, SERHAT |
| Inmate/Resident # | 220712429 - ICE |
| Date of Birth | 01/01/1992 |
| Facility | CCCC |

Race / Sex   U/M

**Type of Examination:**   Initial ⊙   Periodic ○   Date  04/20/2022

**Existing Conditions:**

Missing Teeth:
(check all that apply)

1 ☐ 2 ☐ 3 ☐ 4 ☐ 5 ☐ 6 ☐ 7 ☐ 8 ☐ 9 ☐ 10 ☐ 11 ☐ 12 ☐ 13 ☐ 14 ☐ 15 ☐ 16 ☑

32 ☐ 31 ☐ 30 ☐ 29 ☐ 28 ☐ 27 ☐ 26 ☐ 25 ☐ 24 ☐ 23 ☐ 22 ☐ 21 ☐ 20 ☐ 19 ☐ 18 ☐ 17 ☐

Existing Restorations:
(check all that apply)

1 ☐ 2 ☐ 3 ☐ 4 ☐ 5 ☐ 6 ☐ 7 ☐ 8 ☐ 9 ☐ 10 ☐ 11 ☐ 12 ☐ 13 ☐ 14 ☐ 15 ☐ 16 ☐

32 ☐ 31 ☑ 30 ☑ 29 ☐ 28 ☐ 27 ☐ 26 ☐ 25 ☐ 24 ☐ 23 ☐ 22 ☐ 21 ☐ 20 ☐ 19 ☐ 18 ☑ 17 ☐

Dental Prosthesis Present:   (choose one)   F/F ○   P/P ○   None.

Calculus/Deposits:   (choose one)   None ○   Sligh ○   Moderate ○   Heavy ⊙

Gingiva:   (choose one)   Norma ○   Inflamed ○   Highly Inflamed ⊙

Masticating Efficiency:   Good ⊙   Fair ○   Poor ○

**Head and Neck Exam:**

| | Normal | Abnormal | Comments |
|---|---|---|---|
| Pharnyx | ☑ | ☐ | |
| Soft Palate | ☑ | ☐ | |
| Hard Palate | ☑ | ☐ | |
| Lips | ☑ | ☐ | |
| Tongue | ☑ | ☐ | |
| Floor of the Mouth | ☑ | ☐ | |
| Neck/Thyroid/Nodes | ☑ | ☐ | |
| TMJ | ☑ | ☐ | |
| Salivary Glands | ☑ | ☐ | |

**Signature of Dentist**   Jackson, Dennis     **Title**  DDS

    Proprietary Information - Not For Distribution - Copyrighted - Property of CoreCivic    12/08/10

11502

## Dental Examination

| Inmate/Resident Name | BOZKUS, SERHAT | | |
|---|---|---|---|
| Inmate/Resident # | 220712429 - ICE | Race / Sex | U/M |
| Date of Birth | 01/01/1992 | | |
| Facility | CCCC | | |

**Diseases and Abnormalities:**

Extractions Indicated:

(check all that apply)

1 ☐ 2 ☐ 3 ☐ 4 ☐ 5 ☐ 6 ☐ 7 ☐ 8 ☐ 9 ☐ 10 ☐ 11 ☐ 12 ☐ 13 ☐ 14 ☐ 15 ☐ 16 ☐

32 ☐ 31 ☐ 30 ☐ 29 ☐ 28 ☐ 27 ☐ 26 ☐ 25 ☐ 24 ☐ 23 ☐ 22 ☐ 21 ☐ 20 ☐ 19 ☐ 18 ☐ 17 ☐

Restorations Indicated:

(check all that apply)

1 ☑ 2 ☐ 3 ☐ 4 ☐ 5 ☐ 6 ☐ 7 ☐ 8 ☐ 9 ☐ 10 ☐ 11 ☐ 12 ☐ 13 ☐ 14 ☐ 15 ☐ 16 ☐

32 ☑ 31 ☐ 30 ☐ 29 ☐ 28 ☐ 27 ☐ 26 ☐ 25 ☐ 24 ☐ 23 ☐ 22 ☐ 21 ☐ 20 ☐ 19 ☐ 18 ☐ 17 ☐

Remarks: 

**Dental Priority:**   1 ☐   2 ☐   3 ☑   4 ☐      *(see 13-13 for priority definitions)*

**Signature of Dentist** | Jackson, Dennis |   **Title** | DDS |

    Proprietary Information - Not For Distribution - Copyrighted - Property of CoreCivic    12/08/10

EOIR 3 06 68 78

11503

Uploaded on: 5/22/2022 at 09:55:43 pm. (Central Daylight Time)  Base City: OTO

## Dental Attendance Coding Sheet

13-13E

| | |
|---|---|
| Date Seen: | 04/20/2022 |
| Starting Time: | 1:00 |
| Ending Time: | 1:10 |
| Institution: | CIBOL 100 |

Inmate/Resident Name: BOZKUS, SERHAT

Inmate/Resident #: 5985911

DOB: 01/01/1992

### Type of Visit
(Check Below)

○ DA — Dental Appointment (routine, comprehensive care)

○ DSC — Dental Sick Call/Complaints

○ DEM — Emergency (Unscheduled visit)

○ DNS — Dental No Show

◉ DIE — Dental Initial Exam (Intake)

○ DRF — Dental Appointment Refused

○ DAE — Dental Annual Exam

### Blades and Needle Log

| | |
|---|---|
| #27 Short Needles used | |
| #27 Long Needles used | |
| #30 Short Needles used | |
| Number Blades used | |
| Number of Sutures used | |

### Dental Procedures and Services — check boxes that apply

#### 1. DIAGNOSTICS

- [ ] D0120 - Periodic oral eval
- [X] D0140 - Limited oral eval
- [ ] D0150 - Comp. oral eval

#### RADIOGRAPHS

- [ ] D0210 - Intraoral comp series
- [ ] D0220 - Periapical - first film
- [ ] D0230 - Periapical - add. film
- [ ] D0272 - Bitewing - two films
- [ ] D0274 - Bitewings - four films
- [ ] D0330 - Panoramic film

#### TESTS/LAB EXAMS

- [ ] D0460 - Pulp vitality tests
- [ ] D0470 - Diagnostic Casts

#### II. PREVENTIVE

- [ ] D1110 Prophylaxis - adult
- [ ] D1204 Fl without prophy
- [ ] D1205 Fl with prophy
- [X] D1330 OHI
- [ ] D1351 Sealant - per tooth

- [ ] D2393 Resin-three surf., post.
- [ ] D2394 Resin-four+ surf., post.
- [ ] D2920 Recement crown
- [ ] D2940 Sedative filing
- [ ] D2951 Pin retention/tooth

#### IV. ENDODONTICS

- [ ] D3110 Direct pulp cap
- [ ] D3120 Indirect pulp cap
- [ ] D3220 Pulpotomy
- [ ] D3221 Pulpal debridement
- [ ] D3310 Endo therapy-ant.
- [ ] D3320 Endo therapy-bicusp.

#### V. PERIODONTICS

- [ ] D4274 Distal/proximal wedge
- [ ] D4341 Scaling/RPXquad
- [ ] D4355 Gross debridement
- [ ] D4910 Perio maintenance

- [ ] D5640 Replace broken tooth par dr
- [ ] D5750 Refine com dtr - max lab
- [ ] D5751 Refine com dtr - man lab
- [ ] D5850 Tissue cond - max
- [ ] D5851 Tissue cond - man

#### X. ORAL SURGERY

- [ ] D7140 Ext erupted tooth or exp. root
- [ ] D7210 Surg ext erupted tooth
- [ ] D7220 Rem imp-soft tissue
- [ ] D7230 Rem imp-part bony
- [ ] D7240 Rem imp-full bony
- [ ] D7250 Surg rem residual roots
- [ ] D7286 Biopsy-soft tissue
- [ ] D7310 Alveolo with ext/quad
- [ ] D7320 Alveolo w/o ext/quad
- [ ] D7450 Rem odontogenic cyst
- [ ] D7471 Rem exostosis
- [ ] D7510 I and D intraoral
- [ ] D7550 Sequestrectomy
- [ ] D7903 Pericoronitis tx
- [ ] D7910 Suture wound<5cm

Patient MRN # 5985911

Proprietary Information - Not For Distribution - Copyrighted - Property of CoreCivic       12/08/10

BBIR 4 86 4ɤ 78

11504

Uploaded on 07/27/2022 at 09:54:08 pm (Central Daylight Time)   Base City: OTO

## Dental Attendance Coding Sheet

13-13E

### III. RESTORATIVE

| | |
|---|---|
| | D2140 Amal. - one surface |
| | D2150 Amal. - two surfaces |
| | D2160 Amal. - three surfaces |
| | D2161 Amal. - four surfaces |
| | D2330 Resin-one surf., ant. |
| | D2331 Resin-two surf., ant. |
| | D2332 Resin-three surf., ant. |
| | D2335 Resin-four surf., ant. |
| | D2391 Resin-one surf., post. |
| | D2392 Resin-two surf., post. |

### VI. PROSTHODONTICS

| | |
|---|---|
| | D5110 Max com dtr (ed) |
| | D5120 Man com dtr (ed) |
| | D5211 Max pd-resin base |
| | D5212 Mand pd-resin base |
| | D5213 Max pd-cast metal |
| | D5214 Man pd-cast metal |
| | D5410 Adjust com dtr-max |
| | D5411 Adjust com dtr-man |
| | D5421 Adjust pd-max |
| | D5422 Adjust pd-man |
| | D5510 Repair com dtr base |
| | D5620 Replace broken tooth com dtr |
| | D5610 Repair partial dtr base |

### XII ADJUNCT SERVICES

| | |
|---|---|
| | D9110 Palliative Treatment |
| | D9210 Local anesthetic no procedure |
| | D9215 Local anesthetic |
| X | D9310 Consultation |
| | D9930 Post-op treatment |
| | D9951 Occ adj-limited |

#### WRITE-INS

| |
|---|
| |
| |

Inmate/Resident Name:  **BOZKUS, SERHAT**          Patient MRN #  **5985911**

2 of 2          Proprietary Information - Not For Distribution - Copyrighted - Property of CoreCivic          12/08/2010

Filed at BIA on 7/27/2022 at 9:55:08 p.m. (Central Daylight Time)   Base City: OTO
Uploaded on: 7/7/2022 at 9:55:08 a.m. (Central Daylight Time)

13-13C

## Dental Treatment Plan



A B C D E F G H I J

FRONT

T S R Q P O N M L K

| | PSR | |
|---|---|---|
| S1 | S2 | S3 |
| S8 | S5 | S4 |

|  | Circle one | | |
|---|---|---|---|
| Gingiva: | Normal | Inflamed | Highly Inflamed |
| Deposits: | Slight | Moderate | Heavy |
| Stain: | Slight | Moderate | Heavy |
| Prosthesis Present: | | F/F | P/P |
| Prosthesis Needed: | None | | |

| Tooth # | Treatment Planned | Date Completed |
|---|---|---|
| #11 | 2 - HHR OHI | 4/20/2022 |
| | Tx Plic | |
| 1 | Billn | |
| 30 | Billn? | |
| 3 | Billn? | |
| #11 | prophy | |

| Head and Neck Exam | Normal | Abnormal | Comments |
|---|---|---|---|
| Lips | ✓ | | |
| Commissures | ✓ | | |
| Buccal Mucosa | ✓ | | |
| Pharynx | ✓ | | |
| Soft Palate | ✓ | | |
| Hard Palate | ✓ | | |
| Tongue | ✓ | | |
| Floor of Mouth | ✓ | | |
| TMJ | ✓ | | |
| Neck Nodes | ✓ | | |

COMMENTS:_____

_____

Signature of Dentist _____ Jackson, D., DDS

Date: 04/20/2022

### Legend

Amalgam: Outline and block in solidly with black/blue

Composite/Glass Ionomer: Outline in black or blue

Gold: Outline and inscribe horizontal parallel lines in black/blue

Root Canal Filling: Outline each canal filled and block in solidly

Missing teeth: Black/blue "X" on the root(s) of each tooth

Extraction Indicated: 2 red parallel vertical lines through tooth

Unerupted tooth: Outline tooth with a single oval

Caries: Outline and block in solidly in Red

Radiolucency: Outline size, location, and form in black/blue

Inmate/Resident Name Bozkus, Serhat
Inmate/Resident # 220 712 429 R/S
Race O. Sex M
Date of Birth 01/01/1992
Facility Cibola County Correctional Center

Detainee Speaks English? Yes or No
Staff Speaks Detainee's Language? Yes or No
Language Spoken: Turkish
Did you use the interpreter or language line?
Yes or No Name/Number: 385387

Proprietary Information - Not For Distribution - Copyright

12/08/10

EOIR - 6 of 45 of 78
EOIR - 52 of 78

## Dental Patient Medical History

Inmate/Resident Name **Bozkus, Serhat**    Inmate/Resident # 227/2429

Race ○    Sex M    Date of Birth 01/01/1992

Facility: **Cibola County Correctional Center**

Date 04/20/2022

| Circle Yes or No for the following questions. If yes, please give details. | | |
|---|---|---|
| 1. Are you in good health? | YES | NO |
| 2. Has there been any change in your general health within the past year? | YES | NO |
| 3. Are you under any medical care? | YES | NO |
| 4. Have you had any serious illnesses or operations? If so, what was the problem? | YES | NO |
| 5. Are you taking any medicines or drugs (including over the counter drugs)? | YES | NO |
| 6. Are you allergic to any medicine or materials? | YES | NO |
| 7. Have you ever had a reaction to local anesthetic? | YES | NO |
| 8. Have you had any complication or illness following dental treatment? | YES | NO |
| 9. Women: Are you pregnant? Circle Trimester 1  2  3 | YES | NO |

10. Please draw a circle around any of the following that you have had in the past or presently have.

Rheumatic fever
(Heart disease or condition)
Heart Murmur
Artificial Heart Valves
(High Blood Pressure)
Swollen ankles
Frequent chest pain
Shortness of Breath
Prosthetic (artificial) joint

Liver disease
Jaundice (other than birth)
Hepatitis
History of IV drug abuse
Asthma
Hay fever
Emphysema
Tuberculosis (TB)
Arthritis

Diabetes
Stomach Ulcers
Kidney trouble
Fainting or dizzy spells
Epilepsy or seizures
HIV positive
AIDS or AIDS-related complex
Venereal Disease (syphilis,
gonorrhea, venereal warts)

Genital warts
Psychiatric treatment
Cancer
Radiation Therapy
Chemotherapy
Blood transfusion
Sickle Cell Disease
Hemophilia
Bruise easily

Signature of Patient X _____    Date 04/20/2022

Dentist's Comments _____

Signature of Dentist _____ Jackson, D., DDS    Date 4/20/2022

UPDATE:
Health Changes/Current Medications _____

Signature of Dentist _____    Date _____

Detainee Speaks English? Yes  or  No
Staff Speaks Detainee's Language? Yes or No
Language Spoken: Turkish
Did you use the Interpreter or language line?.
Yes or No  Name/Number: 3853 87

12/08/10

Proprietary Information – Not For Distribution – Copyrighted - Property of CoreCivic

Uploaded On on 6/22/2022 at 10:55:40 pm (Central Daylight Time)   Base City: OTO

13-49B

## REFUSAL TO ACCEPT MEDICAL TREATMENT

I, (Name) _Brekus, Serhat_ (Number) _22021242S_ at

(Facility) Cibola County Correctional Center

refuse to accept the following Dental/ Psychiatric/ Medical/ and/or Surgical services and/ or treatment recommended by this Facility's Dental/ Psychiatric/ Medical staff and/or a referred secondary care specialist: (list treatment(s)/service(s) in layman terminology)

_The mental Illing_

I am refusing the above recommended treatment(s)/service(s) for the following reason(s):

_"I'm on Ramadan"_

I acknowledge that I have been informed of the risks and possible consequences which include, but are not limited to, the following, and which may be up to and including death:

_refused Counsel_

I understand the possible consequences and/or complications, listed above and still refuse recommended treatment. I understand that my failure to follow this advice may seriously affect my health or the health of the person under my guardianship.

I hereby release the Dental/ Psychiatric/ Medical staff and/or a referred secondary care specialist associated with this correctional facility, CoreCivic, any contract managed care company, and their employees and agents of all responsibility regarding this matter, and I am making this decision of my own free will.

_refused to sign_                _22021242S_                _1/1/92_
Inmate/Resident Signature          Inmate/Resident #          DOB

(This section to be completed by a staff member)

Tamara Bennett LPN
Cibola
_1/29/12_
Qualified Health Care Professional Signature          Date/Time
(Note: For CDCR inmates, must be an RN or higher credentialed QHCP)

_1/29/12_
Witness Signature          Date/Time

12/8/14

Proprietary Information – Not For Distribution – Copyrighted - Property of CoreCivic

12508

Filed at BIA on: 7/27/2022 at 9:55:08 p.m. Central Daylight Time
Uploaded on: 6/7/2022 at 10:58:40 a.m. (Central Daylight Time)   Base City: OTO



**U.S. Immigration and Customs Enforcement**

ICE | ERO

# COVID-19 Checklist
### for All ICE ERO Transfers, Removals, and Releases

**DIRECTIONS:** This checklist is intended to provide U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) and contracted staff with the minimum steps required prior to transferring, removing, or releasing a noncitizen from ICE custody and to further mitigate the spread of COVID-19.

**Reason for Detainee Transfer:**
- ☐ Medical Evaluation
- ☐ Medical Isolation/Quarantine
- ☐ Clinical Care
- ☐ Security Concerns
- ☐ Release or Removal
- ☐ Overcrowding
- ☑ Other – FOD Approved
  Reason for Transfer *(e.g., facility closure, etc.)*: Bed Space

| | | OK | N/A |
|---|---|---|---|
| 1) Verify the detainee's current health status and exposure history. | | X | |
| 2) Has the detainee been tested for COVID-19 prior to transfer, removal (if required), or release? | | X | |
| 3) Detainee fully vaccinated? | | | X |

4) Is the detainee currently:

| | OK | N/A |
|---|---|---|
| • In medical isolation? | | X |
| • Experiencing symptoms commonly associated with COVID-19? | | X |
| • Awaiting COVID-19 test results? | | X |
| • Cohorted due to COVID-19 exposure? | | X |

For transfers and removals, if the answer to any of the four bulleted questions above is "Yes," do not transfer or remove and if the answer to all these questions is "No," proceed to Questions 5 and 6 only. For releases, if any answer is "Yes," complete 4a, 4b and the remaining questions and if the answers are "No," complete Questions 5 – 7.

| | | OK | N/A |
|---|---|---|---|
| a. | For released detainees, discuss the release with the relevant state, local, tribal, and/or territorial public health department to coordinate continuation of care. Notate the public health department here, if applicable: | | X |
| b. | Provide the health department with the released detainee's name, intended address, email address, all available telephone numbers, and planned mode of transportation to their intended destination. | | X |

| 5) | Before the detainee leaves the facility or is removed, do verbal symptom screening (fever, cough, shortness of breath or difficulty breathing, chills, muscle pain, sore throat, new loss of taste or smell) and a temperature check. Record temperature here: T. 98.0 04.18.2022 OROIL | X | |
|---|---|---|---|
| | For transfers and removals only, if the detainee does not clear the screening process, delay the transfer or removal and follow the protocol for a suspected COVID-19 case. | | X |
| | For transfers and removals only, is the detainee medically cleared to travel? Record method of travel: Ground ☐  ICE Air ☑  Commercial flight ☑ | X | |

6) Provide the detainee with the following forms and fact sheets in the detainee's preferred language, as available.

| | | OK | N/A |
|---|---|---|---|
| a. | Steps to Help Prevent the Spread of COVID-19 if You are Sick; and | X | |
| b. | Stop the Spread of Germs. | X | |

| 7) | For released noncitizens only, facilitate safe transport, continued shelter, and medical care, as part of release planning. Document what arrangements for transportation were made. | | |
|---|---|---|---|
| a. | Did ICE provide transportation? If yes, where was the noncitizen transported to? _____ | | |
| b. | Did a family member or friend provide transportation? | | |
| c. | Was the noncitizen provided with a personal protective equipment mask upon release? | | |
| d. | Was the noncitizen provided with information on or access to community resources to ensure continued shelter and medical care? | | |
| e. | Was the noncitizen advised to avoid public transportation, commercial ride sharing (e.g. Uber, Lyft), and taxis? | | |

| NONCITIZEN'S PRINTED NAME | | NONCITIZEN'S A-NUMBER | NONCITIZEN'S SIGNATURE |
|---|---|---|---|
| BOZKUS SERHAT | | A220712429 | X |

| OFFICER'S/CONTRACTED STAFF'S PRINTED NAME | OFFICER'S/CONTRACTED STAFF'S SIGNATURE | DATE |
|---|---|---|
| C. Rodriguez | | 4-18-22 |

**U.S. Department of Justice**
**United States Marshals Service**

# Prisoner in Transit Medical Summary

Form USM-553

| 1. IDENTIFYING INFORMATION | 2. TUBERCULOSIS SCREENING |
|---|---|

**Name (Last, First, MI):** BOZKUS, SERHAT,

**Gender:** ☒ M  ☐ F   **DOB:** 01-01-1992   **USMS #:** A220712429

**Departure Date:** 04-18-2022   **Departed From:** Otero Processing Center

**2. TUBERCULOSIS SCREENING**

**Tuberculosis Skin Test (TST) / PPD:**

| Date Placed: | Date Read: | Size in mm: |
|---|---|---|
| N/A | N/A | N/A |

**Tuberculosis Blood Test / IGRA (if applicable):**
☐ Positive   ☐ Negative   Date:
☐ Indeterminate / Borderline

**Chest x-ray done within past year (if indicated):**
Date: 12-7-21   Results: NEG

**Prisoner is cleared for transfer:** ☐ NO  ☒ YES

## 3. CURRENT MEDICAL ISSUES

Check all that apply to the prisoner and explain in the comments section:

☐ Hospitalizations within past month
☐ Contagious illness or quarantine within past month
☐ Seizure activity within past month
☐ Cardiac chest pain within past month
☐ Seizure disorder requiring medications
☐ Stroke within past month
☐ Limited mobility (crutches, wheelchair)
☐ Surgery within past month
☐ Has hard or air cast, splint or brace
☐ Diabetes requiring insulin or other medications
☐ Prescription narcotic pain medications dispensed for travel   N/A
☐ Suicide watch/psychiatric decompensation within past month

**FEMALE PRISONERS: Is prisoner pregnant?** ☐ NO  ☐ YES   If yes, how many weeks?

## 4. SICKLE CELL SCREENING

Prisoner has a history of (check appropriate box):
☐ Sickle Cell Disease   ☐ Sickle Cell Trait
☒ No History of Disease or Trait

If prisoner has disease or trait and is traveling by air, has JPATS Sickle Cell Protocol and Clearance been completed? ☐ NO  ☐ YES

Attach clearance to transfer summary

## 5. LIST ALLERGIES (include drugs, foods, latex, etc.):

NKA

| 6a. CURRENT MEDICAL DIAGNOSIS | 6b. MEDICATIONS DISPENSED WITH PRISONER FOR TRANSPORT (Should match medical diagnosis if applicable. Include dosage, route, and frequency.) |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |

**7. OTHER COMMENTS** (If additional space is needed, write on back, attach separate sheet of paper, or check this box to create a second page: ☐)

## 8. COVID SCREENING; TESTING, AND VACCINATIONS

### PRE-DEPARTURE COVID-19 SCREENING (Required)

**Temperature:** 98.0   **Date/Time:** 04.18.2022

☐ Fever/chills
☐ New cough or difficulty breathing
☐ New body or muscle aches
☐ New sore throat or congestion
☐ New loss of smell or taste
☐ New headache
☐ New nausea or diarrhea

A temperature of ≥ 100.4°F or "Yes" to any of the above questions, the prisoner is NOT CLEARED for transfer. Prisoner must be assessed and cleared in Section 9 below by the "Certifying Health Authority".

### PRE-DEPARTURE COVID-19 TESTING (Required for USM Testing Hubs)

**Type (or Name) of Test:** COVID 19 Rapid Abbott
**Test Date:** 04.17.2022   **Test Result:** ☒ NEG  ☐ POS

If already tested positive < 90 days from move, no pre-departure test required:
☐ Symptomatic (all cleared/improved)  ☐ Never symptomatic
Date Cleared from Isolation:
☐ 14-day Pre-Departure Quarantine Completed (if required)

Prisoners refusing testing at one of the USM testing hubs *must* be placed in a 14-day single cell quarantine. All information should be fully documented in comments.

### COVID-19 VACCINATION (Selection required)

| Vaccine | 1st dose (date) | 2nd dose (date) | Booster (opt.) (date) |
|---|---|---|---|
| ☐ Moderna |  |  |  |
| ☐ Pfizer |  |  |  |
| ☐ Janssen (J&J) |  | N/A |  |
| ☒ Unvaccinated (refused OR vaccine unavailable) |  |  |  |

NOTE: If vaccination started, all series required doses *must* be completed prior to movement!

**ADDITIONAL COVID COMMENTS**

## 9. CERTIFYING HEALTH AUTHORITY - THIS PRISONER IS MEDICALLY CLEARED FOR TRAVEL

**Name (Print):** I. Mardis, LVN   **Title:**   **Signature:** _(signed)_   **Date:** 04.17.2022   **Phone Number:**

BOP/R 10 of 5 78



## CIBOLA COUNTY CORRECTIONAL CENTER

## Abbott ID NOW COVID-19 PCR Rapid Test

Date: _04/18/22_

Inmate/Detainee Name: _____

A220712429
BOZKUS, SERHAT
DOB: 01/01/1992
ARD: 04/18/2022
Cibola County Correctional Center

DOB: _____

ID Number: _____

Result (Circle One):   (Negative)   Positive

Performed By: _____

Medical Review Officer: _____

Keith W. Ivens, MD

EOIR 11 of 45
EOIR — 57 of 78

Uploaded on: 5/7/2022 at 09:56:08 p.m. (Central Daylight Time)   Base City: OTO

BORREGO, ALEJANDRO
| NMOP | OTERO COUNTY
PROCESSING CENTER
26 MCGREGOR RANGE RD

CHAPARRAL, NM 880817753
Acct #:

NPI: 1770783391

**D O C T O R**

**P A T I E N T**

BOZKUS, SERHAT

DOB:1/1/1992
SEX:M                    AGE:30
U/FL:C4                  WING:
ROOM:                    BED: 46
ID:   3611398    ALT-ID: A2207124-
                         29

**S A M P L E**

Specimen ID: 460920220417033504

Report Date: 4/17/2022 3:35
Date Received:4/17/2022 1:34
Date Observed:4/17/2022 14:02

NOTES:

## CLINICAL INFORMATION

FASTING:    N              Total Volume:              Source:

## CLINICAL REPORT

**Clinical Abnormalities Summary:**   (May not contain all abnormal results; narrative results may not have abnormal flags.
Please review entire report.)

ABBOTT ID NOW RAPID MOLECULAR TEST

| Test | Result | Abnormal | Reference | Units | Status | Lab |
|------|--------|----------|-----------|-------|--------|-----|
| ABBOTT ID NOW RAPID MOLECULAR TEST | NEGATIVE | | NEGATIVE | | | |

PERFORMING LAB

L = BELOW LOW NORMAL | LL = ALERT LOW | H = ABOVE HIGH NORMAL | HH = ALERT HIGH | < = PANIC LOW | > = PANIC HIGH | A = ABNORMAL |
AA = CRITICAL ABNORMAL | S = SUSCEPTIBLE | R = RESISTANT | I = INTERMEDIATE | NEG = NEGATIVE | POS = POSITIVE

Manual Entry
26 MCGREGOR RANGE RD |. CHAPARRAL. NM | 880817753 | 575-824-0440

# Trident Care IMAGING℠

SOUTHWEST REGION
3418 MIDCOURT ROAD
CARROLLTON, TX 75006
(800) 843-9729

**46112-CIBOLA COUNTY DETENTION CENTER**

2000 CIBOLA LOOP
MILAN, NM 870219998

| | | | | | |
|---|---|---|---|---|---|
| **Claim Number :** | 36901901 | | | | |
| **Date of Service :** | 04/29/2022 | | **MRN** | 220712429 | |
| **Patient Name :** | BOZKUS, SERHAT | | **DOB :** | 01/01/1992 | **Gender** M |
| | | | **Room::** | | |
| **Ordering Provider:** | KEITH WESLEY IVENS, MD - (NPI: 1932240421) | | | | |
| **Interpreting Physician:** | NEAL P PASSANTE, MD - (NPI: 1437337458) | | | | |
| **Report Date:** | 4/29/2022 5:26:27 PM | | | | |

## RADIOLOGY REPORT

SPINE 1V

Results: AP and lateral views of the cervical spine demonstrate normal bone
mineralization without acute fracture or dislocation. Vertebral body height and AP
alignment are maintained. Intervertebral disc spaces are normal. No significant
degenerative changes of the posterior elements. Prevertebral and paravertebral soft
tissues are unremarkable. Visualized lung apices are normal.

Conclusion: No acute osseous abnormality or significant degenerative change.

Electronically signed by NEAL PATRICK PASSANTE, M.D. 4/29/2022 5:26:27 PM MDT.

T. Romero Peñ/ta, ACNS-BC

6-2-22

**Statement Concerning use of Results:**
I have reviewed this diagnostic report and the results have or will be used in the treatment of the patient's medical condition.

**Ordering Provider Signature:** _____

KEITH WESLEY IVENS, MD - (NPI: 1932240421)

CONFIDENTIALITY NOTICE: This report (including any accompanying files or documents) is intended for the use of TridentCare or the intended recipient, and may
contain information that is privileged or otherwise confidential. If you are not the intended recipient, or person responsible for delivering this report to the intend
recipient, be advised that any review, dissemination, distribution, printing or copying of this report (including any accompanying files or documents) is strictly
prohibited. If you received this report in error, please immediately notify the TridentCare Privacy Office toll free at 866.686.1717, and providing your name, telephone
number and the date and destroy this report (including any accompanying files or documents).

*If you have questions regarding these results or would like to consult with a Rely Radiologist please call 972-468-3590*

Page  1   of  1

25 mm/s

10 mm/mV Frequency Response [0.5-35] Hz 60Hz MAC2 10.09

P/N 10535

BGIR 1460f0á5?8

Name: Boskus
Age:

97.7
20
97°

120/94
85-86

(wt fr- 6:
you fri-
rop at end)

Heart rate: 86 bpm
P/PR: 110/170 ms
QRS: 92 ms
QT/QTc: 344/411 ms
P/QRS/T axis: 75/75/75 deg

warning: sex not available, assumed male
sinus rhythm
Normal ECG
Unconfirmed Report

BER
enlargophritone   75/K
7303 fus , SEEHHYT

Clunt
wint from

I          I         aVR        V1         V4

II         II        aVL        V2         V5

III        III       aVF        V3         V6

12514

Filed at BIA on: 7/27/2022 at 9:55:08 p.m., Central Daylight Time.



Uploaded on: 6/7/2022 at 10:56:40 a.m. (Central Daylight Time)    Base City: OTO

25 mm/s

10 mm/mV Frequency Response 0.5-35] Hz 601s1-xM4xxbon2.10.09

Name:
Age:

P/PR: ------- 100/270 ms
QRS: 90 ms
QT/QTc: 327/415 ms
P/QRS/T axis: 62/68/62 deg
Heart rate: 100 bpm

Warning: sex not available, assumed male
sinus rhythm (rapid)
Normal ECG
Unconfirmed Report

T. Romero

12515

Uploaded on: 6/7/2022 at 10:56:40 a.m. (Central Daylight Time) -Base City: OTO

**Name:** BOZKUS, SERHAT

**Age:**

| | |
|---|---|
| P/PR: | 110/184 ms |
| QRS: | 100 ms |
| QT/QTc: | 350/380 ms |
| P/QRS/T axis: | 61/61/57 deg |
| Heart rate: | 71 bpm |

warning: sex not available, assumed male

sinus rhythm

Normal ECG

**Unconfirmed Report**

T. (Ronald) Peralta, ACNS-BC

4.2522.



25 mm/s          10 mm/mV Frequency Response [0.5-35] Hz 00.01ea1\_Version 2.10.09          P/N 105953

13-49B

### REFUSAL TO ACCEPT MEDICAL TREATMENT

I, (Name) _Berkus, Serhat_ _____ (Number) _22.072.425_ at

(Facility) _Cibola County Correctional Center_ _____,

refuse to accept the following Dental/ Psychiatric/ Medical/ and/or Surgical services and/ or treatment recommended by this Facility's Dental/ Psychiatric/ Medical staff and/or a referred secondary care specialist: (list treatment(s)/service(s) in layman terminology)

_Trileptal 10mg_

I am refusing the above recommended treatment(s)/service(s) for the following reason(s):

_I dont want this morning_

I acknowledge that I have been informed of the risks and possible consequences which include, but are not limited to, the following; and which may be up to and including death:

_refused counsel_

I understand the possible consequences and/or complications, listed above and still refuse recommended treatment. I understand that my failure to follow this advice may seriously affect my health or the health of the person under my guardianship.

I hereby release the Dental/ Psychiatric/ Medical staff and/or a referred secondary care specialist associated with this correctional facility, CoreCivic, any contract managed care company, and their employees and agents of all responsibility regarding this matter, and I am making this decision of my own free will.

_refused to sign_ _____ _22.072.425_ _____ _1/11/92_
Inmate/Resident Signature _____ Inmate/Resident # _____ DOB

### (This section to be completed by a staff member)

Tamara Bennett LPN
Cibola

_5/16/2c_
Qualified Health Care Professional Signature _____ Date/Time
(Note: For CDCR Inmates, must be an RN or higher credentialed QHCP)

_5/16/2c_
Witness Signature _____ Date/Time

12/8/14

Proprietary Information – Not For Distribution – Copyrighted - Property of CoreCivic

BBIR 1769-0578

13-49B

## REFUSAL TO ACCEPT MEDICAL TREATMENT

I, (Name) __Bo Kus__ _____ (Number) __220712429__ at

(Facility)____ **Cibola County Correctional Center** ____

refuse to accept the following Dental/ Psychiatric/ Medical/ and/or Surgical services and/ or
treatment recommended by this Facility's Dental/ Psychiatric/ Medical staff and/or a referred
secondary care specialist: (list treatment(s)/service(s) in layman terminology)

_Refuse meds oxcarbazepine 300mg for Amdepe_

I am refusing the above recommended treatment(s)/service(s) for the following reason(s):
_Did not leave cell_

I acknowledge that I have been informed of the risks and possible consequences which include,
but are not limited to, the following, and which may be up to and including death:

_Ramification for refusing meds as prescribed by_
_MD provider_

I understand the possible consequences and/or complications, listed above and still refuse
recommended treatment. I understand that my failure to follow this advice may seriously affect
my health or the health of the person under my guardianship.

I hereby release the Dental/ Psychiatric/ Medical staff and/or a referred secondary care specialist
associated with this correctional facility, CoreCivic, any contract managed care company, and
their employees and agents of all responsibility regarding this matter, and I am making this
decision of my own free will.

_Refuse_ _____   __220712429__   __1-1-92__

**Inmate/Resident Signature**     **Inmate/Resident #**     **DOB**

### (This section to be completed by a staff member)

_Zephr M Zrn_ _____   __5-10-22 @ 0900__

**Qualified Health Care Professional Signature**     **Date/Time**
*(Note: For CDCR inmates, must be an RN or higher credentialed QHCP)*

_____   __5-10-22__

**Witness Signature**     **Date/Time**

EOIR 18 of 45
EOIR – 64 of 78

12/8/14

Proprietary Information – Not For Distribution – Copyrighted – Property of CoreCivic

13-49B

## REFUSAL TO ACCEPT MEDICAL TREATMENT

I, (Name) _Bozkin, Serbot_ _____ (Number) _22U 712 429_ at

(Facility) __Cibola County Correctional Center__

refuse to accept the following Dental/ Psychiatric/ Medical/ and/or Surgical services and/ or treatment recommended by this Facility's Dental/ Psychiatric/ Medical staff and/or a referred secondary care specialist: (list treatment(s)/service(s) in layman terminology)

_Trileptal 15mg_

I am refusing the above recommended treatment(s)/service(s) for the following reason(s):

_refused because he is Ramadan_

I acknowledge that I have been informed of the risks and possible consequences which include, but are not limited to, the following, and which may be up to and including death:

_refused counsel_

I understand the possible consequences and/or complications, listed above and still refuse recommended treatment. I understand that my failure to follow this advice may seriously affect my health or the health of the person under my guardianship.

~~I hereby release the Dental/ Psychiatric/ Medical staff and/or a referred secondary care specialist~~ associated with this correctional facility, CoreCivic, any contract managed care company, and their employees and agents of all responsibility regarding this matter, and I am making this decision of my own free will.

_refused to sign_ ____ _22072429_ _____

Inmate/Resident Signature      Inmate/Resident #      DOB

### (This section to be completed by a staff member)

Tamara Bennett LPN
Cibola

Qualified Health Care Professional Signature    _4/28/2C_
(Note: For CDCR Inmates, must be an RN or higher credentialed QHCP)    Date/Time

_____    _4/28/2c_
Witness Signature    Date/Time

12/8/14

Proprietary Information – Not For Distribution – Copyrighted - Property of CoreCivic

# Informed Consent - Tele-Health Services

| Facility Name | Cibola County Correctional Center |
|---|---|
| Inmate/Resident Name | BOZKUS, SERHAT |
| Inmate/Resident Number | A220712429 |
| Inmate/Resident DOB | 1/1/1992 |

Tele-Health Sevices is the practice of tele-health and/or telepsychiatry including, but not necessarily limited to, evaluation, diagnosis and treatment of medical/mental health conditions. It is performed by licensed independent practitioners at a remote site, by audio/visual communication equipment.

I acknowledge that the tele-health process was discussed with me and I was given the opportunity to ask questions.

I understand the process as explained and hereby give permission to this facility to render medical and/or mental health treatment using tele-health services.

I further acknowledge that other means of receiving medical/mental health, services at this facility were described to me during the new arrival orientation and that I have the opportunity to decline tele-health services by submitting a written request to the Health Services Department.

X _____     4/18/2022 _____     17 00 _____
Inmate/Resident Signature          Date                      Time

WITNESSED BY:

F. Brunhecu _____     UPN _____
Printed Name                          Title

JBunhecu _____     4/18/2022 _____     17 00 _____
Signature                              Date                      Time

Proprietary Information – Not For Distribution – Copyrighted – Property of CoreCivic

2/19/15

## HEALTH CARE SERVICES - GENERAL CONSENT (ICE facilities only)

The major purpose of the clinic is to provide you with medical care. Medical information obtained will be kept in a confidential medical record. You will be expected to undergo a medical examination to determine your current health status.

I, _BOZKUS,SERHAT_ (detainee name)A220712429 (agency #), hereby consent to medical screening and medical examination to determine my current health status, other medical evaluations, diagnostic procedures, routine care, and medical/dental treatments which the medical and professional staff of the clinic may deem necessary, advisable, or appropriate.

I authorize disclosure of my medical records to a hospital, if hospitalization is deemed necessary, advisable, or appropriate. I authorize disclosure of my medical records to federal and/or state reporting agencies for purposes of disease surveillance and control.

This form has been fully explained to me, and I understand its contents. I further understand that no guarantees have been made to me regarding the results of treatments or examinations performed in the clinic.

## SERVICIOS DE ATENCIÓN DE SALUD - CONSENTIMIENTO GENERAL

El propósito principal de la clínica es proporcionarle a usted con atención médica. Información médica obtenida se mantendrá en un registo médico confidencial. Usted tendra que someterse a un examen médico para determinar su estado actual de salud.

Yo, _____ (nombre del detenido) _____ (número de la Agencia), autorizo a someterme a una investigacion y examen médico para determinar mi estado de salud actual, otras evaluaciones médicas, procedimientos de diagnóstico, atención de rutina, y tratamientos médicos y dentales que el personal médico y profesional de la clínica estime necesario, conveniente o apropiado.

Autorizo revelación de mis archivos médicos a un hospital, Si hospitalización se considera necesario, conveniente o apropiado. Autorizo divulgación de mi registros médicos a agencias federales y/o estatales con fines de control y vigilancia de enfermedades.

Este formulario ha sido explicado plenamente a mí, y entiendo su contenido. Tengo entendido que ninguna garantía ha sido estendida a mí en relación con el resultado de tratamientos o exámenes realizados en la clínica.

| | 4/18/2022 | | 4/18/2022 |
|---|---|---|---|
| Signature of Detainee Firma del detenido | Date Fecha | Signature of Witness Firma del Testigo | Date Fecha |

| Detainee Name: (Last, First) BOZKUS, SERHAT | |
|---|---|
| DOB: 1/1/1992 | Detainee ICE # A220712429 |
| Nationality TURKE | Facility Cibola County Correctional Center |

Proprietary Information – Not for Distribution – Copyrighted – Property of CoreCivic



## Annual Influenza Vaccine Consent Form-FLU SHOT - 2020

### Section 1: Information about the person to Receive Vaccine (please print)

| NAME BOZKUS | (First)SERHAT | (M.I.) | DATE OF BIRTH 1/1/1992 | | |
|---|---|---|---|---|---|
| | | | month | day | year |
| Agency Number A220712429 | | | AGE | | GENDER M / F |
| Facility Cibola County Correctional Center | | | | | |
| | | | | | |

### Section 2: Screening for Vaccine Eligibility

Were you vaccinated with the seasonal influenza vaccine after July 1, 2010?   YES        NO

The following questions will help us to know if you should get the seasonal influenza vaccine. If you answer "NO" to all four of the following questions, you can probably get the influenza vaccine. If you answer "YES" to one or more of the following four questions, you may be able to get the seasonal influenza vaccine, but we will contact you to discuss your options. Please mark YES or NO for each question.

| | YES | NO |
|---|---|---|
| 1. Do you have a serious allergy to eggs? | | |
| 2. Do you have any other serious allergies?   Please list: | | |
| 3. Have you ever had a serious reaction to a previous dose of flu vaccine? | | |
| 4. Have you ever had Guillain-Barré Syndrome (a type of temporary severe muscle weakness) within 6 weeks after receiving a flu vaccine? | | |

### Section 3: Consent

**CONSENT FOR VACCINATION:**

I have read or had explained to me the Vaccine Information Statement for the seasonal influenza vaccine and understand the risks and benefits.

☐ **I GIVE CONSENT** to CoreCivic and its staff to be vaccinated with this vaccine.

☐ **I DO NOT GIVE CONSENT** to CoreCivic and its staff to be vaccinated with this vaccine.

Signature  X _____

Date:  month 4_____ day 18 ____ year 2022 _____

### Section 5: Vaccination Record

FOR ADMINISTRATIVE USE ONLY

| Vaccine | Route | Date Dose Administered | Vaccine Manufacturer | Lot Number | Name and Title of Vaccine Administrator |
|---|---|---|---|---|---|
| Influenza | ☐ IM<br>☐ Intranasal | /  / | | | JBuhrm |

Uploaded on: 6/27/2022 at 9:55:03 p.m. (Central Daylight Time)  Base City: OTO

# Mental Health – Initial or Follow-Up Visit

**Inmate/Resident Name:** SERBAT BOZKUS     **Number** 220712429 – ICE     **DOB** 01/01/1992

**Facility:** Cibola County Correctional Facility     **Date:** 05/17/2022

## SUBJECTIVE (Check all that apply.)

1) Reason for this visit: ☐ Initial   ☑ Follow-up
2) Referral source:
   ☐ Sick Call   ☐ Intake   ☐ Medical staff   ☐ Security   ☑ Follow-up
3) Chief complaint:
   - ☑ Depression    ☑ Anxiety    ☐ Psychosis    ☐ Irritability
   - ☐ Fear    ☐ Anger    ☑ Sleeplessness    ☐ Decrease energy
   - ☐ Thoughts of self-injury    ☐ Drug withdrawal    ☐ Change in appetite    ☐ Poor concentration
   - ☐ Other

4) Please describe current signs and symptoms and/or responses to treatment:

Continued to Last Page

## OBJECTIVE (Check all that apply)

5) Please check all that apply

| | | | | | | |
|---|---|---|---|---|---|---|
| Appearance: | ☑ Neat | ☐ Disheveled | ☐ Bizarre | ☑ Tense | ☐ Poised | ☑ Appropriate |
| Behavior: | ☑ Calm | ☐ Agitated | ☐ Paranoid | ☐ Restless | ☑ Cooperative | |
| Mood: | ☑ Depressed | ☑ Anxious | ☐ Labile | ☐ Euthymic | ☐ Frightened | |
| Affect: | ☐ Blunted | ☑ Within Normal Limits | ☐ Flat | ☐ Constricted | | |
| Speech: | ☐ Rapid | ☐ Pressured | ☐ Mumbled | ☐ Soft | ☑ Normal | |
| Perception: | ☐ Hallucinations | ☐ Illusions | ☑ No Abnormalities | | | |
| Thought process: | ☑ Organized | ☐ Racing | ☐ Loose Associations | | ☐ Flight of Ideas | |
| Thought content: | ☐ Suicidal | ☐ Homicidal | ☐ Delusions | ☐ Paranoia | ☐ Phobias | |

6) Oriented to person, place, and time:   ☑ Yes   ☐ No   Specify

7) Concentration intact:   ☑ Yes   ☐ No    Memory intact:   ☑ Yes   ☐ No

8) Abstract thinking intact:   ☑ Yes   ☐ No    Insight and judgment intact:   ☑ Yes   ☐ No

9) Reliable history and information:   Record ☑ Yes   ☐ No   From patient:   ☑ Yes   ☐ No

**Signature:** Anne Ortiz, M.D.; May 17 2022  2:22PM MST (Author)

BOIR 23 of 678

Uploaded on: 6/27/2022 at 9:55:48 p.m. (Central Daylight Time)  Base City: OTO

## OBJECTIVE *(continued)* (Check all that apply)

10) For new patients check all that apply:

☐ Prior mental health treatment     ☐ Recent suicidal/homicidal ideations
☐ History of psychiatric hospitalization     ☑ Current treatment with psychotropics
☐ Prior suicide attempt

11) Comments regarding result of AIMS assessment (if receiving antipsychotics / neuroleptics /phenothiazines):

12) Current Medications: ☑ Reviewed    Compliant with current medication regimen and/or treatment? ☑ No   ☐ Yes
    ** It is unacceptable to document "See MAR."     Medication name, Dosage and Frequency must be completed

Medication: Dose and Frequency

     Doxepin HCl - 10 MG Oral Capsule #30 Capsule, TAKE 1 CAPSULE BEDTIME, 2 refills
     OXcarbazepine 300 MG Oral Tablet #30 Tablet, 1QHS, 2 refills

Have medications or dosages changed over the past 8 weeks? ☑ No   ☐ Yes, Specify:
AM Medication Non-Compliance

Medication Allergies? ☐ No   ☑ Yes, List:
No Known Allergies

## ASSESSMENT

13) Diagnosis:
Continued to Last Page

**Name:** SERHAT BOZKUS             **Inmate/Resident #** 220712429 - ICE

Signature: Anne Ortiz, M.D.; May 17 2022 2:22PM MST (Author)

## Plan

14) Plan: Include new meds prescribed and/or dosage changes
Trileptal 300mg po qhs-Mood
Doxepin 10mg po qhs-Depression and PTSD caused sleep disturbance

\*\*\* Female offenders must have a pregnancy test prior to initiation of psychotropic medications

15) Follow-up:

16) Education:

| | | | | | |
|---|---|---|---|---|---|
| Counseled on Medication Effects & S/E | ■ Yes | ☐ No | Counseled on Medication Compliance | ■ Yes | ☐ No |
| Counseled on Signs of Toxicity | ■ Yes | ☐ No | Informed Consent for Medications | ■ Yes | ☐ No |

17) Return visit: ☐ 2 weeks   ☒ 1 month   ☐ 3 months   ☐ other

(Order(s) must be written for next scheduled visit, to include laboratory testing, diet, medications, or other therapies)

Name: SERHAT BOZKUS                    Inmate/Resident # 220712429 - ICE

Signature: Anne Ortiz, M.D.; May 17 2022  2:22PM MST (Author)

Page 3 of 5

BOTH 25 of 678

13525

*Please use this page to comment on findings from previous pages*

Continued from Subj 4 signs-symptoms-tx - "I am still having 4-5 nightmares every night after pacing in until 4 or 5 am.
That is why I wasn't getting up to take the am medication. Taking the am medication and not having enough sleep makes me
too sleepy in the day.  So it is better not to take am medication.  Being in jail here bring up all my fears of being put
in jail and tortured.  My stress keeps me from being able to watch TV or Spend time with others here.  Even the officers
ask how I am and say they are sorry that I am feeling so bad."

Continued from Assess 13 Diagnosis text - Chest wall pain
Chronic post-traumatic stress disorder (PTSD)
Major depression, recurrent
Mood problem
Neck pain
Perforation of tympanic membrane

**Name:** SERHAT BOZKUS         **Inmate/Resident #** 220712429 - ICE

**Signature:** Anna Ortiz, M.D.; May 17 2022  2:22PM MST (Author)

Page 4 of 5

*Please use this page to comment on findings from previous pages*

Name: SERHAT   BOZKUS          Inmate/Resident # 220712429 - ICE

Signature: Anne Ortiz, M.D.; May 17 2022  2:22PM MST (Author)

# Mental Health – Initial or Follow-Up Visit

**Inmate/Resident Name:** SERHAT BOZKUS    **Number** 220712429 - ICE    **DOB** 01/01/1992

**Facility:** Cibola County Correctional Facility    **Date:** 05/11/2022

## SUBJECTIVE (Check all that apply.)

1) Reason for this visit:    ☒ Initial    ☐ Follow-up
2) Referral source:
   ☐ Sick Call    ☒ Intake    ☐ Medical staff    ☐ Security    ☐ Follow-up
3) Chief complaint:

| | | | |
|---|---|---|---|
| ☒ Depression | ☒ Anxiety | ☐ Psychosis | ☐ Irritability |
| ☐ Fear | ☐ Anger | ☒ Sleeplessness | ☐ Decrease energy |
| ☐ Thoughts of self-injury | ☐ Drug withdrawal | ☐ Change in appetite | ☐ Poor concentration |
| ☐ Other | | | |

4) Please describe current signs and symptoms and/or responses to treatment:

Continued to Last Page

## OBJECTIVE (Check all that apply)

5) Please check all that apply

| | | | | | | |
|---|---|---|---|---|---|---|
| Appearance: | ☒ Neat | ☐ Disheveled | ☐ Bizarre | ☒ Tense | ☐ Poised | ☒ Appropriate |
| Behavior: | ☐ Calm | ☐ Agitated | ☐ Paranoid | ☐ Restless | ☐ Cooperative | |
| Mood: | ☒ Depressed | ☒ Anxious | ☐ Labile | ☐ Euthymic | ☐ Frightened | |
| Affect: | ☐ Blunted | ☐ Within Normal Limits | ☐ Flat | ☒ Constricted | | |
| Speech: | ☐ Rapid | ☐ Pressured | ☐ Mumbled | ☐ Soft | ☒ Normal | |
| Perception: | ☐ Hallucinations | ☐ Illusions | ☒ No Abnormalities | | | |
| Thought process: | ☒ Organized | ☐ Racing | ☐ Loose Associations | | ☐ Flight of Ideas | |
| Thought content: | ☐ Suicidal | ☐ Homicidal | ☐ Delusions | ☐ Paranoia | ☐ Phobias | |

6) Oriented to person, place, and time:    ☒ Yes    ☐ No    Specify

7) Concentration intact:    ☒ Yes    ☐ No    Memory intact:    ☒ Yes    ☐ No

8) Abstract thinking intact:    ☒ Yes    ☐ No    Insight and judgment intact:    ☒ Yes    ☐ No

9) Reliable history and information:    Record ☒ Yes    ☐ No    From patient:    ☒ Yes    ☐ No

Signature:  Anne Ortiz, M.D.; May 17 2022  1:53PM MST (Author)

---

**OBJECTIVE** *(continued)* (Check all that apply)

10) For new patients check all that apply:

☐ Prior mental health treatment      ☐ Recent suicidal/homicidal ideations
☐ History of psychiatric hospitalization    ☒ Current treatment with psychotropics
☐ Prior suicide attempt

11) Comments regarding result of AIMS assessment (if receiving antipsychotics / neuroleptics /phenothiazines):

12) Current Medications: ☒ Reviewed   Compliant with current medication regimen and/or treatment? ☒ No   ☐ Yes
    ** It is unacceptable to document "See MAR."    Medication name, Dosage and Frequency must be completed

Medication: Dose and Frequency

         OXcarbazepine 300 MG Oral Tablet #30 Tablet, 1QHS, 2 refills

Have medications or dosages changed over the past 8 weeks? ☒ No   ☐ Yes, Specify:
Patient states he has not been AM compliant on Trileptal because it causes am drowsiness, but wants pm dose

Medication Allergies? ☐ No   ☒ Yes, List:
No Known Allergies

---

**ASSESSMENT**

13) Diagnosis:
Continued to Last Page

---

**Name:** SERRAT BOZKUS        **Inmate/Resident #** 220712429 - ICE

**Signature:** Anne Ortiz, M.D.; May 17 2022 1:53PM MST (Author)

## Plan

14) Plan:  Include new meds prescribed and/or dosage changes

Trileptal 300mg po qhs-Mood
Doxepin 10mg po qhs-Depression
Verbally consented for medication and AM medication that made him sleepy in the am was discontinued

*** Female offenders must have a pregnancy test prior to initiation of psychotropic medications

15) Follow-up:

16) Education:

| | | | |
|---|---|---|---|
| Counseled on Medication Effects & S/E | ■ Yes  ☐ No | Counseled on Medication Compliance | ■ Yes  ☐ No |
| Counseled on Signs of Toxicity | ■ Yes  ☐ No | Informed Consent for Medications | ■ Yes  ☐ No |

17) Return visit: ☐ 2 weeks   ☒ 1 month   ☐ 3 months   ☐ other

(Order(s) must be written for next scheduled visit, to include laboratory testing, diet, medications, or other therapies)

Name: SERHAT  BOZKUS             Inmate/Resident # 220712429 - ICE

Signature: Anne Ortiz, M.D.; May 17 2022  1:53PM MST (Author)

Page 3 of 5

*Please use this page to comment on findings from previous pages*

Continued from Subj 4 signs-symptoms-tx - Discussed AM Medication NON-Compliance: Trileptal 300mg [1/2 Tablet] po BID:
Patient explained that medication makes him sleepy in the day, but does want it for the night.
"I am a Kurd. My dad was killed by the government when I was 2 y/o. My father was giving Kurdish classes for Kurdish
people at a time the Government made speaking in Kurdish illegal. My father also celebrated the Kurdish Holiday Newroz
which the Government also banded. Even saying Kurdish was banded. My 3 brothers were jailed and tortured by the police
and military working together. One of my brothers was tortured so severely he could not walk afterwards. The police and
military said of one of my 3 y/o neices would grow up to be a prostitute. I have almost died several times in Turkey.
Just walking down the street a police man tried to shoot me. I have feared the police and soldiers since I was 3 y/o
until now at 30 y/o. My university friends were arrested and detained in jail and tortured. The police would ask my
friends my whore I was and if I was a terrorist. The Police and military picked me up several times, but did not take me
to the Police Station. They took me instead to random place where there was nobody and threatened me. I was studying
Civil Engineering and Justice and because I had to move around so much to not be found I would not have completed my two
degrees without the help from my professors. I even signed up for a third degree, but I had to flee from Turkey. I
finished my Justice degree with honors. I had to escape and leave without telling my sick mother and fiance whose mothe
had just died and they both tell me I have left them. I don't understand, would they want me to be put in jail and
tortured and killed just to be in Turkey. Their logic is that I am in jail here anyway, but if I was in Turkey they woul
be able to see me. I have only called my mom 4 or 5 times in 6 months because I don't want her to cry. My mom has
diabetes, urinary incontinence and I don't want to to hurt her heart by being here. I cannot sleep at night. I have
nightmares and I am depressed. I cannot even relax with the others. I walk around until 4 or 5am. The medication helps
but when I do finally sleep I will have 4 or 5 nightmares about being in Jail or my family in Turkey being harmed. I
actually cannot hear well out of my Left ear and have an old C-spine disc herniation and HTN.

Continued from Assess 13 Diagnosis text - Chest wall pain
Chronic post-traumatic stress disorder (PTSD)
Mood problem
Neck pain
Perforation of tympanic membrane

**Name:**  SERHAT  BOZKUS                    **Inmate/Resident #** 220712429 - ICE

---

**Signature:**  Anne Ortiz, M.D.; May 17 2022  1:53PM MST (Author)

Page 4 of 5

*Please use this page to comment on findings from previous pages*

Name: SERHAT   BOZKUS _____    Inmate/Resident # 220712429 - ICE _____

Signature: Anne Ortiz, M.D.; May 17 2022  1:53PM MST (Author)

Page 5 of 5

EOIR 32 of 45
EOIR 278 of 278

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
OTERO, NM

In the Matter of:  BOZKUS, SERHAT                    File No. A# 220-712-429

ORDER OF THE IMMIGRATION JUDGE

Upon consideration of the Respondent's Motion for Custody, it is HEREBY ORDERED that the
motion be **[ ] GRANTED [ ] DENIED** because:

[ ]    DHS does not oppose the motion.
[ ]    The respondent does not oppose the motion.
[ ]    A response to the motion has not been filed with the court.
[ ]    Good cause has been established for the motion.
[ ]    The court agrees with the reasons stated in the opposition to the motion.
[ ]    The motion is untimely per _____
[X]    Other: _lack of jurisdiction and or no change_

Deadlines:

[ ]    The application(s) for relief must be filed by _____.
[ ]    The respondent must comply with DHS biometrics instructions by

_6/9/22_
Date

_____
Immigration Judge

Certificate of Service

This document was served by: [ ] Mail                [ ] Personal Service   (E)E Semce
To:[ ] Alien    [ ] Alien c/o Custodial Officer      [X] Alien's Attorney   [X] DHS

Date: _6/9/2022_

By: Court Staff _pA_

BOIR 3306845
EOIR – 6 of 6

# Contemporaneous Notes of ICE Custody at Cibola County Correctional Center (private facility operated by Core Civic under contract to ICE in Milan, NM)

Below are the translations of daily accounts of Respondent's treatment in ICE custody at Cibola County Correctional Center taken by hand as a contemporaneous record of his treatment in ICE custody.

## Notes from Detention of Tuesday, June 14th, 2022

"When I woke up this morning, I saw 18 scratches on the paper. So between 03:30 AM and 10:50 AM I woke up with 18 nightmares. In other words, I had a nightmare and woke up every 24 minutes. I was not taken to the otolaryngologist again today. I was not taken to the appointment for the slipped disc. And I was not allowed to see the psychologist Dr. Ortiz. But today I spoke to psychologist Dr. Williams. I told her that I was afraid of committing suicide, that fear of confined spaces has started, that I could not take a shower because of the fear, and that I had physical ailments. She told me that my physical ailments could affect my psychology and that she would write to make a request for treatment. I also told her that I was starting to forget things now. She also gave me a series of question-and-answer papers to strengthen my memory. I am having difficulty walking day-by-day and the pain in my ear is getting worse. I can no longer eat on my left side [of my mouth]. I am constantly coughing and speaking in a low voice because of my throat. Since I have hearing loss, my friends have to speak loudly to communicate with me. Also, an officer who called himself 'moli' asked for me and said she feels sorry for me, she believes I would enter the USA. Also, after I finished talking to my lawyer, the officer whose name was 'King' was there and he said he feels sorry for me and wishes me the best. Regarding the white on my beard, he said that 'My grandfather told me a long time ago that these are a sign of wisdom.'"

1

Serhat BOZKUS A# 220-712-429

<u>**Scan of Original Turkish-language Notes from Detention of Tuesday, June 14th, 2022**</u>

※ 14 Haziran 2022: Bu sabah uyandığımda kağıtta 18 çizik gördüm. Yani 03:30 AM ile 10:30 AM arasında 18 kez kabus görerek uyanmışım. Buda yaklaşık 24 dk. da bir kabus görüp uyanmışım. Bugün yine KBB uzmanına götürülmedim, disk kayması için alınan randevuya götürülmedim ve psikolog DR. ortizle görüştürülmedim. Fakat bugün psikolog williams'la görüştüm. Kendisine intihar etmekten korktuğumu, kapalı alan fobisi başladığını, korkudan duşa giremediğimi, fiziksel rahatsızlıklarımı dile getirdim. Oda bana fiziksel rahatsızlıkların psikolojini etkileyebilir bunların için bir talepte bulunacağını yazdığını söyledi. Ayrıca ona artık unutmaya da başladığımı söyledim oda bana hafıza güçlendirmek için birkaç soru cevap kağıtları verdi. Gün geçtikçe yürümekte zorluk çekiyorum ve kulağımdaki acı gittikçe artıyor. Sol tarafımla artık yemek yiyemez durumdayım şuan. Boğazımdan ötürü sürekli öksürüyer ve kısık sesle konuşuyorum. Duyma kaybı, yaşadığım içinde arkadaşlar benimle iletişim kura bilmek için yüksek sesle konuşmak zorunda kalıyor. Ayrıca kendisine "moli" diyen bir ofisir de beni sever senin için üzgünüm ABD'ye gireceğine inaniyorum dedi. Ayrıca Avukatımla konuşurken bittikten sonra oda da bulunan odı "king" olan ofisir senin için üzgünüm vesenin için en iyisini diliyorum dedi. Burda oluşan sakalımdaki bozuklukları için de "Dedem bana uzun zaman önce bunlar bilgelikten kaynaklanıyor" dedi.

13

Serhat BOZKUS A# 220-712-429

2

**<u>Notes from Detention of Wednesday, June 15th, 2022</u>**

"When I woke up today there were 21 scratches on the paper. So between 03:00 AM and 10:20 AM I had 21 nightmares and woke up. This means that I wake up every 21 minutes on average. I was not shown to the otolaryngologist again today. I wasn't taken to the slipped disc appointment. And I was not allowed to see Doctor Ortiz again. It has been exactly 15 days since they said that the condition of my ear was serious and they said that I need to see a specialist. It's been 12 days since I have foot limp from a slipped disc and the appointment was made. It's been 10 days since I asked for an appointment with Doctor Ortiz. It's been 8 days since the ICE officer said in 15 days.

The total amount of water they bring to 26 people today is 15 liters. That is about half a liter per person. Here, here are psychological and physical disorders, as well as food and beverage problems. Today is my 59th day in Cibola. No fruit or anything like that was given. In other words, the amount of water and vitamins we need to take daily is not provided in any way. Besides, sometimes even the food tastes raw. For example, on June 14, 2022, they fed us raw potatoes.

The painkillers they gave me also started to lose their effectiveness slowly. Yesterday, psychologist Wilson gave me a memory booster test. But when I saw the test, I was very surprised. Because the test was in English. However, I stated that I do not know English. That's why we made the conversation with translation. What a funny situation, isn't it? Look how much they care about my health.

"In addition to knowing these, I really want you to understand me. We have come to the end of another psychological and cruel day that was enforced to me. A funny phrase came to my mind. 'Good night' or 'sweet dreams'? I wonder if it would be bad night with full of nightmares. It's going to be very funny, but I'll give you the answer tomorrow."

Serhat BOZKUS A# 220-712-429

**Scan of Original Turkish-language Notes from Detention of Wednesday, June 15th, 2022**

A 15 Haziran 2022: Bugün uyandığımda kağıtta 21 çizik vardı. Yani 03:00 AM ile 10:20 AM arasında 21 kez kabus görüp uyanmışım. Bu da ortalama 21 dk da bir uyandığım anlamına geliyor. Bugün yine KBB uzmanına gösterilmedim, disk kayması, randevosuna götürülmedim ve Dr. oftizle yine görüştürülmedim. Kulağın durumu ciddi denilip uzmanla görüşmen gerekiyor denmelerinin üstünden tam 15 gün geçti. Disk kaymasından ötürü ayağımın topollaması ve randevu alınmasının üstünden 12 gün geçti. Dr. oftizle randevu ve istememin üstünden tam 10 gün geçti. ICE memuru 5 gün içinde demesinin üzerinden 8 gün geçti. Bugün 26 kişiye getirdikleri toplam su miktarı 15 litre yani kişi başı yakla şık gelen 1 lt re, Şuan burda psikolojik ve fiziksel rahatsızlıklarımın yanı sıra yiyecek ve içecek sıkıntılarıda yaşanıyor. Bugün cibolide 5 j. günüm ve hiçbir şekilde meyve veya benzeri birşey verilmedi. Yani günlük olmamız gereken su miktarı ve vitaminler hiçbir şekilde temin edilmiyor. Bunun yanı sıra bazen yemekler dahi çiğ geliyor. Örngin dün yani 14 haziran 2022'de bize çiğ patates yedirdiler. Bana verdikleri ağrı kesicilerde yakıştan etkisini yitiriyor. Dün psikolog wilson bana hafıza güslendirici test vermişti. Fakat testi görünce çok şaşırdım. Çünkü test ingilizce idi. Oysaki ingilizce bilmediğimi bellirtmiştim. Ki bundan dolayı, konuşmayı translayttan yapmıştık. Ne kadar komik bir durum değilmi. Sağlığımla nekadar ilgilendiklerine bakın. Ne kadar önem vermediklerine bakın.

Serhat BOZKUS A# 220-712-429

Bunları bilmeniz yanısıra gerçekten beni anlamanı-
zı çok isterim. Bana uygulanan psikolojik ve zulüm
dolu bir günün daha sonuna geldik. Aklıma komik
bir cümle geldi "iyi geceler", "tatlı rüyalar" mı? Acaba
ha yoksa kabuslarla dolu hayırsız geceler mi. Çok
komik olacak ama bunun cevabını yarın vereceğim
size.

... ... ... ... ... Gözlerimi her

| Serhat BOZKUS A# 220-712-429 |

**Notes from Detention of Thursday, June 16th, 2022**

"I couldn't sleep tonight. I had nightmares every time I closed my eyes. The total hours I slept was 2 or 3 hours. Thus, I have answered the question that I said yesterday that I would answer tomorrow. I was not shown to the otolaryngologist again today. The doctor didn't see me for the slipped disc. I couldn't meet with [Psychologist] Doctor [Anne] Ortiz. The nurse who gave me the drugs this morning showed me the patient form I had filled earlier and asked, "Is this yours?" I said yes. S/he asked about my problems.[1] After I pointed it out with body language, s/he asked me the degree of pain. Between 1 and 10, I said 6-7. S/he took his/her note and left and never came back. About 35 hours after the 15 liters of water that was brought yesterday morning, today around 04:00 PM only 15 liters were brought again. Of course for 26 people.

Despite the medication I took last night, I couldn't sleep. They didn't give me sleeping pills today either. It seems like this night will be one of the days that I can't sleep. Also tonight I tried to talk to [Cibola County Correctional Center Detainee Case Manager Ms. Joaquina] Galindo regarding my ear by showing the reports. She said that she talked to my lawyer about the situation, then she would come to talk to me. I've also added talking to Galindo, who is in charge here, to my waiting list. I hope this wait will not be as long as my other waits. I have come to the end of the day in this country where freedom is restricted and where I came for freedom, and while doing this, I live in a prison, not in a camp, despite all my illnesses."

---

[1] Note on translation: the Turkish word for "he" and "she" are the same, so "he/she" reflects the fact that the gender of the nurse about whom he is speaking is not known or is unclear.

Serhat BOZKUS A# 220-712-429

**Scan of Original Turkish-language Notes from Detention of Thursday, June 16th, 2022**

Serhat BOZKUS A# 220-712-429

## Notes from Detention of Friday, June 17th, 2022

"I didn't have to count the scratches today. Because, as I mentioned yesterday, I slept for a few hours intermittently because they didn't give me my sleeping pills. It was no different than any other day though. I realized that sleeping pills can't put me to sleep anymore. Today I was not taken to the otolaryngologist as usual. I wasn't taken to the slipped disc appointment. And I wasn't allowed to see Doctor Ortiz. I couldn't talk to Officer Galindo", whom I added to my waiting list. Take a look at what I am told and experiencing in this land where I came as a refugee to live free and save my life. My freedom is restricted, my ear is in danger of being deaf, my leg may be crippled, my throat condition is getting worse and my psychological problem will last a lifetime as it has become chronic. As you can see, I live freely in a free country and have saved my life. I hope you understand this and not just the irony. You know what, time has become a tool that kills me here. Since my pen is short and my papers are limited, I have to write in a limited fashion. Look, there is a person who does not have the freedom to write, in the land of freedom."

Filed at BIA on: 7/27/2022 at 9:55:08 p.m. Central Daylight Time

**Scan of Original Turkish-language Notes from Detention of Friday, June 17th, 2022**

17 Haziran 2022: Bugün çizikleri saymama gerek kalmadı. Çünkü dün belirttiğim gibi uyku ilacımı vermedikleri için kesik kesik bir kaç saat uyudum. Gerçi diğer günlerden farkı yoktu. Anladım ki uyku ilacımla artık beni uyutamıyor. Bugün her zamanki gibi RBB enmunuma götürülmedim, disk kayması randevusuna götürülmedim ve Dr. Ortiz'le görüştürülmedim. Bir de beklemelerim arasına kattığım yetkili "gollada" ile konuşamadım. Mülteci olarak gelip özgür yaşamak ve hayatımı kurtarmak için geldiğim bu topraklarda anlattıklarıma ve yaşadıklarıma baksanıza. Özgürlüğüm kısıtlanmış, kulağım duymama tehlikesi ile karşı karşıya, bacağım sakat kalabilir, boğazımın durumu gittikçe kötüleşiyor ve psikolojik sorunum kronikleştiği için bir ömür öyle sürecek. Gördüğünüz gibi özgür bir ülkede özgür bir şekilde yaşıyor ve hayatımı kurtarmış durumdayım. Umarım yaptığım bu Nasıl bilmekle kalmayıp onlarsınız. Biliyor musunuz burda zaman beni ölülen bir örnek haline gelmiş durumda. Kolumun af kalmış ve bağırlarımda kesitli olduğu için kısıtlı yazmak zorundayım. Baksanıza yazı yazma özgürlüğü olmayan bir insan kaç özgürlükler ülkesinde.

EOIR 42 of 45

Serhat BOZKUS A# 220-712-429

156542

**Notes from Detention of Saturday, June 18th, 2022**

"I didn't even have to scratch tonight too. Because I slept little again. I wasn't taken to any health appointments today either. And the official [CCCC Detainee Case Manager Ms. Galindo] has not come to meet me yet. I had a first in a long time today. 30 liters of water arrived in the ward today. In other words, each person can drink about 1 liter of water. This negative situation has turned into a positive event. My drugs are constantly given irregularly. Sometimes it is not given. At the moment, my pen cannot describe the situation I am in and I cannot write.

I am in such a difficult and untenable situation that it has become unbearable. Sometimes words, syllables and sentences lose their meaning against something and get stuck in the throat. Right now, even the letters are stuck in my pen not only in my throat. And it writes intermittently, as if to force me to stop. No words, no sentences and no pen are able to describe my plight today. Today only silence can speak for me. And it is only for [those] who can listen to the sound of silence. And I'm going to put down my pen and listen to the voice."

**Scan of Original Turkish-language Notes from Detention of Sunday, June 18th, 2022**

※ 18 Haziran 2022: Bu gecede gözük olmumaz gece kalmalı çünkü çok kısıtlı uyudum yine. Bugünde hiçbir sağlık randevu sona götürülmedim ve yetkili "gelindo" beklmde gözüşmeye daha gelmedi. Bugün uzun zamandır bir ilki yaşadım. Bugün koğuşa 30 litre su geldi. Yani kişi başı yaklaşık 1 litre su içebiliyor. Bu olumsuz durum olumlu bir olay halini almış düşününde. Bana verilen ilaçlarda sürekli düzensiz bir şekilde veriliyor. Kimi zaman verilmiyor. Şuan kaleminle içinde bulunduğun doğruyu anlatamıyorsa yazamıyorum. öyle zor ve öyle

16

kabulmez bir durumdayımki kabenler gibi değil. Bazen sözcükler, heceler ve cümleler bir şey karşısında anlamını yitirir ve boğazda düğümleniyor. İşte şuan hecler benim değil kalemimin bile boğazında düğümlenmiş ve anlatılması imkansız olduğun için beni daha fazla zorlarmı dercesine kesik kesik yazıyor. Bugünki kötü olan durumunu anlatmaya hiçbir sözcük, hiçbir cümle ve hiç bir kalemin gücü yetmiyor. Bugün beni sadece sessizlik anlatabiliyor. O da sessizliğin sesini dinleye bilene. Ve ben kalemimi bırakıp sesi dinlemeye gidiyorum.

**Notes from Detention of Sunday, June 19th, 2022**

"When I woke up today there were 16 scratches on the paper. So between 04:30 AM and 10:10 AM I had 16 nightmares and woke up. This means that I wake up due to nightmares approximately every 22 minutes. Again, today I was not taken to any appointments or interviews. Then I filled the patient form again and gave it to the nurse. In our previous conversations with the doctor, the doctor told me, 'You have to go to the hospital, but that's for ICE to decide. I'll take my note, take it to ICE, we'll take it to class.' This means that the ICE police don't care about my health at all. I don't think what I've been through here fits in the US's understanding of justice in any way. I am sure that the day will come when justice will definitely be served and it will be understood that I have been held unjustly. On that day, I have no doubt that I will take those who made me experience these things to court and I will win. Again, no water today. There was no drinking water for about 30 hours. My physical pain is very severe. Sometimes I can't stand the pain. My mental state is getting worse and worse. And I have a hard time dealing them now. I'm afraid of dying here or committing suicide in prison, because I can't go back to my country."

**Scan of Original Turkish-language Notes from Detention of Sunday, June 19th, 2022**



A 19 Haziran 2022: Bugün uyandığımda kağıtta 16 çizik vardı. Yani, 06:30 AM ile 10:10 AM arasında 16 kez ka-bus görüp uyandım. Buda yaklaşık olarak 22 dakikada bir kabus görüp uyandığım anlamına geliyor. Bugün gine hiçbir rondevuma ve görüşmeye götürülmedim. Bunun üzerine tekrardan hasta formu doldurdum ve hemşireye verdim. Daha önceki doktorla konuşmalarımızda doktor bana hastaneye gitmen gerekir ancak buna ICE karar verir. Ben notumu alırım ICE götürün derse biz götürü-rüz. Buda demek oluyorki ICE polisi sağlığımı hiçbir şekilde umursamıyor. Burda yaşadığım bu şeyler ABD'nin Adalet anlayışına hiçbir şekilde sığmıyor sanırım. Ada-letin mutlaka yerini bulacağı ve haksız yere tutulduğumun anlaşılacağı günün geleceğinden eminim. O gün bana bun-ları yaşatanları mahkemeye vereceğimden ve kazanacağımdan şüphem yok. Bugün yine su gelmedi. Yaklaşık 30 saattir içilecek su gelmemiş. Fiziksel ağrılarımda şiddetli bazen eğilmeye dayanamıyorum. Psikolojik durumum gittikçe daha kötüye gidiyor ve Artık bunları kaldırmakta zorla-nıyorum. Ülkeme geri gidemeyeceğim için ceza evinde bu da ölmekten veya intihar etmektende korkmuyor değilim.

17

## Notes from Detention of Monday, June 20th, 2022

"When I woke up today there were 17 scratches on the paper. So, between 05:00 AM and 11:30 AM, I had a total of 17 nightmares and woke up every 23 minutes. They took me to the medical today. But without examining they said, 'Your appointment requests have been made, you have to wait.' Even though I said that my pain was getting worse, it didn't help. I've been waiting to see an ear since June 1, slipped disc since June 3, and the psychologist Ortiz since June 10. And these are problems that have reached serious dimensions, where drugs no longer help. I said again that I have chronic pharyngitis. Even though I told him that I had been coughing constantly for the last week and that no medicine was given for it, he sent me back to the ward without giving any medicine. In other words, my health requests are not answered in any way. The skin under my feet began to peel off. They gave a cream called 'Athlete's Foot' just for it. When I asked the name of the medical officer I spoke to, he/she told me. I also asked him/her to write it down. After that, he/she neither wrote nor said his/her name. I would like to pour my heart out here, but as I said before, 'There is a person in the land of freedom who does not even have the freedom to write.' I caught myself at the last moment when I was going to fall again with sudden dizziness today. Cihat Demir is a witness to this situation. 48 hours later, only 15 liters of water came [for the unit] again."

14

Serhat BOZKUS A# 220-712-429

<u>Scan of Original Turkish-language Notes from Detention of Monday, June 20th, 2022</u>

A 20 Haziran 2022. Bugün uyandığımda kağıtta 17 çizik vardı. Yani 05:00 AM ile 11:30 AM arasında yaklaşık 23 dkde, bir toplam 17 kez kabus görüp uyanmışım. Bugün beni medikale götürdüler fakat muayene etmeden sonra kronik taleplerin yapılmış beklenen gerek dediler. Ağrılarımın şiddetlendiğini söylesem de fayda etmedi. 1 Haziran'dan beri kulak, 3 Haziran'dan beri disk kayması, 10 Haziran'dan beri'de psikolog o/tizle görüşmeyi bekliyorum ve bunlar ciddi boyutlara ulaşmış, ilaçların artık etki etmeliği. Sonunda ki kronik koronjitimin olduğun tekrardan söyledim. Bundan dolayı, son 1 haftadır sürekli öksürdüğümü ve bununla ilgili ilaç verilmediğini söyleme me rağmen ilaç vermeden beni kapıya geri gönderdi. Yani hiçbir şekilde sağlık taleplerime cevap verilmiyor. Ayaklarımın altındaki deri soyulmaya başladı, kaç gündür sadece onun için "Athlete's Foot" adında bir krem verdiler. Bunları konuştuğum medical yetkilisine dalın. Sonra bana söyledi, bende yazıp vermesini istedim, ondan sonra reddetti, nede söyledi adını. Buraya birazda işimi dökmek isterdim ama daha öncede dediğim gibi göz yazma özgürlüğü bile olmayan biriysan nasıl özgürlükler ülkesinde". Bugün yine arı baş dönmesiyle düşecekken kendimi son anda tuttum. Bu durumda cihat demiş şikide. 48 saat sonra içine sadece 15 litre su geldi.

## Notes from Detention of Tuesday, June 21st, 2022

"I couldn't sleep again tonight. I slept limited. I slept 2-3 hours in total. Today my physical pain was very severe. Painkillers had little effect. After 05:00 pm in the evening, my right foot is constantly limping. It's still limp and sore. My chronic pharyngitis is also very bad at the moment, and because of this, I can't talk comfortably, I can't drink and I have a fever all the time.

"The pain in my ear is getting so intense that it gives me a headache. I'm vomiting, I can't eat. And I am constantly experiencing sudden dizziness. Despite this, no intervention nor an appointment is made and I am told to wait. When I ask about the date of the appointment, it is said that the date is not certain. Despite taking painkillers, the pain in my right leg has not subsided and I am limping. I haven't been able to sleep tonight, I don't know how to pass these nights with these pains in addition to the sleepless nights."

16

Serhat BOZKUS A# 220-712-429

**Scan of Original Turkish-language Notes from Detention of Tuesday, June 21st, 2022**

★ 21 Haziran 2022: Bu gece yine uyuyamadım. Kısıtlı uyudum toplam 2-3 saat uyuyabildim. Bugün fiziksel ağrılarım çok şiddetliydi ağrı kesiciler çok az etki etti. Akşam saat 05:00 PM'den sonra sürekli sağ ayağım topalıyor, hala topallıyor ve ağrıyor. Kronik tendonitim çok kötü şuan ve bundan dolayı rahat kaldıramıyor, işeem iyor ve ateşim çıkıyor sürekli.

_18_

Kulağımdaki acı o kadar şiddetleniyor ki başıma ağrı ba tiyor. Kusmağım geliyor yemek yiyemiyorum ve sürekli ani baş dönmeleri yaşıyorum. Buna rağmen müdahele edilmiyor ve randevu alınmış bekle deniliyor. Randevu tarihini sorunca da tarih belli değil deniliyor. Ağrı kesiciler içmeme rağmen sağ bacağımdaki ağrı dinmedi ve topallıyorum. Bu gece zaten uyuyamadığım gecelere rağmen bu ağrılarla bu gece nasıl geçecek bilmiyorum.

**<u>Notes from Detention of Wednesday, June 22nd, 2022</u>**

"I wasn't taken to any of my appointments today either. The effect of the painkillers has decreased a lot today and my right foot is limping. The limp, which started at 05:00, continued throughout the day. Again, no water was brought in today. I couldn't even meet with [Ms.] Galindo. Today I learned the name of the nurse who said he/she would come back but did not come and did not intervene on June 10th when I had dizziness and could not walk. The nurse's name is "Cimerron Hester". I lost my [hearing in my] ear because I wasn't treated here. Now they do the same thing for my slipped disc. They do not treat [it], and I am not taken into consideration. Despite reporting to the ICE Police, no action is taken. Also, this ICE police's name is 'Brant.' Because he has fidelity and loyalty to the American Constitution, he does nothing and ignores the protection of the life of a refugee who becoming a half human and who took refuge in the United States. However, the treatment and safety of a refugee should be a priority according to the Constitution. This ICE police and his boss don't care about my life safety as much as I told you. Do you think this contradiction is due to the laws of the USA, the land of the free, or is it due to the police? As I mentioned before, I have no doubt that in the federal court I'm going to appear, and it will be revealed that there is a problem with these police."

**Scan of Original Turkish-language Notes from Detention of Wednesday, June 22nd, 2022**

Serhat BOZKUS A# 220-712-429

**Notes from Detention of Thursday, June 23rd, 2022**

"Again, today I was not taken to any of my appointments. No drinking water yet. The limp in my right leg, which started yesterday, continued throughout the day. I have a very bad throat and that's why I cough constantly. ICE police don't care about my health problems and they don't have get me treated. The doctor told me that ICE makes the treatment decision, not her. Look at these officials in the land of the freedom. They're just showing their strength leaving me rotting in here. They don't just restrict my freedom, they're after my right to life. They do this not to a criminal, but to a refugee who took refuge in the USA because he was persecuted in his country. They show the USA badly, and as a state that doesn't care about freedom and rights. That's why, tonight, I am ending my writings, which I had to write in a limited way, unable to find the words to describe the bitterness and disappointment in me."

20

Serhat BOZKUS A# 220-712-429

**Scan of Original Turkish-language Notes from Detention of Thursday, June 23rd, 2022**



*23 Haziran 2022 — Bugün yine hiçbir isteğimle ... yüzleşmeden ... Su yine gelmedi. Dün başlayan ... bacağımın teşekkür ... Bugünde gün boyu devam etti. Bacağım çok kötü ve bu yüzden sürekli öksürüyorum. Sağlık sorunlarım ICE personelinin umurunda değil ve beni tedavi ettirmiyorlar. Doktor benim tedavi kararımı ben değil ICE verir. demişti. Özgürlükler ülkesindeki bu memurlara boksunuza gövde gösterisi yapıp beni bu ... sürütüyorlar. Sadece özgürlüğümü kısıtlamıyor. Yaşam hakkıma göz dikiyorlar. Bunu bir suç işlediği değil ülkesinde zulüm gördüğü için ABD'ye sığınmış bir mülteciye reva görüyorlar. ABD'nin nekadar kötü olduğunu ve özgürlüğe, haklara hiç önem vermeyen bir devlet olarak gösteriyorlar. Bu yüzden içimde oluşan korkunun ve ... kırıklığımın büyüklüğünü kelimelerle anlatamayıp kısıtlı yazmak zorunda kaldığım yazımı bu gecede sonlandırıyorum.*

## **Notes from Detention of Friday, June 24th, 2022**

"Again, today I was not taken to any doctor's appointments. The water did not come again today. Everyone was given only half a liter of petted water. My right foot is now sore and I'm having trouble walking. Today I'm depressed again, and I felt the need to cry all day long. I'm having a very difficult time. Again now death seems more attractive than living. No one knows, but death is more appealing in the land where I came to live. I am extremely tired. And I've become so lonely that I'm about to disappear. Also, because I was limping today, I filled out a new patient form and submitted it in."

22

Serhat BOZKUS A# 220-712-429

## Scan of Original Turkish-language Notes from Detention of Friday, June 24th, 2022



*24 Haziran 2022: Bugün yine hiçbir doktor randevosuna götürülmedimedim. Su bugün yine gelmedi. Herkese sadece yarım litre petçe su verildi. Sağ ayağım artık tam ağırmakta ve ve yürümekte zorlanıyorum. Bugün yine için buruk buruk ve gün boyu hep ağlama ihtiyacı duydum. Çok zor günler geçiriyorum şuan. Ölüm daha cazip geliyor yine Hiç kimse bilmiyor ama yaşamak için geldiğim toprraklarda ölüm daha cazip geliyor. Yorgunluğum had safhada ve öyle yaparlaştımki yok olmak üzereyim. Ayrıca bugün tapollandığım için yeni besto formu doldurup içeri verdim.*

**<u>Notes from Detention of Saturday, June 25th, 2022</u>**

"Again, today I was not taken to any appointments. Water is still half a liter. And today unusual things are happening. It's like [the] big bosses [inspectors] will come, they're trying to throw dust in their eyes [*göz boyamaya çalışıyorlar* – an idiom meaning "to mislead"]. There's a good chance that they would come on Monday. Today is the fourth day of my limp. In case these bosses [inspectors] come on Monday, I will request a conversation to explain my situation. Let's see if they'll listen to me. Or will they not find it worth listening to and turn their noses up? If they listen, they will prove either the justice of the USA and that I am in the land of freedom, or will they turn their back on a rotting refugee? Again, I have to finish it tonight due to the writing constraints. Let me also say this before I forget; Don't think that I slept because I haven't written the scratches for days. I sleep very little now. So I didn't need to write. But know that my nightmares have no limits now."

Serhat BOZKUS A# 220-712-429

**Scan of Original Turkish-language Notes from Detention of Saturday, June 25th, 2022**

25 Haziran 2022: Bugün yine hiçbir randevuya götürülmedim. Su yine çamurluydu ve bugün normal olmayan olaylar oluyor. Sanki büyük patronlar gelecek olan için göz boyamaya çalışıyorlar. Pazartesi gelme ihtimalleri yüksek. Bugün açlığımın toparlanmasının 4. günü ve dörtte gelirse pazartesi günü bu patronlara durumumu anlatmak için

20

konuşma talebinde bulunacağım. Bakalım beni dinleyecekler mi yoksa dinlemeye değer bulmayıp bu ruhumu kıracaklar. Orada dinleseler ABD'nin adaletli ve özgürlükler ülkesi mi kanıtlayacaklar yoksa gülmeye yüz tutmuş bir mülteciye sırt mı çevirecekler. Yine yüzü yüzüme kişiliğimden bu gecede bitirmek zorundayım. Unutmadan bunu da söyliyeyim; kaç gündür gizleleri yazmıyorum diye açıktığımı sanmayın artık çok az uyuyorum ondan açık duymadım yazmaya. Ama bilinçli kabuslarımın sınırı yok artık.

### Notes from Detention of Sunday, June 26th, 2022

"Again, today I was not taken to any health checks, namely my appointments. I don't even scratch anymore because I sleep less. It is the fifth day that my right leg is limping. Now there is a possibility that it will be permanent and become disabled. I guess the big bosses [inspectors] are pretty likely to come. My ear can't hear anymore. My right leg is limping. And my throat is getting worse and worse. If they come, I will tell it to the big bosses [inspectors]. Perhaps they might be already informed, and they decided to refute me here. I'm hoping they do not. I sincerely hope that the United States, which I have read, know and learned about, is a country of justice and freedom, as well as a state where people value the rights to life, they will show people, and to the ICE officers who try to convince me that the opposite is the case. I would also like to point out that I couldn't go to the open air for 2 days because of my right leg limping."

26

Serhat BOZKUS A# 220-712-429

**Scan of Original Turkish-language Notes from Detention of Sunday, June 26th, 2022**



26 Haziran 2022: Bugün gine hiçbir sağlık kontrolüne yani randevularıma götürülmedim. Az uyuduğum için artık çiftli'te atmıyorum. Sağ bacağımın topallanmasında 5. gündeyim ve artık kalıcı kalma ve sakat kalma ihtimali var. Bu günde sıradışı bir temizlik var. Herhalde büyük patronların gelme ihtimali bayağı yüksek. Kulağım artık duymuyor. Sağ bacağım topalliyor ve bacağım çiftliğe kötüleşiyor. Bunları dışarda gelse ler bu büyük patronlara ileteceğim. Belli ki iletil miş ve onlarda burda gürültmeye karar vermişler öyle olmamasını varmıyor ve okuduğum, bildiğim, öğren diğim, ABD'nin adaletli ve özgürlükler ülkesi olduğunun yanı sıra insanın yaşam haklarına değer verdiği bir devlet olduğuna herkeşde boşta bulurun tarsı olduğuna beni Monitorlamaya çalışan ICE memurları na göstermesini en içten dileklerimle diliyorum. Ayrıca belirtmek isterimki Sağ bacağımın topalla ması yüzünden 2 gündür havalandırmaya çıkamadım.

## Notes from Detention of Monday, June 27th, 2022

"Today, I was not taken to any control. My leg is getting worse. Yılmaz Bilen and Cihat Demir are helping me. Both are young, 19-20 years old. The big bosses [inspectors] I expected to come did not come. I hope they come. I wonder whether they will see the truth like the judge. Maybe they will see it, maybe they won't want to see it. The truth is that whatever happens, the thing that will not change for the Kurds here is that the Kurds in the USA have a spiritual father. You know, the last branch I trusted was also rotten. Thus, as an abandoned, isolated refugee, I became a prisoner in the USA. In this process, my 4 days were very difficult. Finally, a few days ago, it happened to me by someone I love very much. He was almost the only one I hadn't tried and doubted. Well, I won't keep it long. Today again, only half a liter of water came. Today, I couldn't go into the open air because my right leg was limping."

28

Serhat BOZKUS A# 220-712-429

**Scan of Original Turkish-language Notes from Detention of Monday, June 27th, 2022**

27 Haziran 2022: Bugünde başka şekilde kontrole götürülmedim. Keçamim gittikçe kötüleşiyor. ve Yılmaz bilen ve cihat demir yer tutucu oluyor. bana ikiside 19-20 yaşlarında iki genç. Beklediğim büyük putran
2l

ler gelmedi. Ben ise gelecekleri umuyorum. Bun larda yargıç gibi gerçekleri görecekler mi acaba. Belki görecekler belkide gizli görmek istemeyecekler. Gerçek şu ki ne olursa olsun buradaki kötüler için değiş meyecek şey. ABD'de kötülerin manevi bir kelede olduğu. Bilir misiniz güvendiğim son dalda çürük çıktı. Böylece terkedilmiş yalnız bırakılmış bir mülteci olarak ABD'de cena evinde yaşayan biri haline geldim. Bu kadarlık sürede 6 günüm çok zor geçti. En sonuncu bir kaç gün önce çok sevdiğim biri tarafından başıma geldi. İnandığım ve şüphe etme diğim tek kişiydi neredeyse. Neyse Fazla uzatma yacağım yine. Bugün yine sadece yarım litresu geldi. Bugünde sağ bacağımın topallamasından ötürü havalandırmaya çıkamadım.

## Notes from Detention of Tuesday, June 28th, 2022

"Today, too, I was not taken to any health check-ups. The people who I have waited for came to see me but they didn't talk to me because there was no interpreter at that moment. They will come again tomorrow, but I think they will make excuses for providing an interpreter again. ICE officer "Brant" came today. I talked to him. I said that now I can lose my [hearing in my] ear completely, and besides that, there is a possibility of [my] becoming disabled. He said to me that he is a deportation officer, he cannot help me about my hearing loss. I said either do my treatment or let my sponsor do it. He told me he is not a doctor. Shortly he tries to tell me if I want treatment they could send me back to Turkey which means my returning Turkey means my death there. I should mention that these days I cannot do scratches on the paper, but I still have deprivation of sleep and wake up with nightmares."

30

**Scan of Original Turkish-language Notes from Detention of Tuesday, June 28th, 2022**



28 Haziran 2022: Bugün de hiçbir sağlık kontrolü
ile görülmedim. Beklediğim büyük patronlar geldi
fakat translayt olmadığı için benle görüşmedi. Yarın
gine gelecekler. Bekalim gine translayti bahane ede
cekler mi. Ayrıca bugün ICE memuru "Bront" geldi, onun
la konuştum ve kulağımı artık tamamen kaybediyo
rum bunun için sıra sıkat te kalma ihtimalim
var dedim. O ise bana ben sınır dışı memuruyum
senin için ne yapabilirim dedi, Bende ya tedavimi
gerçekleştirin yada izin verin ben zorum gerçek
leştirsin dedim. O da bana ben sınır dışı memuruyum
senin için ne yapabilirim doktor değilim dedi. Yani
diyorki kulağını biz sağır ettik, sakat koymanıda
sekap olabiliriz istersen seni zorla gönderdiğin ülke
ne geri gönderelim. Bune 8 aydır cezaevlerinde
sindirilip işkence ettikleri yetmemiş ben
bizde ölüme gönderilmeyi düşünüyor. Bunun üzerine
arkadaşım daha öncede konuştuğum yargıca benim
durumu anlatmayı karar verdi. Yarın anlatacak mış

22

Yarın büyük birgün. Bekalim umutlar yeşerecek
mi? yoksa kurumaya yüz tutmuş çiçekler gibi
solup gidecek mi? Yargıç ne dense dersin
değişmeyecek şey kürtlerin burda mazlum bir
babadı olduğu ve bu yargıcın kürtler için çok
değerli olduğu ve değerinin değişmeyeceği.

## Notes from Detention of Wednesday, June 29th, 2022

"Today, I was not taken to any doctor's control again. However, this morning the people I mentioned above came to see me and to talk to me. They listened to my complaints and asked what I wanted. I said that my ear needs urgent surgery; and I said that if my slipped disc is not treated urgently, I will be disabled and I have chronic pharyngitis. I told them I have other diseases too that need to be treated and I asked them let my sponsor help me to get treatment. As far as I understand from his words, they have given him wrong information here and they just made it look like I had a problem only with my ear. I have a lot of pain in my right leg, I could not even go out to get fresh air."

**Scan of Original Turkish-language Notes from Detention of Wednesday, June 29th, 2022**



29 Haziran 2022: Bugün yine hiçbir doktor kontrolüne götürülmedim. Fakat bu sabah dün konuşacağız diyen büyük patronla benle konuştu, şikayetlerimi dinledi ve ne istediğimi sordu. Ben de kulağımın acil ameliyata ve diş kaymamın acilen tedavi edilmemesi durumunda sakat kalacağımı, kronik ferolitim (ve diğer hastalıklarımın ya tedavi edilmesini yada beni Sponsoruma gönderip, onun beni tedavi etmesini sağlamalarını istedim. Onun konuşmalarından anladığım kadarıyla burada ona yanlış bilgi vermişler ve sadece kulağımda sorun var mış gibi göstermişler. Biraz sohbet ettikten sonra kitap yazdığımı ve karakteri gerçek yazmak için ismini öğrenmek istedimse de adını veremeyeceğini söyledi. Ben de sansın olması nedeniyle ona takma ad olarak sana "Sarı" diyeceğim dedim. Bakalım "Sarı" beni dikkate alıp gerçekten yardımcı olacak mı yoksa Medical, ICE ve süper vizör gibi kulak arkası yapıp ABD'nin gerçek adaletini gösterecek mi. Ayrıca kültürüm buradaki manevi babam olan teyze Yunus adındaki bir kişide yine grin kart verdi. Bugün yaklaşık bir haftadır bacağımın sakatlığından yerdeyer çıkamadım ve çok uzun bir süre düşünerek zaten beni sağlığımdan ötürü öldürüyorlar diye kısa bir süre içinde serbest bırakılmazam ve tedavi edilmeme durumunda "ölüm orucuna" gireceğe karar verdim.

23

**<u>Notes from Detention of Thursday, June 30th, 2022</u>**

"Today, I was not taken to any doctor's control again. I am having a hard time now because of my pain.  That's why I took steps to implement my "hunger strike" decision that I took yesterday as soon as possible.  Around 9-10 PM, an officer brought me some patient forms that I filled out. When I opened it up, I see that that they filled all of them out according to their own minds, as if they had checked me out and made it look like I had no health problems other than my hearing. Which proves my suspicions of yesterday were correct."

**Scan of Original Turkish-language Notes from Detention of Thursday, June 30th, 2022**



★ 30 Haziran 2022: Bugün yine hiçbir diktor kontrolüne götürülmedim. Ağrılarımdan ötürü oldukça çok zorluk çekiyorum. Bundan ötürü dün aldığım "ölüm oluca" kararını en kısa sürede uygulamak için girişimlerde bulundum. Hazırlıklarım tamamlandığı an başlayacağım. Bu arada dün aynı kart olan arkadaşım bugün özgürlüğüne kavuştu. Bana da inşallah en kısa sürede sende çıkarsın deyince o an bu cümleyi kuran kazanır kişiydi acaba diye düşünmeye başladım. Tabiki saygımın çoklığından cevabını bulamadım. Akşama doğru hatta akşam 9-10 gibi bir ofisir bana doldurduğum bir kaç hasta formu getirdi. İsmi açıp bakınca hepsini kendi kafalarına göre doldurup sanki beni kontrol etmişler ve kolağım dışında sağlık sorunum yok gibi göstermişler. Bu da dünkü şüphelerimde haklı olduğumu gösteriyor. Ben de bunları bir ispat olarak federal mahkemeye götürmek için diğer delillerin bulunduğu dosyama kattım. Hem biliyormusunuz ben çok özledim. En kısa sürede bu özgürlük sürgününe ya son vereceğim yada özgürlük adına öleceğim.

Serhat BOZKUS A# 220-712-429

## Notes from Detention of Friday, July 1st, 2022

"Today, I was not taken to any doctor's control again. The condition of my right leg is getting worse and worse. And my right arm is starting to hurt and go numb. There is no improvement in chronic pharyngitis, ear pain and chest tightness. I wrote a letter to send to my friend and sponsor regarding my situation, transparency and human rights issues in the detention center. I asked them to send those letters to human rights organizations. I continue to implement my 'hunger strike' decision. My mental and psychological state is as bad as ever."

Serhat BOZKUS A# 220-712-429

**Scan of Original Turkish-language Notes from Detention of Friday, July 1st, 2022**

Serhat BOZKUS A# 220-712-429

## Notes from Detention of Saturday, July 2nd, 2022

"Again, they did nothing but call me to the medical again and say that they can only give painkillers. They give me these painkillers without even checking on me. I am currently given 3 different painkillers. Today the nurse told me that they have informed the ICE officer since June 1st, and they are waiting for them to give permission to go to the hospital. Today's nurse prescribed two more painkillers for me to use: 'Tylenol' one day and 'chlarphen' one day, and increased the number of painkillers to 12 tablets, together with 10 painkillers and 2 Antidepressants, for 3 different days. I hope you understand what this means."

**Scan of Original Turkish-language Notes from Detention of Saturday, July 2nd, 2022**

Serhat BOZKUS A# 220-712-429

### Notes from Detention of Sunday, July 3rd, 2022

"No medicine was given to me this morning. Medicines don't stop the pain in my left ear anymore. I had to spend most of the day in bed and sitting, as I was having more and more difficulty stepping on my right leg. Since I have vomiting, I eat very little. If the pain in my right arm becomes constant, I will be unable to even write. Now I have trouble even going to the bathroom."

**Scan of Original Turkish-language Notes from Detention of Sunday, July 3rd, 2022**

A  3 TEMMUZ 2022: Bugün sabah hiçbir ilaç veril-
medi bana. Sol bacağımın ağrısını ilaçlar dindir-
miyor artık. Sağ bacağıma gittikçe basmaktan
zorlandığım için gün boyu çoğunlukla yatakta
ve oturarak geçirmek zorunda kaldım. Kusmağım
geldiği için yemekleri de kısıtlı yiyiyorum. Sağ ka-
lanımın ağrısı sürekli hale gelirse yüzü bile yoz-
maz hale gelecem. Artık lavaboya bile gitmek-
te zorluk çıkarıyorum. Ha birde bizim mahkeme
abi veya baba dediğimiz yargıç benim için
o üst mahkemede ona ben bir şey yapamam.
Yine büyüklüğünü yapmış ve benim için ne yapa-
cağını bakmış. Kendisine bir teşekkür borcum var.
Belki birgün dar sidiğe söyliyeyim teşekkürler
yargıç "Tayler". Girmeye karar verdiğim ölüm
okumada gittikçe yaklaşıyorum. Son bir
iki hazırlıktan sonra yaşamak için ölüme mey-
dan okumak zorunda kalacağım. Kim bilebilirdi-
ki yaşamak için kaçtığım ülkede bu durum-
lara düşeceğimi. Özgürlüğümün ve yaşam alanımın
kısıtlandığı hatta yok edildiği, sağlığıma kas-
tedildiği bu özgürlükler ülkesinde özgürlük için
özgürlük yolunda öledemiyim? Birlikte göreceğiz

**<u>Notes from Detention of Monday, July 4th, 2022</u>**

"I have given up hoping on doctors and psychologists now. because I realized that it was ICE officer 'Brant' and his boss who was responsible for hindering my treatment. I could not eat with the left side of my mouth. Now I have difficulty eating with the right side. My teeth are in bad condition as they are not treated. I do not have any health-related treatment here. I decided on my hunger strike today. Tomorrow I will inform my attorney and will start the death fasting."

Serhat BOZKUS A# 220-712-429

EOIR 31 of 45

Serhat BOZKUS A# 220-712-429

**Scan of Original Turkish-language Notes from Detention of Monday, July 4th, 2022**

Serhat BOZKUS A# 220-712-429

## Notes from Detention of Tuesday, July 5th, 2022

[First three sentences redacted due to attorney-client privilege]. Because they have already deafened me, my leg may be crippled. My throat may become permanently hoarse [due to pharyngitis], and my right arm, which is starting to ache, may become dysfunctional. I can't even tell you about the psychological and spiritual breakdown I'm in. After a 30-minute discussion, [redacted]. I said that I would start my hunger strike [redacted], then I came back to my ward."

**Scan of Original Turkish-language Notes from Detention of Tuesday, July 5th, 2022**



5 Emmuz 2022

[handwritten note, partially redacted]

... çünkü onlar beni sağlık etmiş, kaçağım sabot kalabilir. Bunun için kalıcı olarak kısık sesli mahkum olabilir ve ağır marya başlayan sağ kolum işleksiz hale geldi bir. İçinde bulunduğum psikolojik ve ruhsal çöküntüyü hiç anlatmıyorum bile. İşin ilginç yanı bunlara göz çıkmak ICE memurun beni sağlığından etmemiş gibi sağlığından olursa denilmesi, Tabi evlatımı da bu için iç gözümü biliyor ama işte sevdiği ve değer verdiği için böyle konuşuyor. Ben ise artık bakın ben siyasi bir rehine değilim, siyasi bir tutukluda değilim. Ben Türkiye'de değilim şu anda özgürlük ve ülkesi ABD'ne sığınmış bir mülteciyim. Burda bana zulüm ve işkence uygulanıyor, Hemde 8 aydır sağlığından olursa diyorsunuz da sağlık durumumun farkında değilsiniz. Ben bunları ABD' gölcamıyorum burdayı, yanlış tanıtmak isteyen ABD'nin asıl ruhunu barındırmayan insanların suçu olarak görüyorum. Çünkü ABD'nin özgürlüğe, insan yaşam hakkına verdiği değeri iyi biliyorum. Sen bana uyguladığın bu zulüm ve işkence anlamına da mülteci hak-

27



[blackened portions contain content redacted to maintain attorney-client privilege]

Serhat BOZKUS A# 220-712-429

**Translation of Notes from Detention of Wednesday, July 6th, 2022**

"I have been limping for about 16 days.

**The dates of the request forms I filled out for medical treatment:**

1st form – 04/30/2022

2nd form-05/05/2022

3rd form-05/12/2022

4th form-05/26/2022

5th form-05/29/2022

6th form-05/30/2022

7th form-05/31/2022

8th form-06/06/2022

9th form-06/10/2022

10th form-06/12/2022

11th form-06/13/2022

12th form-06/19/2022

13th form-06/24/2022

14th form-06/30/2022

**Note:** Despite all my requests, a doctor came to see me one time and gave me antibiotics for a week. I was not provided with other medications and after 3 weeks they provided me with painkillers and cream for my legs/feet that did not help anything. Besides them I was provided with antidepressants and sleeping pills. My health conditions require more than giving me pills.

48

Serhat BOZKUS A# 220-712-429

**Scan of Original Turkish-language Notes from Detention of Wednesday, July 6th, 2022**

AVUKAT

- 6 Temmuz bugün eyaçimun topllanaşının 16 günü
  # DOLDURDUĞUM HASTA FORMLARIN TARİHİ #

① 1. For#AD → 04/30/2022
② 2. Form → 05/05/2022
③ 3. Form → 05/12/2022
④ 4. Form → 05/26/2022
⑤ 5. Form → 05/29/2022
⑥ 6. Form → 05/30/2022
⑦ 7. Form → 05/31/2022
⑧ 8. Form → 06/06/2022
⑨ 9. Form → 06/10/2022
⑩ 10. Form → 06/12/2022
⑪ 11. Form → 06/13/2022
⑫ 12. Form → 06/19/2022
⑬ 13. Form → 06/24/2022
⑭ 14. Form → 06/30/2022

Bunların bir kopyasını ispat
olarak yanımda tutuyorum ve
yaptıklları/ uysüzlükleri bu kopya-
larda ispathı.

NOT — Bunların dışında avukatımın de talep
ettiği randevular var. Bu formlara karşılık sadece
bir kere doktor tarafından kontrol edildim. Buna
karşılık sadece 1 haftalık antibiyotik verildi.
Başka hiçbir ilaç verilmedi. 3 hazirandan sonra
sadece ağrı kesiciler verilmeye başlandı ve ayak
dermim sayılması için etkisi olmayan bir krem
verildi.
— Psikoloğum bunlardan bağımsız olarak uyku ilacı
ve antidepresan ilacı yazmış

49

Serhat BOZKUS A# 220-712-429

196582

**Translation of Notes from Detention of Dates Medication Was Provided**

**Time and dates that I was provided with medication**

June, 9 2022 at 2:30 AM after midnight [being 2:30 AM June 10th]
June 10, 2022 at 11.39 PM
June 11 I was not provided with medication in the morning
June 12, 2022 at 8.30 PM
June 13, 2022 at 8.30 PM
June 14, 2022 at 9.40 AM
June 14, 2022 at 8.30 PM
June 15, 2022 at 8.20 AM
June 15, 2022 at 8.45 PM
June 16, 2022 at 9.00 AM
June 16, 2022 at 8.00 PM
June 17, 2022 at 8.40 AM
June 17, 2022 at 10.20 PM
June 18, 2022 at 9.25 AM
June 19, 2022 at 8.25 PM
June, 20 2022 at 9.00 AM
June 20, 2022 at 9.45 PM
June 21, 2022 at 9.00 AM
June 21, 2022 at 11.00 PM
June 22, 2022 at 8.00 AM
June 22, 2022 at 9.00 PM
June 23, 2022 at 8.25 AM
June 23, 2022 at  8.15 PM
June 24, 2002 at 8.05 AM
June 24, 2022 at 8.50 PM
June 25, 2022 at 9.05 AM
June 25, 2022 at 8.35 PM
June 26, 2022 at 10.00 AM
June 26, 2022 at 9.30 PM
June 27, 2022 at 9.00 AM
June 27, 2022 at 9.10 PM
June 28, 2022 at 9.30 AM
June 28, 2022 at 8.20 PM
June 29, 2022 at 10.00 AM
June 29, 2022 at 9.05 PM
 June 30, 2022 at 9.10 AM
June 30, 2022 at 8.15 PM
July 1, 2022 at 9.40 AM
July 1, 2022 at 8.10 PM

50

Serhat BOZKUS A# 220-712-429

July 2, 2022 at 9.30 AM
July 2, 2022 at 8.15 PM
July 3, 2022 I was not provided with medication in the morning
July 3, 2022 at 8.25 PM
July 4, 2022 at 8.25 AM
July 4, 2022 at 8.00 PM
July 5, 2022 at 8.30 AM
July 5, 2022 at 11.40 PM
July 6, 2022 at 8.30 AM

Serhat BOZKUS A# 220-712-429

**Scan of Original Turkish-language Notes from Detention shows Mr. Bozkus's Medication**



İLAÇ Saatleri.

- 9 Haziran gece Saat 2:30'da verildi
- 10 Haziran gece saat 11.55'te verildi.
- 11 Haziran Sabah İlaç gelmedi
- 11 Haziran gece Saat 10:35'te verildi
- 12 Haziran öğle Saat 10:55'te verildi
- 12 Haziran akşam Saat 08:30'da verildi
- 13 Haziran Sabah Saat 09:50'te verildi
- 13 Haziran akşam Saat 08:30'da verildi
- 14 Haziran Sabah Saat 09:40'ta verildi
- 14 Haziran akşam Saat 08:30'da verildi
- 15 Haziran Sabah Saat 08:20'de verildi
- 15 Haziran akşam Saat 08:45'te verildi.
- 16 Haziran Sabah Saat 09:00'da verildi
- 16 Haziran akşam Saat 08:00'da verildi.
- 17 Haziran Sabah Saat 08:40'ta verildi.
- 17 Haziran akşam Saat 10:20'de verildi.
- 18 Haziran Sabah Saat 09:25'te verildi.
- 18 Haziran akşam Saat 08:30'da verildi.
- 19 Haziran Sabah Saat 09:25'te verildi.
- 19 Haziran akşam Saat 08:25'te verildi.
- 20 Haziran Sabah Saat 09:00'da verildi
- 20 Haziran akşam Saat 09:45'te verildi.
- 21 Haziran Sabah Saat 09:00'de verildi
- 21 Haziran akşam Saat 11:00'de verildi
- 22 Haziran Sabah Saat 09:00'da verildi
- 22 Haziran akşam Saat 09:00'da verildi.
- 23 Haziran Sabah Saat 08:25'te verildi.
- 23 Haziran akşam Saat 08:15'te verildi
- 24 Haziran Sabah Saat 08:05'te verildi
- 24 Haziran akşam Saat 08:30'da verildi.
- 25 Haziran Sabah Saat 09:05'te verildi.
- 25 Haziran akşam Saat 08:35'te verildi.
- 26 Haziran Sabah Saat 10:00'da verildi.
- 26 Haziran akşam Saat 09:30'da verildi.
- 27 Haziran Sabah Saat 09:00'da verildi.
- 27 Haziran akşam Saat 09:10'da verildi.
- 28 Haziran Sabah Saat 09:30'da verildi.
- 28 Haziran akşam Saat 08:20'de verildi.
- 29 Haziran Sabah Saat 10:00'da verildi.
- 29 Haziran akşam Saat 09:05'te verildi.

- 30 Haziran Sabah Saat 09:10'da verildi
- 30 Haziran akşam Saat 08:15'te verildi.
- 1 Temmuz Sabah Saat 09:40'ta verildi.
- 1 Temmuz akşam Saat 08:10'da verildi
- 2 Temmuz Sabah Saat 09:30'da verildi
- 2 Temmuz akşam Saat 08:15'te verildi.
- 3 Temmuz Sabah İlaç verilmedi
- 3 Temmuz akşam Saat 08:25'te verildi.
- 4 Temmuz Sabah Saat 08:25'te verildi.
- 4 Temmuz akşam Saat 08:00'da verildi.
- 5 Temmuz Sabah Saat 08:30'da verildi
- 5 Temmuz akşam Saat 11:40'ta verildi.
- 6 Temmuz Sabah Saat 08:30'da verildi.

**times**

Serhat BOZKUS A# 220-712-429

**Translation of Notes from Detention**

**I was not provided with medicine below mentioned dates:**
June 11th, 2022: I was not provided with any of the medicine that morning.
June 16th, 2022: I was not provided with the medicine "Doxepin HCL Capsule" that evening.
July 3rd, 2022: I was not provided with medicine that morning.

53

Serhat BOZKUS A# 220-712-429

**Scan of Original Turkish-language Notes from Detention shows the dates Mr. Bozkus was not provided medicine**

VERİLMEYEN İLAÇLAR

← 11 Haziran  Sabah ilaçların hiçbiri gelmedi
– 16 Haziran  akşam "Doxepin Hcl–10mg capsule" verilMedi
– 3 Temmuz   Sabah ilaç verilmedi.

54

Serhat BOZKUS A# 220-712-429

## CERTIFICATE OF TRANSLATION

I, Tugce Arit Cinaroglu, hereby certify that I am fluent and competent to translate from Turkish language into English. I certify under penalty of perjury under the laws of the United States of America that the below-listed documents have been truly, accurately, and completely translated to the best of my ability.

1- Notes of Serhat Bozkus treatment in ICE custody at Cibola County Correctional Center from June 14th, 2022 to July 6th, 2022.

Name of the Translator      : Tugce Arit Cinaroglu

Date                                   : 7/18/2022

Signature                         : _____

Serhat BOZKUS A# 220-712-429

## Witnesses to Respondent's Treatment in ICE Custody at Cibola County Correctional Center

I'm Serhat Bozkus's friend, Celal CETINTAS, from the ward.
Serhat's health problems are not intervened in anyway.
Necessary interventions are being made to other friends with health problems.

<div align="right">

Celal CETINTAS
/signature/
05.12.2022

</div>

I'm Serhat Bozkus's friend, Muslum Celik, from the ward. There is no intervention for Serhat's health problems in any way. Necessary interventions are being made for other friends' health problems.

<div align="right">

Muslum Celik
/signature/
05.12.2022

</div>

I'm Serhat BOZKUS's friend, Enis Altay, from the ward. There is no intervention for Serhat's health problems in any way. Other friends' health problems are receiving necessary interventions.

<div align="right">

Enis Altay
/signature/
05.12.2022

</div>

I'm Serhat BOZKUS's friend, Emin Abay, from the ward. Serhat's health problems are not addressed in any way. Other friends' health problems are being addressed.

<div align="right">

Emin Abay
/signature/
05.12.2022

</div>

I'm Baris Can Alan. I am a friend of Serhat Bozkus from the ward in Cibola. Serhat Bozkus has physical and psychological health problems here. Despite reporting it to the prison hospital, there is no intervention.

<div align="right">

06.01.2022
Baris Can Alan
/signature/

</div>

I'm Cihat Demir. I am a friend of Serhat Bozkus from the ward in Cibola. Serhat Bozkus has physical and psychological health problems here. Despite reporting it to the prison hospital, there is no intervention.

<div align="right">

06.01.2022
Cihat Demir
/signature/

</div>

I'm Yunus Demir. I am a friend of Serhat Bozkus from the ward in Cibola. Serhat Bozkus has physical and psychological health problems here. Despite reporting it to the prison hospital, there is no intervention.

06.01.2022
Yunus DEMIR
/signature/

I'm Muhammer Seyran. I am a friend of Serhat Bozkus from the ward in Cibola. Serhat Bozkus has physical and psychological health problems here. Despite reporting it to the prison hospital, there is no intervention.

06.01.2022
Muhammer Seyran
/signature/

I'm Baris Can Alan. I am the ward friend of Serhat Bozkus in Cibola. Serhat Bozkus had a serious health problem on 06.10.2022. Although we reported this situation to the medical team, they did not take any action. I have witnessed this happen over and over again.

06.11.2022
Baris Can Alan
/signature/

I'm Yunus DEMIR. I am the ward friend of Serhat Bozkus in Cibola. Serhat Bozkus had a serious health problem on 06.10.2022. Although we reported this situation to the medical team, they did not take any action. I have witnessed this happen over and over again.

06.11.2022
Yunus DEMIR
/signature/

I'm Muhammer Seyran. I am the ward friend of Serhat Bozkus in Cibola. Serhat Bozkus had a serious health problem on 06.10.2022. Although we reported this situation to the medical team, they did not take any action. I have witnessed this happen over and over again.

06.11.2022
Muhammer Seyran
/signature/

I'm Cihat Demir. I am the ward friend of Serhat Bozkus in Cibola. Serhat Bozkus had a serious health problem on 06.10.2022. Although we reported this situation to the medical team, they did not take any action. I have witnessed this happen over and over again.

06.11.2022
Cihat Demir
/signature/

I'm Ibrahim KayaIi. I am a friend of Serhat Bozkus from the ward. I feel sad for our friend Serhat. The reason was that he was suffering from psychological and physical ailments. And as far as I can see, the medical staff have not given attention to Serhat. Serhat cannot hear when you are talking to him, he does not sleep at night, he sleeps from morning to evening. He told me that he was in a lot of pain. I met Serhat when I came here. Our compatriots also met him. Some of our compatriots do not approach Serhat, do not talk to him, and are not interested in interacting with him. The reason for this is that Serhat has stayed here for a very long time. The fear is that if they talk to Serhat, they will also be kept here for a very long time. These friends came and shared their fears about this with me. I shared their fears with Serhat. Serhat was very upset. When I got up in the morning, they took Serhat to the cell. Serhat came back a few days later. He had himself thrown into the cell because of what his friends said, his mother's poor condition, his fiancee's condition, his health problems, that he could not stand it, that he was very bad, and that he was afraid of committing suicide. I ask you to help our brother Serhat.

Ben Serhat BOLKUŞ'un Koğuş arkadaşı Celal ÇETİNTAŞ, serhatın sağlık sorunlarına hiçbir şekilde müdahale edilmiyor.

Diğer sağlık sorunları olan arkadaşlara gerekli müdahaleler yapılıyor.

Celal ÇETİNTAŞ = (imza) 12.05.2022

Ben Serhat Bolkuşun koğuş arkadaş, Müslüm selli serhatın sağlık sorunlarıyla hiçbir şekilde müdahale edilmiyor, diğer sağlık sorunu olan arkadaşlara gerekli müdahale yapılıyor, Müslüm selli (imza) 12.05.2022

Ben Serhat Bolkuşun Koğuş arkadaşı Enis Altay serhatın sağlık sorunlarıyla hiçbir şekilde müdahale edilmiyor diğer sağlık sorunları olan arkadaşlara müdahale ediliyor Enis Altay (imza) 12.05.2022

Ben Serhat Bolkuş'un Koğuş arkadaşı Emir Abay serhat'ın sağlık sorunlarıyla hiçbir şekilde müdahale edilmiyor, diğer sağlık sorunları olan arkadaşlara müdahale ediliyor. Emir Abay (imza) 12.05.2022

Ben Kasif Can Alac Serhat başkan ve Cihatdaki
başkan arkadaşı Serhat başkar burada tutuklu ve kötü
bir şekilde ona karşı yapılan işkence ve baskılara bütün
zararını rağmen müdahale edilmiştir.

06.01.2022 Kasif Can Alac

Ben serhat destek Serhat başkanın Cihattadaki
başkan arkadaşı Serhat başkaf burada tutuklu ve
fiziksel sağlık sorunları yaşar Hükümet hapishane
bildirmemize rağmen müdahale edilmemiştir.

06.01.2022
Serhat destek

Ben ...... burada Serhat başkan cihattadaki
başkan arkadaşı, Serhat başkan burada fiziksel ve psikolojik
sağlık sorunları yaşıyor hapishane hastanesine bildirmemize
rağmen müdahale edilmemiştir.

06.01.2022

Ben Yavuz Demir Serhat başkan ve Cihatta'daki başkan
arkadaşım Serhat başkan burada fiziksel ve psikolojik sağlık
sorunları yaşar hapishane hastanesine bildirmemize rağmen müdahale
edilmemiştir.

06.01.2022
Yavuz Demir

Ben Kaya can Alan Serhat Boztur'un Cibolodaki koşucu arkadaşı. Serhat Boztur 06.10.2022 da çok ciddi sağlık sorunu yaşadı. Bu durumu sağlık ekiplerine bildirmemize rağmen hiç bir müdahalede bulunulmadı. Bu durumu defalarca yaşadığına şahit oldum.

06.11.2022  Kaya can Alan

Ben Yunus Demir Serhat Boztur'un Cibola'daki koşu arkadaşıyım. Serhat Boztur 06.10.2022 de çok ciddi sağlık sorunu yaşadı. Bu durumu sağlık ekiplerine bildirmemize rağmen hiçbir müdahalede bulunulmadı. Bu durumu defalarca yaşadığına şahit oldum.

06.11.2022  Yunus Demir

Ben Muhammed Sağlan Serhat Boztur'un Cibola'daki koşu arkadaşıyım. Serhat boztur 06.10.2022 de çok ciddi sağlık sorunu yaşadı. Bu durumu sağlık ekiplerine bildirmemize rağmen hiçbir müdahalede bulunulmadı. Bu durumu defalarca yaşadığına şahit oldum.

06.11.2022  Muhammed Sağlan

Ben Cihat Demir Serhat boztur'un Cibola'daki koşu arkadaşı. Serhat boztur 06.10.2022 de çok ciddi sağlık sorunu yaşadı. Bu durumu sağlık ekiplerine bildirmemize rağmen hiç bir müdahalede bulunmadılar. Bu durum defalarca yaşadığına şahit oldum.

06.11.2022  Cihat Demir

# CERTIFICATE OF TRANSLATION

I, Tugce Arit Cinaroglu, hereby certify that I am competent to translate documents from the Turkish language into English. I certify that the below listed documents have been truly and accurately translated to the best of my ability.

1- Witness Statement of detainee Celal CETINTAS dated May 12th, 2022
2- Witness Statement of detainee Muslum Celik dated May 12th, 2022
3- Witness Statement of detainee Enis Altay dated May 12th, 2022
4- Witness Statement of detainee Emin Abay dated May 12th, 2022
5- Witness Statement of detainee Baris Can Alan dated June 1st, 2022
6- Witness Statement of detainee Cihat Demir dated June 1st, 2022
7- Witness Statement of detainee Yunus Demir dated June 1st, 2022
8- Witness Statement of detainee Muhammer Seyran dated June 1st, 2022
9- Witness Statement of detainee Baris Can Alan dated June 11th, 2022
10- Witness Statement of detainee Yunus Demir dated June 11th, 2022
11- Witness Statement of detainee Muhammer Seyran dated June 11th, 2022
12- Witness Statement of detainee Cihat Demir dated June 11th, 2022
13- Witness Statement of detainee Ibrahim Kayali

Name of the Translator        : Tugce Arit

Cinaroglu Date        : 7/12/2022

Signature        :

**Translation of Statement from ICE Detainee Juan Poma Capelo concerning Mr. Bozkus**

I, Juan Poma Capelo, with A# 240558058 am bearing witness to the fact that during the time that we have shared together in the dormitory, I have noticed my colleague Serhat Bozkus' health problems from consuming the medication administered to him by the institution, and he sends requests on repeated occasions without any response whatsoever from the doctor.

Juan Poma Capelo
[signature]



**Translation of Statement from ICE Detainee Juan Poma Capelo concerning Mr. Bozkus**

I, Juan Pablo Arango Arbeluez, with A# 240865752, would like to express that Mr. Serhat Bozkus since he has entered the housing unit has presented with various medical problems, despite not sleeping well and taking the medications administered they do not give the desired effect, when he fills out forms requesting medical assistance the reply comes too many days too late.

Juan Pablo Arango
[signature]



**CERTIFICATE OF TRANSLATION**

I, William Shipley, hereby certify that I am competent to translate from the Spanish language into English. I certify that the below listed document(s) have been translated accurately and completely to the best of my ability.

    1- Witness Statement of detainee Juan Poma Capelo
    2- Witness Statement of detainee Juan Pablo Arango Arbeluez

Name of the Translator:     William Shipley

Date:     7/14/2022

Signature:     /s/ William Shipley

Metin Serbest, Esquire                                          **DETAINED**
Law Office of Metin Serbest
2200 E. Devon Ave. Suite 358
Des Plaines, Illinois 60018

## UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## OTERO IMMIGRATION COURT
## 26 MCGREGOR RANGE ROAD
## CHAPARRAL, NEW MEXICO 88081

In the Matter of:                    )
BOZKUS, SERHAT                       **)**          File No. A# 220-712-429
Respondent In Removal Proceedings    )
                                     )

## REPLY TO DHS OPPOSITION TO RESPONDENT MOTION FOR BOND
## REDETERMINATION HEARING

Metin Serbest, Esquire                                               DETAINED
Law Office of Metin Serbest
2200 E. Devon Ave. Suite 358
Des Plaines, Illinois 60018

## UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## OTERO IMMIGRATION COURT
## 26 MCGREGOR RANGE ROAD
## CHAPARRAL, NEW MEXICO 88081

In the Matter of:                          )
BOZKUS, SERHAT                             )          File No. A# 220-712-429
Respondent In Removal Proceedings   )

## REPLY TO DHS OPPOSITION TO RESPONDENT MOTION FOR BOND
## REDETERMINATION HEARING

**COMES NOW** the Respondent BOZKUS, SERHAT by and through his undersigned attorney

and in reply to the DHS Opposition to Respondent's Motion for Redetermination of Custody,

and in further support of his Motion for Bond Redetermination Hearing, states as follows:

1.  Respondent reiterates that this Court has jurisdiction to redetermine Respondent's custody
    pursuant to 8 C.F.R. §§ 1003.14(a) and 1003.19(a).
2.  Respondent reiterates that bond proceedings, including the instant motion presently before this
    Court, are "separate and apart from, and shall form no part of, any deportation or removal
    hearing or proceedings;" 8 C.F.R. §§ 1003.19(d).
3.  DHS did not contest the fact that Respondent has been diagnosed with chronic post-traumatic
    stress disorder ("chronic PTSD"), "Major Depression, recurrent," and a "Mood problem," or
    the obvious fact Respondent's medical reports evidencing these diagnoses made in May 2022
    were unavailable to him at the time of his previous bond hearing on March 9, 2022; see
    Respondent Motion for Redetermination of Custody ("Motion"), paras. 4-5; Supplement in
    Support of Motion for Redetermination of Custody Hearing ("Supp."), Pg. 74-78 (Medical
    Evaluation Report, May 11, 2022), Pg. 69-73 (Medical Evaluation Report, May 17, 2022)
    (these reports also being Exhibit 1 to Respondent's Motion).
4.  DHS did not contest the fact that Respondent suffers from increasingly acute symptoms of

PTSD that are both triggered by his confinement, and exacerbated by his continued confinement, which include heightened anxiety, nightmares, sleeplessness, and chest pain; *Id.*

5. In reply to DHS' statement that Respondent "claims" he is being treated with psychotropic medication (DHS Opposition to Respondent's Motion for Bond Determination Hearing ("DHS Opp."), Pg. 2), Respondent draws the Court's attention to portions of the record indicating Respondent's active consent to, and ongoing treatment with respect to, his psychotropic medication; Supp. Pg. 75 (May 11, 2022 "Objective" assessment by Dr. Anne Ortiz #10 indicating Respondent's "Current treatment with psychotropics,"), Pg. 76 (indicating Respondent gave informed consent for same, May 11, 2022), Pg. 70 (Dr. Anne Ortiz indicating Respondent's "Current treatment with psychotropics" continues as of May 17, 2022), Pg. 71 (indicating Respondent's informed consent to taking psychotropic medications continued as of May 17, 2022).

6. In reply to DHS that Respondent allegedly refused "treatment he is being given" with respect to his psychotropic medications for PTSD and Major Depression (DHS Opp., Pg. 2, citing Supp. Pg. 63, 64, 70, 72), the record indicates the medication in question was not prescribed for Respondent's chronic PTSD or "Major Depression – recurrent" (Supp. Pg. 71, 76), nor was it refused by Respondent. Rather, Respondent was asleep at the time it was administered, the first instance being 9 AM on May 10, 2022 (Supp. Pg. 64) the other being May 16, 2022 (time not otherwise indicated, but medication was for his "AM" dose) (Supp. Pg. 63). There is no instance documented of any alleged refusal of treatment on May 17th or May 26th, as DHS asserts (DHS Opp. Pg. 2).

7. The record further indicates Respondent missed these 9 AM doses because he was up until 4 or 5 AM the previous night due to the recurrent major depression and chronic PTSD symptoms from which he suffers and continues to suffer; Supp., Pg. 63, 77 ("I cannot sleep at night. I have nightmares and I am depressed. I cannot even relax with the others. I walk around until 4 or 5 am. The medication helps but when I do finally sleep I will have 4 or 5 nightmares about being in Jail or my family in Turkey being harmed.");

8. Two incidents of missed medication occasioned by Respondent's fatigue from symptoms of chronic PTSD do not evidence a refusal by Respondent to pursue or continue any course of treatment. Nor do they evidence any past, present, or future refusal to continue any prescribed course of treatment. On the contrary, the aforementioned medical records indicating Respondent's consent to treatment and the fact of his ongoing treatment evidence the opposite.

9. Furthermore, within 24 hours of each incident, Respondent requested changes to his medication schedule to accommodate his symptoms of PTSD and depression; Supp. Pg. 70, 72, 75. Pg. 75 ([Question] "Have medications or dosages changed over the past 8 weeks? [Answer] No;" [Specify] "Patient states he has not been AM compliant on [medication]. because it causes AM drowsiness, but wants PM dose"), Pg. 76 ("14) [Treatment] Plan" indicates Respondent "Verbally consented for medication and AM medication that made him sleepy in the AM was discontinued"); Pg. 77 ("Patient explained that medication makes him sleepy in the day, but does want it for the night.")

10. Contrary to DHS' characterization of "refusing treatment," the record here evidences the opposite: active efforts by Respondent to sustain and comply with his medical treatment regimen by immediately addressing the reasons for any missed doses with medical staff and requesting an adjustment to the timing of its administration to the afternoon to accommodate his worsening symptoms. Furthermore, the medication in question did not even pertain to respondent's chronic PTSD or "Major Depression – recurrent."

11. Because Respondent consented to all courses of treatment prescribed to him and made reasonable best efforts to avoid any missed doses occasioned by his symptoms, and because the only missed doses were not for treatment of Respondent's PTSD or depression, DHS's attribution of Respondent's worsening symptoms to an alleged refusal of "treatment he is being given" is both inaccurate and irrelevant. Respondent is not the cause of the materially changed circumstances described in his motion, which is entirely due to Respondent's worsening health.

12. The allegedly refused medication in question is irrelevant to Respondent's acute and worsening symptoms of Major Depression and chronic PTSD, which are triggered by Respondent's confinement, and significantly exacerbated by his continued confinement over time, as they involuntarily call to mind Respondent's experiences of past trauma suffered at the hands of Turkish police and security forces. Motion, para. 5; Supp. Pg. 72 ("Being in jail here bring up all my fears of being put in jail and tortured [in Turkey]. My stress keeps me from being able to watch TV or Spend time with others here. Even the officers ask how I am and say they are sorry that I am feeling so bad.")

13. DHS did not contest that the increasing acuity of his symptoms is evidenced by his timeline for follow-up visit accelerated from one month to one week (Motion, Para. 8, Ex. 1 / Supp. Pg. 70-78). Respondent's acuity is additionally evidenced by his previously-existing condition of "chest pain due to anxiety" (as of April 26, 2022, Supp. Pg. 33) progressing to reported difficulty breathing possibly induced by panic attacks and "pain in chest reproducible and worsens with time" (Supp. Pg. 20-21); as well as orders from his clinician Dr. Ortiz to "complete all suicide orders" after 6 months of detention (Supp., Pg. 9) and Respondent's being placed on suicide watch due to his suicidal ideation (Pg. 11).

14. DHS did not contest the fact that Respondent's circumstances of confinement aggravate his symptoms of Major Depression and chronic PTSD, instead misattributing these to Respondent's non-existent refusal to take his medication in an attempt to absolve itself of responsibility for this unnecessary situation; DHS Opp., Pg. 2 ("Respondent cannot be the cause of his materially changed circumstances.")

15. DHS did not contest the fact that these symptoms of PTSD and Major Depression are consistent with the harm suffered by persons having experienced past traumas in their home countries while seeking asylum; Motion, para. 7; Ex. 2.

16. DHS did not contest the fact that the increasing acuity of Respondent's symptoms are also consistent with the harm suffered by persons having experienced past traumas in their home countries while seeking asylum which are aggravated by circumstances of confinement while their proceedings remain pending, and which grow worse over time; *Id.*

17. The fact that Respondent's conditions may have existed while in Turkey or prior to his previous bond hearing is irrelevant to the materiality of their acuity now, as his symptoms are aggravated by his continued detention.

18. DHS did not address the increasing acuity of Respondent's physical health conditions, including the fact that, after 7 months in detention, Respondent's hearing is "almost completely gone in one ear" and is now so painful that it is "radiat[ing] to his neck;" Supp. Pg. 4, 37.

19. To the best of Respondent's knowledge, the surgery necessary to treat Respondent's physical health condition resulting in possible permanent loss of hearing (which loss is now near-total) is not offered to detainees at Cibola County Correctional Center. Respondent invites DHS to present any evidence to the contrary in this regard, and if so, to make appropriate arrangement to provide Respondent with such treatment so Respondent may avoid permanent hearing loss.

20. Respondent notes he is now in his eighth month of detention (since November 2021).

21. Respondent concedes some mental health care has been made available to him, but the care is inadequate to remedy the harms occasioned by his further prolonged detention, nor the increasingly severe symptoms that prolonged detention is occasioning in Respondent.

22. DHS has made no showing that Respondent's continued detention is necessary to protect the community or to prevent Respondent from absconding or evading further proceedings, other than an assertion that the fact of Respondent's pursuit of asylum and to avoid being deported to Turkey somehow suggest that he is a flight risk; DHS Ops. Pg. 4.

23. The fact that some of Respondent's physical and mental health conditions may be chronic or previously existed either while Respondent was in Turkey or at the time of his only bond hearing does not account for the cumulative impact Respondent's ongoing detention on his mental and physical health conditions, specifically, his "Chronic post-traumatic stress disorder (PTSD)" and his "Major Depression – recurrent" and his risk of permanent hearing loss; Supp. Pg. 72. Respondent's previously-existing health conditions did not present Respondent with deafness in one ear, panic attacks, and a substantial risk of suicide when he was first detained.

24. Respondent contends that demonstrable evidence indicating the advancing degree of acuity of Respondent's medical conditions resulting from his prolonged detention is not an irrelevant factor in the Court's determination as to whether Respondent is entitled to a hearing to determine whether or not release from custody on bond is appropriate under these circumstances, as these circumstances are "of such a nature that knowledge of the item would affect [the Court's] decision-making." (Black's Law Dictionary, 11th Ed. 2019). It is the degree of the acuity of Respondent's physical and mental health conditions, and not the fact of their existence, that constitutes the circumstances that have "materially changed"; 8 CFR §1003.19(d).

25. Respondent has demonstrated the fact of this acuity with clear and convincing medical evidence now before the Court that was prepared by Cibola County Correctional Center health professionals, specifically multiple medical evaluations over time documenting the acuity of Respondent's conditions, the fact that they persist despite Respondent's active cooperation with what treatment is made available to him; the possibly permanent and irreversible

consequences for Respondent's inability to treat his impending loss of hearing; as well as the severity of his depression (qualified as "Major – recurring") and its symptoms, including his suicidal ideation, and being subject to orders to "complete all suicide orders" including being placed on suicide watch; the fact if Respondent's chronic PTSD diagnosis and the acuity of those symptoms advancing from "stress-induced chest pain" to panic attacks and difficulty breathing. All of these constitute clear and convincing evidence of Respondent's circumstances having "materially changed" since his last bond hearing on March 9, 2022.

26. Respondent's declining state of health due to his confinement and his inability to seek medical treatment for increasingly acute medical conditions engenders a serious risk of irreversible harm to Respondent, which is also relevant to the Court's custody determination here. Respondent's health records provide clear and convincing evidence of this risk.

27. DHS has no basis upon which to presume Respondent could be a flight risk, much less any clear and convincing evidence of it. The only support offered is the fact of his immigration proceedings and this Court's previous findings with respect to the same. However, pursuant to 8 C.F.R. § 1003.19(d), bond determinations are "separate and apart from, and shall form no part of, any deportation or removal hearing or proceedings." The fact of Respondent's proceedings is not evidence of anything, in and of itself, other than that Respondent is seeking asylum protection and the withholding of removal back to Turkey due to asserted claims of persecution and of a well-founded fear of persecution and torture upon his return to Turkey. The fact of Respondent's seeking asylum to avoid being removed to Turkey, from which he has only just recently escaped, does not evidence any risk Respondent will return to Turkey.

28. Additionally, Respondent is actively sought by authorities in Turkey and continues to pursue his claims for asylum and withholding of removal on appeal, none of which support a contention that there is a risk that Respondent will return to Turkey, as Respondent has an ongoing and vital interest in his liberty and freedom which he advances through claims still proceeding before this Court which may not conclude in time to avoid the serious risk of harm that Respondent presently faces from materializing

29. Respondent is not a risk to the community, as he has no criminal record and no basis for DHS to conclude that he presents any risk to anyone.

30. In this case, we are only asking the Court for a hearing to further assess this evidence and make a determination as to the appropriateness of Respondent's release from detention under these circumstances, in order to avoid the serious risk of irreparable to Respondent occasioned by his prolonged detention, the clear and convincing evidence of which was not available to Respondent at the time of his last bond hearing.

The Immigration Judge has the authority to order release and determine the amount of bond, if any, under which the person may be released. 8 C.F.R. §§ 1236.1(d), 1003.19, and the present circumstances call for such a redetermination. Pursuant to 8 C.F.R. 1003.14(a), we reiterate our request for a hearing to redetermine the custody of Respondent by the Department of Homeland Security (DHS), in order to ameliorate the conditions under which Respondent is

held in custody, absent which Respondent faces the risk of serious and irreparable harm.

Respectfully submitted this 9th day of June, 2022,

By:_____

Metin Serbest, Esq.

## CERTIFICATE OF SERVICE

On June 9th, 2022, I, Metin Serbest, served a copy of this Motion for Reconsideration of Custody Hearing in the above-titled matter to the Department of Homeland Security, Office of Chief Counsel via ICE e-service, El-Paso portal.

Respectfully Submitted,

Metin Serbest, Esq.

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**IMMIGRATION COURT**
**OTERO, NM**

In the Matter of:   BOZKUS, SERHAT                    File No. **A# 220-712-429**

**ORDER OF THE IMMIGRATION JUDGE**

Upon consideration of the Respondent's Motion for Custody, it is HEREBY ORDERED that the motion be **[  ] GRANTED [  ] DENIED** because:

      [  ]    DHS does not oppose the motion.
      [  ]    The respondent does not oppose the motion.
      [  ]    A response to the motion has not been filed with the court.
      [  ]    Good cause has been established for the motion.
      [  ]    The court agrees with the reasons stated in the opposition to the motion.
      [  ]    The motion is untimely per _____.
      [  ]    Other: _____.

Deadlines:

      [  ]    The application(s) for relief must be filed by _____.
      [  ]    The respondent must comply with DHS biometrics instructions by

_____                         _____
Date

                                    Immigration Judge

_____

**Certificate of Service**

This document was served by: [ ] Mail       [ ] Personal Service
To:[ ] Alien   [ ] Alien c/o Custodial Officer    [ ] Alien's Attorney   [ ] DHS

Date:_____

By: Court Staff_____

April 19,2022

CIBOLA COUNTY CORRECTIONAL CENTER

Attn: OFFICER DEAN KING

Dear Mr. King ,

    Please find below the information of our client's sponsor in support of our client's/respondent's custody determination. We kindly ask that he be released on recognizance due to not only the COVID-19 Virus epidemic but to his current health concerns. Our client suffers from a heart condition along with high blood pressure. The respondent has inconsistent breathing issues and also has been experiencing nose bleeding frequently. Our client also has symptoms of hearing loss from his left ear. Please kindly consider coordinating with medical staff to see his records since he has been detained, it will show you his urgent need to be released. This custody determination request is made based on court's new order, dated October 7, 2020 in Fraihat V. ICE.

    ICE has an affirmative obligation to identify and track all detained individuals and therefore should already be on notice that Mr. Bozkus is a Fraihat subclass member. Fraihat v. ICE, Case No. 5:19-cv-01546-JGB-SHK (C.D. Cal. Apr. 20, 2020), ECF No. 133.Furthermore, Mr. Bozkus suffers from mental illness, which has only been exacerbated in detention. Furthermore, Mr. Bozkus has been experiencing severe psychiatric illness, which has led him to have suicidal thoughts. The lack of appropriate medical attention in view of Mr. Bozkus's vulnerable psychological state is the direct result of his detention, where he is isolated and unable to communicate with anyone due to language barriers. Mr. Bozkus is entitled to an individualized consideration for release. According to the Court Order, the presence of his/her/their Risk Factors and the current public health emergency must be treated as a significant factor(s) weighing in favor of release, and "detainees should generally be released absent a specific finding they would pose a danger to property or persons." Id. at 14.

    Per the court's order, only in rare cases can ICE continue detaining a subclass member such as Mr. Bozkus, because he/she is not subject to 1226(c) mandatory detention. Mr. Bozkus requires a safe environment where he can receive intensive medical treatment. When released, Mr. Bozkus will go to Cincinnati, Ohio to be with his relative and sponsor Mr. Comert Kurdistan.

For these reasons, I respectfully request that Mr. Bozkus be released from ICE custody. As required by the Court order: 1) I expect your response in writing within the next week, by April 26, 2022 and 2) ICE must turn over this Fraihat request and your notice in response, to Fraihat Class Counsel. If you would like further information, please do not hesitate to contact me. I look forward to hearing from you, and thank you in advance for your assistance in this matter.

Yours Sincerely,

_____

Metin Serbest, Esq.

LAW OFFICES OF METIN SERBEST
2200 E. Devon Ave Suite # 358
Des Plaines IL 60018
TELEPHONE -312-473-5500
EMAIL-m.serbest@SERBESTLAW.COM

From: **Bryant, Paul C** <Paul.C.Bryant@ice.dhs.gov>
Date: Tue, Apr 19, 2022 at 4:00 PM
Subject: RE: FW: Bozkus, Serhat 220712429
To: Melis Comert <melis.comert@serbestlaw.com>
Cc: Sanchez, Azucena <Azucena.Sanchez@ice.dhs.gov>

Good afternoon,

Pursuant to the bond request that was denied by an Immigration Judge on 3/9/2022 your client was deemed to be a flight risk and the I-286 from January states that he is a possible threat to public safety. To the best of my knowledge, ICE management reviewed your client's file and medical conditions and determined that he should remain in custody.

Paul C. Bryant
Deportation Officer, Detained Unit
Crisis Negotiator Team
El Paso Field Office, Albuquerque
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
(505)-366-9253 cell

**From:** Melis Comert <melis.comert@serbestlaw.com>
**Sent:** Tuesday, April 19, 2022 2:51 PM
**To:** Bryant, Paul C <Paul.C.Bryant@ice.dhs.gov>
**Cc:** Sanchez, Azucena <Azucena.Sanchez@ice.dhs.gov>; Julie.Griego2@corecivic.com
**Subject:** Re: FW: Bozkus, Serhat 220712429

**CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

Hello Officer Bryant,

His left ear is a pre-existing condition where he had problems in Turkey. His heart condition was something that the nurse told him while at Otero, which then he told us after having frequent nose bleeds.

Could you also clarify why he is still detained if he has fraihat qualifying conditions? If his conditions were apparent then, maybe his condition is getting worse and it is leading to other factors. Please advise.

Thank you,
Melis

On Tue, Apr 19, 2022 at 2:40 PM Bryant, Paul C <Paul.C.Bryant@ice.dhs.gov> wrote:

Good afternoon,

Your G-28 has been added to your clients electronic and paper files.  And your Fraihat concerns are being forwarded to the Supervisory Detention and Deportation Officer over the detained docket in Albuquerque and Cibola medical staff.  At least two custody determinations have been conducted regarding your client.  On December 3, 2021, your client was encountered and arrested by US Border Patrol, who determined your client would remain in custody.  On or about January 10, 2022, your client was recognized as have Fraihat qualifying conditions and a custody determination was made on January 12, 2022 that your client would remain in custody.  Are the conditions you're presenting on behalf of your client new and previously unknown to ICE?

Paul C. Bryant
Deportation Officer, Detained Unit
Crisis Negotiator Team
El Paso Field Office, Albuquerque
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
(505)-366-9253 cell

**From:** King, Dean <Dean.King@ice.dhs.gov>
**Sent:** Tuesday, April 19, 2022 1:36 PM
**To:** Bryant, Paul C <Paul.C.Bryant@ice.dhs.gov>
**Subject:** FW: Bozkus, Serhat 220712429

R/

Dean King
Deportation Officer
Cibola Detained Unit
El Paso Field Office-Albuquerque
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
C: 505-235-5658  (e-mail is best)

**From:** Melis Comert <melis.comert@serbestlaw.com>
**Date:** Tuesday, Apr 19, 2022, 13:22
**To:** King, Dean <dean.king@ice.dhs.gov>
**Subject:** Bozkus, Serhat 220712429

**CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

Hello Officer King,

Please find attached fraihat release request for our client along with the G28 from his previous detention center (otero).

I look forward to hearing from you.

Melis


--
**Melis Comert**
**Law Offices of Metin Serbest, LLC.**
El Paso Office
401 E Main Str. Ste: 416
El Paso, Tx 79901
Office: 915-308-7777
Cell: 915-309-4404

Chicago Office
2200 E Devon Ave Ste:358
Des Plaines, IL 60018
Office Phone: 312-473-5500

Miami Office
701 Brickell Ave Ste:1550
Miami, FL 33131
Office Phone: 305-337-0550

Morristown Office
67 E Park Place
Morristown, NJ 07960
Office: 551-249-7777

San Francisco Office
433 Airport Blvd. Ste 330
Burlingame, CA 94010
Office: 415-870-7777


www.serbestlaw.com

---------- Forwarded message ---------
From: **Metin Serbest** <metin@serbestlaw.com>
Date: Tue, May 3, 2022 at 1:35 PM
Subject: Serhat bozkus A429
To: <paul.c.bryant@ice.dhs.gov>

Greetings Officer Bryant ,

I hope this email finds you well.

We have contacted your office regarding the medial condition of my client, however, I do not see any abstract measures have been taken.
My client has been complaining about several issues as follows:
He indicates that he is not getting proper medical treatment, nor being released. Furthermore, he complains that he is being over-medicated which does nothing, but make him sleep around 15 hours a day.

He is also experiencing additional medical issues:
1- Neck hernia
2- Hearing Loss
3- Chest pain/pressure/cardio
4- high blood pressure
5-chronic pharyngitis

We have previously requested our client to be released under Fraihat. The above conditions are cause for immediate release and meanwhile our client should receive proper medical attention and care.

If you would like to discuss the matter please contact me. My direct number is 773-815-3341.

Sincerely,

Metin Serbest,Esq

Chicago, IL Office
2200 E. Devon Ave. Suite 358
Des Plaines, IL 60018
Phone: 312 473 5500
Fax:    773 337 5544

El Paso, TX Office
401 E Main St Suite 416
El Paso, TX 79901
Phone: 915 308 7777

Morristown,NJ Office
67 E Park Pl Suite 675
Morristown, NJ 07960
Phone: 551 249 7777

Miami, FL Office
701 Brickell Ave Suite 1550
Miami, FL 33131
Phone: 305 377 0550

San Francisco, CA Office
433 Airport Blvd Ste 330
Burlingame Ca 94010
Phone: 415 870 7777

| | |
|---|---|
| **From:** | william.shipley@serbestlaw.com |
| **To:** | "Sanchez, Azucena" |
| **Cc:** | Mark.gallegos@corecivic.com; Paul.C.Bryant@ice.dhs.gov; William.S.Shaw@ice.dhs.gov |
| **Subject:** | RE: Serhat Bozkus |
| **Date:** | Thursday, July 14, 2022 8:48:56 PM |
| **Attachments:** | 2022-04-19 Letter to ICE DO Dean King requesting release on Bond pending hearing.pdf |
| | 2022-05-03 Email of M.Serbest to ICE D.O. King requesting Medical Care for Mr. Bozkus.pdf |
| | Allen S Keller et al - Mental Health of detained asylum seekers - Lancet 2003 362 at 1721-23.pdf |
| | DHS CRCL ICE Memo re Cibola County Correctional Center (redacted) (5 Mar 2020.pdf |
| | Prevalence-of-psychiatric-disorders-among-refugees-and-migrants-in-immigration-detention.pdf |
| | 2019-09-26 U.S. House Oversight Committee Hearing on ICE Detention Facilities - Is ICE Doing Enough.docx |
| **Importance:** | High |

Thank you Officer Sanchez,

Per our conversation, please see the attached prior correspondence with D.O. Bryant with respect to our client Mr. Serhat BOZKUS A# 220-712-429. I'm not aware of any written reply to our communications from D.O. Bryant or from ICE with respect to these communications, or any actions being taken in response to these requests, other than DHS counsel's opposition to our efforts to petition for Mr. Bozkus' release from detention, which we sought in light of his diagnoses in May which took place after his removal hearing. If there were any such communications or affirmative actions to provide Mr. Bozkus health care with respect to his hearing, dental, and other serious medical needs (other than the assessment and limited dental care provided to him today) please forward those to me as soon as possible.

I'm also attaching relevant research concerning the detrimental impacts of continued detention on asylum-seekers' mental health with respect to anxiety, PTSD, and depression even for periods as short as two months. These are all conditions our client is suffering from that are aggravated by the circumstances of his detention. Given my client's medical records indicate he suffers from the same conditions described by this research, and given this research's thoroughness in documenting the serious and detrimental impacts to the mental health of asylum-seekers in detention, it's clear that only his immediate release will alleviate the continued aggravation of his severe mental health symptoms, which are also impacting his physical health. And he's been in detention now for over eight months now, since November 2021.

The facility is not compliant with respect to its obligations under Section 504 of the Rehabilitation Act to accommodate my client's basic health needs either, specifically with respect to his ability to bathe himself, or with respect to his other mental and physical health care needs. I'm also noting for the record the extremely inappropriate comment made to my client by a clinician at Cibola County Correctional Center that he should "get health care in your own country" when he expressed concern for the inadequate quality of care he was receiving, which he indicated during our conference call yesterday. This does not reinforce my confidence that he has been humanely and fairly treated at this facility. Quite the opposite.

Finally, I'm attaching a copy of a Congressional hearing from 2019 which investigated the practices at Cibola County Correctional Center, from the GPO website, which noted (among other things) that "ICE's processes for oversight of confinement were insufficient to sustain compliance with ICE's own standards," as well as a redacted copy of the memo that I believe was the basis for this Congressional inquiry into inadequate health care at Cibola County Correctional Center. I'd

appreciate it if you could please provide me with an unredacted version of this memo so that I can assess what recommendations were made and whether those recommendations were ever implemented, as they directly concern the inadequacy of the health care provided to my client at this facility, and spare me and your organization the time and trouble of having to file a FOIA claim for the same.

It is my belief that Mr. Bozkus' deteriorating mental health likely detrimentally impacted his testimony at the hearing in April and contributed to the denial of his asylum claim. Clients of ours with trauma FAR less severe than that suffered by Mr. Bozkus have been granted asylum. Frankly, Mr. Bozkus never should have been detained in the first place. He has no criminal record, no prior immigration proceedings or immigration violations (except for his single EWI initiating his current proceedings), and multiple ties to the community including from multiple U.S. citizens willing to sponsor and care for him, including a physician who has been employed by the State of Ohio for over 20 years. He's a well-educated professional (in civil engineering) who would otherwise be a productive and law-abiding member of our society, but who is instead essentially being punished for the symptoms of the very traumas and persecution from which he fled and for which is seeking asylum.

As a side note, and not that this should have any bearing on your decision-making here, but the Kurdish people have always been strong and loyal allies to our nation in its military campaigns against Saddam Hussein's regime in Iraq and against ISIS in Syria, for which their support was particularly crucial. They are the world's largest ethnic group without a nation of their own, divided between multiple nations (primarily Iraq, Iran, Syria, and Turkey) many of which are dictatorships hostile to their very existence as a people. Like my client, they value democracy, civil rights, and the basic rights and freedoms our country champions, in a part of the world where respect for those rights is very poor. Their pursuit of these rights in Turkey has resulted in their systemic persecution there, where they are beaten for on the street just for speaking their native language, for advocating for their civil rights, and for demanding that country acknowledge its responsibility for past massacres of Kurds, of which there are many throughout its history. They value and have fought for the rights and democratic values our nation stands for. And they deserve far better from our country than to be treated in this manner.

I'm attempting to expedite the decision on his appeal, and while we appreciate the actions being taken now on our client's behalf now, this is too little too late. His case warrants immediate consideration for the Alternatives to Detention Program as only his release will alleviate the very serious and very acute mental health disorders from which he continues to suffer, which worsen with every passing day he remains in detention.

I thank you for your cooperation with respect to the medical interventions needed for our client, and for your timeline consideration of his release on recognizance through the Alternatives to Detention Program, or otherwise through the exercise of DHS's prosecutorial discretion over his case in light of the new evidence of his mental health diagnoses and DHS' consideration for their possible impacts on his testimony at the hearing, in a manner similar to considerations given by Asylum Officers during their credible fear screening interviews (when interviewees are asked about whether they suffer from Depression or other mental health conditions that may impact the Officers' assessment

of their answers with respect to their fears concerning past and future persecution). I'm not sure whether such an assessment of my client's mental health was ever made before DHS fought his asylum claim and attempted to deport him back into the hands of his persecutors. Regardless of the outcome of his proceedings, his pursuit of his legitimate and meritorious asylum claim here should not come at the cost of his health, his sanity, or his life.


Sincerely,

William B. Shipley, Esq. | *Senior Associate*
**Law Offices of Metin Serbest LLC**
Chicago Office
2200 E Devon Ave, Ste. 358
Des Plaines, IL 60018
312-473-5500 ext. 204

---

**From:** Sanchez, Azucena <Azucena.Sanchez@ice.dhs.gov>
**Sent:** Thursday, July 14, 2022 5:46 PM
**To:** william.shipley@serbestlaw.com
**Subject:**

Shaw, William S William.S.Shaw@ice.dhs.gov
Bryant, Paul C Paul.C.Bryant@ice.dhs.gov

**Azucena Sanchez**
**Supervisory Detention and Deportation Officer**
**El Paso Field Office, Albuquerque Sub-office**
**Enforcement and Removal Operations**
**U.S. Immigration and Customs Enforcement**
**Office: (505) 452-4830**

| | |
|---|---|
| **From:** | william.shipley@serbestlaw.com |
| **To:** | "Sanchez, Azucena"; "Mark.gallegos@corecivic.com" |
| **Cc:** | "William.S.Shaw@ice.dhs.gov" |
| **Subject:** | RE: Serhat Bozkus |
| **Date:** | Monday, July 18, 2022 11:58:00 PM |
| **Attachments:** | 2022-07-18 Form I-830E Notice of Transfer to Denver Contract Detention Facility.pdf |
| | Sponsor records.pdf |

Good Afternoon Officer Sanchez,

Having received no response to my previous email from Thursday July 14th (below) I presume you have no records of any correspondence or actions taken by ICE or the Cibola County Correctional Center in response to the multiple written communications sent to ICE requesting immediate medical intervention to provide adequate medical care to our client, Mr. Bozkus, attached to my previous email, specifically:

1) the April 19, 2022 letter to ICE Deportation Officer Dean King from our principal attorney Metin Serbest requesting our client's urgent release due to his acute need for medical care and the detrimental impact of detention on his health due to multiple physical and mental health issues, and also requesting immediate medical attention for the same, including for his hearing loss in his left ear, inconsistent breathing issues, frequent nosebleeds, and severe psychiatric illness which was worsening as a result of his detention, including leading to suicidal ideation, and notifying DO King that our client should not be subject to mandatory detention, pursuant to the order of April 20th, 2020 of the U.S. District Court (Central District Of California – Eastern Division) in *Fraihat, et al. v. U.S. Immigration and Customs Enforcement, et al.* Case No. 5:19-cv-01546-JGB-SHK (C.D. Cal. Apr. 20, 2020), ECF No. 133, of which our client, as someone suffering from high blood pressure, chronic respiratory disease, and severe psychiatric illness, is a member of Subclass Two of this order, and notifying him of the need for consideration of our client's release to a sponsor in Ohio willing to care for our client and to assist in providing him with a safe environment in which to live and assist in securing him medical care, to which a written response was requested by April 26th, 2022, from which letter no response was received by our office by that date nor anytime since then;

2) the follow-up email of May 3rd, 2022 from Mr. Serbest to ICE Deportation Officer Paul Bryant notifying him that our client has not received proper or adequate medical treatment, nor has he been released, and that he is being overmedicated with pain-killers and sleep-inducing medication but under-treated with respect to his other health conditions, including multiple physical health conditions including his hearing loss from his damaged left ear, a herniated disc in his neck, his chest pain, high blood pressure, and chronic pharyngitis.

I'll note that simultaneous with these efforts on our client's behalf to effectuate much-needed medical intervention for our client, he was himself submitting multiple written requests for medical care and assistance for the aforementioned health needs, as well as for his increasing panic attacks, chest pains, his passing out on at least one occasion, and his degenerating neurological condition occasioned by the herniated disc in his neck which was (and still is) resulting in decreasing mobility and sensation on the right side of his body, as well as the pain from his ear and his neck and his pharyngitis all of which were making it difficult for him to eat and swallow cold water.

Despite your agency ignoring our multiple requests for immediate medical intervention or release of our client from detention, I STILL made multiple good-faith efforts in June and July to reach out to Cibola County Correctional Center to attempt to effectuate the immediate care our client needed – especially with respect to his ear and his hearing loss; his inability to chew and swallow due to the extreme pain in his neck and his increasingly severe and untreated pharyngitis, as well as his need for dental care and the replacement of multiple inadequate fillings; to have adequate and immediate follow-up with his mental health practitioner Dr. Anne Ortiz, as well as a dentist and an ENT physician; and to coordinate an effective medical care plan for him consistent with the regulatory and legal standards under which both ICE and this facility are required to operate. I also requested some accommodation for his PTSD symptoms and his ear in the form of any type of bathing facility other than a shower that did not risk pain and infection in his ear due to his perforated eardrum, and that did not trigger his PTSD symptoms by causing him to pass out from the steam in the shower as had happened already on at least one occasion, resulting in injury to him.

After patiently and persistently pursuing these good-faith efforts with the both of you to coordinate an effective care plan for our client, I'm aware only of limited dental care being provided to him as of late last week, but I am not aware of any other care being provided to him other than another (re-)assessment of the same conditions that you were already made aware of both by our office, as well as by your own clinicians assessing him on his intake in April and subsequently. As I stressed to you during our conference call on Wednesday, our client doesn't need more assessment. He needs multiple immediate medical interventions to save his hearing and he needs to be released from detention as soon as possible so that his already extremely serious conditions do not worsen further.

Both of you just assured me last week Wednesday that ICE and Cibola County Correctional Center are cooperating to put together a comprehensive medical care plan for him on an immediate and expedited basis and that ICE would take appropriate follow-up steps in an appropriately timely manner to see that he received appropriate care that could not be provided from inside the facility directly (such as treatment for his perforated eardrum or the herniated disc in his neck) following your immediate completion of your (re-)assessment of his current state of physical and mental health. And Ms. Sanchez, you assured me you would take appropriate steps to coordinate a review of his eligibility for humanitarian parole or other form of compassionate release and/or prosecutorial discretion immediately following that assessment in light of the obvious and increasingly severe detrimental impacts that our client's prolonged detention are having on his physical and mental health, pursuant to 8 C.F.R. § 212.5(b) "(1) Aliens who have serious medical conditions in which continued detention would not be appropriate." and "(5) Aliens whose continued detention is not in the public interest as determined by those officials identified in paragraph (a) of this section" (in this case, the ICE El Paso Field Office Director and/or Deputy Field Office Director or any other person or official appropriately designated by the Secretary of the Department of Homeland Security for this purpose.)

So I ask you: if you were both seriously trying to provide him with the long-awaited health care that we have FINALLY been able to get some movement on, after THREE MONTHS of trying and (until last week) being entirely ignored here, with our client languishing away and growing so increasingly desperate in the meantime as to have been placed on suicide watch at least once and seriously

considering a hunger strike unless he had his immediate care needs addressed in a serious manner – one which we went to GREAT lengths to cooperate with you on to avoid – if that was the case, WHY then is ICE now suddenly transferring him to Colorado (per the attached ICE Form I-830)? And WHY, in light of your previous assurances to me that you would be providing him with immediate and effective care, were we provided NO notice of this transfer by you?

Who is coordinating his medical care here? And which office? Are you coordinating with officials in Aurora to provide him with the immediate medical care he needs? What is going on here?!? For the sake of our client's well-being I need immediate answers, please.

After trying in good faith to address our client's extremely acute medical issues with you, and now that we are finally making progress with respect to his much-needed care, I'm extremely concerned by the fact of his transfer to another facility where I have no idea how long he will have to wait to receive the care I was only just now promised would be provided to him, and without having been provided with even so much as an appropriate point of contact here to follow-up with. Therefore I'd appreciate an immediate explanation from one or both of you BEFORE his scheduled transfer tomorrow as to why this action was taken, what measures you took to assess whether or not it is even safe for him to undertake a 500+-mile journey (I'm assuming by bus) to Auroro, Colorado, given his delicate state of physical and mental health, what specific advanced measures you have taken to ensure that he is appropriately cared for at this new facility, and what measures you are taking to ensure he receives the immediate, appropriate, and direly-needed medical interventions that we had previously discussed there, specifically, the procedures required to treat his ear, his neck/herniated disc, his throat/chronic pharyngitis, his chronic PTSD and Major Depression, his anxiety and panic attacks, as well as appropriate accommodation for his need to bathe himself properly through means other than a shower, and his inability to sleep due to his PTSD-induced insomnia and sleeplessness (nightmares / night terrors, etc.)

Our client has multiple VERY serious and potentially irreversible health problems here that have been requiring IMMEDIATE intervention for MONTHS. Frankly, we have been extremely patient in light of the extremely prejudicial impact your custody of our client has had on his mental and physical health and well-being. I'm not sure where this leaves us with respect to my good-faith attempts to resolve this with you directly and in a non-adversarial manner, but I'm not seeing any of the good faith we've shown on our part reciprocated by you.

I've attempted unsuccessfully to reach out to the both of you today by phone to discuss this issue as soon as I became aware of it, but to no avail. I have not even been able to leave messages at the numbers you provided me with.

I'm sorry you've chosen to address our client's extremely serious and extremely acute health care needs by passing him off to another facility to take responsibility for your own agency and facility's actions and inactions here, in particular given this facility's past record of inadequate care for detainees. I'm holding out a small sliver of hope that I'll hear from either of you before his transfer tomorrow. But I'm not holding my breath.

Regardless of your response to the above situation explaining the reason(s) for his transfer, please

provide me with a complete and accurate record of all Mr. Bozkus's medical treatment at the time of his transfer, either prior to his transfer from his present location or within the next 24 hours, including any and all records of his care and  health status from both the Cibola County Correctional Center and the El Paso ERO Processing Center, whether physical, electronic, or in any other format, as well as any similar records at any other location where he was previously housed by ICE.  These records should specifically include (but are not limited to) all records taken during his initial assessment in April; all written requests for care submitted by our client, and all written replies to those requests (if any) or a description of what action(s) were taken in response to those requests; any and all letters, e-mail correspondence, or any other form of written correspondence with respect to all aspects of his physical and medical care; any and all clinical notes, prescriptions, records of pharmaceuticals administered, EKGs, blood pressure readings, and/or any and all records of any vital signs or other health measurements taken or medical assessments made by any and all staff in your medical unit(s), including nurses, physicians, physical therapists, medical assistants, physician's assistants, or primary care specialists of any kind; as well as any and all lab results or any other formal clinical assessments of his mental and physical health taken while in ICE custody. Please consider yourself advised of your obligation to preserve and maintain these records in their current form, as well as any and all original and any altered, updated, or otherwise modified versions of these records, and any prior deleted records if they are recoverable.

Please provide within the next 48-72 hours any and all of our client's medical records in ICE's possession or otherwise obtainable by ICE from CaseTrakker, MedEZ, the Dental X-Ray System, the Criminal Institution Pharmacy System, the Medical Payment Authorization Request System (MedPAR), and/or the Medical Classification Database, or any other medical database contracted by ICE's Office of Enforcement and Removal Operations to receive, gather, record, and preserve our client's physical exams and treatment, dental services, pharmacy services, and any other medical records and/or treatment plan(s) and/or courses of treatment, and records of any and all care provided to our client or assessment(s) or examination(s) of our client by anyone relating to his medical state or state of health, pursuant to 42 U.S.C. § 249, 42 U.S.C. § 252, 29 U.S.C. § 794, 45 C.F.R. § 400.5, and/or 45 C.F.R. § 707.6.

We repeat our request of April 26th, 2022 pursuant to *Freihat*, as well as our subsequent request last week (verbally and per below), pursuant to 8 C.F.R. § 212.5(b), that our client be immediately released to the care of any one of the three sponsors who have come forward to offer to care for him pending the resolution of his immigration proceedings, preferably Mujgan Inciler of Liberty Township, Ohio, a U.S. citizen and clinical psychologist employed by the State of Ohio for many years (see attached sponsor record previously provided); or secondarily, Mr. Bozkus' relative Comert Kurdistan, also a U.S. citizen of Cincinnati, Ohio, or (if either of these two do not suffice for some reason) a third sponsor from Burlingame, California, a close friend of our client's family, who has also expressed his willingness to sponsor our client.  ANY of these options would be better than continued prolonged detention for our client at another facility in another state, which arguably poses extreme, inappropriate, and unnecessary risks to our client's life, safety, sanity, and well-being, and whose continued detention in light of these conditions constitutes a form of cruel and unusual punishment and an attempt to force his constructive abandonment of his legitimate asylum claims whose proceedings are still pending.

I expect either the requested information or a written response to the above within 24 hours, absent which we will be forced to take further necessary and appropriate action(s) to protect and preserve our client's health, safety, and well-being.


Yours Sincerely,

William B. Shipley, Esq. | *Senior Associate*
**Law Offices of Metin Serbest LLC**
Chicago Office
2200 E Devon Ave, Ste. 358
Des Plaines, IL 60018
312-473-5500 ext. 204

---

**From:** william.shipley@serbestlaw.com <william.shipley@serbestlaw.com>
**Sent:** Thursday, July 14, 2022 8:49 PM
**To:** 'Sanchez, Azucena' <Azucena.Sanchez@ice.dhs.gov>
**Cc:** 'Mark.gallegos@corecivic.com' <Mark.gallegos@corecivic.com>; 'Paul.C.Bryant@ice.dhs.gov' <Paul.C.Bryant@ice.dhs.gov>; 'William.S.Shaw@ice.dhs.gov' <William.S.Shaw@ice.dhs.gov>
**Subject:** RE: Serhat Bozkus
**Importance:** High

Thank you Officer Sanchez,

Per our conversation, please see the attached prior correspondence with D.O. Bryant with respect to our client Mr. Serhat BOZKUS A# 220-712-429.  I'm not aware of any written reply to our communications from D.O. Bryant or from ICE with respect to these communications, or any actions being taken in response to these requests, other than DHS counsel's opposition to our efforts to petition for Mr. Bozkus' release from detention, which we sought in light of his diagnoses in May which took place after his removal hearing.  If there were any such communications or affirmative actions to provide Mr. Bozkus health care with respect to his hearing, dental, and other serious medical needs (other than the assessment and limited dental care provided to him today) please forward those to me as soon as possible.

I'm also attaching relevant research concerning the detrimental impacts of continued detention on asylum-seekers' mental health with respect to anxiety, PTSD, and depression even for periods as short as two months.  These are all conditions our client is suffering from that are aggravated by the circumstances of his detention.  Given my client's medical records indicate he suffers from the same conditions described by this research, and given this research's thoroughness in documenting the serious and detrimental impacts to the mental health of asylum-seekers in detention, it's clear that only his immediate release will alleviate the continued aggravation of his severe mental health symptoms, which are also impacting his physical health.  And he's been in detention now for over eight months now, since November 2021.

The facility is not compliant with respect to its obligations under Section 504 of the Rehabilitation Act to accommodate my client's basic health needs either, specifically with respect to his ability to bathe himself, or with respect to his other mental and physical health care needs. I'm also noting for the record the extremely inappropriate comment made to my client by a clinician at Cibola County Correctional Center that he should "get health care in your own country" when he expressed concern for the inadequate quality of care he was receiving, which he indicated during our conference call yesterday. This does not reinforce my confidence that he has been humanely and fairly treated at this facility. Quite the opposite.

Finally, I'm attaching a copy of a Congressional hearing from 2019 which investigated the practices at Cibola County Correctional Center, from the GPO website, which noted (among other things) that "ICE's processes for oversight of confinement were insufficient to sustain compliance with ICE's own standards," as well as a redacted copy of the memo that I believe was the basis for this Congressional inquiry into inadequate health care at Cibola County Correctional Center. I'd appreciate it if you could please provide me with an unredacted version of this memo so that I can assess what recommendations were made and whether those recommendations were ever implemented, as they directly concern the inadequacy of the health care provided to my client at this facility, and spare me and your organization the time and trouble of having to file a FOIA claim for the same.

It is my belief that Mr. Bozkus' deteriorating mental health likely detrimentally impacted his testimony at the hearing in April and contributed to the denial of his asylum claim. Clients of ours with trauma FAR less severe than that suffered by Mr. Bozkus have been granted asylum. Frankly, Mr. Bozkus never should have been detained in the first place. He has no criminal record, no prior immigration proceedings or immigration violations (except for his single EWI initiating his current proceedings), and multiple ties to the community including from multiple U.S. citizens willing to sponsor and care for him, including a physician who has been employed by the State of Ohio for over 20 years. He's a well-educated professional (in civil engineering) who would otherwise be a productive and law-abiding member of our society, but who is instead essentially being punished for the symptoms of the very traumas and persecution from which he fled and for which is seeking asylum.

As a side note, and not that this should have any bearing on your decision-making here, but the Kurdish people have always been strong and loyal allies to our nation in its military campaigns against Saddam Hussein's regime in Iraq and against ISIS in Syria, for which their support was particularly crucial. They are the world's largest ethnic group without a nation of their own, divided between multiple nations (primarily Iraq, Iran, Syria, and Turkey) many of which are dictatorships hostile to their very existence as a people. Like my client, they value democracy, civil rights, and the basic rights and freedoms our country champions, in a part of the world where respect for those rights is very poor. Their pursuit of these rights in Turkey has resulted in their systemic persecution there, where they are beaten for on the street just for speaking their native language, for advocating for their civil rights, and for demanding that country acknowledge its responsibility for past massacres of Kurds, of which there are many throughout its history. They value and have fought for the rights and democratic values our nation stands for. And they deserve far better from our country than to be treated in this manner.

I'm attempting to expedite the decision on his appeal, and while we appreciate the actions being taken now on our client's behalf now, this is too little too late. His case warrants immediate consideration for the Alternatives to Detention Program as only his release will alleviate the very serious and very acute mental health disorders from which he continues to suffer, which worsen with every passing day he remains in detention.

I thank you for your cooperation with respect to the medical interventions needed for our client, and for your timeline consideration of his release on recognizance through the Alternatives to Detention Program, or otherwise through the exercise of DHS's prosecutorial discretion over his case in light of the new evidence of his mental health diagnoses and DHS' consideration for their possible impacts on his testimony at the hearing, in a manner similar to considerations given by Asylum Officers during their credible fear screening interviews (when interviewees are asked about whether they suffer from Depression or other mental health conditions that may impact the Officers' assessment of their answers with respect to their fears concerning past and future persecution). I'm not sure whether such an assessment of my client's mental health was ever made before DHS fought his asylum claim and attempted to deport him back into the hands of his persecutors. Regardless of the outcome of his proceedings, his pursuit of his legitimate and meritorious asylum claim here should not come at the cost of his health, his sanity, or his life.


Sincerely,

William B. Shipley, Esq. | *Senior Associate*
**Law Offices of Metin Serbest LLC**
Chicago Office
2200 E Devon Ave, Ste. 358
Des Plaines, IL 60018
312-473-5500 ext. 204


---

**From:** Sanchez, Azucena <Azucena.Sanchez@ice.dhs.gov>
**Sent:** Thursday, July 14, 2022 5:46 PM
**To:** william.shipley@serbestlaw.com
**Subject:**

Shaw, William S William.S.Shaw@ice.dhs.gov
Bryant, Paul C Paul.C.Bryant@ice.dhs.gov

**Azucena Sanchez**
**Supervisory Detention and Deportation Officer**
**El Paso Field Office, Albuquerque Sub-office**
**Enforcement and Removal Operations**
**U.S. Immigration and Customs Enforcement**
**Office: (505) 452-4830**

EOIR 35 of 45

Filed at BIA on: 7/27/2022 at 9:57:13 p.m. Central Daylight Time

**Research letters**

# Mental health of detained asylum seekers

*Allen S Keller, Barry Rosenfeld, Chau Trinh-Shevrin, Chris Meserve, Emily Sachs, Jonathan A Leviss, Elizabeth Singer, Hawthorne Smith, John Wilkinson, Glen Kim, Kathleen Allden, Douglas Ford*

**Asylum seekers arriving in the USA are likely to be held in detention for months or years pending adjudication of their asylum claims. We interviewed 70 asylum seekers detained in New York, New Jersey, and Pennsylvania. We used self-report questionnaires to assess symptoms of anxiety, depression, and post-traumatic stress disorder. At baseline, 54 (77%) participants had clinically significant symptoms of anxiety, 60 (86%) of depression, and 35 (50%) of post-traumatic stress disorder; all symptoms were significantly correlated with length of detention (p=0·004, 0·017, and 0·019, respectively). At follow-up, participants who had been released had marked reductions in all psychological symptoms, but those still detained were more distressed than at baseline. Our findings suggest detention of asylum seekers exacerbates psychological symptoms.**

*Lancet* 2003; **362:** 1721–23

Worldwide, there is a growing trend toward detention of asylum seekers arriving in industrialised countries for months or even years pending adjudication of their asylum claims.[1] In the USA, 5000 asylum seekers are estimated to be held in detention,[1,3] although reliable statistics on the number of detained asylum seekers are unavailable. Detention of asylum seekers has concerned health professionals and human rights advocates, in part because of the potential detrimental effects on the mental health of detainees.[1,3] Research on this subject, however, has been limited by difficulties in gaining access to detention centres. The Bellevue New York University (NYU) Program for Survivors of Torture and Physicians for Human Rights have done a systematic and longitudinal study of the effects of postmigration detention on the mental health of asylum seekers.

The US Immigration and Naturalization Services (INS) permitted access to detention facilities in New York, New Jersey, and Pennsylvania. These facilities included two INS detention centres run by private contractors. These jails are virtually windowless converted warehouses where only non-criminal INS detainees are incarcerated. Additionally, access was permitted to three local government-run jails in which criminals are also held. In all of these facilities, asylum seekers are heavily guarded, required to wear jail uniforms, and are shackled whenever they are transported outside of the detention facilities. The INS did not allow us access to a random sample of detained asylum seekers at these facilities. Therefore, we asked six local organisations providing pro-bono legal representation to detained asylum seekers to contact clients and ask about their willingness to be interviewed. Detainees were informed by researchers of the voluntary nature of the study and that participation would not affect their asylum applications. We obtained written informed consent from all participants. The study was approved by the Institutional Review Board of New York University School of Medicine and a review committee for Physicians for Human Rights.

Detainees were interviewed by physicians experienced in caring for refugees; translators assisted if necessary. Standardised psychological symptom measures were used: the Hopkins symptom checklist-25 (HSCL-25)[4] and the post-traumatic stress disorder subscale of the Harvard trauma questionnaire (HTQ).[5] Both measures have been used in studies of refugee populations and previously translated and back-translated in several languages, including French, Spanish, and Arabic. For participants who spoke other languages, scales were translated by the interpreter. Demographic information and history of

| | Detained (n=35) | | Released (n=26) | |
|---|---|---|---|---|
| | Number (%) above recommended cut-off* | Symptom scores, mean (SD) | Number (%) above recommended cut-off* | Symptom scores, mean (SD) |
| **Baseline** | | | | |
| Anxiety | 28 (80%) | 2·40 (0·71) | 19 (73%) | 2·33 (0·72) |
| Depression | 30 (86%) | 2·52 (0·69) | 22 (85%) | 2·45 (0·65) |
| PTSD | 19 (54%) | 2·52 (0·62) | 10 (39%) | 2·45 (0·62) |
| **Follow-up** | | | | |
| Anxiety | 30 (86%) | 2·58 (0·80) | 9 (35%) | 1·59 (0·56) |
| Depression | 31 (89%) | 2·73 (0·70) | 10 (39%) | 1·65 (0·59) |
| PTSD | 21 (60%) | 2·63 (0·71) | 3 (12%) | 1·80 (0·56) |
| **Change in symptom scores†** | | | | |
| Anxiety | ·· | 0·17 (0·61) | ·· | −0·75 (0·84) |
| Depression | ·· | 0·21 (0·42) | ·· | −0·80 (0·81) |
| PTSD | ·· | 0·12 (0·51) | ·· | −0·64 (0·64) |

PTSD=post-traumatic stress disorder. *Cut-offs: 1·75 for HSCL-25 depression and anxiety subscales, 2·5 for HTQ. †p not significant for changes in any symptom score in detained group. p=0·0001 for all three symptom score changes in released group. Mean (SD) values are group mean at each assessment. Change=change in mean score from baseline assessment.

**Psychological symptoms of asylum seekers still detained and those released at follow-up**

For personal use. Only reproduce with permission from The Lancet.

BOIR 36 of 45

RESEARCH LETTERS



**Changes in psychological distress at follow-up**
PTSD=post-traumatic stress disorder.

traumatic experiences were elicited from participants' asylum applications. Detainees who could be located were followed up 2 months or more after the initial interview to assess psychological changes.

Spearman correlation coefficients were used to analyse the relation between length of detention, which had a skewed distribution, and psychological distress. Independent sample $t$ tests were used to assess differences in psychological distress between baseline and follow-up for patients who had been released and those still detained at follow-up.

Between Jan 1, 2001, and June 15, 2002, 87 detainees (73% of the caseload for the six agencies providing referrals) were referred to the study. Of these 87, 17 were excluded from the study: one was deported; ten were released before interview; one had been granted asylum but was still awaiting release; three did not complete the interview questionnaires; one withdrew the asylum claim; and one lost pro-bono legal support. Analyses are based on the remaining 70 participants (56 male, 14 female, mean age 28 years [SD 7·3; range 15–52]). Follow-up interviews were done at a median of 101 days (62–299) with 61 participants; 35 were still in detention and 26 had been released. Of the 26 released, 22 had been granted asylum and four released without asylum for medical or humanitarian reasons. Of the nine participants lost to follow-up: two had been deported; five could not be located; one had been transferred to another facility; and one refused to be interviewed. In April, 2003, 40 (57%) of the 70 participants had been granted asylum in the USA, and 14 individuals (20%) had been denied asylum and deported. Of the 40 individuals granted asylum, the median length of detention had been 7 months (2–42).

61 (87%) participants were detained in two INS detention centres and nine (13%) in three local government-run jails. The median length of detention before initial interview was 5 months (1–54). Most participants were from Africa (n=54), seven were from eastern Europe, four from Asia, two from the Middle East, and three from South America. 28 interviews were done in English, 17 in French, seven in Arabic, and 18 in other languages.

52 (74%) detainees had been tortured before immigration, 47 (67%) had been imprisoned in their native country, 41 (59%) reported the murder of a family member

or friend, and 18 (26%) reported sexual assault. 54 (77%) detainees had clinically significant symptoms of anxiety, 60 (86%) of depression, and 35 (50%) of post-traumatic stress disorder. 18 (26%) participants reported thoughts of suicide while in detention, and two reported having attempted suicide.

49 (70%) participants perceived their mental health as having worsened substantially while in detention, and this perception was supported by Spearman correlations between length of time in detention and baseline levels of anxiety ($r_s$=0·34, p=0·004), depression (0·28, p=0·017), and post-traumatic stress disorder (0·28, p=0·019). Baseline mental health scores did not differ significantly between detainees eventually released and those who remained in detention, although differences were significant at follow-up (table). Participants still detained at follow-up had increased symptom scores for anxiety, depression, and post-traumatic stress disorder, whereas those who had been released had lower scores on all three scales (p<0·0001; figure).

Nearly all the detainees in our study had clinically significant symptoms of anxiety, depression, or post-traumatic stress disorder, which worsened with time in detention and improved on release. Our findings support anecdotal observations of other researchers and highlight the concerns raised by health professionals about the adverse effect of detention on asylum seekers.[1,2]

A limitation of our study is that there was no comparison group of non-detained asylum seekers. Although our sample of released participants was confounded by the fact that most were also granted asylum, the significant correlation between symptom severity at baseline and length of time in detention supports the hypothesis that detention significantly contributed to psychological distress. However, our reliance on self-report questionnaires rather than diagnostic interviews might have increased the proportion of individuals assessed as having clinically significant distress. Additionally, sampling was not random, which might limit the general applicability of our results to the entire population of detained asylum seekers. Furthermore, although we have no reason to think that detained asylum seekers represented by pro-bono legal groups differ from other detained asylum seekers, we cannot be certain.

Some participants could have deliberately exaggerated psychological symptoms, past traumatic experiences, or both, in order to bolster their asylum claims—despite being informed that their asylum application would not be affected by their responses. Nevertheless, the large proportion of participants ultimately granted asylum lends credence to their reports. Furthermore, there was no difference in reported distress at baseline or premigration traumatic experiences between detainees who were or were not granted asylum. Finally, despite a marked reduction in symptoms after release, many participants still had high levels of psychological distress, suggesting that symptom endorsement was not solely motivated by secondary gain.

Despite the limitations of this study, our results suggest that detaining asylum seekers exacerbates symptoms of depression, anxiety, and post-traumatic stress disorder in this vulnerable population. Our findings suggest that

For personal use. Only reproduce with permission from The Lancet.

policies concerning detention of asylum seekers should be reviewed, and highlight the need for mental health intervention to address the psychological needs of these individuals.

*Contributors*
A Keller, D Ford, C Trinh-Shevrin, J Leviss, H Smith, K Allden, and G Kim conceived and designed the study. A Keller, C Meserve, E Sachs, J Leviss, E Singer, H Smith, and J Wilkinson participated in the acquisition of data. E Sachs coordinated data collection. C Trinh-Shevrin and B Rosenfeld did statistical analyses. A Keller, B Rosenfeld, C Trinh-Shevrin, D Ford, C Meserve, J Leviss, E Sachs, and B Rosenfeld participated in analysis and interpretation of data. All authors helped to write the report.

*Conflict of interest statement*
None declared.

*Acknowledgments*
This study was done by the Bellevue/NYU Program for Survivors of Torture and Physicians for Human Rights. We are grateful to Eleanor Acer, Anwen Hughes, Lin Piwowarczyk, and Jon Hubbard for their assistance in developing this project. Zachary Steele, Derrick Silove, and Richard Mollica also provided invaluable insight into issues concerning the health of detained asylum seekers. We thank the INS staff at headquarters and at the detention facilities for their courtesy and cooperation with this study. We thank the following organisations for their cooperation in referring individuals for participation in this study: American Friends Service Committee, Catholic Legal Immigration Network, Circle York, The Lawyers Committee for Human Rights, New York Association for New Americans, and Hebrew Immigrant Aid Society. We also thank Suzanne Dieter for background research; Melanie Jay, Alyssa Finlay, Amina Chaudry, and Joshua Lee for helping with interviews; Caroline Lai and Angela Lee for data entry; and Vincent Iacopino, Frank Davidoff, and Barbara Ayotte for reviewing the manuscript. Support for this research was provided by a grant from the Jeht Fund of the New York Community Trust and the Morton K and Jane Blaustein Foundation. A Keller was supported by a Soros Advocacy Fellowship from the Medicine as a Profession Program of the Open Society Institute. Funding sources had no role in study design, data collection, data analysis, data interpretation, writing of the report, or decision to submit the paper for publication.

1 Keller A, Ford D, Sachs E, et al. From persecution to prison: the health consequences of detention for asylum seekers. Boston and New York City: Physicians for Human Rights and the Bellevue/NYU Program for Survivors of Torture, 2003. http://www.phrusa.org/campaigns/asylum_network/detention_execSummary/(accessed October, 2003).

2 Silove D, Steel Z, Mollica R. Detention of asylum seekers: assault on health, human rights, and social development. *Lancet* 2001; 357: 1436–37.

3 Amnesty International. Lost in the labyrinth: detention of asylum seekers. New York: Amnesty International, 1999.

4 Mollica RF, Wyshak G, de Marneffe D, Khoun F, Lavelle J. Indochinese versions of the Hopkins symptom checklist-25: a screening instrument for the psychiatric care of refugees. *Am J Psychiatry* 1987; 144: 497–500.

5 Mollica RF, Caspi-Yavin Y, Bollini P, Truong T, Tor S, Lavelle J. The Harvard trauma questionnaire: validating a cross-cultural instrument for measuring torture, trauma, and post traumatic stress disorder in refugees. *J Nerv Ment Dis* 1992; 180: 111–16.

**Bellevue/New York University (NYU) Program for Survivors of Torture, Division of Primary Care Medicine, Department of Medicine** (A S Keller MD, C Meserve MD, H Smith PhD, E Sachs BA, J Wilkinson MS), **Institute for Urban and Global Health** (C Trinh-Shevrin MS), and **Department of Emergency Services** (E Singer MD), **NYU School of Medicine, New York, NY 10016, USA; Department of Psychology, Fordham University, Bronx, NY** (B Rosenfeld PhD); **New York City Health and Hospitals Corporation, New York, NY** (J A Leviss MD); **Department of Medicine, Harvard Medical School, Boston, USA** (G Kim MD); **Department of Psychiatry, Dartmouth Medical School, Hanover, NH, USA** (K Allden MD); and **Physicians for Human Rights, Boston, MA** (D Ford JD, A S Keller)

**Correspondence to:** Dr Allen S Keller, Bellevue/NYU Program for Survivors of Torture, Bellevue Hospital, 462 First Avenue, CD710, New York, USA (e-mail: allen.keller@med.nyu)

# Association of intercellular adhesion molecule-1 gene with type 1 diabetes

Sergey Nejentsev, Cristian Guja, Rose McCormack, Jason Cooper, Joanna M M Howson, Sarah Nutland, Helen Rance, Neil Walker, Dag Undlien, Kjersti S Ronninger, Eva Tuomilehto-Wolf, Jaakko Tuomilehto, Constantin Ionescu-Tirgoviste, Edwin A M Gale, Polly J Bingley, Kathleen M Gillespie, David A Savage, Dennis J Carson, Chris C Patterson, A Peter Maxwell, John A Todd

Intercellular adhesion molecule-1 (ICAM-1) functions via its ligands, the leucocyte integrins, in adhesion of immune cells to endothelial cells and in T cell activation. The third immunoglobulin-like extracellular domain binds integrin Mac-1 and contains a common non-conservative aminoacid polymorphism, G241R. Phenotypically, ICAM-1 has been associated with type 1 diabetes, a T-cell-mediated autoimmune disease. We assessed two independent datasets, and noted that R241 was associated with lower risk of type 1 diabetes than is G241 (3695 families, relative risk 0·91, p=0·03; 446 families, 0·60, p=0·006). Our data indicate an aetiological role for ICAM-1 in type 1 diabetes, which needs to be confirmed in future genetic and functional experiments.

*Lancet* 2003; **362:** 1723–24

The molecular mechanisms underlying type 1 diabetes are partly known. Three disease loci have been identified so far: the human leucocyte antigen (HLA) complex, the variable number tandem repeat locus located in the promoter region of the insulin gene (*INS*), and the cytotoxic T lymphocyte-associated antigen-4 gene (*CTLA4*).[1] The known functions of these genes suggest that T-cell activity is an important pathway in development of type 1 diabetes. Results of research in the mouse shows that ICAM-1 function during immune priming is necessary for the generation of effector T cells capable of destroying pancreatic insulin-producing β cells.[2] Genetic analysis of the ICAM-1 gene in families affected by type 1 diabetes could indicate whether its function has a causal role in the disease.

*ICAM1* is located on chromosome 19p13 in a region that has shown some evidence of linkage to type 1 diabetes.[3] Two non-synonymous single nucleotide polymorphisms are known to be frequent in European populations: G→A in exon 4 encoding G241R, and A→G in exon 6 encoding K469E (rs1799969 and rs5030382, respectively; http://www.ncbi.nlm.nih.gov/SNP/).[4] The K469E polymorphism has been investigated in type 1 diabetes in small samples, with variable results.[5] We assessed association of these two *ICAM1* coding polymorphisms in a sample of 3695 families affected by type 1 diabetes.

All family members were white, from Europe or the USA, with at least one affected child in every family (table). Mean age at onset of the affected offspring was 9·3 years (range 0–50). We obtained approval from the relevant research ethics committees and written informed consent of participants. DNA samples were genotyped with Invader (Third Wave Technologies, Madison, WI, USA) and TaqMan (Perkin Elmer Applied Biosystems, Foster City, CA, USA) assays. We recorded 99·5% concordance between these methods in 1242 samples tested to assess error in genotyping of the G241R polymorphism. Statistical analysis was done with STATA (version 8.1). Calculations of p values and 95% CI of relative risk (RR) were based on robust variance estimates, used to correct for clustering of affected individuals within families.

K469E did not show any association with the disease: K469 was transmitted 1931 times of 3897 (49·6%, p=0·59). By contrast, R241 was transmitted significantly less often: 938 transmissions of 1974 (47·5%, p=0·03; table). To control for the possibility that genotyping error or transmission ratio

For personal use. Only reproduce with permission from The Lancet.

EOIR 38 of 45

Filed at Bryon: 7/27/2022 at 9:57:13 p.m. Central Daylight Time

open

BJPsych open (2021)
7, e204, 1–8. doi: 10.1192/bjo.2021.1026

CrossMark

## Review

# Prevalence of psychiatric disorders among refugees and migrants in immigration detention: systematic review with meta-analysis

Irina Verhülsdonk, Mona Shahab and Marc Molendijk

**Background**

The number of forced migrants is increasing worldwide. Some governments detain refugees and migrants in immigration detention centres, which is associated with adverse mental health outcomes.

**Aims**

To estimate prevalence rates of depression, anxiety and post-traumatic stress disorder (PTSD) in child and adult refugees and migrants in immigration detention.

**Method**

Pre-registered systematic review with meta-analysis (Prospero ID: CRD42020196078).

**Results**

Systematic searches in Medline, Embase and Web of Science (final search date 1 October 2020) yielded nine eligible studies on the mental health of detained refugees and migrants (total $n = 630$ refugees and migrants, 522 of them in detention, among which 26 were children). For adults, prevalence rates for depression were 68% (95% CI 0.53–0.83%), for anxiety 54% (95% CI 0.36–0.72%) and for PTSD 42% (95% CI 0.22–0.63%). Theoretical comparisons with data from other meta-analyses

revealed that prevalence rates and symptom severity were higher in detained, relative to non-detained samples.

**Conclusions**

Our data show a huge burden of mental health problems in detained refugees and migrants of all ages, also relative to non-detained samples. This suggests that immigration detention independently and adversely affects the mental health of refugees and migrants. This insight should encourage countries to minimise the use of immigration detention and implement alternative measures instead.

**Keywords**

Refugees; immigration detention; depression; anxiety; PTSD.

**Copyright and usage**

© The Author(s), 2021. Published by Cambridge University Press on behalf of the Royal College of Psychiatrists. This is an Open Access article, distributed under the terms of the Creative Commons Attribution licence (https://creativecommons.org/licenses/by/4.0/), which permits unrestricted re-use, distribution, and reproduction in any medium, provided the original work is properly cited.

## Background

In the past two decades, forced migration and the displacement of people have reached a new high.[1] Forced by war, civil conflicts, (natural) disasters, persecution or other violations of human rights, 82.4 million people worldwide have been forced to flee their homes by June 2021.[2] Among them are internally displaced people, refugees and asylum seekers. Internally displaced people, representing the majority of forced migrants (around 48 million people) are those who have been 'forced or obliged to flee from their home or place of habitual residence, in particular as a result of or in order to avoid the effects of armed conflicts, situations of generalised violence, violations of human rights or natural or human-made disasters' and have not crossed 'an internationally recognised State border'.[3] Refugees are the second largest group among those forcefully displaced (around 20.7 million people).[2] According to the 1951 Refugee Convention, a refugee is 'unable or unwilling to return to their country of origin owing to a well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group, or political opinion'.[4] The third and smallest group (around 4.1 million people) are asylum seekers.[2] Whereas refugees are already under a form of protection, asylum seekers are still awaiting a decision whether or not they will be granted protection.[5] Terms to refer to these groups are used inconsistently and interchangeably. The International Organization for Migration defines irregular migrants as individuals moving 'outside the regulatory norms of the sending, transit and receiving countries'.[6] In this article, we will follow the

recommended practice of the United Nations High Commissioner for Refugees (UNHCR) and use 'refugees and migrants' as a generic term to refer to internally displaced people, refugees, asylum seekers and irregular migrants as defined above.[7,8] Forced migration in general is associated with adverse mental health outcomes because of different pre-, peri- and post-migration factors.[9,10]

Refugees and migrants may be exposed to potentially traumatic events and other stressful situations that can occur before migration, during migration and after arrival in the receiving country. As a result, refugees and migrants are particularly vulnerable to psychiatric problems, such as symptoms of depression, post-traumatic stress disorder (PTSD) or anxiety.[11–13] Upon arrival many countries regularly detain refugees and migrants.[14,15] The International Organization for Migration defines immigration detention as 'the deprivation of liberty for migration-related reasons'.[16] According to the UNHCR, confinement that is enforced 'within a narrowly bounded or restricted location ... and where the only opportunity to leave this limited area is to leave the territory' qualifies as immigration detention, for example in prisons, detention facilities or closed camps.[17] Immigration detention is mostly used as a tool to manage migration by speeding up the asylum process. Immigration detention assures compliance with the migration process decision and facilitates efficient deportation after irregular entry, irregular residence or after the commitment of a criminal offence.[14,18]

Even though immigration detention centres mostly do not have a punitive purpose as prisons do, detainees perceive them as punishing and even worse than prisons.[19] Reliable statistics on how many

EOIR 39 of 45

Filed at BIA on: 7/27/2022 at 9:57:13 p.m. Central Daylight Time
Vermeulen R et al.

individuals are currently in detention on a worldwide scale are not available.[20] In the USA, in 2019, 143 099 forced migrants were arrested, and the average population in detention centres per day amounted to 50 165. On average, detainees spent 34.3 days in so-called US Immigration and Customs Enforcement detention facilities.[21] In Canada, between 2019 and 2020, 8825 people were detained in total and spend on average 13.9 days in so-called immigration holding centres.[22] In Australia, 1440 people were detained in immigration detention centres at 31 August 2021; the majority of them (95%) have been detained for more than 31 days at that point, more than a quarter of them (35%) for more than 2 years.[23] Australia is particularly being criticised for implementing offshore detention facilities, that are inhumane and unsafe for their detainees.[24,25] In the UK, between April 2019 and March 2020, 23 075 people were detained.[26] Many other countries implement immigration detention but do not share statistics.[15]

### The association between immigration detention and mental health

Research on the underlying mechanisms through which immigration detention could have an impact on mental health remains scarce. Some detainees fear their safety because of inhumane conditions, criminalisation, and physical and verbal abuse by the officers. They may often experience uncertainty concerning their future and remain isolated the majority of their time, and experience a loss of control.[27–30] Studies suggest that the deterioration of mental health in detainees may be related to the loss of agency that is reported by detainees. Refugees and migrants who have experienced lengthy asylum processes often feel trapped, as if they were 'boxed in', and report being helpless and hopeless.[31] The confinement of refugees and migrants has been associated with adverse mental health effects.[28–31] Upon release from detention, a substantial proportion of the detainees report symptoms of depression, anxiety and PTSD. They often withdraw themselves from others, fearing rejection or exclusion.[29,32–34] The only efficient way to improve the detainees' mental health is to release them from detention.[35]

Detained children are at an even higher risk of experiencing symptoms of depression, anxiety or self-harm and this may be as a result of the lack of parental support. Their parents are often distressed and emotionally unavailable, and children have no sense of adult protection.[36] The detention itself, the exposure to potentially traumatic events in detention as well, and the absence of parental support may negatively affect the children's mental health. Because of its adverse effects, the implementation of immigration detention centres has been repeatedly criticised.[15,27,28] Even though the UNHCR, among others, has urged countries to apply alternative solutions,[15,19] immigration detention continues to be a widely used method.[15,20,37]

### The current meta-analysis

Von Werthern and colleagues[37] performed a systematic review of the impact of immigration detention on mental health. They concluded that detained refugees and migrants experience more severe symptoms of anxiety, depression, PTSD and a lower quality of life than non-detained refugees and migrants. Furthermore, symptoms are more severe when the detainees are isolated. Filges and colleagues[18] applied meta-analytical methods and found preliminary evidence that immigration detention has an independent role in deteriorating mental health. The authors also conclude that the more time refugees and migrants spend in immigration detention, the more accentuated the symptoms become. However, this evidence derives from only two studies that head-to-head compared detained and non-detained refugees and

migrants. Owing to ethical considerations, controlled studies on mental health in detained samples are scarce if not non-existant.[33,38]

The current meta-analysis aims to provide an updated systematic review of the existing body of literature and to add to the previously conducted meta-analytical methods by including single-group studies in the analysis. We thereby address the following research question: are refugees and migrants under immigration detention at increased risk for psychiatric disorders, such as anxiety, depression and PTSD, compared with refugees and migrants in community settings or other non-confining environments?

### Method

The execution and reporting of this meta-analysis followed the guidelines as defined in the PRISMA statement.[39] A drafted protocol for this meta-analysis was pre-registered in the International Prospective Register of Systematic Reviews (PROSPERO), registration number: CRD42020196078.

### Search and selection strategy

A computer-based search was performed using Embase, Medline, Web of Science and Google Scholar.[40] The formulation of search strings followed the strategy by Filges and colleagues.[41] The search terms were all related to immigration detention. In Supplementary Table 1 available at https://doi.org/10.1192/bjo.2021.1026, we present the complete search strategy. The reference lists of systematic reviews and meta-analyses that were conducted on the topic before, as well as included studies, were additionally reviewed for eligible studies. Only articles that were written in English, German, French, Spanish or Dutch were considered. The literature search was carried out, independently, by two researchers (I.V. and M.M.), who also independently screened the identified articles' titles and abstracts to assess their eligibility. If it was ambiguous whether a study was eligible, the study was assessed in full. Based on the inclusion and exclusion criteria, a conclusion was made on the eligibility of the study. Disagreement was resolved through discussion and consensus.

### Inclusion and exclusion criteria

Inclusion was not limited to comparison studies but extended to single-group, prospective and retrospective cohort studies, case–control studies, cross-sectional studies and multiple case series.

Articles were included when the sample consisted of refugee or migrant populations who were in immigration detention either at the time of the study or who were released from immigration detention. For comparison studies, we included studies that contained a refugee or migrant sample that was not in detention either before or during the time of assessment as a control group. Studies were eligible when individuals were in immigration detention in a country other than their home country and when detention had immigration purposes. Studies that reported prevalence rates or mean severity scores on depression, anxiety disorder, PTSD or other psychiatric disorders, assessed through clinical diagnostic interviews or using the validated cut-off score on self-report questionnaires were included.

Articles were excluded when the detention had a punitive purpose solely, and when detention was not depriving the liberty of movement (such as semi-open centres), when they did not report original data or when participants were selected based on the outcome. In cases where data on the prevalence or the mean severity score of psychiatric disorders were missing in articles where it was expected that such data were gathered, the corresponding authors of these particular articles were contacted with the



**Fig. 1** Flow chart on identification, screening and inclusion of eligible articles.

PTSD, post-traumatic stress disorder.

request to share relevant data. Only if the data could not be acquired was the study excluded. We did not implement additional exclusion criteria for the comparison group, as it is challenging to find a suitable control group and approaches in doing so differ among studies.[18] Studies were not excluded based on methodological quality.

### Assessment of methodological quality

Included studies were assessed on their methodological quality independently by two of the authors (I.V. and M.M.). The methodological quality was assessed using the quality assessment tool recommended by the US Department of Health and Human Services.[42]

### Data extraction and management

Information on the prevalence of depression, anxiety disorders, PTSD or other psychiatric disorders, participant characteristics, detention characteristics, assessment type, time of assessment (during versus post-detention), sample size and research design were extracted, in duplicate, by two researchers (I.V. and M.M.).

### Statistical analysis

The analyses were conducted using the software Jamovi and the *metafor* package for meta-analyses.[43] We used the random-effects model with 95% CI for data synthesis.[44] Pooled prevalence rates of anxiety, depression and PTSD were calculated for child/adolescent and adult detained refugees and migrants separately for data derived by self-report and diagnostic interviews.

The $I^2$ measure was used as a measure for statistical heterogeneity. To explore statistical heterogeneity, moderator analyses were performed with age (child versus adult samples), gender distribution, host country, time of assessment and assessment type as predictors. Publication bias was assessed by means of Kendall's Tau rank correlation test for the assessment of funnel plot asymmetry. Statistical significance was set at $P < 0.05$.

### Theoretical comparison

The pooled prevalence rates of detained refugees and migrants were compared with prevalence rates for non-detained refugees and migrants as reported in the meta-analysis by Henkelmann and colleagues.[9] Theoretical comparisons were also made with continent-specific prevalence rates of anxiety, depression and PTSD in general adult and child/adolescent populations.

For the purpose of comparability among samples, we choose estimates derived through a diagnostic interview. The estimates on prevalence rates for non-detained refugees and migrants were derived from the three most recent meta-analyses on non-detained refugees and migrants.[9,10,45] Studies that reported on detained refugees were excluded from the Henkelmann and colleagues (2020) data[9] and prevalence rates were re-calculated prior to comparisons.

## Results

### Description of studies

The search was performed between July 2020 and 1 October 2020. Overall, we identified 3529 citations after the removal of duplicates. After screening these records, 93 studies were assessed in full text for eligibility. Fig. 1 outlines the search and selection process. Nine independent studies were included in the review, reporting on a total of 630 participants, 522 of them were in immigration detention before or at the time of the study. Key characteristics of the included studies can be found in Table 1.

The included studies predominantly assessed depression, anxiety and PTSD. For the assessment of depression and anxiety, different instruments were used (see Supplementary Table 2). Supplementary Table 3 provides single-study prevalence rates for other disorders. Country-specific differences in detention policy and approach are provided in Supplementary Table 4.

https://doi.org/10.1192/bjo.2021.1026 Published online by Cambridge University Press

Filed at BIA on: 7/27/2022 at 9:57:13 p.m. Central Daylight Time
Vernandooir et al

**Table 1** Description of studies included in the meta-analysis of the prevalence of psychiatric disorders among forced refugees and migrants in immigration detention

| Author (year) | Assessment | n, detained | n, non-detained | Age, years: mean | Female, % | Country of origin | Host country | Year of assessment | Months in detention[a] | Meta-analysis[b] |
|---|---|---|---|---|---|---|---|---|---|---|
| **Adults** | | | | | | | | | | |
| Coffey et al (2010)[29] | Diagnostic interview post-detention | 17 | – | 42 | 5.88 | Asia, Africa, Europe | Australia | 2007–2009 | x̄: 38 | I, III |
| Cleveland & Rousseau (2013)[46] | Diagnostic interview/self-report during detention[c] | 122 (asylum seekers) | 66 (asylum seekers) | 31.6 | 40.96 | Africa, Asia, South America and Europe | Canada | 2010–2011 | x̄: 1 | I, II, III |
| Ehntholt et al (2018)[53] | Diagnostic interview post-detention | 35 | – | 19.1 | 40 | Africa, Asia | UK | 2004–2006 | x̄: 0.76 | I, III |
| Graf et al (2013)[47] | Diagnostic interview during detention | 80 | – | 29.9 | 0 | Africa, Europe | Switzerland | 2007–2008 | – | I, II, III |
| Keller et al (2003)[48] | Diagnostic interview during detention | 61 | – | 28 | 20 | Africa, Europe, Asia, South America | USA | 2001–2002 | x̄: 5 | I, II, III |
| Robjant et al (2009)[49] | Self-report during detention | 66 | 42 (asylum seekers) | 29.5 | 32.88 | – | UK | – | x̄: 1 | I, II, III |
| Sen et al (2018)[50] | Diagnostic interview during detention | 101 | – | 31.65 | 0 | Asia, Africa | UK | 2014–2015 | – | I, II, III |
| Steel et al (2004)[51] | Diagnostic interview post-detention | 14 | – | – | 64.29 | Not disclosed to protect anonymity | Australia | 2002–2003 | x̄: 28 | I, III |
| **Children** | | | | | | | | | | |
| Lorek et al (2009)[52] | Self-report during detention | 6 | – | – | 50 | Asia, Jamaica, North America | UK | 2006 | – | I, II, III |
| Steel et al (2004)[51] | Diagnostic interview post-detention | 20 | – | – | 40.9 | Not disclosed to protect anonymity | Australia | 2002–2003 | x̄: 28 | I, III |

a. x̄ = mean, x̃ = median.
b. I, Depression, prevalence; II, Anxiety, prevalence; III, PTSD, prevalence.
c. Assessed using self-report questionnaires; due to literacy problems, clinical interviews were implemented for some of the participants.

## Quality assessment

Methodological quality scores for the included studies ranged between 4 and 9.5 (mean 6.3, s.d. = 2.4). The interrater reliability of the quality assessments was high ($\kappa = 0.88$, s.e. = 0.04).[53] In the Supplementary Tables 5 and 6, information on the methodological scores can be found.

## Prevalence rates of depression, anxiety and PTSD in detained refugees and migrants

Pooled prevalence rates were 0.72 for depression (see Supplementary Figure 1), 0.55 for anxiety (see Supplementary Figure 2) and 0.45 for PTSD (see Supplementary Figure 3) for detained refugees and migrants.

For an overview of prevalence rates for depression, anxiety and PTSD in adult and child detainees, see Table 2. Heterogeneity was high in all cases. There was no evidence of publication bias in any of the analyses (see Table 2).

## Prevalence rates of depression, anxiety and PTSD in detained compared with non-detained refugees and migrants

Only two studies met the inclusion criteria for a direct comparison between detained and non-detained refugees and migrants.[46,49] Therefore, comparative prevalence rates could not be calculated for either depression, anxiety or PTSD.

Among the eligible studies, three included a control group. Keller and colleagues[48] compared the prevalence rates for anxiety, depression and PTSD in detained versus released non-detained asylum seekers. Their study did not meet our inclusion criteria for comparative analysis, as the control group was in detention at baseline, too. Participants were interviewed twice; at follow-up, the symptoms of the detained sample significantly deteriorated. The detained sample reported significantly higher levels of depression (0.89 v. 0.35), anxiety (0.86 v. 0.35), and PTSD (0.60 v. 0.12) than the non-detained sample.[48]

The two studies that met inclusion criteria reported on refugees and migrants living in community settings as a control group. In both studies, the control group had not been detained before.[46,49] Cleveland & Rousseau report that significantly more participants in the detained group met the criteria for depression (0.78 v. 0.52), anxiety (0.63 v. 0.47) and PTSD (0.32 v. 0.18) than in the non-detained control group.[46] Robjant and colleagues compared detained asylum seekers with non-detained asylum seekers living in community settings and former prisoners. The latter control group did not match our inclusion criteria. Detained asylum seekers reported higher mean and prevalence rates for depression (0.76 v. 0.26), anxiety (0.72 v. 0.50), and PTSD (mean 68.02 v. 54.35).[49]

## Moderators for pooled prevalence rates in detained refugees and migrants

Pooled prevalence estimates for depression and PTSD did not differ significantly for adults compared with children ($P = 0.28$ and 0.69, respectively) (for stratified analyses, see Supplementary Table 7). The age of the sample and host country did not have a significant moderating effect on the prevalence rates of depression ($P = 0.27$ and 0.08, respectively), anxiety ($P = 0.57$ and 0.97 respectively) or PTSD ($P = 0.79$ and $P = 0.23$, respectively). The time of assessment (during v. post-detention) and the type of assessment (interview v. self-report questionnaire) did not have a significant moderating effect on the prevalence rates of depression ($P = 0.61$ and $P = 0.56$, respectively) or PTSD ($P = 0.53$ and $P = 0.29$, respectively). Prevalence rates of anxiety were also not associated with type of assessment ($P = 0.32$) The percentage of female participants in the sample was positively associated with the prevalence rate of

https://doi.org/10.1192/bjo.2021.1026 Published online by Cambridge University Press

**Table 2**  Prevalence rates of depression, anxiety and post-traumatic stress disorder with 95% CI

|  | Studies, $n$ | Participants, $n$ | Prevalence (95% CI) | $I^2$ | Kendall's Tau[a] |
|---|---|---|---|---|---|
| Adults |  |  |  |  |  |
| Depression | 9 | 496 | 0.68 (0.53–0.83) | 93.88*** | −0.22 |
| Anxiety | 6 | 429 | 0.54 (0.36–0.72) | 93.85*** | 0.2 |
| Post-traumatic stress disorder | 7 | 395 | 0.42 (0.22–0.63) | 95.61*** | 0.52 |
| Children/adolescents |  |  |  |  |  |
| Depression | 2 | 26 | 0.83; 0.95[c] | NA*** | NA |
| Anxiety[b] | 1 | 6 | 1.00 | NA | NA |
| Post-traumatic stress disorder | 2 | 26 | 0.17; 0.5[c] | NA*** | NA |

NA, not applicable.
a. Kendall's Tau; rank correlation test for funnel plot asymmetry. A significant correlation is an indication for the presence of publication bias.
b. Only one of the included studies[41] reported on anxiety prevalence data for children.
c. Only two of the included studies 51,52 reported on depression and PTSD prevalence data for children.
*** $P < 0.001$.

depression ($r = 0.58$, $P = 0.03$) but not with the prevalence rate of anxiety and PTSD ($P = 0.09$ and 0.19, respectively).

### Theoretical comparison

Prevalence rates for all three disorders were considerably higher in adults and child/adolescent detained refugees and migrants, notably for depression and anxiety, relative to non-detained refugees and migrants,[8] (see Supplementary Table 8). Supplementary Table 9 provides an overview of the prevalence estimates for depression, anxiety and PTSD in detained and non-detained refugees and migrants.[9,10,45]

## Discussion

### Summary of main results

The present meta-analysis shows that three out of four detained refugees and migrants experienced depression, more than half of them experienced anxiety, and almost half of them experienced PTSD. Prevalence rates for all three disorders are around twice as high in detained relative to non-detained refugees and migrants. In line with studies on gender differences and depression,[54] our data shows that estimated prevalence rates were higher in females; however, gender did not have a significant moderating effect on either anxiety or PTSD.

In previously conducted systematic reviews, von Werthern and colleagues[37] and Filges and colleagues[18] concluded that immigration detention exacerbates and elicits depression, anxiety and PTSD symptoms. Our current meta-analysis gives further evidence for an independent and negative effect of immigration detention on mental health.

### Immigration detention and the aversive impact on mental health

The literature states that exposure to trauma, especially torture, is linked to PTSD symptoms in a dose-dependent manner, and the severity of pre-migration war-related traumatic events negatively influence trauma-related mental health, such as depression, anxiety and PTSD.[32,55,56] However, trauma as a stressor cannot solely explain the deterioration of refugees' and migrants' mental health. Contextual factors in the hosting country have a significant impact.[57,58] Symptoms of depression, anxiety and PTSD have been associated with post-migration factors, such as holding a temporary visa, insecurity about visa status, no access to health services and being separated from society.[13,59–61] Refugees and migrants who are integrated into society or hosted in a supportive environment experience fewer symptoms of depression, distress and PTSD than refugees and migrants separated from society.[27,61,62] Hence,

as expected, prevalence rates of depression and PTSD are higher among non-detained refugees and migrants than among non-refugee or migrant populations.[10,63,64] Given lack of experimental control, it remains inconclusive whether immigration detention causally elicits or exacerbates anxiety, depression and PTSD symptoms.

Keller and colleagues[48] published the first study that directly compared symptom scores within-subjects during detention and after being released from detention. They found that depression, anxiety and PTSD symptoms increased with detention length and decreased upon release. Our results did not yield a significant difference between symptoms during detention and post-detention and therefore do not support their finding. In a longitudinal study on asylum seekers holding a temporary protection visa released from immigration detention, Steel and colleagues[34] found that overall mental health did not improve or even deteriorated further 2 years upon release, compared with after being released from detention. Prospective studies investigating whether mental health improves or deteriorates upon release from detention are scarce. Future research should investigate the development and the content of the PTSD, depression and anxiety symptoms in detained and released refugees and migrants to shed more light on the theoretical explanation of elevated levels of depression, anxiety and PTSD.

### Strengths and limitations

A strength of our meta-analysis is our broad approach (we included studies focusing on detained samples without a control group and studies using different assessment methods). Additionally, we implemented a comprehensive search strategy. We assume, therefore, that all relevant studies on the effect of immigration detention on refugees' and migrants' mental health were identified and included in the present meta-analysis.

The methodological score for most studies was good. All included studies were observational; hence, no causal conclusions can be drawn. However, ethical issues rule out the implementation of randomised controlled comparison studies on the impact of immigration detention on mental health. As the included studies used convenience, opportunity or snowball sampling, confounding factors are likely to have an impact on the results of the included studies.

Heterogeneity among studies was high, and the source of the high heterogeneity between studies remains mostly unclear. It is possible that differences between countries, detention centres, visa status or demographic characteristics of the sample accounted for the heterogeneity. Unfortunately, the data reported in the studies was insufficient to specify the impact of those variables, and moderator analyses to investigate their impact were most likely underpowered. Also, it is possible that country-specific policies, such as

defining refugees and migrants for an indefinite versus a definite time period, may lead to increased symptoms of depression, anxiety and PTSD. In addition, it is possible that symptoms differ when comparing detention centres managed by private companies compared with federal institutions. In the USA, for example, conditions in private immigration detention centres were less humane compared with federal immigration detention centres.[65] We had too little data on these potential moderator variables to actually perform such comparisons. Further studies are needed to investigate differences between refugee and migrant samples from different backgrounds and residing in different host countries and institutions.

One source of heterogeneity is the difference in sampling methods between studies. Ehntholt and colleagues[33] reported mental health data obtained from previously detained refugees who were in a legal process to get compensated for being unlawfully detained as minors. Participants were informed that the mental health assessment aimed to support their legal case. In the studies by Lorek and colleagues[52] and by Steel and colleagues,[51] participants responded to an advertisement for free legal assistance to challenge individual detention. Participants in these studies could have exaggerated their symptoms to increase their chances of compensation or being released. It is also possible that the detention's unlawful character increased symptoms of anxiety, depression and PTSD in the study by Ehntholt and colleagues[33] and that those who reached out for legal assistance in the samples studied by Lorek and colleagues[52] and Steel and colleagues[51] are most severely affected by immigration detention. Although the results were not significantly different when those three references were excluded from analysis, further research with greater statistical power is needed to exclude with certainty the possibility that symptoms were not higher in those samples.

Second, our results most likely do not provide a complete picture of the impact of immigration detention on mental health. Very few studies reported on psychiatric disorders other than depression, anxiety or PTSD. Previous research shows that disorders such as personality disorders and psychosis are more prevalent among detained than non-detained refugees and migrants.[47,50] However, more research on a broader spectrum of psychiatric disorders among refugees and detained migrants is needed to further shed light on this. Also, the pooled prevalence rates are based on samples from only five different countries. However, many other countries implement immigration detention and the conditions vary between detention. Prevalence rates for mental health disorders may be higher in detention centres that are known for their inhumane conditions. Australia, for example, is being criticised for their offshore detention policies.[66] A study that did not meet inclusion criteria because it was not peer reviewed showed that on Manus Island, 90% of detained asylum seekers report symptoms of depression, anxiety and PTSD.[67] An investigation by UNHCR revealed that almost 90% of asylum seekers in Papua New Guinea met criteria for depression and anxiety, and almost 80% of them for PTSD.[68] Other countries are infamous for their inhumane conditions in their detention centres. For example, in immigration detention centres in Libya,[69,70] detainees endure deprivation of food, water and medical supplies. They often report being sexually assaulted, raped and tortured.[71] Humanitarian organisations, such as Doctors without Borders or UNHCR, witness adverse effects on the detainees' mental health. However, to our knowledge, no empirical research on the detainees' mental health has been conducted yet. It is possible that prevalence rates are higher when studies are conducted in countries known for their inhumane conditions.

Third, among the studies that included a control group,[46,48,49] the samples differed considerably. Keller and colleagues[48]

administered a mixed design. They studied detained refugees and migrants and compared between- and within-subjects, including a follow-up, at which time part of the sample was released from detention. Their study did not match inclusion criteria. Cleveland & Rousseau[46] and Robjant and colleagues[49] included asylum seekers in community settings who had not been held in detention before as a control group. As a result of the scarceness of studies including a control group and the heterogeneity among those who did, pooled prevalence rates for depression, anxiety and PTSD could not be derived to directly compare detained and non-detained samples.

Fourth, using psychiatric concepts such as depression, anxiety and PTSD are limited in investigating the detainees' symptoms. Those concepts are subject to cultural bias. The instruments used may fail to consider culture-specific expressions of symptoms.[72] Additionally, some populations tend to report lower symptom scores compared with high-income populations. Those differences are unlikely to decrease the comparability between detained and non-detained refugees and migrants. However, when putting the prevalence rates into broader perspective and comparing them with the prevalence rates of high-income populations or other non-migrant populations, it is important to consider that the symptoms of detainees are most likely to be underreported.[73] Additionally, in clinical interviews and especially in self-report questionnaires, differentiating between emotional distress as a reaction to adverse circumstances and symptoms of an underlying mental disorder remains challenging.[36]

A final limitation is the lack of comparability between the prevalence data in our sample and the non-detained refugee and migrant sample from the most recent meta-analyses on refugee mental health by Henkelmann and colleagues[9] and Blackmore and colleagues.[10,45] These comparisons are not ideal because of the heterogeneity between samples. Such pooled prevalence data can, however, give a first indication for the direction of the impact of immigration detention. Further research is needed to draw more sound conclusions about the mental health of detained compared with non-detained refugees and migrants.

## Implications

In conclusion, immigration detention is associated with independent adverse effects on the mental health of refugees and migrants. Our results strengthen the findings of the previous systematic reviews[18,37,49,74] that immigration detention harms the mental health of detained refugees and migrants.

Refugees and migrants are a vulnerable sample owing to various pre- and peri-migration factors.[11–13] Based on our results, it could be argued that immigration detention should no longer be implemented to avoid further mental health deterioration. The aversive effects are likely to outweigh the reasons why some countries employ immigration detention. Countries claim to use immigration detention to guarantee that detainees are present at their proceedings, to ensure that they cannot be a flight risk when they are to be removed, to establish their identity, security status and their health.[15,21,22,75,76] Receiving countries should use alternative settings to host refugees and migrants. The Council of Europe[77] and the UNHCR[2] suggest different arrangements, such as community care, residential facilities or open settings in which forced migrants are required to regularly check-in with authorities. These alternatives are better equipped to host vulnerable populations, such as refugees and migrants, and offer them an adequate home with access to healthcare.[1] These arrangements serve the reasons for immigration detention mentioned above without leading to further deterioration in the mental health of refugees and migrants or even traumatising them.

**Irina Verhülsdonk**, Faculty of Social and Behavioural Sciences, Clinical Psychology Department, Leiden University, the Netherlands; **Mona Shahab**, Faculty of Social and Behavioural Sciences, Clinical Psychology Department, Leiden University, the Netherlands and Department of Clinical Epidemiology, Leiden University Medical Center, the Netherlands; **Marc Molendijk** (iD), Faculty of Social and Behavioural Sciences, Clinical Psychology Department, Leiden University, the Netherlands and Leiden University Medical Center, Leiden institute of Brain and Cognition, the Netherlands

**Correspondence:** Marc Molendijk. Email: m.l.molendijk@fsw.leidenuniv.nl

First received 19 Mar 2021, final revision 10 Sep 2021, accepted 11 Sep 2021

## Supplementary material

Supplementary material is available online at https://doi.org/10.1192/bjo.2021.1026.

## Data availability

The data that support the findings of this study are available upon request.

## Acknowledgements

We thank the anonymous reviewers for their constructive input and our colleagues at Leiden University for inspiration and the discussions on the topic on formal and informal occasions.

## Author contributions

I.V. and M.M. had full access to the data and takes responsibility for the integrity of the data and the accuracy of the results presented in this manuscript. Concept and design: all authors. Data acquisition and analysis: I.V. and M.M. Quality rating: I.V. and M.M. Drafting of the manuscript: I.V. and M.M. Critical revision of the manuscript for important intellectual content: all authors.

## Funding

This project was funded through continued support by Leiden University.

## Declaration of interest

The authors declare that there are no conflicts of interest.

## References

1 United Nations High Commissioner for Refugees (UNHCR). *UNHCR Beyond Detention Toolkit. Guiding Questions for the Assessment of Alternatives to Detention*. UNHCR, 2018 (https://www.refworld.org/docid/5b1e662d4.html).

2 United Nations High Commissioner for Refugees (UNHCR). *Figures at a Glance*. UNHCR, 2021 (https://www.unhcr.org/figures-at-a-glance.html).

3 United Nations High Commissioner for Refugees (UNHCR). *Guiding Principles on Internal Displacement*. UNHCR, 1998 (https://www.refworld.org/docid/3c3da07f7.html).

4 United Nations General Assembly. *Convention Relating to the Status of Refugees*. UN, 1951.

5 United Nations High Commissioner for Refugees (UNHCR). *UNHCR Master Glossary of Terms*. UNHCR, 2006 (https://www.refworld.org/docid/42ce7d444.html).

6 International Organization for Migration (IOM). Glossary on migration. *Int Migr Law* 2011; **25**: 1–114.

7 United Nations High Commissioner for Refugees (UNHCR). *'Refugees' and 'Migrants' – Frequently Asked Questions (FAQs)*. UNHCR, 2016 (https://www.unhcr.org/news/latest/2016/3/56e95c676/refugees-migrants-frequently-asked-questions-faqs.html#_ftn3).

8 United Nations General Assembly. *New York Declaration for Refugees and Migrants: Resolution adopted by the General Assembly on 19 September 2016*. UN General Assembly, 2016 (https://www.refworld.org/docid/57ceb74a4.html).

9 Henkelmann JR, de Best S, Deckers C, Jensen K, Shahab M, Elzinga B, et al. Anxiety, depression and post-traumatic stress disorder in refugees resetting in high-income countries: systematic review and meta-analysis. *BJPsych Open* 2020; **6**: 668.

10 Blackmore R, Boyle JA, Fazel M, Ranasinha S, Gray KM, Fitzgerald G, et al. The prevalence of mental illness in refugees and asylum seekers: a systematic review and meta-analysis. *PLoS Med* 2020; **179**: 1–24.

11 Fazel M, Wheeler J, Danesh J. Prevalence of serious mental disorder in 7000 refugees resettled in western countries: a systematic review. *Lancet* 2005; **365**: 1309–14.

12 Fazel M, Reed RV, Panter-Brick C, Stein A. Mental health of displaced and refugee children resettled in high-income countries: risk and protective factors. *Lancet* 2012; **379**: 266–82.

13 Hou WK, Liu H, Liang L, Ho J, Kim H, Seong E, et al. Everyday life experiences and mental health among conflict-affected forced migrants: a meta-analysis. *J Affect Disord* 2020; **264**: 50–68.

14 Sykiotou AP. *A Study of Immigration Detention Practices and the use of Alternative to Immigration Detention of Children*. Committee on Migration, Refugees and Displaced Persons of the Parliamentary Assembly of the Council of Europe, 2017 (https://edoc.coe.int/en/migration/7533-a-study-of-immigration-detention-practices-and-the-use-of-alternatives-to-immigration-detention-of-children.html).

15 United Nations High Commissioner for Refugees (UNHCR). *Beyond Detention: A Global Strategy to Support Governments to end the Detention of Asylum-Seekers and Refugees 2014–2019*. UNHCR, 2014. (https://www.unhcr.org/protection/detention/53aa929f6/beyond-detention-global-strategy-support-governments-end-detention-asylum.html).

16 Sampson R, Chew V, Mitchell G, Bowring L. *There Are Alternatives: A Handbook for Preventing Unnecessary Immigration Detention (Revised)*. Melbourne International Detention Coalition, 2015.

17 United Nations High Commissioner for Refugees (UNHCR). *Guidelines on the Applicable Criteria and Standards Relating to the Detention of Asylum-Seekers and Alternatives to Detention*. UNHCR, 2012 (https://www.refworld.org/docid/503489533b8.html).

18 Filges T, Montgomery E, Kastrup M. The impact of detention on the health of asylum seekers: a systematic review. *Res Soc Work Pract* 2018; **28**: 399–414.

19 United Nations High Commissioner for Refugees (UNHCR). *Global Strategy Beyond Detention*. UNHCR, 2020 (https://www.unhcr.org/protection/detention/5fa26ed64/unhcr-global-strategy-beyond-detention-final-progress-report-2014-2019.html).

20 Stefanelli JN. *Judicial Review of Immigration Detention in the UK, US and EU: From Principles to Practice*. Bloomsbury Publishing, 2020.

21 Enforcement And Removal Operations. *U.S. Immigration and Customs Enforcement Fiscal Year 2019 Enforcement and Removal Operations Report*. U.S. Immigration and Customs Enforcement, 2020 (https://www.ice.gov/sites/default/files/documents/Document/2019/eroReportFY2019.pdf).

22 Canada Border Services Agency. *Arrests, Detentions and Removals*. Government of Canada, 2020 (https://www.cbsa-asfc.gc.ca/security-securite/detent/menu-eng.html).

23 Australian Border Force. *Immigration Detention and Community Statistics Summary*. Australian Government Department of Home Affairs, 2021 (https://www.homeaffairs.gov.au/research-and-stats/files/immigration-detention-statistics-31-august-2021.pdf).

24 McLoughlin P, Warin M. Corrosive places, inhuman spaces: mental health in Australian immigration detention. *Health Place* 2008; **14**: 254–64.

25 Global Detention Project (GDP). *Country Report: Australia*. GDP, 2018 (https://www.globaldetentionproject.org/countries/asia-pacific/australia).

26 Home Office. *National Statistics: How Many People are Detained or Returned?* Gov.UK, 2020 (https://www.gov.uk/government/publications/immigration-statistics-year-ending-march-2020/how-many-people-are-detained-or-returned).

27 Broeders D. Return to sender?: administrative detention of irregular migrants in Germany and the Netherlands. *Punishm Soc* 2010; **12**: 169–86.

28 Khosravi S. Sweden: detention and deportation of asylum seekers. *Race Class* 2009; **50**: 38–56.

29 Coffey GJ, Kaplan I, Sampson RC, Tucci MM. The meaning and mental health consequences of long-term immigration detention for people seeking asylum. *Soc Sci Med* 2010; **70**: 2070–79.

30 Puthoopparambil SJ, Ahlberg BM, Bjerneld M. "A prison with extra flavours": experiences of immigrants in Swedish immigration detention centres. *Int J Migr Health Soc Care* 2015; **11**: 73–85.

31 Procter NG, Kenny MA, Eaton H, Grech C. Lethal hopelessness: understanding and responding to asylum seeker distress and mental deterioration. *Int J Ment Health Nurs* 2018; **27**: 448–54.

32 Steel Z, Silove D, Brooks R, Momartin S, Alzuhairi B, Susljik I. Impact of immigration detention and temporary protection on the mental health of refugees. *Br J Psychiatry* 2006; **188**: 58–64.

33 Ehnholt KA, Trickey D, Hendriks JH, Chambers H, Scott M, Yule W. Mental health of unaccompanied asylum-seeking adolescents previously held in British detention centres. *Clin Child Psychol Psychiatry* 2018; **23**: 238–57.

34 Steel Z, Momartin S, Silove D, Coello M, Aroche J, Tay KW. Two year psychosocial and mental health outcomes for refugees subjected to restrictive or supportive immigration policies. *Soc Sci Med* 2011; **72**: 1149–56.

35 Triggs G. Mental health and immigration detention. *Med J Aust* 2013; **199**: 721–2.

von Werthern et al

36 Newman LK, Steel Z. The child asylum seeker: psychological and developmental impact of immigration detention. *Child Adolesc Psychiatr Clin N Am* 2008; **17**: 665–83.

37 von Werthern MV, Robjant K, Chui Z, Schon R, Ottisova L, Mason C, et al. The impact of immigration detention on mental health: a systematic review. *BMC Psychiatry* 2018; **18**: 382–401.

38 United Nations High Commissioner for Refugees (UNHCR). *Progress Report 2018: a Global Strategy to Support Governments to end the Detention of Asylum-Seekers & Refugees, 2014–2019*. UNHCR, 2019 (https://www.unhcr.org/protection/detention/5c934bbd7/unhcr-global-strategy-beyond-detention-progress-report-2018.html).

39 Moher D, Shamseer L, Clarke M, Ghersi D, Liberati A, Petticrew M, et al. Preferred reporting items for systematic review and meta-analysis protocols (PRISMA-P) 2015 statement. *Syst Rev* 2015; **4**: 1–9.

40 Bramer WM, Rethlefsen ML, Kleijnen J, Franco OH. Optimal database combinations for literature searches in systematic reviews: a prospective exploratory study. *Syst Rev* 2017; **6**: 245–57.

41 Filges T, Lindstrøm M, Montgomery E, Kastrup M, Jørgensen AK. PROTOCOL: The impact of detention on the health of asylum seekers: a protocol for a systematic review. *Campbell Syst Rev* 2017; **13**: 1–51.

42 National Institutes of Health. *Quality Assessment Tool for Observational Cohort and Cross-Sectional Studies*. National Institutes of Health, 2014 (https://www.nhlbi.nih.gov/health-pro/guidelines/in-develop/cardiovascular-risk-reduction/tools/cohort).

43 Viechtbauer W. Conducting meta-analyses in R with the metafor package. *J Stat Softw* 2010; **36**: 1–48.

44 Metelli S, Chaimani A. Challenges in mete-analyses with observational studies. *Evid Based Ment Health* 2020; **23**: 83–7.

45 Blackmore R, Gray KM, Boyle JA, Fazel M, Ranasinha S, Fitzgerald G, et al. Systematic review and meta-analysis: the prevalence of mental illness in child and adolescent refugees and asylum seekers. *J Am Acad Child Adolesc Psychiatry* 2020; **59**: 705–14.

46 Cleveland J, Rousseau C. Psychiatric symptoms associated with brief detention of adult asylum seekers in Canada. *Can J Psychiatry* 2013; **58**: 409–16.

47 Graf M, Wermuth P, Häfeli D, Weisert A, Reagu S, Pflüger M, et al. Prevalence of mental disorders among detained asylum seekers in deportation arrest in Switzerland and validation of the brief jail mental health screen BJMHS. *Int J Law Psychiatry* 2013; **36**: 201–6.

48 Keller AS, Rosenfeld B, Trinh-Shevrin C, Meserve C, Sachs E, Leviss JA, et al. Mental health of detained asylum seekers. *Lancet* 2003; **362**: 1721–23.

49 Robjant K, Robbins I, Senior V. Psychological distress amongst immigration detainees: a cross-sectional questionnaire study. *Br J Clin psychol* 2009; **48**: 275–86.

50 Sen P, Arugnanaseelan J, Connell E, Katona C, Khan AA, Moran P, et al. Mental health morbidity among people subject to immigration detention in the UK: a feasibility study. *Epidemiol Psychiatr Sci* 2018; **27**: 628–37.

51 Steel Z, Momartin S, Bateman C, Hafshejani A, Silove DM, Everson N, et al. Psychiatric status of asylum seeker families held for a protracted period in a remote detention centre in Australia. *Aust N Z J Public Health* 2004; **28**: 527–36.

52 Lorek A, Ehntholt K, Nesbitt AW, Emmanuel G, Chipo RE, Wickramasinghe R. The mental and physical health difficulties of children held within a British immigration detention center: a pilot study. *Child Abuse Negl* 2009; **33**: 573–85.

53 McHugh ML. Interrater reliability: the kappa statistic. *Biochem Med* 2012; **22**: 276–82.

54 Salk RH, Hyde JS, Abramson LY. Gender differences in depression in representative national samples: meta-analyses of diagnoses and symptoms. *Psychol Bull* 2017; **143**: 783–822.

55 Carlsson J, Sonne C. Mental health, pre-migratory trauma and post-migratory stressors among adult refugees. In *Mental Health of Refugee and Conflict-Affected Populations* (eds N Morina, A Nickerson): 15–35. Cham: Springer International Publishing, 2018.

56 Silove D, Sinnerbrink I, Field A, Manicavasagar V, Steel Z. Anxiety, depression and PTSD in asylum-seekers: associations with pre-migration trauma and post-migration stressors. *Br J Psychiatry* 1997; **170**: 351–57.

57 Porter M, Haslam N. Predisplacement and postdisplacement factors associated with mental health of refugees and internally displaced persons: a meta-analysis. *JAMA* 2005; **294**: 602–12.

58 Wright AM, Dhalimi A, Lumley MA, Jamil H, Pole N, Arnetz JE, et al. Unemployment in Iraqi refugees: the interaction of pre and post-displacement trauma. *Scand J Psychol* 2016; **57**: 564–70.

59 Nickerson A, Steel Z, Bryant R, Brooks R, Silove D. Change in visa status amongst Mandaean refugees: Relationship to psychological symptoms and living difficulties. *Psychiatry Res* 2011; **187**: 267–74.

60 Newnham EA, Pearman A, Olinga-Shannon S, Nickerson A. The mental health effects of visa insecurity for refugees and people seeking asylum: a latent class analysis. *Int J Public Health* 2019; **64**: 763–72.

61 Iversen VC, Morken G. Differences in acute psychiatric admissions between asylum seekers and refugees. *Nord J Psychiatry* 2004; **58**: 465–70.

62 Jakobsen M, Meyer DeMott MA, Wentzel-Larsen T, Heir T. The impact of the asylum process on mental health: a longitudinal study of unaccompanied refugee minors in Norway. *BMJ Open* 2017; **7**: 1–8.

63 Koenen KC, Ratenatharathorn A, Ng L, McLaughlin KA, Bromet EJ, Stein DJ, et al. Posttraumatic stress disorder in the world mental health surveys. *Psychol Med* 2017; **47**: 2260–74.

64 Kessler RC, Aguilar-Gaxiola S, Alonso J, Chatterji S, Lee S, Ormel J, et al. The global burden of mental disorders: an update from the WHO World Mental Health (WMH) surveys. *Epidemiol Psichiatr Soc* 2009; **18**: 23–33.

65 United States Commission on Civil Rights (USCCR). *With Liberty and Justice for All. The State of Civil Rights at Immigration Detention Facilities*. USCCR, 2015 (https://www.usccr.gov/pubs/docs/Statutory_Enforcement_Report2015.pdf).

66 Global Detention Project (GDP) and Asia Pacific Refugee Rights Network. *Joint Submission to the Universal Periodic Review: Papua New Guinea*. GDP, 2021 (https://www.globaldetentionproject.org/joint-submission-to-the-universal-periodic-review-papua-new-guinea).

67 Sundram S, Ventevogel P. The mental health of refugees and asylum seekers on Manus Island. *Lancet* 2017; **390**: 2534–6.

68 United Nations High Commissioner for Refugees (UNHCR). *Submission by the Office of the United Nations High Commissioner for Refugees on the Inquiry Into the Serious Allegations of Abuse, Self-Harm and Neglect of Asylum-Seekers In Relation to the Manus Island Regional Processing Centre*. UNHCR, 2016 (https://www.unhcr.org/5836zda34.pdf).

69 Doctors without Borders. *Refugees Face Death, Disease, and Despair in Libya's Detention Centers*. Doctors without Borders, 2019 (https://www.doctorswithoutborders.org/what-we-do/news-stories/story/refugees-face-death-disease-and-despair-libyas-detention-centers).

70 United Nations High Commissioner for Refugees (UNHCR). *'On this Journey, no One Cares if you Live or die' Abuse, Protection, and Justice Along the Routes Between East and West Africa and Africa's Mediterranean Coast*. UNHCR, 2020 (https://www.unhcr.org/protection/operations/5f2129fb4/journey-cares-live-die-abuse-protection-justice-along-routes-east-west.html).

71 Beşer ME, Elfeitori F. *Libya Detention Centres: A State of Impunity*. Migration Policy Center, 2018 (https://aybu.edu.tr/gpm/contents/files/enesbeser.pdf).

72 Stevanovic D, Jafari P, Knez R, Franic T, Atilola O, Davidovic N, et al. Can we really use available scales for child and adolescent psychopathology across cultures? A systematic review of cross-cultural measurement invariance data. *Transcult Psychiatry* 2017; **54**: 125–52.

73 Silove D, Ventevogel P, Rees S. The contemporary refugee crisis: an overview of mental health challenges. *World Psychiatry* 2017; **16**: 130–9.

74 Storm T, Engberg M. The impact of immigration detention on the mental health of torture survivors: a systematic review. *Eur Psychiatry* 2013; **28**: A4728.

75 Canada Border Services Agency. *Annual Detention, Fiscal Year 2019 to 2020*. Government of Canada, 2020 (https://www.cbsa-asfc.gc.ca/security-securite/detent/stat-2019-2020-eng.html).

76 Silverman SJ, Griffiths M, Walsh PW. Immigration detention in the UK. *Migration Observatory*, 2020 (https://migrationobservatory.ox.ac.uk/resources/briefings/immigration-detention-in-the-uk/#:~:text=Policy%20reasons%20for%20detaining%20typically,to%20be%20'conducive%20to%20the).

77 Council of Europe. *Alternatives to Immigration Detention: Fostering Effective Results*. Council of Europe, 2019 (https://rm.coe.int/migration-practical-guide-alternatives-migration/1680990236).





BOIR 1 of 30

*Office for Civil Rights and Civil Liberties*
**U.S. Department of Homeland Security**
Washington, DC 20528



March 5, 2020

MEMORANDUM TO:     Enrique M. Lucero
                          Executive Associate Director
                          Enforcement and Removal Operations
                          U.S. Immigration and Customs Enforcement

FROM:                Peter E. Mina (b)(5)
                          Deputy Officer for Programs and Compliance
                          Office for Civil Rights and Civil Liberties

                          Dana Salvano-Dunn (b)(6)
                          Director, Compliance Branch
                          Office for Civil Rights and Civil Liberties

SUBJECT:          Cibola County Correctional Center
                          Complaint Nos. 18-08-DHS-0342, 18-08-ICE-0745,
                          18-11-ICE-0668, 18-11-ICE-0742, 19-02-ICE-0072,
                          19-03-ICE-0071, 19-03-ICE-0110, and 19-06-ICE-0211

The U.S. Department of Homeland Security (DHS), Office for Civil Rights and Civil Liberties (CRCL) is conducting an investigation into conditions of detention for U.S. Immigration and Customs Enforcement (ICE) detainees at the Cibola County Correctional Center (CCCC) in Milan, New Mexico. CRCL's onsite investigation occurred on August 13-15, 2019 in response to allegations received alleging civil rights and civil liberties violations of medical and mental health care, conditions of detention, and environmental health and safety at CCCC. Additionally, CRCL reviewed violations' that impacted detainees housed in CCCC's dedicated transgender housing unit.

We greatly appreciated the cooperation and assistance provided by ICE and CCCC personnel before and during the onsite investigation. As part of the onsite, CRCL engaged the assistance of four subject-matter experts: a medical consultant, a mental health consultant, a corrections consultant and an environmental health and safety consultant. As a result of detainee and staff interviews, document and record reviews, and direct observation, the subject-matter experts identified concerns regarding medical and mental health care, conditions of detention, and environmental health and safety at the facility.

On August 15, 2019, as part of the out-briefing for CCCC and ICE, CRCL and the subject-matter experts discussed the most serious findings with ICE ERO field office management personnel, personnel from ICE ERO headquarters, and CCCC senior management. During the discussions, the subject-matter experts also provided recommendations to address the identified concerns. An

email summary of those, which CRCL sent to ICE ERO leadership immediately following the onsite is attached here. Also enclosed with this memorandum are the reports prepared by our subject-matter experts. The experts' recommendations have been designated as priority and best practice recommendations. Priority recommendations are listed in the body of this memorandum, and CRCL requests that ICE formally concur or non-concur with these and provide an action plan for all accepted recommendations within 60 days. Best practice recommendations are contained in a separate attachment to this memorandum. Although CRCL is not requesting formal responses to these best practice recommendations, we encourage ICE to also consider and implement these recommendations to the fullest extent possible.

### *Medical Care*

1. An effective quality assurance program is needed at CCCC. It must be comprehensive and monitor all aspects of the medical program for risk, frequency, and trends to identify major problems/issues, and develop action plans to address them in the order of priority. Although a nurse is assigned to conduct quality assurance studies at CCCC, and a good system was developed to audit *some* programs on a rotating schedule, the audits were not comprehensive and did not monitor *all* aspects of the medical care program for risk, frequency and trends, in order to identify major issues and develop action plans. When serious issues of concern were identified, the current quality assurance program did *not* develop appropriate action plans to address the findings. (2011 PBNDS 4.3, Medical Care V.BB.2) Related to these concerns, CRCL's medical expert has the following three recommendations:

   a. CCCC's medical leadership team (Health Services Administrator (HSA), Medical Director and Director of Nursing) should become more involved in the quality assurance program, as well as support and take advantage of it, allowing improved monitoring of all healthcare services at the facility, rather than only the few being audited at the time of the onsite.

   b. CCCC's medical leadership team (Health Services Administrator (HSA), Medical Director and Director of Nursing) should collaboratively develop and implement corrective action plans to address and resolve problems that are identified in the quality assurance audits.

   c. CCCC's medical leadership team should reevaluate the most recent quality assurance audit and determine whether the problems have been addressed effectively with proper corrective actions.

2. CCCC had a continual mumps outbreak from April 2019 through CRCL's August onsite, and continued to be under quarantine after the onsite. While onsite, our medical expert observed a nurse dispensing medications between the quarantined and non-quarantined housing units without changing gloves, even though there was a sign outside the housing units with orders to follow contact isolation protocols. Significantly, an additional pod was placed on quarantine during the CRCL investigation, which may have been related. (2011 PBNDS 4.3, Medical Care V.C.1) Related to these concerns, CRCL's medical expert has the following two recommendations:

   a. The correctional and medical staff should be trained on contact isolation practices.

    b.  The improved quality assurance program (see Medical Care recommendation #1) should monitor these practices to ensure compliance. (2011 PBNDS 4.3, Medical Care V.C.1)[1]

3.  Although the medical staff are using the language line and translators for intake screening and health assessments, the nurses are not consistently providing language assistance during sick-call visits. For example, correctional staff are sometimes used by the medical staff to address language needs in violation of the standards and violating medical privacy. (2011 PBNDS 4.3, Medical Care V.E.) Related to these concerns, CRCL's medical expert has the following two recommendations:

    a.  The medical staff should consistently use the language line or professional translators when interacting with detainees and, in particular, when providing medical and mental health services.

    b.  The medical staff's use of correctional staff for translation/interpretation needs should cease immediately, except in emergency situations.

4.  The medical files at CCCC were found to be incomplete, with misfiled and missing documentation. The medical unit is not filing or maintaining medical information appropriately, and there is no quality assurance process (see Medical Care recommendation #1) to ensure medical files are accurate and kept up to date. The medical unit also has thousands of loose medical documents that are waiting to be filed into patient charts. This failure to maintain patient records means that clinical staff do not have the complete medical information needed to appropriately treat detainees. Providing medical care with incomplete information can lead to serious medical care and medication errors. (2011 PBNDS 4.3, Medical Care V.Y) Related to these concerns, CRCL's medical expert has the following four recommendations:

    a.  CCCC should immediately assign resources to file the loose documents into the patients' charts.

    b.  Medical records should be part of a quality assurance process to ensure that all medical charts are filed correctly and in a timely manner.

    c.  The paper chart system currently used by CCCC is outdated. CCCC should consider transitioning to an electronic medical record, which is the current medical practice norm, to improve safety and efficiency.

    d.  (b)(5)

5.  CCCC's medication procurement and management processes and procedures are problematic and can lead to detainee health risks. The current practice results in detainees missing critical medications, medication delays, or receiving the wrong medications. While onsite, expired

---

[1] Given the current COVID-19 outbreak, this recommendation, as well as recommendation #6 below, becomes even more important to implement in a timely manner.

medications were found in the medication carts because the medical unit does not have a standardized process to check for expired medications nor standard guidelines for when to discard opened multi-use medications. Also, CCCC does not have a reliable medication refill process or medication renewal process, which disrupted chronic disease patients' medication continuity. Finally, the pharmacy tech and the nursing staff did not have adequate training related to medication management. (2011 PBNDS 4.3, Medical Care V.S and multiple other 2011 PBNDS). Related to these concerns, CRCL's medical expert has the following six recommendations:

    a.  CCCC should establish a standard process requiring that medication orders are faxed to the off-site pharmacy. In turn, CCCC pharmacy staff should ensure that all medications are received from the offsite pharmacy and should verify they match the providers' orders.

    b.  Nursing staff should administer the patient-detainee's prescribed medications when received from the offsite pharmacy, thus reducing the use of common stock medications, and preventing medication errors.

    c.  The HSA, Pharmacist, and Director of Nursing should establish a standard process and a schedule to check for expired medications, then ensure the medical staff are conducting the check as required. The pharmacy staff should consistently perform random checks to ensure there are no expired medications in the medication cart or storage area.

    d.  The HSA should establish timelines for the disposal of open multi-use medications and ensure medical staff's adherence.

    e.  Nursing and pharmacy staff should receive training on medication management.

    f.  The quality assurance program should conduct random audits to identify opportunities for improvements in medication administration and develop action plans to address them. (See Medical Care recommendation #1.)

6.  Pill distribution ("pill pass") at CCCC is unsafe and places detainees at risk to receive incorrect medications. The observed pill pass process demonstrated numerous areas of concern: The nurse did not perform the standard five "rights" of medication administration.[2] The nurse did not check the medications against the medical administration record to ensure the correct medication was being administered. The nurse did not perform hand hygiene between detainees, even when medications were being administered between quarantined housing units and housing units not under quarantine. Neither the nurse nor the housing unit officer called out for the detainees who were scheduled to receive medications during pill pass, and the nurse did not check to ensure that all detainees who were scheduled for medication received them before leaving each housing unit. (2011 PBNDS 4.3, Medical Care V.G). Related to these concerns, CRCL's medical expert has the following three recommendations:

    a.  The Director of Nursing should establish a standard process for medication administration, and the nursing staff should be trained on the process and the

---

[2] The five "rights" are: check to ensure the right patient, the right time and frequency of administration, the right dose, the right route of administration, and the right drug, before administering medication to the CCCC detainees.

responsibility to adhere to it. When implemented, nursing leadership and the quality assurance staff should monitor the process to ensure compliance. (See Medical Care recommendation #1.)

b. During pill pass, nurses should call out the names of detainees who are scheduled to receive medications, so the detainees are aware that they have medications to take. Moreover, the nurses should make an effort to ensure that detainees with medications receive them; especially when the medication is of a critical nature.

c. The HSA, Medical Director, and Director of Nursing should immediately identify lapses in medication administration and immediately address them, to ensure the CCCC detainees' health and safety.

7. The clinic staff schedule appointments for detainees who need to be seen by a medical provider (physicians and nurse practitioners). The appointments are scheduled based on the medical providers planned shift schedule. However, the providers often do not show up for their scheduled shift, causing the need for detainee-patient rescheduling. Review of the providers' schedules showed that providers cancelled five out of 15 scheduled shifts. (2011 PBNDS 4.3, Medical Care V.A, V.B, V.DD) Related to these concerns, CRCL's medical expert has the following three recommendations:

a. The HSA and Medical Director should develop a staffing plan which identifies positions needed to perform the required services, as well as identify the training needs of the medical staff and offer them resources.

b. The HSA and Medical Director should develop a reliable provider schedule to ensure that the detainees are seen by the provider without delay.

c. The HSA and Medical Director should consider telemedicine options to increase provider availability.

8. The facility has a large transgender housing unit (Unit 900) where the detainees are primarily managed by one physician. This specific physician is going on an extended leave of absence. However, there are no other medical providers (physicians or nurse practitioners) trained or qualified to provide care specific to transgender individuals. (2011 PBNDS 4.3, Medical Care II.21, V.A.5, V.B, V.C.4.b, V.U). Related to these concerns, CRCL's medical expert has the following two recommendations:

a. The HSA and Medical Director should provide educational opportunities to other physicians and nurse practitioners, so they are comfortable and capable of providing care for the transgender detainee population.

b. The medical unit should ensure adequate medical staff are available onsite to provide appropriate care for the transgender detainee population.

9. The medical staff were performing physical exams on detainees in the medical clinic without sufficient privacy. The doors to the hallway were open and there were no privacy screens being used. (2011 PBNDS 4.3, Medical Care V.F, V.L) Related to these concerns, CRCL's medical expert recommends:

a. Medical staff must ensure adequate privacy for the detainees during all medical and mental health encounters. The HSA should discuss with the medical staff, their

reasons for not closing the exam room door and then identify ways to address the related concerns.

10. The current sick-call program underwent several recent changes, resulting in confusion among the staff. (2011 PBNDS 4.3, Medical Care V.B, V.Q, V.BB) Related to this concern, CRCL's medical expert recommends:

   a. The HSA, Medical Director, and the Director of Nursing should establish a standard sick-call process and educate the medical and corrections staff and the detainees on the new process.

11. There is no reliable way to ensure sick-call requests are collected daily at CCCC. Additionally, there is a long delay and inconsistent triaging of sick-call requests at CCCC. The current policy states that a sick-call request should be addressed with a face-to-face visit with a medical staff member within 24-hours of the request's receipt. However, chart reviews demonstrated that most of the responses to sick-call requests did not meet this requirement.[3] Chart reviews also demonstrated that several sick-call requests were marked as "completed" without any documentation of nursing assessments or without a nurse having performed an assessment. (2011 PBNDS 4.3, Medical Care V.A.6, V.Q, V.S) Related to these concerns, CRCL's medical expert has the following three recommendations:

   a. The nurse managers should ensure that sick-call requests are collected every day and triaged by a Registered Nurse (RN), so they can immediately address those requests with emergent and urgent needs.

   b. The nurses should be trained on the nursing guidelines and required to follow them. Training should include when to consult with the provider or refer detainees to the provider for further evaluation based on the detainees' condition.

   c. The nurses should be expected to conduct face-to-face assessments with the detainee whenever a symptom is mentioned in the detainee's sick-call request or complaint including, fever, headache, pain, etc. The nurses should also be required to document their complete assessment in the medical record.

12. CCCC's sick-call program appears to be largely nurse-run and there is minimal escalation for a higher level of care. Nearly all sick-call requests reviewed while onsite were handled by the nurses and, of those, *no* detainees were referred by the nurses to medical providers for a higher level of evaluation. Instead, the nurses discussed the cases with the medical providers, and received orders from the provider without a provider evaluation. The CCCC higher level medical providers do not conduct a regular sick-call clinic and, as nurses rarely refer detainees to them for evaluation, they are not being fully utilized. This practice impacts detainee medical care at CCCC, leading to delays and inadequate levels of care. (2011 PBNDS 4.3, Medical Care V.A.6, V.Q, V.S) Related to these concerns, CRCL's medical expert has the following two recommendations:

---

[3] For example, a detainee submitted several sick-call requests stating that he was not receiving his seizure medications, but the request was not addressed timely and the patient subsequently had two emergency room visits for seizures.

a. The Director of Nursing should discuss with the nursing staff the reasons for not referring detainees to additional medical providers when the illness or condition indicates need for a referral, and then address any indicated barriers.

b. The quality assurance program should monitor and evaluate compliance with and effectiveness of the sick-call program on a monthly basis, and subsequently make necessary improvements. (See Medical Care recommendation #1.)

13. CCCC's dental clinic has difficulty meeting the 14-day dental screening requirement, and detainees due for the 14-day screen are asked if they would like to refuse the dental screen. The dentist and dental assistant are on site four days a week. Detainees are seen by the dentist on Monday and Tuesday, with priority given to new detainees for an initial dental assessment. This causes delays for non-newcomer detainees who have dental needs like pain and follow-up visits with the dentist. Additionally, the medical clinic serves the facility's county and immigration custody populations, which cannot be mixed, and therefore causes further delays in care. Lastly, the dental clinic shares space in the medical unit. Because the facility doesn't allow intermingling of inmates and detainees, this shared clinic space configuration limits clinic availability for the transgender detainees and causes many delays and cancellations within the medical, nursing, and dental clinics. (2011 PBNDS 4.3, Medical Care V.P) Related to these concerns, CRCL's medical expert has the following four recommendations:

a. The HSA should identify issues related to medical space availability in order to ensure the transgender detainees are brought to the dental clinic.

b. The HSA should adjust the dental clinic schedule to ensure that all detainees with dental needs receive timely assessment and care.

c. The prioritized initial dental screening for new detainees should not delay dental care for the established detainees who have dental needs. All detainees who report dental pain should be evaluated and appropriately treated without delay.

d. The HSA should investigate the 14-day dental screen refusal process that is occurring at CCCC, to ensure that detainees are not being influenced to refuse care.

14. CCCC medical staff are not responding to urgent medical requests in a timely manner as required by the PBNDS. Onsite, it was found that several urgent medical needs were not responded to for approximately 13-17 days. Reportedly, this was because the housing unit officer was determining whether the detainees' medical need warranted an immediate medical response. If the officer determined the detainee's need was not urgent, the matter was not immediately brought to the medical unit's attention. For example, a transgender detainee reported an urgent medical need to the housing unit officer due to rectal bleeding, but her request went unaddressed for approximately 13 days. When the detainee was finally seen and tested, she was determined to be HIV positive. (2011 PBNDS 4.3, Medical Care II.4, II.10, II.11, V.A, V.T) Related to these concerns, CRCL's medical expert has the following five recommendations:

a. (b)(5)

b. Corrections officers should immediately be informed that they cannot determine whether or not a medical issue is urgent or can wait. Corrections officers should be

required to immediately notify the medical staff of all medical emergencies, medical issues, and medical requests that are reported or observed.

c. Medical staff should immediately assess detainees whom corrections officers report have requested medical care or whom corrections officers observe to need medical care. The assessment and care should occur in a private setting.

d. When urgency is indicated by either corrections or medical staff, the detainee should be immediately referred to a higher level of care.

e. Detention staff and clinical staff should be educated on medical emergencies and appropriate responses.

15. The facility does not have a standardized process to track detainees with chronic medical conditions like diabetes, hypertension, HIV, asthma, seizures, etc., which places CCCC's chronically ill detainees at risk. (2011 PBNDS 4.3, Medical Care V.X.1) Related to these concerns, CRCL's medical expert recommends:

a. The medical unit should maintain a chronic disease registry to consistently track detainees with chronic medical conditions and ensure the provided care complies with the disease-specific clinical practice guidelines that are established by the Medical Director. Quality assurance audits should be used to ensure this is occurring. (See Medical Care recommendation #1.)

### *Mental Health Care*

16. Review of healthcare records provided examples of inadequate access to emergency mental health care at CCCC. In two different instances, detainees disclosed concerning information to medical staff during the intake screening process that warranted an urgent mental health evaluation or emergent referral, but care was delayed. Serious mental health care referrals were found not to be timely and care was further delayed because the telecommunication system was not working properly at the time of the onsite. (2011 PBNDS 4.3, Medical Care II.1, II.2, II.4, II.6, II.9, II.16, II.27, V.J, V.L, V.M, V.N.1; 4.6, Significant Self-harm and Suicide Prevention and Intervention V.B, V.C, V.D; 2.12 Special Management Units II.6, II.12, V.C, V.N; NCCHC Standards for Health Services in Jails, Access to Care J-A-01, essential; NCCCH Standards for Health Services in Jails, Segregated Inmates J-G-02, essential, Compliance Indicator 2) Related to these concerns, CRCL's mental health expert recommends:

a. CoreCivic healthcare and custodial leadership should ensure all custodial and medical staff are aware of when and how detainees can access emergent mental health care during business and non-business hours.

17. Review of mental health sick-call requests demonstrated delays in access to care resulting from the nursing triage process. Nursing staff failed to triage mental health care requests in a timely manner, causing delays. In some cases, poor triage documentation (illegible or missing dates and times) impacted the ability to provide timely assessment and response.

There were also delays in routing sick-call requests to mental health staff.[4,5] Wellpath Mental Health Services policy required that transgender detainees on psychiatric medications be seen by a mental health clinician every 30 days, and psychiatric appointments every 30 days for detainees on psychiatric medications. However, review of medical records demonstrated that mental health staff were not compliant with these requirements. (This may be due to inadequate staffing and supervision, which is discussed below in recommendation #37.) (2011 PBNDS 4.3, Medical Care II.1, II.2, II.4, II.6, II.9, II.16, II.27, V.J, V.L, V.M, V.N.1; 4.6, Significant Self-harm and Suicide Prevention and Intervention V.B, V.C, V.D; 2.12 Special Management Units II. 6, II.12, V.C, V.N; NCCHC Standards for Health Services in Jails, Access to Care J-A-01, essential; NCCCH Standards for Health Services in Jails, Segregated Inmates J-G-02, essential, Compliance Indicator 2.a) Related to these concerns, CRCL's mental health expert has the following three recommendations:

    a. The sick-call triaging process by nursing staff should also apply to the mental health program. (See Medical Care recommendation #10.)

    b. Leadership should ensure that mental health staff conduct and record weekly rounds with all detainees in CCCC's Special Management Unit (SMU).

    c. Regarding compliance with timely contact requirements, implementation of the recommended electronic record can resolve delays, if utilized because the detainee's medical care history and needs, including dates seen and required follow-up appointments, will be easily accessible electronically as opposed to paper medical files. Moreover, an electronic medical record system will provide alerts to providers.

18. Inadequate staffing at CCCC has impacted the facility's ability to comply with the 2011 PBNDS. In particular, the mental health program is inadequately staffed to meet detainees' mental health needs. Insufficient mental health staffing has contributed to delays found in access to mental health care and problematic mental health documentation. At the time of the onsite, there was no designated staff position responsible for the clinical and administrative supervision of the mental health staff. During the onsite, the mental health program included one full-time tele-psychiatrist and three master's level clinicians. The tele-psychiatrist provided on-call services after business hours. Additionally, when tele-psychiatry was utilized for psychiatric care, the tele-psychiatrist had the medical records clerk in the room during the detainee's appointment, which is a confidentiality violation of the Health Insurance Portability and Accountability Act (HIPAA).[6] (2011 PBNDS 4.3, Medical Care II.21, II.23, II.25, V.B, V.I, V.Y, V.BB.2; NCCHC Standards for Health Services in Jails,



(b)(5)

Mental Health Services J-5-03, essential) Related to these concerns, CRCL's mental health expert recommends:

a. CoreCivic healthcare leadership should conduct a staffing assessment to determine appropriate staffing levels. This assessment will need to consider:
- The number of facility admissions;
- Establishment of a caseload that includes all detainees that are regularly followed by mental health;
- The number of sick-call contacts;
- The number of referrals (urgent, emergent, routine);
- Suicide watches; and
- Segregation contacts

### *Conditions of Detention*

19. CCCC's current grievance process is ineffective and does not comply with the 2011 PBNDS. The grievance system is designed to act as an early warning system to the facility administration, so detainee issues can be resolved timely and at the lowest possible level. Transgender detainees reported the grievance system is neither effective nor responsive, and their grievances were routinely not responded to timely, or not responded to at all. As well, through record reviews, it was substantiated that the transgender detainees' verbal complaints of abusive staff treatment were not adequately investigated by the Chief of Security.[78] Also, (b)(5) the Grievance Coordinator's investigations were determined to be superficial, and grievance investigations were being inappropriately assigned to housing unit staff within the same housing unit where the grieved event occurred, creating a conflict of interest. (ICE National Detainee Handbook, April 2016; 2011 PBNDS 6.2, Grievance System II.3, II.7, V.A.1, V.A.2, V.A.6, V.C, V.D, V.H) Related to these concerns, CRCL's conditions of detention expert has the following five recommendations:

a. The transgender detainees' verbal reports and grievances about disrespectful staff treatment and verbal abuse should be fully investigated by ICE and CCCC to ensure they are treated with dignity and respect, as required by the PBNDS.[9]

b. CCCC and ICE should identify those corrections officers identified in multiple detainee mistreatment complaints and address, through training or otherwise, their skills and abilities to work with the transgender detainee population.

c. CCCC and ICE should jointly review all FY2018 and 2019 detainee grievances previously investigated by the Chief of Security to identify complaints that merit further investigation.

---

[7] 2011 PBNDS, 6.2 Grievance System, Section A. 6. Written Procedures Required, mandates the facility to "ensure each grievance receives appropriate review;"

[8] Over 15 CoreCivic staff had multiple staff abuse complaints filed against them by the transgender detainee population.

[9] ICE ERO's "Further Guidance Regarding the Care of Transgender Detainees" (June 19, 2015) requires, "ICE ERO will provide a respectful, safe and secure environment for all detainees, including those individuals who identify as transgender. Discrimination or harassment of any kind based on a detainee's actual or perceived sexual orientation or gender identify is strictly prohibited."

    d. The Chief of Security's current practices, which include inadequate grievance investigations, poor documentation of grievance investigations, and inappropriate verbal instruction to the Grievance Coordinator regarding grievance outcomes, should immediately cease.

    e. (b)(5)

20. (b)(5)

    a. (b)(5)

21. While onsite CRCL found that CCCC and ICE staff fail to consistently address transgender detainees by their preferred pronoun, as required by the Transgender Care Guidance. (ICE 2015 Transgender Care Guidance) Related to this concern, CRCL's conditions of detention expert recommends:

    a. ICE and CCCC leadership should ensure this is immediately corrected to comply with the Guidance. Both facility and ICE staff should be respectful of transgender detainees' preferred pronoun.

22. Transgender detainees do not have regular access to the ICE Detention Officer (DO) assigned to their case. The DO schedule that is posted in Unit 900 is not followed. Some Unit 900 transgender detainees reported that they had not seen their DO in weeks, while others stated they had never spoken with their DO. In discussion with the Assistant Field Office Director (AFOD), he stated that he was aware of the problem and reported that new ERO staff was recently placed in the Supervisory Detention and Deportation Officer (SDDO) position. The AFOD assured CRCL that they will be monitoring the issue to ensure DOs conduct their detainee visits as required and scheduled. (2011 PBNDS 2.13, Staff-Detainee Communication II.1, II.3, V.A) Related to this concern, CRCL's conditions of detention expert recommends:

    a. ICE should monitor ERO's Deportation Officer (DO) visits to the detainee housing units to ensure the DO's are adhering to the schedule.

23. Transgender detainees' emergency medical needs are not sufficiently or timely addressed when reported to the housing unit corrections staff. Detainees stated that when they have made efforts to obtain medical assistance for other transgender detainees in Unit 900 who are too ill to seek it on their own, they are commonly ignored by housing unit staff. The transgender detainees also reported that the housing unit staff will often decide if a detainee's medical need is valid and will only call the medical unit if they deem the need is critical. In accordance with the above medical findings, transgender detainees reported that medical staff are not consistently responsive when a medical emergency occurs. (2011 PBNDS 4.3,

Medical Care II. 9) Related to these concerns, CRCL's conditions of detention expert recommends:

    a. CCCC should ensure that Unit 900 staff immediately notify the medical unit when any detainee requests emergency medical care, to ensure that medical emergencies are responded to timely. Corrections staff should not be allowed to determine a detainee's medical need.

24. Review of SMU operations exposed numerous violations of the PBNDS. One finding is that detainees were not being provided with immediate notice of the reason for their SMU placement, which is mandated by the PBNDS SMU standard requiring that "ICE and the detainee shall be immediately provided a copy of the administrative segregation order describing the reasons for the detainee's placement in the SMU." (2011 PBNDS 2.12, Special Management Units V.A.2.e, V.E) Related to these concerns, CRCL's conditions of detention expert recommends:

    a. CCCC should ensure that ICE detainees conform to the PBNDS SMU standard requiring that detainees placed in segregation immediately receive a copy of the administrative segregation order describing the reason(s) for their placement in the SMU.

25. Review of SMU records exposed operational inconsistencies between watch assignments. Staff turnover and inadequate management oversight has contributed to the problems found during the onsite, such as SMU records that are incomplete and not compliant with the PBNDS. Daily activity logs are also not accurately maintained. (2011 PBNDS 2.12, Special Management Units V.C.3) Related to these concerns, CRCL's conditions of detention expert recommends:

    a. CCCC must maintain detailed SMU records of the detainees' daily activities, including but not limited to meals, showering, recreation, medical and mental health staff rounds, access to law library, and telephones. All disciplinary orders and other records created while the detainee is in the SMU must be appropriately detailed, complete, and maintained. Upon a detainee's release from the SMU, all records must be placed in the detainee's detention file.

26. Review of CCCC records and two group interviews with Limited English Proficient (LEP) detainees demonstrated that the language access resources available at CCCC are not consistently or effectively being used to assist LEP detainees. There were few records demonstrating that either translation or interpretation services were being utilized. Further, official forms and other documents found in detention files were in English and lacked evidence that they were translated for the detainees. (2011 PBNDS 2.13, Staff-Detainee Communication II.6, B.B and various other 2011 PBNDS; DHS Language Access Plan, February 28, 2012; ICE Language Access Plan, January 17, 2017[10]) Related to these concerns, CRCL's conditions of detention expert has the following four recommendations:

---

[10] Consistent with Executive Order (EO) 13166, *Improving Access to Services for Persons with Limited English Proficiency*) (August 11, 2000), ERO's Language Access Plan (LAP or Plan) builds upon the ICE LAP released in August 2015, by describing the various means ERO uses to provide LEP persons with meaningful access to its programs and activities. The LAP covers current language access activities and language access procedures. The Plan also identifies future priorities for ERO to improve the efficiency and effectiveness of its LAP and to develop

a. CCCC should provide training to staff on their obligations to provide meaningful language access to LEP detainees, and on the various language access resources that are available to assist staff in meeting this obligation. This training should be documented.

b. (b)(5)

c. To ensure compliance with the screening and processing requirements for new arrivals, CCCC should ensure that detainees understand necessary information by using qualified interpreters and/or professionally translated informational postings and forms that are commonly used (intake, the medical unit, commissary, facility programs, disciplinary proceedings, and segregation). These should be translated into Spanish, at a minimum, to ensure meaningful detainee access.

d. (b)(5)

27. The CCCC Grievance Coordinator was not providing detainees with grievance forms in Spanish and was using "google translate" to understand the detainees' grievances and to provide grievance responses because she could not read or speak Spanish. However, the Grievance Coordinator's Google translated responses reviewed during the onsite did not make sense. (2011 PBNDS 6.2, Grievance System II.1, II.3, II.9, V.A.9, V.C.1, V.C.3; 2.13 Staff-Detainee Communication V.B; DHS Language Access Plan, February 28, 2012; ICE Language Access Plan, January 17, 2017) Related to these concerns, CRCL's conditions of detention expert recommends:

a. A qualified Spanish-speaker should be assigned to the position of Grievance Coordinator or the language line must be used in reading and responding to grievances written in Spanish by ICE's LEP detainees.

28. Detainees' access to recreation at CCCC demonstrated that transgender detainees are routinely denied equal access to the large outside exercise yard, even though detainees in the male housing units have regular access. In addition, the CCCC Detainee Handbook section on outside recreation requires only two-hours of daily recreation, which does not comport with the PBNDS. (2011 PBNDS 5.4, Recreation V.B) Related to these concerns, CRCL's conditions of detention expert has the following three recommendations:

a. (b)(5)



---

new methods of providing language assistance services to LEP persons. The DHS and ICE Language Access Plans may be found at https://www.dhs.gov/publication/dhs-language-access-plan.

b. (b)(5)

c. CCCC should update their Detainee Handbook on "Access to Outside Recreation," by changing the required hours from 2-hours to 4-hours, in compliance with the PBNDS.

29. Based on review of a CRCL complaint alleging that a paroled detainee's property was not returned upon his departure from CCCC, it was found that there were incomplete detainee property records, property receipts that were not consistently or accurately issued or maintained, understaffed and inadequately supervised property operations, and property that was not identified or stored appropriately.[11] (2011 PBNDS 2.5, Funds and Personal Property II.2, V.A.2, V.A.5, V.C.4, V.C.5, V.G, V.L, V.L.3; 7.3 Staff Training II.1, V.C) Related to these concerns, CRCL's conditions of detention expert has the following three recommendations:

a. (b)(5)

b. CCCC should conduct a comprehensive audit of all detainee property that is currently retained in the property room and ensure that it is properly identified and stored, and accurately recorded in the detainee detention files.

c. CCCC should hire an adequate number of staff for property needs, provide property staff with appropriate training to prevent mistakes and losses, and ensure detainee property is returned to the detainee upon their release or removal, as required by the PBNDS.

30. Review of CCCC's Sexual Assault and Abuse Prevention and Intervention policies and procedures demonstrated that CCCC's Detainee Handbook PREA/SAAPI section is difficult to follow, lacks clarity, and lacks CCCC's zero-tolerance policy statement. It also lacks clear definitions of prohibited acts of assault and abuse pertaining to both staff and detainees. (2011 PBNDS 2.11, Sexual Abuse and Assault Prevention and Intervention II.1, II.2, V.A, V.F; 6.1 Detainee Handbook V.A, V.E) Related to these concerns, CRCL's conditions of detention expert has the following two recommendations:

a. (b)(5)

b.

31. Based on a 2018 ICE Office of Detention Oversight (ODO) audit finding that detainees remained in hold rooms for excessive periods of time beyond the PBNDS-mandated 12-hour limit, we reviewed hold room records for the month of July 2019 and found that 24 out of 314 hold room placements exceeded the 12-hour parameter. (2011 PBNDS 2.6, Hold Rooms

---

[11] The paroled detainee's detention file contained a note that he arrived with luggage, clothing, jewelry, and other personal belongings, but the file did not contain his property inventory records.

in Detention Facilities II.2, V.B) Related to this concern, CRCL's conditions of detention expert recommends:

    a.  CCCC must ensure that ICE detainees are processed out of hold rooms within the PBNDS mandated 12-hours.

### *Environmental Health and Safety*

32.  Floors in the food service area were found to be excessively worn and damaged. The epoxy was eroded, which exposed the older tile floor in numerous areas rendering it no longer "easily cleanable," as required by the New Mexico Food Code. To maintain required levels of floor-cleanliness, floors must be in good repair and be routinely cleaned. The PBNDS Food Service standard mandates that floors are routinely cleaned. (2011 PBNDS 4.1, Food Service II.3, II.7, V.J.5.c) Related to this concern, CRCL's environmental health and safety expert recommends:

    a.  In compliance with the 2011 PBNDS, CCCC should immediately renovate the kitchen's excessively worn and damaged floors.

33.  The low levels of cleanliness and sanitation found on the floors in Unit 900 and the SMU do not comply with thw PBNDS, Environmental Health and Safety standard stating, "Facility cleanliness shall be maintained at the highest level." The floors should be maintained in a clean manner with thorough sweeping and mopping, including along the floor and wall junctures, and particularly under the beds and lockers, to further ensure standards compliance requiring that, "Floors shall be mopped daily and when soiled." (2011 PBNDS 1.2, Environmental Health and Safety II.1, V.A.3.d) Related to this concern, CRCL's environmental health and safety expert recommends:

    a.  (b)(5)

34.  Unit 900's walls were found to be extremely soiled and unsanitary. Of particular concern, as discussed in the above Medical Care section, the medical expert found a detainee who had HIV and rectal bleeding in Unit 900 and noted that the soiled walls could contain hazardous body fluids. This must be immediately addressed. (2011 PBNDS 1.2, Environmental Health and Safety II.1, II. 2, II.11, V.A, V.D.4.b; 4.3, Medical Care V.C.4) Related to this concern, CRCL's environmental health and safety expert has the following three recommendations:

    a.  CCCC administrators should ensure that blood and bodily fluid spills are handled in accordance with the 2011 PBNDS, Environmental Health and Safety standard stating, "Spills of blood and body fluids shall be cleaned up and the surface decontaminated in an appropriate manner to minimize the possibility of workers becoming exposed to infectious organisms, including HIV and HBV."

    b.  (b)(5)

    c.  As highlighted by the above examples, CCCC must ensure the facility is able to provide appropriate and timely clean-up by obtaining a suitable "cleanup kit," as

required by the 2011 PBNDS, Environmental Health and Safety standard, stating, "A suitable cleanup kit shall be maintained for use in cases of spills of blood and body fluids. Cleanup kits may be obtained from commercial sources or may be compiled by Health Services Department (HSD) staff or the designated health care provider."

35. Inspection of housing units and other facility areas, commonly revealed buildup of dust and dirty grime in corners, along floors and wall junctures, and under beds and lockers. The observed accumulations suggest a lack of appropriate cleaning at CCCC for several weeks, if not considerably longer. (2011 PBNDS 1.2, Environmental Health and Safety II.1, II.2, V.A.3, V.D.2, V.D.6.4.b) Related to this concern, CRCL's environmental health and safety expert has the following two recommendations:

   a. CCCC should ensure cleanliness and sanitation compliance throughout the facility where ICE detainees are housed, work, and participate in facility programs, by adhering to Environmental Health and Safety standards that mandate thorough cleaning and sanitation, minimizing the potential harm to detainees' health.

   b. When the facility's soiled areas, including walls and floors, are appropriately cleaned and brought into compliance with the PBNDS, the facility administrator should then ensure they are maintained in sanitary condition, as required by the PBNDS stating, "The facility administrator shall ensure that staff and detainees maintain a high standard of facility sanitation and general cleanliness." (2011 PBNDS 1.2, Environmental Health and Safety V.A.3)

36. Potentially hazardous foods that were not consumed during meal periods were observed in Unit 900, creating serious health and safety hazards for ICE detainees. The 2011 PBNDS define potentially hazardous foods as "those foods that provide a good medium for bacteria growth. They include any perishable food that consists in whole or part of milk, milk products, eggs, meat, poultry, fish or shellfish or other high-protein foods." Also, per the standard: hot foods, such as scrambled eggs, should be maintained at a temperature of at least 140 F degrees (120 F degrees in food trays) and foods that require refrigeration, including milk should be maintained at 41 F degrees or lower. (2011 PBNDS 4.1, Food Service V.A.1.d, V.F.2.a, V.F.7, V.D.2.a.3) Related to this concern, CRCL's environmental health and safety expert recommends:

   a. To ensure food safety, detainees should not be allowed to store potentially hazardous foods at room temperature inside the housing units.

37. The food tray pass slots in the SMU's cell doors were found to be extremely dirty. The build-up of dirt and grime suggests they have not been cleaned, or have not been cleaned effectively or consistently, as required by the 2011 PBNDS Food Service standard stating, "Equipment surfaces not intended for contact with food, but located in places exposed to splatters, spills, etc., require frequent cleaning." (2011 PBNDS 4.1, Food Service II.1, V.J.7.c.2) Related to this concern, CRCL's environmental health and safety expert recommends:

   a. The SMU food tray pass slots should be thoroughly cleaned and maintained in a sanitary manner, in compliance with the PBNDS.

38. ICE detainees are using damaged pillows and mattresses at CCCC. Because damaged bedding items do not allow for appropriate cleaning and sanitation, all cracked or torn

coverings should be replaced to prevent the transfer of disease-causing pathogens between detainees. The 2011 PBNDS, Personal Hygiene standard requires that, "Each detainee shall have suitable, clean bedding." (2011 PBNDS 1.2, Environmental Health and Safety II.1; 4.5, Personal Hygiene II.2, V.A) Related to this concern, CRCL's environmental health and safety expert recommends:

    a.  All mattresses and pillows should be immediately inspected and replaced when damage is observed, in compliance with the 2011 PBNDS.

39. The CCCC barber area was unsanitary and not appropriately cleaned and the barber chair was damaged, rendering it unable to be appropriately sanitized. (2011 PBNDS 1.2, Environmental Health and Safety 1.2, V.E.2, V.E.3, V.E.4; 4.5, Personal Hygiene V.F) Related to this concern, CRCL's environmental health and safety expert has the following two recommendations:

    a.  CCCC should ensure that all barber tools and supplies are properly cleaned and disinfected after each use as mandated by the 2011 PBNDS, Environmental Health and Safety standard, which states, "After each detainee visit, all hair care tools that came in contact with the detainee shall be cleaned and effectively disinfected."

    b.  (b)(5)

40. Due to the importance of disinfection in barber operations, it is imperative that postings regarding barber procedures correspond with the actual procedures employed at CCCC. Related to this concern, CRCL's environmental health and safety expert recommends:

    a.  Barber postings should comply with the 2011 PBNDS, Environmental Health and Safety standard stating, "Detailed hair care sanitation regulations shall be conspicuously posted in each barbershop for the use of all hair care personnel and detainees" and "are actually followed at the facility." (2011 PBNDS 1.2, Environmental Health and Safety V.E.4)

It is CRCL's statutory role to advise department leadership and personnel about civil rights and civil liberties issues, ensuring respect for civil rights and civil liberties in policy decisions and implementation of those decisions. We look forward to working with ICE to determine the best way to resolve these complaints. You may send your response and action plan by email. If you have any questions, please contact Senior Policy Advisor (b)(6) by telephone at (b)(6) (b)(6) or by email at (b)(6).

Copies to:

Tae Johnson
Deputy Executive Associate Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
(b)(6), (b) (7)(C)

Russell Hott
Assistant Director, Custody Management
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
(b)(6), (b) (7)(C)

Alison Walder
Chief of Staff, Custody Management
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
(b)(6), (b) (7)(C)

Dr. Stewart D. Smith
Assistant Director, ICE Health Service Corps
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
(b)(6), (b) (7)(C)

Dr. Ada Rivera
Medical Director, ICE Health Service Corps
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
(b)(6), (b) (7)(C)

Enclosures

# APPENDIX A

## BEST PRACTICE RECOMMENDATIONS

### *Mental Health Care*

1. (b)(5)

2.

3.

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

## NOTICE TO EOIR: ALIEN ADDRESS

Date: 07/19/2022

To: Enter Name of BIA or Immigration Court I-830 BIA

Enter BIA or Immigration Court Three Letter Code@usdoj.gov BIA

From: Enter Name of ICE Office ERO - Cibola County Detention Center

Enter Street Address of ICE Office 2000 Cibola Loop

Enter City, State and Zip Code of ICE Office Milan, New Mexico, 87201

Respondent: Enter Respondent's Name Bozkus, Serhat

Alien File No: Enter Respondent's Alien Number 220 712 429

---

This is to notify you that this respondent is:

☐ Currently incarcerated by federal, state or local authorities. A charging document has been served on the respondent and an Immigration Detainer-Notice of Action by the ICE (Form I-247) has been filed with the institution shown below. He/she is incarcerated at:

Enter Name of Institution where Respondent is being detained

Enter Street Address of Institution where Respondent is being detained

Enter City, State and Zip code of Institution where Respondent is being detained

**Enter Respondent's Inmate Number**

His/her anticipated release date is Enter Respondent's Anticipated Release Date.

☐ Detained by ICE on **Enter Date Respondent was Detained by ICE** at:

Enter Name of ICE Detention Facility where Respondent is being detained

Enter Street Address of ICE Detention Facility where Respondent is being detained

Enter City, State and Zip Code of ICE Detention Facility where Respondent is being detained

☒ Detained by ICE and transferred on **Enter Date Respondent was transferred** to: 07/19/2022
Enter Name of ICE Detention Facility where Respondent has been transferred Denver Contract Detention Facility

Enter Street Address of ICE Detention Facility where Respondent has been transferred 3130 Oakland Street

Enter City, State and Zip Code of ICE Detention Facility where Respondent has been transferred Aurora, CO 80010

☐ Released from ICE custody on the following condition(s):
　☐ Order of Supervision or Own Recognizance (Form I-220A)
　☐ Bond in the amount of Enter Dollar Amount of Respondent's Bond
　☐ Removed, Deported, or Excluded
　☐ Other

---

Upon release from ICE custody, the respondent reported his/her address and telephone number would be:
Enter Respondent's Street Address

Enter Respondent's City, State and Zip Code

Enter Respondent's Telephone Number (including area code)

☐ I hereby certify that the respondent was provided an EOIR-33 Form and notified that they must inform the Immigration Court of any further change of address.

ICE Official: Enter Your First, Last Name and Title Paul Bryant Deportation Officer

ICE Form I-830E (9/09)

Allyson Saperstein                                              **DETAINED**
Assistant Chief Counsel
Elias Gastelo
Chief Counsel
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security
11541 Montana Ave., Suite O
El Paso, TX 79936

## UNITED STATES DEPARTMENT OF JUSTICE
### EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
### IMMIGRATION COURT
### CHAPARRAL, NM

|  |  |
|---|---|
| IN THE MATTER OF: | ) |
| | ) |
| BOZKUS, Serhat | ) |
| | ) |
| In Removal Proceedings | ) |

File No.: A220 712 429

Immigration Judge Ralph Girvin                 Next Hearing: N/A

## THE DEPARTMENT OF HOMELAND SECURITY'S OPPOSITION TO
## RESPONDENT'S MOTION FOR BOND DETERMINATION HEARING

EOIR 23-0638

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**IMMIGRATION COURT**
**CHAPARRAL, NEW MEXICO**

| | |
|---|---|
| In The Matter of: | ) |
| | ) |
| BOZKUS, Serhat | ) |
| | )    File No.:    A 220 712 429 |
| In removal proceedings | ) |
| | ) |
| | ) |

**THE DEPARTMENT OF HOMELAND SECURITY'S**
**OPPOSITION TO RESPONDENT'S MOTION FOR BOND DETERMINATION**
**HEARING**

The U.S. Department of Homeland Security, Immigration and Customs Enforcement ("DHS"), by and through undersigned counsel, hereby files its opposition to respondent's Motion for Bond Determination Hearing. Generally, a noncitizen in custody is entitled to only one bond hearing. Once an initial bond determination has been made, a noncitizen's subsequent redetermination "shall be considered only upon a showing that the alien's circumstances have changed materially since the prior bond determination." *See* 8 C.F.R. § 1003.19(e). Here, there has been no showing that the respondent's circumstances have "materially changed" since his initial bond hearing on March 09, 202. DHS respectfully requests this Court to deny respondent's Motion for Bond Redetermination Hearing. *Id.*

In the instant case, respondent is arguing materially changed circumstances due to mental health diagnoses. *See* Respondent's Motion for Bond Redetermination Hearing (unpaginated) ("Motion"). Respondent admits that he is being treated for these issues at the Cibola County Correctional Center. *Id*; *see* also Respondent's Supplement in Support of Custody Hearing

1

271558

("Supplement"). Respondent is claiming that he is being treated with psychotropic medication, but that the medication has not diminished or relieved his symptoms. Motion at 2. However, as evidenced in respondent's Supplement, respondent is *most often refusing the treatment he is being given*. See Supplement at 63, **Refusal to Accept Medical Treatment**, dated May 26, 2022, "*I don't want this mornin*g"; *Id* at 72, **Mental Health – Initial or Follow-Up Visit**, dated May 17, 2022, "*Taking the am medication and not having enough sleep makes me sleepy in the day. So it is better not to take am medication*"; *Id at* 70. **Mental Health – Initial or Follow-Up Visit**, dated May 17, 2022 "*Compliant with current medication regimen and/or treatment: No*, dated May 17, 2022; *Id* at 64,**Refusal to Accept Medical Treatment**, dated May 10, 2022 "*Did not leave cell*". *Id* (emphasis added).

Respondent cannot be the cause of his materially changed circumstances. More importantly, the evidence shows that that medical support is available to respondent. *Id* at 1-78. There does not appear to be any evidence showing that respondent has not received adequate care (whether he chooses to accept it or not) medical or otherwise while in custody, or evidence suggesting he will not receive adequate care in the future. *Id*. As the appropriate medical support is available to respondent, these conditions cannot qualify as material changed circumstances. *See* 8 C.F.R. § 1003.19(e).

Furthermore, it appears that respondent's other medical issues he is claiming as materially changed circumstances are based on evidence and information that existed prior to his March 09, 2022, bond hearing. *See* Motion at 3. Respondent states these medical issues to be high blood pressure, mood order, herniated disk, and hearing loss. *Id*. However, as evidenced from respondent's Supplement all of these medical issues existed in nearly the same medical state previously from when respondent still lived in Turkey. *See* Supplement at 33. "**Inmate/Resident**

2

**Health Appraisal, dated April 26, 2022;** *Neck pain DX in Turkey; possible herniated c spine disk, perforated ear drum: occurred in Turkey continues now; Anxiety and on/off chest pain due to anxiety; per pt he was seen by cardiology in Turkey and cleared from cardiac conditions*"; *Id* at 36, **"Inmate/Resident Health Appraisal,** "Also C/O left ear pain, he states when he was in Otero camp he was told he had a hole in the ear drum but he had not received any treatment. He states his hearing is also decreased in that ear. *After further discussion he advised that this issue has been going on since Turkey and he was thinking about having surgery in turkey to have a patch placed.*" (emphasis added).

As such, this was evidence and information that existed prior to respondent's March 09, 2022, bond hearing, and are not new or changed circumstances. The phrase "changed materially" carries a plain meaning of something different than what was presented before, or something that was unavailable and therefore could not have been presented before. *See, e.g.*, *Material*, Black's Law Dictionary (11th Ed. 2019) (defining "material" as "having some logical connection with the consequential facts…[o]f such a nature that knowledge of the time would affect a person's decision-making."). Presenting evidence which could have been presented at the last bond hearing is not changed circumstances. Moreover, and as stated previously, it appears that the appropriate medical support is available to respondent, and as such these conditions cannot qualify as material changed circumstances. *See* 8 C.F.R. § 1003.19(e); see also Supplement 1-78.

Furthermore, health concerns are generally not among the factors to be considered in the totality of custody redeterminations. *See Matter of Guerra*, 24 I&N Dec. 37 (BIA 2007). Generally the factors to be considered are: (1) whether the alien has a fixed address in the United States; (2) the alien's length of residence in the United States; (3) the alien's family ties in the United States, and whether they may entitle the alien to reside permanently in the United States

3

in the future; (4) the alien's employment history; (5) the alien's record of appearance in court; (6) the alien's criminal record, including the extensiveness of criminal activity, the recency of such activity, and the seriousness of the offenses; (7) the alien's history of immigration violations; (8) any attempts by the alien to flee prosecution or otherwise escape from authorities; and (9) the alien's manner of entry to the United States. *Matter of R-A-V-P-*, 27 I&N Dec. 803, 807 (BIA 2020) quoting *Guerra*, 24 I&N Dec. at 40.

Moreover, *The Immigration Judge ("IJ") may also consider the likelihood that relief from removal will be granted in determining whether an alien warrants bond. Matter of R-A-V-P-,* 27 I&N Dec. at 807 (emphasis added). Conditions of detention are generally unrelated to an IJ's determination of whether the respondent poses a danger to the community or a flight risk and therefore are not material such that they should justify holding another bond hearing. *See Matter of Guerra*, 24 I&N Dec. 37.

Here, respondent argues that he is not a flight risk, and has a family friend willing to sponsor him. *See* Motion at 3. However, DHS contends that in light of the record of proceedings, circumstances have changed to the extent that respondent presents even more of a flight risk.

Respondent had his final merits hearing on March 15, 2022. On April 12, 2022, the IJ issued a written decision making an adverse credibility finding, and in the alternative denying respondent all forms of relief finding that he failed to meet his burden. Though this removal order is not yet final, respondent is no longer scheduled to appear in Immigration Court. Furthermore, as evidenced from the record of proceedings, it appears the likelihood of relief from removal is minimal, and respondent no longer has any incentive to appear before the Immigration Court. Moreover, the respondent intends on leaving the court's jurisdiction and moving to California,

4

which significantly increases his risk of flight from Immigration Authorities. *See* Motion at 3. Additionally, respondent has not his met his burden in establishing that he even has a viable sponsor, as he has not submitted any documentation regarding his alleged sponsor. *Id.* As such, respondent's continued detention is entirely in accordance with applicable law and Supreme Court precedent, and respondent's argument do not present a "material change" in his circumstances to warrant a Bond Redetermination Hearing. *See Jennings v. Rodriguez*, 583 U.S. ___ (2018) (holding that Sections 1225(b), 1226(a) and 1226(c) of Title 8 of the U.S. Code do not give detained noncitizens the right to periodic bond hearings during the course of their detention); *see also Carlson v. Landon*, 342 U.S. 524, 534 (1952) (holding that INA § 236(a) does not give detained aliens any right to release on bond)*; see* also 8 C.F.R. § 1003.19(e).

For the foregoing reasons, DHS contends that respondent has not met his burden in establishing that his circumstances have changed materially since his bond hearing to warrant a reconsideration of his custody status. *Id*; *see* also *Matter of Uluocha*, 20 I&N Dec. 133 (BIA 1989). As such, DHS respectfully moves this Court to deny respondent's Motion for Bond Redetermination Hearing.


Respectfully Submitted,

Allyson Saperstein
Assistant Chief Counsel
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

EOIR 27606638

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**IMMIGRATION COURT**
**CHAPARRAL, NEW MEXICO**

| | |
|---|---|
| In The Matter of: | ) |
| | ) |
| BOZKUS, Serhat | )    File No.:    A 220 712 429 |
| | ) |
| In removal proceedings | ) |
| | ) |
| | ) |

## ORDER OF THE IMMIGRATION JUDGE

Upon consideration of the DHS's Opposition to Respondent's Motion for Bond Redetermination Hearing. It is HEREBY ORDERED that the motion be:

☐ **GRANTED;**   ☐ **DENIED** because:

☐    Respondent does not oppose the motion

☐    A response to the motion has not been filed with the court.

☐    Good cause has been established for the motion

☐    The court agrees with the reasons stated in opposition to the motion.

☐    The motion is untimely per_____.

☐    Other:_____.


_____          _____
Date                                              Ralph Girvin
                                                     Immigration Judge

## CERTIFICATE OF SERVICE

I certify that on this 7th day of June, 2022, I served a true and correct copy of the foregoing DHS Opposition to Respondent's for Bond Redetermination Hearing on respondent's counsel, *Metin Serbest*. **This document was electronically filed through ECAS and both parties are participating in ECAS. Therefore no separate service was completed.**

Respectfully Submitted,

Allyson Saperstein
Assistant Chief Counsel
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

## CERTIFICATE OF SERVICE

**BO      US, Serhat**

A# 220-712-429

*I, Metin Serbest, do herby certify that I have served a true and correct copy of the attached Motion for Expedited Decision and Supporting Exhibits upon the following via E-service portal of DHS/ICE:*

*El Paso Office of Chief Counsel, 11541 Montana Avenue Suite O, El Paso, TX, 79936*

*This 27th day of July, 2022*

Metin Serbest, Esq.

Counsel for Respondent

**Law Office of Metin Serbest**
**2200 E Devon Ave Ste 358**
**Des Plaines IL 60018**
**312-473-5500**

**773-337-5544 fa**

**contact    Serbestlaw.com**